UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 JUN 21  P 4: 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| CYCLE-CRAFT CO., INC. d/b/a | * | |
| BOSTON HARLEY-DAVIDSON/BUELL | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | Civil Action No.  04-11402-NMG |
|  | * | |
| HARLEY-DAVIDSON MOTOR CO., INC. | * | |
| and BUELL DISTRIBUTION CO., LLC | * | |
| Defendant. | * | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Harley-Davidson Motor Co., Inc. and Buell Distribution Co., LLC (collectively, "Harley-Davidson") threaten to terminate a motorcycle dealership that has operated as a family business and outstanding corporate citizen in the Boston area for 45 years, and which recently invested $2.7 million into the renovation of a new state-of-the-art facility on Revere Beach Parkway in Everett. The sole purported basis for the termination is Harley-Davidson's allegation that 45 Cycle-Craft motorcycle sales, out of approximately 2,800 sales from 2001-2003, violate certain Harley-Davidson sales policies.

Chapter 93B of the Massachusetts General Laws, however, requires Harley-Davidson to prove that it has "good cause" for the termination, a burden it cannot meet. As explained below, these 45 alleged sales infractions, which Harley Davidson never gave Cycle-Craft any chance to explain or cure, were at most *de minimis*. They do not amount to good cause in view of all of the relevant facts and circumstances, including Cycle-Craft's history, performance, and investment in its business. Pending trial on the merits, this Court should preserve the status quo by entering a preliminary injunction forbidding Harley-Davidson from terminating plaintiff's dealership.

*See Matos v. Clinton School District*, 367 F.3d 68, 72 (1st Cir. 2004) ("The aim of a preliminary injunction 'is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.'") (internal citation omitted). Termination by Harley-Davidson would irreparably harm – indeed ruin – Cycle-Craft, which has no other suppliers or alternative business options and would therefore be forced to close its doors. *See, e.g., Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197 (2d Cir. 1970) (termination of dealership constitutes irreparable harm warranting preliminary injunction.) In addition, as explained further below, Cycle-Craft is likely to succeed on the merits and the public interest will be served by preliminary injunctive relief. Accordingly, all of the relevant criteria indicate that a preliminary injunction is appropriate.

## I.    BACKGROUND

### A. *Brief History of The Cycle-Craft Dealership*

Cycle-Craft is a motorcycle dealership located in Everett, Massachusetts, and operated by the Atwood family, first by Bill and Kitty Atwood, and more recently by their children, John and Karen Atwood. Since 1959, it has been authorized to sell and service Harley-Davidson motorcycles, under successive dealer franchise agreements with Harley-Davidson or its predecessor (the "Dealer Contracts"). Declaration of John Atwood ("Atwood Declaration") at ¶ 3 and Exhibit 1.[1] Cycle-Craft carries no other product lines.

Cycle-Craft has historically been one of the top 10% of Harley-Davidson dealers in the United States in purchases of motorcycles, parts, accessories and general merchandise. Atwood Declaration at ¶ 18. It has been the recipient of both Harley-Davidson's "Bronze Shield" award

---

[1] Cycle-Craft is also a franchisee of Buell Distribution Co., LLC and its predecessor ("Buell"), and has sold and serviced Buell motorcycles under separate Dealer Contracts since approximately 1994. Buell is a sister corporation of Harley-Davidson, and the two are interrelated to such a degree that they share the same principal place of

and Buell's "Pegasus" award, both conferred in recognition of exemplary performance. *Id.* at ¶ 19-20. In 2001, it received the United States Police Sales and Service Dealership of the Year Award for the Eastern Region. *Id.* at ¶ 21. Most recently, Cycle-Craft was invited to participate in a dealer incentive trip to Alaska, an honor bestowed only on the top 30 (of over 650) dealerships in the country. This invitation was subsequently revoked, purportedly due to the present controversy. *Id.* at ¶ 22 and Exhibit 6 (letter from Harley-Davidson revoking invitation). Cycle-Craft is an exemplary dealership with an extraordinarily loyal customer base. Atwood Declaration at ¶ 24.

Over the past 45 years, John Atwood and his family have made enormous investments in real estate, equipment and personnel, including a $2.7 million facility relocation and renovation project. Atwood Declaration at ¶ 6-9. The dealership employs over 60 men and women, most motorcycle riders and enthusiasts hailing from the Everett area. *Id.* at ¶ 15. Cycle-Craft currently has an estimated net worth of over $10 million, and last year (2003) the dealership realized net sales of almost $6 million. *Id.* at ¶ 17.

Cycle-Craft is an exemplary corporate citizen. The dealership sponsors or contributes to a wide variety of civic and charitable organizations, sells and leases motorcycles to dozens of area police departments, and routinely hosts family-oriented, public events. *Id.* at ¶¶ 25-28.

### B. *The 1997-98 Expansion*

In 1993, Cycle-Craft began looking for a new location for the dealership, which had long since outgrown its 16,000 square-foot facility on the Revere Beach Parkway. *Id.* at ¶ 6. John and Karen Atwood identified an abandoned paint factory immediately across the street from their then-present facility as a potential location. The factory offered much more space, and the

---

business in Milwaukee, Wisconsin. By contract, termination of one dealership contract automatically results in termination of the other. Atwood Declaration at ¶ 3 and Ex. 1.

structure reminded the Atwoods of Harley-Davidson's headquarters in Milwaukee. *Id.* The building was in extreme disrepair, however, and was highly contaminated by paint waste. Undaunted, the Atwoods secured cooperation, assistance and financial backing from the City of Everett, the Massachusetts Small Business Association, and from MassCertified Development Corporation, and undertook a massive relocation and renovation project to move Cycle-Craft across the street into a the paint factory. *Id.* at ¶¶ 9-10. The project cost $2.7 million, and was completed in January 1998.   *See* Atwood Declaration, Ex. 2.

The remodeled building consists of 86,000 square feet of motorcycle sales and service space, an enormous retail accessories operation, and ample motorcycle storage. This made Cycle-Craft one of the largest Harley-Davidson dealerships in the world. At the time of the opening of the new facility, David Ragucci, Mayor of Everett, predicted that it would help revitalize that portion of the Revere Beach Parkway, commenting, "It is a worthwhile investment that can only serve to attract new businesses to our community." Atwood Declaration, Ex. 3. Indeed, today the formerly dilapidated portion of the Parkway on which Cycle-Craft sits is a thriving commercial area.

The renovation and renewal project and the performance of the Cycle-Craft dealership prompted the Massachusetts chapter of the U.S. Small Business Association ("SBA") in 1998 to name Karen and John Atwood Small Business Persons of the Year for Massachusetts. At the time, Elaine Guiney, Massachusetts SBA director, said, "Their action catapulted them into a leadership role in the Harley-Davidson [company]. They took over a building and a business that was faltering, and rescued it." Atwood Declaration, Ex.3 at page 2. The president of MassCertified commented, "We liked what we saw in [Cycle-Craft]…   It was a well-known

4

product – and a family-owned business – with a long history. They were going to renovate an ugly building and create jobs. We felt it was a winner." *Id.*

Cycle-Craft was featured prominently in the 1997 Harley-Davidson Annual Report. The report held up the Atwood's investment as an example to other Harley-Davidson dealers, commenting, "The skills acquired by dealers each year at Harley-Davidson University, as well as the capital improvements exemplified by the Atwood's investments, make our dealers the best in the business. The Atwoods' three-story, 86,000 square-foot facility is an example of that excellence." Atwood Declaration, Ex. 4. The 1997 Annual Report also highlighted Cycle-Craft's state-of-the-art facilities, noting, "In addition to a 5,000 square-foot showroom, 15,000 square-feet are dedicated to MotorClothes apparel and collectibles, and parts and accessories. The service department has 15,000 square feet, featuring 16 lifts and a fully outfitted dynomometer area." *Id.* Cycle-Craft's facilities have only improved since those words were published by Harley-Davidson. *See* Atwood Declaration, Ex. 5 (video recording of the Cycle-Craft facility, recorded on Saturday June 12, 2004).

## C. *Harley-Davidson's Attempt to Encroach Upon Cycle-Craft's Market Area*

Notwithstanding these accolades, on February 4, 2003, Harley-Davidson sent Cycle-Craft a letter stating that Harley-Davidson was removing 25 zip codes from Cycle-Craft's territory. Harley-Davidson stated in that letter that it intended to "monitor" these 25 zip codes for the purpose of possibly installing a new Harley-Davidson/Buell dealer in the vicinity of Danvers. Atwood Declaration, Ex. 21. Danvers is within a 20-mile radius of Cycle-Craft, meaning that any new dealership located there would cut into Cycle-Craft's statutorily-protected market area. *See* G.L. c. 93B (1). Accordingly, Cycle-Craft's counsel responded on March 7, 2003, with a letter notifying Harley-Davidson that cycle-Craft intended to protest the appointment of any new

5

Harley-Davidson or Buell dealer in the vicinity of Danvers, Massachusetts. Atwood Declaration,

Ex. 22. Harley-Davidson never responded to that letter.[2]

### D. *The Current Controversy*

1.  The Non-Retail Policy

Cycle-Craft's most recent Dealer Contracts with Harley-Davidson and Buell, dated

September 19, 2000, incorporate by reference a separate set of General Conditions. These

General Conditions, which consist of 19 pages of fine print, under the heading "Sales Efforts,"

state in part that "Dealer shall not sell Harley-Davidson Products for resale to non-retail

customers," and state that Harley-Davidson "reserves the right to establish from time to time

such policies and position statements it believes are necessary or advisable." *See* Dealer

Contract, General Conditions, Atwood Declaration, Ex. 17 at ¶ B-6.[3] Effective for the 2003

model year, which began on August 1, 2002, Harley-Davidson unilaterally published and

distributed a separate written policy titled "Motorcycle Non-Retail Policy -- Pleasure Units"

("Non-Retail Policy"). The Non-Retail Policy purports to define a "non-retail sale" as a sale

where:

> the motorcycle is not properly set up, inspected, tested, sold and delivered at the dealership
> facility, directly to the ultimate consumer. An "ultimate consumer" is the retail end user
> who purchases, as indicated on the Certificate of Origin, a new or previously unregistered
> motorcycle for his or her own use, without the intent to resell, pays all applicable taxes and
> registration fees, and titles the vehicle in his or her own name.

Atwood Declaration, Ex. 18, ¶1.

---

[2] In fact, a lawsuit is currently ongoing in New Hampshire, concerning the potential encroachment of a Danvers dealership on a New Hampshire Harley-Davidson dealer's statutory market area. *See* Atwood Declaration, Ex. 23 (a sample filing from that suit).

[3] The General Conditions attached to the Atwood Declaration are dated April 9, 2002. According to Harley-Davidson's field representative, the version in effect in September 2000, when Cycle-Craft signed its most recent Dealer Agreement, is identical. Atwood Declaration, n. 2.

2.  Harley-Davidson's Inspection and Allegations of Violation of the Non-Retail Policy

On February 17 and 18, 2004, during the pendency of the Danvers protest described above, Harley-Davidson personnel conducted an unprecedented inspection of Cycle-Craft's sales records for the period 2001 through 2003. Declaration of Cycle-Craft Operations Manager Kenneth McPhee ("McPhee Declaration") at ¶ 3; Atwood Declaration at ¶ 38. Almost two months later, with no interim communications with Cycle-Craft about the inspection, Harley-Davidson identified forty-five sales – out of 2,800 total – which it alleges were sold in violation of the non-retail policy. These sales are described in a letter from Harley-Davidson Vice President Jon Flickinger to Cycle-Craft, dated April 20, 2004 and titled "Inspection of Records." *See* Atwood Declaration at ¶ 40 and Exhibit 22. The sales are described in detail below.

3.  The Notice of Termination

The "Inspection of Records" letter was accompanied by a second letter, also from Mr. Flickinger, dated April 20, 2004, titled "Notice of Dealer Contract Termination." *See* Atwood Declaration, Ex. 26. This letter contended that Cycle-Craft had submitted false information to Harley-Davidson, that it had sold Harley-Davidson products to non-retail purchasers, and that Cycle-Craft had failed to complete and maintain completed Sales and Warranty Registration ("SWR") forms [4] and other paperwork. *Id.* at 1. Harley-Davidson asserted that this conduct "constitutes a direct and material violation of Cycle-Craft's contractual obligations to Harley-Davidson." *Id.* Consequently, Harley-Davidson notified Cycle-Craft that its Dealer Contracts for the Harley-Davidson and Buell franchises would be terminated sixty days from Cycle-Craft's receipt (on April 23, 2004) of the letter (June 22, 2004). *Id.*

7

4. <u>Explanation of Alleged Violations</u>

Because both the "Inspection of Records" letter and the "Notice of Dealer Contract Termination" letter were sent on the same day, April 20, 2004, Cycle-Craft had no opportunity to explain, justify or cure the alleged violations prior to being faced with termination of its 45-year-old dealership. Had Cycle-Craft been afforded such an opportunity, it could have established the following:

(a) *Motorcycles Allegedly Sold to DC Imports in Florida*

The "Inspection of Records" letter claims that Cycle-Craft sold nineteen motorcycles to DC Imports, a motorcycle wholesaler in Florida, in violation of the non-retail sales policy. Atwood Declaration, Ex. 24. In fact, each of these motorcycles was purchased by an individual customer. In keeping with the provisions of the non-retail policy, each purchaser took title to his or her motorcycle in his or her own individual name, as reflected on the Certificate of Origin for each motorcycle. Each individual purchaser was properly identified on the SWR. Each of the cashier's checks bore a name matching the name on the corresponding SWR. *See* McPhee Declaration at ¶ 6. Each of these units was properly set up, inspected and sold at the dealership. Declaration of Cycle-Craft Finance Manager Jamie McGrath ("McGrath Declaration") at ¶ 5.

(b) *Motorcycles Allegedly Sold to Lee Custom Cycles In New Hampshire*

The "Inspection of Records" letter also alleges that Cycle-Craft sold eight motorcycles to Lee Custom Cycles, a motorcycle dealer in New Hampshire, in violation of the non-retail sales policy. Atwood Declaration, Ex. 24. Cycle-Craft's management at the time of these transactions was unaware of any affiliation between the individual purchasers and Lee Custom Cycle.

---

[4] Upon every sale, the dealer is required to submit a Sales and Warranty Registration form ("SWR") to notify Harley-Davidson that the unit is sold and should be identified with a particular retail customer for warranty purposes. Dealer Contracts, General Conditions, at ¶F(7), Atwood Declaration, Ex. 17.

McPhee Declaration at ¶ 9. Again, based on the documentation submitted, purportedly by individual purchasers, these were bona-fide retail sales to individual purchasers.[5] *Id.* at ¶ 10.[6]

### (c) *The Remaining Seventeen Motorcycles*

The April 20, 2004 "Inspection of Records" Letter claims that "Cycle-Craft also submitted false Sales and Warranty Registration Forms," under fictitious names or sales dates, for 17 units. Atwood Declaration, Ex. 24. These were all legitimate retail sales, misinterpreted by Harley-Davidson.

Three of these 17 units were kept by Cycle-Craft to add to John Atwood's historical collection, in keeping with his tradition of reserving two or three units per year for this purpose. Atwood Declaration at ¶ 41 and Ex. 25. One unit was sold on July 3, 2003 to Mr. Fred Giordano, who is related to Cycle-Craft employee Joseph Giordano.[7]

The other 13 units were initially ordered by Cycle-Craft employees and their relatives, in a collective effort to relieve the dealership of an overstock situation that could have adversely impacted its vehicle allocation for the following year. Buchbaum Declaration at ¶¶ 3-11. For various reasons, none of these 13 employees and relatives ultimately carried through with their purchases. Buchbaum Declaration at ¶ 7. In most cases, the employees and relatives canceled their orders when customers indicated interest in the units. *Id.* In other words, employees and

---

[5] Sample sets of documents from the Florida and New Hampshire sales are attached as Exhibits 2 and 3 to the McPhee Declaration. Each of the sales folders for the respective groups of sales contain similar documents. The SWR is missing for one of the New Hampshire sales (Christensen). The paperwork is otherwise similar.

[6] The April 20, 2004 "Inspection of Records" Letter also challenges a sale reported as a retail sale to Lou Winz Auto Sales ("Lou Winz"). Atwood Declaration, Ex. 24. Again, this allegation is the result of a misinterpretation of the documents by Harley-Davidson, and not by any violation of the non-retail sales policy. The documents indicate that the motorcycle was purchased in fact for the individual use of Jayne Handscom, the wife of Lou Weinstein, owner of Lou Winz Auto Sales. McPhee Declaration at ¶¶ 11-12 and Ex. 4. The fact that the motorcycle was apparently purchased by Mr. Winz's dealership does not render the sale in violation of the non-retail sales policy.

[7] Fred Giordano paid for the unit with a check written on the account of his business, First Class Autos, Inc. Nevertheless, the sale was strictly to Mr. Giordano individually. Mr. Giordano donated the unit to a Toys for Tots raffle in Michigan. *See* McPhee Declaration at ¶ 15 and Ex. 5.

their relatives initially agreed to purchase motorcycles (at dealer cost or slightly above) that they would not have otherwise purchased, in order to help the dealership avoid a reduction in its allocation. When individual customers also indicated interest in the chosen units, there was no longer a need for the employee or relative to purchase the motorcycles – the overstock situation was avoided through customer purchases. *Id.* The relevant point is, these were not fictitious sales, as Harley-Davidson erroneously claims. They are misunderstandings of the documentation, which on analysis clearly demonstrates that the motorcycles in question – identified by Vehicle Identification Numbers ("VIN") were in fact sold to legitimate retail purchasers. Buchbaum Declaration at ¶ 7; McPhee Declaration at ¶¶ 22-24. In each case, the SWR was appropriately adjusted to reflect the second purchaser as the customer and end-user of the motorcycle.

## II.    ARGUMENT

### A. *Applicable Legal Standards for Preliminary Injunctive Relief*

The standards for preliminary injunctive relief are well-settled. In order to obtain a preliminary injunction, Cycle-Craft must demonstrate that: (1) it will suffer irreparable injury if the relief requested is not granted; (2) there is a likelihood of success on the merits; (3) the harm to Cycle-Craft, if relief is denied, outweighs the harm to Harley-Davidson if relief is granted; and (4) the public interest will not be adversely affected by the injunction. *E.g. Matos v. Clinton School District*, 367 F.3d 68 (1st Cir. 2004). As the First Circuit observed in *Matos*, "The aim of a preliminary injunction 'is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.'" *Id.* at 72. (internal citation omitted).

The relationship between franchisors and franchisees of motor vehicles, including motorcycles, is governed by Mass. Gen. Laws ch. 93B, known as the "Dealers' Bill of Rights."

Section §5(a) prohibits a manufacturer from terminating or refusing to renew a franchise agreement "without good cause, in bad faith or in an arbitrary or unconscionable manner." Section 5(b) requires a minimum 60-day notice of termination, and section 5(f) allows a dealer to petition to enjoin the termination within the notice period. Section 5(g) of its own force imposes a temporary restraining order, preserving the status quo until the Court can rule on a preliminary injunction. It provides, "[p]ending a decision by the court on any motion for an injunction, the manufacturer or distributor and motor vehicle dealer shall in good faith perform all obligations incumbent upon them under the franchise agreement and applicable law."

## B. *Cycle-Craft Will be Destroyed Absent An Injunction*

A clearer case of irreparable harm is hard to imagine. Harley-Davidson seeks to destroy a highly successful business that has been painstakingly built over the last forty-five years. No greater harm could befall Cycle-Craft, which has no other business other than its Harley-Davidson and Buell franchises. Replacing those with another line of motorcycles would be extremely difficult, if not impossible. The application process itself would take several months, during which the business would have no income, its doors would be closed, and its sixty employees out of work. There would be no tenant to pay rent for the facility, leaving the Atwood family personally responsible for $36,000 per month in debt service and taxes on the building unless and until a new tenant can be found. Atwood Declaration at ¶ 14. In addition, if Cycle-Craft is forced to seek another brand of motorcycles to utilize its facility, it is likely to run up against exactly the statutory market-share protections that Harley-Davidson is currently encountering in its efforts to open another dealership in Danvers. *See* G.L. c. 93B, § 6.

Courts have consistently recognized that a franchise termination that would destroy the dealer's business is precisely the type of irreparable injury that should be prevented by

11

preliminary injunctive relief. In *Semmes*, 429 F.2d at 1205 (2d Cir. 1970), Judge Friendly

reasoned as follows:

> Ford's contention that Semmes failed to show irreparable injury from termination is wholly
> unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages
> for wrongful termination, and no one doubts Ford's ability to respond. But the right to
> continue a business in which William Semmes had engaged for twenty years and into which
> his son had recently entered is not measurable entirely in monetary terms; the Semmes want
> to sell automobiles, not to live on the income from a damages award . . . . Moreover, they
> want to continue living.

*See also Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3d Cir. 1962) (a "judgment for damages

acquired years after his franchise has been taken away and his business obliterated is small

consolation to one who, as here, has had a Ford franchise for many years"); *B.P.G. Autoland

Jeep-Eagle, Inc. v. Chrysler Credit Corp.*, 785 F. Supp. 222, 229 (D. Mass. 1991) (granting an

injunction to a dealer where denial of "floor plan" financing would ultimately cause dealer to go

out of business); *Swartz v. Chrysler Motors Corp.*, 297 F. Supp. 834, 842 (D. N.J. 1969)

(granting preliminary injunction to a dealer facing termination); *Chinetti-Garthwaite Imports,

Inc. v. Ferrari Societa Per Azioni Esercizio Fabbriche Automobili E Corse*, 463 F. Supp. 73,

75 (E.D. Pa. 1978) (finding that "CGI introduced credible evidence that it could not readily

become the importer for another manufacturer and would therefore have to go out of business if

preliminary relief were not granted").[8]

---

[8] The court in *Foreign Motors, Inc. v. Audi of America, Inc.*, 755 F.Supp. 30 (D. Mass. 1991) declined to find irreparable harm in the termination of one of the dealer's several line-makes. However, *Foreign Motors* explicitly distinguished *Semmes* because Foreign Motors, Inc. "sells and services automobiles of three other manufacturers, so the loss of the Audi franchise will not drive plaintiff out of business." 755 F.Supp. at 33, n.4. By this reasoning, a dealer who would be driven out of business by the loss of its sole franchise would face irreparable injury. That is precisely the catastrophe looming over Cycle-Craft, which is facing termination of the only two lines it sells. Even if the court rejects the premise that termination would result in immediate destruction of Cycle-Craft's business, the First Circuit has recognized that even non-fatal loss of goodwill and reputation can "wreak substantial (but immeasurable) damage" which is "not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19-20 (1st Cir. 1996) (citations omitted).

### C. *Cycle-Craft is Likely to Succeed On the Merits*

#### 1. Applicable Standards Under Chapter 93B

In light of the stark and irreversible consequences of termination, Cycle-Craft need only "raise[] questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Semmes*, 429 F.2d at 1205-1206 (citation omitted). *See also Ross-Simons, supra* and *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996) (suggesting that likelihood on the merits and irreparable harm be "weighed in tandem" in a "sliding scale" approach).

Accordingly, §5(a) prohibits a manufacturer from terminating its franchise relationship with a dealer "without good cause, in bad faith or in an arbitrary or unconscionable manner." Whether the manufacturer has "good cause" to terminate the franchise is addressed by ch. 93B §5. Subsection §5(m) explicitly places the burden of demonstrating good cause on the manufacturer, while the dealer has the burden of demonstrating arbitrariness or bad faith. In determining whether the manufacturer has met its burden, "the court shall consider all pertinent circumstances, that may include, but shall not be limited to:

(1)   the amount of business transacted by the affected motor vehicle dealer during the 3 year period immediately preceding such notice as compared to the business available to it;

(2)   the investment necessarily made and obligations incurred by the affected motor vehicle dealer to perform its obligations under the existing franchise agreement;

(3)   the permanency of the investment of the affected motor vehicle dealer;

(4)   whether it is injurious or beneficial to the public welfare for the franchise agreement of the affected motor vehicle dealer to expire, to be modified, or to be terminated, or for the affected motor vehicle dealer to be replaced;

(5)   whether the affected motor vehicle dealer has adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumers for motor vehicles handled by the affected motor vehicle dealer;

(6)   whether the affected motor vehicle dealer has been and is rendering adequate services to the public; and

(7)  the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement or of applicable law."

Good cause for termination normally requires serious and chronic problems. *See Amoco Oil Co. v. Dickson*, 378 Mass. 44, 45, 389 N.E.2d 406, 410 (1979) ("good cause" for termination where dealer was "chronically and irremediably unprofitable"); *Foreign Motors, Inc.*, 755 F. Supp. at 34-35 ("good cause" where dealer had "serious operational difficulties" and "continually failed to comply with performance standards"). Although § 5(h) states that "good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship," such failure "must be communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal such that a reasonable opportunity to cure was afforded" (emphasis added).

### 2.  Harley-Davidson Cannot Meet its Burden of Demonstrating Good Cause

Consideration of the first six factors under § 5(m) indicate that Harley-Davidson cannot demonstrate good cause:

(1)  **Amount of business/market penetration:** Cycle-Craft has more than successfully taken advantage of the business available to it during the last three years, routinely performing as one of the top 10% purchasing volume dealers for Harley-Davidson nationwide in every category: motorcycles, parts, accessories and general merchandise. Over the past three years, Harley-Davidson's market share in the Boston area (where Cycle-Craft is the exclusive dealer) has routinely met or exceeded its market share throughout New England. Boston also exceeds Harley-Davidson's market share nationwide. Atwood Declaration at ¶ 23.

(2)  **Investment in the dealership:** The Atwood family has invested nearly five decades of time, money and effort in the Cycle-Craft dealership, which has grown into one of the largest Harley-Davidson dealerships and retail outlets in the world. Over these years, the family has invested literally millions of dollars in the business, exemplified by the $2.7 million it spent in the late 1990s to acquire and renovate the building in which the dealership currently resides. *Id.* at ¶¶ 3, 6-7.

14

(3) **Permanency of investment:** The investments of the Atwoods are not fleeting in nature, but rather inure to the permanent institutional benefit of Harley-Davidson. Harley-Davidson itself featured the Atwoods and the investment they have made in Cycle-Craft as an example of the "excellence" that "make our dealers the best in the business" in its 1997 Annual Report. *Id.* at ¶ 12 and Ex. 4.

(4) **Injury to the public welfare:** Termination of the Cycle-Craft dealership would be highly injurious to the public it serves, as well as to its more than sixty local employees. Cycle-Craft is the only Harley-Davidson dealership in the immediate Boston area (and the only Harley dealership in the country with exclusive coverage of a major metropolitan area). Should Cycle-Craft close down, its customers would literally have nowhere else convenient to turn either for purchases of new motorcycles or for service of their current motorcycles. The dozens of area police departments that purchase and lease their motorcycles from Cycle-Craft would be forced to seek another supplier. *Id.* at ¶¶ 26, 50 and Ex. 8. All of the multiple civic and charitable organizations that depend on Cycle-Craft's financial support and active participation in their endeavors, including the Muscular Dystrophy Association, the Comen Breast Cancer Foundation, the Ronald McDonald House, My Brother's Table, the Massachusetts Firefighters' Association, the Everett Cal Ripkin Buddy Ball League for Mentally Challenged Children, the American Cancer Society and the local Kiwanis chapter would lose the benefit of Cycle-Craft's significant contributions. *Id.* at ¶ 27 and Exs. 9-14. Less tangibly, but no less importantly, Cycle-Craft is community institution. Generations of the Atwoods have sold Harley-Davidson motorcycles to generations of families in and around Boston since 1959. Even if Harley-Davidson could seamlessly replace Cycle-Craft with another dealer, which is extremely unlikely, the loyalty and sense of community institution that exists now would be irretrievably lost. Further, Cycle-Craft's extraordinary facility, which preserves the concept of Harley-Davidson's original headquarters, would also become unavailable.

(5) **Superior facilities and service:** Cycle-Craft has exemplary, state-of-the-art motorcycle sales and service facilities, a comprehensive accessory sales operation, and an enthusiastic, knowledgeable staff. Again, Harley Davidson's 1997 Annual Report, published soon after the opening of the current Cycle-Craft facility, noted: "In addition to a 5,000 square-foot showroom, 15,000 square-feet are dedicated to MotorClothes apparel and collectibles, and parts and accessories. The service department has 15,000 square feet, featuring 16 lifts and a fully outfitted dynomometer area." *Id.* at ¶ 13 and Ex. 4. Since these accolades were published in 1997, Cycle-Craft's facilities, services and capabilities have only improved.

(6) **Service to the public:** Cycle-Craft has been and is rendering superior service to the public, in all aspects of its business and in all aspects of its active life as a corporate citizen of the Everett area. As noted above, Cycle-Craft is a top performer among Harley-Davidson dealers nationwide. Its facilities are state-of-the-art. Its staff is comprised of highly-qualified motorcycle enthusiasts, mostly

from the Everett area. It is active in a wide range of civic and charitable activities, provides a home and sponsorship for the local HOG chapter, and has been credited by the media with spurring a revitalization of the area of the Revere Beach Parkway on which its facility sits. John and Karen Atwood were named Small Business Persons of the Year for 1998 by the Small Business Association, based on the booming performance, expansion and corporate citizenship of Cycle-Craft. *Id.* at ¶¶ 8, 9, 15, 28 and Exs. 2, 12, 15, 16.

The seventh § 5(m) factor – the existence and <u>materiality</u> of any violations – also cuts in favor of Cycle-Craft. As explained above and as detailed in the attached Declarations, the 27 sales to residents of Florida and New Hampshire were legitimately made to individuals. McGrath Declaration at ¶¶ 3-5; McPhee Declaration at ¶ 6-10 and Exs. 2-3. Similarly, the sale to Lou Winz, for the use of its owner's family member, was unquestionably a retail sale. *Id.* at ¶ 11-12 and Ex. 4.

With respect to the 17 units allegedly sold to "fictitious names," any transgression is revealed to be much less than meets the eye. Three of these sales were legitimate sales to Cycle-Craft itself, for the purpose of inclusion in John Atwood's historical collection. Atwood Declaration at ¶ 41 and Ex. 25. Four of these units reached their ultimate consumers on or before July 31, 2003, the cutoff date for the allocation year. The remaining ten units were sold to Cycle-Craft employees or employee relatives, who either changed their minds about the purchases, or canceled the orders as a courtesy to the dealership, to allow the dealership to make the sales to the ultimate consumer. McPhee Declaration at ¶¶ 15-24 and Exs. 5-18.

Even if a few of these sales involved technical violations of Harley-Davidson's reporting rules, the minor infractions do not constitute "good cause" for termination of the franchise, when weighed against the outstanding performance and unblemished honesty of this dealership over the past 45 years, all of which must be taken into account under M.G.L. ch. 93B §5(j). When the examination and weighing of all of the factors is concluded, it is clear that there is no "good cause" to terminate this dealership as required by M.G.L. ch. 93B §5(a).

3.  The Attempted Termination is Arbitrary and Made in Bad Faith

For several reasons, Cycle-Craft will likely be able to prove that the threatened termination

was arbitrary. *See Coady Corp.* v. *Toyota Motor Distributors, Inc.*, 361 F.3d 50, 2004 U.S. App.

LEXIS 5128, *10-11 (1st Cir. 2004) (a manufacturer's decision is "arbitrary" if it was

egregiously unreasonable). First, as noted above, Massachusetts law requires that a dealer be

given "a reasonable opportunity to cure" an alleged violation. G.L. c. 93B, § 5(h). Section M(5)

of the Harley Davidson Motor Company General Conditions of Sales and Service has a similar

requirement:

> Seller shall advise Dealer in writing of such failures and will offer
> to review promptly with Dealer the reasons which, in Seller's
> opinion, or in Dealer's opinion account for such failure or failures
> and will provide Dealer with a reasonable opportunity to cure the
> same.  Seller may terminate this Contract upon no less than ninety
> (90) days prior written notice in the event Dealer fails or refuses to
> cure the same within the reasonable time allowed after the initial
> letter of Seller required in this paragraph.

(Emphasis added).

It is indisputable that on the same day Harley-Davidson notified Cycle-Craft of the

questions raised by its February 2004 inspection, it also sent a notice of termination of Cycle-

Craft's franchise. No opportunity to cure was afforded, much less the "reasonable opportunity"

required by Chapter 93B, subsection 5(h) or the "no less than ninety (90) days... required" by

subsection M(5) of Harley-Davidson's own General Conditions.  The attempted termination is

therefore arbitrary as it violates the statute and ignores the contract requirements.

Second, Harley-Davidson not only failed to provide an opportunity to cure but it also

passed over specified, less draconian sanctions.  To the extent that it is controlling, the 2003

model year Non-Retail Policy itself, at paragraph 8, suggests a range of possible sanctions.  The

most common of these, assigned subnumerals in the second sentence of paragraph 8, are

17

allocation reductions and incentive chargebacks. Atwood Declaration, Ex. 18 at ¶ 8. Harley-Davidson has already availed itself of a $24,000 chargeback, as it informed Cycle-Craft in the Notice of Termination. Atwood Declaration, Ex. 26 at pp. 4-6. Termination is alluded to only later in paragraph 8, following this language: "[i]n addition, Harley-Davidson reserves the right to take any further action it deems appropriate...."

Third, Harley-Davidson's rush to impose the ultimate sanction of termination appears to contradict ordinary Harley-Davidson procedures for addressing suspected sales records. On June 1, 2004, Michael Malicki, Director, Field Operations for Harley-Davidson, sent a letter to John Atwood questioning whether the sale of a specified motorcycle might have violated the non-retail sales policy. *See* June 1, 2004 letter, attached as Exhibit 1 to this Memorandum. That letter begins, "I am requesting your help to clarify the following situation," identifies a specific motorcycle that [o]ur records indicate... may not have been sold directly to the retail end user," and asks for a number of documents "that can substantiate each retail sale within 30 days from the date of this letter." *Id.* The fact that the letter refers to "vehicles" – plural – but only identifies one motorcycle suggests that this is a form letter, routinely used by Harley-Davidson to address suspected non-retail sales. No such letter was sent with regard to the sales that purportedly form the basis for Harley-Davidson's attempted termination of Cycle-Craft.

All of these facts suggest that Harley-Davidson's termination decision may well be motivated by a hidden agenda. As explained above, Harley-Davidson is considering a new dealership in Cycle-Craft's market area, and Cycle-Craft has notified Harley-Davidson that it intended to exercise its right to protest the eventual appointment, pursuant to M.G.L. ch. 93B §6. Atwood Declaration at ¶¶ 36-37 and Ex. 22. Harley-Davidson is already facing litigation from a

New Hampshire dealer over the Danvers location. Terminating Cycle-Craft would avoid a similar obstacle to install a new dealership.

If Harley-Davidson has an ulterior motive for pressing this termination, such a motive can render the termination arbitrary or in bad faith, even if Harley-Davidson otherwise had good cause. *See Stamps v. Ford Motor Company*, 1986 U.S. Dist. LEXIS 18614 (N.D. Ga. 1986) *Id.* at *15 - *21 (dealer with financial problems could still prevail if termination was actually motivated by personal animus) (attached as Exhibit 2 to this Memorandum); *Bronx Automall v. American Honda Motor Co.*, 934 F.Supp. 596, 612 (S.D.N.Y. 1996) (interpreting a New York dealer statute that prohibited termination in the absence of "due cause," and enjoining termination ostensibly based on inadequate facility where Honda wanted to rid itself of a dealer who conducted downscale advertising of Honda's luxury Acura vehicles in a low income area).

### IV.  The Balance of Equities Favor Cycle-Craft

The harm to Cycle-Craft if the injunction is denied far outweighs any harm to Harley-Davidson if the injunction is granted. Cycle-Craft merely seeks to preserve the *status quo* which will not harm Harley-Davidson at all. Cycle-Craft will continue successfully to penetrate the Boston area with Harley-Davidson's products, just as it has done in the past. In fact, sales are on track to increase over last year. McPhee Declaration at ¶ 25. Harley-Davidson will suffer no damage to its image, nor will it risk losing the appearance of zero-tolerance with other dealers. Cycle-Craft is already treating the matter extremely confidentially and would be willing to abide by a protective order to protect the reputations of both parties. Cycle-Craft is willing to release to Harley-Davidson whatever documentation it requests concerning completed sales, pending a decision on the merits, to assure Harley-Davidson of its continuing compliance.

In similar circumstances, the court in *Semmes*, 429 F.2d at 1205 (2d Cir. 1970), concluded that "the hardship to Ford in continuing the Semmes dealership *pendente lite* was relatively small." Mass. Gen. Laws ch. 93B, §5(f) requires that the merits be heard in short order. The balance of the equities overwhelmingly favors allowing Cycle-Craft to continue in business in anticipation of the merits hearing.

## V.   <u>An Injunction will not Adversely Affect the Public Interest</u>

The public interest will not be adversely affected in any way by granting the relief requested.  If the requested injunction is denied, then loyal customers of both Harley-Davidson and Cycle-Craft will suddenly be without a place to buy motorcycles or accessories, or even to have their motorcycles serviced during the peak summer season.  Even if Harley-Davidson had a replacement dealer in the wings, there would be awkwardness in the transition which could be avoided by granting the injunction.  Atwood Declaration at ¶¶ 34, 50.  In any event, generations of Boston area motorcycle enthusiasts have viewed Cycle-Craft as their unique institution.  *Id.* This strong interest on the part of motorcycling public will be served by granting the requested relief.

Respectfully submitted,

**CYCLE CRAFT CO., INC.**

By its attorneys,

James C. Rehnquist, BBO# 552602
Daniel P. Haley, BBO# 651172
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Dated: June 21, 2004

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing has been forwarded this day, June 21, 2004, by hand to William N. Berkowitz, Esquire, Bingham McCutchen, LLP, 150 Federal Street, Boston, MA 02110-1726, counsel for the Defendants.

Daniel P. Haley, Esq.

LIBA/1387534.3

21