# TAB B

VOLUME:     I
PAGES:      1-253
EXHIBITS:   See Index


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


|  |  |
|---|---|
| CYCLE-CRAFT CO., INC., d/b/a BOSTON HARLEY-DAVIDSON/BUELL, Plaintiff vs. HARLEY-DAVIDSON MOTOR COMPANY, INC., and BUELL DISTRIBUTION COMPANY, LLC, Defendants | CASE NO. 04 11402 NMG |


DEPOSITION of JOHN ATWOOD, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the
Commonwealth of Massachusetts held at the
Law Offices of Bingham McCutchen,
150 Federal Street, Boston, Massachusetts,
on June 7, 2005, commencing at 9:04 a.m.


REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617.786.7723

1              MR. REHNQUIST:  You mean, since

2        '84?

3              MR. BERKOWITZ:  Yes.

4    Q.   Mr. Atwood, we've marked as Exhibit No. 1, a

5        copy of Harley-Davidson Dealer Contract with

6        Cycle-Craft.

7              And the first thing that I want you

8        to do is, if you can, identify your

9        signature on this document.

10             We have numbers in the lower

11       right-hand corner, and do you see your

12       signature on Page HD0035?

13   A.   Yes, I do.

14   Q.   All right.  And did you sign the

15       Harley-Davidson Dealer Contract on

16       September -- on or about September 19, 2000?

17   A.   Yes.

18             MR. REHNQUIST:  Wait a second.  I

19       have a question.  Which -- my -- the thing I

20       have marked as Exhibit 1 only goes through

21       HD32.

22             MR. BERKOWITZ:  Yeah.  For the

23       record, Atwood Exhibit 1 is HD1 and the

24       numbers, I think, are not perfectly in

1    order, but the last page is HD32, consists

2    of Dealer Contract and General Conditions of

3    Sales and Service.

4    Q.    Can you identify Exhibit 1A as an extension

5    of your dealer contract?

6              MR. REHNQUIST:  Can you identify 1A

7    for the record?

8              MR. BERKOWITZ:  Sure.  An extension

9    of the dealer contract, that's what it's

10   called.

11   Q.    Harley-Davidson Motor Company, Motorcycle

12   Dealer Contract Extension; is that what that

13   is?

14             MR. REHNQUIST:  I object to the

15   form.

16   Q.    You still have to answer.

17             MR. REHNQUIST:  If I object, you

18   still have to answer --

19             THE WITNESS:  Yes.

20             MR. REHNQUIST:  Unless I tell you

21   not to answer.

22   Q.    Is that a contract extension for the

23   Harley-Davidson contract?

24   A.    Yes.

1    Q.    All right.  And did you sign this document

2          on June 5, 2002?

3    A.    Yes.

4    Q.    We've marked as Exhibit 2 a copy of the

5          Buell Distribution Corporation Dealer

6          Contract, for the record, bates-number

7          beginning HD33 ending HD61.

8               And do you recognize your signature

9          to the Buell Distribution Contract on

10         Page HD3?

11              MR. REHNQUIST:  I'm just going to

12         object to the form of the question because

13         these pages are not sequentially numbered.

14         I just want that to be on the record.

15              MR. BERKOWITZ:  Okay.

16   Q.    Do you recognize your signature on Page HD3?

17   A.    Yes.

18   Q.    All right.  And Karen attested to your

19         signature on that day?

20   A.    Yes.

21   Q.    And that was on or about September 19th of

22         2000?

23              MR. REHNQUIST:  I object to the

24         form.

1    A.    Yes.

2    Q.    And do you recognize Exhibit 2A as Buell

3          Extension of your dealer contract with

4          Buell?

5    A.    Yes.

6    Q.    And you signed that extension on June 5,

7          2002?

8    A.    Yes.

9    Q.    Did you understand that with respect to

10         coming back to -- strike that.

11               Coming back to Exhibit 1, did you

12         understand that under this contract

13         Harley-Davidson was granting your company

14         the right to purchase and resell Harley

15         Davidson products?

16               MR. REHNQUIST:  Object to the form.

17         The document speaks for itself.  It's a

18         legal document.  His understanding is

19         irrelevant.

20               MR. BERKOWITZ:  No, it isn't.  And

21         I object to the coaching.

22   Q.    Did you read the contract before signing it?

23   A.    Probably not.

24   Q.    Did you have counsel available to you to

1    might jeopardize your relationship with

2    Harley-Davidson?  And by "your," I mean your

3    companies.

4              MR. REHNQUIST:  I object to the

5    form.

6    A.    Yes.

7    Q.    We've premarked as Exhibit 3, a copy of your

8    declaration in this case; do you recognize

9    your signature on Page 14?

10   A.    Yes.

11   Q.    And did you understand when you signed this,

12   that you were declaring under the penalties

13   of perjury that the statements in your

14   declaration were true?

15   A.    Yes.

16   Q.    And you understood that this document was

17   going to be submitted to the court in this

18   case?

19   A.    Yes.

20   Q.    And that it was, therefore, an important

21   document?

22             MR. REHNQUIST:  Object to the form.

23   A.    Yes.

24   Q.    I want to direct your attention to Paragraph

1    used, but basically they didn't want U.S.

2    dealers selling bikes over to Europe.

3  Q.    Okay.  And were you aware of the Non-Retail

4    Policy taking different forms over the years

5    since 1988?

6              MR. REHNQUIST:  Object to the form

7    of the question.

8  A.    I know they've -- I knew that they had made

9    some changes here and there in it.

10             What they were exactly, I couldn't

11    tell you.

12  Q.    And have you generally been familiar, let's

13    say, since the early 1990s that

14    Harley-Davidson had policies prohibiting

15    dealers from selling to persons intending to

16    resell motorcycles?

17  A.    Yes.

18             MR. REHNQUIST:  Object to the form.

19             Mr. Atwood, please give me a chance

20    to put my objection on the record before you

21    answer.

22             THE WITNESS:  Okay.

23  Q.    Do you recall --

24  A.    (Cell phone rings.)  Is that me?

1          motorcycles only to ultimate consumers?

2                    MR. REHNQUIST:  I object to the

3          form and object to the lack of a time

4          frame.

5     Q.   Let's say since, what you said, the late

6          1980s.

7     A.   I'm not getting this.  I'm not getting this.

8          It seems like you're asking me the same

9          question.

10    Q.   Okay.  Let me try it again.

11    A.   And I want to make sure I give you a proper

12         "yes" or "no."

13    Q.   I appreciate that.  Let me try it again.

14                    Did your under -- strike that.

15                    Did you understand that

16         Harley-Davidson's Non-Retail Sales Policy

17         required dealers not to sell to persons

18         intending to resell the bikes?  I'm talking

19         about new bikes.

20    A.   Yes.

21    Q.   All right.  And did you understand that

22         dealers were supposed to only sell to

23         ultimate consumers?

24    A.   Yes.

1    A.    No.

2    Q.    And I take it until this day you have not

3          had any conversations with Mr. DeMattia

4          about Ron Buchbaum; is that correct?

5    A.    Correct.

6    Q.    Have you seen him at any dealer functions?

7    A.    I haven't even seen him.  I don't know what

8          he looks like.

9    Q.    Okay.  Do you know who Gregg Cook is?

10   A.    Doesn't sound familiar.

11   Q.    Do you know a former dealer in Florida named

12         Gregg Cook?  Does that sound familiar to

13         you?

14   A.    No.

15   Q.    If I were to suggest to you that he's a

16         dealer in Louisiana currently, does that --

17         does that jog your memory at all?

18   A.    Nope.

19   Q.    Okay.  Do you know what a sales and warranty

20         registration is or an SWR?

21   A.    Yes.

22   Q.    What is it?

23   A.    It's a paper that you send into the factory

24         to start the warranty on a motorcycle.

1    Q.    Okay.  Start the warranty for whom?

2    A.    The owner of the motorcycle.

3    Q.    Okay.  Is that the customer?

4    A.    The end user.

5    Q.    So, the person to whom your dealership would

6          sell a motorcycle?

7                    MR. REHNQUIST:  I object to the

8          form.

9    Q.    Is that right?

10   A.    Yes.

11   Q.    And when did you first become familiar with

12         the SWRs?

13   A.    Back in like in '88, '87.  '87, '88.

14   Q.    Is that when they first started using them?

15   A.    I think they called them "SWRS," though.

16   Q.    SWRS?

17   A.    Yeah.  They changed to SWR.

18   Q.    Do you remember what that last "S" stood

19         for?

20   A.    No idea.  I don't know what "SWR" stands

21         for.

22   Q.    If I were to suggest to you that it stands

23         for "sales and warranty registration," does

24         jog your memory?

1    A.    Yep.  I'm not that good at acronyms.

2    Q.    Okay.  How -- do you know how the dealership

3          submits SWRs today?

4    A.    Yeah, they do it electronically.

5    Q.    And for how long have they been doing that?

6    A.    Three years, four years they've been doing

7          that.

8    Q.    And at what point in time does the

9          dealership submit the SWR relative to the

10         sale of a motorcycle?

11              MR. REHNQUIST:  I object to the

12         form.

13   A.    When the bike is sold.

14   Q.    And then you send in the SWR electronically;

15         is that correct?

16              MR. REHNQUIST:  I object to the

17         form.

18   A.    I would assume that.  I haven't done one.

19   Q.    Okay.  Is it your understanding that after

20         the SWR is sent in, though, the -- that

21         starts the warranty for the customer?

22   A.    Yes.  It starts the warranty on the

23         motorcycle.

24   Q.    For the customer?

1    Q.    And did you give it to somebody?

2    A.    Yes.

3    Q.    Who did you give it to?

4    A.    My sister.

5    Q.    When did you do that?

6    A.    Back in 2001, 2002.  And then, of course --

7          well...

8    Q.    Apart from your handwritten notes, have you

9          seen any other document whether in

10         handwritten form or typed like this,

11         relating to the motorcycles that the

12         dealership owns on your behalf?

13   A.    I may have.

14   Q.    Okay.  But do you remember that sitting here

15         today?

16   A.    No, I don't specifically remember sitting

17         down looking at a list of machines that I

18         owned or the company owned.

19   Q.    Could you turn back to your declaration and

20         take a look at Page 10, Paragraph 41.

21   A.    (Witness reviews document.)

22               Uh-huh.

23   Q.    Mr. Atwood, this paragraph refers to three

24         motorcycles that Cycle-Craft purchased for

1          your collection; do you recall that?

2     A.   Yes.

3     Q.   And what kind of motorcycles were they?

4     A.   Two anniversaries and a Buell.

5     Q.   When you say "two anniversaries," what do

6          you mean?

7     A.   Two, 2003 Harley-Davidson motorcycles and

8          one, I think it was a 2003 Fire Bolt.

9     Q.   Is that a Buell?

10    A.   Yes.

11    Q.   When you say "anniversary," does that -- is

12         that a special kind of 2003 Harley-Davidson

13         motorcycle or were all the 2003 anniversary

14         year bikes?

15    A.   The latter.

16    Q.   Do you recall what kind of 2003

17         Harley-Davidson motorcycles they were?

18    A.   Oh, yes.

19    Q.   What kind were they?

20    A.   One was a Sportster and the other one was a

21         full dresser with a sidecar, FLHTCUI.

22    Q.   And these motorcycles are still owned by

23         Cycle-Craft today?

24    A.   Yes.

1    Q.    They've never been sold by Cycle-Craft to

2          anyone?

3    A.    No.

4    Q.    Including you?  Cycle-Craft did not sell

5          them to you?

6    A.    Not that I'm aware of.

7    Q.    And Cycle-Craft obtained ownership of these

8          three motorcycles by purchasing them from

9          Harley-Davidson; is that correct?

10   A.    Yes.

11   Q.    Do you know whether they have been

12         registered with a Massachusetts DMV?

13   A.    Yes.

14   Q.    That is, they have been?

15   A.    One.

16   Q.    Which one?

17   A.    FLHTCU -- FLHTCUI.

18   Q.    That's one of the -- is that the Sportster

19         or --

20   A.    That's a full dresser.  That's the ultra

21         with a sidecar rig.

22   Q.    And you know that because you've ridden it

23         out on the street; is that right?

24   A.    Yes.