# TAB F

```
                    VOLUME:    I
                    PAGES:     1-288
                    EXHIBITS:  1-13
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
                                 x
CYCLE-CRAFT CO., INC.,           x
d/b/a BOSTON                     x
HARLEY-DAVIDSON/BUELL,           x
        Plaintiff                x
                                 x   CASE NO.
            vs.                  x   04 11402 NMG
                                 x
HARLEY-DAVIDSON MOTOR            x
COMPANY, INC., and BUELL         x
DISTRIBUTION COMPANY, LLC,       x
        Defendants               x
```

DEPOSITION of RONALD S. BUCHBAUM, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jill Kourafas, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts held at the Law Offices of Bingham McCutchen, 150 Federal Street, Boston, Massachusetts, on June 2, 2005, commencing at 9:10 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

|    |    |                                                                 |
|----|----|-----------------------------------------------------------------|
| 1  |    | plans required to be submitted to                              |
| 2  |    | Harley-Davidson on an annual basis by                          |
| 3  |    | dealerships?                                                    |
| 4  | A. | I don't know. We submit it when the                            |
| 5  |    | district manager asks me for one.                              |
| 6  | Q. | Do you know what an "SWR" is?                                  |
| 7  | A. | Yes.                                                            |
| 8  | Q. | What is an "SWR"?                                              |
| 9  | A. | It's a form that Harley has to show the date                   |
| 10 |    | of the warranty of a motorcycle.                               |
| 11 | Q. | And that's a form that dealers submit to                       |
| 12 |    | Harley-Davidson?                                                |
| 13 | A. | Yes. Dealers electronically submit this to                     |
| 14 |    | Harley-Davidson.                                                |
| 15 | Q. | All right. And has Cycle-Craft been                            |
| 16 |    | submitting SWRs on its sales to customers                      |
| 17 |    | electronically since you joined the                            |
| 18 |    | dealership?                                                     |
| 19 | A. | Yes, I believe so.                                              |
| 20 | Q. | All right. And are you familiar with a                         |
| 21 |    | system, a computer system called "Talon,"                      |
| 22 |    | T-A-L-O-N?                                                      |
| 23 | A. | Yes.                                                            |
| 24 | Q. | Is that how -- does Cycle-Craft submit SWRs                    |

```
 1              through that computer system to
 2              Harley-Davidson?
 3      A.      Yes, I believe so.
 4      Q.      And is it your understanding that the effect
 5              of submitting the SWR is that's the point
 6              where the warranty for the motorcycle starts
 7              for the customer, that is, it's the
 8              submission of the SWR that triggers that
 9              warranty period to start?
10      A.      As far as I know, that sounds correct.
11      Q.      And that by submitting an SWR, the dealer is
12              reporting to the factory that a customer has
13              taken delivery of a motorcycle and that the
14              warranty period should now begin for that
15              customer?
                        MR. REHNQUIST:  Objection.
17      Q.      You can answer.
18      A.      I don't know if that's the way it's supposed
19              to be.
20                      Sometimes SWRs have been submitted
21              at the dealership that I work at Boston
22              Harley prior to the customer taking home the
23              motorcycle.
24      Q.      What is -- is there a usual practice in
```

```
1    A.    Yes, sir.
2    Q.    The second sentence says, "Any inventory not
3          sold by July 1 is deducted from the
4          dealership's allocation in the following
5          year and then replaced in the year after
6          that"; do you see that?
7    A.    Yes.
8    Q.    And what do you mean when you say "its
9          replaced in the year after that"?
10   A.    I have to lean back, I have neck -- my neck
11         has a crick in it, so I'm not doing it to be
12         lazy.
13   Q.    It's all right.
14   A.    (Reading) "Any inventory not sold by July 31
15         is deducted from the dealership's allocation
16         for the following the year and then replaced
17         in the year after that."
18               In other words, Harley-Davidson
19         forces the dealership every year to sell out
20         its allocation of the motorcycles that it
21         received, as far as I know it to be.  The
22         end of the model year is July 31.  August
23         begins a new model year.
24               If a dealership has any motorcycles
```

|   |   |
|---|---|
| 1 | left on the last day of July 31 that it has |
| 2 | not promised to a customer or sold to a |
| 3 | customer or held for a customer, whatever, |
| 4 | and that bike is not accounted for as being |
| 5 | held, sold, the way I understood it, then |
| 6 | the next year, instead of the dealership |
| 7 | getting 800 bikes a year -- let's say there |
| 8 | were 200 of those -- it would only get 600 |
| 9 | the following year because those 200 were |
| 10 | not accounted for or held or sold or |
| 11 | whatever. And then they'll -- that wouldn't |
| 12 | be replaced until the next year, and then |
| 13 | they get their 800 back. |
| 14 Q. | Assuming that they sell through the |
| 15 | allocation in the following year? |
| 16 A. | Yes, sir. Yeah, yeah. They have gotta sell |
| 17 | it. They can't keep them. |
| 18 Q. | So, bikes that have not been sold as of the |
| 19 | last day of the allocation period are |
| 20 | deducted from the next year's allocation? |
| 21 A. | That's the way I understand it to be. |
| 22 Q. | What were the consequences for the |
| 23 | dealership if they didn't sell through the |
| 24 | allocations? |

| | | |
|---|---|---|
| 1 | | MR. REHNQUIST: Objection to the |
| 2 | | form. |
| 3 | A. | If you're running a business, that means |
| 4 | | that the next model year in 2006 -- let's |
| 5 | | say '06, the consequence is instead of |
| 6 | | getting 700 new bikes from Harley-Davidson |
| 7 | | '06s, you'll only get 500 '06s. |
| 8 | Q. | Which is going to lead to a reduction in |
| 9 | | sales? |
| 10 | A. | Which leads to a reduction in sales, a |
| 11 | | reduction in profit and not being able to |
| 12 | | sell the amount of motorcycles that you're |
| 13 | | supposed to be getting. |
| 14 | Q. | Is it fair to say that it was important to |
| 15 | | avoid that situation for the dealership in |
| 16 | | that year and every year? |
| 17 | A. | Absolutely. |
| 18 | Q. | How did Cycle-Craft inform Harley-Davidson |
| 19 | | that a bike had been sold prior to the end |
| 20 | | of the model year? |
| 21 | | MR. REHNQUIST: Object to the form. |
| 22 | Q. | Was that through the SWR submission? |
| 23 | A. | Yes. |
| 24 | Q. | All right. You say in the same paragraph |

|    |    |    |
|----|----|----|
| 1  |    | that "in July of 2003, Cycle-Craft faced" -- |
| 2  |    | still Paragraph 3 "in July 2003 Cycle-Craft |
| 3  |    | faced an overstocked inventory situation"; |
| 4  |    | do you see that? |
| 5  | A. | Yes. |
| 6  | Q. | And did that overstocked situation arise by |
| 7  |    | virtue of bikes having been sent to the |
| 8  |    | warehouse and then released or are you |
| 9  |    | referring to something else? |
| 10 | A. | No, it was -- it was just -- we had extra -- |
| 11 |    | we haven't sold all of our allocated bikes. |
| 12 |    | I think it was a culmination of a lot of |
| 13 |    | things why the dealership didn't sell all |
| 14 |    | the allocated bikes. |
| 15 |    | Of course, one of the areas I blame |
| 16 |    | would be what you just said, you know, the |
| 17 |    | warehouse released them in July, so we had |
| 18 |    | to hustle and that's why we had that big |
| 19 |    | sale in July. |
| 20 | Q. | You do not, though, hold Harley-Davidson |
| 21 |    | responsible in any way for that overstocked |
| 22 |    | inventory situation, do you? |
| 23 |    | MR. REHNQUIST: I object to the |
| 24 |    | form. |

|    |    |    |
|----|----|----|
| 1  |    | I remember Jason Marsca is another |
| 2  |    | fella that worked for us, I remember I |
| 3  |    | offered him a V-rod at that time and he |
| 4  |    | was contemplating and then he turned it |
| 5  |    | down below cost. He said, "No, I don't want |
| 6  |    | one. |
| 7  | Q. | Okay. As of that time, the bikes hadn't |
| 8  |    | been sold yet; ultimately, they were sold to |
| 9  |    | other people; is that right? |
| 10 |    | MR. REHNQUIST: Object to the form. |
| 11 | A. | At the time that these people got them? |
| 12 | Q. | The meeting that you're talking about. |
| 13 | A. | They were available. |
| 14 | Q. | But they hadn't been sold? |
| 15 | A. | No. |
| 16 | Q. | Okay. |
| 17 | A. | So, that's why I got two. Mike -- now, in |
| 18 |    | my case, I got two, Mike Bloom got three or |
| 19 |    | four, we would -- if we didn't sell these |
| 20 |    | bikes in a timely fashion to someone else, |
| 21 |    | I was going to buy these bikes. I |
| 22 |    | committed to these bikes. That's why we |
| 23 |    | held them. |
| 24 | Q. | The dealership submitted SWRs for these |

```
 1            bikes according to Harley-Davidson
 2            records?
 3     A.     They did.
 4     Q.     And that was done on July 31?
 5     A.     That's correct.
 6     Q.     Of 2003?
 7     A.     Correct.
 8     Q.     And then after that, the bikes were sold to
 9            other individuals?
10     A.     Other individuals, correct, and then we
11            called up or transmitted -- let's say,
12            Ron Buchbaum had a bike and then
13            Mr. Berkowitz -- Ron Buchbaum didn't pick up
14            that bike. We transmitted the SWR, but I
15            never got it, because I would rather have
16            a customer pay for it and, you know, pay
17            more money for it, and you were the
18            customer, Mr. Berkowitz, he came in and got
19            it.
20     Q.     But at that point it was after the end of
21            the model year, right?
22     A.     Yeah.
23     Q.     But you've already reported it sold to
24            Harley-Davidson?
```

| | | |
|---|---|---|
| 1 | A. | No, sold to me. |
| 2 | Q. | I mean, you've already reported to |
| 3 | | Harley-Davidson that that bike's been sold? |
| 4 | A. | To me. |
| 5 | Q. | Right, but you haven't actually physically |
| 6 | | taken possession? |
| 7 | A. | I haven't physically taken possession of it. |
| 8 | Q. | Was it Jamie's responsibility, at your |
| 9 | | direction, to submit the SWRs? |
| 10 | | MR. REHNQUIST: I object to the |
| 11 | | form. |
| 12 | A. | I don't know whether it was under my |
| 13 | | direction. I think it was Jamie's |
| 14 | | responsibility to do it and it probably was |
| 15 | | under my direction, because, as I said |
| 16 | | earlier in my testimony, I've done this at |
| 17 | | Motown, I've done this at Barnett. |
| 18 | | This is a practice that I've done |
| 19 | | year after year to protect the dealership |
| 20 | | from losing allocated bikes. |
| 21 | | And if I may add something? |
| 22 | | MR. REHNQUIST: No. |
| 23 | Q. | Don't add anything. |
| 24 | A. | Okay. |

1    Q.    No offense. Nobody wants to hear it, at
2        least not now.
3            MR. REHNQUIST: It's about an hour.
4        Bill, do you want to break?
5            MR. BERKOWITZ: Let me finish this
6        line. It won't take long.
7    Q.    The corrections to the SWRs or the
8        adjustments that were made to SWRs, did you
9        ask Jamie to make those changes after the
10       bikes were sold to --
11    A.    She would have done that automatically.
12    Q.    All right. Mr. McPhee's affidavit, if you
13       take a look at it, the bottom of
14       Paragraph 23, it says, "In each case the SWR
15       was appropriately adjusted to reflect the
16       second purchaser as the customer"; do you
17       see that?
18    A.    Yes, sir.
19    Q.    And, you know, before you had said you
20       wanted to change your declaration because of
21       the use of the word "purchaser," in fact,
22       none of the people in the first column
23       actually purchased the bikes; is that
24       correct?

| | | |
|---|---|---|
| 1 | | MR. REHNQUIST: I object the form |
| 2 | | of the question. |
| 3 | Q. | You may answer. |
| 4 | | MR. REHNQUIST: What do you mean |
| 5 | | "purchase"? |
| 6 | Q. | Well, in fact, none of the people in the |
| 7 | | first column actually purchased the |
| 8 | | bikes? |
| 9 | A. | They all purchased them. We put them |
| 10 | | aside for them. They all committed to a |
| 11 | | purchase. |
| 12 | Q. | All right. But they didn't actually buy |
| 13 | | the bikes, pay them and take delivery of |
| 14 | | them? |
| 15 | A. | They weren't paid and they weren't |
| 16 | | delivered, but they did say, "Hey, we're |
| 17 | | taking that bike, put it aside for us," |
| 18 | | yes. |
| 19 | | (Pause.) |
| 20 | | Well, I don't know about these |
| 21 | | people (indicating). |
| 22 | Q. | Which ones don't you know about? |
| 23 | A. | I wasn't aware of Dan Sica and John Sica. |
| 24 | | They were Jamie's friends. |

```
 1             before?
 2   A.    I think I've had that conversation before,
 3         that's why it was not new to me.
 4   Q.    And do you recall how you learned of that
 5         requirement, if you learned of it?
 6   A.    (Witness nodding.)
 7   Q.    You're shaking your head, but you've got to
 8         answer verbally, do you recall?
 9   A.    Probably in my tenure with Harley.
10   Q.    Okay.  I'm sure that's the case, but do you
11         recall from whom or under what
12         circumstances?
13   A.    Well -- no.
14   Q.    Did you ever see anything in writing that
15         specified that rule or requirement?
16   A.    No.
17               MR. REHNQUIST:  Do you mean prior
18         to the termination letter?
19               THE WITNESS:  That's prior to this
20         litigation I haven't seen it.
21   Q.    Do you recall anyone from Harley-Davidson
22         telling you about that?
23               MR. REHNQUIST:  About what?  I
24         object to the form.
```

```
 1    A.    About?
 2    Q.    Your belief that -- that bikes could only be
 3          sold to individuals.
 4    A.    I think I always knew it was an unwritten
 5          rule that Harley did not want you reselling
 6          these motorcycles to people that were going
 7          resell them.
 8                You had to sell it to a person that
 9          was going to ride this bike and we run into
10          that a lot where people will try to buy them
11          and we don't sell them two or three bikes.
12          We sell one bike per person.
13    Q.    How do you find out whether the person's
14          going to resell them?
15    A.    Well, you don't find out.  You find out if a
16          person comes in and says, "Hey, I want three
17          motorcycles."
18                "You can't buy three motorcycles.
19          What do you want three motorcycles for?"
20    Q.    If you find out that they want to buy them
21          for three customers, do you tell them, Well,
22          those customers have come into the
23          dealership and we'll deal with them?
24    A.    Yeah, I've had a lot of people that have
```

1      Slim's buyers?
2              MR. REHNQUIST:  I object to the
3      form.
4   Q. Was that what you were telling him?
5   A. No.  My instructions were, "Call this fella
6      up and handle him."  That's what I told him.
7      'Cuz you said on the first call.
8   Q. Well, was your -- were you intending to
9      indicate to Sean that he should deal with
10     this gentleman, Slim's buyers?
11  A. I don't even think I mentioned that.
12  Q. Okay.
13  A. I told Sean to call this fellow and he's got
14     20 people that wants to buy bikes or 25 -- I
15     forget the number -- but call him right away
16     and get something going.
17  Q. Well, my question is whether was it okay
18     with you for Sean to deal with Slim so long
19     as he got individual names for the bikes
20     that were being sold?
21  A. Absolutely, as long as a person bought the
22     bike, an individual.
23             If you, Mr. Berkowitz, bought a
24     bike and Mr. Berkowitz was paying for that

```
1    A.    I don't think I would have been privy to
2          that.
3    Q.    You don't recall actually --
4    A.    Yeah, yeah, yeah.  I take that back.  Yes, I
5          do remember it.
6    Q.    And do you recall when a carrier came in to
7          pick up the motorcycles destined for
8          Florida?
9    A.    I recall a carrier coming, but I didn't get
10         involved with that.  I was told that the
11         Florida bikes are being picked up now.
12   Q.    So, you don't remember actually seeing 19
13         motorcycles loaded onto a truck?
14   A.    Yes, yes, I saw it from downstairs.
15   Q.    And do you remember when in relation to that
16         carrier's arrival the checks came in for the
17         bikes?
18   A.    No.  But the bikes wouldn't have been
19         released unless and I hope everybody
20         followed my instructions, unless they
21         received checks from individual people
22         that were buying those bikes, and that the
23         titles were signed by those individual
24         people.
```

VOLUME:    2
PAGES:     117
EXHIBITS:  14-18

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC., d/b/a BOSTON HARLEY-DAVIDSON/BUELL, Plaintiff | x x x x x x |
| vs. | x  CASE NO. x  04 11402 NMG x |
| HARLEY-DAVIDSON MOTOR COMPANY, INC., and BUELL DISTRIBUTION COMPANY, LLC, Defendants | x x x x |

*CONTINUED DEPOSITION of RONALD S. BUCKBAUM,* taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jill Kourafas, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts held at the Law Offices of Bingham McCutchen, 150 Federal Street, Boston, Massachusetts, on Tuesday, June 21, 2005, commencing at 10:42 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

```
 1            I don't want -- I'm not suggesting you're
 2            mischaracterizing, but it's not fair to the
 3            witness to try to summarize his testimony
 4            from a couple of weeks ago.
 5    Q.      Is that, in fact, what your testimony is,
 6            that you had an initial conversation with a
 7            gentleman from Florida and then turned the
 8            transaction or possible transaction over to
 9            Sean Walsh?
10                  MR. REHNQUIST:  Object to the form.
11    A.      I don't know if I said that.
12    Q.      I'm not asking if you said that, I'm asking
13            you if that's accurate.
14                  MR. REHNQUIST:  Object to the form.
15    A.      I think what I said was I remember talking to
16            somebody in Florida, and then -- I don't
17            remember, but I think I said I remember his
18            name or nickname or something, and then I
19            turned it over to Sean Walsh.
20    Q.      All right.  And did you leave it to Mr. Walsh
21            to handle whatever negotiations needed to be
22            handled with the gentleman from Florida?
23                  MR. REHNQUIST:  Object to the form.
24    A.      As the person doing the deal, it would be his
```

```
 1                responsibility.
 2      Q.        All right.  And was that within his authority
 3                to do that without your being directly
 4                involved?
 5                     MR. REHNQUIST:  Object to the form.
 6      A.        Yes.  And keep me up to date on what's going
 7                on.
 8      Q.        In the summer of 2003, did you have meetings,
 9                whether regularly scheduled or not, of your
10                direct reports at the dealership?
11      A.        With what?
12      Q.        With management of the dealership, managers
13                meetings.
14      A.        In '03?
15      Q.        Yes.
16      A.        I don't remember.
17      Q.        How was Sean Walsh's performance as a
18                salesman?
19      A.        Satisfactory, to the best of my recollection.
20      Q.        Do you recall ever having any problems with
21                him?
22      A.        I don't remember.
23      Q.        Do you recall whether Sean Walsh ever
24                did anything that you considered to be
```