# TAB J

```
                                                          1
 1                                          VOLUME 1
 2                                          PAGE: 1-144
 3                                          EXHIBITS: 1-17
 4              UNITED STATES DISTRICT COURT
 5               DISTRICT OF MASSACHUSETTS
 6   CYCLE-CRAFT CO., INC.                ) CIVIL ACTION
 7   D/B/A BOSTON HARLEY-DAVIDSON/BUELL,  ) NO. 11402NMG
 8       PLAINTIFF,                       )
 9   v.                                   )
10   HARLEY-DAVIDSON MOTOR COMPANY, INC., )
11   AND BUELL DISTRIBUTION COMPANY, LLC, )
12       DEFENDANTS.                      )
13   _____)
14            DEPOSITION OF SEAN WALSH
15       DATE:    APRIL 27, 2005
16       TIME:    10:11 A.M.
17       PLACE:   BINGHAM MCCUTCHEN
18                150 FEDERAL STREET
19                BOSTON, MA  02110
```

**MEDEIROS STENO & VIDEO GROUP**

"FOR THE TRAVELING LITIGATOR SINCE 1988"

| | | |
|---|---|---|
| *Boston: | 617.590.9767 | *Depositions |
| *New York: | 646.413.4499 | *Arbitrations |
| *Florida | 305.321.7414 | *E-transcript |
| *E-mail: | depo@gomedeiros.com | *Video |

*MA *CT *NJ *NY *FL

Case 1:04-cv-11402-NMG   Document 41-11   Filed 08/12/2005   Page 3 of 12
4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.   4/27/05

21

1   A:  I've never seen the SWR in this form.  On
2   the computer it looks different when you submit it.
3          MR. REHNQUIST:  What number is this,
4   Bill?
5          MR. BERKOWITZ:  This is number 2.  The
6   subpoena is number 1.
7   **Q:  Do you see your name, though, on the**
8   **document?**
9   A:  Yes.
10  **Q:  And it indicates registration created on**
11  **July 31, 2003?**
12  A:  Yes.
13  **Q:  And there's a vehicle identification number**
14  **on that document, exhibit 2?**
15  A:  Yes.
16  **Q:  Showing you what we've marked as exhibit 3,**
17  **do you recognize the type of document that appears in**
18  **exhibit 3?**
19  A:  Yes.  It's a certificate of origin.
20  **Q:  What is a certificate of origin?**
21  A:  It's the document showing overwhelming of
22  the motorcycle which becomes the title once a vehicle
23  is registered and titled with the state.
24  **Q:  And this document has a vehicle**

```
 1    identification number on it as well?
 2         A:   Yes.
 3         Q:   Can you confirm for us that it matches the
 4    vehicle identification on exhibit 2?
 5         A:   Yes it does.
 6         Q:   Looking at exhibit 3 under, "Series or
 7    Model" do you see, "2003 VRSCA"?
 8         A:   Yes.
 9         Q:   Do you know what kind of a model motorcycle
10    that is?
11         A:   Yes.  That's a V-Rod.
12         Q:   From your testimony I understand you did
13    not buy this bike.  Is that correct?
14         A:   No, I did not.
15         Q:   Did you have any contract or agreement to
16    buy that bike?
17         A:   No, I did not.
18         Q:   Did you ever sign a purchase order for that
19    motorcycle from Cycle-Craft in or around July of
20    2003?
21         A:   No, I did not.
22         Q:   Did you ever put down a deposit for that
23    motorcycle in 2003?
24         A:   No.
```

1    Q:  Did you ever fill out any forms or
2  paperwork related to that motorcycle in 2003?
3    A:  No.
4    Q:  Did you have any intent to buy that
5  motorcycle or any similar motorcycle at the end of
6  the model year 2003?
7    A:  No.
8    Q:  Do you have an understanding as to how your
9  name came to be used on an SWR for this motorcycle in
10 2003?
11   A:  Yes.
12   Q:  How did it come to be used?
13   A:  Ron Buchbaum told me that he was going to
14 put my name on this vehicle along with several other
15 employees.
16   Q:  For what purpose?
17   A:  He was going to SWR the bike, I'm assuming
18 so he could show the bike as sold.
19   Q:  And to your knowledge this was done with
20 other employees as well?
21   A:  Yes.
22       MR. REHNQUIST:  Object to the form.
23   Q:  Do you know any of the employees with whom
24 this was done?

24

1    MR. REHNQUIST: Object to the form. Does
2  he know that it was done or does he know the
3  employees?
4    Q: You can answer the question that's pending
5  which is do you know any of the other employees with
6  whom this was done?
7    MR. REHNQUIST: Object to the form.
8    A: Yes. The only name that I know off the top
9  of my head is Joe Giordano, but there were several
10 people.
11   Q: Is Joe also known as Salvatore Giordano or
12 is that a different Giordano?
13   A: I don't know. I only knew him as Joe.
14   Q: Do you know how many other motorcycles
15 approximately were reported as having been sold by
16 the dealership to employees?
17   MR. REHNQUIST: Objection. Form,
18 foundation.
19   A: I believe it was nine or ten.
20   Q: Do you know who was responsible for
21 submitting the SWRs to the factory reporting these
22 sales in the names of employees?
23   A: I think that was the finance manager. Part
24 of her job was to do that.

4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.                    4/27/05

40

1   Q: **Do you know whose handwriting they are?**
2   A: The two numbers, "186,000" and "$185,000"
3   look like Ron's handwriting. "Kathy" I'm not sure,
4   I'm not sure if that's his or not.
5        MR. BERKOWITZ: For the record, exhibit 6
6   is Bates number CC-1079
7   Q: **Do you recall how this document came to**
8   **you?**
9        MR. REHNQUIST: Objection.
10  A: This document was prepared by me for Ron to
11  know which motorcycles DC Imports wanted. It looks
12  to me like this was faxed by DC Imports because I
13  would not have written, "Attention Ron B. sales
14  manager" and the total out the door price, all that
15  is written, was typed by system else. So this
16  document I think was faxed to me, but the list I
17  prepared and faxed to DC Imports.
18  Q: **So the typing --**
19  A: It looks like they retyped what I sent them
20  and then I wrote on this sheet.
21  Q: **But the typing on the document is not**
22  **something that you did. Is that correct?**
23  A: I did a list just like this but it looks
24  like they just took my list and retyped it. This is

MEDEIROS STENO & VIDEO GROUP           FOR THE TRAVELING LITIGATOR   E-MAIL: VIDEOSTENO@GOMEDEIROS.COM
BOSTON: 617.590.9767                    NEW YORK/NEW JERSEY: 646.413.4499           FLORIDA:   305.321.7414

43

```
 1        A:  I don't remember if he did.  I got the name
 2   from when I called and they answered the phone.
 3   That's how I knew the name.  I don't remember him
 4   telling me I work for XX company.
 5        Q:  Do you remember whether you contacted him
 6   on a cell phone or a business phone in that first
 7   conversation?
 8        A:  I'm not sure if it was a business phone or
 9   a cell phone.  I just called the number I was given
10   which I would assume is this number here.
11            MR. BERKOWITZ:  For the record, the
12   witness is referring to "954.558.4905" that appears
13   under the name "Mike Stevens" on exhibit 6.
14        Q:  Did you have subsequent conversations with
15   Mr. Stevens after that first one?
16        A:  Yes.
17        Q:  Approximately how many telephone
18   conversations did you have with him?
19        A:  I would estimate two or three.
20        Q:  And during your discussions with Mr.
21   Stevens did you come to learn that he worked for DC
22   Imports?
23        A:  Yes.  I knew that, yes, he did mention
24   that.
```

51

1  them.  He did not tell me where they were going to go
2  or who they were going to go to.
3      Q:  **Was it your understanding in dealing with**
4  **Mr. Stevens from time to time he was acting on behalf**
5  **of DC Imports and not in his own individual capacity?**
6           MR. REHNQUIST:  Object to the form.
7      A:  I knew that he worked for DC Imports based
8  on conversations with other people working there who
9  told me that Mike Stevens worked with them.
10     Q:  **Did you have conversations with other**
11 **individuals at DC Imports about this deal besides Mr.**
12 **Stevens?**
13     A:  Yes.  Yes.
14     Q:  **Who did you speak to?**
15     A:  I don't remember specific names.  I believe
16 Julie or Laurie.  It was a female.
17     Q:  **If I were to suggest to you Debra Lunsford,**
18 **does that refresh your recollection?**
19     A:  The last name definitely somebody I talked
20 to.
21     Q:  **And did you talk to Ms. Lunsford about this**
22 **particular deal?**
23     A:  Yes.  She was the one who had the credit
24 card.

1   Q: And based on your conversations with Mr.
2   Stevens and Ms. Lunsford did you gain the
3   understanding that Mr. Stevens was not purchasing 19
4   motorcycles for his own individual use?
5         MR. REHNQUIST: Objection. Object to the
6   form.
7   A: Right. I knew that he worked for a company
8   and that he was purchasing the motorcycles. I did
9   not think that he was buying it for himself
10  individually.
11  Q: Was it your understanding that in his
12  dealings with you he was acting on behalf of the
13  company --
14        MR. REHNQUIST: Objection.
15  Q: -- and not his individual capacity?
16        MR. REHNQUIST: Objection. Asked and
17  answered.
18        MR. BERKOWITZ: It hasn't been answered.
19  You can answer it.
20  A: I knew that he worked for DC Imports. I
21  didn't think that he was working for himself, no.
22  Q: In his dealings with you?
23        MR. REHNQUIST: Objection.
24  A: Right.

57

1  all the supporting documentation that we would
2  require for the sale of a bike to any person, all the
3  paperwork done in that person's name for each
4  motorcycle.
5      Q: **Did you have an understanding as to who**
6  **would be paying for the bikes?**
7      A: We asked DC Imports to provide us with
8  separate money orders for each motorcycle remitted to
9  the person who is buying that motorcycle.
10     Q: **But did you have an understanding as to**
11 **what entity or entities was putting up the money for**
12 **the bikes?**
13         MR. REHNQUIST: Objection.
14     A: We knew that DC Imports would be sending us
15 the money. We definitely asked them not to have a DC
16 Imports check, to have it specifically represented by
17 the person purchasing the bike.
18     Q: **And again, was that to make it appear as**
19 **though you were complying with the Harley-Davidson**
20 **policy?**
21         MR. REHNQUIST: Object to the form.
22         MS. SMAGULA: Objection.
23     A: It was so that, yes, yes it was. We were
24 very specific with Mike Stevens as to how to fill out

1   provide us with individual checks.
2       Q:  Do you recall any discussion with DC
3   Imports personnel about the need to obtain individual
4   addresses and driver's licenses?
5       A:  Yes.
6       Q:  What do you recall on that topic?
7       A:  I was instructed by Ron to make sure that
8   all the supporting documentation for each individual
9   sale pertained to that sale, so the individual buying
10  the motorcycle would have a specific license. All
11  the information would all go together for each sale
12  individually.
13      Q:  During this process did it ever come to
14  your attention that Mr. Stevens and Ms. Lunsford were
15  listed as buyers for two of these 19 motorcycles?
16      A:  I noticed the names on some of them.
17      Q:  Did you have any communication with either
18  one of them about that?
19      A:  No.
20      Q:  At some point after you returned from
21  vacation in August of 2003 did you learn of a police
22  investigation relating to the sale of these 19
23  vehicles?
24      A:  Yes.