# EXHIBIT 1



Not Reported in F.Supp.2d
1999 WL 1711085 (E.D.Ky.)
(Cite as: 1999 WL 1711085 (E.D.Ky.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, E.D. Kentucky.
Jaguar CARS, a Division of Ford Motor Company, Plaintiff,
v.
BLACKHORSE MOTORWORKS, LTD., and J. Douglas Rood, Defendants.
No. CIV. A. 94-289.

Nov. 2, 1999.

MEMORANDUM OPINION AND ORDER

HOOD, J.

*1 The plaintiff, Jaguar Cars ("Jaguar"), has moved the Court [Record No. 263] for partial summary judgment. The defendants, Blackhorse Motorworks and J. Douglas Rood (collectively, "Blackhorse"), have responded [Record No. 322], to which Jaguar has replied [Record No. 356]. This matter is now ripe for decision.

This action arises from Jaguar's eight-month investigation of Blackhorse's alleged fraudulent business practices. The investigation was initiated when, in November of 1993, Jaguar's warranty department received an unsolicited telephone call from David Kohlman, a service technician at Blackhorse. This investigation revealed that between 1992 and 1994, Blackhorse systematically defrauded Jaguar through the submission of sham warranty claims. Some of Jaguar's undeniable proof consists of sworn statements from former employees of Blackhorse: Tom Cadwallader, Blackhorse's Service Director, Terri Wyatt, Blackhorse's Parts Manager, and Ken McLaughlin, a Blackhorse service technician, have all sworn that they participated in defrauding Jaguar through the submission of sham warranty claims. [FN1]

With the overwhelming evidence of Blackhorse's fraudulent activities, Jaguar commenced this action alleging, *inter alia,* violations of the Racketeer Influenced and Corrupt Practices Act and seeking termination of its franchise agreement with Blackhorse. Confronted with Jaguar's allegations, Blackhorse filed a massive counterclaim asserting, *inter alia,* that Jaguar's investigation was conducted in an inappropriate manner and that Jaguar's fraud charges were meritless.

This case has been going on since July 29, 1994, and is in its seventeenth volume at the time of this Opinion. The Court has given Blackhorse the benefit of the doubt on many of its claims and has allowed it to pursue a vigorous course of discovery. Discovery, however, is now complete, and the Court must shine the light of reality on Blackhorse's counterclaims and arguments.

Jaguar has moved for partial summary judgment on the following points: (1) Jaguar asks that the Court authorize the termination of its franchise agreement with Blackhorse; and (2) Jaguar wants the Court to grant it summary judgment as to all of the claims in Blackhorse's third amended counterclaim. Each of Jaguar's points will be dealt with separately.

The first issue to be addressed is whether to grant Jaguar summary judgment on its termination claim. In a previous opinion, denying Blackhorse's motion for partial summary judgment, the Court found that there were genuine issues of material fact surrounding Jaguar's termination of Blackhorse's franchise. The Court will now revisit that finding in light of Jaguar's motion.

In Kentucky, a manufacturer can terminate a dealer's franchise if it meets the notice requirement, has good cause for termination, and acts in good faith. *See* KRS 190, *et seq.* Because it is clear that the 15-day notice requirement has been satisfied, the only issues to be determined are whether Jaguar acted with good cause and in good faith in issuing the termination notice.

*2 First, it should be pointed out that Jaguar has the right to terminate any of its dealerships if one of them is engaging in fraudulent activity. Multiple employees of Blackhorse have sworn out affidavits that Blackhorse was submitting fraudulent warranty claims . [FN2] This undisputed testimony alone warrants summary judgment, but it should be noted, in order to be comprehensive, that Jaguar's auditors also found that Blackhorse routinely obtained reimbursement for repair work by falsely identifying the cars on which the work had allegedly been performed. [FN3] *See L.J. Dreiling Motor Co. v. Peugeot Motors,* 850 F.2d 1373, 1377-78 (10th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
1999 WL 1711085 (E.D.Ky.)
(Cite as: 1999 WL 1711085 (E.D.Ky.))

Cir.1988) (holding that submission of fraudulent warranty claims by a service manager constitutes proper grounds for termination); _Ormsby Motors v. GMC, 842 F.Supp. 344 (N.D.Ill.1994)_ (holding that a dealer may be terminated for warranty fraud). [FN4]

Having found no genuine issues of material fact surrounding Blackhorse's fraudulent activities, the Court will now address whether there are any genuine issues of material fact as to whether Jaguar acted in good faith in attempting to terminate Blackhorse's dealership. As noted earlier, a franchisor may not terminate a car dealer's franchise agreement unless it has acted honestly and observed reasonable commercial standards of fair dealing, i.e. good faith. _See_ KRS 190.045(1), 190.010.

In _Jim White Agency Co. v. Nissan Motor Corp., 126 F.3d 832, 834 (6th Cir.1997)_, the provision at issue defined good faith as "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade." The Sixth Circuit noted that the Ohio dealer statute, much like the Kentucky statute, derives the good faith definition from the Uniform Commercial Code. _Id._ at 834. The Sixth Circuit then held that the operative inquiry is whether the manufacturer's actions were "commercially justifiable." _Id._ at 835. Applying this standard, the _Jim White_ court affirmed an entry of summary judgment for Nissan on the ground that the manufacturer had merely exercised its contractual rights, and thus, it had acted with commercial justification in refusing to grant a dealer's request to relocate its dealership. _Id._

In the case at bar, Jaguar exercised its clear contractual right to audit Blackhorse's warranty records and to terminate the dealership based on the submission of fraudulent claims. The record clearly shows that Jaguar was acting out of commercial necessity when it asserted its contractual right to audit Blackhorse's books and terminate its franchise based upon clear fraud. [FN5] _See Bill Call Ford, Inc. v. Ford Motor Company, 48 F.3d 201, 207 (6th Cir.1994)_ (awarding summary judgment to a manufacturer on a good faith issue where it "exercised its clearly expressed contractual rights"); _Hickman v. American Honda Motor Co., 982 F.Supp. 881, 885-886 (N.D.Ga.1997)_ (finding no violation of Georgia's good faith requirement where franchisor acted "with a legitimate business interest in mind").

*3 In rebuttal, Blackhorse claims that Jaguar was not honest and failed to observe reasonable commercial standards of fair dealing regarding its investigation. Specifically, Blackhorse asserts that Jaguar wrongfully disguised its investigation as a routine warranty audit when in fact it suspected fraud. In essence, Blackhorse is claiming that the "good faith" requirement dictates that Jaguar disclose its information to Blackhorse and give it an opportunity to dispose of incriminating evidence before the audit.

The Court, however, finds that good faith does not require a franchisor who is conducting a fraud investigation to apprise the target of its findings. [FN6] The appropriate inquiry, like in _Jim White,_ is whether Jaguar's actions were commercially justified. Based on the overwhelming evidence of fraud, the Court finds that Jaguar's actions were commercially justified. The fact that Jaguar may have misled Blackhorse as to the nature of the audit is irrelevant.

Moreover, the good faith requirement relates to the grounds upon which Jaguar based its decision to terminate, not its investigation. _See Scuncio Motors v. Subaru of New England, 555 F.Supp. 1121, 1131-33 (D.R.I.1982)_. Jaguar's decision to terminate was not based on speculation and conjecture, which would have been bad faith, but rather an extensive and fair investigation. The fact that Jaguar may have mislead or withheld information from Blackhorse relating to its fraud investigation does not in any way mean that Jaguar did not have a good faith belief to conduct its investigation and seek to terminate Blackhorse's dealership. Based on the above analysis, the Court will grant Jaguar summary judgment on its termination claim. [FN7]

The Court will now address Blackhorse's counterclaims. In order to maintain its fraud claim, Blackhorse must establish six elements by clear and convincing evidence: "(1) a material misrepresentation, (2) which is false, (3) which was known to be false, or made recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance thereon, and (6) causes injury." _See Compressed Gas Corp. v. U.S. Steel Corp., 857 F.2d 346, 349-50 (6th Cir.1988)_. Blackhorse's fraud claims are based on the following: (1) the two alleged promises made by Lawrence Williams, Jaguar's National Franchise Development Manager; (2) statements made by Jaguar's president, Michael Dale, in a videotape distributed to all dealers on or about April 1991, and (3) Jaguar's alleged failure to disclose certain internal corporate information.

In a letter dated July 5, 1991 from Blackhorse's counsel [FN8] to First Security, Blackhorse's counsel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summarized the state of affairs among Blackhorse, the bank, and Jaguar and candidly acknowledged that "Jaguar has not made a written commitment to Blackhorse, or for that matter any definitive oral commitment ..." See Jaguar's Exhibit 27, p. 3. This letter is subsequent to the dates upon which Lawrence Williams allegedly made his promises to Mrs. Rood that Jaguar would "step in" and act as a guarantor for financing if Blackhorse's application was denied and that Jaguar would "see to it" that Blackhorse had inventory.

*4 Furthermore, in a July 15, 1991 response to Blackhorse's letter, First Security's counsel, Charles Shivel, confirmed the Bank's understanding that Jaguar had made no commitments to Blackhorse. See Jaguar's Exhibit 26. On July 30, 1991, Blackhorse's counsel sent Mr. Shivel a follow-up letter, and it did not contradict or refute in any way Mr. Shivel's letter dated July 15.

The Court finds that Blackhorse's above correspondence precludes its fraud claims as a matter of law. See Glass v. Kemper Corp., 949 F.Supp. 1341, 1349 (N.D.Ill.1997). Blackhorse's attempts to explain away its letter dated July 5, 1991 is disingenuous. [FN9] Blackhorse sent the letter to First Security at a time when the dealership was desperate to persuade First Security of Jaguar's commitment to the franchise. The letter, however, not only neglects to mention Jaguar's alleged commitments, it expressly states that no such written or oral commitments had been made.

Notwithstanding the above analysis, it is not reasonable for Blackhorse to have relied on Williams's alleged promises. After the purported promises but before the settlement with First Security, Mrs. Rood acknowledged that Williams advised her that Blackhorse should give up its Jaguar franchise [FN10] and declare bankruptcy. [FN11] This advice renders any reliance by Blackhorse on Williams's alleged prior inconsistent statements unreasonable. [FN12]

As to the alleged promise made in the videotape by Michael Dale, president of Jaguar, Blackhorse stated in the above-mentioned letter that it had not received any oral or written commitments from Jaguar. Because this writing was made long after Blackhorse had received the videotape with Dale's alleged promise, Blackhorse has failed to meet its burden on this claim.

Moreover, Dale's generic statements to all Jaguar dealers about possible financial support are not actionable because no dealer could have reasonably relied on a non-specific videotape to incur substantial new debts and risks. See Schott Motorcycle Supply v. American Honda Motor, 976 F.2d 58, 65 (1st Cir.1992) (holding that no reasonable person would rely on franchisor's "trade talk").

In regard to the nondisclosure claims, the Court finds that Blackhorse has failed to adduce any pertinent evidence in which to support these claims. There is simply no evidence demonstrating that the parties' relationship gave rise to a duty of disclosure on the part of Jaguar. See O'Heal v. Burger Chef Systems, 860 F.2d 1341, 1349-50 (6th Cir.1988). Likewise, no evidence is presented which would show that Blackhorse relied to its detriment on the nondisclosures relating to Jaguar's financial condition. In fact, the record shows that Mr. Rood was aware that Jaguar was losing a million dollars a day. See Jaguar Exhibit 9. [FN13]

Blackhorse also claims that Jaguar defrauded it by failing to disclose the real reason behind the warranty audits. As the Court has noted earlier, this is frivolous.

*5 Furthermore, Blackhorse's claims concerning the 1992 and 1994 notices of termination fail to raise a genuine issue of material fact. The Court finds that Jaguar properly attempted to terminate Blackhorse based upon undisputed testimony from multiple employees of Blackhorse that it was submitting fraudulent warranty claims. Along with being employees of Blackhorse, the employees in question were central to the fraud and were able to provide explicit detail of how the fraud was carried out. Because the Court is granting Jaguar authorization to terminate Blackhorse, Blackhorse's claims in regard to the notices lack merit. [FN14]

As to Blackhorse's discrimination claims, there is nothing in the dealer's agreement that states that every dealer must be treated the same way. See Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, 970 F.2d 273, 279 (7th Cir.1992) (holding that even if a franchisor treats other franchisees more leniently this is "no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense to a speeding ticket"). Hence, Blackhorse's claims in this respect are dismissed. [FN15]

Blackhorse also asserts that Jaguar refused to provide vehicles to Blackhorse in accordance with its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

own allocation system. Because, however, there is no evidence that Jaguar failed to provide Blackhorse with a single vehicle to which Blackhorse was entitled under the allocation system, the Court will grant Jaguar summary judgment as to this claim. [FN16]

The next issue to be addressed is Blackhorse's implied covenant claim. After reviewing the pleadings, the Court finds that the record does not support the imputation of any such obligation on Jaguar. [FN17]

In regard to Blackhorse's tortious interference claim, the Court notes that the manufacturer-dealer relationship is governed by the contract between the parties. See *Tractor & Farm Supply v. Ford New Holland*, 898 F.Supp. 1198 (W.D.Ky.1995). In this case, the record shows that Jaguar acted pursuant to its rights under the dealer agreement, and there was no wrong doing on the part of Jaguar. Notwithstanding the fact that the manufacturer-dealer relationship is governed by the dealer agreement, Blackhorse's claim would also fail because there is no pertinent evidence of an improper motive on Jaguar's part. See *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1080 (W.D.Ky.1995) (holding that the cort of interference with existing contractual relations requires the pleading party to proof an improper motive). [FN18]

Moving on to the next issue, Blackhorse has failed to support its claims of business defamation with respect to the Bassett and Dealer Directory claims. Thus, these claims will be dismissed. As to the statement that Dale allegedly made to the Roods at the Detroit Auto Show, the Court notes that there is insufficient evidence of publication to support this claim. [FN19] Hence, this claim will also be dismissed.

*6 In summary, this action has been vigorously litigated for many years, but the dust has now settled, and it is clear that Blackhorse defrauded Jaguar by submitting fraudulent warranty claims. Hence, Jaguar was well within its contractual rights when it attempted to terminate Blackhorse. As noted earlier, the fact that Jaguar made some misrepresentations in conducting its audit investigation is irrelevant and does not preclude it from terminating its franchise agreement with Blackhorse. [FN20] Lastly, even though many of Blackhorse's counterclaims were skillfully crafted by able-bodied attorneys, this does not change the fact they lack factual support in the record and must be dismissed. [FN21] Accordingly,

IT IS ORDERED that the plaintiff's motion for partial summary judgment [Record No. 263] be, and the same hereby is, GRANTED.

FN1. Although Jaguar has much more evidence of Blackhorse's fraudulent activities, the statements of Cadwallader, Wyatt, and McLaughlin alone are enough to terminate Blackhorse's franchise. Whether Mr. Rood knew of his employees' fraudulent activities is irrelevant because it is clear that Blackhorse, via its management, was engaged in fraudulent activities.

FN2. Blackhorse's attack on the creditibility of its former employees is merely speculation. Blackhorse has produced no evidence that would contradict these former employees or show that these employees have committed perjury. In fact, the testimony from the employees is extremely credible because they acknowledge that their own conduct was improper. See *Robinson v. Cheney*, 876 F.2d 152, 162 (D.C.Cir.1989).

FN3. The parts journal revealed a pattern of fraudulent activities. Additionally, Jaguar's National Warranty Manager, Don Krumholz, provided an affidavit supplying documentary evidence of fraud. Although Blackhorse notes the affidavits of Spurlock and Langley, customers of Blackhorse, they certainly do not contradict the statements of Blackhorse's former employees.

FN4. The fact that Rood may not have directed the warranty fraud is irrelevant because the conduct of his managers is imputed to him. See *Frederick v. Collins*, 378 S.W.2d 617 (Ky.1964).

FN5. No business has to sit back and allow another business to cheat it. At the same time, Jaguar did not want to jump the gun and falsely accuse Blackhorse, Hence, Jaguar conducted a methodical investigation which yielded some of the overwhelming evidence before the Court today. The Court notes that Ginther's attacks on Jaguar's audit does not change the clear and undisputed testimony of Blackhorse's former employees.

FN6. The Court agrees with Jaguar that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 1711085 (E.D.Ky.)
(Cite as: 1999 WL 1711085 (E.D.Ky.))

Page 5

Blackhorse is attempting to use the good faith standard to carve out a procedural escape clause for perpetrators of fraud. Although Blackhorse's attempt is creative, it is also meritless. It should be pointed out that police often use deceptive tactics in order to investigate criminal activity. It would defy common sense for this Court to find that it is perfectly fine for the police to use deceptive tactics to help put people behind bars, but a business who suspects it is being cheated by one of its business partners has to be perfectly open and honest with the alleged perpetrator. This Court refuses to give Kentucky's good faith standard such a ludicrous interpretation.

FN7. In other words, Jaguar is free to terminate its franchise agreement with Blackhorse.

FN8. Blackhorse's counsel at that time was the late C., Gibson Downing.

FN9. The letter is clear and unambiguous. Blackhorse is attempting to make a factual issue where there is not one. Additionally, Mrs. Rood does not dispute that she reviewed Downing's July 5 letter before it was sent to First Security.

FN10. The pertinent testimony concerns a July 29 phone conversation between Williams and Mrs. Rood that occurred shortly after First Security had terminated Blackhorse's floor-plan financing. At that time, Williams allegedly advised Mrs. Rood that, in light of the loss of its floor-plan financing, Blackhorse did not have much of a choice but to go into Chapter 11. *See* Jaguar's Exhibit 17, p. 98-99. According to Mrs. Rood, Williams also advised her that Mr. Rood should give up the franchise before he filed Chapter 11 and that he could apply to be reappointed as a Jaguar dealer in the future. *Id.* at 99-100. Based on Mrs. Rood's testimony, Williams advised the Roods to do the opposite of the course they ultimately chose.

FN11. This was a detailed conversation, and the implications of the conversation were clear.

FN12. In other words, Williams advised the Roods to give up the franchise and ask the bank to release them from their personal debt in exchange for the deed on Palumbo Drive. Finally, on this point, the Court finds that there is no evidence of Jaguar's fraudulent intent or that Jaguar intended to induce Blackhorse to act upon any promise; as to this point, the Court adopts the reasoning laid out in Jaguar's motion and reply.

FN13. If a company is losing a million dollars a day, there is a pretty good chance that it might not be able to offer financial assistance to others. Additionally, because Blackhorse concedes that the claim surrounding the budgets for repair expenses should be dismissed, the Court will summarily dismiss it.

FN14. Blackhorse's contract claims based upon the auditing procedures are meritless. Jaguar had every right to conduct its audit as it saw fit so long as it was performed in good faith. There certainly was no set procedure it had to follow. It should also be noted that there is no evidence of an occasion where Jaguar refused to pay a goodwill claim that Blackhorse submitted. Even if such evidence was available, the dealer agreement imposes no obligation on Jaguar to pay goodwill claims on repairs of out-of-warranty vehicles.

FN15. It should also be noted that Blackhorse's claim that Jaguar violated the Dealership Agreement by threatening to file a RICO suit lacks merit.

FN16. The Court finds that Article 5.2 does not impose any duty on Jaguar not to grant more than one Jaguar Dealer Agreement to another authorized dealer. Even if, however, this provision conferred some right on Blackhorse, it has failed to produce any proof that Jaguar ever approved any such proposal by another dealer. Additionally, Blackhorse has failed to support its claim that Jaguar breached its duty to defend and indemnify Blackhorse pursuant to Articles 13.1 and 13.3(b). In other words, Blackhorse has failed to produce any documentary proof that it received or paid a legal bill for any of the cases in issue. Even if it could show that it had paid some legal fees, the language of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 1711085 (E.D.Ky.)
(Cite as: 1999 WL 1711085 (E.D.Ky.))

Article 13.3(b) precludes the claim because Jaguar agreed to defend and indemnify Blackhorse as to each of the suits.

FN17. The Court further finds that the parties' agreement does not give rise to any fiduciary duties on the part of Blackhorse. See *Lagrew v. Hooks-Superx, Inc., 905 F.Supp. 401, 405 (E.D.Ky.1995)* (holding that "implied covenants can only rise where there is no express provision on the subject in the Agreement").

FN18. The Court adopts Jaguar's arguments on this point as set out in its memorandum in support of its motion for partial summary judgment as well as its reply.

FN19. There is no evidence as to the pecuniary loss because of the alleged defamation. Once again, Jaguar has done a good job of setting out the defects of these claims in its briefs, and the Court will adopt Jaguar's arguments and reasoning on these claims.

FN20. Police departments everywhere use deception in investigating wrongdoing. There is certainly nothing in Kentucky law and/or the dealer agreement that would impose on Jaguar a more stringent standard in conducting its audit than what is appropriate for law enforcement; of course, law enforcement must also conduct its investigation in good faith.

FN21. In other words, many of Blackhorse's claims fail to meet one or more of the necessary elements and often do not have enough factual support for other elements in order to raise a genuine issue of material fact for the jury.

1999 WL 1711085 (E.D.Ky.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.