UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 04 11402 NMG |

## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

William N. Berkowitz
Sabita Singh
William F. Benson
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
617-951-8000


*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

SUMMARY OF UNDISPUTED FACTS ................................................................................2

    I.    Dealer Agreement Between Harley-Davidson and Cycle-Craft................................2

    II.   Non-Retail Sales Policy ...........................................................................................3

    III.  Submission of SWRs and Allocation of Motorcycles ..............................................4

    IV.  Harley-Davidson's Inspection of Cycle-Craft's Sales Records .................................6

    V.   Cycle-Craft's Submission of False SWRs .................................................................6

        A.   Cycle-Craft Submitted SWRs for Thirteen Sales That Were
             Never Made. ................................................................................................6

        B.   Cycle-Craft Falsely Reported an Additional Three Retail Sales
             That it Never Made .....................................................................................9

        C.   In Violation of the Dealer Agreement and NRSP, Cycle-Craft
             Sold Nineteen Motorcycles To a Wholesaler, DC Imports, and
             Falsely Reported Them as "Retail" Sales...................................................10

        D.   In Violation of the Dealer Agreement and NRSP, Cycle-Craft
             Sold Eight Motorcycles to Lee Custom Cycle ...........................................12

    VI.  Harley-Davidson's Inspection of Records and Notice of Termination ....................13

    VII. Harley-Davidson's Discovery of Additional False Sales By Cycle-Craft ..............13

ARGUMENT.........................................................................................................................15

    I.    On the Undisputed Facts, Harley-Davidson Has Good Cause to
        Terminate Cycle-Craft and Did Not Violate Chapter 93B. ....................................15

        A.   Cycle-Craft Materially Breached the Dealer Agreement By
             Selling Motorcycles to Non-Retail Customers...........................................17

        B.   Cycle-Craft Materially Breached the Dealer Agreement By
             Submitting False Sales Reports to Harley-Davidson ..................................18

        C.   Cycle-Craft's Material Violation of the Dealer Agreement
             Establishes Good Cause For Termination ...................................................19

        D.   Harley-Davidson's Decision To Terminate Was Not Made In
             Bad Faith or in an Arbitrary or Unconscionable Manner............................21

    II.   On the Undisputed Facts, Harley-Davidson Did Not Breach the Dealer
        Agreement .............................................................................................................22

        A.   Harley-Davidson's Notice of Termination Did Not Violate the
             Dealer Agreement.......................................................................................22

LITDOCS/609630.1

      B.   Because Cycle-Craft Materially Breached the Dealer Agreement, Harley-Davidson is Relieved From Performing under the Contract ..................................................................................................24

III.  On the Undisputed Facts, Harley-Davidson Did Not Breach the Covenant of Good Faith and Fair Dealing ..............................................................24

CONCLUSION ..................................................................................................................25

LITDOCS/609630.1

## TABLE OF AUTHORITIES

### FEDERAL CASES

*BeerMart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409 (7th Cir. 1986).............................................20

*Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.*, 992 F. Supp. 64 (D. Mass. 1998)...............17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................................15

*Coady Corp. v. Toyota Motor Distribution, Inc.*, 361 F.3d 50 (1st Cir. 2004) .............................21

*Custom Products Corp. v. Intermet Corp.*, 170 F. Supp. 2d 853 (E.D. Wis. 2001)................23, 24

*David Glen, Inc. v. Saab Cars USA, Inc.*, 837 F. Supp. 888 (N.D. Ill. 1993) ...............................19

*Dreilling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373 (10th Cir. 1988) ...........................19

*Foreign Motors, Inc. v. Audi of America, Inc.*, 755 F. Supp. 30 (D. Mass. 1991) ........................16

*General GMC, Inc. v. Volvo White Truck Corp.*, 1987 WL. 30965 (D. Mass. Nov. 19,
1987)...............................................................................................................................................16

*Goldman v. First National Bank*, 985 F.2d 1113 (1st Cir. 1993)..................................................15

*Home Valu, Inc. v. Pep Boys*, 213 F.3d 960 (7th Cir. 2000) .........................................................24

*Jaguar Cars v. Blackhorse Motorworks, Ltd.*, 1999 WL. 1711085 (E.D. Ky. 1999) ...................20

*Lafayette Beverage Distributors, Inc. v. Anheuser-Busch, Inc.*, 545 F. Supp. 1137
(N.D. Ind. 1982) .............................................................................................................................20

*Ormsby Motors, Inc. v. General Motors Corp.*, 842 F. Supp. 344 (N.D. Ill. 1994)................19-20

*Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.*, 976 F.2d 58
(1st Cir. 1992)................................................................................................................................21

*Smith v. Rainsoft Water Conditioning Co.*, 848 F. Supp. 1413 (E.D. Wis. 1994)........................24

*Sportfolio Publications, Inc. v. AT&T Corp.*, 320 F.3d 75 (1st Cir. 2003) ...................................23

*St. Joseph Equip. v. Massey-Ferguson, Inc.*, 546 F. Supp. 1245 (W.D. Wis. 1982).............23, 25

LITDOCS/609630.1

## STATE CASES

*Amoco Oil Co. v. Dickson*, 378 Mass. 44 (1979) .......................................................................... 16

*Case Credit Corp. v. Stephens & Michaels Associates, Inc.*, 2005 WL. 1154262
    (E.D. Wis. April 28, 2005) ................................................................................................. 22

*Craig Foster Ford, Inc. v. Iowa Department of Trans.*, 562 N.W.2d 618 (Iowa 1997).......... 16, 20

*Dooling v. Fire Commissioner of Malden*, 309 Mass. 156 (1941) ................................................. 14

*Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 177 N.W.2d 899 (1970)..................................... 24

*Hodas v. Morin*, 442 Mass. 544 (2004) ........................................................................................ 17

*Howe v. Fiduciary Trust*, 2001 WL. 497104 (Mass. Super. April 19, 2001) ................................. 22

*Lease-It, Inc. v. Massachusetts Port Authority*, 33 Mass. App. Ct. 391 (1992) ............................ 17

*Management Comp. Serv. v. Hawkins*, 206 Wis. 2d 158, 557 N.W.2d 67 (1996) .................. 17, 24

*Metropolitan Sewerage Commission v. R.W. Construction*, 72 Wis. 2d 365,
    241 N.W.2d 371 (1976) ..................................................................................................... 24

*State v. Deilke*, 274 Wis. 2d 595, 682 N.W.2d 945 ) (Wis.Sup.Ct. 2004) ..................................... 17

*Super Valu Stores v. D-Mart*, 146 Wis. 2d 568, 431 N.W.2d 721 (Wis.App. 1988) ............... 24-25

*Zussman v. Rent Control Board*, 367 Mass. 561 (1975) ................................................................ 16

LITDOCS/609630.1

Defendants, Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively, "Harley-Davidson"), submit this memorandum of law in support of their Motion for Summary Judgment.[1]

## INTRODUCTION

Each model year, Harley-Davidson allocates new motorcycles to its dealers based on the number of motorcycles sold by each dealer in the preceding model year. In recent years, the popularity of Harley-Davidson motorcycles has grown, and Harley-Davidson dealers have generally sought to maximize their factory allocation of new motorcycles by selling out of their allocation each model year. Accordingly, as the end of the 2003 model year approached (July 31, 2003), it was very important for plaintiff, Cycle-Craft Co., Inc. d/b/a Boston-Harley-Davidson Buell ("Cycle-Craft"), to sell its inventory to avoid having its allocation reduced for the 2004 model year.

However, instead of submitting true and accurate sales reports to Harley-Davidson for motorcycles that it had actually sold at retail to consumers and earn the allocation it truly deserved and to which it was entitled, the undisputed facts demonstrate that on numerous occasions at the end of the 2003 model year, Cycle-Craft, in violation of its Dealer Agreement, submitted false sales reports to Harley-Davidson for motorcycles that it (a) had never even sold to a customer and (b) had not sold to the ultimate consumer (as required by the Dealer Agreement) but instead sold to companies that intended to resell these motorcycles.

The question for the Court to answer is whether, as a mater of law under M.G.L. Chapter 93B, the submission of numerous false sales reports constitutes "good cause" for termination. As set forth below, the answer is yes.

---

[1] Harley-Davidson has filed herewith a Statement of Undisputed Facts ("Statement") pursuant to Local Rule 56.1 and an Appendix ("App."). Harley-Davidson has summarized those facts herein where appropriate without repeating them in their entirety. The abbreviations set forth herein shall have the same meaning as provided in the Statement.

- 1 -

## SUMMARY OF UNDISPUTED FACTS

### I.    DEALER AGREEMENT BETWEEN HARLEY-DAVIDSON AND CYCLE-CRAFT

Harley-Davidson, including its affiliate, Buell Distribution Corporation (collectively hereinafter, "Harley-Davidson"), manufactures and distributes Harley-Davidson motorcycles, parts and accessories to retail customers through a network of independent dealers located throughout the United States. Statement, ¶2. The relationship between Harley-Davidson and its independent dealers is governed by the terms of the Harley-Davidson Motor Company Motorcycle Dealer Contract entered into by the respective parties. *Id.,* ¶4. As discussed below, under the terms of this contract, a dealer becomes authorized to purchase new Harley-Davidson motorcycles and to resell them to retail (i.e., end-user) customers; however, sales to persons other than retail customers (e.g., wholesalers, brokers, unauthorized bike shops) are expressly prohibited. *Id.*

On or about September 19, 2000, Harley-Davidson entered into a Dealer Agreement with Cycle Craft, which was extended in June 2002. Statement, ¶5; App. Tab A. The relevant provisions of the Dealer Agreement include the following:

- Section A: Purposes and Objectives of the Contract
  Cycle-Craft represented to Harley-Davidson that it would "Tell the Truth."

- Section B(6): Non-Retail Sales
  "Dealer [Cycle-Craft] shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers. Seller [Harley-Davidson] reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract."

- Section F(7): Sales and Warranty Registration Form
  "Dealer [Cycle-Craft] shall complete and return to Seller [Harley-Davidson] a sales and warranty registration form for every new Harley-Davidson Motorcycle sold by Dealer. Dealer must submit such form to Seller within ten (10) days of the delivery of such Harley-Davidson Motorcycle to its customer to comply with the provisions of the National Traffic and Motor Vehicle Safety Act, Public Law 89-563, as amended,

> and to qualify the Harley-Davidson Motorcycle for coverage under Seller's customer warranty."

- Section M(4)(b): Termination by Seller

  > Harley-Davidson may terminate the Dealer Agreement if a dealer submits "any application, claim, report, record or other information which is fraudulent or contains material misrepresentations."

- Section M(6)(f): Termination by Seller

  > Harley-Davidson may terminate the Dealer Agreement if a dealer breaches, violates or fails to fulfill any of its responsibilities under the contract.

- Section M(4): Termination of Buell Dealer Agreement

  > "If Dealer has entered into a dealer agreement with Buell Distribution Corporation ("Buell Agreement"), Dealer hereby agrees that the Buell Agreement shall, at the option of Buell Distribution Corporation, terminate automatically and without further notice upon termination of this Contract for any reason."

- Section P(6): Acknowledgements

  > "Dealer [Cycle-Craft] acknowledges that each of its responsibilities under this Contract is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill any of them would constitute a material breach.   Dealer also acknowledges that any such failure, occurrence, event or default would constitute a reasonable, fair, good, due and just cause and provocation for termination or non-renewal of this Contract by Seller [Harley-Davidson]."

Statement ¶¶5, 7-9, App. Tab A.

## II.   NON-RETAIL SALES POLICY

Pursuant to the Dealer Agreement, for every year since the early 1990s, Harley-Davidson has issued annual policies describing its Non-Retail Sales Policy ("NRSP"). Statement, ¶10. For the 2003 Model Year (August 1, 2002 to July 31, 2003), Harley-Davidson issued a Motorcycle Non-Retail Sales Policy ("2003 NRSP"). *Id.,* ¶11, App. Tab E. As set forth in the 2003 NRSP, the policy is designed to "ensure customer satisfaction and safety, facilitate compliance with federal and state law and laws in various foreign countries, maintain Harley-Davidson's competitive position and protect the integrity of Harley-Davidson's worldwide distribution

- 3 -

network." *Id.,* ¶12. Among other things, by prohibiting Harley-Davidson dealers from selling motorcycles to resellers and by requiring dealers to submit the names and addresses for the retail customers to whom they sell motorcycles, Harley-Davidson can better (i) assure that consumers are receiving proper guidance, instructions and orientation with respect to the safe operation of our motorcycles; (ii) allocate and distribute our products to those geographic areas and dealers where they are most needed, and (iii) notify customers in case of a safety recall. *Id.*

The 2003 NRSP states that "[a]s provided in the Dealer Contract, dealers are prohibited from engaging in non-retail sales of motorcycles." *Id.,* ¶13, App. Tab E. Further, "[a] sale by a U.S. dealer of a new or previously unregistered motorcycle will be considered a 'non-retail sale' for purposes of the Dealer Contract and this policy if the motorcycle is not properly set up, inspected, tested, sold and delivered at the dealership facility, directly to the ultimate consumer. An 'ultimate consumer' is the retail end user who purchases, as indicated on the Certificate of Origin, a new or previously unregistered motorcycle for his or her own use, without the intent to resell, pays all applicable taxes and registration fees, and titles the vehicle in his or her own name." *Id.*

It is undisputed that since the early 1990s, Cycle Craft was aware that Harley-Davidson had policies prohibiting dealers from selling motorcycles to persons intending to resell them, and was aware that it was only supposed to sell motorcycles to ultimate consumers. Statement, ¶14. As set forth in the 2003 NRSP, Harley-Davidson reserved the right to terminate a dealer's Motorcycle Dealer Contract for failing to comply with this policy. *Id.,* ¶15, App., Tab E.

### III.   SUBMISSION OF SWRS AND ALLOCATION OF MOTORCYCLES

To inform Harley-Davidson that a new motorcycle has been sold, Cycle-Craft submits an electronic Sales & Warranty Registration ("SWR") form to Harley-Davidson. Statement, ¶16. As noted above, the Dealer Agreement requires such a submission by a dealer to Harley-Davidson for each motorcycle sold by Cycle-Craft. Dealer Agreement, Section F(7). The SWR provides Harley-Davidson with the Vehicle Identification Number for the motorcycle sold, the

name of the customer, the customer's address and telephone number, a certification that the Harley-Davidson dealer that sold the motorcycle had delivered the motorcycle to the customer, that the customer was a retail customer, and that the warranty had been explained to the customer. Statement, ¶16. Harley-Davidson requires that its dealers submit SWRs electronically within ten days of delivery to the customer to enable Harley-Davidson to comply with federal law and to ensure that the motorcycle is qualified for warranty coverage. *Id.* After the SWR is submitted to Harley-Davidson, the warranty period for that motorcycle starts for the customer who purchased the motorcycle. *Id.,* ¶17. Cycle-Craft submits an SWR to Harley-Davidson only after the motorcycle is sold and delivered to the retail customer. *Id.* Harley-Davidson's allocation of motorcycles to dealers for a given model year is determined in substantial part by the dealers' reported retail sales for the preceding model year. *Id.*

Harley-Davidson's allocation of motorcycles to dealers for a given model year is based substantially upon the dealers' reported retail sales for the preceding model year. Statement, ¶18. The model year ends on July 31 of each year. *Id.* Any dealer inventory not sold by July 31 is deducted from the dealership's allocation in the following year. *Id.* In recent years, including 2003 and 2004, the popularity of Harley-Davidson motorcycles has grown, and Harley-Davidson dealers have generally sought to maximize their factory allocation of new motorcycles by selling out their allocation each model year. *Id.,* ¶19. In addition, as is common in the motor vehicle industry, Harley-Davidson routinely administers dealer incentive programs which offer dealers cash payments based upon their reported retail sales. *Id.* However, as described above, sales must only be made to bona-fide retail consumers, as set forth in our dealer agreement and NRSP. *Id.*

A reduction in allocation for Cycle-Craft would result in a reduction in sales and a reduction in profits for the dealership; therefore, it was very important to Cycle-Craft to avoid having its allocation reduced. *Id.,* ¶20. As of July 2003, Cycle-Craft had not sold all of its allocated bikes and there was a risk that its 2004 allocation would by reduced by Harley-Davidson. *Id.,* ¶21.

- 5 -

## IV.    HARLEY-DAVIDSON'S INSPECTION OF CYCLE-CRAFT'S SALES RECORDS

On August 9, 2003, Harley-Davidson received an email from a dealer alerting it to certain new Harley-Davidson motorcycles being sold by an unauthorized store (i.e., a non-Harley-Davidson dealer). Statement, ¶22. By tracing the Vehicle Identification Number ("VIN") for one of those vehicles, Harley-Davidson determined that the new motorcycle had been originally sold by Harley-Davidson to Cycle-Craft. *Id.* Based on this fact, and the fact that Cycle-Craft had reported a large number of retail sales at the very end of the 2003 Model Year, i.e., close to July 31, 2003, Harley-Davidson decided to exercise its contractual right to conduct an on-site inspection of certain of Cycle-Craft's sales records to determine whether the dealership was in compliance with the Dealer Agreement and the 2003. *Id.*

On February 17 and 18, 2004, Harley-Davidson conducted an inspection of certain of Cycle-Craft's sales records. Statement, ¶23. During this inspection, Harley-Davidson reviewed the SWRs and supporting documents for the new motorcycles that Cycle-Craft had reported as being sold during the 2002, 2003, and year-to-date 2004 model years. *Id.*

## V.    CYCLE-CRAFT'S SUBMISSION OF FALSE SWRS

### A.    Cycle-Craft Submitted SWRs for Thirteen Sales That Were Never Made.

On the last day of the 2003 Model Year, July 31, 2003, Cycle-Craft submitted SWRs to Harley-Davidson for thirteen individuals indicating that retail sales had been made to them by Cycle-Craft. Statement, ¶24. However, none of these thirteen individuals actually purchased the motorcycles from Cycle-Craft. *Id.; see* Declaration of Ronald Buchbaum, ¶7 (App. Tab G), filed June 21, 2004 ("none of these 13 prospective employee/employee-relative buyers carried through with their purchases"); Declaration of Kenneth McPhee, ¶20 (App. Tab H), filed June 21, 2004 (identical sworn statement as Mr. Buchbaum). These thirteen motorcycles were eventually sold to other individuals after the close of the model year — i.e., after July 31, 2003. Statement, ¶25; McPhee Decl, ¶20 (App. Tab H) ("[e]ach motorcycle was thereafter in fact sold to individual

LITDOCS/609630.1

purchasers") (emphasis added).[2]

Specifically:

1.  Cycle-Craft reported that a motorcycle with a Vehicle Information Number ("VIN") of 1HD1FSW143Y638979 was sold to Jarred Buchbaum. However, this motorcycle was, in fact, never sold by Cycle-Craft to Jarred Buchbaum, the son of Ronald Buchbaum, Cycle-Craft's general manager. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Edwin Velasquez. Statement, ¶¶26-28.

2.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1BWB183Y107390 was sold to Cycle-Craft Sales Manager Michael Bloom. However, this motorcycle was, in fact, never sold by Cycle-Craft to Michael Bloom.[3] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Joann Stanwood. Statement, ¶¶29-31.

3.  Cycle-Craft reported that a motorcycle with a VIN of 1HDBYB493Y097183 was sold to Roderick Granese. However, this motorcycle was, in fact, never sold by Cycle-Craft to Roderick Granese. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Jason Blodgett. Statement, ¶¶32-34.

4.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1BSY123Y105487 was sold to Salvatore Giordano, a relative of Cycle-Craft employee Joe Giordano. However, this motorcycle was, in fact, never sold by Cycle-Craft to Salvatore Giordano. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Michael Botelho. Statement, ¶¶35-37.

5.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ113K842917 was sold to Lissa Bloom, daughter of Michael Bloom (Cycle-Craft Sales Manager). However, this motorcycle was, in fact, never sold by Cycle-Craft to

---

[2] Ronald Buchbaum testified as follows:

Q:  The dealership submitted SWRs for these bikes according to Harley-Davidson records?
A:  They did.
Q:  And that was done on July 31?
A:  That's correct.
Q:  Of 2003?
A:  Correct.
Q:  And then after that, the bikes were sold to other individuals?
A:  Other individuals, correct . . . (Buchbaum Dep., pp. 212-213; App. Tab F).

[3] Michael Bloom testified as follows:

Q:  Did you purchase a new motorcycle from Cycle-Craft in July of '03?
A:  No, I did not (Bloom Dep., p. 16) (App. Tab I).

Lissa Bloom.[4] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Jorge Orellana. Statement, ¶¶38-40.

6.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1BMY473Y085436 was sold to Matthew Bloom, son of Michael Bloom (Cycle-Craft Sales Manager). However, this motorcycle was, in fact, never sold by Cycle-Craft to Matthew Bloom.[5] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Mark Connelly. Statement, ¶¶41-43.

7.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1BJY183Y052286 was sold to Cycle-Craft employee Joseph Giordano. However, this motorcycle was, in fact, never sold by Cycle-Craft to Joseph Giordano. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Deborah Colleran. Statement, ¶¶44-46.

8.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ133K839405 was sold to Cycle-Craft's former Sales Manager Sean Walsh. However, this motorcycle was, in fact, never sold by Cycle-Craft to Sean Walsh.[6] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Paul Kalinoski. Statement, ¶¶47-49.

9.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1FFW103Y638193 was sold to Cycle-Craft General Manager Ronald Buchbaum. However, this motorcycle was, in fact, never sold by Cycle-Craft to Ronald Buchbaum. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Tindle. Statement, ¶¶50-52.

---

[4] Michael Bloom testified as follows:
  Q:  Did Lissa, your daughter, purchase a new motorcycle from Cycle-Craft in July of '03?
  A:  No, she did not. (Bloom Dep., p. 15) (App. Tab I).

[5] Michael Bloom testified as follows:
  Q:  Did your son Matt purchase a new motorcycle from Cycle-Craft in July of '03?
  A:  No, he did not. (Bloom Dep., pp. 15-16) (App. Tab I).

[6] Mr. Walsh testified as follows:
  Q:  From your testimony I understand you did not buy this bike? Is that correct?
  A:  No, I did not.
  Q:  Did you have any contract or agreement to buy that bike?
  A:  No, I did not.
  Q:  Did you ever sign a purchase order for that motorcycle from Cycle-Craft in or around July of 2003?
  A:  No, I did not.
  Q:  Did you ever put down a deposit for that motorcycle in 2003?
  A:  No.
  Q:  Did you ever fill out any forms or paperwork related to that motorcycle in 2003?
  A:  No.
  Q:  Did you have any intent to buy that motorcycle or a similar motorcycle at the end of the model year 2003?
  A:  No. (Walsh Dep., pp. 22-23) (App. Tab J).

LITDOCS/609630.1

10.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1BHY143Y099680 was sold to John Sica, a friend of Cycle-Craft employee Jamie McGrath. However, this motorcycle was, in fact, never sold by Cycle-Craft to John Sica. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Richards. Statement, ¶¶53-55.

11.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1GDV443K314331 was sold to Daniel Sica. However, this motorcycle was, in fact, never sold by Cycle-Craft to Daniel Sica. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Stephen Kenney. Statement, ¶¶56-58.

12.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ403K842594 was sold to Cycle-Craft employee Jamie McGrath. However, this motorcycle was, in fact, never sold by Cycle-Craft to Jamie McGrath.[7] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Vincent Fiamma. Statement, ¶¶59-61.

13.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ133K848962 was sold to Elaine Bloom, wife of Michael Bloom (Cycle-Craft Sales Manager). However, this motorcycle was, in fact, never sold by Cycle-Craft to Elaine Bloom.[8] It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Thomas Mulvey. Statement, ¶¶62-64.

Cycle-Craft's false submission of SWRs for thirteen individuals to whom Cycle-Craft actually never sold a motorcycle materially violated the Dealer Agreement. Statement, ¶65. By submitting falsified SWRs to Harley-Davidson on July 31, 2003 for thirteen individuals that did not purchase the motorcycles, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

**B.    Cycle-Craft Falsely Reported an Additional Three Retail Sales That it Never Made**

On July 31, 2003, Cycle-Craft also submitted three SWRs to Harley-Davidson indicating that it had sold three motorcycles (VINs 1HD1FCW463Y630589, 1HD1PAC25YY951664, and 1HD1CGP413K431340) at retail, when, in fact, these motorcycle were never sold by Cycle-

---

[7] Jamie McGrath testified as follows:
    Q:  In any event, you didn't buy this motorcycle, correct?
    A:  Correct, yes. (McGrath Dep., p. 45) (App. Tab K)

[8] Michael Bloom testified as follows:
    Q:  Did Elaine, your wife, purchase a new motorcycle from Cycle-Craft in July of '03?
    A:  No, she did not. (Bloom Dep., p. 15) (App. Tab I).

- 9 -

Craft to anyone. Statement, ¶¶66-68. Indeed, these motorcycle are still owned by Cycle-Craft and have never been sold to any retail customer. *Id.*[9]

Cycle-Craft's submission of false SWRs for three motorcycles that it never actually sold to a retail customer materially violated the Dealer Agreement. Statement, ¶69. By submitting SWRs to Harley-Davidson on July 31, 2003 for these three motorcycles which it never sold, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

### C.    In Violation of the Dealer Agreement and NRSP, Cycle-Craft Sold Nineteen Motorcycles To a Wholesaler, DC Imports, and Falsely Reported Them as "Retail" Sales

In July 2003, Sean Walsh, a sales manager at Cycle-Craft, had conversations with Michael Stevens and Debra Lunsford of DC Imports, a motorcycle wholesaler, concerning DC Imports' interest in purchasing 19 motorcycles from Cycle-Craft. Statement, ¶71. Mr. Walsh was authorized by Mr. Buchbaum to make a deal with DC Imports for these nineteen motorcycles. *Id.,* ¶72.[10] Specifically, after an initial conversation with Mr. Stevens, Mr. Walsh received a fax from DC Imports indicating the 19 motorcycles that DC Imports wanted to purchase from Cycle-Craft. *Id.* ¶73. Thereafter, Ms. Lunsford advised Mr. Walsh that DC

---

[9] Mr. Atwood testified as follows:

    Q:  And these motorcycles are still owned by Cycle-Craft today?
    A:  Yes.
    Q:  They've never been sold by Cycle-Craft to anyone?
    A:  No.
    Q:  Including you?  Cycle-Craft did not sell them to you?
    A:  Not that I'm aware of.
    Q:  And Cycle-Craft obtained ownership of these three motorcycles by purchasing them from Harley-Davidson; is that correct?
    A:  Yes. (Atwood Dep., pp. 95-96) (App. Tab B).

[10] Mr. Buchbaum testified as follows:

    Q:  All right. And did you leave it to Mr. Walsh to handle whatever negotiations needed to be handled with the gentlemen from Florida? (Objection)
    A:  As the person doing the deal, it would be his responsibility.
    Q:  All right. And was that within his authority to do that without your being directly involved? (Objection)
    A:  Yes. And keep me up to date on what's going on.

- 10 -

Imports planned to resell the 19 motorcycles to another dealer, from whom it had already received a deposit. *Id.*, ¶74. Cycle-Craft's General Manager, Ron Buchbaum, approved the sale to DC Imports "so long as he [Mr. Walsh] got individual names for the bikes being sold." *Id.* ¶75. This was despite the fact that Mr. Buchbaum "always knew . . . Harley did not want you reselling these motorcycles to people that were going [to] resell them." *Id.* Mr. Walsh informed Ms. Lunsford that the deal between Cycle-Craft and DC Imports had to be listed in 19 individual names. *Id.*

DC Imports purchased 19 motorcycles from Cycle-Craft. Statement, ¶76. Ms. Lunsford took 19 names of DC Imports employees, as well as friends and relatives of employees to insert into deal documentation to make it appear as if those individuals were the actual buyers. *Id.*, ¶77. All of the money to purchase the 19 motorcycles came from DC Imports. *Id,* ¶76.[11/] Sean Walsh, on behalf of Cycle-Craft, knew that DC Imports, and not the named individuals, would be providing the money for the 19 motorcycles. *Id.* The 19 motorcycles were, in fact, not sold to retail customers at the Cycle-Craft dealership as required by the Dealer Agreement and the NRSP. *Id.*, ¶78. Instead, DC Imports contracted with a carrier to pick up the motorcycles at Cycle-Craft and deliver them back to DC Imports in Florida. *Id.*, ¶79. The 19 motorcycles were loaded onto a truck at the Cycle-Craft dealership. *Id.*, ¶80.

Cycle-Craft had DC Imports complete SWRs and return them to Cycle-Craft. Statement, ¶81. On or about July 30, 2003, Cycle-Craft then submitted the SWRs electronically to Harley-Davidson designating these sales as "retail." *Id.* In August 2003, the Florida Highway Patrol

---

[11/] Ms. Lunsford testified as follows:

> Q: Did any of the 19 people that are identified as these fictitious customers, did they provide any money to DCI for any of these bikes?
>
> A: No, they did not. This was all DC International's money.
>
> . . .
>
> Q: In fact, DCI purchased all of the 19 motorcycles, is that correct?
>
> A: Yes, we did.
>
> Q: And Boston Harley-Davidson was aware of that, is that correct?
>
> A: Boston Harley-Davidson instructed us to do it that way.
> (Lunsford Dep., pp. 51, 114) (App. Tab M).

- 11 -

("FHP") investigated the titling of these 19 motorcycles. *Id.,* ¶83. The FHP concluded that "[t]he records reflect that DC Imports applied for title in the name of 19 individuals who are friends and family of Mrs. Cooke [DC Imports principal] to make the purchases look like individual retail sales. This was done to circumvent Harley-Davidson policy prohibiting dealer to dealer sales." *Id.,* ¶84 (emphasis added).

Cycle-Craft's sale of nineteen motorcycles to a wholesaler intending to resell them was a material violation of the parties' Dealer Agreement, Section B(6). Statement, ¶82. Its false reporting of the sales as "retail" in the SWR submissions to Harley-Davidson was also a material violation of the Dealer Agreement, Section F(7); Statement, ¶82. By submitting SWRs to Harley-Davidson for these nineteen motorcycles that were not sold by Cycle-Craft to a retail buyer, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

### D.  In Violation of the Dealer Agreement and NRSP, Cycle-Craft Sold Eight Motorcycles to Lee Custom Cycle

At or about the end of the 2003 model year, Cycle-Craft sold eight new motorcycles to a Lee, New Hampshire motorcycle store called Lee Custom Cycle ("Lee"). Statement, ¶86.[12/] As part of its ordinary business, Lee purchases motorcycles on the open market and resells them to retail customers. *Id.,* ¶85. For some time, Lee had been a regular customer of Cycle-Craft for the purchase of used motorcycles. *Id.*

Prior to consummating the sale to Lee, Cycle-Craft salesperson Jason Marasca advised Lee's owner, Jeff Christensen, that in order to sell new motorcycles to Lee Custom Cycle, he (Christensen) needed to provide eight individual names to be inserted into Cycle-Craft's paperwork as (fictitious) customers. Statement, ¶87. Christensen gave Marasca names of Lee employees and his friends to plug into the Cycle-Craft paperwork as fictitious purchasers. *Id.*

---

[12/] Jason Marasca, Cycle-Craft salesperson, testified as follows:

    Q:  During 2003 did Lee Custom Cycle purchase eight new Harley-Davidson motorcycles from Cycle-Craft?

    A:  Yes. (Marasca Dep., p. 11) (App. Tab Q).

Marasca was aware that the eight motorcycles were being purchased by Lee for resale to its customers. *Id.* All of the funds to purchase these motorcycles came from Lee's bank accounts. *Id.*, ¶86. The eight motorcycles were delivered to Lee and were sold by Lee in the ordinary course of its business to its own retail customers. *Id.*[13/]

Cycle-Craft submitted SWRs to Harley-Davidson falsely indicating that these eight motorcycles were "retail" sales made to eight individual retail customers. *Id.*, ¶88. By submitting SWRs to Harley-Davidson for these eight motorcycles that were not sold by Cycle-Craft to a retail buyer, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation of 2004 Model Year motorcycles to which it was not entitled. *Id.*, ¶89.

## VI.    HARLEY-DAVIDSON'S INSPECTION OF RECORDS AND NOTICE OF TERMINATION

On April 20, 2004, Harley-Davidson sent a letter to Cycle-Craft informing them of the results of its February 2004 inspection, including the non-retail sales described above. Statement, ¶90. Based on this inspection, Harley-Davidson simultaneously issued a Notice of Termination to Cycle-Craft based on Cycle-Craft's submission of false sales information to Harley-Davidson. *Id.*, ¶91.

## VII.   HARLEY-DAVIDSON'S DISCOVERY OF ADDITIONAL FALSE SALES BY CYCLE-CRAFT

During the course of this litigation, Cycle-Craft produced a two-page document entitled "July 2003 SWRs." Statement, ¶92 and Verduyn Aff., Ex. 39. This document listed the 13 units listed in Section V(A) above, and the three units referenced in V(B) above, and indicated both

---

[13/] Jeff Christensen testified as follows:

> Q:  Okay.  So all the motorcycles which are set forth on Exhibit 3, those are motorcycles that were purchased by Lee Custom Cycle?
>
> A:  Correct.
>
> Q:  And they were brought to your dealership in Lee, New Hampshire?
>
> A:  Correct.
>
> Q:  And all eight motorcycles were then sold by Lee Custom Cycle?
>
> A:  Right.
>
> Q:  And they were sold to other individuals, correct?
>
> A:  Correct.  (Christensen Dep., pp. 57-58) (App. Tab P).

- 13 -

the fictitious and actual purchasers. *Id.* In addition, a number of other units were listed. From this document and its own records, Harley-Davidson discovered that Cycle-Craft, on July 31, 2003 (the last day of the 2003 Model Year) had submitted seven additional SWRs to Harley-Davidson for seven individuals indicating that retail sales had been made to them by Cycle-Craft. *Id.* However, none of these seven individuals actually purchased the motorcycles from Cycle-Craft. *Id.* These seven motorcycles were eventually sold to other individuals after the close of the model year — i.e., after July 31, 2003. *Id.*.

Specifically:

1.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1BMY153Y105320 was sold to Robert Misiano. However, this motorcycle was, in fact, never sold by Cycle-Craft to Robert Misiano. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer David Hamner. Statement, ¶¶93-95.

2.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1GHV193K310865 was sold to James Jouve. However, this motorcycle was, in fact, never sold by Cycle-Craft to James Jouve. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Duff. Statement, ¶¶96-98.

3.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1GEV183K318650 was sold to Robin Misiano. However, this motorcycle was, in fact, never sold by Cycle-Craft to Robin Misiano. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Romig. Statement, ¶¶99-101.

4.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1GEV193K330502 was sold to Marisa Olivo. However, this motorcycle was, in fact, never sold by Cycle-Craft to Marisa Olivo. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Louis Nardone. Statement, ¶¶102-104.

5.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1BTY1X3Y091568 was sold to Howard Cook. However, this motorcycle was, in fact, never sold by Cycle-Craft to Howard Cook. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Scott Desalvo. Statement, ¶¶105-107.

6.  Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ423K849398 was sold to Andre Silva. However, this motorcycle was, in fact, never sold by Cycle-Craft to Andre Silva. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Theodore Shomos. Statement, ¶¶108-110.

LITDOCS/609630.1

7.    Cycle-Craft reported that a motorcycle with a VIN of 1HD1HAZ183K843207 was sold to Sheila Firth. However, this motorcycle was, in fact, never sold by Cycle-Craft to Sheila Firth. It was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer John Holbrook. Statement, ¶¶111-113.

Cycle-Craft's submission of SWRs for seven individuals to whom Cycle-Craft actually never sold a motorcycle violated both the NRSP and the Dealer Agreement. Statement, ¶114. By submitting SWRs to Harley-Davidson on July 31, 2003 for seven individuals that did not purchase the motorcycles, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

## ARGUMENT

Summary judgment should be granted under Fed. R. Civ. P. 56 if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Goldman v. First Nat'l Bank,* 985 F.2d 1113, 1116 (1st Cir. 1993). Summary judgment is properly regarded "as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action . . . '" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) *quoting* Fed. R. Civ. P. 1. In this case, Harley-Davidson is entitled to summary judgment because, as discussed below, (1) plaintiff's multiple, material violations of the parties' Dealer Agreement gave Harley-Davidson "good cause" for termination of the Agreement as a matter of law under M.G.L. c.93B; (2) plaintiff has proffered no evidence from which a fact-finder could lawfully infer any bad faith, arbitrary or unconscionable conduct otherwise violative of c.93B; and (3) by exercising its contractual right of termination, Harley-Davidson has not breached the parties' Agreement.

## I.    ON THE UNDISPUTED FACTS, HARLEY-DAVIDSON HAS GOOD CAUSE TO TERMINATE CYCLE-CRAFT AND DID NOT VIOLATE CHAPTER 93B.

Mass. G. L. c. 93B, §5(a) provides that "[i]t shall be a violation of subsection (a) of Section 3 for a manufacturer, distributor or franchisor representative without good cause, in bad faith or in an arbitrary or unconscionable manner: (1) to terminate the franchise agreement of a

- 15 -

motor vehicle dealer; (2) to fail or refuse to extend or renew the franchise agreement of a motor vehicle dealer upon the expiration; [or] (3) to offer a renewal, replacement or succeeding franchise agreement . . ." (emphasis added).  Although "good cause" is not defined under the statute, Section 5(h) states, "Good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship . . ."   Here, the dealer's repeated violation of Harley-Davidson's contractual prohibition on non-retail sales, together with its false reporting of sales, gave Harley-Davidson good cause for termination as a matter of law. *See Foreign Motors, Inc. v. Audi of America, Inc.,* 755 F. Supp. 30, 34 (D. Mass. 1991) (defining "good cause" to mean "good faith business judgment," and stating, "Massachusetts courts, grappling with the somewhat analogous concepts of 'due cause' and 'just cause,' have taken into account both the business judgment of the decisionmaker and the economic realities confronting the business"), *citing Amoco Oil Co. v. Dickson,* 378 Mass. 44, 50 (1979); *Zussman v. Rent Control Bd.,* 367 Mass. 561, 566-67 (1975); *Dooling v. Fire Comm'r of Malden,* 309 Mass. 156, 162 (1941). *See also General GMC, Inc. v. Volvo White Truck Corp.,* 1987 WL 30965 at *3 (D. Mass. Nov. 19, 1987) ("Clearly, legitimate business reasons satisfy the requirement of good cause.").[14]

---

[14] Pursuant to M.GL. c. 93B, §5(h), if the Court determines that, as a matter of law, there was a material breach of the Dealer Agreement, the Court need not perform an analysis of the factors a court may consider in M.G.L. 93B, §5(j) to determine whether good cause exists. *See, e.g., Craig Foster Ford, Inc. v. Iowa Dept. of Transportation,* 562 N.W.2d 618, 623 (Iowa 1997) ("positive factors — such as increased sales — cannot outweigh findings of pervasive fraud in a dealership's service department") *citing Chesapeake Ford, Inc. v. Ohio Motor Vehicle Dealers Bd.,* 103 Ohio App.3d 515, 660 N.E.2d 481, 485 (Ohio App. 1995).

- 16 -

A.    **Cycle-Craft Materially Breached the Dealer Agreement By Selling Motorcycles to Non-Retail Customers** [15/]

The Dealer Agreement provides, among other things, that "Dealer [Cycle-Craft] shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers." Dealer Agreement, Section B(6). Further, Harley-Davidson's NRSP makes clear that all dealers are prohibited from making sales except where the motorcycle is "properly set up, inspected, tested, sold and delivered at the dealership facility, directly to the ultimate consumer." 2003 NRSP.

Here, based on the undisputed facts, Harley-Davidson sold 19 motorcycles to DC Imports, a wholesaler that intended to resell these motorcycles to and so indicated to Cycle-Craft. It is also undisputed that Cycle-Craft sold 8 motorcycles to Lee, a New Hampshire cycle shop that was well known to Cycle-Craft (Marasca Dep., p. 11; Christensen Dep., p. 57) and that Lee resold them to its customers (Christensen Dep., p. 58). Because Cycle-Craft sold 19 motorcycles to DC Imports (a reseller) and 8 motorcycles to Lee Custom Cycle (a reseller), it materially breached Section B(6) of the Dealer Agreement and the 2003 NRSP. Indeed, Cycle-Craft acknowledged that "each of its responsibilities under this Contract [including Section B(6)] is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill

---

[15/] Under Wisconsin law, a "material breach can be one that deprives the non-breaching party of a benefit that party reasonably expected." *State v. Deilke,* 274 Wis.2d 595, 682 N.W.2d 945, n.9) (Wis.Sup.Ct. 2004); *citing Management Comp. Serv. v. Hawkins,* 206 Wis.2d 158, 186, 557 N.W.2d 67 (1996). Here, the parties agreed that the Dealer Agreement is "to be executed as a Wisconsin agreement and to be construed in accordance with the laws of the State of Wisconsin." Dealer Agreement, Section 10. It is well established that "[w]here the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." *Hodas v. Morin,* 442 Mass. 544, 549 (2004) *quoting Steranko v. Inforex, Inc.,* 5 Mass.App.Ct. 253, 260 (1977). *See also Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.,* 992 F. Supp. 64, 72 (D. Mass. 1998) ("Court's construction of any contract between the parties will be governed by the choice-of-law provision in the dealership agreement that designated Michigan law . . . As Chrysler has its principal place of business in Michigan, the Court honors this designation."). Similarly, here, because Harley-Davidson has a principal place of business in Wisconsin, the Court should honor the parties' designation of Wisconsin law. Under Massachusetts law, "[a] material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract.'" *Lease-It, Inc. v. Massachusetts Port Authority,* 33 Mass.App.Ct. 391, 396 (1992) *quoting Bucholz v. Green Bros. Co.,* 272 Mass. 49, 52 (1930).

- 17 -

any of them would constitute a material breach." Dealer Agreement, Section P(6).[16] (Emphasis added.)

**B.    Cycle-Craft Materially Breached the Dealer Agreement By Submitting False Sales Reports to Harley-Davidson**

It is undisputed that, on July 31, 2003 (the last day of the model year), in an effort to avoid reduction in allocation for the 2004 model year, Cycle-Craft submitted fifty false sales reports for motorcycles that it never sold to retail customers. Specifically, as set forth above, Cycle-Craft submitted: twenty (20) SWRs to Harley-Davidson for motorcycles that were in fact not sold by Cycle-Craft to the customers identified on the SWRs or on the date listed (July 31, 2003) (*See* Sections V(A) and VII, above); three (3) SWRs to Harley-Davidson for motorcycles that were never even sold to any customer (Section V(B) above); nineteen (19) SWRs that falsely reported retail sales to individuals when in fact the subject units were sold to DC Imports (Section V(C), above); and eight (8) SWRs that falsely reported retail sales to individuals when in fact the subject units were sold to Lee (Section V(D), above).

Such submission of false sales reports is a material violation of the Dealer Agreement. Indeed, the first value identified by the parties as the purpose and objective of the contract was to "Tell the Truth." Dealer Agreement, Section A. Thus, it was expected by Harley-Davidson (and agreed-to by Cycle-Craft) that Cycle-Craft would be honest and truthful with Harley-Davidson. Further, Cycle-Craft agreed that it "shall complete and return to [Harley-Davidson] a sales and warranty registration form for every new Harley-Davidson Motorcycle sold by Dealer." Dealer Agreement, Section F(7) (emphasis added). The Dealer Agreement also provides that Harley-Davidson may terminate a dealer if it submits "any application, claim, report, record or other

---

[16] Cycle-Craft had a contractual obligation not to sell motorcycles to entities or individuals that would resell the motorcycles. To show a material breach of the Dealer Agreement, Harley-Davidson need only demonstrate that the entity to whom Cycle-Craft had sold the motorcycles resold them to other individuals. On the undisputed facts, Harley-Davidson has made that showing. Further, even though it is undisputed that Cycle-Craft employees knew that these motorcycles were going to be resold by DC Imports and Lee Custom, even if it was unaware of this fact, the Dealer Agreement does not require that Cycle-Craft knowingly sell to an entity (or individual) that intends to resell the motorcycle; all that is required is evidence that such a sale by Cycle-Craft to a reseller was actually made.

- 18 -

information which is <u>fraudulent</u> <u>or</u> <u>contains</u> <u>material</u> <u>misrepresentations</u>." Dealer Agreement, Standard Provisions, Section M(4)(b) (emphasis added).

Cycle-Craft's submission of these fifty false sales reports not only breached Section F(7) of the Dealer Agreement but also violated an explicit, fundamental tenet of the Dealer Agreement: "To Tell the Truth." Cycle-Craft acknowledged that each of its responsibilities under this Contract [including Section F(7)] is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill any of them would constitute a material breach." Dealer Agreement, Section P(6). Accordingly, there can be no serious argument that the submission of fifty false sales reports to Harley-Davidson does not materially breach the Dealer Agreement, and Harley-Davidson plainly had the contractual right to terminate based on such false representations. *See* Dealer Agreement, Section M(4)(b). Further, as discussed in the following section, Massachusetts law does not protect a dealer from the consequences of submitting false statements to its supplier.

### C.    Cycle-Craft's Material Violation of the Dealer Agreement Establishes Good Cause For Termination

Under Chapter 93B, "[g]ood cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship . . ." M.G.L., c. c. 93B, §5(h). As set forth above, Cycle-Craft materially breached the Dealer Agreement by (i) selling 27 motorcycles (19 to DC Imports and 8 to Lee) to entities that resold these motorcycles and (ii) submitting fifty false SWRs to Harley-Davidson as described above. As a matter of law, Harley-Davidson has good cause for termination. M.G.L., c. c. 93B, §5(h). *See also David Glen, Inc. v. Saab Cars USA, Inc.,* 837 F. Supp. 888, 889, 891 (N.D. Ill. 1993) (dealerships submission of "false sales reports to Saab in order to collect certain sales incentives being offered by the distributor . . . clearly falls within the realm of 'good cause' for termination"); *Dreilling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1377-78 (10th Cir. 1988) ("In the face of the admitted fraudulent warranty claims, Peugeot's termination of the dealership does not breach the dealer agreement."); *Ormsby Motors, Inc. v. General Motors*

- 19 -

*Corp.,* 842 F. Supp. 344, 350 (N.D. Ill. 1994) ("OMI cannot avoid responsibility under the franchise agreement for the false warranty claims submitted on its behalf by Kain.").

*Ormsby* is instructive on this issue. In *Ormsby,* General Motors Corporation sought to terminate OMI's dealer agreement based on "OMI's submission of false warranty claims." *Id.,* at 346. In denying a motion for preliminary injunction, the court determined that it was "undisputed that false claims for warranty work were submitted to GM and that OMI's open account was credited for those claims . . . [and found] that OMI breached a material term of the franchise agreement that gave GM a right to terminate the agreement . . . hence, good cause is shown." *Id.* at 349, 351. Similarly, here, Cycle-Craft's materially breached the Dealer Agreement by submitting false sales reports, thus providing Harley-Davidson for good cause to terminate. *See also Jaguar Cars v. Blackhorse Motorworks, Ltd.,* 1999 WL 1711085 at \*2 and n. 5 (E.D. Ky. Nov. 2, 1999) (court determined that Jaguar was entitled to terminate dealer agreement based on Blackhorse's submission of fraudulent warranty activity and noted that "[n]o business has to sit back and allow another business to cheat it") (copy attached hereto as Exhibit 1); *Craig Foster Ford, Inc. v. Iowa Dept. of Trans.,* 562 N.W.2d 618, 620, 624 (Iowa 1997) (holding that there was good cause for termination based on dealerships false rebate reporting, including when the dealership "incorrectly reported sales, [because] the named 'buyers' were actually Foster Ford employees, not bona fide buyers.") (copy attached hereto as Exhibit 2); *BeerMart, Inc. v. Stroh Brewery Co.,* 804 F.2d 409, 412 (7th Cir. 1986) (court held that Stroh's was entitled to terminate its wholesale agreement with plaintiff based on BeerMart's fraudulent acts); *Lafayette Beverage Distributors, Inc. v. Anheuser-Busch, Inc.,* 545 F. Supp. 1137, 1150 (N.D. Ind. 1982) (Anheuser-Busch had right to terminate contract because "it is clear that Lafayette Beverage engaged in fraudulent conduct").

Because Cycle-Craft sold motorcycles to resellers and submitted false sales reports to Harley-Davidson, Cycle-Craft was in material breach of its obligations of the Dealer Agreement. Accordingly, there is no dispute that Harley-Davidson has a legitimate business reason and good cause to terminate Cycle-Craft's Dealer Agreement under M.G.L. c. 93B, §5(h).

- 20 -

### D.   Harley-Davidson's Decision To Terminate Was Not Made In Bad Faith or in an Arbitrary or Unconscionable Manner

It is Cycle-Craft's burden to demonstrate "that a termination . . . was in bad faith, or was in an arbitrary or unconscionable manner." M.G.L. c. 93B, §5(m). The First Circuit has recently stated that Chapter 93B does not "warrant a substitution of judicial for business judgment. A distributor acting honestly is entitled to latitude in making commercial judgments . . . In this context, it is only the egregious decision that should be labeled 'arbitrary' or 'unfair.'" *Coady Corp. v. Toyota Motor Distribution, Inc.,* 361 F.3d 50, 56 (1st Cir. 2004). Here, after taking numerous depositions and after receiving thousands of pages of documents from Harley-Davidson in discovery, Cycle-Craft can proffer no evidence from which a fact-finder could lawfully infer that Harley-Davidson's decision to terminate Cycle-Craft was made in bad faith or was made in an arbitrary or unconscionable manner. Although Cycle-Craft may attempt to assert that Harley-Davidson sought to terminate Cycle-Craft because the dealer threatened to protest a possible new Harley-Davidson dealership in the vicinity of Danvers, Massachusetts, this assertion is not supported by anything in the record. Indeed, the undisputed facts are that Harley-Davidson's decision to inspect Cycle-Craft's sales records was triggered solely on an unsolicited email Harley-Davidson received in August, 2003, and unusual sales activity by the dealership at the end of the 2003 model year (Verduyn Aff., ¶48), and its notice of termination, in turn, was based solely on the contractual breaches by the dealership discovered as a result of Harley-Davidson's inspection of records. *Id.* Harley-Davidson had no "ulterior motives" whatsoever, and plaintiff cannot show otherwise.

Accordingly, judgment as a matter of law on Cycle-Craft's 93B claim is appropriate. *See Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 63-64 (1st Cir. 1992) ("Plaintiff presented no facts suggesting that defendant's conduct was 'without reason' or 'shockingly unfair.' Nor did plaintiff make any showing that defendant's actions were dishonest or commercially unreasonable . . . Under these circumstances, plaintiff's mere conclusory

- 21 -

assertions that defendant's predictions were arbitrary, in bad faith and unconscionable . . . presents no genuine issue of material fact, and summary judgment was appropriate.").

## II.    ON THE UNDISPUTED FACTS, HARLEY-DAVIDSON DID NOT BREACH THE DEALER AGREEMENT

Under Wisconsin law, to prevail on a breach of contract theory, a plaintiff must show "the existence of a valid contract, a breach and damages resulting from the breach." *Case Credit Corp. v. Stephens & Michaels Associates, Inc.,* 2005 WL 1154262 at *2 (E.D. Wis. April 28, 2005) *citing Steele v. Pacesetter Motor Cars, Inc.,* 267 Wis.2d 873, 880, 672 N.W.2d 141 (Wis.Ct.App. 2003).[17]   Summary judgment is appropriate here because (a) Cycle-Craft cannot marshal any material facts to support its contention that Harley-Davidson failed to perform under the Dealer Agreement and (b) Cycle-Craft materially breached the Dealer Agreement, which relieved Harley-Davidson of any subsequent contractual obligations to Cycle-Craft.

Cycle-Craft claims that Harley-Davidson breached the Dealer Agreement by "improperly threatening to terminate the franchise relationship by improperly altering Cycle-Craft's vehicle allocation and by improperly assessing other charges on Cycle-Craft in connection with the threatened termination." Amended Complaint, ¶45. However, the undisputed facts demonstrate that — consistent with the specific provisions contained in the Dealer Agreement — Cycle-Craft was in material default of its obligations under the Dealer Agreement and Harley-Davidson simply enforced its contractual right to terminate.  Importantly, Cycle-Craft cannot cite to a single contract provision that Harley-Davidson violated.

### A.    Harley-Davidson's Notice of Termination Did Not Violate the Dealer Agreement

Pursuant to Section M(4)(b) of the Dealer Agreement, Harley-Davidson may terminate the Dealer Agreement "[i]f Dealer submits to Seller any application, claim, report, record or

---

[17] Under Massachusetts law, "[t]o recover on a claim for breach of contract, a plaintiff must show the existence of a contract, his own performance of his material obligations under the contract, the opponent's breach of a material obligation, and the resulting damages." *Howe v. Fiduciary Trust,* 2001 WL 497104 at*3 (Mass. Super. April 19, 2001) citing *Singarella v. City of Boston,* 342 Mass. 385, 387 (1961).

- 22 -

other information which is fraudulent or contains any material misrepresentation by Dealer." Harley-Davidson may also terminate the Dealer Agreement if Cycle-Craft fails to fulfill its obligations under the agreement. Dealer Agreement, Section M(6)(f). Further, pursuant to the 2003 NRSP, Harley-Davidson may terminate the Dealer Agreement if a "dealer fails to comply with this policy or submits false SWR information." 2003 NRSP, Par. 8. Harley-Davidson is also permitted, pursuant to the 2003 NRSP, to "(1) deduct a like number (and model) of motorcycles from such dealer's current and, in certain circumstances, all subsequent model year SUAs [Sales Unit Allocation] and (2) charge back to the dealer any incentives or allowances credited or paid with respect to each motorcycle." As set forth above, there is no dispute that Cycle-Craft, in violation of the NRSP and the Dealer Agreement, submitted false sales reports for 50 motorcycles. Based on such fraudulent misrepresentations, Harley-Davidson had the contractual right to (i) terminate Cycle-Craft's Dealer Agreement, (ii) deduct motorcycles from its allocation, and (iii) charge back Cycle-Craft for incentives and allowances it had received for the sale of these motorcycles. Further, Harley-Davidson complied with Section M(4) and M(6) by providing 60 days notice to Cycle-Craft that it was terminating the Dealer Agreement.

Because the Dealer Agreement expressly permitted Harley-Davidson to terminate Cycle-Craft based on its submission of fraudulent sales reports, Harley-Davidson's exercise of that right cannot constitute a breach. *See Sportfolio Publications, Inc. v. AT&T Corp.,* 320 F.3d 75, 81 (1st Cir. 2003) ("AT&T's termination of the contract was proper because the contract explicitly states that AT&T reserves the right to terminate the agreement immediately"); *Custom Products Corp. v. Intermet Corp.,* 170 F.Supp. 2d 853, 859 (E.D. Wis. 2001) ("CPC's failure to meet the PPAP date was a breach of the contract that justified Intermet's termination of the contract and the resourcing of the work to Linimiar."); *St. Joseph Equip. v. Massey-Ferguson, Inc.,* 546 F. Supp. 1245, 1251 (W.D. Wis. 1982) ("it is clear as a matter of express contractual language that under the terms of the Dealership Agreement M-F had the authority to do as it did in this case and therefore the contract was not breached"). Similarly, there can be no breach of the Dealer Agreement simply because Harley-Davidson exercised its right to reduce Cycle-

- 23 -

Craft's allocation and charge back its account for allowances and incentives it had improperly received. *See id.*

**B.     Because Cycle-Craft Materially Breached the Dealer Agreement, Harley-Davidson is Relieved From Performing under the Contract**

It is well established that "a material breach by one party to a contract excuses subsequent performance by the other party." *Entzminger v. Ford Motor Co.,* 47 Wis.2d 751, 755, 177 N.W.2d 899 (1970). *See also Management Comp. Serv. v. Hawkins,* 206 Wis.2d 158, 183, 557 N.W.2d 67 (1996); *Metropolitan Sewerage Comm'n v. R.W. Constr.,* 72 Wis.2d 365, 387, 241 N.W.2d 371 (1976). As noted above, there is no dispute that Cycle-Craft was in material breach of the Dealer Agreement. Thus, even if Cycle-Craft can demonstrate that Harley-Davidson subsequently breached the Dealer Agreement, which it cannot, Harley-Davidson had no further contractual obligations to Cycle-Craft after its submission of false sales reports. *See, e.g., id.* ("the persistent refusal of the MSC to negotiate an equitable adjustment was a material breach of contract which justified R.W.'s refusal to continue performance").

**III.    ON THE UNDISPUTED FACTS, HARLEY-DAVIDSON DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING**

Under Wisconsin law, "[t]he implied covenant of good faith and fair dealing is breached when a party's conduct is 'arbitrary and unreasonable.'" *Custom Products Corp. v. Intermet Corp.,* 170 F.Supp. 2d 853, 860-61 (E.D. Wis. 2001). However, "[u]nder Wisconsin law there can be no breach of the implied covenant of good faith and fair dealing based on acts which are specifically authorized in the agreement." *Smith v. Rainsoft Water Conditioning Co.,* 848 F. Supp. 1413 (E.D. Wis. 1994) *citing Super Valu Stores v. D-Mart,* 146 Wis.2d 568, 431 N.W.2d 721 (1988). *See also Home Valu, Inc. v. Pep Boys,* 213 F.3d 960, 966 (7th Cir. 2000) ("implied covenant 'does not support an independent cause of action for failure to act in good faith under a contract")

Because Harley-Davidson — by issuing a Notice of Termination — was simply enforcing its contractual rights as set forth in Section M(4) and (6) of the Dealer Agreement, Harley-

- 24 -

Davidson did not breach the Dealer Agreement or any implied covenant. *See Super Valu Stores v. D-Mart,* 146 Wis.2d 568, 577, 431 N.W.2d 721 (Wis.App.Ct. 1988) ("where, as here, a contracting party complains of acts of the other party which are specifically authorized in the agreement, we do not see how there can be any breach of the covenant of good faith"); *Massey-Ferguson,* 546 F. Supp. at 1251 ("in making its decision M-F was exercising a right reserved to it under a contract, it follows without more that the decision could not be a breach of any implied duty to cooperate in permitting the plaintiff to perform its duties under the contract").

## CONCLUSION

Based on the foregoing, Harley-Davidson is entitled to judgment as a matter of law on all of the claims asserted against it by plaintiff.

> **Harley-Davidson Motor Company, Inc., and Buell Distribution Company, LLC**
>
> By their attorneys,
>
> ___/s/ William F. Benson_____
> William N. Berkowitz, BBO# 544148
> Sabita Singh, BBO# 560146
> William F. Benson, BBO# 646808
> BINGHAM McCUTCHEN LLP
> 150 Federal Street
> Boston, MA 02110
> Ph: (617) 951-8000
> Fx: (617) 951-8736

Dated: August 12, 2005

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand on August 12, 2005.

> _____/s/ William F. Benson_____
> William F. Benson

- 25 -