UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
CYCLE-CRAFT CO., INC.                          )
d/b/a BOSTON HARLEY-DAVIDSON/BUELL,            )
                                               )
                              Plaintiff,        )
                                               )        Civil Action
                     v.                        )        No. 04 11402 NMG
                                               )
HARLEY-DAVIDSON MOTOR COMPANY, INC.,           )
and BUELL DISTRIBUTION COMPANY, LLC,           )
                                               )
                              Defendants.       )
_____ )

---

**PLAINTIFF CYCLE-CRAFT CO., INC.'S
MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

*Attorneys for Plaintiff Cycle-Craft
Co., Inc.
d/b/a Boston Harley-Davidson/Buell*

Dated: August 30, 2005

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................ 1

**BACKGROUND** ............................................................................. 3

      A.    Harley-Davidson's Dealer Contract and the "Non-Retail
             Sales Policy" ................................................................. 3

            1.    The Dealer Contract.................................................. 3
            2.    Harley-Davidson's Unilaterally Decreed NRSPs.............. 5
            3.    Harley-Davidson's Enforcement of Its Non-Retail
                 Sales Policy ................................................... 7

      B.    The Motorcycle Sales Challenged By Harley-Davidson................ 8

            1.    Sales to Florida Residents ................................... 8
            2.    Sales to New Hampshire Residents................................. 10
            3.    The Offer to Cycle-Craft Employees, Relatives and
                 Friends........................................................... 12

**SUMMARY OF ARGUMENT**...................................................... 14

      I.    CYCLE-CRAFT DID NOT BREACH THE NON-RETAIL
           SALES PROVISION OF THE DEALER CONTRACT......................... 15

          A.    The NRSPs Are Not Part Of The Dealer Contract..................... 15
          B.    The Doctrine of Judicial Estoppel Precludes Harley-
              Davidson  from Arguing That the NRSPs Are Part of Its
              Contract with  Cycle-Craft........................................ 16
          C.    Cycle-Craft's Sales to Florida and New Hampshire
              Residents  Did Not Violate the Non-Retail Sales Provision
              in the Dealer Contract............................................ 18
          D.    A Dealer Cannot Be Terminated For  Violations of a
              Unilaterally Promulgated Non-Contractual Policy. ................ 19

      II.    CYCLE-CRAFT'S SUBMISSION OF SALES REPORTS  DID
           NOT MATERIALLY BREACH ANY PROVISION  OF THE
           DEALER CONTRACT ...................................................... 20

      III.    EVEN IF THIS COURT WERE TO FIND A TRIABLE ISSUE
           AS TO WHETHER CYCLE-CRAFT COMMITTED MINOR
           BREACHES OF THE DEALER CONTRACT, SUMMARY
           JUDGMENT FOR CYCLE-CRAFT IS STILL WARRANTED
           BECAUSE ANY SUCH BREACHES WERE NOT MATERIAL.......... 22

**CONCLUSION** ............................................................................ 25

i

# TABLE OF AUTHORITIES

Cases

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) .......... 17

*American Isuzu Motors, Inc. v. New Motor Vehicle Bd.*, 230 Cal. Rptr. 769, 775-77 (Cal. Ct. App. 1986). ...................................................................................................... 20

*Bronx Auto Mall, Inc. v. American Honda Motor Co., Inc.*, 934 F. Supp. 596, 610 (S.D.N.Y. 1996) ....................................................................................................... 18

*G.A. Imports, Inc. v. Subaru Mid-America, Inc.*, 799 F.2d 1200, 1207 (8th Cir. 1986) ... 20

*Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994) ........................................ 24

*InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) ............................................ 17

*Lease-It, Inc. v. Massachusetts Port Auth.*, 600 N.E.2d 599, 602 (Mass.App.Ct. 1992) ... 3

*Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 47 (D. Mass. 1995) ....................................... 16

*Macoviak v. Chase Home Mort. Corp.*, 667 N.E.2d 900, 904 (Mass.App.Ct. 1996) ....... 22

*Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977) ................... 19

*Racine Harley-Davidson, Inc. v. Harley Davidson Motor Co.*, 692 N.W.2d 670 (Wis. Ct. App. 2004) .................................................................................................................. 17

## INTRODUCTION

Plaintiff Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") hereby submits this memorandum of law in support of its Motion for Summary Judgment on Count I of its Amended Complaint.

Cycle-Craft has operated continuously in the Boston area as a family-owned and operated Harley-Davidson dealership since the 1950s. On April 20, 2004, without any warning whatever, defendants Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson"), sent Cycle-Craft a "Notice of Dealer Contract Termination Letter," alleging that Cycle-Craft had breached its Dealer Contract by selling motorcycles to "non-retail purchasers" and by submitting "fraudulent" sales reports to Harley-Davidson. Harley-Davidson's allegations were without merit, and Cycle-Craft responded by bringing this action under Mass. Gen. Laws Ch. 93B, the Massachusetts "Dealer's Bill of Rights," to prevent the wholly unwarranted termination. That statute provides that dealerships can only be terminated for "good cause," and identifies seven factors that should be considered in determining whether the manufacturer (i.e., Harley-Davidson) can demonstrate good cause for the termination. Mass. Gen. Laws Ch. 93B § 5(j). *See id.* at § 5(m) (manufacturer has burden of proving good cause). Although Cycle-Craft contends that a consideration of each of the enumerated factors demonstrates that there is no "good cause" to terminate the dealership, Harley-Davidson contends that only one of the seven factors – the "existence and materiality of any breaches of the [Dealer Contract]," *id.* at § 5(j)(7) – is relevant to the "good cause" determination. The undisputed facts, however, demonstrate that Cycle-

1

Craft did not breach the Dealer Contract. Accordingly, Cycle-Craft is entitled to summary judgment on Count I of its Amended Complaint.[1]

First, Cycle-Craft did not breach its obligations under the "Non-Retail Sales" provision of the Dealer Contract. That provision prohibits dealers from selling motorcycles "for resale to non-retail customers," and the undisputed facts show that Cycle-Craft did not make any such sales. The 27 motorcycle sales that Harley-Davidson challenges were made to individuals. Harley-Davidson largely ignores the language of the Dealer Contract itself, instead alleging that Cycle-Craft breached purported obligations contained in fine-print Non-Retail Sales Policy documents (NRSPs) that Harley-Davidson unilaterally decrees and distributes to dealers. The NRSPs, however, are not part of the contract between Cycle-Craft and Harley-Davidson: they are not incorporated by reference into the Dealer Contract and it is undisputed that Cycle-Craft never agreed to or was even aware of their requirements. Indeed the Harley-Davidson District Manager who was responsible for Cycle-Craft's territory at the time of the threatened termination was himself unaware of the requirements the NRSPs purport to impose. In addition, the doctrine of judicial estoppel bars any argument that the NRSPs are part of the Contract, as Harley-Davidson has successfully argued in previous litigation that the contractual obligations between it and dealers are limited by the four corners of the Dealer Contract.

---

[1]    In the Amended Complaint, Cycle-Craft asserts three separate counts against Harley-Davidson: Count I alleges a violation of Chapter 93B; Count II alleges breach of contract; and Count III alleges a violation of the implied covenant of good faith and fair dealing. Am. Compl. ¶¶ 28-50. Cycle-Craft seeks summary judgment on Count I to the extent that Count seeks to prevent Harley-Davidson from terminating its dealership because there is no "good cause" for such termination. A decision that no good cause can be shown will likely end, or at least narrow, this litigation.

Second, Cycle-Craft did not breach the Dealer Contract by submitting "fraudulent" sales reports to Harley-Davidson. The reported sales that Harley-Davidson contends were "fraudulent" were, to the contrary, sales where Cycle-Craft employees (and their friends and family members) had made a commitment to purchase motorcycles from Cycle-Craft at rock-bottom prices in connection with a special discount offered to employees. Although the transactions were not finalized, Cycle-Craft believed that these commitments were sufficient to warrant reporting a "sale" to Harley-Davidson, and nothing in the Dealer Contract or any other Harley-Davidson policy provides that such a commitment is not a "sale" for reporting purposes.

Finally, even if the Court were to find a triable issue as to whether minor contractual violations occurred, there can be no genuine dispute as to whether those breaches were "material" as required to establish "good cause" under Chapter 93B. As explained below, the violations alleged by Harley-Davidson were not "essential and inducing features" of the Dealer Contract, and are therefore not material breaches under Massachusetts law. *See Lease-It, Inc. v. Massachusetts Port Auth.*, 600 N.E.2d 599, 602 (Mass.App.Ct. 1992) (material breach is a breach of "an essential and inducing feature of the contract").

## BACKGROUND

### A.    Harley-Davidson's Dealer Contract and the "Non-Retail Sales Policy"

#### 1.    The Dealer Contract

The operative contract between Harley-Davidson and Cycle-Craft is the Harley-Davidson Motor Company Motorcycle Dealer Contract ("Dealer Contract"), which the parties signed on or about September 19, 2000 and then extended in June 2002. *Exhibit 1* (Dealer Contract) at 5; Statement of Undisputed Facts ("SUF") ¶ 7; *Exhibit 1A*

(Extension); SUF ¶ 7. As its title suggests, the Dealer Contract is a standard form Harley-Davidson contract, written by Harley-Davidson, with a blank space for individual dealer information. *Exhibit 1* (Dealer Contract) at 1-3; SUF ¶ 8. The Dealer Contract refers to and incorporates another Harley-Davidson form document, titled Harley-Davidson Motor Company General Conditions of Sales and Service ("General Conditions"), *Exhibit 2* (General Conditions); SUF ¶ 9, which "are hereby expressly made a part of this Contract and incorporated herein." *Exhibit 1* (Dealer Contract) at 2; SUF ¶ 9.

The Dealer Contract makes clear that it memorializes the entire agreement between Harley-Davidson and the dealer, and that the obligations set forth in the Contract cannot be informally altered. Section P.8 of the General Conditions, titled "Entire Contract," states "[e]xcept as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered herein." *Exhibit 2* (General Conditions) at 20; SUF ¶ 10. Section P.8 also provides that "[n]o modifications, amendments, or changes to this Contract, except as provided herein, shall be valid and binding unless made in writing and *signed by both parties.*" (emphasis added). *Id.*

Two sentences of the 21 pages of "General Conditions" address the topic of "Non-Retail Sales," the provision at the center of this dispute. Under the section heading "Sales Effort," Section B.6 states in full:

> Dealer shall not sell Harley-Davidson Products <u>for resale to non-retail customers</u> other than United States authorized Harley-Davidson dealers.

4

> Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of the Contract.

*Id.* at 3, SUF ¶ 11. (emphasis added). Nothing in Section B.6, nor in any other part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that might violate this provision. *Id.*, SUF ¶ 12. And nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Id.*, SUF ¶ 13.

### 2.    Harley-Davidson's Unilaterally Decreed NRSPs

Beginning in the early 1990s, Harley-Davidson began annually publishing its 1-2 page, fine-print NRSPs. *Exhibit 3* (1991-2004 Model Year NRSPs); SUF ¶ 14. A prime reason for the policy was Harley-Davidson's desire to prohibit U.S. dealers from making sales in the overseas market, so Harley-Davidson could keep that market to itself. *Exhibit 4* (Flickinger Dep. I)[2] at 98:18-19; 99:8-12; 102:14-17; SUF ¶ 15. Indeed the policy was sometimes referred to as the "Policy on Exports." *Exhibit 3* (1991-2004 NRSPs) at H-D 1624-26; SUF ¶ 15. A consultant that advised Harley-Davidson on implementation of the policy recommended that the NRSPs be signed by dealers and incorporated into the Dealer Contract. *Exhibit 5* (Fontana Group Study) at 14-16; SUF ¶ 16. Harley-Davidson chose not to do so, even though the option was specifically considered. *Exhibit 6* (NRSP Meeting Minutes) at H-D 1606; SUF ¶ 17. Instead of seeking dealer assent to, or even acknowledgement of the provisions of the NRSPs, Harley-Davidson's practice was simply to include the document in a voluminous package of documentation sent annually

---

[2]    Throughout the brief, cites to deposition testimony will include the deponent's last name and the abbreviation "Dep." for deposition.

to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit 4* (Flickinger Dep. I) at 118:7-11; 119:4-8; SUF ¶ 17.

Though Harley-Davidson does not seek the dealer's assent to their terms, the annual NRSPs purport to impose obligations on dealers that are above and beyond those set forth in the Dealer Contract.  Most pertinent here, the NRSPs purport to require that a motorcycle be "delivered at the dealership facility, directly to the ultimate consumer." *See Exhibit 3* (1991-2004 NRSPs); SUF ¶ 18.  Indeed the NRSP for Model Year 2003, explicitly acknowledges that the NRSPs have "expanded upon" the requirements of the Dealer Contract,  and that the NRSPs "have been amended over the last twelve years." *Id.* at H-D 0987; SUF ¶ 18.  Notably, the 1990 NRSP (for the 1991 Model Year) consisted of three short paragraphs, while the 2003 NRSP consisted of nine more detailed paragraphs.  *Id.* at H-D 0987, 1624; SUF ¶ 19.

Because Harley-Davidson disseminates the NRSPs under the radar, as it were, dealers and even some of Harley-Davidson's own employees are not familiar with their purported requirements.  For example, consistent with the non-retail provision of the Dealer Contract, Cycle-Craft Owner John Atwood understood that dealers were only allowed to sell units to retail customers, but was not familiar with the additional requirements of the NRSP, such as the requirement that motorcycles be delivered at the dealership.  *Exhibit 7* (Atwood Dep.) at 42:13-43:6; SUF ¶ 20.  Similarly, Cycle-Craft General Manager Ronald Buchbaum knew that Harley-Davidson requires dealers to sell motorcycles to individuals but was unfamiliar with the more detailed provisions of the NRSP.  *Exhibit 8* (Buchbaum I) at 80:15, 241:7-8, 245:4-12; SUF ¶ 21.  The Cycle-Craft sales representatives who negotiated the Florida and New Hampshire sales were also

unaware of the specific requirements of the NRSP. *Exhibit 9* (Walsh Dep.) at 36:5-7;
SUF ¶ 22; *Exhibit 10* (Marasca Dep.) at 42:13, 57:14-23; SUF ¶ 22.

Indeed Harley-Davidson's own Al Contois, a 10-year veteran employee who
served as the District Manager for Cycle-Craft's territory when the termination letter was
sent, testified at his deposition to an understanding of the non-retail sales policy that was
similar to that of Messrs. Atwood and Buchbaum.  Mr. Contois testified that motorcycles
had to be sold to the end user, but conceded that he was unaware of any additional
requirements of the policy. *Exhibit 11* (Contois Dep.) at 9:11-10:20, 23:21-24:12; SUF ¶
23.

### 3.    Harley-Davidson's Enforcement of Its Non-Retail Sales Policy

Harley-Davidson employee Steven Verduyn is responsible for investigating
potential non-retail sales by dealers, which Harley-Davidson refers to as "gray market
activity." *Exhibit 12* (Verduyn Dep. I) at 43:18-46:17; SUF ¶ 24.  Although Harley-
Davidson maintains information on known "gray market" dealers who attempt to
purchase motorcycles from dealers under fraudulent pretenses – i.e., by pretending to be
retail customers – Harley-Davidson refuses to share this intelligence with its dealerships
even though dealerships have requested that the company do so. *Id.* at 88:25-89:4;
*Exhibit 13* (North-End Harley-Davidson Letter); SUF ¶ 25.  Mr. Verduyn advocated
internally for sharing gray-market information with dealers to assist them in adhering to
Harley-Davidson's policy, but his advice was not followed. *Exhibit 12* (Verduyn Dep. I)
at 89:3-4; 91:22-92:18; SUF ¶ 25.

Harley-Davidson deals with alleged violations of its non-retail sales policy on an
uneven, ad hoc basis.  Each Director of Field Operations ("DFO"), the Harley-Davidson
executive responsible for overseeing one of Harley-Davidson five sales regions, is given

the discretion to overlook policy violations. *Exhibit 12* (Verduyn Dep. II) at 326:5-7;

*Exhibit 4* (Flickinger Dep. II) at 64:4-19; SUF ¶ 26. The DFOs are permitted to exercise

their discretion for what are so-called "de minimis" breaches, typically violations

involving ten or fewer sales. *Exhibit 4* (Flickinger Dep. II) at 68:6-20; SUF ¶ 27.

Circumstances under which the DFO may exercise his discretion include a dealership

being new, the dealership having acted in good faith, and lack of intent to sell to a broker.

*Exhibit 12* (Verduyn Dep. II) at 325:15-23; *Exhibit 4* (Flickinger Dep. II) at 60:8-15; SUF

¶ 27.

### B.    The Motorcycle Sales Challenged By Harley-Davidson

#### 1.    Sales to Florida Residents

Harley-Davidson alleges that nineteen motorcycles Cycle-Craft sold to Florida

residents in July 2003 were purchased by DC Imports International ("DCI"), a

motorcycle wholesaler in Florida. *Exhibit 14* (Inspection of Records Letter) at 1-2; SUF

¶ 28. The undisputed facts show otherwise.

Although the purchase and delivery of these motorcycles was negotiated with

Cycle-Craft by a Florida resident, Michael Stevens, the motorcycles were indisputably

sold to 19 separate individuals. Cycle-Craft received from Mr. Stevens nineteen

completed Bills of Sale containing identifying information about each individual

purchaser as well as each individual purchaser's signature. *Exhibit 15* (Stevens Dep.) at

78:5-79:19; *Exhibit 16* (Florida Bills of Sale); SUF ¶ 29-30. It also received nineteen

completed Sales and Warranty Registration forms ("SWRs") reflecting each individual

purchaser's identifying information and individual signatures. *Exhibit 15* (Stevens Dep.)

at 80:13-20; *Exhibit 17* (Florida SWRs); SUF ¶ 31. Mr. Stevens also sent photocopies of

the nineteen individuals' drivers licenses to Cycle-Craft. *Exhibit 15* (Stevens Dep.) at

81:3-9; *Exhibit 18* (Florida Licenses); SUF ¶ 32. The motorcycles were paid for with nineteen separate cashier's checks, each with the name of one of the individual buyers in the space on the check for "remitter." *Exhibit 19* (Lunsford Dep.) at 47:24, 50:25; *Exhibit 20* (Florida Cashier's Checks); SUF ¶ 33.

During the negotiations Cycle-Craft emphasized to Mr. Stevens and his associate Debra Lunsford that any new motorcycles could only be sold to individual buyers, in the names of those buyers. *Exhibit 15* (Stevens Dep.) at 77:2-12; *Exhibit 19* (Lunsford Dep.) at 167:16-18, 168:2-4; SUF ¶ 34. Sean Walsh, the Cycle-Craft salesperson who dealt with Mr. Stevens, was specifically instructed by Cycle-Craft General Manager Ronald Buchbaum that the motorcycles could only be sold if they were purchased by individual buyers. *Exhibit 8* (Buchbaum Dep. I) at 254:13-22; *Exhibit 9* (Walsh Dep.) at 55:20-24; SUF ¶ 34.

Debra Lunsford of DCI was subsequently convicted of title fraud for submitting forged and false documentation to Florida authorities in connection with her attempts to have the 19 motorcycles registered. *Exhibit 19* (Lunsford Dep.) at 140:22-141:5; SUF ¶ 35.[3]

---

[3] Harley-Davidson's summary judgment papers present a misleading and incomplete description of the admissible record evidence regarding Cycle-Craft's sales to the 19 Florida residents. Cycle-Craft will respond to those assertions more fully in its opposition to Harley-Davidson's brief, but a few observations are in order here. First, although it argues boldly that "Cycle-Craft sold nineteen motorcycles to a wholesaler, DC imports," Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment ("Def. Br.") at 10, Harley-Davidson utterly ignores the paperwork (checks, bills of sale, SWRs, drivers' license) that demonstrates that the motorcycles were being sold not to a company but to individuals, as Cycle-Craft insisted. Second, Harley-Davidson suggests that Cycle-Craft knew that DC Imports was a motorcycle wholesaler, Def. Br. at 10, even though Sean Walsh, the former Cycle-Craft salesman who dealt with Mr. Stevens and Ms. Lunsford, and on whose testimony Harley-Davison heavily relies, testified that he had no conversations with Mr. Stevens or Ms. Lunsford about DC Imports' business, but just "assumed from the name DC Imports . . . that they imported goods. I don't know what they did." *Exhibit 9* (Walsh Dep.) at 101:15-17. Third, although Harley-Davidson states that "Mr. Walsh was authorized by Mr. Buchbaum to make a deal with <u>DC Imports</u>," Def. Br. at 10 (emphasis added), the testimony cited by Harley-Davidson makes it clear that Mr. Buchbaum only instructed Mr. Walsh to deal with a "gentleman from Florida," and not a

### 2.    Sales to New Hampshire Residents

Harley-Davidson also claims that Cycle-Craft sold eight motorcycles to Lee Custom Cycle, a used motorcycle dealer in Lee, New Hampshire. *Exhibit 14* (Inspection of Records Letter) at 2; SUF ¶ 36. Once again, the undisputed facts show that these motorcycles were purchased by eight individual buyers. Each of the eight individuals came to Cycle-Craft's dealership and completed the appropriate paperwork for the sales. The individuals signed the Bill of Sale for the motorcycle he or she was purchasing, *Exhibit 21* (Christensen Dep.) at 51:18-24; *Exhibit 22* (New Hampshire Bills of Sale); signed the Certificate of Origin, or "title," for the motorcycle he or she was purchasing, *Exhibit 21* (Christensen Dep.) at 59:20-60:2; *Exhibit 23* (New Hampshire Certificates of Origin); presented an individual bank check for his or her motorcycle, *Exhibit 24* (New Hampshire Cashier's Checks); and presented his or her license, *Exhibit 21* (Christenson Dep.) at 65:7-12; *Exhibit 25* (New Hampshire Licenses); SUF ¶ 37.

The sales to these New Hampshire residents were handled by Cycle-Craft salesperson Jason Marasca. When Mr. Marasca informed Mr. Buchbaum in July 2003 that a New Hampshire customer wanted to buy multiple motorcycles, Mr. Buchbaum specifically instructed Mr. Marasca that the motorcycles had to be sold to individuals and that each individual buyer had to sign the necessary paperwork. *Exhibit 8* (Buchbaum Dep. I) at 246:21-247:2 *Exhibit 10* (Marasca Dep.) at 55:9-10; SUF ¶ 38. Mr. Marasca then told the New Hampshire customer, Jeffrey Christensen of Lee Custom Cycles, that

---

company. Finally, as support for its assertion that the money to purchase the 19 motorcycles came from DC Imports, Harley-Davidson relies on wholly inadmissible testimony it obtained in Ms. Lunsford's deposition, and even goes so far as to remove the objections of Cycle-Craft's counsel (without any ellipses) in the deposition excerpts it reproduces in its brief. <u>Compare</u> Def. Br. at 11 n.11 with *Exhibit 19* (Lunsford Dep.) at 51:7-16, 114:8-17.

the motorcycles needed to be purchased by individual buyers, *Exhibit 21* (Christensen

Dep.) at 108:3-12; SUF ¶ 39, and that is exactly what happened.

Although it appears that these individuals may have resold their motorcycles to

Lee Custom Cycle, a New Hampshire wholesaler, the sales were made to individuals as

required by the Dealer Contract.  Mr. Marasca did not have any conversation with Mr.

Christensen about what was going to happen to the motorcycles once they left the

dealership and does not know whether Mr. Christensen was acting as a broker for the

individual buyers.  *Exhibit 10* (Marasca Dep.) at 64:11-21; SUF ¶ 40.  Mr. Christensen

bluntly acknowledged his deceptive tactics in his deposition, admitting it is Lee Custom

Cycle's regular business practice to deceive dealers by providing individual names in

purchasing motorcycles from Harley-Davidson dealerships, even where Lee Custom

Cycle is ultimately acquiring the motorcycles for re-sale.  *Exhibit 21* (Christensen Dep.)

at 116:5-14; SUF ¶ 41.  According to Mr. Christensen, "Lee Custom Cycle isn't on the

bank check . . . [s]o the dealer can be sitting there and not even know that we suck bikes

out."  *Id.* at 115:11-14.  In short, Jason Christenson of Lee Custom Cycle was a gray

market player who deceived Cycle-Craft.  *Exhibit 21* (Christensen Dep.) at 113-16; SUF

¶ 42.[4]

---

[4]    Harley-Davidson presents a similarly misleading view of the record evidence regarding the sale to
New Hampshire residents.  As with the Florida sales, Harley-Davidson reproduces inadmissible
deposition testimony, in question-and-answer form, but eliminates (without even providing ellipses)
the objections of Cycle-Craft's counsel.  Def. Br. at 12 n.12.  Harley Davison also implies that Mr.
Marasca and Mr. Christenson of Lee Custom Cycle discussed that the motorcycles would be sold to
"fictitious" purchasers.  Def. Br. at 12.  The cited testimony does not support such an assertion, and
Mr. Marasca acknowledged in his deposition that he did not know what the individuals who
purchased the motorcycles were going to do with them.  *Exhibit 10* (Marasca Dep.) at 64:1-10.
Cycle-Craft will respond to Harley-Davidson's inaccurate rendition of the record more fully in its
opposition brief.

3.    **The Offer to Cycle-Craft Employees, Relatives and Friends**

Harley-Davidson also alleges that Cycle-Craft submitted fraudulent sales and warranty registration information (SWRs) for seventeen additional motorcycles in July 2003. It contends that termination of the dealership is warranted under Section M.4(b) of the Dealer Contract, which authorizes Harley-Davidson to terminate a dealer who submits to Harley-Davidson "any application, claim, report, record or other information which is fraudulent or contains any material misrepresentation." *See Exhibit 14* (Inspection of Records Letter) at 2; *Exhibit 26* (Termination Letter) at 1-2; SUF ¶ 43. The undisputed facts, however, demonstrate that the sales reports submitted by Cycle-Craft were not fraudulent.

In July 2003, Cycle-Craft was faced with an overstock situation and a potential decrease in its 2004 motorcycle allocation. Accordingly, knowing that Cycle-Craft employees, like those of Harley-Davidson dealers everywhere, are Harley-Davidson enthusiasts, Cycle-Craft General Manager Ronald Buchbaum made a rock-bottom offer to Cycle-Craft employees (and their family and friends) whereby they could purchase motorcycles at or just above dealer cost. *See Exhibit 27* (McPhee Dep.) at 124:5-8 and 125:11-14; *Exhibit 8* (Buchbaum Dep. I) at 187:19-23, 198:6-13, and 199:11-14; *Exhibit 28* (Bloom Dep.) at 18:1-10; SUF ¶ 44. In the words of one Cycle-Craft employee, the offer was a "fantastic deal." *Exhibit 28* (Bloom Dep.) at 18:9-12; SUF ¶ 44. This offer was consistent with the dealership's longstanding policy of offering deep discounts on motorcycles to Cycle-Craft employees, which was viewed by those employees as one of the perquisites of employment at Cycle-Craft. *Exhibit 9* (Walsh Dep.) at 135:17-136:18; *Exhibit 10* (Marasca Dep.) at 62:8-63:5; SUF ¶ 45. Two Cycle-Craft employees, Mr. Giordano and Mr. Potts, purchased motorcycles at $500 over invoice in response to Mr.

12

Buchbaum's original offer from late June/early July. *Exhibit 8* (Buchbaum Dep. I) at 189:21-190:13; SUF ¶ 46. Numerous Cycle-Craft employees and their relatives and friends took advantage of the later offer for a purchase at cost with the understanding that if a regular customer desired to purchase the motorcycle that motorcycle would be sold to the regular customer. *Id.* at 207:16-208:5, 211:20-23; *Exhibit 28* (Bloom Dep.) at 17:20-24, 20:3-21:6; *Exhibit 29* (McGrath Dep.) at 109:24-110:2; SUF ¶ 47. Other employees decided not to take advantage of the offer. *Exhibit 8* (Buchbaum Dep. I) at 212:1-6; SUF ¶ 47. No down payment or other paperwork was required to formalize these commitments, consistent with standard practice for sales to employees. *Exhibit 8* (Buchbaum Dep. I) at 162:4-13; SUF ¶ 47.

When it received commitments to purchase, Cycle-Craft then submitted SWRs for the thirteen individuals who had so committed. *Exhibit 8* (Buchbaum Dep. I) at 212:24-213:3; SUF ¶ 48. After sales of those motorcycles were subsequently made to other, non-employee customers, Cycle-Craft informed Harley-Davidson of the change of owner information and Harley-Davidson changed its records accordingly, and without question. *Exhibit 8* (Buchbaum Dep. I) at 215:7-11; *Exhibit 30* (Bolden Dep.) at 33:10-22, 66:6-20; SUF ¶ 49.

The three motorcycles that Harley-Davidson alleges remained in Cycle-Craft's inventory, s*ee Exhibit 14* (Inspection of Records Letter) at 2-3; were actually purchased by Cycle-Craft. *Exhibit 7* (Atwood Dep.) at 95:7-24; *Exhibit 9* (Walsh Dep.) at 128:7-14; SUF ¶ 50. Each year Cycle-Craft Owner John Atwood purchases two or three units to add to the dealership's collection. *Exhibit 7* (Atwood Dep.) at 94:23-95:2; SUF ¶ 51. As John Atwood is the President, Chief Executive Officer, the Chairman (and the only

13

member) of the Board of Directors, and the owner of the overwhelming majority of the stock in Cycle-Craft, any purchase by the dealership is in essence a purchase by Mr. Atwood. *Exhibit 7* (Atwood Dep.) at 9:1-4, 14:10-16; *Exhibit 31* (Vesey Dep.) at 41:4-42:17; SUF ¶ 51. The three motorcycles in question were purchased by Cycle-Craft to be featured in the dealership's collection and SWRs were properly submitted to reflect the purchase by Cycle-Craft.[5] *Exhibit 7* (Atwood Dep.) at 94:23-95:2; *Exhibit 9* (Walsh Dep.) 128:7-21; SUF ¶ 52.

## SUMMARY OF ARGUMENT

Cycle-Craft is entitled to summary judgment as to its claim under Mass. Gen. Laws Ch. 93B because the pleadings and discovery in this case "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Cycle-Craft alleges in Count I that Harley-Davidson violated Mass. Gen. Laws Ch. 93B by purporting to terminate the franchise agreement without good cause. Under Chapter 93B, the manufacturer bears the burden of proving that good cause existed for a termination decision.[6] Mass. Gen. Laws Ch. 93B §5(m). Here, Harley-Davidson claims that good cause exists because Cycle-Craft materially breached its non-retail sales policy and because it submitted "fraudulent" sales

---

[5]    The seventeenth motorcycle identified by Harley-Davidson was purchased by the brother of a Cycle-Craft employee for a Toys for Tots raffle in Michigan and later titled to the winner of the raffle. *Exhibit 8* (Buchbaum Dep. I) at 195:2-17. Based on its summary judgment submissions, Harley-Davidson apparently no longer challenges this sale.

[6]    Harley-Davidson maintains that Cycle-Craft's alleged breach of the Dealer Contract served as the basis of the termination and that, as a result, only the seventh factor of Mass. Gen. Laws Ch. 93B §5(j) – "the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement" – is at issue in this case. *See Exhibit 32* (Defs. Int. Answer No. 25) ("Harley-Davidson denies that any other factor enumerated in Mass. Gen. Laws Ch. 93B § 5(j) is pertinent to the circumstances of this case.") While Cycle-Craft disputes that none of the other factors set forth in Mass. Gen. Laws Ch. 93B §5(j) are pertinent to this case, and that all factors cut against any finding of good cause, Harley-Davidson's position narrows

reports to Harley-Davidson, in violation of Section M.4(b) of the Contract. Under the undisputed facts, however, neither allegation can be proven by Harley-Davidson.

First, Cycle-Craft did not sell motorcycles "for resale to non-retail customers," as prohibited by the Dealer Contract. The undisputed facts show that the 27 sales challenged by Harley-Davidson were in fact made to individuals. Harley-Davidson cannot rely on its unilaterally promulgated NRSPs to attempt to establish material contractual violations, as those NRSPs were not part of the Dealer Contract, and Harley-Davidson is estopped for arguing otherwise. Second, Cycle-Craft did not submit "fraudulent" sales reports to Harley-Davidson. Cycle-Craft did not falsely represent any sales to be "retail sales," and in good faith reported to Harley-Davidson commitments it received from employees to purchase motorcycles, and sales made to Cycle-Craft's President, John Atwood.

**I.    CYCLE-CRAFT DID NOT BREACH THE NON-RETAIL
        SALES PROVISION OF THE DEALER CONTRACT.**

    **A.    The NRSPs Are Not Part Of The Dealer Contract.**

Harley-Davidson relies heavily on the specific language of the NRSPs to attempt to show that Cycle-Craft breached its non-retail sales policy. *See* Def. Br. at 3-4, 10, 12, 17. Specifically, Harley-Davidson relies on the language in the NRSP that purports to require that a sale "will be considered a non-retail sale for purposes of the Dealer Contract and this policy if the motorcycle is not properly set up, inspected, tested, sold, and delivered at the dealership facility, directly to the ultimate consumer." Def. Br. at 4,

---

the issues for present purposes, and requires that summary judgment be granted in favor of Cycle-Craft on Count I.

17. Indeed Harley-Davidson does not even attempt to address the operative language in the Dealer Contract, or to explain how Cycle-Craft may have violated that provision.

But the NRSPs on which Harley-Davidson relies are not part of the Dealer Contract, which does not incorporate or even refer to them. Under Massachusetts law, "it is well established that 'incorporation by reference requires that the document to be incorporated be referred to and described in the contract so that the referenced document may be identified beyond doubt.'" *Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 47 (D. Mass. 1995) (citations omitted). The NRSPs are not referred to in the Dealer Contract, and certainly are not "identified beyond doubt." Notwithstanding its facility with incorporating other documents into the Dealer Contract – the General Conditions, for example, are "expressly made a part of [the Dealer] Contract and incorporated [into that Contract]" – Harley-Davidson chose not to attempt to do so with the NRSP. In other words, as in *Lowney*, the parties "knew how to incorporate," and the Contract's failure to expressly incorporate the NRSPs is dispositive. *See Lowney*, 925 F.Supp. at 47 (agreement's explicit incorporation of one document shows parties "knew how to incorporate," and incorporation of a different document is unwarranted).

### B. The Doctrine of Judicial Estoppel Precludes Harley-Davidson from Arguing That the NRSPs Are Part of Its Contract with Cycle-Craft.

Harley-Davidson has successfully taken the position in previous dealer litigation that obligations not contained within the four corners of the Harley-Davidson Dealer Contract are not part of that agreement. It is thus estopped from arguing here that the NRSP imposes contractual obligations on Cycle-Craft. In general, "the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant . . . in a prior legal proceeding." *InterGen N.V. v. Grina*,

16

344 F.3d 134, 144 (1st Cir. 2003). In the First Circuit, "at a minimum, two conditions must be satisfied before judicial estoppel can attach. First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position." *See Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted). Judicial estoppel is invoked to prevent litigants from "playing fast and loose with the courts." *Id.* (citation omitted).

Both conditions are met here. Contrary to its current position, Harley Davidson argued successfully in *Racine Harley-Davidson, Inc. v. Harley Davidson Motor Co.*, 692 N.W.2d 670 (Wis. Ct. App. 2004), that its contractual obligations are governed *only* by the four corners of the dealer agreement. Specifically, in connection with a "protest" brought by Racine Harley-Davidson under the Wisconsin analogue of Ch. 93B, § 6, "Harley-Davidson argued that [Racine's] assigned territory was not contained within the four corners of the motor vehicle dealer agreement; therefore, a change in the composition of the assigned territory is not a modification of the dealer agreement." *Id.* at 675. Racine Harley-Davidson had taken the position that a list of zip codes that were to be included in its territory, presented to it by Harley-Davidson when it signed its Dealer Contract, formed part of its agreement with Harley-Davidson, making the transfer of one of Racine's zip codes to another dealer a modification of the dealership agreement. *See id.* at 673, 675. The Wisconsin Division of Hearing and Appeals granted summary judgment in favor of Harley-Davidson on this issue, a decision that was reversed by the circuit court but later upheld by the court of appeals. *See id.* at 680. Given Harley-Davidson's previous success in arguing that obligations under the Dealer Contract are

limited to those contained within the four corners of the document, Harley-Davidson is

estopped from arguing that the NRSP is part of its agreement with Cycle-Craft.[7]

**C.      Cycle-Craft's Sales to Florida and New Hampshire Residents
         <u>Did Not Violate the Non-Retail Sales Provision in the Dealer Contract.</u>**

Cycle-Craft did not breach the operative "non-retail sales" provision of the Dealer

Contract, which only prohibits sales "for resale to non-retail customers."  The Dealer

Contract does not define the terms "retail" or "non-retail customers" and fails to define

the hallmarks of a retail sale, as opposed to a sale made "for resale to a non-retail

customer."  Cycle-Craft's sales of motorcycles to Florida and New Hampshire

individuals qualify as retail sales given that Cycle-Craft sold the motorcycles to

individual buyers and not to "non-retail customers."

As explained above, Cycle-Craft's sales of motorcycles to Florida and New

Hampshire residents were made to individuals and not to businesses or other "non-retail

customers."  For the nineteen sales to Florida residents, Cycle-Craft received copies of

signed Bills of Sale for each of the purchasers, signed SWRs for each of the purchasers,

an individual cashier's check for each of the purchasers, and copies of each of the

individuals' drivers licenses.  For the eight sales to New Hampshire, consistent with the

instructions of its General Manager, each of the eight individuals came to Cycle-Craft's

facility, signed the Bill of Sale for the motorcycle he or she was purchasing, signed the

motorcycle's Certificate of Origin, or "title," presented an individual check for his or her

---

[7]      Harley-Davidson has also waived any right to argue that its termination can be defended by an alleged
violation of the NRSP.  The NRSP was not mentioned in the termination letter, which only cited
alleged violations of the non-retail provision in the General Conditions.  Chapter 93B requires that a
termination notice provide "the specific grounds for such termination," *Id. § 5(b)*, and courts
construing similar language in analogous statutes have precluded manufacturers from defending
terminations on grounds not set forth in the notices.  *E.g., Bronx Auto Mall, Inc. v. American Honda
Motor Co., Inc.*, 934 F. Supp. 596, 610 (S.D.N.Y. 1996).

motorcycle, presented his or her license, and took delivery of the motorcycle he or she was purchasing.  No provision of the Dealer Contract prohibits sales through an intermediary or requires that a motorcycle be delivered to the customer at the dealership.

Remarkably, Harley-Davidson argues that it can prove a contractual violation simply by showing that "the entity to whom Cycle-Craft had sold the motorcycles resold them to other individuals," Def. Br. at 18 n.16, regardless of whether the customers were individuals or businesses and regardless of whether Cycle-Craft knew of any plans for resale.  This argument ignores the language of the Dealer Contract, which prohibits sales that have two characteristics:  (1) they are made "for resale" and (2) they are made to "non-retail customers."  Plainly, sales made to individuals, as these sales were, are not sales to "non-retail customers."  In addition, the argument is inconsistent with an implied intent requirement in Section B.6, as a dealer can only make a sale "for resale" – i.e., for the purposes of resale – if the dealer knows that a motorcycle is going to be resold.

Finally, any ambiguity regarding the meaning of the phrase "resale to non-retail customers" in the Dealer Contract should be construed against Harley-Davidson, which drafted the agreement.  *See, e.g., Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977) ("a writing is construed against the author of the doubtful language").  Courts frequently apply this interpretive principle in franchise litigation.  *E.g., G.A. Imports, Inc. v. Subaru Mid-America, Inc.*, 799 F.2d 1200, 1206 (8th Cir. 1986).

### D.   A Dealer Cannot Be Terminated For Violations of a Unilaterally Promulgated Non-Contractual Policy.

Cycle-Craft cannot be terminated for any alleged breaches of the NRSP, as opposed to violations of the Dealer Contract.  Section 5(j)(7) of Chapter 93B speaks of "the existence and materiality of any breaches, defaults or violations by the affected

motor vehicle dealer of the terms or provisions of the *existing franchise agreement* or of applicable law."  (emphasis added). The provision contains no reference to breaches of extra-contractual "policies," and certainly does not contemplate such a draconian sanction for violation of a unilaterally promulgated policy.  An illustrative case is *American Isuzu Motors, Inc. v. New Motor Vehicle Bd.*, 230 Cal. Rptr. 769, 775-77 (Cal. Ct. App. 1986).  In *American Isuzu*, the court held that a dealer's failure to provide an exclusive showroom for an automobile manufacturer's products was not good cause for termination because the franchise agreement did not require the dealer to provide an exclusive showroom, and a letter of intent signed by the manufacturer and dealer requiring a separate showroom was not expressly incorporated into the franchise agreement.  *Id.*  Similarly, a violation of the NRSP, which unlike the letter in *American Isuzu* is not even signed by the dealer, cannot serve as good cause for termination because it is not part of the Contract.  *G.A. Imports, Inc. v. Subaru Mid-America, Inc.*, 799 F.2d 1200, 1207 (8th Cir. 1986) (upholding district court's finding that even if dealer was in default of the franchise agreement, there was no good cause to terminate because the default was not substantial as it did not damage the distributor or decrease the distributor's future sales).

## II.    CYCLE-CRAFT'S SUBMISSION OF SALES REPORTS DID NOT MATERIALLY BREACH ANY PROVISION OF THE DEALER CONTRACT.

Harley-Davidson also alleges that Cycle-Craft reported some non-retail sales as retail and others as having occurred during the 2003 Model Year when they did not take

place.[8]  *Exhibit 26* (Termination Letter) at 1.  As explained above, the sales questioned as

non-retail sales were actually retail sales and, thus, no false information was submitted in

the relevant SWRs.  Likewise, the SWRs submitted on behalf of Cycle-Craft employees,

family, and friends and for the units purchased for Mr. Atwood's collection do not

contain false information and, thus, Cycle-Craft did not violate Section M.4(b), which

states that Harley-Davidson may terminate the Contract if Cycle-Craft "submits . . . any

application, claim, report, record or other information which is fraudulent or contains any

material misrepresentation."

　　　As explained above, in July 2003 Cycle-Craft was faced with an overstock

situation.  Accordingly, it made an offer to its employees, (and their family and their

friends) to buy motorcycles at or around dealer cost with the understanding that if a

regular customer wanted to purchase the motorcycle the motorcycle would instead be

sold to the regular customer.  In response to this offer, Cycle-Craft received several

commitments to purchase motorcycles on these terms.  Believing that such a commitment

to purchase was sufficient to evidence a sale, Cycle-Craft submitted SWRs to Harley-

Davidson.

　　　Cycle-Craft did not breach any contract provision through the submission of these

SWRs.  Although Section F.7 of the Contract requires that an SWR be submitted "for

every new Harley-Davidson Motorcycle sold" by Cycle-Craft, neither that provision nor

---

[8]　　Despite Harley-Davidson's contention to the contrary, *Exhibit 26* (Termination Letter) at 1, there is no
basis for its claim that Cycle-Craft's alleged failure to maintain pre-delivery and inspections reports
and SWRs is a violation of the Contract.  The provisions of the Contract upon which Harley-Davidson
relies on as support for this aspect of the termination, such as Sections J.2, F.1, F.2, or F.7, offer little
to no instruction on the proper completion or maintenance of any allegedly required records.  The
only arguable record-keeping requirement in any of these provisions is in Section F.7, which states
that "Dealer shall complete and return to Seller a sales and warranty registration form for every new
Harley-Davidson Motorcycle sold by Dealer," which Cycle-Craft complied with.

any other provision in the Contract defines a sale or details when a motorcycle is considered to have been "sold." Nor did Cycle-Craft commit "fraud" by submitting the SWRs. Based on the undisputed facts, Harley-Davidson could not even begin to establish the elements of fraud. *See Macoviak v. Chase Home Mort. Corp.*, 667 N.E.2d 900, 904 (Mass.App.Ct. 1996) (fraud requires proof of "a false representation of a material fact with knowledge of its falsity for the purpose of inducing [Harley-Davidson] to act thereon, and that [Harley-Davidson] relied upon the representation as true and acted upon it to his damage.") Among other things, the lack of any definition of the term "sale" or "sold" under the Dealer Contract precludes any finding of a false representation, much less a knowingly false one. Cycle-Craft's lack of fraudulent intent is also demonstrated by its subsequent dealings with Harley-Davidson on the motorcycles in question, in which it duly reported adjustments in the SWRs after the motorcycles were sold to other customers.[9]

### III.    EVEN IF THIS COURT WERE TO FIND A TRIABLE ISSUE AS TO WHETHER CYCLE-CRAFT COMMITTED MINOR BREACHES OF THE DEALER CONTRACT, SUMMARY JUDGMENT FOR CYCLE-CRAFT IS STILL WARRANTED BECAUSE ANY SUCH BREACHES WERE NOT MATERIAL.

As explained above, Cycle-Craft did not breach the Dealer Contract. But even if this Court were to find a triable issue as to whether some breaches may have occurred, it should still grant summary judgment for Cycle-Craft. Under § 5(j)(7) of Chapter 93B, only "material" breaches can show good cause for termination, and there is no genuine

---

[9]    Harley-Davidson also alleged that Cycle-Craft submitted false SWRs for three units that remained in Cycle-Craft's inventory as of the date of inspection. The SWRs submitted by Cycle-Craft for these three motorcycles did not contain any false or misleading information as they accurately reflected the fact that the motorcycles were purchased by Cycle-Craft. As described above, each year John Atwood retains a few motorcycles to add to the dealership's collection. Given that John Atwood has

issue of material fact as to whether any of Cycle-Craft's violations were "material." *See Lease-It, Inc.*, 600 N.E.2d at 602 (Mass.App.Ct. 1992 (material breach is a breach of "an essential and inducing feature of the contract").[10]

Harley's own conduct with respect to the non-retail sale policy demonstrates that the policy is not "an essential and inducing feature of the contract." First, Harley-Davidson devotes only two sentences in the Dealer Contract to the policy, and made a deliberate decision not to incorporate its more detailed, "expanded" and "amended," NRSPs into the contract, even rejecting a consultant's recommendation that it require dealers to agree to the additional restrictions set forth in the NRSPs. Instead it opted to silently distribute the NRSPs to dealers in a large package of unrelated information. Second, Harley-Davidson refused to share with dealers its intelligence regarding known "gray market" players, even though that information would have helped dealers monitor for potential "non-retail customers" and even though its own "gray market" expert recommended sharing the intelligence with dealers. Third, Harley-Davidson has a history of overlooking "de minimis" breaches of the policy, a practice that belies any claim that the policy is "material."

Cycle-Craft's conduct also indicates that any breaches of the policy requiring the submission of SWRs was not a material breach of the Dealer Contract. Although Harley-

---

nearly complete ownership and control of Cycle-Craft, any purchase by or for the dealership is a purchase by or for Mr. Atwood.

[10]    It could not be clearer that Massachusetts law governs the interpretation of Dealer Contract. Under § 15(e) of Chapter 93B, "[n]otwithstanding any term or provision of a franchise agreement to the contrary: (1) the laws of the commonwealth shall govern the interpretation of the franchise agreement of a motor vehicle dealer located in the commonwealth and the performance of the parties thereunder . . . ." Despite this directive, Harley-Davidson argues in its Memorandum of Law in Support of Their Motion for Summary Judgment that Wisconsin law applies in this case. *Defs. Br.* at 17 n.15. Harley-Davidson's attempt to rely on Wisconsin law, which applies a less stringent standard of "materiality"

Davidson now contends that the SWRs submitted by Cycle-Craft for the 13 employee commitments were "fraudulent," the Dealer Contract contains no guidance on what constitutes a "sale" for reporting purposes. Were this truly "an essential and inducing feature" of the Dealer Contract, Harley-Davidson surely would have provided some guidance or definition on criteria that had to be satisfied before a sale could be reported.

Based on Cycle-Craft's own conduct with respect to the contractual terms at issue, and based on the minor nature of any violations that present triable issues, this Court can conclude as a matter of law that any breaches Cycle-Craft may be able to prove at trial are not "material." Although materiality is sometimes a question for the fact finder, "if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." *Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994). This is such a case, and this Court should find as a matter of law that Harley-Davidson cannot prove that Cycle-Craft materially breached the Dealer Contract.

---

than Massachusetts, is a transparent attempt to avoid the fact that any breaches allegedly committed by Cycle-Craft were immaterial under Massachusetts law.

## CONCLUSION

For the foregoing reasons, Cycle-Craft is entitled to judgment as a matter of law on its claim under Count I that Harley-Davidson should be precluded from terminating its dealership.

Respectfully submitted,

CYCLE-CRAFT CO., INC.

By its attorneys,


    /s/ James C. Rehnquist
James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

August 30, 2005
LIBA/1573522.5