UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
CYCLE-CRAFT CO., INC.                       )
d/b/a BOSTON HARLEY-DAVIDSON/BUELL,         )
                                            )
                    Plaintiff,              )
                                            )   Civil Action
        v.                                  )   No. 04 11402 NMG
                                            )
HARLEY-DAVIDSON MOTOR COMPANY, INC.,        )
and BUELL DISTRIBUTION COMPANY, LLC,        )
                                            )
                    Defendants.             )
_____)

**PLAINTIFF CYCLE-CRAFT CO., INC.'S STATEMENT OF UNDISPUTED
FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") hereby submits this Statement of Undisputed Facts in Support of Motion for Summary Judgment on Count I of its Amended Complaint against Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (together "Harley-Davidson").

**UNDISPUTED FACTS**

**A.     The Parties**

1.     Plaintiff Cycle-Craft is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Everett, Massachusetts. Cycle-Craft is in the business of selling and servicing motorcycles and selling motorcycle parts, accessories and motor clothes. Amended Complaint ¶4.

2.     Defendant Harley-Davidson Motor Company, Inc. is a corporation organized under the laws of the state of Wisconsin, with a principal place of business in

Milwaukee, Wisconsin. Defendant Buell Distribution Co., LLC is a limited liability company organized under the laws of the state of Wisconsin, with a principal place of business in Milwaukee, Wisconsin. Amended Complaint ¶¶5-6.

### B.     The Dispute

3.     On April 20, 2004, without any warning at all, Harley-Davidson sent Cycle-Craft a "Notice of Dealer Contract Termination Letter," alleging that Cycle-Craft had breached its Dealer Contract by selling motorcycles to "non-retail purchasers" and submitting "fraudulent" sales reports to Harley-Davidson. *Exhibit 26* (Termination Letter).

4.     The termination was allegedly based on the results of an audit that Harley-Davidson conducted of Cycle-Craft's sales records, the results of which were reported to Cycle-Craft in a "Inspection of Records Letter" dated the same day as the Termination Letter. As both letters were sent on the same date, Cycle-Craft was precluded from responding to or offering explanations for any of the allegations in the Inspection of Records Letter. *Exhibit 14* (Inspection of Records Letter).

5.     As Harley-Davidson allegations were baseless, Cycle-Craft responded by bringing suit under Mass. Gen. Laws Ch. 93B, the Massachusetts "Dealer's Bill of Rights," to prevent the unwarranted termination of its dealership. *See generally* Amended Complaint. The statute provides that dealerships can only be terminated for "good cause," and identifies seven non-exclusive factors that a court must consider in determining whether a manufacturer can demonstrate good cause for the termination. Mass. Gen. Laws. Ch. 93B § 5(j) and (m).

6.     Cycle-Craft asserts that consideration of all the enumerated factors demonstrates that there is no "good cause" to terminate, but Harley-Davidson argues

2

that only one of the seven factors – the "existence and materiality of any breaches of the [Dealer Contract]," *id.* at § 5(j)(7) – is relevant to this dispute. *Exhibit 25* (Harley-Davidson's Interrogatory Answer No. 25).

### C. Harley-Davidson's Dealer Contract and the "Non-Retail Sales Policy"

#### 1. The Dealer Contract

7. The operative contract between Harley-Davidson and Cycle-Craft is the Harley-Davidson Motor Company Motorcycle Dealer Contract ("Dealer Contract"), which the parties signed on or about September 19, 2000, and then extended in June 2002. *Exhibit 1* (Dealer Contract) at 5; *Exhibit 1A* (Extension).

8. As its title suggests, the Dealer Contract is a standard form Harley-Davidson contract, written by Harley-Davidson, with a blank space for individual dealer information. *Exhibit 1* (Dealer Contract) at 1-3.

9. The Dealer Contract refers to and incorporates another Harley-Davidson form document, titled Harley-Davidson Motor Company General Conditions of Sales and Service ("General Conditions"), *Exhibit 2* (General Conditions), which "are hereby expressly made part of this Contract and incorporated herein." *Exhibit 1* (Dealer Contract) at 2.

10. The Dealer Contract makes clear that it memorializes the entire agreement between Harley-Davidson and the dealer, and that the obligations set forth in the Contract cannot be informally altered. Section P.8 of the General Conditions, titled "Entire Contract," states "[e]xcept as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous

3

agreements between the parties that relate to any matters covered herein.." *Exhibit 2* at 20. Section P.8 also provides that "[n]o modifications, amendments, or changes to this Contract, except as provided herein, shall be valid and binding unless made in writing and *signed by both parties*." (emphasis added). *Id.*

11.     Only two sentences of the 21 pages of "General Conditions" address the topic of "Non-Retail Sales," the provision at the center of this dispute. Under the section heading "Sales Effort," Section B.6 states in full:

> Dealer shall not sell Harley-Davidson Products <u>for resale to non-retail customers</u> other than United States authorized Harley-Davidson dealers. Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of the Contract.

*Id.* at 3. (emphasis added).

12.     Nothing in Section B.6, nor in any other part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that might violate this provision. *Id.*

13.     And nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Id.*

### 2.     **Harley-Davidson's Unilaterally Decreed NRSPs**

14.     Beginning in the early 1990s, Harley-Davidson began annually publishing its 1-2 page, fine-print NRSPs. *Exhibit 3* (1991-2004 Model Year NRSPs).

15.     A prime reason for the policy was Harley-Davidson's desire to prohibit U.S. dealers from making sales in the overseas market so Harley-Davidson could keep that market to itself. *Exhibit 4* (Deposition Testimony of Jon Flickinger ("Flickinger

4

Dep.") I) at 98:18-19; 99:8-12; 102:14-17. Indeed the policy was sometimes referred to as the "Policy on Exports." *Exhibit 3* (1991-2004 NRSPs) at H-D 1624-26.

16. A consultant that advised Harley-Davidson on implementation of the policy recommended that the NRSPs be signed by dealers and incorporated into the Dealer Contract. *Exhibit 5* (Fontana Group Study) at 14-16.

17. Harley-Davidson chose not to do so, even though the option was specifically considered. *Exhibit 6* (Meeting Minutes) at 1. Instead of seeking dealer assent to, or even acknowledgement of, NRSPs, Harley-Davidson's practice was simply to include the NRSPs in a voluminous package of documentation sent annually to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit 4* (Flickinger Dep. I) at 118:7-11; 119:4-8.

18. Though Harley-Davidson does not seek the dealer's assent to their terms, the annual NRSPs purport to impose obligations on dealers that are above and beyond those set forth in the Dealer Contract. Most pertinent here, the NRSPs purport to require that a motorcycle be "delivered at the dealership facility, directly to the ultimate consumer." *See Exhibit 3* (1991-2004 NRSPs). Indeed the NRSP for Model Year 2003, explicitly acknowledges that the NRSPs have "expanded upon" the requirements of the Dealer Contract, and that the NRSPs "have been amended over the last twelve years." *Id.* at H-D 0987.

19. The 1990 NRSP (for the 1991 Model Year) consisted of three short paragraphs, while the 2003 NRSP consisted of nine more detailed paragraphs. *Id.* at H-D 0987, 1624.

20. Because Harley-Davidson disseminates the NRSPs under the radar, as it were, dealers and even some of Harley-Davidson's own employees are not familiar with their purported requirements. For example, consistent with the non-retail provision of the Dealer Contract, Cycle-Craft Owner John Atwood understood that dealers were only allowed to sell units to retail customers, but was not familiar with the additional requirements of the NRSP, such as the requirement that motorcycles be delivered at the dealership. *Exhibit 7* (Deposition Testimony of John Atwood ("Atwood Dep.")) at 42:13-43:6.

21. Similarly, Cycle-Craft General Manager Ronald Buchbaum knew that Harley-Davidson requires dealers to sell motorcycles to individuals but was unfamiliar with the more detailed provisions of the NRSP. *Exhibit 8* (Deposition of Ronald Buchbaum ("Buchbaum Dep.") I) at 80:15, 241:7-8, 245:4-12.

22. The Cycle-Craft sales representatives who negotiated the Florida and New Hampshire sales were also unaware of the specific requirements of the NRSP. *Exhibit 9* (Deposition Testimony of Sean Walsh ("Walsh Dep.")) at 36:5-7; *Exhibit 10* (Deposition Testimony of Jason Marasca ("Marasca Dep.")) at 42:13, 57:14-23.

23. Harley-Davidson's own Al Contois, a 10-year veteran employee who served as the District Manager for Cycle-Craft's territory when the termination letter was sent, testified at his deposition to an understanding of the non-retail sales policy that was similar to that of Messrs. Atwood and Buchbaum. Mr. Contois testified that motorcycles had to be sold to the end user, but conceded that he was unaware of any additional requirements of the policy. *Exhibit 11* (Deposition Testimony of Al Contois ("Contois Dep.")) at 9:11-10:20, 23:21-24:12.

6

### 3. Harley-Davidson's Enforcement of Its Non-Retail Sales Policy

24. Harley-Davidson employee Steven Verduyn is responsible for investigating potential non-retail sales by dealers, which Harley-Davidson refers to as "gray market activity." *Exhibit 12* (Deposition Testimony of Steven Verduyn ("Verduyn Dep.") I) at 43:18-46:17.

25. Although Harley-Davidson maintains information on known "gray market" dealers who attempt to purchase motorcycles from dealers under fraudulent pretenses – i.e., by pretending to be retail customers – Harley-Davidson refuses to share this intelligence with its dealerships even though dealerships have requested that the company do so. *Id.* at 88:25-89:4; *Exhibit 13* (North-End Harley-Davidson Letter). Mr. Verduyn advocated internally for sharing gray market information with dealers to assist them in adhering to Harley-Davidson's policy, but his advice was not followed. *Exhibit 12* (Verduyn Dep. I) at 89:3-4, 91:22-92:18.

26. Harley-Davidson deals with alleged violations of its non-retail sales policy on an uneven, ad hoc basis. Each Director of Field Operations ("DFO"), the Harley-Davidson executive responsible for overseeing one of Harley-Davidson's five sales regions, is given the discretion to overlook policy violations. *Exhibit 12* (Verduyn Dep. II) at 326:5-7; *Exhibit 4* (Flickinger Dep. II) at 64:4-19.

27. The DFOs are permitted to exercise their discretion for what are so-called "de minimis" breaches, typically violations involving ten or fewer units. *Exhibit 4* (Flickinger Dep. II) at 68:6-20. Circumstances under which the DFO may exercise his discretion include a dealership being new, the dealership having acted in good faith, and lack of intent to sell to a broker. *Exhibit 12* (Verduyn Dep. II) at 325:15-23; *Exhibit 4* (Flickinger Dep. II) at 60:8-15.

7

### D.   The Motorcycle Sales Challenged By Harley-Davidson

#### 1.   Sales to Florida Residents

28.   Harley-Davidson alleges that nineteen motorcycles Cycle-Craft sold to Florida residents in July 2003 were purchased by DC Imports International ("DCI"), a motorcycle wholesaler in Florida.  *Exhibit 14* (Inspection of Records Letter) at 1-2.

29.   The undisputed facts show otherwise.  Although the purchase and delivery of these motorcycles was negotiated with Cycle-Craft by a Florida resident, Michael Stevens, the motorcycles were sold to 19 individuals.  Cycle-Craft received ample documentation indicating that the nineteen motorcycles were being purchased by individual buyers.  *Exhibit 15* (Deposition Testimony of Michael Stevens ("Stevens Dep.")) at 78-82.

30.   First, Cycle-Craft received from Mr. Stevens nineteen completed Bills of Sale containing identifying information about each individual purchaser as well as each individual purchaser's signature.  *Id.* at 78:5-79:19; *Exhibit 16* (Florida Bills of Sale).

31.   Next, Cycle-Craft received nineteen completed Sales and Warranty Registration forms ("SWRs") reflecting each individual purchaser's identifying information and individual signatures.  *Exhibit 15* (Stevens Dep.) at 80:13-20; *Exhibit 17* (Florida SWRs).

32.   Mr. Stevens also sent photocopies of the nineteen individuals' drivers licenses to Cycle-Craft.  *Exhibit 15* (Stevens Dep.). at 81:3-9; *Exhibit 18* (Florida Licenses).

33.   Finally, the motorcycles were paid for with nineteen separate cashier's checks, each with the name of one of the individual buyers in the space on the check for

"remitter." *Exhibit 19* (Deposition Testimony of Debra Lunsford ("Lunsford Dep.")) at 47:24, 50:25, *Exhibit 20* (Florida Cashier's Checks).

34. During negotiations Cycle-Craft emphasized to Mr. Stevens and his associate Debra Lunsford that any new motorcycles could only be sold to individual buyers, in the names of those buyers. *Exhibit 15* (Stevens Dep.) at 77:2-12; *Exhibit 19* (Lunsford Dep.) at 167:16-18, 168:2-4. Sean Walsh, the Sales Manager at Cycle-Craft at that time, was specifically instructed by Cycle-Craft General Manager Ronald Buchbaum that the motorcycles could only be sold if they were purchased by individual buyers. *Exhibit 8* (Buchbaum Dep. I) at 254:13-22; *Exhibit 9* (Walsh Dep.) at 55:20-24.

35. Debra Lunsford of DCI was subsequently convicted of title fraud for submitting forged and false documentation to Florida authorities in connection with her attempts to have the 19 motorcycles registered. *Exhibit 19* (Lunsford Dep.) at 140:22-141:5.

### 2. Sales to New Hampshire Residents

36. Harley-Davidson also claims that Cycle-Craft sold eight motorcycles to Lee Custom Cycle, a used motorcycle dealer in Lee, New Hampshire. *See Exhibit 14* (Inspection of Records Letter) at 2.

37. Once again, the undisputed facts show that these motorcycles were purchased by eight individual buyers. Each of the eight individuals came to Cycle-Craft's dealership and completed the appropriate paperwork for the sales. The individuals signed the Bill of Sale for the motorcycle he or she was purchasing, *Exhibit 21* (Christensen Dep.) at 51:18-24; *Exhibit 22* (New Hampshire Bills of Sale); signed the Certificate of Origin, or "title," for the motorcycle he or she was purchasing, *Exhibit 21* (Christensen Dep.) at 59:20-60:2; *Exhibit 23* (New Hampshire Certificates of Origin);

9

presented an individual bank check for his or her motorcycle, *Exhibit 24* (New Hampshire Cashier's Checks); and presented his or her license, *Exhibit 21* (Christenson Dep.) at 65:7-12; *Exhibit 25* (New Hampshire Licenses)

38.   The sales to these New Hampshire residents were handled by Cycle-Craft salesperson Jason Marasca. When Mr. Marasca informed Mr. Buchbaum in July 2003 that a New Hampshire customer wanted to buy multiple motorcycles, Mr. Buchbaum specifically instructed Mr. Marasca that the motorcycles had to be sold to individuals and that each individual buyer had to sign the necessary paperwork. *Exhibit 8* (Buchbaum Dep. I) at 246:21-247:2; *Exhibit 10* (Marasca Dep.) at 55:9-10.

39.   Mr. Marasca then told the New Hampshire customer, Jeffrey. Christensen of Lee Custom Cycle, that the motorcycles needed to be purchased by individual buyers, *Exhibit 21* (Christensen Dep.) at 108:3-12, and that is exactly what happened.

40.   Although it appears that these individuals resold their motorcycles to Lee Custom Cycle, a New Hampshire wholesaler, the sales were made to individuals as required by the Dealer Contract. Mr. Marasca did not have any conversation with Mr. Christensen about what was going to happen to the motorcycles once they left the dealership and does not know whether Mr. Christensen was acting as a broker for the individual buyers. *Exhibit 10* (Marasca Dep.) at 64:11-21.

41.   Mr. Christensen bluntly acknowledged his deceptive tactics in his deposition, admitting it is Lee Custom Cycle's regular business practice to deceive dealers by providing individual names in purchasing motorcycles from Harley-Davidson dealerships, even where Lee Custom Cycle is ultimately acquiring the motorcycles for re-sale. *Exhibit 21* (Christensen Dep.) at 116:5-14.

10

42.     According to Mr. Christensen, "Lee Custom Cycle isn't on the bank check . . . [s]o the dealer can be sitting there and not even know that we suck bikes out." *Id.* at 115:11-14.  In short, Jason Christenson of Lee Custom Cycle was a gray market player who deceived Cycle-Craft.  *Exhibit 21* (Christensen Dep.) at 113-16.

### 3.     The Offer to Cycle-Craft Employees, Relatives and Friends

43.     Harley-Davidson also alleges that Cycle-Craft submitted fraudulent sales and warranty registration information (SWRs) for seventeen additional motorcycles in July 2003.  It contends that termination of the dealership is warranted under Section M.4(b) of the Dealer Contract, which authorizes Harley-Davidson to terminate a dealer who submits to Harley-Davidson "any application, claim, report, record or other information which is fraudulent or contains any material misrepresentation." *See Exhibit 14* (Inspection of Records Letter) at 2; *Exhibit 26* (Termination Letter) at 1-2.

44.     The undisputed facts, however, demonstrate that the sales reports submitted by Cycle-Craft were not fraudulent.  In July 2003, Cycle-Craft was faced with an overstock situation and a potential decrease in its 2004 motorcycle allocation.  Accordingly, knowing that Cycle-Craft employees, like those of Harley-Davidson dealers everywhere, are Harley-Davidson enthusiasts, Cycle-Craft General Manager Ronald Buchbaum made a rock-bottom offer to Cycle-Craft employees (and their family and friends) whereby they could purchase motorcycles at or just above dealer cost.  *See Exhibit 27* (Deposition Testimony of Kenneth McPhee ("McPhee Dep.")) at 124:5-8; *Exhibit 8* (Buchbaum Dep. I) at 187:19-23, 198:6-13, 199:11-14; *Exhibit 28* (Deposition Testimony of Michael Bloom ("Bloom Dep.")) at 18:1-10.  In the words of one Cycle-Craft employee, the offer was a "fantastic deal." *Exhibit 28* (Bloom Dep.) at 18:9-12.

45. This offer was consistent with the dealership's longstanding policy of offering deep discounts on motorcycles to Cycle-Craft employees, which was viewed by those employees as one of the perquisites of employment at Cycle-Craft. *Exhibit 9* (Walsh Dep.) at 135:17-136:18; *Exhibit 10* (Marasca Dep.) at 62:8-63:5.

46. Two Cycle-Craft employees, Mr. Giordano and Mr. Potts, purchased motorcycles at $500 over invoice in response to Mr. Buchbaum's original offer from late June/early July. *Exhibit 8* (Buchbaum Dep. I) at 189:21-190:13.

47. Numerous Cycle-Craft employees and their relatives and friends took advantage of the later offer for a purchase at cost with the understanding that if a regular customer desired to purchase the motorcycle that motorcycle would be sold to the regular customer. *Id.* at 207:16-208:5, 211:20-23; *Exhibit 28* (Bloom Dep.) at 17:20-24, 20:3-21:6; *Exhibit 29* (Deposition Testimony of Jamie McGrath ("McGrath Dep.")) at 109:24-110:2. Other employees decided not to take advantage of the offer. *Exhibit 8* (Buchbaum Dep. I) at 212:1-6. No down payment was required as these were employee purchases. *Exhibit 8* (Buchbaum Dep. I) at 162:4-13.

48. When it received commitments to purchase, Cycle-Craft then submitted SWRs for the thirteen individuals who had so committed. *Exhibit 8* (Buchbaum Dep. I) at 212:24-213:3.

49. After sales of those motorcycles were subsequently made to other, non-employee customers, Cycle-Craft informed Harley-Davidson of the change of owner information and Harley-Davidson changed its records accordingly, and without question. *Exhibit 8* (Buchbaum Dep. I) at 215:7-11; *Exhibit 30* (Deposition Testimony of Dianne Bolden ("Bolden Dep.")) at 33:10-22, 66:6-20.

LIBA/1577322.1

50. The three motorcycles that Harley-Davidson alleges remained in Cycle-Craft's inventory, s*ee Exhibit 14* (Inspection of Records Letter) at 2-3, were actually purchased by Cycle-Craft. *Exhibit 7* (Atwood Dep.) at 95:7-24, *Exhibit 9* (Walsh Dep.) at 128:7-14.

51. Each year Cycle-Craft Owner John Atwood purchases two or three units to add to the dealership's collection. *Exhibit 7* (Atwood Dep.) at 94:23-95:2. As John Atwood is the President, Chief Executive Officer, the Chairman (and the only member) of the Board of Directors, and the owner of the overwhelming majority of the stock in Cycle-Craft, any purchase by the dealership is in essence a purchase by Mr. Atwood. *Exhibit 7* (Atwood Dep.) at 9:1-4, 14:10-16; *Exhibit 31* (Deposition Testimony of Stephen Vesey ("Vesey Dep.")) at 41:4-42:17.

52. The three motorcycles in question were purchased by Cycle-Craft to be featured in the dealership's collection and SWRs were properly submitted to reflect the purchase by Cycle-Craft. *Exhibit 7* (Atwood Dep.) at 94:23-95:2; *Exhibit 9* (Walsh Dep.) 128:7-21.

Respectfully submitted,

CYCLE-CRAFT CO., INC.

By its attorneys,


   /s/ James C. Rehnquist
James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

August 30, 2005

14

LIBA/1577322.1