Affidavit of Christopher C. Nee, Esq.

# EXHIBITS 9-16

# EXHIBIT 9

1

```
 1                                          VOLUME 1

 2                                          PAGE: 1-144

 3                                          EXHIBITS: 1-17

 4                  UNITED STATES DISTRICT COURT

 5                   DISTRICT OF MASSACHUSETTS

 6    CYCLE-CRAFT CO., INC.            )  CIVIL ACTION

 7    D/B/A BOSTON HARLEY-DAVIDSON/BUELL, )  NO. 11402NMG

 8         PLAINTIFF,                   )

 9    v.                               )

10    HARLEY-DAVIDSON MOTOR COMPANY, INC.,)

11    AND BUELL DISTRIBUTION COMPANY, LLC,)

12         DEFENDANTS.                  )

13    _____ )

14              DEPOSITION OF SEAN WALSH

15        DATE:     APRIL 27, 2005

16        TIME:     10:11 A.M.

17        PLACE:    BINGHAM MCCUTCHEN

18                  150 FEDERAL STREET

19                  BOSTON, MA  02110
```

**MEDEIROS STENO & VIDEO GROUP**

"FOR THE TRAVELING LITIGATOR SINCE 1988"

| | | |
|---|---|---|
| *Boston: | 617.590.9767 | *Depositions |
| *New York: | 646.413.4499 | *Arbitrations |
| *Florida | 305.321.7414 | *E-transcript |
| *E-mail: | depo@gomedeiros.com | *Video |

**\*MA \*CT \*NJ \*NY \*FL**

36

1    there's a section about non-retail sales.

2         Q:  **What was your understanding in 2003 as to**

3    **Harley-Davidson's policy with respect to non-retail**

4    **sales?**

5         A:  My understanding was that motorcycles could

6    not be sold to businesses, to resalers.  They had to

7    be sold to personal individuals.

8         Q:  **By "personal individuals" what do you mean?**

9         A:  Just people, regular customers, not in

10   business names and not company names.

11        Q:  **You say you first became aware of this**

12   **policy when?**

13        A:  When I first started selling motorcycles in

14   2002 it had come up just in discussion about selling

15   motorcycles.  A customer wanted to buy a bike and put

16   it in  his company name and I was told that he had to

17   put it in his personal name by the finance manager at

18   the time and by the sales manager.

19        Q:  **Who was the finance manager at that time?**

20        A:  Rhonda Young.

21        Q:  **And the sales manager was Mr. Capucci?**

22        A:  Yes.

23        Q:  **At some point did you become involved with**

24   **the sale of motorcycles to a Florida company called**

55

1      A:   It was somebody at DC Imports.  They told
2  me that the name DC Imports was on the credit card in
3  addition to their personal name.  I'm not, I don't
4  remember whose specific name it was.  Obviously this
5  was declined.

6      Q:  Do you recall at some point, though, a
7  $10,000 deposit was accepted via a charge card?

8      A:   Yes.  The second credit card that they gave
9  us went through.

10     Q:  Do you recall whose name was on that second
11  credit card?

12     A:   I don't.  It was a woman who worked at DC
13  Imports.  I'm not sure of the name.

14     Q:  During the process of your dealings with
15  Mr. Stevens and Ms. Lunsford at DC Imports, did you
16  have any discussion with Mr. Buchbaum as to how the
17  paperwork on this deal should be handled?

18     A:   Yes.

19     Q:  Can you describe that discussion for us?

20     A:   Yes.  Ron was very specific that the bills
21  of sale all had to be written up in individual names.
22  He wouldn't sell anything to DC Imports as a name
23  and he asked me to convey that to Mike Stevens and
24  let them know.

1   would put Mike Stevens on hold, go up to Ron's office

2   and Ron would pick up the phone and talk to Mike

3   because I wasn't able to negotiate price which is

4   why.

5        Q:  **Is it your understanding that the**

6   **conversations as far as you arranged for them or**

7   **participated in them, the conversations between**

8   **Buchbaum and Stevens had to do with the price?**

9        A:  Yes.  They talked about the price of the

10   motorcycles.

11        Q:  **I think you testified that you never had**

12   **any conversations with Mike Stevens or anyone at DCI**

13   **about DCI's business and what they did?**

14        A:  No, I never talked to them directly about

15   what their company did.  I mean I just assumed from

16   the name DC Imports, I would assume that they

17   imported goods.  I didn't know what they did.

18        Q:  **Did you even know if they were in the**

19   **motorcycle business?**

20        A:  No, we never talked about it.  I did talk

21   with Mike about his past.  I know he had a history

22   with motorcycles because he's from the Boston area.

23   So I just talked to him about that but that was it.

24        Q:  **Nothing about DCI and what it did?**

4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.                    4/27/05

102

1          A:   No.

2          Q:   So did you have any conversations with

3    anyone at DCI about who the individual purchasers of

4    the motorcycles were?

5               MR. BERKOWITZ:   Objection.

6          A:   No, I didn't talk to them about the people.

7    I just had the names.   I didn't talk to them about

8    who they were.

9          Q:   Did you have any conversations with anyone

10   at DCI about what the individual purchasers were

11   going to do with the motorcycles once they received

12   them?

13              MR. BERKOWITZ:   Objection.

14         A:   No.

15         Q:   Do you remember around the time when you

16   were talking to Mike Stevens that Mr. Buchbaum told

17   you in manager's meetings that any sales had to be to

18   individuals?

19              MR. BERKOWITZ:   Objection.

20         A:   Not in the manager's meetings.   He would

21   tell me individually.   He would call me up to his

22   office and he did say that all the bikes have to be

23   in individual's names.

24         Q:   You don't recall him telling in the

128

1    Maciano.   Number 9 Dennis Seca.   Number 10 Robin

2    Maciano.   Number 12 John Seca.   Number 13 Howie Cook.

3    Number 14 Sal Giordano.   Number 15 Rod Gernese.

4    Number 18 Lisa Bloom.   I'm not familiar with name

5    "Elaine Bloom" but I would assume that's one of the

6    Bloom family.   Number 19 Jamie McGrath.   Obviously

7    number 20, myself.   That's it.   The three that are

8    listed to Boston Harley-Davidson were motorcycles

9    that the owner of Boston Harley-Davidson was taking

10   as his own.   So I was told to SWR them in Boston

11   Harley-Davidson's name and the company would be

12   paying for the bikes and the company would be keeping

13   the bikes in Boston Harley-Davidson's name so that

14   the owner could use them.

15        Q:   **Who told you that?**

16        A:   Ron Buchbaum told me to do that.

17        Q:   **What did you do, if anything?**

18        A:   I instructed Rochelle Poletti who is the

19   payroll administrator who does all the books upstairs

20   also to pay for the motorcycles.   And then I SWR'd

21   them in Boston Harley-Davidson's name.

22        Q:   **Was it at the same meeting that you**

23   **testified about earlier that Mr. Buchbaum said that**

24   **those motorcycles would be bought by the dealership**

135

1          A:   No.   No, she didn't mention that to me.

2          Q:   **Was there any discussion about that**

3     **subject?**

4          A:   No.   No.

5               MR. REHNQUIST:   Nothing further.   Hang on

6     one second, I'm told that I should ask more

7     questions.   One question on a different subject.

8          Q:   **Mr. Walsh, I think you said you purchased a**

9     **bike from Boston Harley-Davidson --**

10         A:   I did.

11         Q:   **-- in I think March or so of '03?**

12         A:   February or March.   I believe I started the

13    procedure in February.

14         Q:   **On any other occasion have you purchased a**

15    **motorcycle from Boston Harley-Davidson?**

16         A:   Yes.   I believe this is my third.

17         Q:   **Did John Atwood have a policy that you were**

18    **aware of of permitting employees who had been working**

19    **there for sometime to buy a motorcycle from the**

20    **company at a low price?**

21         A:   Yes.   When I originally started there I was

22    told it was a year and then you would get a deal on a

23    bike.

24         Q:   **And you took advantage of that I think**

136

1    three times?

2        A:    Yeah, that was my third motorcycle I

3    bought.

4        Q:    Do you recall the prices, maybe not the

5    actual number but the relationship between the price

6    that the employee could buy the motorcycle and the

7    MSRP?

8        A:    The general deal was $500.00 over cost for

9    an employee but John Atwood would administer the

10   final price, but as a rule it was $500.00 over cost.

11       Q:    Do you know if other employees took

12   advantage of that opportunity as well?

13       A:    Yes.    Several employees.

14       Q:    Was this complaints considered by the

15   employees almost sort of like a fringe benefit of

16   working there?

17       A:    Yeah, I would say so.    It was definitely a

18   benefit.

19       Q:    Have you ever bought a motorcycle in the

20   open market for anywhere close to $500.00 over MRSP?

21            MR. BERKOWITZ:    Objection.

22       A:    I never bought a new motorcycle until I

23   worked at Boston Harley-Davidson.    I had bought two

24   pre-owned Harleys before then from individuals, not

# EXHIBIT 10

4/28/05 DEPOSITION OF JASON MARASCA RE CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

Case 1:04-cv-11402-NMG    Document 54-4    Filed 08/30/2005    Page 12 of 75

1

```
 1                                            VOLUME 1

 2                                            PAGE:  1-82

 3                                            EXHIBITS: 1-9

 4                   UNITED STATES DISTRICT COURT

 5                   DISTRICT OF MASSACHUSETTS

 6    CYCLE-CRAFT CO., INC.              ) CIVIL ACTION

 7    D/B/A BOSTON HARLEY-DAVIDSON/BUELL, ) NO. 11402NMG

 8          PLAINTIFF,                   )

 9    v.                                 )

10    HARLEY-DAVIDSON MOTOR COMPANY, INC.,)

11    AND BUELL DISTRIBUTION COMPANY, LLC,)

12          DEFENDANTS.                  )

13    _____ )

14          DEPOSITION OF JASON MARASCA

15          DATE:   APRIL 28, 2005

16          TIME:   10:06 A.M.

17          PLACE:  BINGHAM MCCUTCHEN

18                  150 FEDERAL STREET

19                  BOSTON, MA  02110
```

**MEDEIROS STENO & VIDEO GROUP**

```
20

21

22
```

**"FOR THE TRAVELING LITIGATOR SINCE 1988"**

| | | |
|---|---|---|
| *Boston: | 617.590.9767 | *Depositions |
| *New York: | 646.413.4499 | *Arbitrations |
| *Florida | 305.321.7414 | *E-transcript |
| *E-mail: | depo@gomedeiros.com | *Video |

**\*MA \*CT \*NJ \*NY \*FL**

42

```
 1    of Harley-Davidson's sometimes referred to as a

 2    non-retail sales policy?

 3         A:   No.

 4         Q:   When did you first become aware of that

 5    policy?

 6         A:   A couple months ago.

 7         Q:   How did you become aware of it?

 8         A:   At my new employer.

 9         Q:   At Kelly's?

10         A:   Correct.

11         Q:   When you were at Cycle-Craft were you aware

12    of such a policy?

13         A:   No, I wasn't.

14         Q:   Can you describe for me what your

15    understanding of the policy is?

16         A:   Now?

17              MR. BERKOWITZ:   Yes.

18              THE WITNESS:   You cannot wholesale bikes

19    to another dealer for them to sell the bike.   I

20    believe that's the way it works.

21         Q:   What do you mean when you say "wholesale"?

22         A:   Discount.

23         Q:   Do you know whether the policy prohibits

24    sales to other people who are going to resell the
```

4/28/05 DEPOSITION OF JASON MARXSCH RE-CYCLE CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

Case 1:04-cv-11402-NMG   Document 54-4   Filed 08/30/2005   Page 14 of 75

55

```
 1        A:   I believe they had said Lee Custom Cycles.

 2        Q:   Are you positive?

 3        A:   I'm pretty sure, yes.

 4        Q:   Isn't it true that when you walked in there

 5   and told Mr. Buchbaum about this transaction that he

 6   told you that those motorcycles have to be sold to

 7   individuals?

 8             MR. BERKOWITZ:   Objection.   Leading.

 9        A:   He said that they had to be under different

10   names, individual different names, yes.

11        Q:   I gather you thought at the time that he

12   was doing this more or less just to bust your chops

13   to use a colloquial term?

14        A:   Pretty much, yeah.

15        Q:   Do you now know that in fact he was doing

16   that because Harley-Davidson does not permit

17   motorcycles to be sold to businesses?

18             MR. BERKOWITZ:   Objection.   Leading.

19        A:   Yeah, I know that now.

20        Q:   Did you have any discussion with, well I

21   gather you and Sean Walsh are friendly?

22        A:   Yes.

23        Q:   Did you have any discussion with Sean Walsh

24   around that time when Mr. Buchbaum gave you this
```

56

1    direction about why he was causing you to do it the

2    hard way?

3            A:    I honestly can't recall.

4            Q:    Do you recall if he told you that you had

5    to do the deposits on separate credit cards?

6            A:    Who, Ron Buchbaum?

7                    MR. REHNQUIST:    Yes.

8                    THE WITNESS:    Yes.

9            Q:    Do you recall that he told you that those

10    motorcycles had to be picked up at the dealership by

11    the individuals whose names were on them?

12            A:    No, he told me that each individual had to

13    come in and sign the paperwork.    Nothing about

14    picking up the bike.

15            Q:    But he did say that each individual had to

16    come to the dealership?

17            A:    Yes.

18            Q:    Have you had any dealings with Mr.

19    Christensen since you've been working at Kelly's

20    Harley-Davidson?

21            A:    No, I have not.

22            Q:    Have you had any conversations with anyone

23    at Kelly's about Christensen or about Lee Custom

24    Cycle?

57

1        A:  No.

2        Q:  **How is it in the last few months that you**

3     **came to learn of this policy that Harley-Davidson has**

4     **against not selling motorcycles to businesses?**

5              MR. BERKOWITZ:  Objection.  Go ahead.

6        A:  I read the contract and talked to my GM

7     about it.  I believe actually I learned about this

8     when I got the subpoena I talked to my GM about it

9     and he told me, "Yeah, that's the way it is."  And he

10    showed me a copy of the contract.

11       Q:  **When you say "the contract", that he showed**

12    **you a copy of the contract can you describe the**

13    **document that he showed you?**

14       A:  He showed me a page in a book that

15    described not selling bikes to wholesalers or

16    something like that.  He went over that really quick

17    and I said okay.

18       Q:  **Do you recall if it was a small paragraph**

19    **in a large contract?**

20       A:  I believe it was, yeah, it was about a page

21    I thought.

22       Q:  **Had you ever seen that before?**

23       A:  No, I hadn't.

24       Q:  **I gather that now you report to the General**

62

1    Harley-Davidson ride motorcycles?

2         A:   A good percentage of them.

3         Q:   In fact, a lot of them bought motorcycles

4    from Boston Harley-Davidson, didn't they?

5              MR. BERKOWITZ:   Objection.   Leading.   You

6    can answer.

7         A:   Yeah, sure.

8         Q:   Do you recall that John Atwood would

9    sometimes allow employees who had been with Boston

10   Harley-Davidson for a certain period of time to buy a

11   motorcycle at a good price?

12        A:   Yes.

13        Q:   Did you take advantage of that opportunity

14   yourself?

15        A:   Yes, I did.

16        Q:   What were the terms of your purchase?   Let

17   me ask you this, how many bikes did you buy from the

18   dealership?

19        A:   I purchased two new motorcycles from the

20   dealership.

21        Q:   At what price?

22        A:   I don't remember the exact prices.

23        Q:   Do you recall that it was a good price?

24        A:   Yeah, I got a pretty good deal.

63

1       Q:  Do you recall that this was perceived by

2  some of the employees as almost being like a fringe

3  benefit of working there?

4          MR. BERKOWITZ:  Objection.

5       A:  Yeah, I guess.

6       Q:  I believe you testified earlier that you

7  did not have any discussion with Mr. Christensen

8  about what was going to happen to the motorcycles

9  after they left the Boston Harley-Davidson

10  dealership?

11       A:  Correct.

12       Q:  I believe you said that you simply assumed

13  because he was in the motorcycle business that he was

14  planning to get the motorcycles and resell them?

15       A:  Correct.

16       Q:  But you never had any conversation with him

17  about that?

18       A:  Not that I can recall.

19       Q:  And you don't know from any conversations

20  with him what, if anything, the individuals whose

21  names were on the files at Boston Harley-Davidson

22  were going to do with those motorcycles, do you?

23          MR. BERKOWITZ:  Objection.

24       A:  Do I know for sure?

64

1        Q:  Do you know based on any conversations you

2    had with Mr. Christensen about what the individuals

3    who came down and filled out the paperwork were going

4    to do with those motorcycles?

5        A:  No.

6            MR. BERKOWITZ:  Objection.

7        Q:  You don't know whether they rode

8    motorcycles or whether they didn't?

9            MR. BERKOWITZ:  Objection.

10       A:  I do not know that.

11       Q:  You don't know whether Mr. Christensen was

12   acting as a broker for these sales and perhaps they

13   were paying him the commission and were going to keep

14   the motorcycles themselves, do you?

15           MR. BERKOWITZ:  Objection.

16       A:  I do not believe so.

17       Q:  Do you know?  Did you have any conversation

18   with Mr. Christensen about what was going to happen

19   to the motorcycles after they left the dealership in

20   Boston Harley-Davidson?

21       A:  Not that I can recall.

22       Q:  You testified that you believed the

23   motorcycles were paid for by check?

24       A:  Yes.

# EXHIBIT 11

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3          * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                          *
4          CYCLE-CRAFT CO., INC., d/b/a*
           BOSTON HARLEY-DAVIDSON/BUELL*
5                         Plaintiff,     *
                                          *
6                 v.                      *CIVIL ACTION
                                          *NO. 04-11402-NMG
7          HARLEY-DAVIDSON MOTOR CO.,    *
           INC., AND BUELL DISTRIBUTION*
8          CO., LLC                      *
                          Defendant.     *        COPY
9                                         *
           * * * * * * * * * * * * * * * * * * * * * * * * * * *

10

11                     DEPOSITION OF AL CONTOIS

12            Deposition taken by agreement of counsel

13            in the Daniel Webster Conference Room at

14            the Sheraton Harborside Portsmouth Hotel,

15            250 Market St., Portsmouth, New Hampshire,

16            on Friday, June 17, 2005, commencing at

17            9:00 a.m.

18            Court Reporter:   Sonia E. Bishop, CCR

19         ----------------------------------------------------

20                 DAVID R. JORDAN & ASSOCIATES

21                  Certified Court Reporters

22         P.O. Box 303                  (603) 778-7710

23         Exeter, NH   03833          NH 1-800-562-3945

1          unclear, please let me know, and I will try to

2          rephrase the question so that it's

3          understandable.

4                 Do you understand that?

5     A.   Yes.

6     Q.   If you need to take a break at any time, we can

7          do that.  I would like you just to finish any

8          question that's pending before we take a break.

9                 Do you understand that?

10    A.   Yes.

11    Q.   Okay.  Now, you're represented here today by

12         counsel, correct?

13    A.   Correct.

14    Q.   And who is the attorney representing you today?

15    A.   Bill Benson.

16    Q.   And you understand that he also represents

17         Harley-Davidson Motor Company?

18    A.   Yes.

19    Q.   That's your former employer?

20    A.   Correct.

21    Q.   And your current employer is?

22    A.   Seacoast Harley-Davidson.

23    Q.   And what's Seacoast Harley-Davidson's address?

1    A.    17 Lafayette Road, North Hampton,

2          New Hampshire.

3    Q.    Is North Hampton in the Portsmouth area?

4    A.    Yes.

5    Q.    And what is your residential address?

6    A.    9 Chestnut Way, Stratham, New Hampshire.

7    Q.    And is Stratham south of Portsmouth?

8    A.    Yes.

9    Q.    How long have you worked at Seacoast

10         Harley-Davidson?

11   A.    Since August of last year.

12   Q.    August of '04?

13   A.    Yes.

14   Q.    And prior to that, what did you do?

15   A.    I was a district manager for Harley-Davidson

16         Motor Company.

17   Q.    For how long were you district manager for

18         Harley-Davidson?

19   A.    Approximately eight, nine years.

20   Q.    Did you work in the same district the entire

21         eight or nine years?

22   A.    No.

23   Q.    What districts did you work in during your

1              eight or nine years as district manager?

2    A.       Originally I was in eastern Pennsylvania, New

3             York, New Jersey and Connecticut.

4    Q.       For approximately how long?

5    A.       About seven years.

6    Q.       And after that?

7    A.       I went to Harley corporate, Juneau Avenue,

8             worked in the offices.

9    Q.       What did you do at Harley corporate?

10   A.       I was manager of performance consulting.

11   Q.       How long did you do that?

12   A.       For two and a half years, three years.

13   Q.       And what did you do after that?

14   A.       Then I came back to a district manager role.

15   Q.       And that would be for the district that

16            includes Boston?

17   A.       Correct.

18   Q.       And how long were you the district manager for

19            the area that includes Boston?

20   A.       A year and a half, approximately.

21   Q.       What did you do before you were a

22            Harley-Davidson district manager for work?

23   A.       I was working for Hershey Foods.

1          expressed in the dealer contract is the same as

2          the policy that is handed out every year in a

3          manual, as you testified?

4              MR. BENSON:  Objection.

5              MR. REHNQUIST:  Basis?

6              MR. BENSON:  Foundation.

7          BY MR. REHNQUIST:

8    Q.    You can answer the question.

9    A.    Yes.

10   Q.    So in other words, your understanding is that

11         the -- the policy as it exists in the dealer

12         contract is the same as the policy that is

13         distributed every year?

14   A.    That's what I believe.

15   Q.    Are you aware of -- well, withdraw.

16             During the period that you were a district

17         manager in the eastern Pennsylvania district --

18         just to make it simpler, what's the name of

19         that district, the eastern Pennsylvania, New

20         York?  Is there a number for that or something?

21   A.    District 4.

22   Q.    And then the New England district is District

23         1?

23

```
1    A.    District 1.

2    Q.    While you were district manager in District 4,

3          do you recall that the nonretail sales policy

4          changed at any time during the period when you

5          were district manager in District 4?

6    A.    No.

7    Q.    Do you recall whether the policy ever changed

8          during the one and a half years you were

9          district manager in District 1?

10   A.    No.

11   Q.    Did you ever receive any training from

12         Harley-Davidson regarding the non-retail sales

13         policy?

14   A.    No.

15   Q.    Do you recall that it was explained to you or

16         you saw it when you first joined the company,

17         and that was it?

18   A.    Yes.

19   Q.    What is your understanding as you sit here

20         today of the non-retail sales policy?

21   A.    That you have to sell a motorcycle to the end

22         user.

23   Q.    Are there any other requirements as you sit
```

1          here today that you -- withdrawn.

2              Are there any other requirements of the

3          non-retail sales policy, to your knowledge?

4              MR. BENSON:  Objection to form, foundation.

5              THE WITNESS:  I'm not sure I understand.

6          BY MR. REHNQUIST:

7    Q.    Are you aware of any other requirements of the

8          non-retail sales policy except the one

9          requirement that you've just said that a

10         motorcycle can only be sold to an end user?

11             MR. BENSON:  Objection to form.

12             THE WITNESS:  No.

13         BY MR. REHNQUIST:

14   Q.    Mr. Contois, have you done anything to prepare

15         for your deposition today?

16   A.    No.

17   Q.    Did you meet with Mr. Benson or any of his

18         colleagues from his law firm at any point prior

19         to today?

20   A.    Yes.

21   Q.    When did you first meet with Mr. Benson or any

22         of his colleagues?

23   A.    Yesterday.

# EXHIBIT 12

Deposition of Steven R. Verduyn, 4/6/2005

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3       ------------------------------------------------------

CYCLE-CRAFT CO., INC., d/b/a
4       BOSTON HARLEY-DAVIDSON/BUELL,

5                    Plaintiff,

6            vs.              Civil Action No. 04 11402 NMG

7       HARLEY-DAVIDSON MOTOR COMPANY, INC.
        and BUELL DISTRIBUTION COMPANY, LLC,

8

9                    Defendants.

10      ------------------------------------------------------

11

12

            Video Deposition of STEVEN R. VERDUYN
13
            Wednesday, April 6th, 2005
14

15                    10:09 a.m.

16                        at

17              GRAMANN REPORTING, LTD.
            710 North Plankinton Avenue, Suite 710
18                  Milwaukee, Wisconsin

19

20      Reported by Sarah A. Reinicke, RPR/RMR/CRR

21

22

23

24

25

Deposition of Steven R. Verduyn, 4/6/2005

```
 1              the record?

 2                         MR. REHNQUIST:  We may.

 3                         (Pause in proceedings.)

 4                         THE VIDEOGRAPHER:  We're back on the record

 5              at 11:33 a.m.

 6     BY MR. REHNQUIST:

 7     Q    Mr. Verduyn, how long have you been working at

 8          Harley-Davidson?

 9     A    Just over 12 years.

10     Q    And what is your current position?

11     A    My job title is manager of credit programs.

12     Q    And do you also have responsibilities for -- in sort

13          of -- for lack of a better term, enforcement of the

14          nonretail sales policy?  And by that I mean sort of

15          the inquiries and reviews into potential nonretail

16          sales policy violations that we've been talking

17          about.

18     A    Yes, I do.

19     Q    And if I use the term sort of "enforcement

20          procedures" or "enforcement policies," will you

21          understand what I'm talking about?

22     A    Can you give me your -- again, your kind of

23          definition of that?

24     Q    What would you call it?  What would you call the --

25          your responsibilities for conducting --
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1    A    Investigation.

 2    Q    Investigation?

 3    A    Um-hmm.

 4    Q    Investigation into nonretail sales policy violations.

 5         Okay, when did you first assume the responsibilities

 6         that you have today for investigating potential

 7         nonretail sales policy violations?

 8    A    There was no formal date, per se.  I became involved

 9         with it approximately five, six years ago.

10    Q    And how does it relate to your other responsibilities

11         as the manager of credit programs?

12              MR. BERKOWITZ:  Objection.  If you could be

13         more specific, I can withdraw the objection.

14              THE WITNESS:  Yeah, I don't so much

15         understand the question.

16    BY MR. REHNQUIST:

17    Q    Well, how did you come to take on responsibilities

18         for investigation of potential nonretail sales policy

19         violations?

20    A    As best I can recall, I was asked to review paperwork

21         that had been sent in by a dealer on a different

22         inquiry.

23    Q    Who asked you to do that?

24    A    As best I can recall, it would have been the director

25         of that area, DFO.
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1   Q   And do you have an understanding as to why this
 2       person asked you?
 3   A   I can surmise.
 4   Q   Please.
 5   A   My primary function at Harley-Davidson had been and
 6       to a degree still continues to be with handling
 7       matters of wholesale financing of our product, of
 8       collection-related activities, and work out
 9       negotiations with dealers that find themselves in a
10       financial bind.  It's paramount, critical that I have
11       a certain level of detail in what I do in examining
12       things and that I'm consistent in what I do and that
13       I understand the responsibilities and the rules and
14       programs around that.
15   Q   So your belief is that the sort of -- the
16       characteristics and traits that you bring to bear in
17       dealing with work-outs and financial issues with
18       dealerships also lend themselves to having ability to
19       do the kinds of investigations necessary when there's
20       a suspect nonretail sale?
21   A   In part.  I have a reputation for impeccable
22       integrity and fairness in any capacity of work I've
23       been involved with.  And I believe in my mind that
24       that certainly played a part in why I was asked to
25       begin examining these things and become involved in
```

Deposition of Steven R. Verduyn, 4/6/2005

1        this process.

2    Q   After that sort of one off situation when you were

3        asked to follow up with a -- with a particular

4        dealer, was your role in these investigations ever

5        sort of more formalized?

6    A   Just through the process of day-to-day business, I, I

7        guess, grew to be one of the primary people that was

8        involved with it.  Through -- just through time and

9        through my experience in -- you know, that I learned

10       and gained by working with these matters over time

11       and having some experience in dealing with dealers

12       and with, you know, what can be difficult situations.

13   Q   And are you sometimes called the gray market expert?

14              MR. BERKOWITZ:  Objection.  You may answer.

15              THE WITNESS:  I don't know that I've ever

16       heard myself called that, but -- that specifically,

17       but I think that's fairly accurate.

18   BY MR. REHNQUIST:

19   Q   Have Harley-Davidson's investigative procedures or

20       policies changed at all over time, to your knowledge?

21   A   The nonretail policy has changed slightly over time

22       to address different market conditions and different

23       business opportunities as we've -- we've grown.

24   Q   Have any of those changes in the policy itself caused

25       any change in the -- the methods or procedures that

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        substantial.
 2   Q    I mean, were you marking this confidential so that
 3        Mr. Malicki and Mr. Contois would be careful with the
 4        information?  Or were you marking this E-mail as
 5        confidential so that other people at Harley would be
 6        careful with the information?
 7   A    No.  It was intended solely for Mike and Al.  At that
 8        point I hadn't copied anyone else on it, so I don't
 9        know who -- who else would -- would get it.
10   Q    Had you dealt with Al Contois and Mike Malicki before
11        on investigations like this?
12   A    Mike, yes.  And Al, I can't recall.
13   Q    You note in your E-mail a sale to a Disimone or
14        Disimone, D-I-S-I-M-O-N-E.  Do you see that?
15   A    Um-hmm.
16   Q    And you say, "There is a Thomas and Jeanette Disimone
17        that own a large after-market shop in New York State
18        that I have dealt with on other gray market
19        activity."  Do you see that?
20   A    Yes.
21   Q    Had dealers been advised in any way to look out for
22        Disimones or either of the Disimones as potential
23        purchasers of Harley bikes?
24   A    Not to my knowledge.
25   Q    To your knowledge, had dealers ever been given any
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1          advice or warnings about certain gray market

 2          purchasers to avoid dealing with?

 3    A     They were not given lists of specific individuals to

 4          avoid.

 5    Q     Did you ever participate in any discussions at

 6          Harley-Davidson about whether or not that would be a

 7          good idea?

 8    A     Yes.

 9    Q     With whom did you discuss that?

10    A     Counsel.

11    Q     Who?

12    A     Jenny Kent.

13    Q     Anybody else?

14    A     Christine Hansen.

15    Q     Anybody else?

16    A     Gene Ostrum.

17    Q     Is he counsel?

18    A     No.   Gene's not counsel.

19    Q     Did you discuss it with Gene Ostrum outside the

20          presence of counsel?

21    A     No, not that I recall.

22    Q     Is this one particular meeting or conversation that

23          you're thinking about?

24    A     There were more than one.

25    Q     When did these conversations occur?
```

Deposition of Steven R. Verduyn, 4/6/2005

1   A   A year or two years ago.  I don't -- I don't have an
2       exact date.
3   Q   And did you discuss this matter with counsel because
4       you were seeking legal advice?
5   A   Yes.
6   Q   Did you initiate the conversation with counsel, or
7       did counsel initiate the conversation with you?
8   A   Which conversation?
9   Q   Well, how many conversations were there?
10  A   There were a couple meetings.
11  Q   Let's talk about the meetings first.  Who initiated
12      the meetings?
13  A   I would have been proactive with those in asking that
14      those be set up.
15  Q   And who did you go to to set up such a meeting?
16  A   The attorney on staff at the time.  Initially it was
17      Chris Hansen.
18  Q   And did you go to -- did you initiate a meeting with
19      counsel because you thought it would be a good idea
20      to disclose the names of gray market actors to
21      dealers?
22          MR. BERKOWITZ:  Objection.  Calls for
23      attorney/client privileged communication.  I instruct
24      you not to answer.
25          MR. REHNQUIST:  I'm asking him why he

Deposition of Steven R. Verduyn, 4/6/2005

1       decided to go to counsel.

2                   MR. BERKOWITZ:  Right.

3                   MR. REHNQUIST:  I'm not asking for any

4       communication with counsel at all.  I'm asking why he

5       made the decision to seek advice of counsel, and that

6       is, I don't believe, privileged.

7                   MR. BERKOWITZ:  I believe it is, and I'm

8       going to stand by the instruction.

9   BY MR. REHNQUIST:

10  Q    Are you going to follow your counsel's instruction?

11  A    Yes.

12  Q    Did you -- did you initiate a meeting with counsel

13       because you thought it would be a bad idea to share

14       gray market information with dealers?

15                      Go ahead.  I'm setting the record.  Go

16       ahead.  You can instruct him.

17                   MR. BERKOWITZ:  All right.  I object to the

18       question and instruct you not to answer.

19  BY MR. REHNQUIST:

20  Q    Are you going to follow the instruction?

21  A    Yes.

22  Q    Did you form an opinion on whether disclosing

23       information regarding gray market actors to dealers

24       would be a good idea before you sought a meeting with

25       counsel?

Deposition of Steven R. Verduyn, 4/6/2005

```
 1                    MR. BERKOWITZ:  You can answer.
 2                    THE WITNESS:  Can you repeat the question,
 3           please?
 4    BY MR. REHNQUIST:
 5    Q    .Yeah.  Before initiating a meeting with counsel, did .
 6           you form an opinion or make a recommendation as to
 7           whether it would be a good idea or not for
 8           Harley-Davidson to disclose to dealers the identity
 9           of gray market actors?
10    A    In my own mind, yes.
11    Q    And what was that -- what was the view that you
12           developed in your own mind?
13    A    It was my opinion that that information should be
14           shared.
15    Q    Why?
16    A    To stem the growth in nonretail sales activity to
17           certain brokers, certain common last name people that
18           were appearing throughout the country buying bikes.
19    Q    Was Lee Custom Cycle one of those?
20    A    No.
21    Q    Did you discuss your view on this matter with anyone
22           else at Harley-Davidson before you initiated a
23           meeting with counsel?
24                    MR. BERKOWITZ:  Other than counsel?
25                    MR. REHNQUIST:  Well, yeah.  Sorry.
```

Deposition of Steven Verduyn, 5/26/2005

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3    -----------------------------------------------

      CYCLE-CRAFT CO., d/b/a
 4    BOSTON HARLEY-DAVIDSON/BUELL,

 5                  Plaintiff,

 6
                 vs.          Civil Action No. 04 11402 NMG
 7
      HARLEY-DAVIDSON MOTOR COMPANY, INC.
 8    and BUELL DISTRIBUTION COMPANY, LLC,

 9

10                  Defendants.

11    ----------------------------------------------

12

13
               Video Deposition of STEVEN VERDUYN
14
                 Thursday, May 26th, 2005
15

16                      9:54 a.m.

17                        at

18              Gramann Reporting, Inc.
                710 North Plankinton Avenue
19                Milwaukee, Wisconsin

20

21

22

23

24
              Reported by Rosanne E. Pezze, RPR/CRR
25
```

Deposition of Steven Verduyn, 5/26/2005

1        least some of these.

2    Q    Is it the case that on ten or 15 different occasions

3        Harley-Davidson Motor Company has given a dealer an

4        exception as it is described in these letters even

5        though there has been a determination by

6        Harley-Davidson that the non-retail sales policy has

7        been violated?

8    A    That's correct.

9    Q    To your knowledge under what circumstances has

10       Harley-Davidson given dealers an exception?

11   A    As is stated in the correspondence to the dealers,

12       there are a number of reasons on why that could

13       occur.

14   Q    What are they?

15   A    They might include such things as the dealership

16       being very, very new, not having been in business for

17       a long time, so perhaps not being familiar with the

18       policies.

19   Q    What other reasons?

20   A    It may have been a single or very, very small number

21       of sales that the dealership made that it was of the

22       opinion that they acted in good faith when they made

23       those sales.

24   Q    Other reasons?

25   A    The dealership may have had a new employee who may

*Deposition of Steven Verduyn, 5/26/2005*

| | | |
|---|---|---|
| 1 | | have handled the sales transaction and was not |
| 2 | | familiar with the individual policy that prohibited |
| 3 | | it. |
| 4 | Q | Anything else you can think of? |
| 5 | A | In general there's a provision in the policy that |
| 6 | | allows the director of operations for that area to |
| 7 | | grant an exception as they see or feel or deem fit. |
| 8 | Q | Are you aware of any other reasons -- when you say |
| 9 | | the director, do you mean the director of field |
| 10 | | operations? |
| 11 | A | That's correct. |
| 12 | Q | And are you aware of directors giving exceptions for |
| 13 | | any reasons other than the ones that you've just |
| 14 | | stated? |
| 15 | A | They would be the ones that made the decision.  I |
| 16 | | wouldn't know why they -- why they made any |
| 17 | | particular decision that they did unless it's in a |
| 18 | | letter on which I'm copied. |
| 19 | Q | Are you aware of any decisions to give exceptions |
| 20 | | that have not been communicated to the dealer in |
| 21 | | letter form? |
| 22 | A | None that immediately come to mind. |
| 23 | Q | In other words, to the best of your knowledge, when a |
| 24 | | decision is made to give a dealer an exception, there |
| 25 | | is a letter sent to the dealer indicating that an |

# EXHIBIT 13

### NORTH END HARLEY-DAVIDSON INC.
### 594 ROUTE 3
### PLATTSBURGH, NEW YORK 12901
### 800-445-1342
### THOMAS WYAND , PRESIDENT

January 11, 2005

Mr. Mike Malicki
Director of Field Ops. Region 1
Harley-Davidson Motor Company
3700 W. Juneau Avenue
Milwaukee, WI 53201

Dear Michael;

I am writing *regarding the non-retail sales disputes, previously noted in your inquiries.* I would have hoped that a final determination would have been made by this time since the brunt of the documentation was sent to your office in March and more in October of 2004, including titles on file with various states. As you know we are unable to register vehicles purchased from out of state as well as unable to force the owners to provide state registrations to us once their bikes are registered.

It is also not uncommon to have sales of multiple units to be purchased within the same family. I will list dozens of families who have purchased 3 and 4 units from me within a short period of time. So duplication of sales to the same family or family name is not uncommon. There are no red flags that go up when such buyers purchase in that manner, often bargining quanity into a lower purchase price , accessory or labor discounts.

As for the bikes titled in Maine all units ,as previously mentioned, were sold at retail and titled in the state of Maine. Titles of the bikes were mailed to you along with other documention we were able to produce. At that time individual state registrations were not asked for, I did not have them to produce and I do not have them now. I have 4 full time salesmen on my sales floor and Harley Sales Policy is standard training. I teach them to look for red flags and grey market sales, none of these buyers fit that criteria.

I will say again, if Harley - Davidson has a "list of names" that red flags Director of Filed Operation why isn't such a list made available to dealers! If you have insider information that would be available to warn dealers of "suspected" grey marketers, why aren't we in the information loop? We are not highly suspect of every retail sale that comes walking

H-D 11001
CONFIDENTIAL

through our door. Sales being what they are with new Harley units, it is not my policy to be confrontational with any retail buyer. We prefer to make the sales process as helpful and friendly as possible, and that sales dogma often brings back members of the same family.

At this point I would like to defer directly to my mea culpas, I am therefore sorry 100% of the required documentaion is not available. We are a small retail outlet in a city with a (declining) population of 15,000 people. To say the least we try to be more than helpful with family members who wish to purchase multiple units, Harley or otherwise. In this case we obtained title documentaion from them to insure that individual state sales taxes were paid. If a unit ends up being resold or available for resale after the fact I am sorry. I do not intend to put units up for sale in other markets and in fact that is why I get retail or retail plus for every unit I sell to a customer.

I fully understand Harley-Davidsons policys & intentions , however I do believe I followed proper checks and balances procedurally in the sales of all these units. If, down the road, Harley-Davidson comes to different conclusions after reviewing all the documentation I have provided then I will abide by your ruling in the matter. In the meantimeI will continue to retail the marque as best as I believe I have these past 20 years, to a customer base we have developed through honesty, integrity and hard work. Thank You.


Sincerely,

Thomas Wyand
attached

H-D 11002
CONFIDENTIAL

# EXHIBIT 14



Harley-Davidson Motor Company, 3700 West Juneau Ave., PO Box 653. Milwaukee, WI 53201  414/342-4680

April 20, 2004

<u>BY CERTIFIED MAIL – RETURN RECEIPT REQUIRED</u>

Cycle-Craft Co., Inc.
1760 Revere Beach Parkway
Everett, MA  02149
Attention:  John F. Atwood, President and Dealer Operator

Re:    *Inspection of Records*

Dear Mr. Atwood:

As you know, Harley-Davidson representatives recently completed an inspection of certain Cycle-Craft Co., Inc. sales records in accordance with Section J.6 of the General Conditions of the Harley-Davidson Dealer Contract ("Dealer Contract"). This inspection was conducted at your dealership facilities in Everett, Massachusetts on February 17-18, 2004.

The inspection of Cycle-Craft records revealed that the following units, identified by VIN number, were falsely reported by Cycle-Craft as motorcycles sold at retail to the customer listed below, when in fact they were purchased from Cycle-Craft by a motorcycle wholesaler, DC Imports International of Deerfield Beach, Florida (DCI). The purchases were made by consecutive cashier's checks drawn at Northern Trust Bank of Florida and delivered by Cycle-Craft to the wholesaler.

| VIN | Northern Trust Bank Cashier Check # | Customer/SWR Names | Customer City/State | SWR Date of Sale |
|---|---|---|---|---|
| 1HD1GHV173K318821 | 301053 | Paulovich, S. | Margate, FL | 7/30/2003 |
| 1HD4CAM163K449790 | 301052 | Lunsford, D. | Coral Springs, FL | 7/30/2003 |
| 1HD1BSY133Y075190 | 301051 | Christiansen, H. | Boca Raton, FL | 7/30/2003 |
| 1HD1GEV403K325618 | 301050 | Christiansen, K. | Boca Raton, FL | 7/30/2003 |
| 1HD1CAP103K448116 | 301049 | Wiingard, H. | Coral Springs, FL | 7/30/2003 |
| 1HD4CEM183K450253 | 301048 | Stevens, M. | Lighthouse Point, FL | 7/30/2003 |
| 1HD4CEM113K447680 | 301047 | Lunsford, B. | Coral Springs, FL | 7/30/2003 |
| 1HD1CAP163K450548 | 301046 | Gusoff, J. | Fort Lauderdale, FL | 7/30/2003 |
| 1HD1PFO1X3Y954586 | 301045 | Larsen, L. | Margate, FL | 7/30/2003 |
| 1HD1CGP193K447808 | 301044 | Stimpston, T. | Fort Lauderdale, FL | 7/30/2003 |
| 1HD1CAP1X3K453887 | 301043 | Gusoff, L. | Fort Lauderdale, FL | 7/30/2003 |
| 1HD1CAP113K450151 | 301042 | Myliymart, R. | For Lauderdale, FL | 7/30/2003 |

Cycle-Craft Co., Inc.
April 19, 2004
Page 2

| VIN | Northern Trust Bank Cashier Check # | Customer/SWR Names | Customer City/State | SWR Date of Sale |
|---|---|---|---|---|
| 1HD1CAP153K441145 | 301041 | Lozon, J. | Pompano Beach, FL | 7/30/2003 |
| 1HD1GEV153K330500 | 301040 | Gusoff, L. | Fort Lauderdale, FL | 7/30/2003 |
| 1HD4CAM193K451727 | 301039 | Gotham, J. | Plantation, FL | 7/30/2003 |
| 1HD1CGP143K443654 | 301038 | Kapilla, C. | Fort Lauderdale, FL | 7/30/2003 |
| 1HD4CEM193K451492 | 301037 | Cagnina, C | Lighthouse Point, FL | 7/30/2003 |
| 1HD4CEM153K450792 | 301036 | Stevens, E. | Lighthouse, FL | 7/30/2003 |
| 1HD4CAM143K443289 | 301035 | Green, K. | Lighthouse Point, FL | 7/30/2003 |

The inspection of Cycle-Craft records further revealed that the following sales were made by Cycle-Craft to Lee Custom Cycle, a used motorcycle dealer in Lee, New Hampshire:

| VIN | SWR Name | Customer City, State | SWR Date |
|---|---|---|---|
| 1HD1BRY443Y089070 | Dellacroce, M. | Somersworth, NHJ | 7/25/2003 |
| 1HD1BVB143Y106103 | Issa, R. | Nottingham, NH | 7/24/2003 |
| 1HD1BVB173Y114065 | Gallagher, R. | Hampton, NH | 9/9/2003 |
| 1HD1FSW183Y644686 | Galleger, G. | Hampton, NH | 9/9/2003 |
| 1HD1BXB433Y115249 | Karp, A. | Plaistow, NH | 9/19/2003 |
| 1HD1FRW403Y746907 | Karp, D. | Plaistow, NH | 9/19/2003 |
| 1HD1GHV103K336352 | Rist, D. | Dover, NH | 7/25/2003 |
| 1HD1BMY453Y052113 | Christiansen, J. | Lee, NH | 7/25/2003 |

The foregoing motorcycle sales were falsely reported by Cycle-Craft as retail sales made to the customers listed above. In addition, VIN 1HD1FYW103Y610226 was sold by Cycle-Craft to Lou Winz Auto, a Massachusetts used vehicle dealer, but falsely designated as a retail sale.

Cycle-Craft also submitted false Sales and Warranty Registration Forms for the following units, including giving false or fictitious names and/or dates of sale:

| | | |
|---|---|---|
| 1HD1HAZ133K839405 | 1HD1HAZ403K842594 | 1HD1FSW143Y638979 |
| 1HD1BWB183Y107390 | 1HD1BSY123Y105487 | 1HD1FFW103Y638193 |
| 1HD1BMY473Y085436 | 1HD1BYB493Y097183 | 1HD1CGP413K431340 |
| 1HD1HAZ113K842917 | 1HD1BJY183Y052286 | 1HD1HAZ133K848962 |
| 1HD1GDV443K314311 | 1HD1PAC25YY951664 | 1HD1BXB493Y082225 |
| 1HD1BHY143Y099660 | 1HD1FCW463Y630589 | |

Cycle-Craft Co., Inc.
April 19, 2004
Page 3

Of these, three motorcycles, VIN 1HD1FCW463Y630589, 1HD1PAC25YY951664, and 1HD1CGP413K431340 were falsely reported as having been sold at retail, when in fact they had not been sold at all, but remained in dealer inventory as of the date of inspection.

Should you have any questions with regard to these matters, please contact me.

Sincerely,

Jon Flickinger
Vice President
North American Sales and Dealer Services

JF04042

# EXHIBIT 15

Stevens, Michael  24725sm                                    www.floridarealtime.com

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


CIVIL ACTION
NO. 04 11402 NMG


CYCLE-CRAFT CO., INC., D/B/A
BOSTON HARLEY-DAVIDSON/BUELL,

           Plaintiff,

vs.

HARLEY-DAVIDSON MOTOR COMPANY, INC.
AND BUELL DISTRIBUTION COMPANY, LLC,

           Defendants.

_____/


           Rice Pugatch Robinson & Schiller, P.A.
           33 N.E. 2nd Street
           Suite 101
           Fort Lauderdale, Florida
           Friday, February 25, 2005
           Scheduled for 1:00 a.m.
           Commenced at 1:13 p.m. to 3:05 p.m.


           VIDEOTAPED DEPOSITION

                  OF

           MICHAEL STEVENS



1    confirmed that we could purchase bikes.

2        Q.    Okay.  And I think you testified that

3    Mr. Buchbaum said in one of these conversations about

4    new motorcycles that the motorcycles would have to be

5    sold to individuals?

6            MR. BENSON:  Objection.

7        A.    Correct.

8            MR. BENSON:  That's misleading his

9        testimony.

10       A.    He did.  He did.  That was the only way he

11   would sell them to us, was if we put them in

12   individual names.

13       Q.    And you proceeded to supply him with

14   certain documents?

15       A.    He supplied me with the documents.  I

16   filled them out.  We filled them out.

17       Q.    Okay.  And you testified about some of

18   those documents today.  I believe you testified that

19   Exhibit 3, the bills of sale, that these were

20   documents that in their completed form you sent back

21   to Mr. Buchbaum, is that right?

22       A.    Correct.

23       Q.    And you had the individual -- the

24   individuals who are listed as the purchaser sign the

25   signature line at the bottom of these forms, is that

1    correct?

2         A.       Correct.

3                  MR. BENSON:  Objection.  I don't know if he

4         testified to each single form.

5         Q.       Well, do you recall if -- let me just make

6    sure I understand this.  You received the bills of

7    sale that are set forth in Exhibit 3 in an unsigned

8    form from Mr. Buchbaum, is that correct?

9         A.       Right, which is motorcycle and price

10   information.

11        Q.       Okay.  And that would be -- just to look at

12   the first page of Exhibit 3, that would be the --

13        A.       From make, from the make, Harley Davidson

14   all the way down to the price.

15        Q.       And it would not include the top three

16   lines that gives information about the purchaser then?

17        A.       Right.  A lot of those, either the

18   individual or myself filled out the information.

19        Q.       And again, the form in which you received

20   these documents from Mr. Buchbaum would not include a

21   signature at the bottom?

22        A.       Right.  Individuals signed them.

23        Q.       And I believe you testified that the

24   documents that you returned to Mr. Buchbaum were in

25   this form, where they had the individual signatures on

1   the bottom and the individual purchaser information on

2   the top?

3       A.      Correct.

4       Q.      And you were the one who -- let me just ask

5   you.  I can't remember if you said this or not.

6               Were you involved in obtaining the

7   individual signatures that you can see on the bottom

8   of Stevens Exhibit 3?

9       A.      Only the personal ones, my family and

10  myself.  The rest are the employees there got the

11  signatures and information from the people who they

12  knew.

13      Q.      Okay.  And did they then return the

14  completed forms to you?

15      A.      Yes.

16      Q.      And then you sent the packet of completed

17  forms back to Mr. Buchbaum?

18      A.      Right, both the warranty and the bill of

19  sale forms.

20      Q.      Do you know -- do you know who else was

21  involved in getting the signatures and the purchaser

22  information on these forms besides you?

23      A.      All the employees at DC Imports.

24      Q.      So everybody was sort of responsible for --

25      A.      Had at least one or two.

1     Q.     Okay.  And looking at Stevens Exhibit 2,

2   the SWR forms, was the procedure essentially the same

3   with respect to the SWR forms?

4     A.     Yes.

5     Q.     In other words, the -- you received these

6   from -- from Boston Harley Davidson in -- with the

7   typed-in information that gives information about the

8   motorcycle?

9     A.     Correct.

10     Q.     And then you filled in the information

11   about the purchaser and the signatures were obtained

12   by the relevant employee?

13     A.     Right.

14     Q.     And so, when you testified earlier about

15   the forms that you sent back to Boston Harley

16   Davidson, it was these two forms?

17     A.     Correct.

18     Q.     The bills of sale and the SWRs that are put

19   together here as Exhibit 2 and 3?

20     A.     Right.

21     Q.     Now, did you also have any involvement in

22   getting photocopies of driver's licenses to send to

23   Boston Harley Davidson?

24     A.     I received mine, my grandfather's and my

25   mother's, everybody else knew that they had to get the

Stevens, Michael 24725sm                        www.floridarealtime.com

```
 1   photocopies along with the signatures when they
 2   returned them to me.
 3        Q.      Okay.  And were those -- were those
 4   photocopied driver's license part of the information
 5   that you included --
 6        A.      In the package.
 7        Q.      -- in the package that you sent back to
 8   Mr. Buchbaum?
 9        A.      Right.
10             MR. REHNQUIST:  Can you mark this as the
11        next exhibit, which is what?
12             MR. BENSON:  Five.
13             MR. REHNQUIST:  Stevens Exhibit 5.
14             (Thereupon, Exhibit 5 was marked for
15   Identification.)
16             MR. REHNQUIST:  Can you mark this as
17        Stevens Exhibit 6?
18             (Thereupon, Exhibit 6 was marked for
19   Identification.)
20   BY MR. REHNQUIST:
21        Q.      I'm showing you, Mr. Stevens, what's been
22   marked as Stevens Exhibit 6 and see if you -- take a
23   minute and flip through it.  I'm just going to ask you
24   if you recognize this as the photocopies of driver's
25   license that were part of the package.
```

# EXHIBIT 16

EXHIBIT
3
GMP 2-25-05



Cycle-Craft Co. Inc. D/B/A
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(770)



**BILL OF SALE**

DATE  7-23-03

PURCHASER  DEBORAH J. LUNSFORD          E-MAIL

STREET  5896 N.W. 56TH DR    CITY  CORAL SPRINGS    STATE  FL    ZIP  33067

RES. #  954-834-0834    BUS. # (954)    LIC. #    D.O.B.

| MAKE Harley Davidson | MODEL XL 883 | | TYPE MC | YEAR 2003 |
| V.I.N. 1HD4CAM16 3K 449790 | KEY # | COLOR Gunmetal | WHEELS Laced | SEC. N |

One New Harley Davidson 883 Sportster       6448 00
12 month unlimited mileage warranty  /laced  6265 00

| | REG. FEES | |
| | DOCUMENT FEE | NC 00 |
| | SUB-TOTAL | 6465 00 |
| **RECORD OF TRADE-IN** | | 6265 00 |

| MAKE | | YEAR | TYPE | MODEL | | TRADE VALUE |
|------|--|------|------|-------|--|-------------|
| COLOR | V.I.N. | | | KEY # | | |
| TITLE NO. | | MILEAGE | PREVIOUS OWNER | | | |

[dark illegible block of fine print terms and conditions]

X BUYER'S SIGNATURE: _Deborah J Lunsford_     ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                    DEALER'S SIGNATURE:          C-C 00698
              This order is not valid unless signed by Dealer.    CONFIDENTIAL

Δ π EXHIBIT  7
Deponent  Lunsford
Date 2/2/05 Rptr. TJ
WWW.DEPOBOOK.COM



Cycle-Craft Co. Inc. DBA
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com
**BILL OF SALE**



(712)

DATE **7-23-03**

PURCHASER **Branford Lunsford**          E-MAIL

STREET **5896 N.W. 56th Dr**   CITY **Coral Springs**   STATE **FL**   ZIP **33067**

RES. # **(954) 1834-0534**   BUS. # (   )          LIC. #          D.O.B.

| MAKE | | MODEL | | TYPE | YEAR |
|---|---|---|---|---|---|
| *Harley Davidson* | | *XL 883 H* | | *MC* | *2003* |
| V.I.N. *1HD4 CEM 113K 447 680* | KEY # | COLOR *Black* | WHEELS *Laced* | SEC. *N* | |

| | | | |
|---|---|---|---|
| *One New Harley Davidson 883 "Hugger"* | | *6550* | *00* |
| *w/ laced wheels* | | *6350* | *00* |
| *12 month unlimited mileage warranty* | | *inc* | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | REG. FEES | | |
| | DOCUMENT FEE | ~~45~~ | 00 |
| | SUB-TOTAL | *6550* | *00* |

**RECORD OF TRADE-IN**          | 6350 | 00 |

| MAKE | | YEAR | TYPE | MODEL | | TRADE VALUE |
|---|---|---|---|---|---|---|
| COLOR | | V.I.N. | | KEY # | | |
| TITLE NO. | | MILEAGE | PREVIOUS OWNER | | | |

BUYER'S SIGNATURE _____          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN: _____          DEALER'S SIGNATURE: _____

This order is not valid unless signed by Dealer.

C-C 00729
**CONFIDENTIAL**



Cycle-Craft Co. Inc. DBA
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888 BostonHarley.com



(495)

**BILL OF SALE**

DATE 7-23-03

PURCHASER Kevin Greene                    E-MAIL

STREET 3000 NE 19TH Terr #B    CITY Lighthouse Point    STATE FL   ZIP 33064

RES # (    )        BUS. # (    )                    LIC. #           D.O.B.

| MAKE Harley Davidson | MODEL XL 883 | TYPE MC | YEAR 2003 |
| VIN 1HD4CAM143K443289 | KEY # | COLOR Black | WHEELS Laced | SEC N |

| One New Harley Davidson 883 Sportster / laced | $6865 | 00 |
| 12 month unlimited milenge warranty | inc | |
| | 5965 | 00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | REG. FEES | |
| | DOCUMENT FEE | 395 | 00 |
| | SUB-TOTAL | 6865 | 00 |
| | | 5965 | 00 |

**RECORD OF TRADE-IN**

| MAKE | YEAR | TYPE | MODEL | | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

[black redacted block]

BUYER'S SIGNATURE: Kevin Greene          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                    DEALER'S SIGNATURE:          C-C 00827
                                                         CONFIDENTIAL
This order is not valid unless signed by Dealer.



Cycle-Craft Co. Inc. D/B/A
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(756)



**BILL OF SALE**

DATE 7-23-03

PURCHASER *Edward B. Stevens*                                      E-MAIL

STREET *3000 NE 19th Terk #A*   CITY *Lighthouse Point*   STATE *FL*   ZIP *33064*

RES. # (*954*) *632- 8932*   BUS. # (     )          LIC. #          D.O.B.

| MAKE *Harley Davidson* | MODEL *XL 883 H* | TYPE *MC* | YEAR *2003* |
|---|---|---|---|
| V.I.N. *1HDYCEM153K450792* | KEY # | COLOR *Gunmetal* | WHEELS *laced* | SEC. *N* |

*One New Harley Davidson   883 Hugger*          *6615 00*
*w/ laced wheels*          *6415 00*
*12 month unlimited mileage warranty*          *inc*

| | REG. FEES | |
| | DOCUMENT FEE ~~149~~ | 00 |
| | SUB-TOTAL *6615* | 00 |

**RECORD OF TRADE-IN**          *6415 00*

| MAKE | YEAR | TYPE | MODEL | | TRADE VALUE |
|---|---|---|---|---|---|
| COLOR | V.I.N. | | KEY # | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

The transfer and resale of this Order comprise the entire agreement effective this Order and no other agreement or understanding of any nature concerning same has been made or entered into, or will be recognized. I hereby certify that no credit has been extended to me for the purchase of this merchandise except as appears in writing on the face of this agreement. I hereby certify that I am of legal age (21 or older) and acknowledge receipt of a true copy of this order and agree to the terms thereof and that the vehicle described above is sold and delivered subject to the terms and conditions set forth herein. All additional payments due on delivery. I hereby assume and agree to pay all charges for License and registration of this Motor Cycle. All additional payments to be satisfied on delivery.

BUYER'S SIGNATURE: *Edw. R. Stevens*          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN                    DEALER'S SIGNATURE:          C-C 00682
This order is not valid unless signed by Dealer.          **CONFIDENTIAL**

05/14/2004  05:58   6173992675                                                    PAGE 05



Cycle-Craft Co. Inc. dba
Boston Harley-Davidson/Buell
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

**BILL OF SALE**                          DATE 7-23-03

PURCHASER  Carolyn Cagnina                          E-MAIL

STREET 3000 NE 19TERR  #A   CITY LIGHTHOUSE Point  STATE FL  ZIP 33064

RES.# 954-632-8932  BUS.#                    LIC.#              D.O.B.

| NAME Harley Davidson | MODEL XL 883 H | TYPE MC | YEAR 2003 |
| VIN 1HD4CEM19K451492 | KEY # | COLOR Gunmetil | MILES Laced | SER. N |

| One New Harley Davidson 883 Hugger w/laced | 8615 | 00 |
| 12 month unlimited mileage warranty | 14C | |
| | 6415 | 00 |

| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | REG. FEES | |
| | DOCUMENT FEE | 18 | 00 |
| | SUB-TOTAL | 6615 | 00 |

**RECORD OF TRADE-IN**                  6415 | 00

| NAME | | YEAR | TYPE | MODEL | | TRADE VALUE |
| COLOR | KEY# | | KEY # | | |
| TITLE NO. | MILEAGE | REC'D BY OWNER | |

BUYER'S SIGNATURE:  Carolyn Cagnina          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                                   DEALER'S SIGNATURE:

This order is not valid unless signed by Dealer.

C-C 00901
CONFIDENTIAL



**Cycle-Craft Co. Inc.** ᴅ/ʙ/ᴀ
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com
**BILL OF SALE**



(725)

ᴅᴀᴛᴇ **7-23-03**

| | | |
|---|---|---|
| PURCHASER **Michael G. Stevens** | | E-MAIL |
| STREET **3000 NE 19ᵀᴴ Terr #B**  CITY **Light House Point** | STATE **FL**  ZIP **33064** | |
| RES. # **(954) 558-4905**  BUS. # (   ) | LIC. # | D.O.B. |

| MAKE **Harley Davidson** | MODEL **XL 883 H** | TYPE **MC** | YEAR **2003** |
|---|---|---|---|
| V.I.N. **1HD4CEM83K450253** | KEY # | COLOR **Black** | WHEELS **Laced**  SEC. **N** |

| | REG. FEES |
|---|---|
| One New Harley Davidson 883 Hugger/Laced wheels | 6550 00 |
| 12 month unlimited mileage warranty inc | |
| | 6350 00 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| REG. FEES | |
| DOCUMENT FEE | ~~195~~ 00 |
| SUB-TOTAL | ~~6550~~ 00 |

| RECORD OF TRADE-IN | | | | | 6,350 | 00 |
|---|---|---|---|---|---|---|
| MAKE | YEAR | TYPE | MODEL | | TRADE VALUE | |
| COLOR | V.I.N. | | KEY # | | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | | |

[block of illegible fine print]

BUYER'S SIGNATURE: _[signature]_     ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN: _____     DEALER'S SIGNATURE: _____     C-C 00747
This order is not valid unless signed by Dealer.                CONFIDENTIAL



Cycle-Craft Co. Inc. DBA
Boston Harley-Davidson/Buell
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

**BILL OF SALE**

(715)



DATE 7-23-03

PURCHASER   Thomas Stimpson                    E-MAIL
STREET  2900 NE 30TH S; #9B   CITY FT. Lauderdale   STATE FL  ZIP 33306
RES. # (754) 235-5709  BUS. # ( )          LIC. #              D.O.B.

| MAKE Harley Davidson | MODEL XL 1200 C | TYPE MC | YEAR 2003 |
| V.I.N. 1HD1CGP193K447808 | KEY # | COLOR Red | WHEELS Laced | SEC. |

| One New Harley Davidson 1200 Custom | ~~8925~~ 00 |
| | 8925 00 |
| 12 month unlimited mileage warranty — | inc |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | REG. FEES |
| | DOCUMENT FEE ~~145~~ 00 |
| | SUB-TOTAL 8925 00 |

**RECORD OF TRADE-IN**

| NAME | YEAR | TYPE | MODEL | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | |

BUYER'S SIGNATURE _[signature]_     ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                DEALER'S SIGNATURE:          C-C 00867
         This order is not valid unless signed by Dealer.   CONFIDENTIAL



Cycle-Craft Co. Inc. D/B/A
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(777)



**BILL OF SALE**

DATE 7-23-03

PURCHASER Heather Wingard                 E-MAIL

STREET 5896 NW 56th Dr     CITY Coral Springs     STATE FL   ZIP 33067

RES. # (954) 791-6290     BUS # (    )          LIC. #                D.O.B.

| MAKE Harley Davidson | MODEL XL 1200 | | TYPE MC | YEAR 2003 |
| VIN 1HD1CAP103K448116 | KEY # | COLOR Gunmetal | WHEELS Cast | SEC. ✓ |

| One  New  Harley  Davidson  XL  1200  Sportster | $8125 00 |
| | 7925 00 |
| 12  month  unlimited  mileage  warranty | inc |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| REG. FEES | |
| DOCUMENT FEE | 345 00 |
| SUB-TOTAL | 8125 00 |
| | 7925 00 |

**RECORD OF TRADE-IN**

| MAKE | YEAR | TYPE | MODEL | | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

BUYER'S SIGNATURE: Heather Wingard          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                    DEALER'S SIGNATURE:              C-C 00784

This order is not valid unless signed by Dealer.          **CONFIDENTIAL**



**Cycle-Craft Co. Inc.** DBA
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com



(752)

**BILL OF SALE**

DATE 7-23-03

| PURCHASER | KAREN L. CHRISTENSEN | | | E-MAIL | |
|---|---|---|---|---|---|
| STREET | 25 FOREST HILLS LN | CITY Boca Raton | | STATE FL ZIP 33431 | |
| RES.# 9541834-0834 | BUS.# ( ) | | LIC.# | D.O.B. | |

| MAKE | MODEL | TYPE | YEAR |
|---|---|---|---|
| Harley Davidson | FXDWG | MC | 2003 |
| V.I.N. 1HD1GEV403K325618 | KEY# | COLOR Anniv | WHEELS Laced | SEC. N |

| Description | Amount |
|---|---|
| One New Harley Davidson Dyna Wide Glide | 16985 00 |
| | 16469 00 |
| 12 month unlimited mileage warranty  — | inc |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| REG. FEES | |
| DOCUMENT FEE | NC 00 |
| SUB-TOTAL | 16985 00 |
| | 16469 00 |

**RECORD OF TRADE-IN**

| NAME | YEAR | TYPE | MODEL | | TRADE VALUE |
|---|---|---|---|---|---|
| COLOR | V.I.N. | | KEY# | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

X **BUYER'S SIGNATURE:** Karen Christensen    ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:    **DEALER'S SIGNATURE:**    C-C 00771

This order is not valid unless signed by Dealer.    CONFIDENTIAL



Cycle-Craft Co. Inc. DBA
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(776)



## BILL OF SALE

DATE **7-23-03**

PURCHASER **HAROLD Christensen**        E-MAIL

STREET **25 Forrest Hills CN**   CITY **Boca Raton**   STATE **FL**  ZIP **33431**

RES. #(   )        BUS. # **834/833/0234**     LIC. #        D.O.B.

| MAKE | | MODEL | | TYPE | YEAR |
|---|---|---|---|---|---|
| Harley  Davidson | | FXSTD | | MC | 2003 |
| VIN. 1HD1BSY133Y075190 | KEY # | COLOR White Pearl | WHEELS Placed | SEC. Yes | |

| | | | | |
|---|---|---|---|---|
| One  New Harley  Davidson  Softail  Deuce | | | | 16770 00 |
| 12 month  unlimited  mileage  warranty | | | | inc |
| | | | w/ security | 16484 00 |

| | | |
|---|---|---|
| | REG. FEES | |
| | DOCUMENT FEE | X̶̶ 00 |
| | SUB-TOTAL | 16770 00 |

### RECORD OF TRADE-IN
16484 00

| NAME | | YEAR | TYPE | | MODEL | TRADE VALUE |
|---|---|---|---|---|---|---|
| COLOR | | VIN. | | | KEY # | |
| TITLE NO. | | MILEAGE | PREVIOUS OWNER | | | |

[dense illegible fine print block]

BUYER'S SIGNATURE: **A—P C**        ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:        DEALER'S SIGNATURE:        **C-C 00641**
This order is not valid unless signed by Dealer.        **CONFIDENTIAL**



**Cycle-Craft Co. Inc.** DBA

**Boston Harley-Davidson/Buell**

*1760 Revere Beach Parkway (Rte. 16)*

Everett, Massachusetts 02149

617-389-8888  BostonHarley.com

**BILL OF SALE**

(741)



DATE  7-23-03

| | |
|---|---|
| PURCHASER  Leo Carson | E-MAIL |
| STREET  6124 NW 20th CT  CITY  MARGATE | STATE  FC  ZIP  33063 |
| RES. # (   )  BUS. # ( 954 ) 856 8324  LIC. # | D.O.B. |

| NAME Harley Davidson | MODEL FXSTDSEI | TYPE MC | YEAR 2003 |
|---|---|---|---|
| VI.N. 1HD1PFD1X3Y954586 | KEY # | COLOR Gold/Black | WHEELS Cast | SEC. Yes |

| | | |
|---|---|---|
| One New Harley Davidson Screamin' Eagle Deuce | | 25000 00 |
| 12 month unlimited mileage warranty | | inc |
| | | 25247 00 |

| | REG. FEES | |
|---|---|---|
| | DOCUMENT FEE | 249- 00 |
| | SUB-TOTAL | 25000 00 |
| | | 25247 00 |

**RECORD OF TRADE-IN**

| NAME | YEAR | TYPE | MODEL | TRADE VALUE |
|---|---|---|---|---|
| COLOR | V.I.N. | | KEY # | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | |

BUYER'S SIGNATURE  *Leo Le___*          ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN                                   DEALER'S SIGNATURE:                    C-C 00626

This order is not valid unless signed by Dealer.                              CONFIDENTIAL

**Cycle-Craft Co. Inc.** D/B/A
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888 BostonHarley.com



(737)

**BILL OF SALE**

DATE 7-23-03

PURCHASER Sonia Pavlovich          E-MAIL

STREET 612 NW 20th CT   CITY MARGATE   STATE FL   ZIP 33063

RES. # (   )          BUS. # (954)834-0834          LIC. #          D.O.B.

| NAME Harley Davidson | MODEL FXD | | TYPE MC | YEAR 2003 |
| YEAR 1HDIGMV173K318821 | KEY # | COLOR Gunmetal | WHEELS Laced | SEC. N |

| One New Harley Davidson Dyna Superglide | | 12540 | 00 |
| | w/ laced wheels | 12058 | 00 |
| 12 month unlimited mileage warranty | | inc | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | REG. FEES | | |
| | DOCUMENT FEE | NC | 00 |
| | SUB-TOTAL | 12540 | 00 |

**RECORD OF TRADE-IN**          | 2054 | 00 |

| NAME | YEAR | TYPE | MODEL | | TRADE VALUE |
| COLOR | VIN # | | KEY # | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

BUYER'S SIGNATURE: _____   ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN: _____   DEALER'S SIGNATURE: _____

This order is not valid unless signed by Dealer.

C-C 00802
CONFIDENTIAL

Cycle-Craft Co. Inc. DBA
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(757)

**Buell**
AMERICAN MOTORCYCLES

## BILL OF SALE

DATE 7-23-03

PURCHASER Craig Kapila    E-MAIL

STREET 2900 NE 50th St #Bon Fg Laud    STATE FL    ZIP 33317

RES. # 2786667652    BUS. # ( )    LIC. #    D.O.B.

| MAKE Harley Davidson | MODEL XL 1200C | TYPE MC | YEAR 2003 |
| V.I.N. 1HD1CGP143K433654 | KEY # | COLOR Gunmetal | WHEELS — | SEC ✓ |

One New Harley Davidson 1200 Custom    | 7895 | 00 |
    | 9095 | 00 |

12 month unlimited mileage warranty    inc

|  | REG. FEES |  |
|  | DOCUMENT FEE | 145 | 00 |
|  | SUB-TOTAL | 9295 | 00 |
|  |  | 9095 | 00 |

### RECORD OF TRADE-IN

| MAKE |  | YEAR | TYPE | MODEL |  | TRADE VALUE |
| COLOR |  | V.I.N. |  | KEY # |  |  |
| TITLE NO. |  | MILEAGE | PREVIOUS OWNER |  |  |

BUYER'S SIGNATURE [signature]    ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:    DEALER'S SIGNATURE:    C-C 00854
CONFIDENTIAL

This order is not valid unless signed by Dealer.



**Cycle-Craft Co. Inc.** dba
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

(717)



### BILL OF SALE

DATE 7-23-03

PURCHASER Jason Gafker
E-MAIL

STREET 8100 Classy Blvd          CITY Plantation FL          STATE          ZIP 33324

RES. # (    )          BUS. # (    )          LIC. #          D.O.B.

| MAKE Harley Davidson | MODEL XL 883 | TYPE MC | YEAR 2003 |
| V.I.N. 1HD4CAM193K451727 | KEY # | COLOR Black | WHEELS Laced | SEC. N |

One New Harley Davidson 883 Sportster          6165 00
                                   w/ laced wheels  5965 00
12 month unlimited mileage warranty              inc

| | REG. FEES | |
| | DOCUMENT FEE | 138 | 00 |
| | SUB-TOTAL | 6105 | 00 |

#### RECORD OF TRADE-IN

| | | | | 5965 | 00 |

| NAME | YEAR | TYPE | MODEL | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | |

[illegible fine print agreement text]

BUYER'S SIGNATURE: Jason G

SALESMAN:

ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

DEALER'S SIGNATURE:
This order is not valid unless signed by Dealer.

C-C 00669
CONFIDENTIAL

Cycle-Craft Co. Inc. D/B/A
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

**Buell** AMERICAN MOTORCYCLES

(734)

## BILL OF SALE

DATE 7-23-03

| | | |
|---|---|---|
| PURCHASER JASON LOZON | E-MAIL | |
| STREET 2121 S OCEAN DR CITY | STATE | ZIP |
| RES. # 954/818-3634 BUS. # ( | LIC. # | D.O.B. |

| MAKE Harley Davidson | MODEL 1200 | TYPE MC | YEAR 2003 |
|---|---|---|---|
| VIN 1HD1CAP153K441145 | KEY # | COLOR Black | WHEELS Cast | SEC. N |

| | |
|---|---|
| One New Harley Davidson 1200 Sportster | 7855 00 |
| | 7855 00 |
| 12 month unlimited mileage warranty | inc |

| | | |
|---|---|---|
| | REG. FEES | |
| | DOCUMENT FEE | 345 00 |
| | SUB-TOTAL | 7855 00 |
| **RECORD OF TRADE-IN** | | 7855 00 |

| MAKE | YEAR | TYPE | MODEL | | TRADE VALUE |
|---|---|---|---|---|---|
| COLOR | V.I.N. | | KEY # | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | |

BUYER'S SIGNATURE:                    ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:                    DEALER'S SIGNATURE:            C-C 00894
                This order is not valid unless signed by Dealer.        CONFIDENTIAL



Cycle-Craft Co. Inc. ⁼ᵈ⁼
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com

720

**BILL OF SALE**

DATE 7-23-03

PURCHASER *Louis Gosolff*    E-MAIL

STREET *2900 NE 30th St*    CITY    STATE    ZIP

RES. # *(3/3)205-5603*    BUS. # (    )    LIC. #    D.O.B.

| MAKE *Harley Davidson* | MODEL *FXDWG* | TYPE *MC* | YEAR *2003* |
| VIN. *1HD1GEV153K330500* | KEY # | COLOR *Black* | WHEELS *Laced* | SEC. *X* |

*One New Harley Davidson Dyna Wide Glide*    16205 00
*W/ security*    15639 00
*12 month unlimited mileage warranty —*    inc

REG. FEES
DOCUMENT FEE    *100* 00
SUB-TOTAL    15735 00
    15639 00    TRADE VALUE

**RECORD OF TRADE-IN**

| MAKE | YEAR | TYPE | MODEL |
| COLOR | V.I.N. | | KEY # |
| TITLE NO. | MILEAGE | PREVIOUS OWNER |

BUYER'S SIGNATURE:
SALESMAN:    DEALER'S SIGNATURE:

ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

This order is not valid unless signed by Dealer.

C-C 00836
CONFIDENTIAL

Cycle-Craft Co. Inc. d/b/a
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com
**BILL OF SALE**

(699)

DATE  7-23-03

| | | | |
|---|---|---|---|
| PURCHASER | _Ames Golsch_ | E-MAIL | |
| STREET | _2900 NE 5th St Ft Cord_ | STATE: _FL_ ZIP _33306_ | |
| RES. # | _(954)ZH-H02_   BUS. # ( ) | LIC. # | D.O.B. |

| MAKE | _Harley Davidson_ | MODEL | _XL 1200_ | TYPE _MC_ | YEAR _2003_ |
|---|---|---|---|---|---|
| V.I.N. | _1HD1CAP1X3K453887_ | KEY # | COLOR _Black_ | WHEELS _Laced_ | SEC. _N_ |

| Description | | Amount |
|---|---|---|
| _One New Harley Davidson 1200 Sportster_ | | _8370 00_ |
| _w/laced wheels_ | | _8170 00_ |
| _12 month unlimited mileage warranty —_ | | _inc_ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | REG. FEES | |
| | DOCUMENT FEE | _245_  00 |
| | SUB-TOTAL | _8370 00_ |

**RECORD OF TRADE-IN**                                           _8170  00_

| MAKE | | YEAR | TYPE | MODEL | TRADE VALUE |
|---|---|---|---|---|---|
| COLOR | V.I.N. | | | KEY # | |
| TITLE NO. | | MILEAGE | PREVIOUS OWNER | | |

| | |
|---|---|
| BUYER'S SIGNATURE: _James Golsch_ | ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY |
| SALESMAN: | DEALER'S SIGNATURE: |

C-C 00596
CONFIDENTIAL

This order is not valid unless signed by Dealer.



Cycle-Craft Co. Inc. d/b/a
**Boston Harley-Davidson/Buell**
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888  BostonHarley.com
**BILL OF SALE**

723



DATE 7-23-03

PURCHASER Z900  NE 30th St #94   E-MAIL

STREET  Daniel W. Cusack  CITY Ft Laud  STATE Fl  ZIP 33306

RES. # 954 214-1102  BUS. # ( )   LIC. #   D.O.B.

| MAKE Harley Davidson | MODEL XL1200 | | TYPE MC | YEAR 2003 |
| VIN 1HD1CAP163K450548 | KEY # | COLOR Black | WHEELS Laced | SEC N |

One New Harley Davidson 1200 Sportster  8370

w/laced wheels 8170 00

12 month unlimited mileage warranty

| | | REG. FEES | |
| | | DOCUMENT FEE | ~~145~~ | 00 |
| | | SUB-TOTAL | 8370 | 00 |

**RECORD OF TRADE-IN**   8170 00

| NAME | YEAR | TYPE | MODEL | | | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | | | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | | | |

███████████████████████████████

BUYER'S SIGNATURE: _____   ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN: _____   DEALER'S SIGNATURE: _____   C-C 00608
CONFIDENTIAL

This order is not valid unless signed by Dealer.



Cycle-Craft Co. Inc. DBA
Boston Harley-Davidson/Buell
1760 Revere Beach Parkway (Rte. 16)
Everett, Massachusetts 02149
617-389-8888 BostonHarley.com

(714)



**BILL OF SALE**

DATE 7-23-03

PURCHASER _Renee J. Myllymaki_    E-MAIL

STREET _2900 NE 30th_ CITY _E_ _CAd_    STATE _FL_ ZIP _33306_

RES. # _954 56 f-649c_ BUS. # (    )    LIC. #    D.O.B.

| MAKE _Harley Davidson_ | MODEL _XL 1200_ | TYPE _MC_ | YEAR _2003_ |
| VIN. _1HD1CAP113K 450151_ | KEY # | COLOR _Gunmetal_ | WHEELS _Laced_ | SEC. _N_ |

_One New Harley Davidson    1200 Sportster_    | 8478 | 00 |
| | 8242 | 00 |

_12 month unlimited mileage warranty inc_

| | REG. FEES | |
| | DOCUMENT FEE _249_ | 00 |
| | SUB-TOTAL _8478_ | 00 |

**RECORD OF TRADE-IN**    | 8242 | 00 |

| MAKE | YEAR | TYPE | MODEL | TRADE VALUE |
| COLOR | V.I.N. | | KEY # | |
| TITLE NO. | MILEAGE | PREVIOUS OWNER | | |

[illegible dark band]

BUYER'S SIGNATURE: _Renee Myllymaki_    ALL TAKE OFF PARTS MUST BE TAKEN AT TIME OF DELIVERY

SALESMAN:    DEALER'S SIGNATURE:    C-C 00713
This order is not valid unless signed by Dealer.    CONFIDENTIAL