Affidavit of Christopher C. Nee, Esq.

# EXHIBITS 25-32

# EXHIBIT 25

4104
1694
0035   (visa)
4205
X-9-05

MINNIHH LUMBER        Fax:1-978-229-2190        Jul 19 2003 12:24        P.01



C-C 00522
CONFIDENTIAL

EXHIBIT
CHRISTENSEN
6
4/6/05





C-C 00507
CONFIDENTIAL



C-C 00442
CONFIDENTIAL



C-C 00545
CONFIDENTIAL



C-C 00558
CONFIDENTIAL



C-C 00492
CONFIDENTIAL



C-C 00466
CONFIDENTIAL

# EXHIBIT 26

 Harley-Davidson Motor Company, 3700 West Juneau Ave., PO Box 653, Milwaukee, WI 53201  414/342-4680

April 20, 2004

<u>BY CERTIFIED MAIL – RETURN RECEIPT REQUIRED</u>

Cycle-Craft Co., Inc.
1760 Revere Beach Parkway
Everett, MA  02149
Attention:  John F. Atwood, President and Dealer Operator

Re:   *Notice of Dealer Contract Termination*

Dear Mr. Atwood:

This is to notify you that the September 19, 2000 Dealer Contract between Cycle-Craft Co., Inc. ("Cycle-Craft") and Harley-Davidson Motor Company ("Harley-Davidson") is hereby terminated effective sixty days from the date of your receipt of this letter, pursuant to Sections M.4 and M.6 of the General Conditions of that Contract. You are further notified that Cycle-Craft's Dealer Contract of same date for the sale of Buell Products will also terminate at that time pursuant to Section N.3 of that Contract and for the reasons set forth herein.  As summarized herein, termination of the Dealer Contracts is based upon: (1) Cycle-Craft's repeated submission of false sales reports and information to Harley-Davidson; (2) Cycle-Craft's repeated sale of Harley Davidson Products to non-retail purchasers; and (3) Cycle-Craft's failure to complete and maintain pre-delivery inspection reports and sales and warranty registration forms for new motorcycles sold by the dealership, each instance of which constitutes a direct and material violation Cycle-Craft's contractual obligations to Harley-Davidson.

As you know, Harley-Davidson recently completed an inspection of certain Cycle-Craft sales records in accordance with Section J.6 of the General Conditions of the Harley-Davidson Dealer Contract ("Dealer Contract"). The results of this audit are set forth under separate cover to you dated April 19, 2004, a copy of which is enclosed herewith and incorporated by reference. The audit revealed numerous instances in which Cycle-Craft falsely reported the identity of the purchaser, the date of the purchase, and/or other information, including designating the sale as retail. Specifically, retail sales were reported by Cycle-Craft before they actually occurred and under false names. In a number of instances, Cycle-Craft used names of employees and/or their family members, falsely reporting sales to such individuals. Moreover, a substantial number of Cycle-Craft sales were falsely reported as having been made to retail customers, when in fact they were made to wholesalers and/or unauthorized dealers. Finally, our review of Cycle-Craft records during the audit showed that numerous customer files did not contain proper records of pre-delivery inspection and/or sales and warranty registration forms for new motorcycle sales.

Cycle-Craft Co., Inc.
April 19, 2004
Page 2

Cycle-Craft's conduct violates core Harley-Davidson values, and hence, core provisions of the Dealer Contract. Section A of the General Conditions of that Contract identifies its "Purposes and Objectives" – namely, to sell and service Harley-Davidson Products in a manner consistent with the company's Values, Issues, Vision and Mission. The first-listed Harley-Davidson Value is: "Tell the Truth." From Cycle-Craft's conduct, it is clear that it does not share this value, and has repeatedly violated this fundamental covenant of the Dealer Contract.

The Dealer Contract General Conditions further provide (Section J.2) that "Dealer will cooperate with Seller in furnishing inventory, retail sales and other statistical reports as may reasonably be requested by Seller from time to time." By falsifying its sales reports to Harley-Davidson, Cycle-Craft has plainly failed to cooperate in the provision of this information, and has otherwise violated Section F.7 of the General Conditions and related Harley-Davidson policies concerning the proper completion of Sales and Warranty Registration Forms. Additionally, by selling Products to wholesalers and/or unauthorized dealers, Cycle-Craft has directly violated Section B.6 of the General Conditions, which states: "Dealer shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers." Lastly, by failing to maintain proper records of pre-delivery inspections and sales and warranty registration forms, Cycle-Craft has violated Sections F.1, F.2 and F.7 of the General Conditions of the Dealer Contract and related Harley-Davidson policies.

Under these circumstances, Harley-Davidson has the right to terminate the Dealer Contract according to its terms. Specifically, Section M.4(b) of the General Conditions gives Harley-Davidson the right to terminate the Dealer Contract on thirty-days notice in the event that "Dealer submits to Seller any application, claim, report, record or other information which is fraudulent or contains any material misrepresentation by Dealer." Further, under Section M.6(c), Harley-Davidson has the right of termination on sixty-days notice whenever it "reasonably believes that the Dealer, Dealer Operator or any Owner(s) has failed, refused or neglected to conform his or her conduct (whether personal or business) with Seller's Mission, standards of good citizenship or generally acceptable behavior in contemporary society or the local community, in a way that may adversely affect the Ownership, operation, management, reputation, business, goodwill or interests of Dealer or Seller or may impair the goodwill associated with the Trademarks." In this regard, Harley-Davidson believes that by engaging in non-retail sales and submitting false sales reports, which reports appear designed to obtain an unfair allocation of Products and/or to conceal non-retail transactions from Harley-Davidson, Cycle-Craft has failed to conform its conduct to the standards referenced in Section M.6(c). Finally, Section M.6(f) of the General Conditions allows Harley-Davidson to terminate the Dealer Contract upon any "[b]reach, violation or failure to fulfill any of Dealer's other responsibilities under this Contract." As set forth above, Cycle-Craft's submission of false sales reports and its sales to wholesalers violates both the letter and the spirit of the Dealer Contract.

Cycle-Craft Co., Inc.
April 19, 2004
Page 3

As noted above, termination of the Dealer Contracts shall be effective sixty days following your receipt of this notice. In the meantime, pursuant to the Dealer Contract and applicable policies, the sales referenced in the audit report will be deducted from your new motorcycle allocation. All factory incentives and allowances on these motorcycles will be charged-back against your account, and a summary of these charge-backs is included with this letter. Further, please take note of Cycle-Craft's post-termination obligations under Section M.7 of the General Conditions of each of the Harley-Davidson and Buell Dealer Contracts, which provisions will be strictly enforced.

While Harley-Davidson is committed to exercising its termination rights as referenced above, we nevertheless wish to achieve as smooth and professional a transition as possible. To that end, please contact me at your convenience to discuss how this may be achieved.

Sincerely,

Jon Flickinger
Vice President
North American Sales and Dealer Services

JF04041

# EXHIBIT 27

VOLUME:   I
PAGES:    176
EXHIBITS:  See Index

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC., | x |
| d/b/a BOSTON | x |
| HARLEY-DAVIDSON/BUELL, | x |
| Plaintiff | x |
| | x  CASE NO. |
| vs. | x  04 11402 NMG |
| | x |
| HARLEY-DAVIDSON MOTOR | x |
| COMPANY, INC., and BUELL | x |
| DISTRIBUTION COMPANY, LLC, | x |
| Defendants | x |

*VIDEOTAPED DEPOSITION of*
*KENNETH MCPHEE,* taken pursuant to the
applicable provisions of the Federal Rules
of Civil Procedure, before Jill Kourafas,
Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts held at the Law Offices of
Bingham McCutchen, 150 Federal Street,
Boston, Massachusetts, on May 2, 2005,
commencing at 9:17 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

1   Sundays.

2 Q. What discussion was there relating to this

3   offer to employees that you recall at the

4   managers meeting?

5 A. Ron made the offer that if people were

6   interested in buying a new motorcycle that

7   he would -- made the offer to sell them a

8   unit at $500 over dealer cost.

9 Q. Did you understand that the purpose of this

10   or the goal of this was to unload the

11   inventory by the end of the model year?

12      MR. REHNQUIST:  Objection.

13 A. I understood that we were trying to sell

14   units, yes.

15 Q. You were trying to sell units, new units by

16   the end of the model year?

17 A. Yes.

18 Q. Did Mr. Buchbaum indicate that that was

19   something that he considered to be important

20   to get those units sold by the end of the

21   model year?

22 A. Yes.

23 Q. Did that sale or offer of units at $500 over

24   invoice allow the dealership to sell all of

1           its remaining 2003 inventory by the end of

2           the model year?

3                 MR. REHNQUIST:  Object to the form.

4   A.   No.

5   Q.   And was another offer made at some point?

6   A.   Yes.

7   Q.   Is that the offer you referred to at the top

8           of Page 6 of your declaration in

9           Paragraph 19?

10  A.   Yes.

11  Q.   So, Mr. Buchbaum essentially dropped the

12         price to dealer cost without any markup at

13         some point?

14  A.   Yes.

15  Q.   How long before the end of the model year do

16         you recall that offer was made?

17  A.   Approximately maybe two weeks.

18  Q.   How was that offer conveyed?

19  A.   Same way, morning managers meeting.

20  Q.   And then the managers conveyed it, to your

21         knowledge, to other employees?

22  A.   Yes.

23  Q.   Do you recall anything in writing relating

24         to either of these two offers, either

# EXHIBIT 28

VOLUME:   I
PAGES:    55
EXHIBITS:  See Index

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| x |  |
| CYCLE-CRAFT CO., INC.,   x |  |
| d/b/a BOSTON   x |  |
| HARLEY-DAVIDSON/BUELL,   x |  |
| Plaintiff   x |  |
| x | CASE NO. |
| vs.   x | 04 11402 NMG |
| x |  |
| HARLEY-DAVIDSON MOTOR   x |  |
| COMPANY, INC., and BUELL   x |  |
| DISTRIBUTION COMPANY, LLC, x |  |
| Defendants   x |  |

**VIDEOTAPED DEPOSITION of MICHAEL BLOOM,**
taken pursuant to the applicable provisions
of the Federal Rules of Civil Procedure,
before Jill Kourafas, Certified Shorthand
Reporter and Notary Public in and for the
Commonwealth of Massachusetts held at the
Law Offices of Bingham McCutchen,
150 Federal Street, Boston, Massachusetts,
on May 2, 2005, commencing at 3:10 p.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

1   A.   No.

2   Q.   Did you or your wife or your son or your

3        daughter fill out any forms or paperwork for

4        the purchase of a new motorcycle from

5        Cycle-Craft in July of '03?

6   A.   I did not, my wife did not, my son did not

7        and, to the best of my recollection, my

8        daughter did not.

9   Q.   Did any of you put down a deposit for a new

10       motorcycle to be purchased from Cycle-Craft

11       in July of '03?

12  A.   I did not.

13  Q.   To your knowledge, did your wife, daughter

14       or son?

15  A.   Not that I'm aware of.

16  Q.   Now, what was the understanding that you

17       said was reached?  You said there was some

18       understanding regarding a purchase of a

19       motorcycle?

20  A.   Yeah, that we could purchase motorcycles at

21       a discounted rate, and also that there's no

22       guarantee we are going to get those

23       motorcycles 'cuz if they were sold to a

24       retail customer, they were gonna be sold.

1    Q.    So, is this an offer that Mr. Buchbaum made?

2    A.    Yes.

3    Q.    And was it made to you as well as others?

4    A.    Yes, it was.

5    Q.    Was it made in or around July of '03?

6    A.    Yes, it was.

7    Q.    Do you remember what the discounted rate

8          was?

9    A.    We were told it would be above -- a little

10         above cost.  To me, I didn't know what that

11         was at the time, but it sounded like a

12         fantastic deal.

13   Q.    Did you promise anyone that you would

14         purchase a motorcycle in July of '03?

15   A.    What do you mean by that?

16                   MR. REHNQUIST:  Object to the

17         form.

18   Q.    Did you promise Mr. Buchbaum that you would

19         buy a motorcycle in July of '03?

20   A.    I would buy the motorcycles if they were

21         available to me.  I never promised him,

22         because the understanding was that they

23         could be sold and we couldn't get them.  But

24         if they were not sold, we were gonna get

1           motorcycle from the dealership?

2     A.    No.

3     Q.    Did your daughter Lissa indicate to anyone

4           at the dealership that she would buy a

5           motorcycle from the dealership?

6                     MR. REHNQUIST:  Objection;

7           foundation.

8     Q.    You can answer.

9     A.    My daughter was going to take the course to

10          buy a motorcycle, so --

11    Q.    Take the course?

12    A.    There's a Rider's Ed. course, they call it.

13          She wanted to learn how to ride a motorcycle

14          and she was going to buy a motorcycle and

15          she was talking about several different

16          models and coming to me.

17                    But what was your question, did

18          she --

19    Q.    Whether she indicated to anyone at the

20          dealership that she would buy a motorcycle.

21    A.    You'd have to -- I don't know.  I mean, she

22          indicated to me she would, but I don't know

23          anyone else in the dealership that she

24          talked with.

```
 1   Q.   How about your son Matt, did he indicate
 2        that he would buy a motorcycle from the
 3        dealership?
 4   A.   Absolutely.
 5   Q.   Who did he say that to?
 6   A.   To me.
 7   Q.   Did he pick one out?
 8   A.   I picked it out, but again, I don't know
 9        what the model was, because he's 6-foot-7,
10        6-foot-8, so it would have to be a big
11        motorcycle, it wouldn't be a Sportster or a
12        little bike.
13   Q.   Did he fill out any paperwork committing to
14        buy a motorcycle?
15   A.   Not that I know of, no.
16   Q.   Did you?
17   A.   No.
18   Q.   And, to your knowledge, your wife and
19        daughter did not either fill out --
20   A.   I already told you that, no, they did not.
21   Q.   Do you know what an "SWR Form" is?
22   A.   Yes.
23   Q.   What is it?
24   A.   It's a paper that once a motorcycle is sold,
```

# EXHIBIT 29

```
 1                                        Volume: I

                                          Pages: 1-117

 2                                        Exhibits: 1-3

 3               UNITED STATES DISTRICT COURT

 4                 DISTRICT OF MASSACHUSETTS

 5   CYCLE-CRAFT COMPANY, INC.,              )

 6   d/b/a BOSTON                            )

 7   HARLEY-DAVIDSON/BUELL,                  )DOCKET NO.:

 8                   Plaintiff              )04-11402-NMG

 9          vs.                              )

     HARLEY-DAVIDSON MOTOR COMPANY,          )

10   INC., AND BUELL DISTRIBUTION            )

     COMPANY, LLC,                           )

11                   Defendants.            ).

12   _____ )

13        VIDEO DEPOSITION OF JAMIE E. MCGRATH

14              DATE:      MAY 20, 2005

15              TIME:      9:08 A.M.

16              PLACE:     BINGHAM MCCUTCHEN LLP

17                         150 FEDERAL STREET

18                         BOSTON, MA   02110

19

20

21          MEDEIROS STENO & VIDEO GROUP
         "THE TRAVELING REPORTER FOR THE TRAVELING LITIGATOR SINCE 1988"

22   *Boston:       617.590.9767
     *New York:/NJ   646.413.4499                        *Depositions
                                                         *Arbitrations
23   *Florida       305.321.7414                         *E-transcript

24   *E-mail:    depo@gomedeiros.com                     *V ideo

               *MA *CT *NY *NJ *FL
```

109

1    and buy three to five motorcycles at a time with or

2    on behalf of friends or acquaintances and it is not

3    particularly unusual for a single individual to

4    represent a number of buyers." Do you see that

5    written there?

6         A.    Yes.

7         Q.    And I believe you testified to Miss

8    Singh's questioning that you remembered a couple of

9    instances where that had happened before?

10        A.    Yeah.

11        Q.    And you specifically remember the 19 bikes

12   to Florida?

13        A.    Yeah.

14        Q.    And then a police officer who would come

15   in with friends?

16        A.    Yes.

17        Q.    Do you remember any other instances?

18        A.    I don't remember. I know that there were

19   other instances, I don't remember specifically what

20   they were, but I do remember that it happened. I

21   don't remember the names, though.

22        Q.    But you can't identify the names?

23        A.    No, I don't recall.

24        Q.    In July 2003 did you agree to buy a

5/20/05 DEPOSITION OF JAMIE MCGRATH

110

1    motorcycle?

2        A.    I did.

3        Q.    And why did you do that?

4        A.    Because I was interested in learning how

5    to ride.  I was going to take a learn-how-to-ride

6    class.

7        Q.    Offered by Boston Harley-Davidson?

8        A.    No, they didn't offer it.  Beverly Cycles

9    I think it's called.

10       Q.    And did you end up taking that class?

11       A.    No.  I never got out of the office enough

12   to actually go and do it, so...

13       Q.    And so did you end up purchasing the bike?

14       A.    I didn't.

15       Q.    And why was that?

16       A.    Because I didn't end up learning how to

17   ride, so I never had the time to.

18       Q.    I think Miss Singh asked you a question

19   about some testimony that Sean Walsh said about Ron

20   Buchbaum giving you a list of names in a meeting?

21       A.    Uh-huh.

22       Q.    She asked you if you remembered that

23   meeting and that exchange of dialogue happening.

24   And I believe the first time she asked you that, you

111

1    testified no and the second time she asked you that

2    you testified you don't recall.  What is your memory

3    about that?

4        A.    I don't have a memory.  Didn't happen.

5        Q.    So you don't remember that happening?

6        A.    No.

7              MS. SMAGULA:  Okay.  That's all I

8    have.

9              MS. SINGH:  Just a second.

10             REDIRECT EXAMINATION

11      BY MS. SINGH:

12       Q.    Just a couple of more questions for me.

13       A.    Okay.

14       Q.    You stated just now that in July 2003 you

15   agreed to buy a cycle, right?

16       A.    Right.

17       Q.    Did you make an agreement with somebody?

18       A.    I don't remember who, but I made an

19   agreement to buy one.

20       Q.    Okay.  Somebody within Cycle-Craft?

21       A.    Yes.

22       Q.    Okay.  So did somebody within Cycle-Craft

23   approach you and ask you to buy a cycle?

24       A.    It was known that we were, you know, that

112

1    there was a big sale going on and we were, you know,

2    eligible to buy a bike at a good price.

3         Q.    Okay.  And so you told somebody at

4    Cycle-Craft that you wanted to buy a cycle?

5         A.    Uh-huh.

6         Q.    Okay.  Did you look at a specific bike?

7         A.    Yes.

8         Q.    What was that bike?

9         A.    V Rod.

10         Q.    And what color was it?

11         A.    Silver.

12         Q.    And you said that you were interested in

13    learning how to ride a cycle?

14         A.    Uh-huh.

15         Q.    And you picked out a class that you could

16    take for it?

17         A.    Yes.  I didn't pick it out, but I knew of

18    classes that I could have gone to.  There's a couple

19    of them offered.

20         Q.    Okay.  So you said in July 2003 there's

21    this sale going on and you agreed to buy a cycle.

22    Did you memorialize that agreement in some way?  Did

23    you put it in writing to anyone?

24         A.    No, that that that I remember, no.

# EXHIBIT 30

Deposition of Dianne Bolden, 5/25/2005

```
 1            IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

 2                      STATE OF WISCONSIN
        --------------------------------------------------
 3
        CYCLE-CRAFT CO., INC. d/b/a
 4      BOSTON HARLEY-DAVIDSON/BUELL,

 5

 6

 7            vs.                    Case No. 04-11402-NMG

 8      HARLEY-DAVIDSON MOTOR CO., INC.
        AND BUELL DISTRIBUTION CO., LLC.,
 9

10
                         Defendant.
11
        --------------------------------------------------
12

13

14            Video Deposition of DIANNE BOLDEN

15               Wednesday, May 25th, 2005

16                      2:56 p.m.

17                        at

18               Gramann Reporting, LTD
                 710 N. Plankinton Ave.
19                  Milwaukee, WI

20

21          Reported by Rose M. Coulthart, RPR

22

23

24

25
```

Deposition of Dianne Bolden, 5/25/2005

```
 1            it says transfer, correct?

 2   A    Yes.

 3   Q    So this would be a limited -- an example of a limited

 4        warranty transfer?

 5   A    Yes.

 6   Q    And that's separate from the dealer contacting you

 7        and telling you they want new information entered

 8        into a registration?

 9   A    Yes.

10   Q    What does a dealer have to do to change an SWR?

11        What's the process?

12   A    The process is to contact me through a fax, phone.

13        We have a feature on our HD-Net that allows dealers

14        to electronically submit changes.

15   Q    So you said phone, fax or HD-Net?

16   A    Yes.

17   Q    Can they call you or there has to be a written

18        submission?

19   A    They call me.

20   Q    Um-hmm.  But do you need something written after they

21        call you?

22   A    Basically, yes.

23   Q    Okay.

24            (Exhibit No. 71 marked for identification.)

25   BY MR. NEE:
```

Deposition of Dianne Bolden, 5/25/2005

```
 1                    MR. NEE:  Pre-2000.

 2                    THE WITNESS:  I don't think it was a

 3           policy.  I probably had had lists when I first began

 4           to understand and to do it properly.

 5   BY MR. NEE:

 6   Q     Okay.  On Exhibit 73, the requested changes from

 7           Boston Harley-Davidson?

 8   A     Um-hmm?

 9   Q     Would the fact that you had printed this out and

10           written on it and put it in your file indicated that

11           Jamie had an acceptable reason?

12                    MR. BERKOWITZ:  Objection.  You can answer.

13                    THE WITNESS:  It was common procedure when

14           a dealer called and I printed -- made a print screen

15           and put a name and their -- their system that they

16           used that that was a acceptable reason.  Yes.

17   BY MR. NEE:

18   Q     Okay. So this would indicate that you had accepted

19           their reason?

20   A     Yes.

21   Q     Okay.  Do you pass along the daily SWR information to

22           accounting, your accounting department at

23           Harley-Davidson?

24   A     No.

25   Q     Do you know if anyone else within the sales
```

# EXHIBIT 31

1                                    VOLUME:    I
                                     PAGES:    1 - 95
2                                    EXHIBITS:  1 - 18

3

                        UNITED STATES DISTRICT COURT
4
                          District of Massachusetts
5

6
           CYCLE-CRAFT CO., INC.            )
7          d/b/a BOSTON                      )
           HARLEY-DAVIDSON/BUELL,            )
8                  Plaintiff,                )
                                             )
9              VS.                           )   Case No.
                                             )   04 11402 NMG
10         HARLEY-DAVIDSON MOTOR             )
           COMPANY, INC., and BUELL          )
11         DISTRIBUTION COMPANY, LLC.        )
                   Defendants.               )
12

13

                    DEPOSITION OF STEPHEN T. VESEY, a witness
14     called by and on behalf of the Defendants, taken
       pursuant to the applicable provisions of the Federal
15     Rules of Civil Procedure, before Sandra L. Bray,
       Registered Diplomate Reporter, CSR Number 103593, and
16     Notary Public in and for Commonwealth of Massachusetts,
       at the offices of Bingham McCutchen, 150 Federal Street,
17     Boston, Massachusetts, on Wednesday, June 22, 2005,
       commencing at 10:01 a.m.
18

19

20

21                         REPORTERS, INC.
                  GENERAL & TECHNICAL COURT REPORTING
22                23 Merrymont Road, Quincy, MA  02169
                   617.786.7783/facsimile 617.786.7723
23

24

1        salaries, say, 1995 through 1999, that would

2        include John and Karen Atwood?

3                    MS. SMAGULA:   Objection.

4    A.   That should include only John and Karen.

5    Q.   No other officers, to your knowledge?

6    A.   There are no other officers.

7    Q.   And they were the only two shareholders as

8        well?

9                    MS. SMAGULA:   Objection.

10   A.   Yes, they were the only two shareholders.

11       There may have been a year or two where some

12       of the stock may have been kept inside

13       Mr. Atwood's estate, but they're the only two

14       shareholders, officers.

15   Q.   And is Karen Atwood still an owner of

16       Cycle-Craft?

17   A.   She owns --

18                   MS. SMAGULA:   Objection.

19   A.   She owns a small percentage of stock.

20   Q.   Do you recall what percentage she owns today?

21   A.   No.

22   Q.   How about at the year end 2004?  Do you recall

23       what percentage?

24   A.   It's footnoted in the body of the financial

1          statements.

2     Q.   Okay.  Year end 2004?

3     A.   '4.

4     Q.   Can you go to Atwood Number 14?  I guess on

5          Vesey 85, is that the note you're referring

6          to?

7     A.   Yes.

8     Q.   So as of year end 2004, John Atwood owned 458

9          shares and Karen Rossi owned the remaining 42

10          shares?

11     A.   Yes.

12     Q.   And pursuant to the buyout agreement, is

13          Mr. Atwood required to purchase those

14          remaining 42 shares?

15     A.   Yes.

16     Q.   And that would be by the end of 2005?

17     A.   Yes.

18                    MS. SMAGULA:  Objection.

19     A.   Well, there's no timetable for it.  She has

20          not been pushing to get the money out.  She's

21          very happy to make 6 percent on the interest

22          on this thing.  So it may or may not happen at

23          the end of 2005.

24     Q.   As of today, she still owns the 42 shares?

# EXHIBIT 32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>     Plaintiff,<br><br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>     Defendants. | CIVIL ACTION<br>NO. 04 11402 NMG |

## ANSWERS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES

Defendants Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson") hereby respond to the Third Set of Interrogatories (the "Interrogatories") of Plaintiff Cycle-Craft Co., Inc., d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") as follows.

### GENERAL OBJECTIONS

1.  Harley-Davidson's responses shall not be deemed to constitute an admission that any particular document exists, is relevant, or is admissible as evidence or that any statement or characterization in the request is accurate or complete.

2.  Harley-Davidson objects to these requests to the extent that they seek documents protected by the attorney-client privilege, the work-product doctrine or are otherwise protected from disclosure.

3.      Harley-Davidson objects to any definition, request or instruction that purports to impose any obligation not expressly provided for in the Federal Rules of Civil Procedure or Local Rules.

4.      To the extent the Request calls for information or the production of documents Harley-Davidson regards as confidential and/or sensitive business information, Harley-Davidson objects to providing that information until a suitable protective order has been agreed upon by the parties and entered by the Court.

5.      Harley-Davidson objects to the definition of the term "material involvement" as vague, particularly to the extent that the term "material" is inherently subjective.

6.      Harley-Davidson objects to the definition of the term "adverse action" as overbroad, particularly to the extent that Cycle-Craft has arbitrarily identified certain actions such as "allocation adjustments" and "chargebacks" as "adverse."

7.      These general objections are incorporated into each numbered response, as if each general objection was specifically set forth therein.

## ANSWERS

### INTERROGATORY NO. 25

Please identify and state the basis for each fact or circumstance that you contend establishes, in whole or in part, "good cause" for the termination of the Cycle-Craft dealership under Mass. Gen. Laws Ch. 93B § 5(j).

### ANSWER NO. 25

Harley-Davidson objects to this request on grounds that it is vague, ambiguous and overbroad inasmuch as it asks defendant to "state the basis" for a "fact or circumstance." Subject to and without waiving these objections, Harley-Davidson states that Cycle-Craft's falsification of its sales reports to Harley-Davidson, and related material violations of the Harley-Davidson Dealer Agreement and Non-Retail Sales Policy, as set forth in the two April 20, 2004 letters from Jon Flickinger of Harley-Davidson to John Atwood of Cycle-Craft (which are incorporated herein by reference) and efforts by Cycle-Craft to conceal same constitute good cause for termination, pursuant to Mass. Gen. Laws ch. 93B § 5(h) and (j)(7).

In addition, during this litigation, Harley-Davidson has discovered that Cycle-Craft falsified additional sales reports to Harley-Davidson with respect to motorcycles having the following vehicle identification numbers: 1HD1BMY153Y105320, 1HD1GHV193K310865, 1HD1GEV183K318650, 1HD1GEV193K330502, 1HD1BTY1X3Y091568, 1HD1HAZ423K849398, 1HD1HAZ183K843207. Harley-Davidson denies that any other factor enumerated in Mass. Gen. Laws ch. 93B § 5(j) is pertinent to the circumstances of this case. To the extent that other factors are deemed to be pertinent, they do not outweigh Cycle-Craft's material breach of contract; for example, and without limitation, the following facts and circumstances weigh in favor of termination:

- Cycle-Craft's sales performance is insufficient to outweigh its material breaches of the Dealer Agreement. [see § 5(j)(1)]

- Cycle-Craft's investment is insufficient to outweigh its material breaches of the Dealer Agreement. Additionally, Cycle-Craft's investment has been and/or may be recouped. [see § 5(j)(2-3)]

- Any alleged impact on the public welfare is insufficient to outweigh Cycle-Craft's material breaches of the Dealer Agreement. Among other considerations, it is Harley-Davidson's intention to establish a new dealership in the Boston area following termination of the Cycle-Craft Dealer Agreement. [see § 5(j)(4)]

- The adequacy of Cycle-Craft's facilities, equipment, vehicle parts and personnel is insufficient to outweigh Cycle-Craft's material breaches of the Dealer Agreement. Among other things, Cycle-Craft has failed to engage properly qualified personnel by employing as its general manager an individual with prior convictions for fraudulent conduct [see § 5(j)(5)]

- The adequacy of Cycle-Craft's services to the public is outweighed by Cycle-Craft's material breaches of the Dealer Agreement. Additionally, Cycle-Craft has poor Customer Satisfaction Index scores. [see § 5(j)(6)]

AS TO ANSWERS

I, Gene Ostrom, depose and state that I am the Director of U.S. Field Sales of Harley-Davidson Motor Company, Inc. and I am authorized to sign these Interrogatories on behalf of Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson").   I have read the foregoing Answers to Plaintiff's Third Set of Interrogatories and know their contents; the answers were prepared with the assistance and advice of counsel and employees of Harley-Davidson upon whose information I have relied; the answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these answers; Harley-Davidson reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been made therein or that more accurate information is available; subject to these limitations these answers are true to the best of my knowledge, information and belief.  Signed under pains and penalties of perjury this __12th__ day of July, 2005.

Gene Ostrom
Director of U.S. Field Sales
Harley-Davidson Motor Company, Inc.

AS TO OBJECTIONS:

William N. Berkowitz, BBO# 544148
Sabita Singh, BBO# 560146
William F. Benson, BB# 646808
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Attorneys for Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC

## CERTIFICATE OF SERVICE

I, Sabita Singh, hereby certify that a true copy of the above document was served upon the attorney of record for each other party, listed below, by hand on July _14_, 2005:

Angela Buchanan Smagula, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Sabita Singh