UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CYCLE-CRAFT CO., INC.                   )
d/b/a BOSTON HARLEY-DAVIDSON/BUELL,     )
                                        )
                    Plaintiff,          )
                                        )          Civil Action
            v.                          )          No. 04 11402 NMG
                                        )
HARLEY-DAVIDSON MOTOR COMPANY, INC.,    )
and BUELL DISTRIBUTION COMPANY, LLC,    )
                                        )
                    Defendants.         )
_____)

---

## PLAINTIFF CYCLE-CRAFT CO., INC.'S MEMORANDUM OF LAW IN OPPOSITION TO HARLEY-DAVIDSON'S MOTION FOR SUMMARY JUDGMENT

---

James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

*Attorneys for Plaintiff Cycle-Craft
Co., Inc.
d/b/a Boston Harley-Davidson/Buell*

Dated: September 16, 2005

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................ 2

    A.    Introduction to the Cycle-Craft Dealership .................................. 2

    B.    Harley-Davidson's Dealer Contract and the "Non-Retail Sales Policy" ................................................................. 3

        1.    The Dealer Contract ......................................................... 3
        2.    Harley-Davidson's Unilaterally Decreed NRSPs ............... 4
        3.    Harley-Davidson's Enforcement of Its Non-Retail Sales Policy ..................................................................... 6

    C.    The Motorcycle Sales Challenged By Harley-Davidson .............. 7

        1.    Sales to Florida and New Hampshire Residents. .............. 7
        2.    The Offer to Cycle-Craft Employees, Relatives and Friends ............................................................................ 9

    D.    Harley-Davidson's Investigation of Cycle-Craft ....................... 10

ARGUMENT ................................................................................ 12

    I.    HARLEY-DAVIDSON IS NOT ENTITLED TO SUMMARY JUDGMENT ON WHETHER IT CAN DEMONSTRATE "GOOD CAUSE" FOR TERMINATION. ........................... 12

        A.    Consideration of the Legislatively Mandated "Good Cause" Factors Demonstrates That Harley-Davidson Is Not Entitled to Summary Judgment ................................... 12
        B.    Harley-Davidson Ignores the Relevant Good Cause Standard Under Chapter 93B And Incorrectly Relies on Inapposite Cases and Wisconsin Law. ....................... 18

    II.    TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER HARLEY-DAVIDSON'S TERMINATION WAS IN BAD FAITH, ARBITRARY, OR UNCONSCIONABLE UNDER SECTION 5(M) AND AS TO WHETHER HARLEY-DAVIDSON BREACHED THE DEALER CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN THAT CONTRACT. ....................... 22

CONCLUSION ................................................................................ 25

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Coady Corp. v. Toyota Motor Distributors, Inc.*, 361 F.3d 50 (1st Cir. 2004) ................ 24

*David Glen, Inc. v. Saab Cars USA, Inc.*, 837 F. Supp. 888 (N.D. Ill. 1993) .................. 21

*Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373 (10th Cir. 1988) .......... 20-21

*Foreign Motors, Inc. v. Audi of America, Inc.*, 755 F. Supp. 20 (D. Mass. 1991) ...... 19-20

*General GMC, Inc. v. Volvo White Truck Corp.*, 1987 WL 30965 (D. Mass. Nov. 3, 1987) ....................................................................................................................... 20

*Ormsby Motors, Inc. v. General Motors Corp.*, 842 F. Supp. 344 (N.D. Ill. 1994) ......... 20

*Ruffino v. State Street Bank and Trust Co.,* 908 F. Supp. 1019 (D. Mass. 1995) ............ 24

### STATE CASES

*Amoco Oil Co. v. Dickson*, 378 Mass. 44 (1979) .......................................................... 20

*Beard v. Toyota Motor Distrib., Inc.*, 395 Mass. 428 (1985) .......................................... 13

*G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262 (1991) ........................ 24

*Marx v. Globe Newspaper Co., Inc.*, 2002 WL 31662569 (Mass. Super. 2002) ............. 22

*Owen v. Kessler*, 56 Mass. App. Ct. 466 (2002) .......................................................... 22

*Racine Harley-Davidson, Inc. v. Harley-Davidson Motor Co.*, 692 N.W.2d 670 (Wis. Ct. App. 2004) ................................................................................................................... 18

*Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313 (1978) ............... 13

## INTRODUCTION

Plaintiff Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") hereby submits this memorandum of law in opposition to the motion of Defendants Harley-Davidson Motor Company, Inc. and Buell Distribution Co., LLC (collectively "Harley-Davidson") for summary judgment. This Court should deny Harley-Davidson's motion for two reasons.

*First*, Harley-Davidson has failed to carry its burden of demonstrating that "good cause" exists for its termination of Cycle-Craft's dealership agreement under Mass. Gen. Laws Ch. 93B. As an initial matter, Harley-Davidson ignores the legislatively mandated factors for determining good cause under Mass. Gen. Laws Ch. 93B § 5(j) and attempts to justify the termination under an inapplicable provision of Chapter 93B, § 5(h). Even under that provision, however, Harley-Davidson is unable to demonstrate the absence of triable factual issues, and the caselaw it enlists is inapposite for several reasons.

*Second*, genuine issues of material fact exist as to whether the termination was in bad faith, or in an arbitrary or unconscionable manner, in violation of Mass. Gen. Laws Ch. 93B and the implied covenant of good faith and fair dealing in the Dealer Contract. Cycle-Craft has alleged that Harley-Davidson's stated reason for termination of the dealership was pretextual, and that Harley-Davidson's true motivation was to prevent Cycle-Craft from exercising its "protest rights" under Chapter 93B to challenge the establishment of another Harley-Davidson dealership in the Danvers/Peabody Massachusetts area. There is ample evidence from which the factfinder could infer that Harley-Davidson was operating pursuant to a hidden agenda, and questions of motive are best left to the finder of fact.

**BACKGROUND**

A.    **Introduction to the Cycle-Craft Dealership**

Since 1959, Cycle-Craft has been operating as a family owned and operated Harley-Davidson dealership in the Boston area. *Exhibit 41* (Affidavit of John Atwood ("Atwood Aff.")) ¶ 2.[1]  Its original location was in Roxbury, and the dealership has been located in Everett since 1969. *Id.*  Under the stewardship of the Atwood family — Bill and Kitty Atwood from 1959 to 1991; their children, John and Karen Atwood, from 1991-2000; and John Atwood since 2000 — the dealership has grown to be one of the nation's largest and most successful Harley-Davidson dealerships. *Id.* ¶¶ 2-4.  Cycle-Craft is exclusively a Harley-Davidson dealer; it carries no other product lines. *Id.* ¶ 3.  Cycle-Craft has historically been one of the top 10% of Harley-Davidson dealers in the United States in purchases of motorcycles, parts, accessories and general merchandise, and has received numerous awards for its performance. *Id.* ¶ 16-20.  Since the early 1990s, it has sold 100% of the motorcycles allocated to it annually by Harley-Davidson. *Id.* ¶ 16.

Cycle-Craft has been a loyal Harley-Davidson dealer through thick and thin. *Id.* ¶ 3.  Throughout, the Atwoods have made enormous investments in real estate, equipment, and personnel, including a $2.7 million facility relocation and renovation project in 1998. *Id.* ¶ 5-12.  Cycle-Craft is also an exemplary corporate citizen.  The dealership sponsors or contributes to a wide variety of civic and charitable organizations, and sells and leases motorcycles to dozens of area police departments. *Id.* ¶¶ 22-25.

---

[1]      For ease of reference Cycle-Craft has combined into a single volume the exhibits from both its Motion for Summary Judgment and its Opposition to Harley-Davidson's Motion for Summary Judgment.

**B.**     **Harley-Davidson's Dealer Contract and the "Non-Retail Sales Policy"**

**1.**     **The Dealer Contract**

The operative contract between Harley-Davidson and Cycle-Craft is the Harley-Davidson Motor Company Motorcycle Dealer Contract ("Dealer Contract"), which the parties signed on or about September 19, 2000 and extended in June 2002. *Exhibit 1* (Dealer Contract) at 5; *Exhibit 1A* (Extension). As its title suggests, the Dealer Contract is a standard form Harley-Davidson contract, written by Harley-Davidson, with a blank space for individual dealer information. *Exhibit 1* (Dealer Contract) at 1-3. The Dealer Contract incorporates another Harley-Davidson form document, titled Harley-Davidson Motor Company General Conditions of Sales and Service ("General Conditions"), *Exhibit 2* (General Conditions), which "are hereby expressly made a part of this Contract and incorporated herein." *Exhibit 1* (Dealer Contract) at 2.

The Dealer Contract makes clear that it memorializes the entire agreement between Harley-Davidson and the dealer, and that the obligations set forth in the Contract cannot be informally altered. Section P.8 of the General Conditions, titled "Entire Contract," states "[e]xcept as explicitly agreed in this Contract, Seller has made no promises to Dealer, Dealer Operator or Owner(s) and there are no other agreements or understandings, either written or oral, between the parties affecting this Contract. Except as otherwise provided herein, this Contract supersedes and cancels all previous agreements between the parties that relate to any matters covered herein." *Exhibit 2* (General Conditions) at 20. Section P.8 also provides that "[n]o modifications, amendments, or changes to this Contract, except as provided herein, shall be valid and binding unless made in writing and *signed by both parties.*" (emphasis added). *Id.*

3

Two sentences of the 21 pages of "General Conditions" address the topic of "Non-Retail Sales," the provision at the center of this dispute. Under the section heading "Sales Effort," Section B.6 states in full:

> Dealer shall not sell Harley-Davidson Products <u>for resale to non-retail customers</u> other than United States authorized Harley-Davidson dealers. Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of the Contract.

*Id.* at 3 (emphasis added). Nothing in Section B.6, nor in any other part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that might violate this provision. *Id.*. And nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Id.*

## 2.    Harley-Davidson's Unilaterally Decreed NRSPs

Beginning in the early 1990s, Harley-Davidson began annually publishing its 1-2 page, fine-print NRSPs. *Exhibit 3* (1991-2004 Model Year NRSPs). A prime reason for the policy was Harley-Davidson's desire to prohibit U.S. dealers from making sales in the overseas market, so Harley-Davidson could keep that market to itself. *Exhibit 4* (Flickinger Dep. I)[2] at 98:18-19; 99:8-12; 102:14-17. Indeed the policy was sometimes referred to as the "Policy on Exports." *Exhibit 3* (1991-2004 NRSPs) at H-D 1624-26. A consultant that advised Harley-Davidson on implementation of the policy recommended that the NRSPs be signed by dealers and incorporated into the Dealer Contract. *Exhibit 5* (Fontana Group Study) at 14-16. Harley-Davidson chose not to do so, even though the option was specifically considered. *Exhibit 6* (NRSP Meeting Minutes) at H-D 1606. Instead of seeking dealer assent to, or even acknowledgement of the provisions of the NRSPs, Harley-Davidson's

practice was simply to include the document in a voluminous package of documentation sent annually to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit 4* (Flickinger Dep. I) at 118:7-11; 119:4-7.

Though Harley-Davidson does not seek the dealer's assent to their terms, the annual NRSPs purport to impose obligations on dealers that are above and beyond those set forth in the Dealer Contract. Most pertinent here, the NRSPs purport to require that a motorcycle be "delivered at the dealership facility, directly to the ultimate consumer." *See Exhibit 3* (1991-2004 NRSPs). Indeed the NRSP for Model Year 2003, explicitly acknowledges that the NRSPs have "expanded upon" the requirements of the Dealer Contract, and that the NRSPs "have been amended over the last twelve years." *Id.* at H-D 0987. Notably, the 1990 NRSP (for the 1991 Model Year) consisted of three short paragraphs, while the 2003 NRSP consisted of nine more detailed paragraphs. *Id.* at H-D 0987, 1624.

Because Harley-Davidson disseminates the NRSPs under the radar, as it were, dealers and even some of Harley-Davidson's own employees are not familiar with their purported requirements. For example, consistent with the non-retail provision of the Dealer Contract, Cycle-Craft Owner John Atwood understood that dealers were only allowed to sell units to retail customers, but was not familiar with the additional requirements of the NRSP, such as the requirement that motorcycles be delivered at the dealership. *Exhibit 7* (Atwood Dep.) at 42:15-43:6. Similarly, Cycle-Craft General Manager Ronald Buchbaum knew that Harley-Davidson requires dealers to sell motorcycles to individuals but was unfamiliar with the more detailed provisions of the NRSP. *Exhibit 8* (Buchbaum I) at 80:12-15, 241:7-8, 245:4-12. The Cycle-Craft sales representatives who negotiated the Florida and New Hampshire sales

---

[2]     Cites to deposition testimony will include the witness's last name and the abbreviation "Dep."

were also unaware of the specific requirements of the NRSP. *Exhibit 9* (Walsh Dep.) at 36:2-
7; *Exhibit 10* (Marasca Dep.) at 42:11-13, 57:14-23.

Indeed Harley-Davidson's Al Contois, a 10-year veteran employee who was the
District Manager for Cycle-Craft's territory when the termination letter was sent, testified at
his deposition to an understanding of the non-retail sales policy that was similar to that of
Messrs. Atwood and Buchbaum. Mr. Contois testified that motorcycles had to be sold to the
end user, but conceded that he was unaware of any additional requirements of the policy.
*Exhibit 11* (Contois Dep.) at 9:11-10:20, 23:19-24:12.

### 3.     Harley-Davidson's Enforcement of Its Non-Retail Sales Policy

Harley-Davidson employee Steven Verduyn is responsible for investigating potential
non-retail sales by dealers, which Harley-Davidson refers to as "gray market activity."
*Exhibit 12* (Verduyn Dep. I) at 43:12-46:17. Although Harley-Davidson maintains
information on known "gray market" dealers who attempt to purchase motorcycles from
dealers under fraudulent pretenses – i.e., by pretending to be retail customers – Harley-
Davidson refuses to share this intelligence with its dealerships even though dealerships have
requested that the company do so. *Id.* at 88:25-89:4; *Exhibit 13* (North-End Harley-Davidson
Letter). Mr. Verduyn advocated internally for sharing gray-market information with dealers
to assist them in adhering to Harley-Davidson's policy, but his advice was not followed.
*Exhibit 12* (Verduyn Dep. I) at 89:3-4; 91:22-92:18.

Generally, Mr. Verduyn begins an investigation of a dealer's records based on some
kind of complaint received regarding new motorcycles being sold by non-authorized Harley-
Davidson dealerships or from finding new motorcycles offered for sale on the internet.
*Exhibit 12* (Verduyn Dep. I) at 52:12-53:6. He starts by reviewing an internally generated
spreadsheet that reflects sales and warranty registration (SWR) information for a dealer's

sales. *Id.* at 59:20-60:13. Based on that review, he then makes a recommendation to the relevant Director of Field Operations ("DFO"), the Harley-Davidson executive responsible for overseeing one of Harley-Davidson's five sales regions, about whether to do nothing, send a "Dear Dealer Letter," or conduct an on-site audit of the dealership. *Id.* at 75:14-76:25. A "Dear Dealer Letter" is typically sent to the dealership requesting information on suspected non-retail sales, providing the dealer with an opportunity to explain the circumstances of the sales. *Id.* at 48:3-5.

Harley-Davidson deals with alleged violations of its non-retail sales policy on an uneven, ad hoc basis. Each DFO is given the discretion to overlook policy violations. *Exhibit 12* (Verduyn Dep. II) at 326:5-7; *Exhibit 4* (Flickinger Dep. II) at 64:4-19. The DFOs have discretion to overlook so-called "de minimis" breaches, typically violations involving ten or fewer sales. *Exhibit 4* (Flickinger Dep. II) at 68:6-20. Circumstances under which the DFO may exercise his discretion include where the dealership has acted in good faith or lacked intent to sell to a broker. *Exhibit 12* (Verduyn Dep. II) at 325:15-23; *Exhibit 4* (Flickinger Dep. II) at 60:8-15.

### C.    The Motorcycle Sales Challenged By Harley-Davidson

#### 1.    Sales to Florida and New Hampshire Residents.

As explained in Cycle-Craft's Memorandum of Law in Support of Its Motion for Summary Judgment ("*Pl. Br.*"), Cycle-Craft sold motorcycles not to DC Imports International ("DCI") and Lee Custom Cycle ("Lee"), as Harley-Davidson contends, but rather to individuals. *Pl. Br.* at 8-11. These sales were consistent with the Dealer Contract, which prohibits only "sales for resale to non-retail customers." *Id.* at 18-19.

Harley-Davidson's summary judgment papers present a misleading description of the admissible record evidence regarding Cycle-Craft's sales to these Florida and New Hampshire

7

residents.  First, although it argues boldly that "Cycle-Craft sold nineteen motorcycles to a wholesaler, DC imports," Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment ("*Def. Br.*") at 10, Harley-Davidson utterly ignores the paperwork (checks, bills of sale, SWRs, drivers' license) that demonstrates that the motorcycles were being sold not to a company but to individuals, as Cycle-Craft insisted.  Second, Harley-Davidson suggests that Cycle-Craft salesman Sean Walsh knew that DC Imports was a motorcycle wholesaler, *Def. Br.* at 10 ("Sean Walsh, a sales manager at Cycle-Craft, had conversations with Michael Stevens and Debra Lunsford of DC Imports, a motorcycle wholesaler . . ."), even though Walsh testified that he had no conversations with Mr. Stevens or Ms. Lunsford about DC Imports' business, but just "assumed from the name DC Imports . . . that they imported goods.  I don't know what they did." *Exhibit 9* (Walsh Dep.) at 101:11-17.  Third, although Harley-Davidson states that "Mr. Walsh was authorized by Mr. Buchbaum to make a deal with <u>DC Imports</u>," *Def. Br.* at 10 (emphasis added), the testimony cited by Harley-Davidson makes it clear that Mr. Buchbaum only instructed Mr. Walsh to deal with a "gentleman from Florida," and not a company.  Finally, as support for its assertion that "DC Imports purchased 19 motorcycles from Cycle-Craft," *Def. Br.* at 11, Harley-Davidson relies on inadmissible testimony it obtained in Ms. Lunsford's deposition, and even goes so far as to remove the objections of Cycle-Craft's counsel (without any ellipses) in the deposition excerpts it reproduces in its brief.  <u>Compare</u> *Def. Br.* at 11 n.11 with *Exhibit 19* (Lunsford Dep.) at 51:7-16, 114:8-17.  Because Harley-Davidson never acknowledged in its brief that 19 individual checks, in 19 individual names, were received by Cycle-Craft, this characterization of the so-called "undisputed facts" is wholly misleading.

Harley-Davidson presents a similarly misleading view of the record evidence regarding the sales to New Hampshire residents.  Again, Harley-Davidson reproduces inadmissible deposition testimony, in question-and-answer form, but eliminates (without ellipses) the objections of Cycle-Craft's counsel.  *Def. Br.* at 12 n.12.  Harley Davidson also implies that Mr. Marasca and Mr. Christensen of Lee Custom Cycle discussed that the motorcycles would be sold to "fictitious" purchasers.  *See Def. Br.* at 12 ("Cycle-Craft sales person Jason Marasca advised Lee's owner . . . [that] he needed to provide eight individual names to be inserted into Cycle-Craft's paperwork as (fictitious) customers.").  The cited testimony, to the extent it is even admissible, does not support such an assertion, but indicates that the motorcycles had to be sold to individuals, and not to a company, and Mr. Marasca acknowledged in his deposition that he did not know what the individuals who purchased the motorcycles through Lee Christensen were going to do with them.  *Exhibit 10* (Marasca Dep.) at 64:1-10.  Harley-Davidson also implies, by a clever use of the passive voice, that Cycle-Craft "delivered" the motorcycles to Lee, *Def. Br.* at 13 ("The motorcycles were delivered to Lee . . . .").  It is undisputed that Harley-Davidson did <u>not</u> deliver the motorcycles to Lee, and the implication is misleading in light of Harley-Davidson's failure to acknowledge that eight individuals came to Cycle-Craft, with individual checks, and filled out individual sets of paperwork reflecting their purchase of the 8 motorcycles.

### 2.    The Offer to Cycle-Craft Employees, Relatives and Friends

Harley-Davidson also alleges that Cycle-Craft submitted fraudulent sales and warranty registration information (SWRs) for seventeen additional motorcycles in July 2003.  It contends that termination of the dealership is warranted under Section M.4(b) of the Dealer Contract, which authorizes Harley-Davidson to terminate a dealer who submits to Harley-Davidson "any application, claim, report, record or other information which is fraudulent or

9

contains any material misrepresentation." *See Exhibit 14* (Inspection of Records Letter) at 2; *Exhibit 26* (Termination Letter) at 1-2. The undisputed facts, however, as described in detail in Cycle-Craft's Memorandum of Law in Support of Its Motion for Summary Judgment, demonstrate that the sales reports submitted by Cycle-Craft were not fraudulent and did not materially breach any provision of the Dealer Contract. *Pl. Br.* at 12-14, 20-22. Cycle-Craft submitted SWRs on behalf of employees (and their family and friends) who had committed to purchase 13 of those motorcycles and then requested that changes, which Harley-Davidson accepted without question, be entered to the SWRs when regular customers purchased the motorcycles. *Id.* Three of the remaining motorcycles were purchased by Cycle-Craft to be featured in the dealership's collection and the SWRs submitted for those motorcycles accurately reflect that fact.[3] *Id.* at 13-14.

      **D.**    **Harley-Davidson's Investigation of Cycle-Craft**

      Harley-Davidson began investigating Cycle-Craft for possible violations of its non-retail sales policies in July 2003, just four months after Cycle-Craft informed Harley-Davidson, through its counsel, of its intention to exercise its legal rights under Mass. Gen. Laws Ch. 93B § 6 to "protest" any establishment of a new dealership in its backyard. *Exhibit 33* (Protest Letter). Under that statute, a dealer may bring a legal challenge in state or federal court to enjoin a manufacturer's establishment of a new dealership in its market area, and the manufacturer must prove that there is good cause to establish the new dealership. *Id.* at § 6(e). Harley-Davidson's Legal Department was brought into the loop early on for an analysis of Cycle-Craft's protest rights under Massachusetts law. *Exhibit* 34 (Market Study E-mail).

---

[3]     The seventeenth motorcycle identified by Harley-Davidson was purchased by the brother of a Cycle-Craft employee for a Toys for Tots raffle in Michigan and later titled to the winner of the raffle. *Exhibit 8* (Buchbaum Dep. I) at 195:2-17. Based on its summary judgment submissions, Harley-Davidson apparently no longer challenges this sale.

The investigation of Cycle-Craft that followed on the heels of Cycle-Craft's protest threat was notable in several respects. First, Cycle-Craft had no history of violations of the non-retail sales policy. *Exhibit 41* (Atwood Aff.) ¶ 26. Second, the investigation was initiated by Mr. Verduyn without the level of suspicion that normally triggers such an investigation.[4] Third, contrary to standard practice, no "Dear Dealer" letter was sent to Cycle-Craft requesting an explanation of the questioned sales. *Exhibit 12* (Verduyn Dep. I) at 100:25-101:17; *Exhibit 35* (SWR Report Request E-mail). Fourth, the on-site inspection at Cycle-Craft, conducted by Mr. Verduyn in February 2004 as the culmination of the investigation, was unusual in that Mr. Verduyn was accompanied by a senior Harley-Davidson employee, Director of Field Operations Michael Malicki. No executive of Mr. Malicki's stature had ever accompanied Mr. Verduyn on such an audit, and the only person he had brought with him on an on-site audit conducted during the same period was his girlfriend. *Exhibit 12* (Verduyn Dep. II) at 273:2-6; 282:2-3.. Fifth, Mr. Verduyn based the conclusions of his investigation — that violations of the non-retail sales policy occurred — on the policy as defined in the NRSP, not the Dealer Contract, and admitted that he was unfamiliar with the

---

[4]    Mr. Verduyn testified that he conducts no routine or "random" investigations of dealers for potential non-retail sales, but would only commence an investigation when there is a "foundation" for doing so. *Exhibit 12* (Verduyn Dep. I) at 51:2-17. He would "typically act on some kind of a complaint" from a dealership about "an unauthorized motorcycle dealer having new vehicles for sale in their market area." *Id.* at 51:15-16, 52:17-18. Mr. Verduyn acknowledged that a large number of sales toward the end of the model year, however, would not be enough in itself to commence an investigation. *Id.* at 58:12-17. Despite this testimony, it is indisputable that Mr. Verduyn began his investigation of Cycle-Craft simply because it had made a large number of sales in July of 2003, as the model year was ending. *Exhibit 35* (SWR Report Request E-mail). Although Harley-Davidson stated in sworn interrogatory answers that its investigation was triggered by an email complaint from a competitor, *see Exhibit 36* (Harley-Davidson's Supplemental Answers to Interrogatories) at Answer No. 3, Verduyn's review of Cycle-Craft's records had begun two weeks earlier. The email complaint from Seacoast Harley-Davidson about new units being available at Lee Custom Cycle was received by Verduyn on August 11, 2003. *Exhibit 37* (Seacoast Harley-Davidson E-Mail) at H-D 1856. Verduyn was already conducting an investigation into Cycle-Craft's records on July 28, 2003, as evidenced by his email to Mr. Contois and Mr. Malicki outlining the results of his review of an SWR report on Cycle-Craft. *Exhibit 35* (SWR Report Request E-mail) at H-D 1852. In the email exchange of July 28, 2003 – again, two weeks prior to the receipt of the email complaint from Seacoast – Mr. Malicki also indicated that they should take another look at Cycle-Craft's records again after the model year had ended. *Id.*

Dealer Contract. *Id.* at 146-160. The Termination Letter, however, which was based on Verduyn's recommendation and report, says nothing about the NRSP and cites only alleged contractual violations. Sixth, Cycle-Craft was never given any opportunity after the audit to explain the challenged sales. After the February 2004 audit, the next Cycle-Craft heard on the subject was the Inspection of Records Letter and the Notice of Termination Letter, dated April 20, 2004.

## ARGUMENT

## I. HARLEY-DAVIDSON IS NOT ENTITLED TO SUMMARY JUDGMENT ON WHETHER IT CAN DEMONSTRATE "GOOD CAUSE" FOR TERMINATION.

As fully explained in Cycle-Craft's Memorandum of Law in Support of Its Motion for Summary Judgment, the undisputed facts demonstrate that Cycle-Craft did not sell motorcycles "for resale to non-retail customers," and did not submit any "fraudulent" sales reports to Harley-Davidson. *Pl. Br.* at 15-25. Accordingly, Harley-Davidson is unable as a matter of law to demonstrate a material breach of the Dealer Contract, and it is Cycle-Craft, and not Harley-Davidson, that is entitled to summary judgment on the issue of whether there was "good cause" for termination of the dealership. At a minimum, however, Harley-Davidson is not entitled to summary judgment on whether good cause existed for the termination decision.

### A. Consideration of the Legislatively Mandated "Good Cause" Factors Demonstrates That Harley-Davidson Is Not Entitled to Summary Judgment.

Chapter 93B of the Massachusetts General Laws is sometimes referred to as the "Dealer's Bill of Rights." The statute "was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated

12

dealers." *Beard Motors, Inc. v. Toyota Motor Distrib., Inc.*, 395 Mass. 428, 432 (1985); *see also Tober Foreign Motors v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 319, 321 (1978), ("[The act] was a response to long-recognized problems including that of the coercion of dealers by automobile manufacturers . . . ." and sought to protect dealers from "the inequitable consequences of overweening economic power wielded by manufacturers."). Due to this potential for oppression, § 5(a) of Chapter 93B forbids the termination of a dealer's franchise agreement without "good cause."

Section 5(j) of Chapter 93B sets forth the appropriate standard for determining whether "good cause" cause exists for terminating a franchise agreement. It provides, "In determining whether good cause has been established for terminat[ion] . . . the court shall consider all pertinent circumstances," *id.*, and provides the following non-exhaustive list of circumstances to be considered:

(1)     the amount of business transacted by the affected motor vehicle dealer during the 3 year period immediately preceding such notice as compared to the business available to it;

(2)     the investment necessarily made and obligations incurred by the affected motor vehicle dealer to perform its obligations under the existing franchise agreement;

(3)     the permanency of the investment of the affected motor vehicle dealer;

(4)     whether it is injurious or beneficial to the public welfare for the franchise agreement of the affected motor vehicle dealer to be terminated;

(5)     whether the affected motor vehicle dealer has adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumers for motor vehicles handled by the affected motor vehicle dealer;

(6)     whether the affected motor vehicle dealer has been and is rendering adequate services to the public; and

> (7)    the existence and materiality of any breaches, defaults or violations by
> the affected motor vehicle dealer of the terms or provisions of the existing
> franchise agreement or of applicable law.

Mass. Gen. Laws Ch. 93B, § 5(j).  Under the plain meaning of this language, while the

Court "shall consider" any alleged breaches of the Dealer Contract as a factor in the

"good cause" inquiry, the Court also must consider "all pertinent circumstances."

Cycle-Craft has already set forth in its summary judgment brief its argument as to

factor (7) under § 5(j)—the materiality and existence of any contractual breaches—and will

not repeat it here.  Consideration of each of the additional six factors under § 5(j), as well as

additional "pertinent circumstances," resoundingly demonstrates that Harley-Davidson is not

entitled to summary judgment.

(1)    <u>Amount of Business</u>:  Cycle-Craft took advantage of all business available to it

during the three years preceding the notice of termination.  Cycle-Craft consistently sold all

motorcycles in its annual allocation during those three years.  *Exhibit 41* (Atwood Aff.) ¶ 16.

In addition, Cycle-Craft routinely performed as one of the top purchasing volume dealers for

Harley-Davidson nationwide for parts, accessories, and general merchandise.  *Id.*

(2)    <u>Investment in Dealership</u>:  The Atwood family has invested nearly five

decades of time, money, and effort into the Cycle-Craft dealership, which has resulted in

Cycle-Craft becoming one of the largest Harley-Davidson dealerships and retail outlets in the

world.  *Id.* ¶¶ 2, 4-5.  Specifically, in the late 1990s, the family spent $2.7 million to acquire

and renovate the building where the dealership is now located, upgrading from a 16,000

square foot facility to an 86,000 square foot facility, which was inspired by the original

Harley-Davidson headquarters building in Milwaukee, Wisconsin.  *Id.* ¶¶ 5-6.  Harley-

Davidson itself recognized the commitment of the Atwood family in its 1997 Annual Report,

which prominently featured the Cycle-Craft renovation, and praised the Atwood's "capital

14

improvements" as an example of the traits that "make our dealers the best in the business." *Id.* ¶ 11. Harley-Davidson's Chairman personally visited the renovated facility, and told Mr. Atwood it looked more like Harley-Davidson's original headquarters in Milwaukee than did the present headquarters. *Id.* ¶ 10. For their renovation's contribution to a revitalization of the Revere Beach Parkway area in Everett, John and Karen Atwood were named Massachusetts Small Business Persons Of The Year for 1998. *Id.* ¶ 8.

(3)    <u>Permanency of Investment</u>: Cycle-Craft is a venerable and long-established dealership as a result of the Atwood family's commitment to, and financial investment in, the dealership. *Id.* ¶ 2. The Atwoods have owned and run the dealership since 1959, providing over 45 years of continued service to Harley-Davidson customers in the Boston area. *Id.* ¶ 2-4. Cycle-Craft has been with Harley-Davidson through good times and bad, and has always been exclusively a Harley-Davidson dealer. *Id.* ¶ 3-4. For example, in the 1980s, when Harley-Davidson motorcycles did not enjoy the widespread popularity they do today, Bill and Kitty Atwood had to work on the side managing apartment housing in order to supplement their income. *Id.* ¶ 3. During this time, employees sometimes had to be laid off during the slower winter months. *Id.*

(4)    <u>Injury/Benefit to Public Welfare</u>: The termination of the Cycle-Craft dealership would disserve the public welfare. Cycle-Craft employs dozens of area residents, supplies motorcycles to numerous police departments in the Boston area, and supports multiple civic and charitable organizations. *Id.* ¶ 14, 22-25. Cycle-Craft's loyal customers would be ill-served by the termination of the dealership and lose a long-standing member of their community. If the dealership was terminated, the loyalty and sense of community cultivated for decades by Cycle-Craft would be lost.

The visibility and venerability of Cycle-Craft have resulted in it becoming something of a Boston-area institution.  This visibility has allowed it to become an effective sponsor of numerous charitable causes and events, which have been publicized in the media, thereby increasing the dealership's visibility.  *Id.* ¶ 24.  Among the many charitable causes with which Cycle-Craft has been involved are the Ronald McDonald House, the American Cancer Society, and the Susan G. Komen Breast Cancer Foundation.  *Id.*

To increase its local profile Cycle-Craft has cultivated relationships with Boston-area celebrities as part of its business plan.  *Id.* ¶ 25.  Former Boston College football star and New England Patriot Steve DeOssie is president of the Harley Owners' Group ("HOG") Chapter affiliated with Cycle-Craft.  *Id.*  Members of the Red Sox, Patriots, and Bruins are familiar faces at the dealership, both as customers and for being involved in promotional and charitable activities.  *Id.*  Senator John Kerry is a customer.  *Id.*

(5)     <u>Adequate Facilities and Service</u>:  Cycle-Craft provides superior facilities and service to its customers, including exemplary, state-of-the-art sales and service facilities, a comprehensive parts and accessories sales operation, and an enthusiastic, knowledgeable staff.  Harley-Davidson itself highlighted Cycle-Craft's facilities in its 1997 Annual Report. *Id.* ¶¶ 11-12.  Since publication of the 1997 Annual Report, Cycle-Craft's facilities, service, performance, and capabilities have only improved.  Harley-Davidson's own dealer evaluations confirm this high-level of performance.  Cycle-Craft's "Bar and Shield" Scoresheets, *Exhibit 38* (Bar and Shield Scoresheets 2000-2003), show that from 2000-2003 Cycle-Craft achieved an average of 94 percent of the possible points in the "Operations" category, an average of 98 percent of the possible points in the "People" category, an average of 95 percent of the possible points in the "Customer Service Category," an average of 100

16

percent of the possible points in the "Facility" category, and an average of 90 percent of the possible points in the "Performance" category. *Id.* Indeed over the course of that same period Cycle-Craft achieved the maximum possible score at least once in every single category. *Id.*

(6)    Adequate Service to the Public:  Cycle-Craft provides superior services to the public today, as it has historically.  In addition to its state-of-the-art facilities and knowledgeable staff, Cycle-Craft is an exemplary corporate citizen that participates in a wide range of civic and charitable activities, some in conjunction with the dealership-sponsored HOG chapter. *Exhibit 41* (Atwood Aff.) ¶ 24.  Cycle-Craft's 1998 relocation has also been credited with a revitalization of the Revere Beach Parkway area in Everett. *Id.* ¶ 7.

In short, each of the factors enumerated in Mass. Gen. Laws Ch. 93B § 5(j) weighs in favor of Cycle-Craft.  But there is more.  Consideration of additional "pertinent circumstances," including Harley-Davidson's conduct in the termination process, confirms even further that Harley-Davidson cannot demonstrate good cause.  First, Harley-Davidson has been less than candid in articulating the basis for Cycle-Craft's termination, notwithstanding the Massachusetts law requirement that a dealer be provided with "the specific grounds for . . . termination."  Mass. Gen. Laws Ch. 93B, § 5(b).  Since it began its investigation, Harley-Davidson has flip-flopped in identifying the basis for its termination decision:  Mr. Verduyn testified that he based his conclusions (and the recommendation to terminate) primarily on violations of provisions of the NRSP, not the Dealer Contract; the subsequent Notice of Termination Letter made no reference to the NRSP, instead citing only violations of the Dealer Contract; and now in this litigation, Harley-Davidson again relies on violations of the NRSP to justify the termination.

17

Second, as explained in Cycle-Craft's opposing brief, *Pl. Br.* at 16-18, Harley-Davidson has also demonstrated a lack of candor towards the judicial system with respect to the scope of the Dealer Contract. Though in this case Harley-Davidson maintains that the NRSP, a wholly separate document from the Dealer Contract, forms part of the contractual obligations between it and Cycle-Craft, in past litigation Harley-Davidson has taken the position that obligations not contained within the four corners of the Dealer Contract are not part of that agreement. *See Racine Harley-Davidson, Inc. v. Harley-Davidson Motor Co.,* 692 N.W.2d 670 (Wis. Ct. App. 2004).

Finally, as discussed in detail below, Harley-Davidson's stated reason for the termination appears to be a pretext to disguise the true motivation behind the termination. This consistent lack of candor should be considered by this Court as a pertinent circumstance under § 5(j). Harley-Davidson has the temerity to self-righteously tout its "values" as part of the basis for its termination decision, *see Exhibit 26* (Termination Letter) at 2 (citing contract provision titled "Tell the Truth"), but in truth it is Harley-Davidson that has not been candid.

### B.  Harley-Davidson Ignores the Relevant Good Cause Standard Under Chapter 93B And Incorrectly Relies on Inapposite Cases and Wisconsin Law.

Harley-Davidson acknowledges that "good cause" is the touchstone to its attempted justification of its termination decision, *Def. Br.* at 15-16 (citing § 5(a), but deliberately avoids any discussion of the legislatively mandated "good cause" factors under § 5(j). It relies instead on § 5(h), which provides in full:

> For purposes of this section, good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation, <u>reasonable sales and service performance criteria and capital, personnel, and facility requirements, which were communicated in writing to the motor vehicle dealer within a reasonable</u>

<u>period before the effective date of the termination or nonrenewal, such that a</u>
<u>reasonable opportunity to cure was afforded.</u>

(emphases added). Harley-Davidson selectively quotes from § 5(h) in its brief, entirely omitting the underscored language above. *Def. Br.* at 16. The reason for this is obvious, as it is the underscored language that renders § 5(h) inapplicable, for two separate reasons. First, Harley-Davidson's termination was not based on Cycle-Craft's noncompliance with "reasonable sales or service performance criteria" or "capital, personnel, and facility requirements" or similar deficiencies. Whatever else Harley-Davidson may say about its non-retail sales policy, it is simply not "material" to the franchise relationship in the same way as performance criteria and operating requirements. Second, even if the violations alleged by Harley-Davidson were "material" under § 5(h), it is indisputable that Harley-Davidson never provided Cycle-Craft with a "reasonable opportunity to cure," as required by the final sentence of § 5(h). Although Harley-Davidson substitutes ellipses for this portion of § 5(h) in its brief, the language is there nonetheless, and Harley-Davidson has no credible argument that it afforded Cycle-Craft a "reasonable opportunity or cure."[5]

Because it erroneously bases its argument on § 5(h), and not § 5(j), Harley-Davidson does not even address the "pertinent circumstances" listed under § 5(j), relying instead on clearly distinguishable cases that discuss "good cause" standards in other contexts. *Def. Br.* at 19-20. Typically inapposite is defendant's lead case, *Foreign Motors, Inc. v. Audi of*

---

[5]     Harley-Davidson sent the Inspection of Records Letter detailing the results of its audit of Cycle-Craft on April 20, 2004, the same day that it sent the Notice of Termination Letter. As the letters were mailed on the same day, Harley-Davidson did not afford Cycle-Craft the opportunity to cure any alleged failure to comply with the requirements of the Dealer Contract. Rather, the Notice of Termination Letter simply states that "[t]his is to notify you that the September 19, 2000 Dealer Contract . . . is hereby terminated sixty days from the date of your receipt of this letter." *Exhibit 26* (Termination Letter) at 1. The letter ends by emphasizing that "Harley-Davidson is committed to exercising its termination rights." *Id.* at 3. The letter makes no mention of an opportunity to cure or to even discuss the alleged non-retail sales. The only invitation extended to Cycle-Craft in the letter is to discuss the "transition" of the dealership. *Id.* Simply put, Harley-Davidson failed to offer any opportunity to cure, much less a reasonable one.

*America, Inc.*, 755 F. Supp. 30 (D. Mass. 1991), where the Court found the manufacturer was likely to succeed on the merits of justifying a termination where the dealer "has experienced, and continues to experience, serious operational difficulties, and . . . has continually failed to comply with performance standards in [the contract]." *Id.* at 35. The court concluded, "In light of overwhelming evidence of FMI's deficiencies, Audi had sound business reasons and sufficient 'good cause' to terminate FMI." *Id.* Here, by sharp contrast, Harley-Davidson has offered no evidence of performance deficiencies that would justify a termination for "business or economic reasons." The other cases Harley-Davidson cites are also situations where good-faith, performance-based business decisions were the reason for the termination.[6]

The cases Harley-Davidson cites in support of its materiality argument, *Def. Br.* at 19-20, do not involve circumstances remotely similar to this case.[7] For example, unlike the situation in *Ormsby Motors, Inc. v. General Motors Corp.*, 842 F. Supp. 344, 349 (N.D. Ill. 1994), where "it [was] undisputed that false claims for warranty work were submitted to GM and that OMI's open account was credited for those claims," Cycle-Craft disputes that it submitted any false sales reports of any kind to Harley-Davidson. *See also Dreiling v.*

---

[6]     *See General GMC, Inc. v. Volvo White Truck Corp.*, 1987 WL 30965 at *3 (D. Mass. Nov. 3, 1987) ("legitimate business reasons" established where manufacturer corporation was being dissolved by its corporate parent); *Amoco Oil Co. v. Dickson*, 378 Mass. 44, 45 (1979) (undisputed that agreement was terminated because of manufacturer's "good faith and honest judgment (that) the station was insufficiently profitable to it").

[7]     As Cycle-Craft pointed out in its opening brief, *Pl. Br.* at 23 n.10, Harley-Davidson incorrectly argues that Wisconsin law governs the interpretation of the Dealer Contract, and bases much of its legal argument on Wisconsin law. *Def. Br.* at 17 n. 15, 22-25. Harley-Davidson ignores unambiguous language in Mass. Gen. Laws Ch. 93B by arguing that Wisconsin law should govern the interpretation of the Dealer Contract. *Defs. Br.* at 17 n.15. In reality, the statute makes crystal clear that Massachusetts law governs the interpretation of Dealer Contract. Under § 15(e) of Chapter 93B, "[n]otwithstanding any term or provision of a franchise agreement to the contrary: (1) the laws of the commonwealth shall govern the interpretation of the franchise agreement of a motor vehicle dealer located in the commonwealth and the performance of the parties thereunder . . . ." Harley-Davidson's attempt to rely on Wisconsin law, which applies a less stringent standard of "materiality" than Massachusetts, is a transparent attempt to avoid the fact that any breaches allegedly committed by Cycle-Craft were immaterial under Massachusetts law. As explained in Cycle-Craft's Memorandum of Law in Support of Its Motion for Summary Judgment, under Massachusetts law, Cycle-Craft did not materially breach the Dealer Contract. *Pl. Br.* at 22-24.

*Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1377-78 (10th Cir. 1988) ("Dreiling's counsel confessed the fraud [and] . . . admitted that Dreiling 'got the money for those fraudulent claims' . . . [i]n the face of the <u>admitted</u> fraudulent warranty claims, Peugeot's termination of the dealership does not breach the dealer agreement.") (emphasis added); *David Glen, Inc. v. Saab Cars USA, Inc.*, 837 F. Supp. 888, 889 (N.D. Ill. 1993) ("According to [the owners], unbeknownst to the [dealership], one of its mechanics . . . falsified documents to show that he had done the recall repairs when in fact he had done nothing. [Dealer] submitted these documents to Saab for reimbursement for parts and labor.") As outlined above and described more fully in Cycle-Craft's Memorandum of Law In Support of Its Motion for Summary Judgment, Cycle-Craft submitted SWRs to Harley-Davidson that accurately reflected sales to individuals, commitments to purchase made by employees, and purchases made for the dealership's collection. *Pl. Br.* at 8-14.

In sum, Harley-Davidson has not demonstrated that it is entitled to summary judgment on whether its termination decision was supported by good cause. It is wrong on the facts and wrong on the law. If anything Cycle-Craft is entitled to summary judgment that Harley-Davidson cannot meet the "good cause" standard. At a minimum, there are triable issues of fact as to whether a material breach occurred.[8]

---

[8]     Cycle-Craft's breach of contract claim (Count 2) is premised upon Harley-Davidson's improper exercise of its termination rights under the Dealer Contract and the existence of triable issues of fact as to whether Cycle-Craft materially breached the Dealer Contract preclude summary judgment on this count as well.

II.    **TRIABLE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER HARLEY-DAVIDSON'S TERMINATION WAS IN BAD FAITH, ARBITRARY, OR UNCONSCIONABLE UNDER SECTION 5(M) AND AS TO WHETHER HARLEY-DAVIDSON BREACHED THE DEALER CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN THAT CONTRACT.**

Summary judgment in favor of Harley-Davidson is also unwarranted on Cycle-Craft's claim that the termination was "in bad faith, arbitrary, or unconscionable" under § 5(m) of Chapter 93B (part of Count 1) and its related, factually overlapping claim that Harley-Davidson breached the Dealer Contract's covenant of good faith and fair dealing.  (Count 3). At a minimum, there is a triable factual dispute whether Harley-Davidson's termination of Cycle-Craft is motivated by a hidden agenda or was otherwise in bad faith or arbitrary under § 5(m).  Such dispute also precludes summary judgment on Count 3, as a breach of the implied covenant of good faith and fair dealing can be found where "the defendant has acted in bad faith or engaged in unfair dealing."[9]  *Marx v. Globe Newspaper Co., Inc.*, 2002 WL 31662569 at *4 (Mass. Super. Nov. 26, 2002).

On the record evidence, a fact finder could easily conclude that Harley-Davidson was concerned about Cycle-Craft's threatened protest of the new Danvers dealership proposed by Harley-Davidson, especially given the strong protest rights afforded dealers under Massachusetts law,[10] and that its investigation and subsequent termination of Cycle-Craft were motivated by a desire to eliminate this protest threat.  It is undisputed that Cycle-Craft's protest rights under Massachusetts law were seen by Harley-Davidson as a potential obstacle

_____

[9]        "In Massachusetts, every contract is subject to an implied covenant of good faith and fair dealing." *Owen v. Kessler*, 56 Mass. App. Ct. 466, 471 (2002) (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991)).

[10]       Under Mass. Gen. Laws Ch. 93B §6, if a written protest is provided to the manufacturer, then either the manufacturer or the dealer may file a complaint in the superior court or in the federal district court for the district of Massachusetts to enforce or enjoin the proposed appointment,  *id.* at § 6(e), and the appointment of the new dealership must be supported by "good cause."  *Id.* at § 6(a)(1).

to its goal of opening a new dealership in the Danvers/Peabody area, and that Harley-Davidson's legal team was informed of John Atwood's protest threat even before it was formally made. As explained above (pp. 11-12), moreover, Harley-Davidson's investigation, audit and termination of Cycle-Craft were unusual: Harley-Davidson had no history of violations of the non-retail sales policy; the investigation began under unusual circumstances, which Harley-Davidson mischaracterized in sworn interrogatory answers; Cycle-Craft, despite 45 years of service, was at no point given an opportunity to explain the allegedly noncompliant sales; and Harley-Davidson has flip-flopped in articulating the true basis for the termination. The fact finder can easily infer from this evidence that Harley-Davidson had a hidden agenda, and thus acted in bad faith in its dealings with Cycle-Craft.

In addition, no Harley-Davidson employee has denied under oath that Cycle-Craft's protest threat was a basis for the termination decision. When Harley-Davidson employees were questioned about the reasons for the termination during their depositions, they uniformly invoked the attorney-client privilege. *See, e.g. Exhibit 11* (Contois Dep.) at 99:4-13; *Exhibit 12* (Verduyn Dep. I) at 181:1-10, 183:18-184:12; *Exhibit 39* (Ostrom Dep.) at 77:11-78:5; *Exhibit 40* (Malicki Dep.) at 144:10-22. Under Massachusetts privilege law, applicable here under Fed. R. Evid. 501, it is well-settled that opposing counsel is permitted to comment upon the assertion of the attorney-client privilege by a witness for the other side. *See* Paul J. Liacos, *Handbook of Massachusetts Evidence* § 13.4.9 (7th ed. 1999) ("Case law permits opposing counsel to comment upon a party's claim of the attorney-client privilege and to argue to the jury that the claim is an implied admission that the privileged matter would be harmful to the party's case.") Accordingly, Cycle-Craft's counsel will be able to argue at trial that the fact finder should draw an adverse inference from the assertion of the privilege,

23

namely, that the protest threat or other undisclosed reasons were the true basis for the termination decision.[11]

Harley-Davidson relies principally on *Coady Corp. v. Toyota Motor Distributors, Inc.*, 361 F.3d 50, 56 (1st Cir. 2004), in arguing that "Chapter 93B does not 'warrant a substitution of judicial for business judgment. A distributor acting honestly is entitled to latitude in making commercial judgments . . . . In this context, it is only the egregious decision that should be labeled 'arbitrary' or 'unfair.'" *Def. Br.* at 21. The case is distinguishable on several grounds, including that it was not a termination case, it was a review of a trial on the merits (not a summary judgment), and the dealer's challenge was to a manufacturer policy that was indisputably a "commercial judgment" – Toyota's method for allocating its vehicles to dealers. *See id.* at 54-55. Here, as explained above, the judgment being challenged by Cycle-Craft – its termination by Harley-Davidson – is much different. At the very least, the evidence of pretext raises a triable issue as to whether the termination was in bad faith, or was in an arbitrary or unconscionable manner. The finder of fact is best qualified to determine Harley-Davidson's true motive for the termination. *Cf. Ruffino v. State Street Bank and Trust Co.,* 908 F. Supp. 1019, 1028 (D. Mass. 1995) ("motive and intent [are] issues least suited for a determination on a motion for summary judgment.").[12]

---

[11]    Harley-Davidson offers affidavit testimony by Verduyn as evidence that its termination decision was "based solely on the contractual breaches by the dealership." *Def. Br.* at 21. But because Verduyn asserted the privilege in response to questions on this subject at his deposition, this testimony will be inadmissible at trial, *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 270-71 (1991), and must therefore be likewise disregarded for summary judgment purposes. Fed. R. Civ. P. 56(e) ("affidavits . . . shall set forth such facts as would be admissible in evidence.")

[12]    It should also be noted that the First Circuit criticized the "commercial judgments" made by Toyota in *Coady*: "Toyota ought to reflect that it has enjoyed a measure of good fortune in escaping unscathed in this lawsuit. Its allocation practices vis a vis Coady were no model of perfection and a factfinder who condemned them might well have been upheld." *Id.* at 62.

## <u>CONCLUSION</u>

For the foregoing reasons, Harley-Davidson's Motion for Summary Judgment should be denied.

Respectfully submitted,

CYCLE-CRAFT CO., INC.

By its attorneys,


_____/s/ James C. Rehnquist_____
James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

September 16, 2005

LIBA/1581691.1