## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
CYCLE-CRAFT CO., INC.                   )
d/b/a BOSTON HARLEY-DAVIDSON/           )
BUELL,                                  )
                                        )        CIVIL ACTION
                 Plaintiff,             )        NO. 04 11402 NMG
                                        )
HARLEY-DAVIDSON MOTOR                   )
COMPANY, INC. and BUELL                 )
DISTRIBUTION COMPANY, LLC,              )
                                        )
                 Defendants.            )
_____)

## PLAINTIFF CYCLE-CRAFT'S RESPONSE TO
## DEFENDANTS' STATEMENT PURSUANT TO LOCAL RULE 56.1

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, plaintiff

Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") hereby responds to

the Statement of Undisputed Facts in Support of the Motion for Summary Judgment of Harley-

Davidson Motor Company, Inc. and Buell Distribution Company (collectively, "Harley-

Davidson").

## I.    The Parties

1.      Harley-Davidson Motor Company, Inc. is a corporation organized under the laws
of the state of Wisconsin, with a principal place of business in Milwaukee, Wisconsin. Buell
Distribution Co., LLC is a limited liability company organized under the laws of the state of
Wisconsin, with a principal place of business in Milwaukee, Wisconsin. Amended Complaint,
¶5.

Cycle-Craft admits the facts set forth in paragraph 1.

2.      Harley-Davidson, together with its affiliate, Buell Distribution Corporation
(collectively hereinafter, "Harley-Davidson"), manufactures and distributes Harley-Davidson
motorcycles, parts and accessories to retail customers through a network of independent dealers
located throughout the United States. Affidavit of Steven Verduyn ("Verduyn Aff."), ¶3,

submitted herewith. The relationship between Harley-Davidson and its independent dealers is governed by the terms of the Harley-Davidson Motor Company Motorcycle Dealer Contract entered into by the respective parties. *Id.*

       Cycle-Craft admits the facts set forth in paragraph 2.

       3.     Plaintiff Cycle-Craft Co., Inc. d/b/a Boston-Harley-Davidson Buell ("Cycle Craft") is a corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Everett, Massachusetts. Cycle-Craft is in the business of selling and servicing Harley-Davidson motorcycles. Amended Complaint, ¶4.

       Cycle-Craft admits the facts set forth in paragraph 3.

## II.    Dealer Agreement Between Harley-Davidson and Cycle-Craft

       4.     The relationship between Harley-Davidson and its independent dealers is governed by the terms of the Harley-Davidson Motor Company Motorcycle Dealer Contract entered into by the respective parties. Verduyn Aff. ¶3. As discussed below, under the terms of this contract, a dealer becomes authorized to purchase new Harley-Davidson motorcycles and to resell them to retail (i.e., end-user) customers; however, sales to persons other than retail customers (e.g., wholesalers, brokers, unauthorized bike shops) are expressly prohibited. *Id.*

       Cycle-Craft admits that the relationship between Harley-Davidson and its independent dealers is governed by the terms of the Harley-Davidson Motor Company Motorcycle Dealer Contract entered into by the respective parties.  However, Cycle-Craft denies that the Dealer Contract does provides the detailed description that Harley-Davidson claims it does.  The Dealer Contract refers to and incorporates another Harley-Davidson form document, titled Harley-Davidson Motor Company General Conditions of Sales and Service ("General Conditions"), *Exhibit 2* (General Conditions) to Cycle-Craft's Motion for Summary Judgment and Cycle-Craft's Memorandum of Law in Opposition to Harley-Davidson's Motion for Summary Judgment,[1] which "are hereby expressly made part of this Contract and incorporated herein." *Exhibit 1* (Dealer Contract) at 2.

---

[1]     For ease of reference Cycle-Craft has combined into a single volume the exhibits from both its Motion for Summary Judgment and its Opposition to Harley-Davidson's Motion for Summary Judgment.

Only two sentences of the 21 pages of "General Conditions" address the topic of "Non-Retail Sales," the provision at the center of this dispute. Under the section heading "Sales Effort," Section B.6 states in full:

> Dealer shall not sell Harley-Davidson Products <u>for resale to non-retail customers</u> other than United States authorized Harley-Davidson dealers. Seller reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of the Contract.

*Exhibit 2* (General Conditions) at 3. (emphasis added). Nothing in Section B.6, nor in any other part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that might violate this provision. *Id.* And nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Id.*

5.     On or about September 19, 2000, Harley-Davidson and the plaintiff entered into a Harley-Davidson Motor Company Motorcycle Dealer Contract (the "Dealer Agreement"). A true copy of the Dealer Agreement is included in the Appendix ("App.") filed in support hereof at Tab A. *See* Deposition of John Atwood., p. 19 (hereinafter, "Atwood Dep."), App. Tab B. *See also* Verduyn Aff., ¶3. Pursuant to the Dealer Agreement, Cycle-Craft agreed, among other things, (i) "to Tell the Truth" (ii) not to sell Harley-Davidson products, including new motorcycles, to non-retail customers, (iii) to complete and return a sales and warranty registration form for every new Harley-Davidson Motorcycle it sold, and (iv) that each of these responsibilities under the Dealer Agreement was reasonable, proper, and fundamental to the purpose of the Dealer Agreement. *Id.*; Dealer Agreement, Sections A, B(6), F(7), P(6); App. Tab A.

Cycle-Craft admits that it entered into a Harley-Davidson Motor Company Motorcycle Dealer Contract on or about September 19, 2000. The remainder of paragraph does not require a response as its states legal conclusions about the Dealer Contract, which agreement speaks for itself.

6.     In or about June 2002, Harley-Davidson and Cycle-Craft entered into an extension to the Dealer Agreement. Atwood Dep., pp. 20-22, App. Tab B. A true copy of the extension is included in the Appendix filed in support hereof at Tab C.

Cycle-Craft admits the facts set forth in paragraph 6.

7.    The Dealer Agreement provides, among other things, that "Dealer [Cycle-Craft] shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers. Seller [Harley-Davidson] reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract." Dealer Agreement, Standard Provisions, Section 6, App. Tab A. See also Declaration of John F. Atwood, ¶30 ("Atwood Decl."), App. Tab D.

Paragraph 7 does not require a response as its states legal conclusions about the Dealer

Contract, which agreement speaks for itself.  Further, nothing in Section B.6, nor in any other

part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that

might violate this provision.  *Exhibit 2* (General Conditions) at 3.  And nothing in Section B.6,

nor in any other part of the Contract, incorporates or even makes reference to any of the

"policies" or "position statements" that are referred to in the second sentence of Section B.6.  *Id.*

8.    Harley-Davidson may terminate the Dealer Agreement if a dealer submits "any application, claim, report, record or other information which is fraudulent or contains material misrepresentations." Dealer Agreement, Standard Provisions, Section 4(b), App. Tab A. Harley-Davidson may also terminate the Dealer Agreement if a dealer breaches, violates or fails to fulfill any of its responsibilities under the contract. *Id.,* Section 6(f), App. Tab A.

Paragraph 8 does not require a response as its states legal conclusions about the Dealer

Contract, which agreement speaks for itself.

9.    Further, the Dealer Agreement provides that "[i]f Dealer has entered into a dealer agreement with Buell Distribution Corporation ('Buell Agreement'), Dealer hereby agrees that the Buell Agreement shall, at the option of Buell Distribution Corporation terminate automatically and without further notice upon termination of this [Harley-Davidson] Contract for any reason." Dealer Agreement, Section M(4), App. Tab A.

Paragraph 9 does not require a response as its states legal conclusions about the Dealer

Contract, which agreement speaks for itself.

## III.    Non-Retail Sales Policy

10.    For every year since the early 1990s, Harley-Davidson has issued annual policies describing its Non-Retail Sales Policy ("NRSP"). Verduyn Aff., ¶5. True copies of the NRSPs for the years 1998-2002 are attached to the Verduyn Aff. at Exhibit 2.

4

Cycle-Craft admits that, beginning in the early 1990s, Harley-Davidson began annually publishing its 1-2 page, fine-print NRSPs.

11.    For the 2003 Model Year (August 1, 2002 to July 31, 2003), Harley-Davidson issued a Motorcycle Non-Retail Sales Policy ("2003 NRSP"). Atwood Decl, ¶31, App. Tab D; Verduyn Aff., ¶5. A true copy of the 2003 NRSP is included in the Appendix at Tab E. Cycle Craft received a copy of this policy through the mail. Atwood Dep., p. 27, App. Tab B.

Cycle-Craft admits the facts set forth in paragraph 11.

12.    As set forth in the 2003 NRSP, the policy is designed to "ensure customer satisfaction and safety, facilitate compliance with federal and state law and laws in various foreign countries, maintain Harley-Davidson's competitive position and protect the integrity of Harley-Davidson's worldwide distribution network." App. Tab E. Among other things, by prohibiting Harley-Davidson dealers from selling motorcycles to resellers and by requiring dealers to submit the names and addresses of the retail customers to whom they sell motorcycles, our company can better (i) assure that consumers are receiving proper guidance, instructions and orientation with respect to the safe operation of our motorcycles; (ii) allocate and distribute our products to those geographic areas and dealers where they are most needed, and (iii) notify customers in case of a safety recall. Verduyn Aff., ¶6.

Cycle-Craft denies that paragraph 12 sets forth an exhaustive list of the reasons for the NRSP.  A prime reason for the policy was Harley-Davidson's desire to prohibit U.S. dealers from making sales in the overseas market so Harley-Davidson could keep that market to itself. *Exhibit 4* (Flickinger Dep. I)[2] at 98:18-19; 99:8-12; 102:14-17.  Indeed the policy was sometimes referred to as the "Policy on Exports."  *Exhibit 3* (1991-2004 NRSPs) at H-D 1624-26.

13.    The 2003 NRSP states that "[a]s provided in the Dealer Contract, dealers are prohibited from engaging in non-retail sales of motorcycles." App. Tab E. Further, "[a] sale by a U.S. dealer of a new or previously unregistered motorcycle will be considered a 'non-retail sale' for purposes of the Dealer Contract and this policy if the motorcycle is not properly set up, inspected, tested, sold and delivered at the dealership facility, directly to the ultimate consumer. An `ultimate consumer' is the retail end user who purchases, as indicated on the Certificate of Origin, a new or previously unregistered motorcycle for his or her own use, without the intent to resell, pays all applicable taxes and registration fees, and titles the vehicle in his or her own name." *Id. See also* Atwood Decl., ¶32, App. Tab D; Verduyn Aff., ¶7.

Regardless of the language of the 2003 NRSP, Cycle-Craft denies that the 2003 NRSP imposes any contractual requirements upon dealers.  Nothing in Section B.6, nor in any other

---

[2]    Cites to deposition testimony will include the witness's last name and the abbreviation "Dep."

part of the Dealer Contract, defines the terms "retail" or "non-retail customers" or identifies

conduct that might violate this provision. *Exhibit 2* (General Conditions) at 3. And nothing in

Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of

the "policies" or "position statements" that are referred to in the second sentence of Section B.6.

*Id.* Instead of seeking dealer assent to, or even acknowledgement of, NRSPs, Harley-Davidson's

practice is simply to include the NRSPs in a voluminous package of documentation sent annually

to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit*

*4* (Flickinger Dep. I) at 118:7-11; 119:4-8.

14.    Since the early 1990s, Cycle Craft was aware that Harley-Davidson had policies
prohibiting dealers from selling motorcycles to persons intending to resell them. Atwood Dep., p.
32, App. Tab B. Cycle-Craft was also aware that it was only supposed to sell motorcycles to
ultimate consumers. *Id., p.* 42, App. Tab B.

Cycle-Craft was aware that Harley-Davidson requires dealers to sell motorcycles to

individuals but was unfamiliar with the more detailed provisions of the NRSP. *Exhibit 7*

(Atwood Dep.) at 42:13-43:6; *Exhibit 8* (Buchbaum Dep. I) at 80:15, 241:7-8, 245:4-12.

15.    As set forth in the 2003 NRSP, Harley-Davidson reserves the right to terminate a
dealer's Motorcycle Dealer Contract for failing to comply with this policy. App., Tab E.

Cycle-Craft denies that the 2003 NRSP gives Harley-Davidson the right to terminate a

dealer's Dealer Contract for failing to comply with the policy. The 2003 NRSP did not impose

contractual obligations on Cycle-Craft. Nothing in Section B.6, nor in any other part of the

Contract, incorporates or even makes reference to any of the "policies" or "position statements"

that are referred to in the second sentence of Section B.6. *Exhibit 2* (General Conditions) at 3.

Instead of seeking dealer assent to, or even acknowledgement of, NRSPs, Harley-Davidson's

practice is simply to include the NRSPs in a voluminous package of documentation sent annually

to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit*

*4* (Flickinger Dep. I) at 118:7-11; 119:4-8.

6

**IV. Submission of SWRs and Allocation of Motorcycles**

16.     To inform Harley-Davidson that a new motorcycle has been sold, Cycle-Craft submits an electronic Sales & Warranty Registration ("SWR") form to Harley-Davidson. Deposition of Ronald Buchbaum, pp. 169, 185 ("Buchbaum Dep."), App. Tab F; Verduyn Aff., ¶8. The SWR advises Harley-Davidson whether the sale was made to a retail customer and provides Harley-Davidson with the Vehicle Identification Number for the motorcycle sold, the name of the customer, the customer's address and telephone number, a certification that the Harley-Davidson dealer that sold the motorcycle had delivered the motorcycle to the customer and that the warranty had been explained to the customer. Verduyn Aff., ¶8. Harley-Davidson requires that its dealers submit SWRs electronically within ten days of delivery to the customer to enable Harley-Davidson to comply with federal law and to ensure that the motorcycle is qualified for warranty coverage. *Id.*

Cycle-Craft admits the facts set forth in the first sentence of paragraph 16. The SWRs

attached to Mr. Verduyn's Affidavit speak for themselves. *See e.g.,* Verduyn Aff. Ex. 6.

17.     After the SWR is submitted to Harley-Davidson, the warranty period for that motorcycle starts for the customer who purchased the motorcycle. Buchbaum Dep., p. 170, App. Tab F; Atwood Dep., p. 71-72, App. Tab B; Verduyn Aff., ¶9. Cycle-Craft submits an SWR to Harley-Davidson only after the motorcycle is sold and delivered to the retail customer. Atwood Dep., p. 73, App. Tab B; Verduyn Aff., ¶9.

Cycle-Craft denies that it submits an SWR only after the motorcycle is sold and delivered

to the retail customer and denies that Mr. Atwood testified as such. In addition, although Section

F.7 of the Dealer Contract requires that an SWR be submitted "for every new Harley-Davidson

sold," neither that provision nor any other provision in the Contract defines a sale or details when

a motorcycle is considered to have been "sold." *See Exhibit 2* (General Conditions).

18.     Harley-Davidson's allocation of motorcycles to dealers for a given model year is based substantially upon the dealers' reported retail sales for the preceding model year. Verduyn Aff., ¶10. The model year ends on July 31 of each year. Declaration of Ronald Buchbaum, ¶3 ("Buchbaum Decl."), App. Tab G; Any dealer inventory not sold by July 31 is deducted from the dealership's allocation in the following year. Buchbaum Decl., ¶3; Buchbaum Dep., pp. 183-184, App. Tab F; Verduyn Aff., ¶10.

Cycle-Craft admits the facts set forth in paragraph 18.

19.     In recent years, including 2003 and 2004, the popularity of Harley-Davidson motorcycles has grown, and Harley-Davidson dealers have generally sought to maximize their factory allocation of new motorcycles by selling out of their allocation each model year. Verduyn Aff., ¶10. In addition, as is common in the motor vehicle industry, Harley-Davidson

routinely administers dealer incentive programs which offer dealers cash payments based upon their reported retail sales. *Id.* However, as described above, sales must only be made to bona fide retail consumers, as set forth in our dealer agreement and NRSP. *Id.*

Cycle-Craft denies that the NRSP imposes contractual obligations on dealers. Nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Exhibit 2* (General Conditions) at 3. Instead of seeking dealer assent to, or even acknowledgement of, NRSPs, Harley-Davidson's practice is simply to include the NRSPs in a voluminous package of documentation sent annually to dealers regarding pricing and other information on the new model year's motorcycles. *Exhibit 4* (Flickinger Dep. I) at 118:7-11; 119:4-8.

In addition, nothing in Section B.6, nor in any other part of the Contract, defines the terms "retail" or "non-retail customers" or identifies conduct that might violate this provision. *Exhibit 2* (General Conditions) at 3. And nothing in Section B.6, nor in any other part of the Contract, incorporates or even makes reference to any of the "policies" or "position statements" that are referred to in the second sentence of Section B.6. *Id.*

20.     A reduction in allocation for Cycle-Craft would result in a reduction in sales and a reduction in profits for the dealership. Buchbaum Dep., pp. 184-185, App. Tab F. It was very important to Cycle-Craft to avoid having its allocation reduced. *Id., p.* 185, App. Tab F.

Cycle-Craft admits the facts set forth in paragraph 20.

21.     As of July 2003, Cycle-Craft had not sold all of its allocated bikes and there was a risk that its 2004 allocation would by reduced by Harley-Davidson. Buchbaum Decl., ¶3, App. Tab G; Buchbaum Dep., pp. 185-186, App. Tab F.

Cycle-Craft admits the facts set forth in paragraph 21.

### V.    Harley-Davidson's Inspection of Cycle-Craft's Sales Records

22.    On August 9, 2003, Harley-Davidson received an email from a dealer alerting us to certain new Harley-Davidson motorcycles being sold by a motorcycle shop (i.e., a non Harley-Davidson dealer) in Lee, New Hampshire called Lee Custom Cycle. Verduyn Aff., ¶11. By tracing the Vehicle Identification Number ("VIN") for one of those vehicles, Harley-Davidson determined that the new motorcycle had been sold by Harley-Davidson to Cycle-Craft. *Id.* Based on this fact, and the fact that Cycle-Craft had reported a large number of retail sales at the very end of the 2003 Model Year, i.e., close to July 31, 2003, Harley-Davidson decided to exercise its contractual right to conduct an on-site inspection of certain of Cycle-Craft's sales records to determine whether the dealership was in compliance with the Dealer Agreement and the 2003 NRSP. *Id.* Harley-Davidson notified Cycle-Craft of the inspection by letter dated February 13, 2004. *Id.*

Cycle-Craft denies that Harley-Davidson's decision to investigate Cycle-Craft's sales records was motivated by an email complaint.  Although Harley-Davidson stated in sworn interrogatory answers that its investigation was triggered by an email complaint from a competitor, *see Exhibit 36* (Harley-Davidson's Supplemental Answers to Interrogatories) at Answer No. 3, Verduyn's review of Cycle-Craft's records had begun two weeks earlier.  The email complaint from Seacoast Harley-Davidson about new units being available at Lee Custom Cycle was received by Verduyn on August 11, 2003.  *Exhibit 37* (Seacoast Harley-Davidson E-Mail) at H-D 1856.  Verduyn was already conducting an investigation into Cycle-Craft's records on July 28, 2003, as evidenced by his email to Mr. Contois and Mr. Malicki outlining the results of his review of an SWR report on Cycle-Craft.  *Exhibit 35* (SWR Report Request E-mail) at H-D 1852.  In the email exchange of July 28, 2003 – again, two weeks prior to the receipt of the email complaint from Seacoast – Mr. Malicki also indicated that they should take another look at Cycle-Craft's records again after the model year had ended.  *Id.*

23.    On February 17 and 18, 2004, Harley-Davidson conducted an inspection of certain of Cycle-Craft's sales records. Verduyn Aff., ¶12; Atwood Decl., ¶39, App. Tab D. During this inspection, Harley-Davidson reviewed the SWRs and supporting documents for the new motorcycles that Cycle-Craft had reported as being sold during the 2002, 2003, and year-to date 2004 model years. Verduyn Aff., ¶12.

Cycle-Craft admits the facts set forth in paragraph 23.

## VI.    Cycle-Craft's Submission of False SWRs

### A.    Cycle-Craft Submits SWRs for Thirteen Sales That Were Never Made.

24.    On the last day of the 2003 Model Year, July 31, 2003, Cycle-Craft submitted SWRs to Harley-Davidson for thirteen individuals indicating that retail sales had been made to them by Cycle-Craft. Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶10. None of these thirteen individuals purchased the motorcycles from Cycle-Craft. Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶13.

Cycle-Craft denies the facts set forth in paragraph 24 as misleading.  In July 2003, Cycle-Craft was faced with an overstock situation and a potential decrease in its 2004 motorcycle allocation.  Accordingly, knowing that Cycle-Craft employees, like those of Harley-Davidson dealers everywhere, are Harley-Davidson enthusiasts, Cycle-Craft General Manager Ronald Buchbaum made a rock-bottom offer to Cycle-Craft employees (and their family and friends) whereby they could purchase motorcycles at or just above dealer cost.  *See Exhibit 27* (McPhee Dep.) at 124:5-8; *Exhibit 8* (Buchbaum Dep. I) at 187:19-23, 198:6-13, 199:11-14; *Exhibit 28* (Bloom Dep.) at 18:1-10.

This offer was consistent with the dealership's longstanding policy of offering deep discounts on motorcycles to Cycle-Craft employees, which was viewed by those employees as one of the perquisites of employment at Cycle-Craft.  *Exhibit 9* (Walsh Dep.) at 135:17-136:18; *Exhibit 10* (Marasca Dep.) at 62:8-63:5.  Numerous Cycle-Craft employees and their relatives and friends took advantage of the offer for a purchase at cost with the understanding that if a regular customer desired to purchase the motorcycle that motorcycle would be sold to the regular customer.  *Exhibit 8* (Buchbaum Dep. I) at 207:16-208:5, 211:20-23; *Exhibit 28* (Bloom Dep.) at 17:20-24, 20:3-21:6; *Exhibit 29* (McGrath Dep.) at 109:24-110:2.

When it received commitments to purchase, Cycle-Craft then submitted SWRs for the thirteen individuals who had so committed.  *Exhibit 8* (Buchbaum Dep. I)at 212:24-213:3.  After

sales of those motorcycles were subsequently made to other, non-employee customers, Cycle-Craft informed Harley-Davidson of the change of owner information and Harley-Davidson changed its records accordingly, and without question. *Exhibit 8* (Buchbaum Dep. I) at 215:7-11; *Exhibit 30* (Bolden Dep.) at 33:10-22, 66:6-20.

25.    These thirteen motorcycles were eventually sold to other individuals after the close of the model year -- i.e., after July 31, 2003. Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶14.

The actual circumstances of these sales are described in the response to paragraph 24.

26.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number ("VIN") 1HD1FSW143Y638979 was sold to Jarred Buchbaum. Declaration of Kenneth McPhee, ¶22 ("McPhee Decl."), App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶15. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 6.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

27.    This motorcycle (VIN 1 HD 1 FSW 143Y638979) was, in fact, never sold by Cycle Craft to Jarred Buchbaum, the son of Ronald Buchbaum, Cycle-Craft's general manager. McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶15.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

28.    This motorcycle (VIN 1 HD 1 FSW 143Y638979) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Edwin Velasquez. McPhee Decl., ¶22, App. Tab H; Verduyn Aff., ¶15. A true copy of Mr. Velasquez' application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 7.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

LIBA/1583481.2

29.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 BWB 183Y 107390 was sold to Cycle-Craft Sales Manager Michael Bloom. McPhee Decl., ¶22, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff, T1 6. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 8.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

30.    This motorcycle (VIN 1 HD 1 BWB 183Y 107390) was, in fact, never sold by Cycle-Craft to Michael Bloom. Deposition of Michael Bloom, p. 15 ("Bloom Dep."), App. Tab 1; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶16.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

31.    This motorcycle (VIN 1 HD 1 B WB 183Y 107390) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Joann Stanwood. McPhee Decl., ¶22, App. Tab H; Verduyn Aff., ¶16. A true copy of Ms. Stanwood's application to the' Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 9.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

32.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1HDBYB493YO97183 was sold to Roderick Granese. McPhee Decl., ¶22, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶17. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 10.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

33.    This motorcycle (VIN 1HDBYB493Y097183) was, in fact, never sold by Cycle Craft to Roderick Granese. McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶17.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

34.    This motorcycle (VIN 1HDBYB493YO97183) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Jason Blodgett. McPhee Decl., ¶22, App. Tab H; Verduyn Aff., ¶17. A true copy of Mr. Blodgett's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 11.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

35.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 BSY 123Y 105487 was sold to Salvatore Giordano, a relative of Cycle-Craft employee Joe Giordano. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶18. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 12.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

36.    This motorcycle (VIN 1 HD 1 BSY 123Y 105487) was, in fact, never sold by Cycle Craft to Salvatore Giordano. McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶18.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

37.    This motorcycle (VIN 1HD1BSY123Y105487) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Michael Botelho. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶15. A true copy of Mr. Botelho's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 13.

13

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

38.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ 113K842917 was sold to Lissa Bloom, daughter of Michael Bloom (Cycle-Craft Sales Manager). McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶19. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 14.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

39.    This motorcycle (VIN I HD 1 HAZ 113K842917) was, in fact, never sold by Cycle Craft to Lissa Bloom. Bloom Dep., p. 15, App. Tab I; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶19.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

40.    This motorcycle (VIN I HD 1 HAZ 1 13K842917) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Jorge Orellana. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶19. A true copy of Mr. Orellana's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 15.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

41.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 BMY473YO85436 was sold to Matthew Bloom, son of Michael Bloom (Cycle-Craft Sales Manager). McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶20. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 16.

14

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

42.    This motorcycle (VIN 1 HD 1 BMY473Y085436) was, in fact, never sold by Cycle-Craft to Matthew Bloom. Bloom Dep., pp. 15-16, App. Tab I; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶20.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

43.    This motorcycle (VIN 1 HD 1 BMY473Y085436) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Mark Connelly. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶20. A true copy of Mr. Connelly's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 17.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

44.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1HD1BJY183YO52286 was sold to Cycle-Craft employee Joseph Giordano. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶21. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 18.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

45.    This motorcycle (VIN 1 HD I BJY 183Y052286) was, in fact, never sold by Cycle Craft to Joseph Giordano. McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶21.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

46.    This motorcycle (VIN 1 HD 1 BJY 183Y052286) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Deborah Colleran. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶21. A true copy of Ms. Colleran's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 19.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

47.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ 133K839405 was sold to Cycle-Craft's former Sales Manager Sean Walsh. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶22. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 20.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

48.    This motorcycle (VIN 1 HD 1 HAZ 133K839405) was, in fact, never sold by Cycle Craft to Sean Walsh. Deposition of Sean Walsh, pp. 21-24 ("Walsh Dep."), App. Tab J; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶22.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

49.    This motorcycle (VIN 1HD1HAZ133K839405) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Paul Kalinoski. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶22. A true copy of Mr. Kalinoski's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 21.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

50.     On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1HD1FFW103Y638193 was sold to Cycle-Craft General Manager Ronald Buchbaum. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶23. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 22.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

51.     This motorcycle (VIN 1HD1FFW103Y638193) was, in fact, never sold by Cycle Craft to Ronald Buchbaum. McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶23.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

52.     This motorcycle (VIN 1 HD 1 FFW 103Y638193) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Tindle. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶23. A true copy of Mr. Tindle's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 23.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

53.     On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 BHY 143YO99680 was sold to John Sica, a friend of Cycle-Craft employee Jamie McGrath. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶24. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 24.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

54.   This motorcycle *(VIN 1 HD* 1 BHY 143Y099680) was, in fact, never sold by Cycle Craft to John Sica. Deposition of Jamie McGrath, p. 44 ("McGrath Dep."), App. Tab K; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶24.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

55.   This motorcycle (VIN 1 HD 1 BHY 143Y099680) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Richards. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶24. A true copy of the SWR submitted by Cycle-Craft to Harley-Davidson concerning the sale of this motorcycle to Mr. Richards is attached to the Verduyn Aff. at Exhibit 25.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

56.   On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 GDV443K314331 was sold to Daniel Sica. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶25. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 26.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

57.   This motorcycle (VIN 1 HD 1 GDV443K314331) was, in fact, never sold by Cycle Craft to Daniel Sica. McGrath Dep., p. 44, App. Tab K; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶25.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

58.     This motorcycle (VIN 1 HD 1 GDV443K314331) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Stephen Kenney. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶25. A true copy of Mr. Kenney's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 27.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

59.     On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ403K842594 was sold to Cycle-Craft employee Jamie McGrath. McPhee Decl., ¶23, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab; Verduyn Aff., ¶26. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 28.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

60.     This motorcycle (VIN 1 HD 1 HAZ403K842594) was, in fact, never sold by Cycle Craft to Jamie McGrath. McGrath Dep., p. 45, App. Tab K; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶26.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

61.     This motorcycle (VIN 1 HD 1 HAZ403K842594) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Vincent Fiamma. McPhee Decl., ¶23, App. Tab H; Verduyn Aff., ¶26. A true copy of Mr. Fiamma's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 29.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

62.     On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ 133K848962 was sold to Elaine Bloom, wife of Michael Bloom (Cycle-Craft Sales Manager). McPhee Decl., ¶24, App. Tab H; Buchbaum Dep., pp. 212-213, App. Tab F; Verduyn Aff., ¶27. A true copy of the electronic SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 30.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

63.     This motorcycle (VIN 1HD1HAZ133K848962) was, in fact, never sold by Cycle-Craft to Elaine Bloom. Bloom Dep., p. 15, App. Tab I; McPhee Decl., ¶20, App. Tab H; Buchbaum Dep., p. 216, App. Tab F; Verduyn Aff., ¶27.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

64.     This motorcycle (VIN 1 HD 1 HAZ 133K848962) was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Thomas Mulvey. McPhee Decl., ¶24, App. Tab H; Verduyn Aff., ¶27. A true copy of the invoice from Cycle-Craft to Mr. Mulvey for this motorcycle is attached to the Verduyn Aff. at Exhibit 31.

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

65.     Cycle-Craft's submission of SWRs to Harley-Davidson on July 31, 2003 for these thirteen individuals violated the Dealer Agreement and the NRSP. Verduyn Aff., ¶28. By submitting these SWRs for these thirteen individuals that did not purchase the motorcycles, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

LIBA/1583481.2

The actual circumstances of this sale, which involves a motorcycle involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24. Cycle-Craft denies the allegations of paragraph 65 to the extent they state legal conclusions. Cycle-Craft denies that it received incentive payments or increased allocation to which it was not entitled.

**B.    In Violation of the 2003 NRSP, Cycle-Craft Reported that Three Motorcycles Were Sold At Retail When They Remained in its Inventory**

66.    On July 31, 2003, Cycle-Craft submitted an SWR to Harley-Davidson indicating that it had sold a motorcycle (VIN 1HD1FCW463Y630589) at retail, when, in fact, this motorcycle was never sold by Cycle-Craft. Deposition of Kenneth McPhee ("McPhee Dep."), pp. 113-115, App. Tab L; Verduyn Aff., ¶29. This motorcycle is still owned by Cycle-Craft and was never sold to a retail buyer. Atwood Dep., pp. *95-96,* App. Tab B; Verduyn Aff., ¶29. A true copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 32.

Cycle-Craft denies the facts set forth in paragraph 66 as misleading. The three motorcycles that Harley-Davidson alleges remained in Cycle-Craft's inventory, s*ee Exhibit 14* (Inspection of Records Letter) at 2-3, were actually purchased by Cycle-Craft. *Exhibit 7* (Atwood Dep.) at 95:7-24, *Exhibit 9* (Walsh Dep.) at 128:7-14. Each year Cycle-Craft Owner John Atwood purchases two or three units to add to the dealership's collection. *Exhibit 7* (Atwood Dep.) at 94:23-95:2. As John Atwood is the President, Chief Executive Officer, the Chairman (and the only member) of the Board of Directors, and the owner of the overwhelming majority of the stock in Cycle-Craft, any purchase by the dealership is in essence a purchase by Mr. Atwood. *Exhibit 7* (Atwood Dep.) at 9:1-4, 14:10-16; *Exhibit 31* (Vesey Dep.) at 41:4-42:17. The three motorcycles in question were purchased by Cycle-Craft to be featured in the dealership's collection and SWRs were properly submitted to reflect the purchase by Cycle-Craft. *Exhibit 7* (Atwood Dep.) at 94:23-95:2; *Exhibit 9* (Walsh Dep.) 128:7-21.

67.    On July 31, 2003, Cycle-Craft submitted an SWR to Harley-Davidson indicating that it had sold a motorcycle (VIN 1 HD 1 PAC25YY951664) at retail, when, in fact, this

motorcycle was never sold by Cycle-Craft. McPhee Dep., pp. 113-115, App. Tab L; Verduyn Aff., ¶30. This motorcycle is still owned by Cycle-Craft and was never sold to a retail buyer. Atwood Dep., pp. 95-96, App. Tab B; Verduyn Aff., ¶30. A true copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 33.

The actual circumstances of this sale, which involves a motorcycle purchased for the dealership's collection, are described in the response to paragraph 66.

68.    On July 31, 2003, Cycle-Craft submitted an SWR to Harley-Davidson indicating that it had sold a motorcycle (VIN 1 HD 1 CGP413K431340) at retail, when, in fact, this motorcycle was never sold by Cycle-Craft. McPhee Dep., pp. 113-115, App. Tab L; Verduyn Aff., ¶31. This motorcycle is still owned by Cycle-Craft and was never sold to a retail buyer. Atwood Dep., pp. 95-96, App. Tab B; Verduyn Aff., ¶31. A true copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 34.

The actual circumstances of this sale, which involves a motorcycle purchased for the dealership's collection, are described in the response to paragraph 66.

69.    Cycle-Craft's submission of SWRs to Harley-Davidson on July 31, 2003 for these three motorcycles violated the Dealer Agreement. Verduyn Aff., ¶32. By submitting SWRs to Harley-Davidson on July 31, 2003 for these three motorcycles that were not sold by Cycle-Craft to a retail buyer, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

The actual circumstances of this sale, which involves a motorcycle purchased for the dealership's collection, are described in the response to paragraph 66.  Cycle-Craft denies the allegations of paragraph 69 to the extent they state legal conclusions.  As the motorcycles were purchased by the dealership and SWRs were submitted to reflect that fact, Cycle-Craft denies that it received incentive payments or increased allocation to which it was not entitled.

C.    **In Violation of the Dealer Agreement and the 2003 NRSP, Cycle-Craft Sold Nineteen Motorcycles To DC Imports**

70.    DC Imports was an entity that would import motor vehicles into the United States and resell them, primarily to motor vehicle dealers. Deposition of Debra Lunsford, pp. 13-14 ("Lunsford Dep."), App. Tab M.

Regardless of the business of DC Imports, Cycle-Craft denies that it had definite knowledge of what that entity did.  Sean Walsh, the former Cycle-Craft salesman who dealt with

22

Mr. Stevens and Ms. Lunsford, and on whose testimony Harley-Davison heavily relies in its

brief, testified that he had no conversations with Mr. Stevens or Ms. Lunsford about DC Imports'

business, but just "assumed from the name DC Imports . . . that they imported goods. I don't

know what they did." *Exhibit 9* (Walsh Dep.) at 101:15-17.

71.    In July 2003, Sean Walsh, sales manager at Cycle-Craft, had conversations with
Michael Stevens and Debra Lunsford of DC Imports concerning the sale of 19 motorcycles.
Walsh Dep., pp. 43, 51, App. Tab J.

Cycle-Craft denies the facts set forth in paragraph 71 as misleading. The 19 motorcycles

were not purchased by DC Imports but by 19 individual buyers. Although the purchase and

delivery of these motorcycles was negotiated with Cycle-Craft by a Florida resident, Michael

Stevens, the motorcycles were indisputably sold to 19 separate individuals. Cycle-Craft received

from Mr. Stevens nineteen completed Bills of Sale containing identifying information about each

individual purchaser as well as each individual purchaser's signature. *Exhibit 15* (Stevens Dep.)

at 78:5-79:19; *Exhibit 16* (Florida Bills of Sale). It also received nineteen completed Sales and

Warranty Registration forms ("SWRs") reflecting each individual purchaser's identifying

information and individual signatures. *Exhibit 15* (Stevens Dep.) at 80:13-20; *Exhibit 17*

(Florida SWRs). Mr. Stevens also sent photocopies of the nineteen individuals' drivers licenses

to Cycle-Craft. *Exhibit 15* (Stevens Dep.) at 81:3-9; *Exhibit 18* (Florida Licenses). The

motorcycles were paid for with nineteen separate cashier's checks, each with the name of one of

the individual buyers in the space on the check for "remitter." *Exhibit 19* (Lunsford Dep.) at

47:24, 50:25; *Exhibit 20* (Florida Cashier's Checks).

During the negotiations Cycle-Craft emphasized to Mr. Stevens and his associate Debra

Lunsford that any new motorcycles could only be sold to individual buyers, in the names of

those buyers. *Exhibit 15* (Stevens Dep.) at 77:2-12; *Exhibit 19* (Lunsford Dep.) at 167:16-18,

168:2-4. Sean Walsh, the Cycle-Craft salesperson who dealt with Mr. Stevens, was specifically

LIBA/1583481.2

instructed by Cycle-Craft General Manager Ronald Buchbaum that the motorcycles could only be sold if they were purchased by individual buyers. *Exhibit 8* (Buchbaum Dep. I) at 254:13-22; *Exhibit 9* (Walsh Dep.) at 55:20-24.

72.    Sean Walsh was authorized by Cycle-Craft General Manager Ronald Buchbaum to make the deal with DC Imports. Buchbaum Dep., Vol. II., pp. 18-19, App. Tab F.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

73.    After an initial conversation with Mr. Stevens, Mr. Walsh received a fax from DC Imports indicating the 19 motorcycles that DC Imports wanted to purchase from Cycle-Craft. Walsh Dep., p. 40, App. Tab J. See also Exhibit 6 to the Walsh Dep., a copy of which is included in the Appendix filed in support hereof at Tab N. Mr. Walsh knew that Mr. Stevens was working for DC Imports and was not working for himself. Walsh Dep., p. 52, App. Tab J.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

74.    During a conversation with Mr. Walsh, Ms. Lunsford advised Mr. Walsh that DC Imports planned to resell the 19 motorcycles to another dealer. Lunsford Dep., pp. 30-32, App. Tab M. Ms. Lunsford also advised Mr. Walsh that another Harley-Davidson dealer had provided DC Imports with a deposit for the 19 motorcycles that DC Imports wanted to purchase from Cycle-Craft. *Id.,* pp. 32-33, App. Tab M.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

75.    Cycle-Craft's General Manager, Ron Buchbaum, approved the sale to DC Imports so long as Mr. Walsh received individual names for the motorcycles being sold. Buchbaum Dep., p. 254, App. Tab F. This was despite the fact that Mr. Buchbaum always knew that Harley did not want dealers selling motorcycles to people that were going to resell them. *Id.,* pp. 244-245, App. Tab F. Mr. Walsh informed Ms. Lunsford that the deal between Cycle-Craft and DC Imports had to be in 19 individual names. *Id.,* pp. 27-28, App. Tab M.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

76.    DC Imports purchased 19 motorcycles from Cycle-Craft. Lunsford Dep., p. 114, App. Tab M. All of the money to purchase the 19 motorcycles came from DC Imports. Lunsford Dep., p. 51, App. Tab M. Sean Walsh, on behalf of Cycle-Craft, knew that DC Imports, and not

the named individuals, would be providing the money for the 19 motorcycles. Walsh Dep, p. 57, App. Tab J.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

77.    Ms. Lunsford took 19 names of DC Imports employees, as well as friends and relatives of employees to insert into deal documentation to make it appear as if those individuals were the actual buyers. Lunsford Dep., pp. 39, 96, App. Tab M.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

78.    The 19 motorcycles were, in fact, not sold to retail customers at the Cycle-Craft dealership as required by the Dealer Agreement and the 2003 NRSP. Lunsford Dep., p. 118, App. Tab M.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

79.    DC Imports contracted with a carrier to pick up the motorcycles at Cycle-Craft and deliver them back to DC Imports. Lunsford Dep., p. 118, App. Tab M.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

80.    The 19 motorcycles were loaded onto a truck at the Cycle-Craft dealership. Buchbaum Dep., p. 259, App. Tab F.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

81.    Cycle-Craft had DC Imports complete SWRs and return them to Cycle-Craft. Deposition of Michael Stevens, ("Stevens Dep."), pp. 39-40, 48, App. Tab N. On or about July 30, 2003, Cycle-Craft then submitted the SWRs electronically to Harley-Davidson designating these sales as "retail." Verduyn Aff., ¶33. Copies of the SWRs submitted by Cycle-Craft to Harley-Davidson for these motorcycles are attached to the Verduyn Aff. at Exhibit 35.

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.

82.    Cycle-Craft's submission of SWRs to Harley-Davidson on July 31, 2003 for these nineteen motorcycles violated the Dealer Agreement and the NRSP. Verduyn Aff., ¶34. The SWRs falsely reported the customer for these units as individuals rather than DC Imports, and falsely claimed the sales as retail sales. *Id.*  By submitting falsified SWRs to Harley-Davidson for these nineteen motorcycles, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

The actual circumstances of the sale of the 19 motorcycles to individuals in Florida are described in the response to paragraph 71.  Cycle-Craft denies the allegations of paragraph 82 to the extent they state legal conclusions.  Cycle-Craft denies that it received incentive payments or increased allocation to which it was not entitled.

### 1.    Investigation By Florida Highway Patrol

83.    In August 2003, the Florida Highway Patrol investigated the sale of the 19 motorcycles from Cycle-Craft to DC Imports. Walsh Dep., p. 71, App., Tab J; *See also* Declaration of David H. Brierton ("Brierton Decl.") and attached Offense Incident Report, which is included in the Appendix filed in support hereof at Tab O.

Cycle-Craft denies that the Florida Highway Patrol investigated the sale of the 19 motorcycles.  Rather, the Florida Highway Patrol investigated "a possible series of title frauds committed by DC Imports."  Tab O to Harley-Davidson's Appendix, Offense Incident Report. Debra Lunsford of DCI was subsequently convicted of title fraud for submitting forged and false documentation to Florida authorities in connection with her attempts to have the 19 motorcycles registered.  *Exhibit 19* (Lunsford Dep.) at 140:22-141:5.

84.    The Florida Highway Patrol concluded that "[t]he records reflect that DC Imports applied for title in the name of 19 individuals who are friends and family of Mrs. Cooke [DC Imports principal] to make the purchases look like individual retail sales. This was done to circumvent Harley-Davidson policy prohibiting dealer to dealer sales." *See* Brierton Decl., App. Tab O.

Cycle-Craft denies that the Florida Highway Patrol reached a conclusion about Cycle-Craft's involvement in an effort to circumvent Harley-Davidson policy.  The Florida Highway Patrol investigated "a possible series of title frauds committed by DC Imports."  Tab O to Harley-Davidson's Appendix, Offense Incident Report.  Debra Lunsford of DCI was

subsequently convicted of title fraud for submitting forged and false documentation to Florida

authorities in connection with her attempts to have the 19 motorcycles registered. *Exhibit 19*

(Lunsford Dep.) at 140:22-141:5.

> **D.    In Violation of the Dealer Agreement and the 2003 NRSP, Cycle-Craft Sold Eight Motorcycles to Lee Custom Cycle**

85.    Lee Custom Cycle ("Lee") is a business that purchases new and used motorcycles and attempts to resell them for a profit. Deposition of Jeffrey Christensen, p. 11 ("Christensen Dep."), App. Tab P.  For some time, Lee had been a regular customer of Cycle-Craft for the purchase of used motorcycles. Deposition of Jason Marasca, p. 13 ("Marasca Dep."), App. Tab Q.

Cycle-Craft admits that Lee Custom Cycle has purchased used motorcycles from Cycle-

Craft.

86.    In 2003, Lee Custom Cycle purchased 8 new motorcycles from Cycle-Craft in 2003. Christensen dep., pp. 49-51, *57-58,* App. Tab P; Marasca Dep., p. 11, App. Tab Q. All of the funds to purchase these motorcycles came from Lee Custom Cycle's bank accounts. Christensen Dep., p. 47-48, App. Tab P; Marasca Dep., p. 11, App. Tab Q. The 8 motorcycles were then transported to Lee Custom Cycle and were sold by Lee Custom Cycle to other individuals. Christensen Dep., p. 58, App. Tab P.

Cycle-Craft denies that Lee Custom Cycle purchased 8 new motorcycles from Cycle-

Craft in 2003 and asserts that the 8 motorcycles at issue were purchased by individual buyers.

Each of the eight individuals came to Cycle-Craft's dealership and completed the appropriate

paperwork for the sales.  The individuals signed the Bill of Sale for the motorcycle he or she was

purchasing, *Exhibit 21* (Christensen Dep.) at 51:18-24; *Exhibit 22* (New Hampshire Bills of

Sale); signed the Certificate of Origin, or "title," for the motorcycle he or she was purchasing,

*Exhibit 21* (Christensen Dep.) at 59:20-60:2; *Exhibit 23* (New Hampshire Certificates of Origin);

presented an individual bank check for his or her motorcycle, *Exhibit 24* (New Hampshire

Cashier's Checks); and presented his or her license, *Exhibit 21* (Christenson Dep.) at 65:7-12;

*Exhibit 25* (New Hampshire Licenses).

27

The sales to these New Hampshire residents were handled by Cycle-Craft salesperson Jason Marasca. When Mr. Marasca informed Mr. Buchbaum in July 2003 that a New Hampshire customer wanted to buy multiple motorcycles, Mr. Buchbaum specifically instructed Mr. Marasca that the motorcycles had to be sold to individuals and that each individual buyer had to sign the necessary paperwork. *Exhibit 8* (Buchbaum Dep. I) at 246:21-247:2 *Exhibit 10* (Marasca Dep.) at 55:9-10. Mr. Marasca then told the New Hampshire customer, Jeffrey Christensen of Lee Custom Cycles, that the motorcycles needed to be purchased by individual buyers, *Exhibit 21* (Christensen Dep.) at 108:3-12, and that is exactly what happened.

Although it appears that these individuals may have resold their motorcycles to Lee Custom Cycle, a New Hampshire wholesaler, the sales were made to individuals as required by the Dealer Contract. Mr. Marasca did not have any conversation with Mr. Christensen about what was going to happen to the motorcycles once they left the dealership and does not know whether Mr. Christensen was acting as a broker for the individual buyers. *Exhibit 10* (Marasca Dep.) at 64:11-21. Mr. Christensen bluntly acknowledged his deceptive tactics in his deposition, admitting it is Lee Custom Cycle's regular business practice to deceive dealers by providing individual names in purchasing motorcycles from Harley-Davidson dealerships, even where Lee Custom Cycle is ultimately acquiring the motorcycles for re-sale. *Exhibit 21* (Christensen Dep.) at 116:5-14. According to Mr. Christensen, "Lee Custom Cycle isn't on the bank check . . . [s]o the dealer can be sitting there and not even know that we suck bikes out." *Id.* at 115:11-14. In short, Jason Christenson of Lee Custom Cycle was a gray market player who deceived Cycle-Craft. *Exhibit 21* (Christensen Dep.) at 113-16.

87.     In July 2003, Cycle-Craft salesperson Jason Marasca advised Jeff Christensen at Lee Custom Cycle that in order to sell new motorcycles to Lee Custom Cycle, he needed to provide eight individual names for the paperwork. Christensen Dep., pp. 65-66, App. Tab P; Marasca Dep., p. 16, App. Tab Q. Christensen gave Marasca names of Lee employees and

friends to plug into the Cycle-Craft paperwork. Christensen Dep., pp. 41-42, App. Tab P; Marasca Dep., pp. 16-17, App. Tab Q. Jason Marasca, on behalf of Cycle-Craft, was aware that the 8 motorcycles were actually going to Lee Custom Cycle for resale to its customers. Christensen Dep., pp. 67, 72, App. Tab P; Marasca Dep., p. 25, App. Tab Q.

The actual circumstances of the sale of the 8 motorcycles to individuals from New

Hampshire are described in the response to paragraph 86.

88.    Cycle-Craft submitted SWRs to Harley-Davidson indicating that these eight motorcycles were sold to a retail customer. However, these eight motorcycles, in fact, were not sold to retail customers as defined by the 2003 NRSP. Verduyn Aff., ¶35. Copies of the SWRs submitted by Cycle-Craft to Harley-Davidson for these motorcycles are attached to the Verduyn Aff. at Exhibit 36.

The actual circumstances of the sale of the 8 motorcycles to individuals from New

Hampshire are described in the response to paragraph 86.

89.    By submitting falsified SWRs to Harley-Davidson for these eight motorcycles, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation to which it was not entitled. Verduyn Aff., ¶36.

The actual circumstances of the sale of the 8 motorcycles to individuals from New

Hampshire are described in the response to paragraph 86.  Cycle-Craft denies the allegations of

paragraph 89 to the extent they state legal conclusions.  Cycle-Craft denies that it received

incentive payments or increased allocation to which it was not entitled.

## VII. Harley-Davidson's Inspection of Records and Notice of Termination

90.    On April 20, 2004, Harley-Davidson sent a letter to Cycle-Craft informing them of the results of its inspection. Atwood Decl., ¶40, App. Tab D. A copy of Harley Davidson's April 20, 2004 letter is included in the Appendix at Tab R.

Cycle-Craft admits the facts set forth in paragraph 90.

91.    On April 20, 2004, Harley-Davidson issued a Notice of Termination to Cycle Craft based on Cycle-Craft's submission of false sales information to Harley-Davidson. Atwood Decl., ¶42, App. Tab D. A copy of Harley Davidson's April 20, 2004 letter is included in the Appendix at Tab S.

LIBA/1583481.2

Cycle-Craft admits the facts set forth in paragraph 91 and further states that it was not given any opportunity to respond to the Inspection of Records Letter as the Notice of Termination was sent on the same date.

## VIII. Harley-Davidson's Discovery of Additional False Sales By Cycle-Craft

92.     Based on discovery conducted in the course of this litigation, Harley-Davidson discovered that Cycle-Craft, on July 31, 2003, had submitted additional SWRs to Harley-Davidson for individuals that in fact had not made purchases from Cycle-Craft. Verduyn Aff., ¶39. Specifically, Cycle-Craft produced a dealership record entitled "July 2003 SWRs**." *Id.*, *See* Exhibit 39 attached to Verduyn Aff. That document listed all 16 of the falsely reported sales referenced above and in addition, however, listed another seven units that Harley-Davidson did not discover during its inspection of Cycle-Craft's records in February of 2004. *Id.* These seven units were also falsely reported as having been sold on July 31, 2003, when in fact they had not been sold as reported by Cycle-Craft. *Id.*

Cycle-Craft denies that the facts alleged in paragraph 92 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.


93.     On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1HD1BMY153Y105320 was sold to Robert Misiano. Verduyn Aff., ¶40. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 40.

Cycle-Craft denies that the facts alleged in paragraph 93 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of this sale, which involves a motorcycle involved

in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

94.    This motorcycle was, in fact, never sold by Cycle-Craft to Robert Misiano. Verduyn Aff., ¶40.

Cycle-Craft denies that the facts alleged in paragraph 94 are relevant.  The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004.  In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

95.    This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer David Hamner. Verduyn Aff., ¶40. A copy of Mr. Hamner's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 41.

Cycle-Craft denies that the facts alleged in paragraph 95 are relevant.  The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004.  In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

96.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 GHV 193K310865 was sold to James Jouve. Verduyn Aff., ¶41. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 42.

Cycle-Craft denies that the facts alleged in paragraph 96 are relevant.  The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April

2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

97. This motorcycle was, in fact, never sold by Cycle-Craft to James Jouve. Verduyn Aff., ¶41.

Cycle-Craft denies that the facts alleged in paragraph 97 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

98. This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Duff. Verduyn Aff., ¶41. A copy of Mr. Duff's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 43.

Cycle-Craft denies that the facts alleged in paragraph 98 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

99. On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD I GEV 183K318650 was sold to Robin Misiano. Verduyn Aff., ¶42. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 44.

Cycle-Craft denies that the facts alleged in paragraph 99 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation

has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

100.    This motorcycle was, in fact, never sold by Cycle-Craft to Robin Misiano. Verduyn Aff., ¶42.

Cycle-Craft denies that the facts alleged in paragraph 100 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

101.    This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Robert Romig. Verduyn Aff., ¶42. A copy of Mr. Romig's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 45.

Cycle-Craft denies that the facts alleged in paragraph 101 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

102.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 GEV 193K330502 was sold to Marisa Olivo. Verduyn Aff., ¶43. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 46.

LIBA/1583481.2

Cycle-Craft denies that the facts alleged in paragraph 102 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

103.   This motorcycle was, in fact, never sold by Cycle-Craft to Marisa Olivo. Verduyn Aff., ¶43.

Cycle-Craft denies that the facts alleged in paragraph 103 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

104.   This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Louis Nardone. Verduyn Aff., ¶43. A copy of Mr. Nardone's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 47.

Cycle-Craft denies that the facts alleged in paragraph 104 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

105.   On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 BTY 1 X3YO91568 was sold to Howard Cook.

34

Verduyn Aff., ¶44. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 48.

Cycle-Craft denies that the facts alleged in paragraph 105 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

106.    This motorcycle was, in fact, never sold by Cycle-Craft to Howard Cook. Verduyn Aff., ¶44.

Cycle-Craft denies that the facts alleged in paragraph 106 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

107.    This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Scott Desalvo. Verduyn Aff., ¶44. A copy of Mr. Desalvo's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 49.

Cycle-Craft denies that the facts alleged in paragraph 107 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

108. On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ423K849398 was sold to Andre Silva. Verduyn Aff., ¶45. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 50.

Cycle-Craft denies that the facts alleged in paragraph 108 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

109. This motorcycle was, in fact, never sold by Cycle-Craft to Andre Silva. Verduyn Aff., ¶45.

Cycle-Craft denies that the facts alleged in paragraph 109 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

110. This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer Theodore Shomos. Verduyn Aff., ¶45. A copy of Mr. Shomos' application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 51.

Cycle-Craft denies that the facts alleged in paragraph 110 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved

36

in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

111.    On July 31, 2003, Cycle-Craft reported to Harley-Davidson that a motorcycle with Vehicle Information Number 1 HD 1 HAZ 183K843207 was sold to Sheila Firth. Verduyn Aff., ¶46. A copy of the SWR submitted by Cycle-Craft to Harley-Davidson is attached to the Verduyn Aff. at Exhibit 52.

Cycle-Craft denies that the facts alleged in paragraph 111 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

112.    This motorcycle was, in fact, never sold by Cycle-Craft to Sheila Firth. Verduyn Aff., ¶46.

Cycle-Craft denies that the facts alleged in paragraph 112 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

113.    This motorcycle was actually sold and delivered by Cycle-Craft after the close of the 2003 model year to customer John Holbrook. Verduyn Aff., ¶46. A copy of Mr. Holbrook's application to the Massachusetts Registry of Motor Vehicles is attached to the Verduyn Aff. at Exhibit 53.

Cycle-Craft denies that the facts alleged in paragraph 113 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April

37

2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24.

114. Cycle-Craft's submission of SWRs to Harley-Davidson on July 31, 2003 for these seven individuals violated the Dealer Agreement and the 2003 NRSP. Verduyn Aff., ¶47. By submitting these SWRs for these seven individuals that did not purchase the motorcycles, Cycle Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled. *Id.*

Cycle-Craft denies that the facts alleged in paragraph 114 are relevant. The discovery of additional sales, which Harley-Davidson perceives to be "falsely reported," during this litigation has no bearing on whether it had "good cause" to terminate Cycle-Craft's dealership in April 2004. In any event, the actual circumstances of these sales, which involve motorcycles involved in the offer extended to Cycle-Craft employees (and their family and friends), are described in the response to paragraph 24. Cycle-Craft denies the allegations of paragraph 114 to the extent they state legal conclusions. Cycle-Craft denies that it received incentive payments or increased allocation to which it was not entitled.

## IX.    Harley-Davidson's Decision-Making Process

115. Harley-Davidson's decision to inspect Cycle-Craft's sales records was triggered by Mr. Verduyn's recommendation, which, as noted, was based on the unsolicited email Harley-Davidson received in August, 2003, and the unusual sales activity by the Cycle-Craft dealership at the end of the 2003 model year. Verduyn Aff., ¶48. Harley-Davidson's notice of termination, in turn, was based solely on the contractual breaches by the dealership discovered as a result of our inspection of records. *Id.* Harley-Davidson had no "ulterior motives" whatsoever. *Id.*

Cycle-Craft denies that Harley-Davidson's decision to conduct an investigation of Cycle-Craft's sales records was motivated by an email complaint or unusual sales activity at the end of the 2003 Model Year. Cycle-Craft also denies that the termination was based on "the contractual breaches by the dealership" or that Harley-Davidson had no "ulterior motives."

38

Harley-Davidson began investigating Cycle-Craft for possible violations of its non-retail sales policies in July 2003, just four months after Cycle-Craft informed Harley-Davidson, through its counsel, of its intention to exercise its legal rights under Mass. Gen. Laws Ch. 93B § 6 to "protest" any establishment of a new dealership in its backyard. *Exhibit 33* (Protest Letter). Under that statute, a dealer may bring a legal challenge in state or federal court to enjoin a manufacturer's establishment of a new dealership in its market area, and the manufacturer must prove that there is good cause to establish the new dealership. *Id.* at §6(e). Harley-Davidson's Legal Department was brought into the loop early on for an analysis of Cycle-Craft's protest rights under Massachusetts law. *Exhibit* 34 (Market Study E-mail).

The investigation of Cycle-Craft that followed on the heels of Cycle-Craft's protest threat was atypical in several respects. First, Cycle-Craft had no history of violations of the non-retail sales policy. *Exhibit 41* (Atwood Aff.) ¶ 26. Second, the investigation was initiated by Mr. Verduyn without any of the suspicions that normally trigger such an investigation.[3] Third, contrary to standard practice, no "Dear Dealer" letter was sent to Cycle-Craft asking for an explanation of the questioned sales. *Exhibit 12* (Verduyn Dep. I) at 100:25-101:17; *Exhibit 35*

---

[3] Mr. Verduyn testified that he conducts no routine or "random" investigations of dealers for potential non-retail sales, but would only commence an investigation when there is a "foundation" for doing so. *Exhibit 12* (Verduyn Dep. I) at 51:2-17. He would "typically act on some kind of a complaint" from a dealership about "an unauthorized motorcycle dealer having new vehicles for sale in their market area." *Id.* at 51:15-16, 52:17-18. Mr. Verduyn acknowledged that a large number of sales toward the end of the model year, however, would not be enough in itself to commence an investigation. *Id.* at 58:17. Despite this testimony, it is indisputable that Mr. Verduyn began his investigation of Cycle-Craft simply because it had made a large number of sales in July of 2003, as the model year was ending. *Exhibit 35* (SWR Report Request E-mail). Although Harley-Davidson stated in sworn interrogatory answers that its investigation was triggered by an email complaint from a competitor, *see Exhibit 36* (Harley-Davidson's Supplemental Answers to Interrogatories) at Answer No. 3, Verduyn's review of Cycle-Craft's records had begun two weeks earlier. The email complaint from Seacoast Harley-Davidson about new units being available at Lee Custom Cycle was received by Verduyn on August 11, 2003. *Exhibit 37* (Seacoast Harley-Davidson E-Mail) at H-D 1856. Verduyn was already conducting an investigation into Cycle-Craft's records on July 28, 2003, as evidenced by his email to Mr. Contois and Mr. Malicki outlining the results of his review of an SWR report on Cycle-Craft. *Exhibit 35* (SWR Report Request E-mail) at H-D 1852. In the email exchange of July 28, 2003 – again, two weeks prior to the receipt of the email complaint from Seacoast – Mr. Malicki also indicated that they should take another look at Cycle-Craft's records again after the model year had ended. *Id.*

39

(SWR Report Request E-mail).  Fourth, the on-site inspection at Cycle-Craft, conducted by Mr. Verduyn in February 2004 as the culmination of the investigation, was unusual in that Mr. Verduyn was accompanied by a senior Harley-Davidson employee, Director of Field Operations Michael Malicki.  No executive of Mr. Malicki's stature had ever accompanied Mr. Verduyn on such an audit, and the only person he had brought with him on an on-site audit conducted during the same period was his girlfriend.  *Exhibit 12* (Verduyn Dep. II) at 273:2-6; 282:3.  Fifth, Mr. Verduyn based the conclusions of his investigation — that violations of the non-retail sales policy occurred — on the policy as defined in the NRSP, not the Dealer Contract, and admitted that he was unfamiliar with the terms of Dealer Contract.  *Id.* at 146-160.  The Termination Letter, however, which was based on Verduyn's recommendation and report, says nothing about the NRSP and cites alleged contractual violations.  Sixth, Cycle-Craft was never given any opportunity to explain the sales that Harley-Davidson now claims violated the Dealer Contract.  After the February 2004 audit, the next thing Cycle-Craft heard on the subject was the Inspection of Records Letter and the Notice of Termination Letters, which it received on or about April 20, 2004.

LIBA/1583481.2

Respectfully submitted,

CYCLE-CRAFT CO., INC.

By its attorneys,


    /s/ James C. Rehnquist
James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

September 16, 2005

LIBA/1583481.2