# EXHIBIT 5

*May, 1990*



THE FONTANA GROUP, INC.

**CONFIDENTIAL**

<u>ANALYSIS AND RECOMMENDATIONS</u>
<u>CONCERNING EXPORT SALES</u>

Harley-Davidson, Inc. has long served both the domestic market and
many overseas markets.  For reasons of both history and market
size, domestic sales have taken the lions share of available
production.  Harley-Davidson's products have reached overseas
markets in a variety of ways.  In certain countries, Harley-
Davidson has distributorships it owns.  In other markets, Harley-
Davidson sells to independently owned distributors.  In either
situation, the overseas distributors in turn set up their own local
market dealers without any necessary approval process by Harley-
Davidson headquarters.

In the context of the discussion which follows, the term export
sales will be used differently from overseas shipments.  First of
all, overseas shipments will be taken as representing shipments
initiated by and consummated through the efforts of Harley-Davidson
to its overseas distributors whether independent or wholly owned by
Harley-Davidson.  On the other hand, export sales will be taken as
representing those transactions in which American dealers directly
franchised by Harley-Davidson engage in initiating or at least
facilitating sales which are directly or indirectly exported to
markets outside of the continental United States or Alaska.

H-D 1572
Confidential

3507 N. CAMPBELL AVENUE, SUITE 111   TUCSON, ARIZONA 85719   (602) 325-9800   FAX 325-9847



**CONFIDENTIAL**

The Harley-Davidson General Conditions of Sales and Service Agreement (dealer agreement) under which its domestic dealers operate does not expressly prohibit export sales. However, the dealer agreement does require dealers to uncrate, set up, inspect and test each motorcycle prior to delivery to the dealer's customer, which indirectly prohibits dealers from exporting Harley-Davidson motorcycles or from selling such motorcycles in any manner other than to their own retail customers or to other dealers in ordinary dealer-to-dealer transfers.

It is unclear whether the sales and service agreements under which non-U.S. Harley Davidson dealers are franchised by independent or wholly owned overseas Harley-Davidson distributors contain any prohibitions against such dealers arranging for the direct or indirect shipment of Harley-Davidson products beyond their own politically determined market boundaries. That is, if economic forces created the necessary incentive, Harley-Davidson dealers franchised by a distributor in a country such as France or Japan could conceivably find it in their self interest to ship product back to the United States or to another country in some manner to effectively arbitrage foreign exchange rates.

At the request of Harley-Davidson, Inc., I have been asked to review the various trading practices referred to above and assess the wisdom both in the short and long term. For this purpose, I have reviewed:

2

H-D 1573
Confidential

**CONFIDENTIAL**

1) The history of Harley-Davidson unit sales.

2) The market share of Harley-Davidson and its competitors within the U.S. motorcycle market, particularly the 850cc plus segment.

3) The trend in known foreign shipments plus export sales.

4) The General Conditions of Sales and Service Agreement issued to Harley-Davidson dealers within the United States.

5) The terms of Harley-Davidson warranty coverage and servicing requirements to assure proper and safe operation of Harley-Davidson products.

6) Government regulation with regard to safety recall/modification requirements plus manufacturer requirements with regard to pollution control devices.

7) Distributor agreements as to the scope of market coverage and product movement across political boundaries.

8) Last, such marketing programs as set up charge payments to dealers, the product allocation system among American dealers, the Special Incentive Program (involving price discounts or floor plan subsidies), hold back dollars and advertising co-op

3

H-D 1574
Confidential

CONFIDENTIAL

allowances.

## Analysis

The American motorcycle market has gone through substantial contractions since the peak in 1973. In that year, approximately 1,200,000 new units were sold. That number has fallen in a fairly continuous pattern to the point where in 1989, 293,700 units were sold. However, Harley-Davidson has successfully avoided negative impact from that trend partially by virtue of the fact that its products are concentrated in the 850 cubic centimeter engine displacement size (in above segment where growth has continued to occur.) In 1973, unit sales in this heavy size class amounted to about 27,000 units. By 1981, this number had grown to over 130,000 units.

However, by 1989 the 851+cc class retreated to 69,300 units. At the same time however the competitors of Harley-Davidson such as Honda, Kawasaki and Yamaha have experience enormous market share losses, including within the heavy duty segment. As a consequence, Harley-Davidson's market share in that segment has grown from 23 percent in 1983 to 59.1 in 1989. However, at this high level of market penetration, it has become increasingly clear that the current condition of domestic demand outstripping Harley-Davidson supply could change for the worst. In any event, overseas markets continue to witness increased growth in demand beyond what Harley-

4

H-D 1575
Confidential

**CONFIDENTIAL**

Davidson is capable of supplying. Moreover, in the overseas markets, Harley-Davidson does not typically confront the prospect of approaching market share saturation.

While total Harley-Davidson production has continued to fall short of global demand, the Corporation must increasingly plan its deployment or allocation of scarce product to achieve greatest long term results. It would make no sense to fully support with abundant product certain markets while allowing others to starve and thereby weaken or eliminate Harley-Davidson's position in the market as a long term player. Thus, to an increasing degree, the highest level of product allocation decisions made within Harley-Davidson must be on a global market by market basis, not merely a single decision of determining how much will be provided for domestic dealers and how much for overseas markets taken in total.

Once those kinds of decisions are made after carefully assessing each market as to its primary demand by segment and the Harley-Davidson market share within each such segment, all policies of the Corporation must operate consistently to assure that Harley-Davidson product is deployed or allocated in exactly the intended manner. If on the other hand, Harley-Davidson distributor and dealer related policies are loosely woven, the unbridled entrepreneurial zeal of both domestic and overseas dealers, and perhaps even overseas distributors can cause scarce Harley-Davidson product to move among markets in a pattern not intended under

5

H-D 1576
Confidential

**CONFIDENTIAL**

conclusions reached by Harley-Davidson in its overall global plan and business strategy.

Even if such economic concerns of Harley-Davidson for its long term outlook played no role in resolving appropriate handling of overseas shipments and export sales, massive remaining problems argue for prompt and sweeping attention.

## Safety and Recall

As a matter of sound business practice as well as the need for achieving conformance with various governmental regulations, Harley-Davidson has long recognized the critical importance of assuring that each motorcycle it sells is properly set up and inspected by the selling dealer before delivery to the ultimate retail consumer. Unless that set up activity is promptly conducted, serious physical injury could occur to the owner, plus others, in the event of an accident. Inadequate dealer set up of a motorcycle could also bring about physical damage to the vehicle when placed in use, such that product warranty claims could be needlessly triggered.

The dealer must provide suitable instruction to the ultimate consumer as to proper operation of the vehicle . That can best,

6

H-D 1577
Confidential

**CONFIDENTIAL**

and perhaps only, be done by the dealer who has direct contact with the ultimate consumer as keys to the vehicle are turned over to the buyer. Regrettably, the current freedom with which Harley-Davidson vehicles are distributed does not necessarily assure that such proper set up and user instruction is certain to occur. This is true even where Harley-Davidson pays a domestic dealer directly for performing set up and inspection obligations. To the extent that domestic dealers engage in the direct or indirect shipment of vehicles abroad (apart from any tourist program), no proper set up inspection or operator instruction is certain to occur.

In the event of product defects in Harley-Davidson vehicles or genuine parts and accessories, the Corporation must have a method of promptly contacting owners of such products to assure compliance with the Corporation's corrective procedures, and those represented by government regulations, to assure that product recalls occur. The Corporation could, through no fault of its own, find itself liable for massive personal injury claims in the event that its products were sold through distribution channels it could not influence or control. By failing to police its product distribution system in a comprehensive manner, it could be found liable for such claims. While no such cases of this sort are known to have occurred, export sales of both vehicles and parts and accessories heighten the probability that such a disaster could be in the making.

7

H-D 1578
Confidential

**CONFIDENTIAL**

## Trademark Control

To the extent that domestic dealers are creating a direct or indirect conduit for shipment of Harley-Davidson products abroad, there looms a real prospect of unauthorized use of trademarks by agents, brokers, or overseas dealers having no official recognition by Harley-Davidson, but merely recruited by domestic dealers on an ad hoc basis to facilitate their export business. Any failure on the part of Harley-Davidson to minimize or eliminate such unauthorized use of trademarks could damage its claim to the exclusive control and use of such trademarks in one or more overseas markets.

## Warranty

To the extent that Harley-Davidson products are being shipped abroad by unauthorized parties, the ultimate retail consumer may not be receiving full and complete warranty coverage as is intended by Harley-Davidson. Any problems that the ultimate consumer might have in gaining warranty coverage because of having purchased through agents, brokers, or overseas dealers established unofficially by a domestic Harley-Davidson dealer could poison that consumer and eliminate him as a source of repeat Harley-Davidson business in the future. It could also cause that consumer to use the vehicle without benefit of warranty replacement parts and might thereby negatively effect product performance and safety

8

H-D 1579
Confidential

**CONFIDENTIAL**

associated with the vehicle.

## Protection of Dealer Franchise Value

Within each overseas market, authorized Harley-Davidson dealers established by distributors have a long term vested interest in customer satisfaction of each and every Harley-Davidson owner, whether or not that owner purchased a motorcycle directly from them. To the extent that Harley-Davidson permits gray market distribution of its vehicles and thereby fails to assure adequate set up, inspection, operator instruction, product recall and warranty coverage, a long term Harley-Davidson customer becomes dissatisfied and the properly authorized local Harley-Davidson dealer in that foreign country thereby suffers to some degree.

It should be recognized that fluctuation in currency values could suddenly eliminate any economic incentive that domestic Harley-Davidson dealer might have in pursuing export sales. Under these circumstances, prior credit given by Harley-Davidson for such export sales to such a dealer could leave the dealer with a huge inventory of vehicles which suddenly the exporting dealer could no longer dispose of in large measure through export sales. Such a dealer, to maintain his turn and earn allotment of product, would likely flood his local market with surplus vehicles This would cause general havoc in the marketplace, damage to fellow Harley-

9

H-D 1580
Confidential

CONFIDENTIAL

Davidson dealers who had not participated in export sales, and serious erosion to the value of the Harley-Davidson brand in the event a local sudden glut of vehicles reflected poorly upon the appeal of Harley-Davidson.    It could even contribute to the bankruptcy of Harley-Davidson dealers, with corresponding damage to the overriding public interest of maintaining a strong dealer network to provide convenient service to consumers and vigorous competition in the domestic market.

## Foreign Distributor Agreements

While legal analysis of Harley-Davidson foreign distribution agreements is beyond the scope of this report, it seems that failure by Harley-Davidson to adopt and vigorously enforce firm policies restricting export sales by U.S. dealers likely would bring about conflicts and perhaps even litigation with one or more of the company's foreign distributors.    For all of the above reasons, foreign distributors could reasonably claim that the lack of careful policing of export transactions by Harley-Davidson has caused both the direct loss of sales for the distributor as well as the various complications that were cited above with respect to how product defects, product recalls, warranty coverage, franchise value, and overall customer satisfaction.

10

H-D 1581
Confidential

CONFIDENTIAL

## SCOPE OF EXPORT PROBLEM

## AT THE DOMESTIC DEALER LEVEL

Because of recent changes in the Sales and Warranty Registration
form (SWR), domestic dealers are now asked to indicate for each
transaction whether a vehicle sold was to the ultimate retail
consumer, sold as a police or shriner unit, or as an "other unit."
While not explicitly so indicated, it is assumed that all such
"other" transactions (with rare exceptions) represent exports by
domestic dealers.  Certain domestic dealers thought to engage in
export sales make no effort, nor even the pretext of providing the
name and address of each ultimate retail consumer associated with
such "other" transactions.   Other domestic dealers conducting
export transactions will merely provide the name of a  U.S. shipper
or broker to whom the  vehicle is shipped prior to  being  sent
abroad.    Some domestic dealers might falsely indicate that
motorcycles were sold to ultimate U.S. consumers when in fact they
were shipped abroad as a gray market export.

Thus, the entire scope of export sales is not accurately known.
Notwithstanding that fact, analysis of the retail sales reports
does indicate that most export market activity is concentrated in
the hands of only three domestic dealers located in: Los Angeles,
Seattle, and Safford, Arizona.  Remaining suspected export market

11

CONFIDENTIAL

transactions are relatively few in number and broadly dispersed among remaining domestic Harley-Davidson dealers. For these remaining dealers, the economic stakes associated with gray market export activity is not believed to represent a serious source of profitability.

Recommendations

Enormous potential risks confront Harley-Davidson from the myriad of problems outlined above with respect to the unauthorized flow of its products across national boundaries. These same risks pertain to other sales by domestic dealers to non-end users, with the exception of ordinary dealer-to-dealer transfers. Therefore, action to remedy this condition must be taken promptly. None of the proposed actions will come without significant difficulties and cost. However, the risks of inaction are enormous. It is therefore recommended that Harley-Davidson take the following actions:

1) A policy statement should be issued to all U.S. Harley-Davidson dealers reminding them of their obligations under the Harley-Davidson dealer contract to set up, inspect and test each vehicle prior to delivery at the dealership facility, directly to the ultimate consumer, and stating clearly that exports and other non-end user sales constitute a breach of the dealer contract and are not authorized by

12

CONFIDENTIAL

Harley-Davidson. This policy statement should contain a brief rationale explaining that Harley-Davidson's distribution methods, including the export policy, are intended among other things to assure product safety and customer satisfaction, to maintain Harley-Davidson's competitive position, and to protect the integrity of Harley-Davidson's worldwide distribution network.

The policy should make clear that henceforth no credit shall be given on the basis of export sales in the allocation of Harley-Davidson product . It should also be made clear that Harley-Davidson will no longer pay dealers any set up charges, advertising co-op dollars, or Special Incentive Program dollars for vehicles shipped abroad as export sales. In the same manner, no debit back payments to dealers with respect to rebates or destination charges should be provided by Harley-Davidson, nor should any 5% hold back be awarded on export sales. The foregoing policies should also apply to any other vehicle which is not sold to an ultimate consumer at the dealership facility, other than dealer transfers.

The policy statement should caution against any attempts at subterfuge in circumventing this export policy through the use of brokers, agents, or private resellers. For the vast majority of Harley-Davidson dealers, this export policy will not represent any great financial loss. On the contrary, most

13

CONFIDENTIAL

dealers will greet the policy with enthusiasm.

To help police this policy, dealers should be required to obtain a signature from each ultimate retail consumer certifying that he purchased the vehicle at the dealership facility. In addition, dealers should be required to follow up within a reasonable time after the sale by providing Harley-Davidson a copy of the Department of Motor Vehicles (DMV) registration of each vehicle. This should severely discourage attempts by dealers to report bogus names in conjunction with export sales.

2) In conjunction with dealer development activities, all new Harley-Davidson dealers brought on board before 1993 when the new General Conditions of Sales and Service Agreement will be forthcoming, should be required to sign an export sales addendum whereby the above prohibitions with regard to export sales are incorporated into their dealership contract. Any such requirement for an export addendum may, however, run afoul of statutes in states such as Florida which specify that all dealer agreements for any given linemake must be identical among all such Florida dealers.

3) Investigation should be undertaken of all overseas Distributorship Agreements as to language contained with regard to sales outside the country or territory to which each

14

**CONFIDENTIAL**

Distribution Agreement applies. This investigation should disclose whether or not language already exists which would prohibit "gray market" sales from one country to another. If no such language exists, a statement of policy to that effect should be sent to all distributors. Upon origination or renewal of all such Distributor Agreements, prohibitions of gray market shipments should be clearly set forth. Each distributor agreement should also mandate that Harley-Davidson dealers within the geographic area encompassed by a given distributor agreement will correspondingly be prohibited from engaging in export sales.

4)  As a part of updating the General Conditions of Sales and Service Agreement and preparing for dealership renewals in 1993, appropriate contract language should be formulated to prohibit export sales by U.S. dealers. The language should set forth the fact that no allocation credit, set up charges, Special Incentive Program dollars, hold-back dollars, ad co-op dollars, or any other form of compensation from Harley-Davidson will be forthcoming on export sales. The dealer contract shall also make clear that in the event a dealer fails to abstain from making export sales, or if a dealer engages in subterfuge to pursue such export sales, that his franchise is subject to termination by Harley-Davidson.

As a part of revising the General Conditions of Sales and Service

15

H-D 1586
Confidential

CONFIDENTIAL

Agreement, Harley-Davidson should revise and strengthen the language therein which obligates the dealer to provide direct delivery to the ultimate consumer, appropriate set up, inspection and testing of each vehicle, and operator instruction to the ultimate consumer. This would further limit any basis of disguising export sales as having been sales to the ultimate retail consumer. In like manner, an accurate name of customer should be reported by the dealer, and the dealer should be required to obtain a signature from the ultimate retail consumer attesting to that consumer being in fact the ultimate retail consumer, and a copy of the eventual DMV registration of each vehicle.

## Implementation of New Policy on Export Sales

It is recommended that with respect to the 1991 allocations, no downward adjustment be made in turn and earn allocations as a function of each dealer's history of pursuing export sales. That is, no dealer should experience any correction or negative assessment of Harley-Davidson vehicle allocations where such allocations have been in part earned through export sales. This policy should be applied to all Harley-Davidson dealers with the exception of three dealers: Southgate (Los Angeles), Seattle, and Safford, Arizona. Harley-Davidson has authorized The Fontana Group, Inc. to conduct a damage assessment as to the probable economic consequences this export sales policy will have upon these

16

**CONFIDENTIAL**

three dealers.  It is thereafter anticipated that Harley-Davidson will conduct negotiations with each of these three dealers so as to achieve suitable acceptance of the  export policy by virtue of certain benefits and considerations Harley-Davidson would be willing to extend.

17

H-D 1588
Confidential

# EXHIBIT 6

CONFIDENTIAL

**NON-RETAIL POLICY/P & A ALLOCATION MEETING MINUTES**

**MAY 21, 1992**

This meeting was held to review the possible revisions of the 1991 Policy on Exports and Other Non-Retail Sales by Domestic (U.S.) Dealers.

A review of the existing policy concluded with a general review for language, clarification and updating.  Darrell Fink presented a list of issues which he thought may address further restrictions regarding export activity.  Upon review, the policy was revised; and attached is a copy for review.

The process for enforcement of the policy will continue as in the past.

1.    The vehicles will be flagged for potential violation by the account representative in Franchise Operations.  Notice will be provided to the dealer.

2.    The dealer will be provided correspondence asking for verification.

3.    A review committee will be convened consisting of the appropriate account representative, the DFO, Darrell Fink and Linda Drake; and the individual dealers involved will be reviewed for enforcement activity by that group.

4.    Those dealers whose vehicles are deemed to be in violation of the Policy on Exports and Other Non-Retail Sales by Domestic Dealers will be informed of their violation.

5.    Those vehicles will be appropriately billed back at the next motorcycle incentive payment time frame.

6.    Those vehicles will be subsequently deducted from the next year's allocation.

In addition, we reviewed the need to have the non-retail policy appear in more than one area.  The policy should be <u>considered</u> for appearance in the following areas:

1.    In the dealer confidential price book.

2.    In the dealer contract.

3.    In the dealer model year program manual.

H-D 1606
Confidential

# CONFIDENTIAL

In addition, the need was identified to convene a meeting to review several outstanding issues related to the non-retail policy. They are as follows:

1. Review gap of understanding for need to know personnel for the revision and policing of the non-retail policy.

2. Publishing a list of known offenders to our dealer network.

3. Further language clarification.

4. Issues of taxation which could further enhance the provisions of the policy.

5. Seattle communication plan.

6. Evaluate changes to the current SWR form.

7. Review courtesy delivery program.

The next major issued discussed in the meeting was the need to construct a P & A allocation meeting for engines, transmissions and frames.

Attached you will find a policy statement to our dealer network from Bob Powell which reflects Harley-Davidson's position for engines, transmissions and frames for the balance of the 1992 model year.

The committee's proposal for the 1993 model year is as follows:

Engines - For the 1993 model year, a U.S. dealer may order for non-replacement purposes engines and transmissions in the following allocation.

| | |
|---|---|
| Vehicle allocation 0 - 100 | 1 unit |
| Vehicle allocation 101 - 200 | 2 units |
| Vehicle allocation over 200 | 3 units |

An international distributor may order engines and transmissions up to 1% of his total vehicle distributor allocation. An international dealer direct may purchase engines and transmissions in the same unit volumes as a U.S. dealer.

Frames - For the 1993 model year, no frames will be made available to U.S. dealers, international distributors or international dealers for non-replacement purposes. Any exception to this policy requires the express written approval of the Vice President of Triad Distribution.

**CONFIDENTIAL**

**Tires** – Harley–Davidson will continue to monitor tire orders submitted by dealers and/or distributors to insure that volumes on order do not exceed that appropriate for normal retail activity. This policy will insure that the spirit of the exclusivity agreement is protected for all dealers and distributors, and insures that large volume orders do not preclude general availability to all dealers and distributors.

Further communication to our dealers is required on the issue of general P & A non-retail activity. The philosophy and the policies are still in development, and it is anticipated that we will have some information available to our dealer/distributor network by the Seattle Announcement Meeting.

H-D 1608
Confidential

# EXHIBIT 7

```
                        VOLUME:    I
                        PAGES:     1-253
                        EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
                              x
CYCLE-CRAFT CO., INC.,        x
d/b/a BOSTON                  x
HARLEY-DAVIDSON/BUELL,        x
        Plaintiff             x
                              x   CASE NO.
        vs.                   x   04 11402 NMG
                              x
HARLEY-DAVIDSON MOTOR         x
COMPANY, INC., and BUELL      x
DISTRIBUTION COMPANY, LLC,    x
        Defendants            x
```

**DEPOSITION of JOHN ATWOOD,** taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the
Commonwealth of Massachusetts held at the
Law Offices of Bingham McCutchen,
150 Federal Street, Boston, Massachusetts,
on June 7, 2005, commencing at 9:04 a.m.

*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

```
1    Q.    Okay.  You are president and CEO of
2          Cycle-Craft Company, Inc. of 1760 Revere
3          Beach Parkway, Everett, Massachusetts?
4    A.    Correct.
5    Q.    All right.  And that is the plaintiff in
6          this case, correct?
7    A.    Yes.
8    Q.    All right.  I'm going to be asking you
9          questions today, Mr. Atwood.  You understand
10         that you're under oath and giving answers to
11         my questions?
12   A.    Uh-huh.
13   Q.    You need to answer verbally, please.
14   A.    Yes.
15   Q.    That was my second instruction to you.  Our
16         stenographer cannot take down nods, shakes
17         of the head or "uh-huhs."  You need to
18         answer verbally; do you understand that?
19   A.    Yes.
20   Q.    If at any time you don't understand my
21         questions, because you are giving testimony
22         under oath, it's very important that you do,
23         you need to let me know so that I can put
24         the question in a form that you can
```

1    A.    Yes.

2    Q.    Okay.  What alleged crime?

3    A.    DWI.

4    Q.    When was that?

5    A.    1984 February 1st.

6    Q.    What was the outcome of that case?

7    A.    I was convicted.

8    Q.    What sentence did you receive?

9    A.    I had to go to school, I had to pay some

10         fines, loss of license.

11   Q.    Okay.  Apart from that incident, have you

12         been indicted or arrested for any other

13         alleged crime?

14   A.    In '78, '77 -- '76, I got --

15               MR. REHNQUIST:  Don't guess.  Just

16         give your best estimate.

17   A.    Yeah.  Well, I was just out of high school.

18         It was -- what do they call it?  An

19         unauthorized use of a vehicle.

20   Q.    Okay.  What were the circumstances?

21   A.    What do you mean by that?

22   Q.    What were the circumstances that led to your

23         arrest?

24   A.    I moved this guy's car that was in front of

```
1              a fried dough stand up at Salisbury.
2    Q.   Were you convicted?
3    A.   I think it was continued without a finding.
4              Is that a conviction?
5    Q.   Any other arrests --
6    A.   (Witness nods.)
7    Q.   -- or indictments for any alleged crime that
8         you can recall?
9    A.   No.
10   Q.   All right.  In addition to being president
11        and CEO of Cycle-Craft, are you also
12        chairman of the board?
13   A.   Yes.
14   Q.   And for how long have you been chairman of
15        the board?
16   A.   Since '92.
17   Q.   Who was chairman of the board prior to '92?
18   A.   My father, Bill Atwood.
19   Q.   Who sits on the board with you today, if
20        anyone?
21   A.   Nobody.
22   Q.   All right.  And has that been true since '92
23        that you have been the sole member of the
24        board of directors?
```

1       motorcycles only to ultimate consumers?

2                MR. REHNQUIST:  I object to the

3       form and object to the lack of a time

4       frame.

5   Q.   Let's say since, what you said, the late

6       1980s.

7   A.   I'm not getting this.  I'm not getting this.

8       It seems like you're asking me the same

9       question.

10  Q.   Okay.  Let me try it again.

11  A.   And I want to make sure I give you a proper

12      "yes" or "no."

13  Q.   I appreciate that.  Let me try it again.

14               Did your under -- strike that.

15               Did you understand that

16      Harley-Davidson's Non-Retail Sales Policy

17      required dealers not to sell to persons

18      intending to resell the bikes?  I'm talking

19      about new bikes.

20  A.   Yes.

21  Q.   All right.  And did you understand that

22      dealers were supposed to only sell to

23      ultimate consumers?

24  A.   Yes.

1    Q.    All right.  Did you understand that

2          those sales were supposed to be consummated

3          at the dealership premises and not other

4          locations?

5                MR. REHNQUIST:  Object to the form.

6    A.    No.

7    Q.    All right.

8    A.    That was a better way of putting it.

9    Q.    I'm trying.

10               Before this litigation started --

11         strike that.

12               Before you got the notice of

13         termination from Harley-Davidson, had you

14         ever discussed the Non-Retail Sales Policy

15         with Ron Buchbaum?

16               MR. REHNQUIST:  I object to the

17         form.

18   A.    No.

19   Q.    Did you hire Ron Buchbaum as Cycle-Craft's

20         general manager in or about February of

21         2003?

22   A.    Yes.

23   Q.    Why?

24   A.    Why?

1    Q.    And did you give it to somebody?

2    A.    Yes.

3    Q.    Who did you give it to?

4    A.    My sister.

5    Q.    When did you do that?

6    A.    Back in 2001, 2002.  And then, of course --

7          well...

8    Q.    Apart from your handwritten notes, have you

9          seen any other document whether in

10         handwritten form or typed like this,

11         relating to the motorcycles that the

12         dealership owns on your behalf?

13   A.    I may have.

14   Q.    Okay.  But do you remember that sitting here

15         today?

16   A.    No, I don't specifically remember sitting

17         down looking at a list of machines that I

18         owned or the company owned.

19   Q.    Could you turn back to your declaration and

20         take a look at Page 10, Paragraph 41.

21   A.    *(Witness reviews document.)*

22                Uh-huh.

23   Q.    Mr. Atwood, this paragraph refers to three

24         motorcycles that Cycle-Craft purchased for

```
 1              your collection; do you recall that?
 2     A.       Yes.
 3     Q.       And what kind of motorcycles were they?
 4     A.       Two anniversaries and a Buell.
 5     Q.       When you say "two anniversaries," what do
 6              you mean?
 7     A.       Two, 2003 Harley-Davidson motorcycles and
 8              one, I think it was a 2003 Fire Bolt.
 9     Q.       Is that a Buell?
10     A.       Yes.
11     Q.       When you say "anniversary," does that -- is
12              that a special kind of 2003 Harley-Davidson
13              motorcycle or were all the 2003 anniversary
14              year bikes?
15     A.       The latter.
16     Q.       Do you recall what kind of 2003
17              Harley-Davidson motorcycles they were?
18     A.       Oh, yes.
19     Q.       What kind were they?
20     A.       One was a Sportster and the other one was a
21              full dresser with a sidecar, FLHTCUI.
22     Q.       And these motorcycles are still owned by
23              Cycle-Craft today?
24     A.       Yes.
```

```
 1   Q.   They've never been sold by Cycle-Craft to
 2        anyone?
 3   A.   No.
 4   Q.   Including you?  Cycle-Craft did not sell
 5        them to you?
 6   A.   Not that I'm aware of.
 7   Q.   And Cycle-Craft obtained ownership of these
 8        three motorcycles by purchasing them from
 9        Harley-Davidson; is that correct?
10   A.   Yes.
11   Q.   Do you know whether they have been
12        registered with a Massachusetts DMV?
13   A.   Yes.
14   Q.   That is, they have been?
15   A.   One.
16   Q.   Which one?
17   A.   FLHTCU -- FLHTCUI.
18   Q.   That's one of the -- is that the Sportster
19        or --
20   A.   That's a full dresser.  That's the ultra
21        with a sidecar rig.
22   Q.   And you know that because you've ridden it
23        out on the street; is that right?
24   A.   Yes.
```