# EXHIBIT 8

VOLUME:    I
PAGES:     1-288
EXHIBITS:  1-13


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


|  |  |  |
|---|---|---|
| CYCLE-CRAFT CO., INC., | x | |
| d/b/a BOSTON | x | |
| HARLEY-DAVIDSON/BUELL, | x | |
| Plaintiff | x | |
| | x | CASE NO. |
| vs. | x | 04 11402 NMG |
| | x | |
| HARLEY-DAVIDSON MOTOR | x | |
| COMPANY, INC., and BUELL | x | |
| DISTRIBUTION COMPANY, LLC, | x | |
| Defendants | x | |


*DEPOSITION of RONALD S. BUCHBAUM,* taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the
Commonwealth of Massachusetts held at the
Law Offices of Bingham McCutchen,
150 Federal Street, Boston, Massachusetts,
on June 2, 2005, commencing at 9:10 a.m.


*REPORTERS, INC.*
*GENERAL & TECHNICAL COURT REPORTING*
*23 MERRYMOUNT ROAD, QUINCY, MA 02169*
*617.786.7783/FACSIMILE 617.786.7723*

1                someone else?

2     A.    Repeat the question?

3     Q.    Yes.  Was that something that you delegated

4           to someone else?

5     A.    Was what something?

6     Q.    Learning about Harley-Davidson policies with

7           respect to customers to whom dealerships

8           could sell or could not sell?

9                     MR. REHNQUIST:  I object to the

10          form.

11    A.    We sold bikes to anybody.

12    Q.    Were you aware of a policy of

13          Harley-Davidson called a "Non-Retail Sales

14          Policy"?

15    A.    No, sir.

16                    MR. REHNQUIST:  I object to the

17          form.

18    Q.    During your time as general manager at

19          Motown that was not something that you ever

20          heard about?

21                    MR. REHNQUIST:  I object to the

22          form.

23    A.    That's correct.  I didn't hear about it.

24    Q.    Did you hear about any other Harley-Davidson

1          to pay the amount of the deposit -- excuse

2          me, agreeing to pay the amount of the

3          motorcycle less the deposit.

4  Q.    All right.  Now, I want to ask you the same

5          question, but let's suppose that I'm an

6          employee of the dealership, how is the

7          process different?

8  A.    With an employee, it depends.  Usually an

9          employee wouldn't have to pay or wouldn't

10         have to write up an order until the bike

11         came in, and I'd let an employee order a

12         bike without any paperwork, which I have

13         done in the past.

14  Q.   What if the bike is there?

15  A.   When the employee is ready to take the bike

16         home, we'd sit down and the employee would

17         pay for the bike before it left the facility

18         with the employee.

19  Q.   What if the employee wants to hold the bike?

20  A.   We'd just hold the bike for the employee.

21  Q.   Okay.  And you wouldn't do any -- there

22         wouldn't be any paperwork for that to show

23         that it's being held?

24  A.   We might put a tag on it "hold for Ron" or

1    A.    No, no, but personally, I feel that, yeah,

2          they put a lot of pressure on the dealers,

3          because they ship bikes in July for the

4          dealer to sell in July, and some of them

5          even come in as late as mid-July or end of

6          July, and you gotta really hustle and sell

7          them so you don't get penalized the

8          foregoing year.

9    Q.    You say in the last sentence of that

10         paragraph "That as a result, there was a

11         risk to Cycle-Craft of a reduction in its

12         2004 allocation"; do you see that?

13   A.    Yes, sir.

14   Q.    And was that something that was of serious

15         concern to you at the time?

16                 MR. REHNQUIST:   I object to the

17         form.

18   A.    Yes.

19   Q.    The next paragraph you indicate that you

20         extended an offer to employees to buy bikes

21         at $500 over dealer invoice; do you see

22         that?

23   A.    Yes.

24   Q.    Is that something that you had ever done

1           before?

2    A.    Yes.

3    Q.    And at the Boston dealership?

4    A.    I've sold bikes at the Boston dealership for

5          $500 over before.

6    Q.    Before July of '03?

7    A.    Yes.

8    Q.    You go on to say --

9    A.    I think I did.

10   Q.    Was this offer made to all employees and

11         relatives of employees?

12   A.    I don't remember.  It was made to a lot of

13         people.

14   Q.    How did you publicize it?

15   A.    Word-of-mouth around the dealership.

16   Q.    Anything in writing?

17   A.    I don't know.  I don't believe so.  Maybe, I

18         don't know.

19   Q.    Was this deal something better than

20         employees could traditionally get prior to

21         the end of the model year?  Was this

22         something new?

23   A.    Some yes, and some no.

24                   As I think I testified to earlier, I

1     would make different deals with different

2     people.  It wasn't -- it was just what we

3     had it do at the time.  There was no --

4  Q.   Did you offer different deals to different

5     employees?

6  A.   Some people paid $500 over at times.  Some

7     people paid a thousand over.  Some paid

8     cost.  When I had to get models out,

9     sometimes I would even sell it below cost.

10  Q.   Was it based on what you could get for the

11     bike or some seniority level for the

12     employee?

13  A.   It had nothing to do with seniority or

14     liking a person or not liking a person.  It

15     had to do with the motorcycle.  Did I want

16     to get rid of this motorcycle.

17           For example, there's V-rods that I

18     would have gave to them below cost and I

19     offered lots of employees V-rods below cost.

20     I just wanted to get rid of the bikes.

21  Q.   You say in Paragraph 5 that two employees

22     took you up on that offer of $500 over

23     invoice, Mr. Giordano and Mr. Potts, in

24     Paragraph 5?

1    A.    Yes.

2                    MR. REHNQUIST:  Did you want to

3          finish your last answer?

4                    THE WITNESS:  No, that's okay.

5    Q.    You say Mr. Giordano bought a motorcycle on

6          July 3, so was this offer extended sometime

7          prior to July 3?

8    A.    Yeah.  These fellas bought it before that.

9          We started wanting to get rid of bikes

10         sometime in June, July when all those

11         bikes came in.  So, yeah, these fellas were

12         some of the first to take advantage of $500

13         over.

14   Q.    I thought your testimony was, though, that

15         the Vegas show was in July?

16   A.    It was.

17   Q.    And you started this offer after the Vegas

18         show when you got the bikes released?

19   A.    After or before.  These could've been --

20         these could've been bikes that were already

21         in the house and not from released at the

22         Vegas show.

23                    These two bikes could've already

24         been there, I don't know, because these

1       personal knowledge, but go ahead.

2  A.   Mr. Fred Giordano was buying this bike, as

3       told to me, by his brother Joe Giordano,

4       that he was doing some type of raffle for a

5       fundraiser in Michigan.

6             They have a ride every year in

7       Michigan -- Toys for Tots, and he sponsors

8       this ride and it was being raffled off or

9       given away or something to do with the

10      Marine Corps because the Marine Corps

11      collects gifts for this Toy for Tots ride,

12      so he was buying a bike for the

13      Toys for Tots to be given away or raffled

14      away or whatever away at this function.

15            We delivered the bike to Mr. Fred

16      Giordano in Michigan from Boston

17      Harley-Davidson.

18           In fact, his brother, Joe Giordano,

19      got a carrier to take that bike from our

20      facility to deliver it to Fred Giordano.

21      That, I remember.

22  Q.   Okay. So, Fred Giordano did not come to the

23      dealership?

24  A.   No.

1    A.    Yes.

2    Q.    You're willing to sacrifice the profit on

3          those bikes to get them out before the end

4          of the model year?

5    A.    That is correct.

6    Q.    About how long before the end of the model

7          year do you make that second offer to

8          employees and relatives of employees?

9    A.    I don't remember, but it would be the

10         wishing hours or the wishing days, five,

11         four, three days prior to the end as I've

12         seen done in the past and as we did in the

13         past.

14   Q.    So, sometime in the last week of July?

15   A.    Yes.

16   Q.    And how do you communicate that offer to the

17         dealership?

18   A.    Again, word-of-mouth.  Bunch of people

19         sitting in a room, Hey, we have -- this is

20         exactly how it went, "Hey, we have these

21         bikes.  We need to sell them.  We are

22         selling them at cost or V-rods you can have

23         $1,000 below cost."

24              We would do things like that to move

```
 1              the motorcycle.
 2                      Remember, when you're moving the
 3              motorcycle, you're saving your floor plan
 4              charges and you're getting rid of old
 5              inventory that's going to be replaced by new
 6              inventory shortly, and the new inventory is
 7              going to bring the cost of the old inventory
 8              down.
 9     Q.       Did you discuss this offer with Mr. Atwood?
10     A.       No, I don't think so.  I might have.
11     Q.       How about the previous one at $500 over
12              invoice?
13     A.       We talk all the time.  I don't know if we
14              specifically mentioned that or not.
15     Q.       At this point in time, say, the summer of
16              '03, how often were you talking to
17              Mr. Atwood on business?
18     A.       Mr. Atwood -- I would talk to him as much as
19              possible.  He had -- he was going through a
20              bad time with health problems and family
21              health, that restricted him from me seeing
22              him often.
23                      We would communicate on the phone a
24              lot during the day.  If I was busy during
```

1    Q.    Roderick Granese?

2    A.    I don't know who he is.

3    Q.    Okay.  How long was the offer to buy bikes

4          at cost good for, just 'til the end of the

5          model year?

6    A.    'Til midnight.

7    Q.    On July 31st?

8    A.    There you go.

9    Q.    And these -- you say that these 13 employees

10         or employee relatives initially ordered

11         motorcycles; how did they do that?

12               MR. REHNQUIST:  I'm sorry, where

13         are you?

14   Q.    This is Paragraph 6 of your declaration.

15         How did they order them?

16   A.    I don't know.  I believe that the way it

17         went with these bikes was that we had -- we

18         were all in a room and I was in the room

19         with these fellas, and we said, Hey, we have

20         X amount of bikes we would like to obviously

21         get rid of before the end of the model year,

22         you guys could purchase them at either cost,

23         and hopefully, we could put them aside for

24         you, and hopefully we'll sell them before

1    you've got to take them and then you'll

2    have a choice whether to take them or

3    we'll go ahead and make an SWR change in

4    the new customer's name if we were to sell

5    them.

6  Q.   Okay.  But they would have to take them by

7    the end of the model year?

8  A.   They would love to take them because they

9    would sell them for an extremely high

10    profit.

11  Q.   But it would have to be in the current model

12    year, in '03?

13              MR. REHNQUIST:  Objection.

14  A.   No.  We would hold these bikes for these

15    people.  In other words, like my bikes,

16    we -- I was making a commitment to buy them

17    if we didn't sell them.

18  Q.   If you didn't sell them by when?

19  A.   Well, if we didn't sell them, there was

20    no time on it.  It's just we didn't sell

21    them.

22  Q.   Well, you had to buy them by the end of the

23    model year, right?

24  A.   No, we had to commit to them by the end of

1          that here.

2                    We wouldn't -- in other words, I

3          didn't take this bike.  This bike wasn't

4          taken home by me, my bike and my son's

5          bike.

6    Q.    Let me put another question.

7                    What -- did you tell anyone that

8          they had to take a bike?

9    A.    Oh, absolutely not.

10   Q.    Did all of the 13 individuals that we've

11         identified in Paragraphs 22 and 23 and 24 of

12         Mr. McPhee's declaration give you

13         commitments that they would buy new

14         motorcycles?

15   A.    Absolutely.  Everybody that I'm aware of

16         that was in that room -- now, there were

17         some people here that weren't in that room

18         that I don't know.

19   Q.    Okay.  Well, who was in the room with you?

20   A.    I believe Joe Giordano -- the people that --

21         Mike Bloom, myself, Jamie, maybe Sean

22         Walsh, some other salespeople that worked

23         there.

24                    These people that didn't work

1          there, they were not in the dealership or

2          walking around, so I don't know how their

3          commitments came in.

4    Q.    All right.

5    A.    But I can tell you about the commitments of

6          the people that worked at the company.

7    Q.    And do you recall at that meeting telling

8          Jamie to submit SWRs for those 13

9          individuals?

10   A.    I don't recall it, but that would've been

11         the normal course to protect Boston Harley

12         for not losing those bikes the next year.

13   Q.    Okay.  Even though --

14   A.    In other words --

15   Q.    -- as of that point in time, they hadn't

16         been sold?

17               MR. REHNQUIST:  I object to the

18         form.

19   Q.    Right?

20   A.    They'd been committed to.  They said, "Yes,

21         we want this bike.  Ron, we will take this

22         bike if somebody else doesn't want this

23         bike.  If you're going to let us have it at

24         cost," in some cases below cost.

212

```
 1              I remember Jason Marsca is another

 2        fella that worked for us, I remember I

 3        offered him a V-rod at that time and he

 4        was contemplating and then he turned it

 5        down below cost.  He said, "No, I don't want

 6        one.

 7   Q.   Okay.  As of that time, the bikes hadn't

 8        been sold yet; ultimately, they were sold to

 9        other people; is that right?

10              MR. REHNQUIST:  Object to the form.

11   A.   At the time that these people got them?

12   Q.   The meeting that you're talking about.

13   A.   They were available.

14   Q.   But they hadn't been sold?

15   A.   No.

16   Q.   Okay.

17   A.   So, that's why I got two.  Mike -- now, in

18        my case, I got two, Mike Bloom got three or

19        four, we would -- if we didn't sell these

20        bikes in a timely fashion to someone else,

21        I was going to buy these bikes.  I

22        committed to these bikes.  That's why we

23        held them.

24   Q.   The dealership submitted SWRs for these
```

```
 1              bikes according to Harley-Davidson
 2              records?
 3    A.        They did.
 4    Q.        And that was done on July 31?
 5    A.        That's correct.
 6    Q.        Of 2003?
 7    A.        Correct.
 8    Q.        And then after that, the bikes were sold to
 9              other individuals?
10    A.        Other individuals, correct, and then we
11              called up or transmitted -- let's say,
12              Ron Buchbaum had a bike and then
13              Mr. Berkowitz -- Ron Buchbaum didn't pick up
14              that bike.  We transmitted the SWR, but I
15              never got it, because I would rather have
16              a customer pay for it and, you know, pay
17              more money for it, and you were the
18              customer, Mr. Berkowitz, he came in and got
19              it.
20    Q.        But at that point it was after the end of
21              the model year, right?
22    A.        Yeah.
23    Q.        But you've already reported it sold to
24              Harley-Davidson?
```

1    Q.    No offense.  Nobody wants to hear it, at

2           least not now.

3                 MR. REHNQUIST:  It's about an hour.

4           Bill, do you want to break?

5                 MR. BERKOWITZ:  Let me finish this

6           line.  It won't take long.

7    Q.    The corrections to the SWRs or the

8           adjustments that were made to SWRs, did you

9           ask Jamie to make those changes after the

10          bikes were sold to --

11    A.    She would have done that automatically.

12    Q.    All right.  Mr. McPhee's affidavit, if you

13           take a look at it, the bottom of

14           Paragraph 23, it says, "In each case the SWR

15           was appropriately adjusted to reflect the

16           second purchaser as the customer"; do you

17           see that?

18    A.    Yes, sir.

19    Q.    And, you know, before you had said you

20           wanted to change your declaration because of

21           the use of the word "purchaser," in fact,

22           none of the people in the first column

23           actually purchased the bikes; is that

24           correct?

241

1    wanted to make sure that Sean understood

2    that they were sold to individuals.

3  Q.  Why did you want to make sure that he

4      understood that?

5  A.  Because that's what has to be done.

6  Q.  Why?

7  A.  You have to sell -- Harley wants you to sell

8      bikes to individuals.

9  Q.  Where did you -- when did you learn that?

10  A.  Well, that's been like that.  I didn't learn

11      it.

12  Q.  Is that something you knew from Motown?

13  A.  From Motown, from -- we always sold to

14      individuals.

15  Q.  And was it your understanding that that

16      was a Harley requirement to sell to

17      individuals?

18  A.  Just you had to sell them -- I think -- I

19      think I learned that maybe in Motown.

20      Maybe -- yeah, maybe at Motown.  But we've

21      always sold -- I think what prompted it is

22      because they were out-of-state bikes, they

23      were bikes from Florida.

24          So, I said, "Make sure you sell one

1    A.    About?

2    Q.    Your belief that -- that bikes could only be

3          sold to individuals.

4    A.    I think I always knew it was an unwritten

5          rule that Harley did not want you reselling

6          these motorcycles to people that were going

7          resell them.

8                   You had to sell it to a person that

9          was going to ride this bike and we run into

10         that a lot where people will try to buy them

11         and we don't sell them two or three bikes.

12         We sell one bike per person.

13   Q.    How do you find out whether the person's

14         going to resell them?

15   A.    Well, you don't find out.  You find out if a

16         person comes in and says, "Hey, I want three

17         motorcycles."

18                  "You can't buy three motorcycles.

19         What do you want three motorcycles for?"

20   Q.    If you find out that they want to buy them

21         for three customers, do you tell them, Well,

22         those customers have come into the

23         dealership and we'll deal with them?

24   A.    Yeah, I've had a lot of people that have

```
 1              come to me in the past and say, "Hey, we
 2              want to buy three or four bikes," and they
 3              send the customers into the dealership or
 4              deal with it on the phone, and the customer
 5              will show -- you know, sign their own bill
 6              of sale or pay for the bike with their own
 7              check or something like that.
 8    Q.        You say you've always known about that?
 9    A.        Unwritten rule.
10    Q.        And would that go back to the Motown days?
11    A.        I think it would go back to --
12    Q.        Even Barnett?
13    A.        -- the Barnett days.
14    Q.        Did you tell your salesmen about that rule
15              at Boston?
16    A.        I think I had a chat with one of my salesmen
17              at one time.  Whether it was before this
18              incident or after, I don't recollect.
19    Q.        "This incident" being the Florida deal or
20              something --
21    A.        Yeah.  And that's another deal that Jason
22              Marsca was working on and I had told Marsca
23              the same thing, "You can't sell multiple
24              motorcycles to one person.  You must sell it
```

1    to the person that's buying it and using

2    it."

3  Q.  Do you recall Jason coming to you with a

4      possible deal for a sale of multiple bikes?

5  A.  That's why I mentioned that.

6  Q.  And do you recall that it was to Lee Custom?

7  A.  Now I know it was to Lee Custom.

8           At this time I didn't know who Lee

9      Custom was.  I didn't know a Lee Custom.  I

10     was fairly new at the time.

11 Q.  Do you remember Jason coming to you with a

12     bill of sale or bills of sale made out to

13     Lee Custom?

14 A.  No.

15 Q.  Do you remember him coming to you with a

16     possible multiple bike deal to purchasers in

17     New Hampshire?

18 A.  Yes, I think New Hampshire.  I don't know

19     where they were at the time.

20 Q.  All right.  Do you recall Jason saying

21     anything to you about Lee Custom in

22     connection with that deal?

23 A.  Again, I didn't know of that name until

24     after this litigation started.

1    Q.    You don't have any recollection of him

2          saying anything about Lee Custom to you?

3    A.    If he did, I didn't know who they were.

4          I do have recollection that Jason Marsca --

5          we had a sales contest and he tried to sneak

6          buy a deposit for a whole bunch of

7          motorcycles, which we squashed and we said,

8          "You can't do that. I don't care if we're

9          selling the bikes that were on sale, it's

10         one motorcycle sold to one person," because

11         I think he tried to try to pass a check for

12         several bikes.

13               I think this is what it was. He

14         tried to turn in a check that was a deposit

15         for several motorcycles and it was turned

16         back to him.

17   Q.    You recall there was eight?

18   A.    I didn't think it was that many, but it

19         was --

20   Q.    Do you recall it was in connection with a

21         buyer or buyers in New Hampshire?

22   A.    No. I recall that he tried to win a sales

23         contest where I was offering, I think,

24         $1,000 that day to anybody who told ten

1           Slim's buyers?

2                   MR. REHNQUIST:  I object to the

3           form.

4    Q.    Was that what you were telling him?

5    A.    No.  My instructions were, "Call this fella

6           up and handle him."  That's what I told him.

7           'Cuz you said on the first call.

8    Q.    Well, was your -- were you intending to

9           indicate to Sean that he should deal with

10          this gentleman, Slim's buyers?

11   A.    I don't even think I mentioned that.

12   Q.    Okay.

13   A.    I told Sean to call this fellow and he's got

14          20 people that wants to buy bikes or 25 -- I

15          forget the number -- but call him right away

16          and get something going.

17   Q.    Well, my question is whether was it okay

18          with you for Sean to deal with Slim so long

19          as he got individual names for the bikes

20          that were being sold?

21   A.    Absolutely, as long as a person bought the

22          bike, an individual.

23                  If you, Mr. Berkowitz, bought a

24          bike and Mr. Berkowitz was paying for that

1    happened on that deal, the Florida deal?

2                MR. REHNQUIST:  I object to the

3         form.

4    A.   I don't recollect a whole lot other than

5         negotiating prices.  Sean was negotiating

6         prices with these people.

7    Q.   Let me ask you this:  Did you ever have

8         another conversation with Slim?

9    A.   I don't think so.

10   Q.   You don't recall negotiating price with

11        Slim?

12   A.   I don't remember.  I might have.  I might

13        have spoken with him again, but I don't

14        remember.  I hardly remember speaking to him

15        the first time until all this happened.

16   Q.   Do you remember discussing with Slim the

17        need to have individual names associated

18        with the individual bikes that were being

19        sold?

20   A.   I might have.  I don't recollect.

21   Q.   Do you recall having any discussion with --

22        well, strike that.

23                Do you recall learning at any time

24        in July of '03 that Slim worked for a

```
 1           company called DC Imports?
 2    A.     No.
 3    Q.     You don't recall ever learning that in
 4           July of '03?
 5    A.     I don't recollect.
 6    Q.     Do you recall talking with a woman named
 7           Debbie Lunsford in July of '03?
 8    A.     I might have.  I don't remember, and, again,
 9           once this litigation started, I don't
10           remember, but I might have.
11    Q.     Do you recall the content of any
12           conversation that you had with Debbie
13           Lunsford sitting here today?
14    A.     (Witness nods.)
15    Q.     You're shaking your head, but we have to
16           get --
17    A.     No.
18    Q.     Do you recall the content of any discussion
19           that you had with Slim other than what
20           you've testified to?
21    A.     Again, I could have, but I don't recollect
22           today.
23    Q.     Do you recall having any discussion with
24           Debbie about the need for separate checks
```

# EXHIBIT 9

1

1                                                    VOLUME 1

2                                                    PAGE: 1-144

3                                                    EXHIBITS: 1-17

4                    UNITED STATES DISTRICT COURT

5                      DISTRICT OF MASSACHUSETTS

6      CYCLE-CRAFT CO., INC.              ) CIVIL ACTION

7      D/B/A BOSTON HARLEY-DAVIDSON/BUELL, ) NO. 11402NMG

8           PLAINTIFF,                    )

9      v.                                 )

10     HARLEY-DAVIDSON MOTOR COMPANY, INC.,)

11     AND BUELL DISTRIBUTION COMPANY, LLC,)

12          DEFENDANTS.                    )

13     _____ )

14              DEPOSITION OF SEAN WALSH

15          DATE:    APRIL 27, 2005

16          TIME:    10:11 A.M.

17          PLACE:   BINGHAM MCCUTCHEN

18                   150 FEDERAL STREET

19                   BOSTON, MA   02110

20               **MEDEIROS STENO & VIDEO GROUP**

21

22

23          "FOR THE TRAVELING LITIGATOR SINCE 1988"
            *Boston:    617.590.9767      *Depositions
            *New York:  646.413.4499      *Arbitrations
24          *Florida    305.321.7414      *E-transcript
            *E-mail:    depo@gomedeiros.com  *V ideo
                    *MA *CT *NJ *NY *FL

36

1    there's a section about non-retail sales.

2        Q:  **What was your understanding in 2003 as to**

3    **Harley-Davidson's policy with respect to non-retail**

4    **sales?**

5        A:  My understanding was that motorcycles could

6    not be sold to businesses, to resalers.  They had to

7    be sold to personal individuals.

8        Q:  **By "personal individuals" what do you mean?**

9        A:  Just people, regular customers, not in

10   business names and not company names.

11       Q:  **You say you first became aware of this**

12   **policy when?**

13       A:  When I first started selling motorcycles in

14   2002 it had come up just in discussion about selling

15   motorcycles.  A customer wanted to buy a bike and put

16   it in  his company name and I was told that he had to

17   put it in his personal name by the finance manager at

18   the time and by the sales manager.

19       Q:  **Who was the finance manager at that time?**

20       A:  Rhonda Young.

21       Q:  **And the sales manager was Mr. Capucci?**

22       A:  Yes.

23       Q:  **At some point did you become involved with**

24   **the sale of motorcycles to a Florida company called**

4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.    4/27/05

55

1    A:  It was somebody at DC Imports.  They told

2    me that the name DC Imports was on the credit card in

3    addition to their personal name.  I'm not, I don't

4    remember whose specific name it was.  Obviously this

5    was declined.

6        **Q:  Do you recall at some point, though, a**

7    **$10,000 deposit was accepted via a charge card?**

8    A:  Yes.  The second credit card that they gave

9    us went through.

10       **Q:  Do you recall whose name was on that second**

11   **credit card?**

12   A:  I don't.  It was a woman who worked at DC

13   Imports.  I'm not sure of the name.

14       **Q:  During the process of your dealings with**

15   **Mr. Stevens and Ms. Lunsford at DC Imports, did you**

16   **have any discussion with Mr. Buchbaum as to how the**

17   **paperwork on this deal should be handled?**

18   A:  Yes.

19       **Q:  Can you describe that discussion for us?**

20   A:  Yes.  Ron was very specific that the bills

21   of sale all had to be written up in individual names.

22   He wouldn't sell anything to DC Imports as a name

23   and he asked me to convey that to Mike Stevens and

24   let them know.

Case 1:04-cv-11402-NMG    Document 59-5    Filed 09/16/2005    Page 31 of 44
4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.                      4/27/05

101

1  would put Mike Stevens on hold, go up to Ron's office

2  and Ron would pick up the phone and talk to Mike

3  because I wasn't able to negotiate price which is

4  why.

5      Q:  Is it your understanding that the

6  conversations as far as you arranged for them or

7  participated in them, the conversations between

8  Buchbaum and Stevens had to do with the price?

9      A:  Yes.  They talked about the price of the

10  motorcycles.

11      Q:  I think you testified that you never had

12  any conversations with Mike Stevens or anyone at DCI

13  about DCI's business and what they did?

14      A:  No, I never talked to them directly about

15  what their company did.  I mean I just assumed from

16  the name DC Imports, I would assume that they

17  imported goods.  I didn't know what they did.

18      Q:  Did you even know if they were in the

19  motorcycle business?

20      A:  No, we never talked about it.  I did talk

21  with Mike about his past.  I know he had a history

22  with motorcycles because he's from the Boston area.

23  So I just talked to him about that but that was it.

24      Q:  Nothing about DCI and what it did?

4/27/05 DEPOSITION OF SEAN WALSHRE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.    4/27/05

102

1      A:  No.

2      Q:  So did you have any conversations with

3   anyone at DCI about who the individual purchasers of

4   the motorcycles were?

5              MR. BERKOWITZ:  Objection.

6      A:  No, I didn't talk to them about the people.

7   I just had the names.  I didn't talk to them about

8   who they were.

9      Q:  Did you have any conversations with anyone

10  at DCI about what the individual purchasers were

11  going to do with the motorcycles once they received

12  them?

13             MR. BERKOWITZ:  Objection.

14     A:  No.

15     Q:  Do you remember around the time when you

16  were talking to Mike Stevens that Mr. Buchbaum told

17  you in manager's meetings that any sales had to be to

18  individuals?

19             MR. BERKOWITZ:  Objection.

20     A:  Not in the manager's meetings.  He would

21  tell me individually.  He would call me up to his

22  office and he did say that all the bikes have to be

23  in individual's names.

24     Q:  You don't recall him telling in the

128

1    Maciano.   Number 9 Dennis Seca.   Number 10 Robin

2    Maciano.   Number 12 John Seca.   Number 13 Howie Cook.

3     Number 14 Sal Giordano.   Number 15 Rod Gernese.

4    Number 18 Lisa Bloom.   I'm not familiar with name

5    "Elaine Bloom" but I would assume that's one of the

6    Bloom family.   Number 19 Jamie McGrath.   Obviously

7    number 20, myself.   That's it.   The three that are

8    listed to Boston Harley-Davidson were motorcycles

9    that the owner of Boston Harley-Davidson was taking

10   as his own.   So I was told to SWR them in Boston

11   Harley-Davidson's name and the company would be

12   paying for the bikes and the company would be keeping

13   the bikes in Boston Harley-Davidson's name so that

14   the owner could use them.

15        Q:  **Who told you that?**

16        A:  Ron Buchbaum told me to do that.

17        Q:  **What did you do, if anything?**

18        A:  I instructed Rochelle Poletti who is the

19   payroll administrator who does all the books upstairs

20   also to pay for the motorcycles.   And then I SWR'd

21   them in Boston Harley-Davidson's name.

22        Q:  **Was it at the same meeting that you**

23   **testified about earlier that Mr. Buchbaum said that**

24   **those motorcycles would be bought by the dealership**

135

1        A:  No.  No, she didn't mention that to me.

2        Q:  **Was there any discussion about that**

3    **subject?**

4        A:  No.  No.

5             MR. REHNQUIST:  Nothing further.  Hang on

6    one second, I'm told that I should ask more

7    questions.  One question on a different subject.

8        Q:  **Mr. Walsh, I think you said you purchased a**

9    **bike from Boston Harley-Davidson --**

10       A:  I did.

11       Q:  **-- in I think March or so of '03?**

12       A:  February or March.  I believe I started the

13   procedure in February.

14       Q:  **On any other occasion have you purchased a**

15   **motorcycle from Boston Harley-Davidson?**

16       A:  Yes.  I believe this is my third.

17       Q:  **Did John Atwood have a policy that you were**

18   **aware of of permitting employees who had been working**

19   **there for sometime to buy a motorcycle from the**

20   **company at a low price?**

21       A:  Yes.  When I originally started there I was

22   told it was a year and then you would get a deal on a

23   bike.

24       Q:  **And you took advantage of that I think**

136

1    **three times?**

2         A:   Yeah, that was my third motorcycle I

3    bought.

4         **Q:   Do you recall the prices, maybe not the**

5    **actual number but the relationship between the price**

6    **that the employee could buy the motorcycle and the**

7    **MSRP?**

8         A:   The general deal was $500.00 over cost for

9    an employee but John Atwood would administer the

10   final price, but as a rule it was $500.00 over cost.

11        **Q:   Do you know if other employees took**

12   **advantage of that opportunity as well?**

13        A:   Yes.   Several employees.

14        **Q:   Was this complaints considered by the**

15   **employees almost sort of like a fringe benefit of**

16   **working there?**

17        A:   Yeah, I would say so.   It was definitely a

18   benefit.

19        **Q:   Have you ever bought a motorcycle in the**

20   **open market for anywhere close to $500.00 over MRSP?**

21             MR. BERKOWITZ:   Objection.

22        A:   I never bought a new motorcycle until I

23   worked at Boston Harley-Davidson.   I had bought two

24   pre-owned Harleys before then from individuals, not

# EXHIBIT 10

Case 1:04-cv-11402-NMG    Document 59-5    Filed 09/16/2005    Page 37 of 44

4/28/05 DEPOSITION OF JASON MARASCA    RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

1

1                                              VOLUME 1

2                                              PAGE:  1-82

3                                              EXHIBITS: 1-9

4              UNITED STATES DISTRICT COURT

5                DISTRICT OF MASSACHUSETTS

6    CYCLE-CRAFT CO., INC.              ) CIVIL ACTION

7    D/B/A BOSTON HARLEY-DAVIDSON/BUELL, ) NO. 11402NMG

8         PLAINTIFF,                    )

9    v.                                 )

10   HARLEY-DAVIDSON MOTOR COMPANY, INC.,)

11   AND BUELL DISTRIBUTION COMPANY, LLC,)

12        DEFENDANTS.                    )

13   _____)

14        DEPOSITION OF JASON MARASCA

15        DATE:   APRIL 28, 2005

16        TIME:   10:06 A.M.

17        PLACE:  BINGHAM MCCUTCHEN

18              150 FEDERAL STREET

19              BOSTON, MA   02110

**MEDEIROS STENO & VIDEO GROUP**

20

21

22
        **"FOR THE TRAVELING LITIGATOR SINCE 1988"**
23      **\*Boston:**     617.590.9767        **\*Depositions**
        **\*New York:**   646.413.4499        **\*Arbitrations**
        **\*Florida**     305.321.7414        **\*E-transcript**
24      **\*E-mail:**     depo@gomedeiros.com **\*V ideo**
              **\*MA \*CT \*NJ \*NY \*FL**

Case 1:04-cv-11402-NMG   Document 59-5   Filed 09/16/2005   Page 38 of 44

4/28/05 DEPOSITION OF JASON MARASCA      RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

42

1   of Harley-Davidson's sometimes referred to as a

2   non-retail sales policy?

3          A:   No.

4          Q:   When did you first become aware of that

5   policy?

6          A:   A couple months ago.

7          Q:   How did you become aware of it?

8          A:   At my new employer.

9          Q:   At Kelly's?

10         A:   Correct.

11         Q:   When you were at Cycle-Craft were you aware

12  of such a policy?

13         A:   No, I wasn't.

14         Q:   Can you describe for me what your

15  understanding of the policy is?

16         A:   Now?

17              MR. BERKOWITZ:   Yes.

18              THE WITNESS:   You cannot wholesale bikes

19  to another dealer for them to sell the bike.  I

20  believe that's the way it works.

21         Q:   What do you mean when you say "wholesale"?

22         A:   Discount.

23         Q:   Do you know whether the policy prohibits

24  sales to other people who are going to resell the

Case 1:04-cv-11402-NMG    Document 59-5    Filed 09/16/2005    Page 39 of 44

4/28/05 DEPOSITION OF JASON MARASCA    RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

55

1        A:   I believe they had said Lee Custom Cycles.

2        Q:   **Are you positive?**

3        A:   I'm pretty sure, yes.

4        Q:   **Isn't it true that when you walked in there**

5   **and told Mr. Buchbaum about this transaction that he**

6   **told you that those motorcycles have to be sold to**

7   **individuals?**

8             MR. BERKOWITZ:  Objection.  Leading.

9        A:   He said that they had to be under different

10  names, individual different names, yes.

11       Q:   **I gather you thought at the time that he**

12  **was doing this more or less just to bust your chops**

13  **to use a colloquial term?**

14       A:   Pretty much, yeah.

15       Q:   **Do you now know that in fact he was doing**

16  **that because Harley-Davidson does not permit**

17  **motorcycles to be sold to businesses?**

18             MR. BERKOWITZ:  Objection.  Leading.

19       A:   Yeah, I know that now.

20       Q:   **Did you have any discussion with, well I**

21  **gather you and Sean Walsh are friendly?**

22       A:   Yes.

23       Q:   **Did you have any discussion with Sean Walsh**

24  **around that time when Mr. Buchbaum gave you this**

Case 1:04-cv-11402-NMG   Document 59-5   Filed 09/16/2005   Page 40 of 44

4/28/05 DEPOSITION OF JASON MARASCA       RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

56

1    direction about why he was causing you to do it the

2    hard way?

3           A:   I honestly can't recall.

4           Q:   Do you recall if he told you that you had

5    to do the deposits on separate credit cards?

6           A:   Who, Ron Buchbaum?

7               MR. REHNQUIST:   Yes.

8               THE WITNESS:   Yes.

9           Q:   Do you recall that he told you that those

10   motorcycles had to be picked up at the dealership by

11   the individuals whose names were on them?

12          A:   No, he told me that each individual had to

13   come in and sign the paperwork.  Nothing about

14   picking up the bike.

15          Q:   But he did say that each individual had to

16   come to the dealership?

17          A:   Yes.

18          Q:   Have you had any dealings with Mr.

19   Christensen since you've been working at Kelly's

20   Harley-Davidson?

21          A:   No, I have not.

22          Q:   Have you had any conversations with anyone

23   at Kelly's about Christensen or about Lee Custom

24   Cycle?

Case 1:04-cv-11402-NMG Document 59-5 Filed 09/16/2005 Page 41 of 44

4/28/05 DEPOSITION OF JASON MARASCA RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

57

1      A:  No.

2      Q:  **How is it in the last few months that you**

3  **came to learn of this policy that Harley-Davidson has**

4  **against not selling motorcycles to businesses?**

5           MR. BERKOWITZ:  Objection.  Go ahead.

6      A:  I read the contract and talked to my GM

7  about it.  I believe actually I learned about this

8  when I got the subpoena I talked to my GM about it

9  and he told me, "Yeah, that's the way it is."  And he

10  showed me a copy of the contract.

11      Q:  **When you say "the contract", that he showed**

12  **you a copy of the contract can you describe the**

13  **document that he showed you?**

14      A:  He showed me a page in a book that

15  described not selling bikes to wholesalers or

16  something like that.  He went over that really quick

17  and I said okay.

18      Q:  **Do you recall if it was a small paragraph**

19  **in a large contract?**

20      A:  I believe it was, yeah, it was about a page

21  I thought.

22      Q:  **Had you ever seen that before?**

23      A:  No, I hadn't.

24      Q:  **I gather that now you report to the General**

4/28/05 DEPOSITION OF JASON MARASCA    RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

62

1    Harley-Davidson ride motorcycles?

2        A:   A good percentage of them.

3        Q:   In fact, a lot of them bought motorcycles

4    from Boston Harley-Davidson, didn't they?

5             MR. BERKOWITZ:   Objection.  Leading.  You

6    can answer.

7        A:   Yeah, sure.

8        Q:   Do you recall that John Atwood would

9    sometimes allow employees who had been with Boston

10   Harley-Davidson for a certain period of time to buy a

11   motorcycle at a good price?

12       A:   Yes.

13       Q:   Did you take advantage of that opportunity

14   yourself?

15       A:   Yes, I did.

16       Q:   What were the terms of your purchase?  Let

17   me ask you this, how many bikes did you buy from the

18   dealership?

19       A:   I purchased two new motorcycles from the

20   dealership.

21       Q:   At what price?

22       A:   I don't remember the exact prices.

23       Q:   Do you recall that it was a good price?

24       A:   Yeah, I got a pretty good deal.

63

1        Q:  Do you recall that this was perceived by

2    some of the employees as almost being like a fringe

3    benefit of working there?

4              MR. BERKOWITZ:  Objection.

5        A:  Yeah, I guess.

6        Q:  I believe you testified earlier that you

7    did not have any discussion with Mr. Christensen

8    about what was going to happen to the motorcycles

9    after they left the Boston Harley-Davidson

10   dealership?

11       A:  Correct.

12       Q:  I believe you said that you simply assumed

13   because he was in the motorcycle business that he was

14   planning to get the motorcycles and resell them?

15       A:  Correct.

16       Q:  But you never had any conversation with him

17   about that?

18       A:  Not that I can recall.

19       Q:  And you don't know from any conversations

20   with him what, if anything, the individuals whose

21   names were on the files at Boston Harley-Davidson

22   were going to do with those motorcycles, do you?

23             MR. BERKOWITZ:  Objection.

24       A:  Do I know for sure?

Case 1:04-cv-11402-NMG    Document 59-5    Filed 09/16/2005    Page 44 of 44

4/28/05 DEPOSITION OF JASON MARASCA    RE: CYCLE-CRAFT CO., INC. V. HARLEY-DAVIDSON COMPANY, ET AL.

64

1    Q:  Do you know based on any conversations you
2  had with Mr. Christensen about what the individuals
3  who came down and filled out the paperwork were going
4  to do with those motorcycles?
5    A:  No.
6    MR. BERKOWITZ:  Objection.
7    Q:  You don't know whether they rode
8  motorcycles or whether they didn't?
9    MR. BERKOWITZ:  Objection.
10    A:  I do not know that.
11    Q:  You don't know whether Mr. Christensen was
12  acting as a broker for these sales and perhaps they
13  were paying him the commission and were going to keep
14  the motorcycles themselves, do you?
15    MR. BERKOWITZ:  Objection.
16    A:  I do not believe so.
17    Q:  Do you know?  Did you have any conversation
18  with Mr. Christensen about what was going to happen
19  to the motorcycles after they left the dealership in
20  Boston Harley-Davidson?
21    A:  Not that I can recall.
22    Q:  You testified that you believed the
23  motorcycles were paid for by check?
24    A:  Yes.