# EXHIBIT 11

1        UNITED STATES DISTRICT COURT

2         DISTRICT OF MASSACHUSETTS

3     ****************************
                                *
4     CYCLE-CRAFT CO., INC., d/b/a*
      BOSTON HARLEY-DAVIDSON/BUELL*
5              Plaintiff,      *
                                *
6          v.                 *CIVIL ACTION
                               *NO. 04-11402-NMG
7     HARLEY-DAVIDSON MOTOR CO.,  *
      INC., AND BUELL DISTRIBUTION*
8     CO., LLC                 *
               Defendant.       *
9                               *
      ****************************

10

11            DEPOSITION OF AL CONTOIS

12     Deposition taken by agreement of counsel

13     in the Daniel Webster Conference Room at

14     the Sheraton Harborside Portsmouth Hotel,

15     250 Market St., Portsmouth, New Hampshire,

16     on Friday, June 17, 2005, commencing at

17     9:00 a.m.

18     Court Reporter:    Sonia E. Bishop, CCR

19     _____

20         DAVID R. JORDAN & ASSOCIATES

21         Certified Court Reporters

22     P.O. Box 303           (603) 778-7710

23     Exeter, NH  03833       NH 1-800-562-3945

1    unclear, please let me know, and I will try to

2    rephrase the question so that it's

3    understandable.

4        Do you understand that?

5  A.   Yes.

6  Q.   If you need to take a break at any time, we can

7    do that.  I would like you just to finish any

8    question that's pending before we take a break.

9        Do you understand that?

10 A.   Yes.

11 Q.   Okay.  Now, you're represented here today by

12    counsel, correct?

13 A.   Correct.

14 Q.   And who is the attorney representing you today?

15 A.   Bill Benson.

16 Q.   And you understand that he also represents

17    Harley-Davidson Motor Company?

18 A.   Yes.

19 Q.   That's your former employer?

20 A.   Correct.

21 Q.   And your current employer is?

22 A.   Seacoast Harley-Davidson.

23 Q.   And what's Seacoast Harley-Davidson's address?

DAVID R. JORDAN & ASSOCIATES

```
1    A.    17 Lafayette Road, North Hampton,

2          New Hampshire.

3    Q.    Is North Hampton in the Portsmouth area?

4    A.    Yes.

5    Q.    And what is your residential address?

6    A.    9 Chestnut Way, Stratham, New Hampshire.

7    Q.    And is Stratham south of Portsmouth?

8    A.    Yes.

9    Q.    How long have you worked at Seacoast

10         Harley-Davidson?

11   A.    Since August of last year.

12   Q.    August of '04?

13   A.    Yes.

14   Q.    And prior to that, what did you do?

15   A.    I was a district manager for Harley-Davidson

16         Motor Company.

17   Q.    For how long were you district manager for

18         Harley-Davidson?

19   A.    Approximately eight, nine years.

20   Q.    Did you work in the same district the entire

21         eight or nine years?

22   A.    No.

23   Q.    What districts did you work in during your
```

DAVID R. JORDAN & ASSOCIATES

1               eight or nine years as district manager?

2    A.     Originally I was in eastern Pennsylvania, New

3               York, New Jersey and Connecticut.

4    Q.     For approximately how long?

5    A.     About seven years.

6    Q.     And after that?

7    A.     I went to Harley corporate, Juneau Avenue,

8               worked in the offices.

9    Q.     What did you do at Harley corporate?

10   A.     I was manager of performance consulting.

11   Q.     How long did you do that?

12   A.     For two and a half years, three years.

13   Q.     And what did you do after that?

14   A.     Then I came back to a district manager role.

15   Q.     And that would be for the district that

16             includes Boston?

17   A.     Correct.

18   Q.     And how long were you the district manager for

19             the area that includes Boston?

20   A.     A year and a half, approximately.

21   Q.     What did you do before you were a

22             Harley-Davidson district manager for work?

23   A.     I was working for Hershey Foods.

1          expressed in the dealer contract is the same as

2          the policy that is handed out every year in a

3          manual, as you testified?

4                    MR. BENSON:  Objection.

5                    MR. REHNQUIST:  Basis?

6                    MR. BENSON:  Foundation.

7          BY MR. REHNQUIST:

8     Q.   You can answer the question.

9     A.   Yes.

10    Q.   So in other words, your understanding is that

11         the -- the policy as it exists in the dealer

12         contract is the same as the policy that is

13         distributed every year?

14    A.   That's what I believe.

15    Q.   Are you aware of -- well, withdraw.

16              During the period that you were a district

17         manager in the eastern Pennsylvania district --

18         just to make it simpler, what's the name of

19         that district, the eastern Pennsylvania, New

20         York?  Is there a number for that or something?

21    A.   District 4.

22    Q.   And then the New England district is District

23         1?

1    A.    District 1.

2    Q.    While you were district manager in District 4,

3          do you recall that the nonretail sales policy

4          changed at any time during the period when you

5          were district manager in District 4?

6    A.    No.

7    Q.    Do you recall whether the policy ever changed

8          during the one and a half years you were

9          district manager in District 1?

10   A.    No.

11   Q.    Did you ever receive any training from

12         Harley-Davidson regarding the non-retail sales

13         policy?

14   A.    No.

15   Q.    Do you recall that it was explained to you or

16         you saw it when you first joined the company,

17         and that was it?

18   A.    Yes.

19   Q.    What is your understanding as you sit here

20         today of the non-retail sales policy?

21   A.    That you have to sell a motorcycle to the end

22         user.

23   Q.    Are there any other requirements as you sit

DAVID R. JORDAN & ASSOCIATES

1      here today that you -- withdrawn.

2          Are there any other requirements of the

3      non-retail sales policy, to your knowledge?

4          MR. BENSON:  Objection to form, foundation.

5          THE WITNESS:  I'm not sure I understand.

6      BY MR. REHNQUIST:

7   Q.  Are you aware of any other requirements of the

8      non-retail sales policy except the one

9      requirement that you've just said that a

10     motorcycle can only be sold to an end user?

11         MR. BENSON:  Objection to form.

12         THE WITNESS:  No.

13     BY MR. REHNQUIST:

14  Q.  Mr. Contois, have you done anything to prepare

15     for your deposition today?

16  A.  No.

17  Q.  Did you meet with Mr. Benson or any of his

18     colleagues from his law firm at any point prior

19     to today?

20  A.  Yes.

21  Q.  When did you first meet with Mr. Benson or any

22     of his colleagues?

23  A.  Yesterday.

1          MR. REHNQUIST:  Just so it's clear.  And

2     I'll give you a chance to instruct, but I want

3     to pose a question just so it's clear.

4          Do you recall any discussion at this

5     meeting, Mr. Contois, about any possible

6     sanction that would be imposed upon Boston

7     Harley-Davidson as a result of what Mr. Verduyn

8     had determined?

9          MR. BENSON:  I'm going to instruct the

10    witness not to answer.

11         MR. REHNQUIST:  That's based on

12    attorney-client privilege?

13         MR. BENSON:  Attorney-client privilege.

14    BY MR. REHNQUIST:

15    Q.   Exhibit 24, Mr. Contois, is a letter dated

16    April 20th, 2004, from Jon Flickinger to John

17    Atwood.

18         And Exhibit 25 is a similar letter on the

19    same date from Mr. Flickinger to Mr. Atwood.

20         I'm just going to ask you if you've seen

21    either of these two letters before, the two

22    letters marked as Exhibits 24 and 25?

23    A.   I don't recall.

# EXHIBIT 12

Deposition of Steven R. Verduyn, 4/6/2005

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    ------------------------------------------------------------

     CYCLE-CRAFT CO., INC., d/b/a
4    BOSTON HARLEY-DAVIDSON/BUELL,

5              Plaintiff,

6         vs.            Civil Action No. 04 11402 NMG

7    HARLEY-DAVIDSON MOTOR COMPANY, INC.
     and BUELL DISTRIBUTION COMPANY, LLC,

8

9              Defendants.

10   ------------------------------------------------------------

11

12        Video Deposition of STEVEN R. VERDUYN

13        Wednesday, April 6th, 2005

14

15              10:09 a.m.

16                at

17        GRAMANN REPORTING, LTD.
         710 North Plankinton Avenue, Suite 710
18              Milwaukee, Wisconsin

19

20   Reported by Sarah A. Reinicke, RPR/RMR/CRR

21

22

23

24

25

Deposition of Steven R. Verduyn, 4/6/2005

1      the record?

2                  MR. REHNQUIST:  We may.

3                  (Pause in proceedings.)

4                  THE VIDEOGRAPHER:  We're back on the record

5      at 11:33 a.m.

6  BY MR. REHNQUIST:

7  Q    Mr. Verduyn, how long have you been working at

8      Harley-Davidson?

9  A    Just over 12 years.

10 Q    And what is your current position?

11 A    My job title is manager of credit programs.

12 Q    And do you also have responsibilities for -- in sort

13     of -- for lack of a better term, enforcement of the

14     nonretail sales policy?  And by that I mean sort of

15     the inquiries and reviews into potential nonretail

16     sales policy violations that we've been talking

17     about.

18 A    Yes, I do.

19 Q    And if I use the term sort of "enforcement

20     procedures" or "enforcement policies," will you

21     understand what I'm talking about?

22 A    Can you give me your -- again, your kind of

23     definition of that?

24 Q    What would you call it?  What would you call the --

25     your responsibilities for conducting --

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | A | Investigation. |
| 2 | Q | Investigation? |
| 3 | A | Um-hmm. |
| 4 | Q | Investigation into nonretail sales policy violations. |
| 5 | | Okay, when did you first assume the responsibilities |
| 6 | | that you have today for investigating potential |
| 7 | | nonretail sales policy violations? |
| 8 | A | There was no formal date, per se.  I became involved |
| 9 | | with it approximately five, six years ago. |
| 10 | Q | And how does it relate to your other responsibilities |
| 11 | | as the manager of credit programs? |
| 12 | | MR. BERKOWITZ:  Objection.  If you could be |
| 13 | | more specific, I can withdraw the objection. |
| 14 | | THE WITNESS:  Yeah, I don't so much |
| 15 | | understand the question. |
| 16 | BY MR. REHNQUIST: | |
| 17 | Q | Well, how did you come to take on responsibilities |
| 18 | | for investigation of potential nonretail sales policy |
| 19 | | violations? |
| 20 | A | As best I can recall, I was asked to review paperwork |
| 21 | | that had been sent in by a dealer on a different |
| 22 | | inquiry. |
| 23 | Q | Who asked you to do that? |
| 24 | A | As best I can recall, it would have been the director |
| 25 | | of that area, DFO. |

Deposition of Steven R. Verduyn, 4/6/2005

1  Q    And do you have an understanding as to why this

2       person asked you?

3  A    I can surmise.

4  Q    Please.

5  A    My primary function at Harley-Davidson had been and

6       to a degree still continues to be with handling

7       matters of wholesale financing of our product, of

8       collection-related activities, and work out

9       negotiations with dealers that find themselves in a

10      financial bind.  It's paramount, critical that I have

11      a certain level of detail in what I do in examining

12      things and that I'm consistent in what I do and that

13      I understand the responsibilities and the rules and

14      programs around that.

15  Q   So your belief is that the sort of -- the

16      characteristics and traits that you bring to bear in

17      dealing with work-outs and financial issues with

18      dealerships also lend themselves to having ability to

19      do the kinds of investigations necessary when there's

20      a suspect nonretail sale?

21  A   In part.  I have a reputation for impeccable

22      integrity and fairness in any capacity of work I've

23      been involved with.  And I believe in my mind that

24      that certainly played a part in why I was asked to

25      begin examining these things and become involved in

Deposition of Steven R. Verduyn, 4/6/2005

1    this process.

2  Q    After that sort of one off situation when you were

3    asked to follow up with a -- with a particular

4    dealer, was your role in these investigations ever

5    sort of more formalized?

6  A    Just through the process of day-to-day business, I, I

7    guess, grew to be one of the primary people that was

8    involved with it.  Through -- just through time and

9    through my experience in -- you know, that I learned

10    and gained by working with these matters over time

11    and having some experience in dealing with dealers

12    and with, you know, what can be difficult situations.

13  Q    And are you sometimes called the gray market expert?

14        MR. BERKOWITZ:  Objection.  You may answer.

15        THE WITNESS:  I don't know that I've ever

16    heard myself called that, but -- that specifically,

17    but I think that's fairly accurate.

18  BY MR. REHNQUIST:

19  Q    Have Harley-Davidson's investigative procedures or

20    policies changed at all over time, to your knowledge?

21  A    The nonretail policy has changed slightly over time

22    to address different market conditions and different

23    business opportunities as we've -- we've grown.

24  Q    Have any of those changes in the policy itself caused

25    any change in the -- the methods or procedures that

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what are those? |
| 3 | A | That a "Dear Dealer" letter is generally sent for |
| 4 | | low -- relatively low numbers of sales or recommended |
| 5 | | to be sent for low numbers of sales.  High numbers of |
| 6 | | suspicious sales, there will be a general |
| 7 | | recommendation for an audit.  And we've been fairly |
| 8 | | consistent in how we administer that since I've been |
| 9 | | involved with it. |
| 10 | Q | Is the thing that triggers an audit the number of |
| 11 | | suspected violations? |
| 12 | A | That's one factor. |
| 13 | Q | What other factors might lead to an audit? |
| 14 | A | A concern that providing -- if we send a "Dear |
| 15 | | Dealer" letter, we're asking for specific vehicle |
| 16 | | identification number, sales, file information.  In |
| 17 | | an audit that information is not provided to the |
| 18 | | dealer up front.  And we do that generally for -- for |
| 19 | | reasons that ensure the files remain complete, that |
| 20 | | all the information's there, it's not misplaced or |
| 21 | | otherwise adjusted, removed or anything else. |
| 22 | Q | So do I understand you to be saying that if you think |
| 23 | | the dealer might tamper with the evidence, you might |
| 24 | | do an audit regardless of the number of suspected |
| 25 | | sales? |

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        At the top of my head.

 2   Q    Can you describe what information you typically look

 3        to in doing an investigation for a suspected

 4        violation of the nonretail sales policy?

 5   A    Is this for audit purposes or for --

 6   Q    No, no.  Before you've come to the decision to do an

 7        audit.

 8   A    I see.

 9   Q    Let's focus on the -- the investigation that would

10        precede an audit, if any.

11   A    I understand.  There would be a -- initially a cause

12        for me to examine an individual dealer's sales files

13        more closely.  I don't randomly examine any given

14        dealer.  There's not a schedule by which we look at

15        all dealers.  We typically act on some kind of a

16        complaint.  So I've got a foundation to -- to open an

17        investigation.

18   Q    It's not like major league baseball?

19   A    Pardon me?

20   Q    It's not like major league baseball?

21            MR. BERKOWITZ:  Like major league baseball

22        used to be.

23            THE WITNESS:  Right.  Way back when.

24   BY MR. REHNQUIST:

25   Q    So your investigation would be triggered by some
```

Deposition of Steven R. Verduyn, 4/6/2005

1       reason?

2   A   That's accurate.  Correct.  Yeah.

3   Q   And when you say that you -- and I think you

4       mentioned that you would examine sales files -- well,

5       let's back up.  I think you said first that there

6       would be some cause or some reason to begin your

7       investigation.

8   A   That's correct.

9   Q   Okay.  Now, once the investigation is underway, what

10      sources of information would you typically look to?

11  A   It would depend on the nature of the complaint.

12  Q   Okay.  Well, let's -- give me examples of the types

13      of reasons that would cause you to begin an

14      investigation.

15  A   We receive a -- or a field -- most often our field

16      salespeople receive a complaint from another

17      dealership about an unauthorized motorcycle dealer

18      having new vehicles for sale in their market area.

19  Q   And as part of that complaint, would there sometimes

20      be an effort from the other dealer to track down the

21      VIN that might be on display at the unauthorized

22      dealer?

23  A   That's possible.

24  Q   Okay.  What other reasons would cause you to begin an

25      investigation?  And did you say that's the most

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        typical one?
 2                    MR. BERKOWITZ:  Object.
 3                    THE WITNESS:  One of the most.
 4   BY MR. REHNQUIST:
 5   Q    Okay.
 6   A    I routinely review motorcycles for sale on EBay.
 7   Q    How long have you been doing that?
 8   A    Approximately three years.  Two to three years.
 9   Q    Would -- the motorcycles for sale on EBay, would they
10        have a VIN, or do they sometimes have a VIN?
11   A    In some cases.
12   Q    And if you can get the VIN from EBay, you can look in
13        your own records and determine where that was sold or
14        who was the record purchaser of that?
15   A    That's correct.
16   Q    Okay.  What other reasons or causes would lead you to
17        begin an investigation?
18   A    Multiple sales by a dealer to the same individual in
19        a short period of time.
20   Q    And how would you determine that?  In other words,
21        how would multiple sales to an individual be brought
22        to your attention, or how would you learn of it?
23   A    That would be generally a part of my investigation.
24        I would be provided with a name or a VIN number,
25        enter that into our sales warranty registration
```

Deposition of Steven R. Verduyn, 4/6/2005

1    system, and that would give me a purchaser name.  I

2    can then search the system by purchaser name for

3    multiple sales.

4    Q    Okay.  But I mean, at this time you're talking about

5         what you would do in the course of an investigation.

6         I wanted to try to figure out what are the reasons

7         that would lead you to actually begin an

8         investigation?

9    A    Well, that is a reason.

10              MR. BERKOWITZ:  He said a name could be

11        provided to him that would cause him to start an

12        investigation.  I think that was what the response

13        was.

14   BY MR. REHNQUIST:

15   Q    Okay.  A name could be provided to you by whom?

16   A    It could be a dealership, field salesperson, a

17        dealer.

18   Q    Why would a field salesperson or a dealer give you a

19        name to review?

20   A    Because they are conducting business out in that area

21        and would be familiar with those people that are

22        involved in gray market or nonretail-type activities.

23   Q    So this could be a name of a business or an

24        individual?

25   A    It could be either.

Deposition of Steven R. Verduyn, 4/6/2005

1    Q    Okay.  What else?  What other -- what other event

2         would cause you to begin an investigation?

3    A    A substantial number of sales at the end of our model

4         year, typically within the last week or the last

5         couple days of our model year.

6    Q    Why would that be a cause for you to begin an

7         investigation?

8    A    A dealer has an incentive to have all their

9         motorcycles retail sold by July 31st in order to earn

10        allocation credit for the following year.

11   Q    Okay.  So why would -- I understand that.  Why would

12        a substantial number of sales at the end of a model

13        year cause you to begin an investigation?

14   A    It is an inconsistent sales -- sales trend to see a

15        dealer sell a substantial portion or percentage of

16        their allocation that was shipped to them throughout

17        an entire model year, to see that reported as retail

18        sold in a time frame of a week or less.

19   Q    Why?  I mean, I would imagine -- correct me if I'm

20        wrong, but isn't it the case that because the dealers

21        have this incentive to sell their allocation by the

22        end of the model year, that they would reduce prices?

23   A    That's possible.

24   Q    Isn't that probable?

25             MR. BERKOWITZ:  Objection, calls for

Deposition of Steven R. Verduyn, 4/6/2005

```
 1              speculation.  But you may answer.
 2                      THE WITNESS:  I believe some dealers do
 3              that.
 4    BY MR. REHNQUIST:
 5    Q      I mean, if you were going to buy a Harley-Davidson
 6           motorcycle, wouldn't you try to do it in late July?
 7    A      Not necessarily.
 8    Q      Isn't that when prices are apt to be the lowest?
 9    A      Probably.  Most likely.
10    Q      So why would a large volume of sales at the end of a
11           model year cause you to do an investigation?  In
12           other words, I guess what I'm saying is, why is a
13           large volume of sales at the end of the model year
14           something that would raise a red flag?
15    A      Because we've shipped that allocation to the
16           dealership over the previous about 11 to 12 months,
17           and they've had that opportunity to sell through in
18           that time frame.  The peak Harley sales season is
19           early spring in most parts of the country.  We would
20           expect that dealers, especially ones that have been
21           in business for a while and have some experience with
22           it, would have started seeing and forecasting the
23           fact that they're coming up on a model year to have
24           started -- in your example, if they're going to
25           adjust prices, to start doing that earlier in the
```

Deposition of Steven R. Verduyn, 4/6/2005

```
1         year so that they're not facing a situation of a very
2         high level of inventory when it gets down to when
3         they have to have that sold for allocation purposes.
4    Q    Well, in a perfect world, of course, the dealer
5         wouldn't be faced with a situation towards the end of
6         a model year where they have a lot of inventory they
7         have to move.  But isn't it the case that dealers
8         often sell a substantial amount of their inventory
9         towards the end of the model year?
10   A    The bulk of dealer sales that I see occur the last
11        typically four to five months of the model year, not
12        the front six or seven.  That's primarily due to the
13        fact that motorcycles are a very seasonal product and
14        half the country is covered in snow and you can't
15        ride a motorcycle.  There's a shorter window, so we
16        see very large spikes of sales in the spring.
17   Q    How many times have you commenced an investigation
18        based on evidence of a large volume of sales towards
19        the end of the model year?
20   A    I don't have an exact number, but that is a trend
21        that I do see with some regularity in the ones that I
22        have investigated in the past.  It's a telltale
23        potential sign.  And that in and of itself, the fact
24        that there are a large number of sales in July,
25        doesn't automatically mean that there's a problem.
```

Deposition of Steven R. Verduyn, 4/6/2005

1          But when we've got other issues or information that's

2          come to our attention on a particular dealership,

3          it's another reason to believe that an audit's

4          probably the way to proceed.

5     Q    And by audit, do you mean an investigation?  Or, I

6          mean, are you using the term "audit" to include an

7          investigation as opposed to the formal on-site audit

8          at the dealership?

9     A    Let me clarify.  An audit would be a review of the

10         records prior to making a determination of a course

11         of action.

12    Q    Would a large volume of sales towards the end of the

13         model year without anything else cause you to begin

14         an investigation?  In other words, when I say without

15         anything else, without other reasons to suspect

16         nonretail sales?

17    A    No, not that I can think of.

18    Q    Can you think of any other reasons or any other

19         events that would lead you to begin an investigation

20         of a dealership for potential violations?

21    A    Yes.

22    Q    What?

23    A    A number of sales that show that particular vehicle

24         as being resold for a second time in a very short

25         duration.

Gramann Reporting, Ltd. (414) 272-7878

Deposition of Steven R. Verduyn, 4/6/2005

1  Q  And how would that come to your attention?

2  A  As part of the investigation or background that I

3     would do.

4  Q  Okay.  I'm not trying to confuse you here, but I'm

5     trying to figure out -- I understand that's something

6     that you might discover in the course of an

7     investigation.

8  A  Okay.

9  Q  What I'm trying to focus on here is the things or the

10    events that would actually lead you to begin an

11    investigation.

12 A  Okay.

13 Q  And I understand there's -- I want to get to what you

14    look to in an investigation in a minute.

15 A  Okay.

16 Q  But you've mentioned a few things here that would

17    cause you to begin an investigation.  I'm just trying

18    to see if there's anything else you can think of.

19 A  Nothing else that I can think of at the moment.

20 Q  Okay.  Once you've decided to begin an investigation,

21    what -- you know, what would you typically do?  What

22    investigative activities would you typically

23    undertake?

24 A  That is limited, at least initially, to my requesting

25    a consolidated spreadsheet-type report of all of the

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | | dealer's reported sales for a given period of time. |
| 2 | | Customer information basically on all the sales in |
| 3 | | that given period. |
| 4 | Q | And this would be a spreadsheet of the SWR |
| 5 | | information essentially? |
| 6 | A | Correct. |
| 7 | Q | So that's sort of the first thing you would -- well, |
| 8 | | is it fair to say that's the first thing you would do |
| 9 | | after you decided to begin an investigation? |
| 10 | A | Yes. |
| 11 | Q | And I gather you would review that spreadsheet of |
| 12 | | SWRs looking for certain things? |
| 13 | A | That's correct. |
| 14 | Q | And what would you look for? |
| 15 | A | As discussed earlier, a substantial number of sales |
| 16 | | at the end of the model year. And typically I will |
| 17 | | limit even that to the last week of the model year. |
| 18 | Q | By what time of year would the -- I mean, you know, |
| 19 | | for example, is there any kind of a lag time in the |
| 20 | | ability of someone to assemble the kind of |
| 21 | | spreadsheet you're talking about? For example, if |
| 22 | | you wanted to find the -- a spreadsheet of a |
| 23 | | particular dealer for the model year ending |
| 24 | | July 31st, 2005, could you get that on August 1st of |
| 25 | | 2005? |

Deposition of Steven R. Verduyn, 4/6/2005

```
1   A   I could get that.  It may not be complete as -- I
2       don't know that the dealer has submitted all the
3       sales warranty registration forms for any vehicles
4       they may have sold within the previous couple days.
5       I can get a report of whatever we have in our system.
6   Q   So there's no turnaround in the actual -- the system.
7       It's just a question of whether the dealer has
8       actually electronically submitted the SWRs?
9   A   The only potential delay that I could think of would
10      be in my -- I don't pull the requests.  I ask another
11      person to pull them for me.  And if they would be out
12      of the office or otherwise tied up momentarily.  But
13      assuming that they're there, I can have the report
14      within minutes.
15  Q   And that's typically Diane Bolden?
16  A   That's correct.
17  Q   The dealer, as I understand it, has ten days to
18      electronically submit the SWR information after the
19      sale; is that correct?
20  A   My understanding, that's federal law.  National
21      Highway Transportation Safety Administration law.
22  Q   But is that your understanding of what
23      Harley-Davidson's policy is as well?
24  A   Yes.
25  Q   Do dealers sometimes submit the electronic SWR
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1         information after ten days, to your knowledge?
 2    A    I have seen it.
 3    Q    Is that rare?
 4    A    I would say most of our dealers do submit certainly
 5         within the ten days, and most do it that day or the
 6         day after the sale.
 7    Q    And what else would you do in -- you know, once the
 8         investigation is underway, you would get the
 9         spreadsheet of the SWR information, and you would
10         review the spreadsheet for -- for various things.
11         And I think one thing you said you would look for
12         would be a high volume of sales at the end of the
13         model year.  What else would you review the
14         spreadsheet for?
15    A    There are other things that I would look for.  Sales
16         that have been reported as resold in a very short
17         period of time.
18    Q    What else?
19    A    Sales to employees or what would appear to be family
20         or family related that occurred right at the end of
21         the model year.
22    Q    Why would that be a red flag?
23    A    The employee has had a chance, as does anyone, to buy
24         motorcycles for, you know, the entire course of the
25         model year.  And I have seen in past cases -- in my
```

Deposition of Steven R. Verduyn, 4/6/2005

1       experience in investigating these things for the last
2       several years cases where dealer management has used
3       employee names to submit to us without the employee's
4       knowledge in order to pick up and earn allocation
5       credit on vehicles that weren't really sold.
6   Q   What dealers submitted employee names without the
7       employee's knowledge?  Do you recall?
8   A   I would have to look at the individual records of
9       those that I've -- I've audited to -- in cases where
10      we have found nonretail activity, that is a
11      relatively common thing to see.
12  Q   In those cases how did you determine that the
13      employer submitted the employee's name without the
14      employee's knowledge?
15  A   At the point of investigation I haven't made that
16      determination.  The only thing that I've determined
17      is that a sale was reported to the Motor Company to
18      an employee.
19  Q   I understand.  But I believe you testified that in
20      the course of some of the reviews that you've done in
21      the past --
22  A   Um-hmm.
23  Q   -- you've run into situations where the employer has
24      submitted an SWR for the -- in the employee's name
25      without the employee's knowledge.  And I'm asking in

Deposition of Steven R. Verduyn, 4/6/2005

```
 1           investigation of a -- of a dealer for suspect
 2           nonretail sales in addition to or after you had done
 3           this analysis of the SWR spreadsheet?  And, again,
 4           I'm saying in the typical case.
 5    A      Uh-huh.  Usually that will be the extent of the
 6           initial investigation on a particular dealer.
 7    Q      And is that because once you've done the -- well,
 8           withdrawn.  I think you said the first phase or the
 9           first part of an investigation.  Would subsequent
10           parts of the investigation follow your analysis of
11           the spreadsheet?
12    A      Yes.
13    Q      And what would those be?
14    A      Based on the number of sales that I flagged as
15           questionable or suspicious in nature, I would make a
16           recommendation on either doing nothing, sending a
17           letter, or conducting an audit.
18    Q      At this point would you always confer with someone
19           else before deciding what the next step was?  Or
20           would you -- take away the always.  Would you
21           typically after having done your analysis of the
22           spreadsheet confer with someone else about the next
23           step?
24    A      Yes.
25    Q      Who?
```

Deposition of Steven R. Verduyn, 4/6/2005

1    A    In most cases or typically it would be with the DFO

2         for that respective region.

3    Q    And was it the DFO who had the final authority to

4         decide what the appropriate next step was?

5    A    I don't know.

6    Q    Well, putting aside whether it was, you know, sort of

7         authority as a matter of policy or law.  In practice

8         was it your understanding that it was the dealer who

9         would make the decision as to what the appropriate

10        next step was?

11            MR. BERKOWITZ:  You said dealer.

12   BY MR. REHNQUIST:

13   Q    Sorry.  The DFO, not the dealer.

14   A    They -- generally they would.  Now, I don't know if

15        they had conferred with others outside of my initial

16        giving them the list of questionable VINs or

17        explaining to them that I had a number of

18        questionable sales.

19   Q    And what was the -- I gather if the decision was to

20        do an audit, then you would -- you or someone else

21        would proceed to do an audit.  If the next step was

22        nothing, you would do nothing.  And in the event of

23        sending a letter, this would be the sort of "Dear

24        Dealer" letter that we've talked about before?

25   A    Correct.

Deposition of Steven R. Verduyn, 4/6/2005

1            substantial.

2    Q    I mean, were you marking this confidential so that

3         Mr. Malicki and Mr. Contois would be careful with the

4         information?  Or were you marking this E-mail as

5         confidential so that other people at Harley would be

6         careful with the information?

7    A    No.  It was intended solely for Mike and Al.  At that

8         point I hadn't copied anyone else on it, so I don't

9         know who -- who else would -- would get it.

10   Q    Had you dealt with Al Contois and Mike Malicki before

11        on investigations like this?

12   A    Mike, yes.  And Al, I can't recall.

13   Q    You note in your E-mail a sale to a Disimone or

14        Disimone, D-I-S-I-M-O-N-E.  Do you see that?

15   A    Um-hmm.

16   Q    And you say, "There is a Thomas and Jeanette Disimone

17        that own a large after-market shop in New York State

18        that I have dealt with on other gray market

19        activity."  Do you see that?

20   A    Yes.

21   Q    Had dealers been advised in any way to look out for

22        Disimones or either of the Disimones as potential

23        purchasers of Harley bikes?

24   A    Not to my knowledge.

25   Q    To your knowledge, had dealers ever been given any

Deposition of Steven R. Verduyn, 4/6/2005

1       advice or warnings about certain gray market

2       purchasers to avoid dealing with?

3  A   They were not given lists of specific individuals to

4      avoid.

5  Q   Did you ever participate in any discussions at

6      Harley-Davidson about whether or not that would be a

7      good idea?

8  A   Yes.

9  Q   With whom did you discuss that?

10  A   Counsel.

11  Q   Who?

12  A   Jenny Kent.

13  Q   Anybody else?

14  A   Christine Hansen.

15  Q   Anybody else?

16  A   Gene Ostrum.

17  Q   Is he counsel?

18  A   No.  Gene's not counsel.

19  Q   Did you discuss it with Gene Ostrum outside the

20      presence of counsel?

21  A   No, not that I recall.

22  Q   Is this one particular meeting or conversation that

23      you're thinking about?

24  A   There were more than one.

25  Q   When did these conversations occur?

Deposition of Steven R. Verduyn, 4/6/2005

1   A    A year or two years ago.  I don't -- I don't have an

2        exact date.

3   Q    And did you discuss this matter with counsel because

4        you were seeking legal advice?

5   A    Yes.

6   Q    Did you initiate the conversation with counsel, or

7        did counsel initiate the conversation with you?

8   A    Which conversation?

9   Q    Well, how many conversations were there?

10  A    There were a couple meetings.

11  Q    Let's talk about the meetings first.  Who initiated

12       the meetings?

13  A    I would have been proactive with those in asking that

14       those be set up.

15  Q    And who did you go to to set up such a meeting?

16  A    The attorney on staff at the time.  Initially it was

17       Chris Hansen.

18  Q    And did you go to -- did you initiate a meeting with

19       counsel because you thought it would be a good idea

20       to disclose the names of gray market actors to

21       dealers?

22            MR. BERKOWITZ:  Objection.  Calls for

23       attorney/client privileged communication.  I instruct

24       you not to answer.

25            MR. REHNQUIST:  I'm asking him why he

Deposition of Steven R. Verduyn, 4/6/2005

1     decided to go to counsel.

2             MR. BERKOWITZ:  Right.

3             MR. REHNQUIST:  I'm not asking for any

4     communication with counsel at all.  I'm asking why he

5     made the decision to seek advice of counsel, and that

6     is, I don't believe, privileged.

7             MR. BERKOWITZ:  I believe it is, and I'm

8     going to stand by the instruction.

9  BY MR. REHNQUIST:

10   Q   Are you going to follow your counsel's instruction?

11   A   Yes.

12   Q   Did you -- did you initiate a meeting with counsel

13     because you thought it would be a bad idea to share

14     gray market information with dealers?

15             Go ahead.  I'm setting the record.  Go

16     ahead.  You can instruct him.

17             MR. BERKOWITZ:  All right.  I object to the

18     question and instruct you not to answer.

19  BY MR. REHNQUIST:

20   Q   Are you going to follow the instruction?

21   A   Yes.

22   Q   Did you form an opinion on whether disclosing

23     information regarding gray market actors to dealers

24     would be a good idea before you sought a meeting with

25     counsel?

Deposition of Steven R. Verduyn, 4/6/2005

1      MR. BERKOWITZ:  You can answer.

2      THE WITNESS:  Can you repeat the question,

3   please?

4 BY MR. REHNQUIST:

5 Q Yeah.  Before initiating a meeting with counsel, did

6   you form an opinion or make a recommendation as to

7   whether it would be a good idea or not for

8   Harley-Davidson to disclose to dealers the identity

9   of gray market actors?

10 A In my own mind, yes.

11 Q And what was that -- what was the view that you

12   developed in your own mind?

13 A It was my opinion that that information should be

14   shared.

15 Q Why?

16 A To stem the growth in nonretail sales activity to

17   certain brokers, certain common last name people that

18   were appearing throughout the country buying bikes.

19 Q Was Lee Custom Cycle one of those?

20 A No.

21 Q Did you discuss your view on this matter with anyone

22   else at Harley-Davidson before you initiated a

23   meeting with counsel?

24      MR. BERKOWITZ:  Other than counsel?

25      MR. REHNQUIST:  Well, yeah.  Sorry.

Deposition of Steven R. Verduyn, 4/6/2005

```
 1    Q    Al -- when you referenced that you had done a little
 2         digging in this E-mail of August 11, are you
 3         referring to doing some analysis of the SWR
 4         spreadsheet, or do you recall if it was something
 5         else that you did?
 6    A    Something else.
 7    Q    What did you do?
 8    A    The VIN numbers provided by Ed Moulton were
 9         incomplete.  I had to develop the VIN number based on
10         just the last six.  So I had to work various
11         combinations to find a valid VIN number.  When I had
12         that valid VIN number, I entered that information
13         into the sales warranty registration system to tell
14         me who the reported purchaser was and who the
15         reported selling dealer was.
16    Q    Contoise responds to your E-mail with his reply to
17         you, CC Mike Malicki and Dave Hall, on August 11th,
18         and he says, "My suggestion would be to send a "Dear
19         Dealer" letter to both dealers."  Do you see that?
20    A    I do.
21    Q    Why was that not ever done?
22                   MR. BERKOWITZ:  Objection.  You can answer.
23                   THE WITNESS:  I don't know.
24    BY MR. REHNQUIST:
25    Q    Was a "Dear Dealer" letter sent to Cycle-Craft prior
```

Deposition of Steven R. Verduyn, 4/6/2005

1    to the termination letter, to your knowledge?

2  A    Not to my knowledge.

3  Q    Do you recall having any discussions with anyone at

4    Harley-Davidson about whether to send a "Dear Dealer"

5    letter to Cycle-Craft?

6  A    I don't recall any discussions.

7  Q    Does it surprise you to see that both Al Contois and

8    Mike Malicki were in favor of sending a "Dear Dealer"

9    letter to Cycle-Craft and that was never done?

10  A    It does not surprise me that they were in favor of

11    sending the letter to him.  It does surprise me that

12    the letter didn't go out.

13  Q    And you don't recall why it did not go out or -- and

14    you don't recall having any discussions about it?

15  A    In all honesty, I probably dropped the ball on it.

16    Got caught up in other things and didn't follow

17    through.

18        (Exhibit 18 marked for identification.)

19  BY MR. REHNQUIST:

20  Q    Mr. Verduyn, this is Exhibit 18.  It's Bates stamped

21    H-D 1658 to 1676.  And just -- if you want to just

22    spin through this and see if you know what these

23    documents are.

24  A    I'm familiar with the documents.

25  Q    What are they?  First of all, let's put aside the

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | | documents that showed that you had, you know, done an |
| 2 | | initial spreadsheet analysis in late July.  With that |
| 3 | | sort of framework, do you recall where you were, if |
| 4 | | anywhere, in your investigation on or about |
| 5 | | October 24th? |
| 6 | A | At that point I believe that there had been a |
| 7 | | decision to audit.  And, you know, I was in the |
| 8 | | process of gathering or continuing to gather |
| 9 | | information about that. |
| 10 | Q | Do you recall that at some point in time a decision |
| 11 | | was made to conduct an audit? |
| 12 | A | Yes. |
| 13 | Q | And do you recall when that decision was made with |
| 14 | | respect to the actual dates of the audit, which was I |
| 15 | | think February 17th and 18th of '04? |
| 16 | A | Can you -- |
| 17 | Q | Yeah.  Do you recall when the decision to audit was |
| 18 | | made?  Not necessarily the exact date, but how far in |
| 19 | | advance of the actual audit? |
| 20 | A | Several months. |
| 21 | Q | Who was involved in the decision to do an audit? |
| 22 | A | Mike Malicki. |
| 23 | Q | Anyone else? |
| 24 | A | There may have been.  I don't recall.  I know that |
| 25 | | Mike certainly would have been.  The others, I -- |

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | A | To the best of my knowledge, I forwarded everything I |
| 2 | | had to counsel at counsel's request. |
| 3 | Q | Have you had any involvement in producing documents |
| 4 | | in connection with this litigation other than |
| 5 | | providing your own files to counsel? |
| 6 | A | I don't understand your question. |
| 7 | Q | Well, you just said that you provided your files to |
| 8 | | counsel at counsel's request -- |
| 9 | A | Yes. |
| 10 | Q | -- in connection with the -- in connection with the |
| 11 | | production of documents in this litigation.  Apart |
| 12 | | from doing that, have you done anything else with |
| 13 | | respect to producing documents in this litigation? |
| 14 | A | Not that I can recall. |
| 15 | Q | And, again, I believe your testimony was that |
| 16 | | although the audit is not going to be done until the |
| 17 | | middle of February, that you had made the decision |
| 18 | | several months prior to February that an audit should |
| 19 | | be done? |
| 20 | A | I didn't make the decision.  I made the |
| 21 | | recommendation. |
| 22 | Q | Do you recall your discussion with Mr. Malicki about |
| 23 | | that recommendation? |
| 24 | A | Very vaguely. |
| 25 | Q | Did he ask you any questions? |

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | | do? |
| 2 | A | As I believed that this was a bulk sale to DCI, on or |
| 3 | | around the time that this had occurred, in late '03, |
| 4 | | the beginning of '04, the owner or at that time part |
| 5 | | owner of DCI had -- she and her husband purchased a |
| 6 | | Harley-Davidson dealership in the state of Louisiana. |
| 7 | Q | When did you learn that? |
| 8 | A | Again, late '03/beginning of '04. |
| 9 | Q | Did you make any record of that?  Did you maintain |
| 10 | | any record of that in your -- in the papers that you |
| 11 | | were doing in connection with the audit? |
| 12 | A | I wouldn't have any reason to. |
| 13 | Q | And how did that affect your analysis or your |
| 14 | | conclusions? |
| 15 | A | I looked to see if there was a connection of any sort |
| 16 | | relative to these vehicles and the new dealership in |
| 17 | | Louisiana. |
| 18 | Q | And was there? |
| 19 | A | In several cases there was. |
| 20 | Q | What was the connection? |
| 21 | A | The dealership in Louisiana had several of these |
| 22 | | vehicles on their floor plan account with |
| 23 | | Harley-Davidson financial services.  That told me |
| 24 | | that they had purchased the vehicles from someone |
| 25 | | else and had them, as we hadn't shipped the bikes to |

Deposition of Steven R. Verduyn, 4/6/2005

```
 1          them, they hadn't went to Louisiana.

 2    Q     Why isn't what you saw from the data consistent with

 3          a brokered transaction?

 4                MR. BERKOWITZ:  Objection.

 5    BY MR. REHNQUIST:

 6    Q     Do you know what I mean by that?

 7    A     Can you clarify that for me?

 8    Q     Well, how could you eliminate the possibility in your

 9          analysis that DCI had arranged for the bikes to be

10          purchased by individuals who were known to DCI?

11    A     I wouldn't have any knowledge of what DCI's business

12          dealings with retail customers are, as DCI is not an

13          authorized Harley-Davidson dealership.

14    Q     No, but how could you eliminate the possibility in

15          your analysis that DCI had not acted as a broker or

16          kind of a go-between to arrange for the purchase by

17          the 19 individuals of these motorcycles from Boston

18          Harley-Davidson?

19    A     Because had they simply acted in a broker or a finder

20          capacity, it's extremely unlikely that each of those

21          19 customers would have all went to the same bank in

22          Florida, gotten a cashier's check from that bank in

23          Florida, all went to Cycle-Craft Harley-Davidson on

24          the very same day, made purchases of new motorcycles

25          and brought them all back down to Florida.
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1   Q    Well, why couldn't DCI have arranged for the

 2        cashier's checks to be obtained from the bank and

 3        delivered the checks to Harley-Davidson and accepted

 4        the motorcycles from Boston Harley-Davidson on behalf

 5        of the individual purchasers?

 6                   MR. BERKOWITZ:  Objection.  You may answer.

 7   BY MR. REHNQUIST:

 8   Q    Do you understand the question?

 9   A    I understand it, but it doesn't -- in my capacity it

10        doesn't make a bit of difference as you have just

11        very clearly described a violation of the nonretail

12        sales policy by Boston Harley-Davidson had they done

13        that as you've described.

14   Q    And in what ways would that -- let me rephrase the

15        question.  If in fact DCI had arranged for the

16        purchase by these 19 individuals of the motorcycles

17        from Harley-Davidson, including sending the checks to

18        Boston Harley-Davidson and arranged -- sending the

19        checks to Boston Harley-Davidson and arranged for the

20        motorcycles to be shipped to DCI in Florida, how

21        would that have violated the Harley-Davidson

22        nonretail sales policy?

23   A    The customer -- because it is -- by definition it's

24        not a retail sale.  The customer did not conduct

25        their business directly with Boston Harley-Davidson.
```

Deposition of Steven R. Verduyn, 4/6/2005

```
1           They went to another party.  It was a brokered sale.
2           The nonretail sales policy is very clear, that the
3           customer must take retail delivery of that vehicle at
4           the dealership and complete all paperwork at the
5           dealership.  Under your scenario that didn't happen.
6    Q      So it is your testimony that the transaction as I
7           have described it would have violated the nonretail
8           sales policy because the customer did not receive the
9           bike at Boston Harley-Davidson?
10                  MR. BERKOWITZ:  Objection.
11   BY MR. REHNQUIST:
12   Q      That's at least -- is that correct?
13                  MR. BERKOWITZ:  Objection.  You can answer.
14                  MR. REHNQUIST:  Basis?
15                  MR. BERKOWITZ:  Misdescribes the witness's
16          testimony.
17   BY MR. REHNQUIST:
18   Q      I'm not trying to describe your testimony.  I'm just
19          trying to ask a question.
20                  MR. BERKOWITZ:  He listed several things,
21          and you only pointed out one.  That was the basis for
22          the objection.  But go ahead.
23   BY MR. REHNQUIST:
24   Q      I want to make sure I understand every way you
25          believe that type of a brokered transaction would
```

Deposition of Steven R. Verduyn, 4/6/2005

1    violate the nonretail sales policy.  And I believe

2    you testified that one way that type of transaction

3    would violate the nonretail sales policy would be

4    that the customer did not receive the bicycle at the

5    dealership facility; is that correct?

6         MR. BERKOWITZ:  Motorcycle.

7         THE WITNESS:  Would have been a motorcycle,

8    but that's correct.

9         MR. REHNQUIST:  What did I say?

10        MR. BERKOWITZ:  Bicycle.

11        MR. REHNQUIST:  Sorry.

12        MR. BERKOWITZ:  It's a long day.

13  BY MR. REHNQUIST:

14  Q  Apart from not receiving the motorcycle at the

15     dealership facility, how else would that type of

16     brokered transaction violate the nonretail sales

17     policy?

18  A  Again, by definition if we bring the word "broker"

19     into the chain, it is clearly nonretail.  The point

20     and reason that we have the nonretail sales policy in

21     effect is to protect our customers, to ensure that

22     our end user customers have a positive dealership

23     experience and a positive experience with

24     Harley-Davidson.  When we involve nonretail activity

25     and brokers and third-parties, we've lost that

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | | control. |
| 2 | Q | Any other ways in which that transaction would |
| 3 | | violate the nonretail sales policy? |
| 4 | A | There was -- the nonretail sales policy has a |
| 5 | | provision in it that says that for a sale made out of |
| 6 | | state, the dealer will provide title and registration |
| 7 | | for that vehicle.  If they do not or cannot, that |
| 8 | | vehicle is deemed to have been sold in violation of |
| 9 | | the nonretail sales policy. |
| 10 | Q | Anything else? |
| 11 | A | If my recollection is correct, the predelivery |
| 12 | | inspection forms were not in every case complete and |
| 13 | | checked off and/or appropriately signed by customers |
| 14 | | and/or dealership personnel.  That would leave open |
| 15 | | the possibility that the vehicles had not been either |
| 16 | | completely predelivery inspected, safety checked, and |
| 17 | | the customer had not been provided with a copy of |
| 18 | | that document or any other important documents, |
| 19 | | including an owner's manual and information regarding |
| 20 | | any of the other benefits to owning a Harley.  This |
| 21 | | goes straight to why we have the nonretail sales |
| 22 | | policy in effect and insist that the customers |
| 23 | | themselves come to the dealership. |
| 24 | Q | Are you saying that the nonretail sales policy |
| 25 | | requires that the customer sign the setup and |

Deposition of Steven R. Verduyn, 4/6/2005

```
 1              inspection form?
 2      A       The customer is to be provided with a copy of that.
 3              I can't recall -- if you've got one, we can take a
 4              look at it.  At the top of my head I cannot recall
 5              the specific signatures and lines on that form.
 6      Q       Are you aware of any language in the dealer contract
 7              that prohibits a brokered transaction such as the one
 8              I've just described?
 9      A       My expertise in dealing with the dealer contract is
10              extremely limited.
11      Q       Would it change your conclusion in any way if you
12              learned that DCI in fact did attempt to obtain titles
13              to these 19 motorcycles in the names of the 19
14              individuals that were on the SWRs?
15      A       It would make me even more suspect of the
16              transactions.
17      Q       Did it matter to you in drawing the conclusions that
18              you drew whether or not DCI had deceived or misled
19              Harley-Davidson as to whether these sales were to DCI
20              itself or to individuals?
21                      MR. BERKOWITZ:  Objection.
22                      THE WITNESS:  I don't really understand the
23              question.
24      BY MR. REHNQUIST:
25      Q       Well, in reaching the conclusions that you reached,
```

Deposition of Steven R. Verduyn, 4/6/2005

1    did you consider whether or not DCI might have

2    deceived or misled Harley-Davidson as to whether

3    these motorcycles were actually going to end up in

4    the hands of individuals as opposed to DCI itself?

5            MR. BERKOWITZ:  Objection.  Can you -- Jim,

6    maybe you didn't mean to say Harley-Davidson, but

7    your question is whether DCI deceived or misled my

8    client, Harley-Davidson.

9            MR. REHNQUIST:  I'm sorry.  Fair objection.

10   Fair objection.  Your client is Harley-Davidson and

11   mine is Cycle-Craft.  I promise not to forget that.

12 Q   Mr. Verduyn, sorry.  Did you consider in your

13   analysis of the DCI situation whether DCI might have

14   deceived or misled Boston Harley-Davidson as to who

15   would be the ultimate user of the motorcycles?

16 A   I believe that Boston Harley-Davidson knew the

17   circumstances around the sale and that this was a

18   brokered sale.

19 Q   What do you mean a brokered sale?

20 A   It was a bulk sale to a broker.  The motorcycles were

21   not sold by Boston Harley-Davidson directly to the

22   people that Boston Harley-Davidson told

23   Harley-Davidson Motor Company had purchased those

24   bikes.

25 Q   So it didn't matter to you if -- withdrawn.  It

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        didn't matter to you whether DCI had told Boston
 2        Harley-Davidson that these motorcycles were going to
 3        end up in the hands of individuals?  That didn't
 4        matter to you?
 5                  MR. BERKOWITZ:  Objection.  You can answer.
 6                  THE WITNESS:  The point of my investigation
 7        wasn't to determine what DCI might have told Boston
 8        Harley-Davidson.  It was to determine whether Boston
 9        Harley-Davidson had provided false or misleading
10        information to the Motor Company and whether or not
11        they had violated their -- their dealer contract or
12        the nonretail sales policy.
13   BY MR. REHNQUIST:
14   Q    And your conclusion was that this was a violation of
15        the policy because you believe that Boston
16        Harley-Davidson -- well, withdrawn.  You concluded
17        that it was a violation of the policy for -- among
18        other reasons, because you believe that Boston
19        Harley-Davidson knew that this was a transaction in
20        which DCI was acting simply as a broker?
21                  MR. BERKOWITZ:  Objection.  You may answer.
22                  THE WITNESS:  That they knew it was a
23        broker or not doesn't in my mind or help me drawing
24        my conclusion stray from the fact that what Boston
25        Harley-Davidson did was misrepresent what happened to
```

Deposition of Steven R. Verduyn, 4/6/2005

1       19 motorcycles.

2   BY MR. REHNQUIST:

3   Q    And what specifically was the misrepresentation that

4        Boston Harley-Davidson made as to these 19

5        motorcycles?

6   A    That they were the dealership that sold 19

7        motorcycles on July 30th of 2003 to individual retail

8        customers living in the state of Florida.

9   Q    And why was that false?

10  A    We had -- through the investigation, we had obtained

11       documentation that those transactions didn't happen

12       at the dealership and that those motorcycles were not

13       purchased for retail purposes by those people that we

14       had been told -- that Harley-Davidson had been told

15       were the ultimate end users.

16  Q    Let's go back to the Lee Cycle pile, Lee Custom Cycle

17       pile.  What observations did you make about the Lee

18       Custom Cycle transactions?

19  A    The original complaint and reason that we looked

20       at -- or that I looked at Boston Harley-Davidson's

21       sales records was as a result of a complaint made

22       that cited two specific -- three specific parts of

23       vehicle identification numbers.  I was able to get

24       full vehicle identification numbers.  Those customer

25       names were included on those sales that I wished to

Deposition of Steven R. Verduyn, 4/6/2005

1      audit or examine.

2                    When I pulled those sales jackets out

3      of the file cabinet that they were in, immediately

4      one of the first things that I noticed about those

5      was the fact that they had written on the front in

6      marker on the front of the sale jacket either "Lee"

7      or "Lee Custom" near or next to the customer name.

8   Q  Why was that significant?

9   A  It substantiated Seacoast Harley-Davidson's

10     allegation that they had seen these vehicles for sale

11     at Lee Custom.

12  Q  What other observations did you make about the Lee

13     Custom Cycle pile?

14  A  Of that pile, all of the sales in that -- and there

15     were, I believe, six, seven or eight of them,

16     thereabout, all of them had that "Lee" or "Lee

17     Custom" written on the front of the file folders near

18     the customer name.

19  Q  Anything else?

20  A  Not that immediately comes to mind.

21  Q  What determination -- did you make a determination

22     that the Lee Custom Cycle -- that the transactions in

23     the Lee Custom Cycle pile were transactions in which

24     the individual -- individuals listed on the SWR did

25     not take delivery of the motorcycle at Boston

Deposition of Steven R. Verduyn, 4/6/2005

| | | |
|---|---|---|
| 1 | | Harley-Davidson? |
| 2 | A | I was -- based on what was in the file, I was unable |
| 3 | | to make any clear conclusion on that. |
| 4 | Q | Did you make any conclusion at all? |
| 5 | A | Only that Lee Custom Cycles was somehow involved in |
| 6 | | the sale of those motorcycles. |
| 7 | Q | At the time you did the audit, had you learned |
| 8 | | whether this fellow, Smith, that I think you |
| 9 | | mentioned in the E-mail I showed you earlier was in |
| 10 | | fact affiliated with Lee Custom Cycle? |
| 11 | A | His name had surfaced before in other investigations |
| 12 | | and things that I had done. And just that he was up |
| 13 | | in the northeast part of the country. My |
| 14 | | responsibilities for nonretail investigations is |
| 15 | | country-wide. It involves every state. All that I |
| 16 | | could recall was that Smith had operated up in that |
| 17 | | area. We had had a problem with Smith before. And |
| 18 | | that just in passing or at some time in the past I |
| 19 | | had heard of Lee Cycles. But that was the extent of |
| 20 | | it. Again, simply because I'm dealing with so many |
| 21 | | dealers, so many things in addition to all my |
| 22 | | responsibilities, you know, with finance and |
| 23 | | credit-related matters, it was just a that name |
| 24 | | sounds familiar. But I didn't draw any hard, firm |
| 25 | | conclusions that tied Smith directly to Lee Custom. |

Deposition of Steven R. Verduyn, 4/6/2005

| 1 | Q | Apart from the fact that Lee -- the word "Lee" or |
| 2 | | "Lee Custom" was written on the front of the jacket |
| 3 | | in marker, what other evidence led you to the |
| 4 | | conclusion that these six or eight sales were made in |
| 5 | | violation of the nonretail sales policy? |
| 6 | A | Aside from the fact that we had had a dealer |
| 7 | | complaint about two of those, there was nothing else |
| 8 | | that I can immediately remember. |
| 9 | Q | How did you eliminate the possibility that one of the |
| 10 | | individuals named on the SWR had purchased the |
| 11 | | motorcycle from Boston Harley-Davidson and then |
| 12 | | resold it to Lee Custom Cycle? |
| 13 | A | Because it would have been an employee of Boston |
| 14 | | Harley-Davidson that wrote Lee Custom on the file. |
| 15 | | The customer wouldn't have had control on that. |
| 16 | | There was no evidence in the sales files that the |
| 17 | | customer had traded in or resold the vehicle, and no |
| 18 | | one from Lee, to my knowledge, I would believe would |
| 19 | | have access to Boston Harley files. |
| 20 | Q | No, but what I'm saying is, regardless of what is |
| 21 | | written on the file, how could you eliminate the |
| 22 | | possibility that an individual from -- the individual |
| 23 | | named on the SWR had purchased the motorcycle from |
| 24 | | Boston Harley-Davidson and then later resold it -- |
| 25 | | you know, after July 31, '03 sold it to Lee Custom |

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        Cycle?
 2                 MR. BERKOWITZ:  Objection.  You can answer.
 3                 THE WITNESS:  It's possible for them to do
 4        that.  A retail customer, assuming that they are a
 5        retail purchaser, they're the ones that have then
 6        taken the sale or taken the vehicle and decided what
 7        they're going to do with it.  A customer, a retail
 8        customer, might purchase a bike because they like to
 9        ride or because they've got a showroom or that
10        they're a Harley enthusiast.  There's any number of
11        reasons that someone could purchase a bike or an
12        individual could purchase one.
13    BY MR. REHNQUIST:
14    Q   Right.  But in you doing your analysis, there was no
15        way for you to eliminate that individuals had in fact
16        come to Boston Harley-Davidson and purchased those
17        motorcycles.
18    A   That's correct.
19    Q   In other words, the only -- apart from the fact that
20        a couple of these motorcycles had ended up on the
21        showroom at Lee pursuant to the information you
22        received from Ed Moulton, the only thing that led to
23        your conclusion these were nonretail sales was the
24        fact that the word "Lee" was written on these sales
25        jackets; correct?
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1    A    That would be correct.
 2    Q    Did you ever call any of the individuals that were
 3         listed on the SWRs that you associated with Lee
 4         Custom Cycle to see if they had purchased the
 5         motorcycles from Boston Harley-Davidson?
 6    A    I did not.
 7    Q    Did you do any follow-up at all to see if any of
 8         those individuals on the Lee Custom Cycle SWRs had in
 9         fact purchased the motorcycles from Boston
10         Harley-Davidson?
11    A    I'm not quite sure what follow-up I could have done.
12         It's not normal standard practice for me to follow up
13         on a sale after the fact.
14    Q    So that would be a no in response to my question as
15         to whether you did any follow-up?
16    A    Correct.
17    Q    Let's go to the third pile, which was the -- I
18         believe you said the employee -- well, what was the
19         third pile?
20    A    Employee, family, relatives.
21    Q    And what observations did you make about the sales
22         that were documented in that pile?
23              MR. BERKOWITZ:  Objection.  You can answer.
24              MR. REHNQUIST:  Basis?
25              MR. BERKOWITZ:  It's not clear that any
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        Withdrawn.  Did anyone ask -- ask you to explain what
 2        language in the nonretail sales policy had been
 3        violated by these transactions or that you believed
 4        had been violated by these transactions?
 5                  MR. BERKOWITZ:  I'm going to object.  I'm
 6        going to instruct you not to answer.  I think we do
 7        have counsel in the room and I think we are now
 8        crossing the line into matters that involve legal
 9        counsel.  And I am going to instruct you not to
10        answer that question.
11   BY MR. REHNQUIST:
12   Q    Well, let me try to get at it a different way.  And
13        you may get the same instruction.  Was there any
14        discussion in the meeting regarding what language in
15        the policy you believed had been violated by these
16        transactions?  And I'm simply asking you yes or no,
17        was there discussion on that subject?
18                  MR. BERKOWITZ:  You can testify as to
19        whether you have a recollection of there having been
20        or not having been discussion on that topic.
21                  THE WITNESS:  Yes.
22   BY MR. REHNQUIST:
23   Q    There was discussion on that topic?
24   A    Yes.
25                  MR. REHNQUIST:  And if I ask any further
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1          just as a part of the building of the background on
 2          what led to the audit itself.
 3     Q    What did you say about the building?
 4     A    Just that it had been -- he had told us that it had
 5          been a run-down industrial or paint company or some
 6          kind of a manufacturing company, dirty, rundown and
 7          that they had built this large, beautiful building on
 8          that site.
 9     Q    Did you agree that it was a large, beautiful
10          building?
11     A    I would agree that it was large.  I guess beauty is
12          in the eye of the beholder.
13     Q    Well, how about in your eye?  You've seen a lot of
14          dealerships, I assume.
15     A    I have.  It was nice, and it was clean, but it was
16          not one of the most beautiful dealerships I've been
17          in.
18     Q    Was there any discussion in the meeting about what
19          sanction, should be -- if any, should be imposed upon
20          Cycle-Craft?
21               MR. BERKOWITZ:  You can answer yes or no.
22               THE WITNESS:  Yes.
23     BY MR. REHNQUIST:
24     Q    What was that discussion?
25               MR. BERKOWITZ:  Was counsel involved in
```

Deposition of Steven R. Verduyn, 4/6/2005

```
 1        that discussion?
 2                    THE WITNESS:  Yes.
 3                    MR. BERKOWITZ:  I instruct you not to
 4        answer.
 5   BY MR. REHNQUIST:
 6   Q    Was there any discussion in the meeting of any
 7        sanction other than termination?
 8                    MR. BERKOWITZ:  Was counsel involved in
 9        that discussion?
10                    THE WITNESS:  Counsel was involved.
11                    MR. BERKOWITZ:  I instruct you not to
12        answer.
13   BY MR. REHNQUIST:
14   Q    Was there any discussion in the meeting of
15        Harley-Davidson's history of enforcement of the
16        nonretail sales policy?
17   A    Not that I can recall.
18   Q    Was there any discussion of sanctions that had been
19        given to other dealers for violations of the
20        nonretail sales policy?
21   A    Again, not that I recall.
22                    MR. BERKOWITZ:  We've been going about an
23        hour and 20 minutes.  Whenever you can give us a
24        break.
25                    MR. REHNQUIST:  Yeah, I'm finishing a line
```

Deposition of Steven Verduyn, 5/26/2005

```
1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS
     ------------------------------------------------------------
3
     CYCLE-CRAFT CO., d/b/a
4    BOSTON HARLEY-DAVIDSON/BUELL,

5              Plaintiff,

6
               vs.          Civil Action No. 04 11402 NMG
7
     HARLEY-DAVIDSON MOTOR COMPANY, INC.
8    and BUELL DISTRIBUTION COMPANY, 'LLC,

9

10             Defendants.

11   ------------------------------------------------------------

12

13

               Video Deposition of STEVEN VERDUYN
14
               Thursday, May 26th, 2005
15

16                    9:54 a.m.

17                      at

18             Gramann Reporting, Inc.
               710 North Plankinton Avenue
19             Milwaukee, Wisconsin

20

21

22

23

24
               Reported by Rosanne E. Pezze, RPR/CRR
25
```

Deposition of Steven Verduyn, 5/26/2005

```
 1        nature is adversarial.
 2   Q    Have the DFOs -- has a DFO ever accompanied you on an
 3        audit in addition to the Cycle-Craft audit?
 4   A    Not in addition to, no.
 5   Q    That's the only occasion where a DFO accompanied you?
 6   A    That's correct.
 7   Q    And what did Mr. Malicki tell you, if anything, as to
 8        why he wanted to accompany you on the audit?
 9   A    He was interested in seeing how the process itself
10        worked in that I've been the individual at Harley
11        that's conducted the audits.  This was a dealer
12        within his region, so he had an additional interest
13        in it for that, and he had the available time.  It is
14        not uncommon that people express interest in
15        accompanying me on audits, more out of a curiosity
16        and an understanding standpoint.
17   Q    Focusing on the 12 audits that are represented in
18        Exhibit 84, do you recall who accompanied you on the
19        audit of Zylstra Harley-Davidson in Elgin, Illinois?
20   A    I believe I did that myself.
21   Q    Do you recall who accompanied you on the audit of
22        Renegade Harley-Davidson in Alexandria, Louisiana?
23   A    I had done that -- well, not directly accompanied me.
24        There was another person that was conducting a
25        separate audit at the same time in conjunction with
```

Deposition of Steven Verduyn, 5/26/2005

```
1    A    Correct.

2    Q    Who accompanied you on that one?

3    A    My girlfriend.

4    Q    What's her name?

5    A    Kathryn Karn.

6    Q    And does she work for Harley-Davidson?

7    A    She does not.

8    Q    How do you spell her name?

9    A    Last name, K-A-R-N.

10   Q    And why did she accompany you?

11   A    Pleasure trip, vacation we extended after the time

12        out there and took some time and went up the Maine

13        coast.

14   Q    It's nice that time of year, huh?

15   A    Beautiful.

16   Q    Did you tell anybody at Harley-Davidson that you were

17        bringing your girlfriend to do the audit?

18             MR. BERKOWITZ:  Objection.  You can answer.

19             THE WITNESS:  I believe that I had told

20        Mike Malicki.  I can't say with certainty, but I

21        believe so.

22   BY MR. REHNQUIST:

23   Q    Did you tell him after you did this or before you did

24        this?

25   A    I don't recall.
```

Deposition of Steven Verduyn, 5/26/2005

```
 1    Q    Did you seek permission from Mr. Malicki to bring
 2         your girlfriend?
 3    A    No.
 4    Q    Is Mr. Malicki -- well, Mr. Malicki is not your boss,
 5         correct?
 6    A    I don't report to him, however, he is at a level
 7         superior to mine in terms of the management at
 8         Harley.
 9    Q    Are you confident that he knows now that you brought
10         your girlfriend on that audit?
11    A    Yes.
12    Q    Have you been disciplined or reprimanded in any way
13         by the Motor Company for bringing your girlfriend on
14         the audit?
15    A    No.
16    Q    How long did the audit at Schott Harley-Davidson
17         last?
18    A    I believe about two-and-a-half days.
19    Q    Did you tell the principals of Schott that you met
20         with that -- did you introduce Ms. Karn to them?
21    A    Yes, I did.
22    Q    And did you tell them that this was your girlfriend?
23    A    Yes.
24    Q    They didn't have any objection to her assisting?
25    A    Not --
```

Deposition of Steven Verduyn, 5/26/2005

1    least some of these.

2  Q  Is it the case that on ten or 15 different occasions

3     Harley-Davidson Motor Company has given a dealer an

4     exception as it is described in these letters even

5     though there has been a determination by

6     Harley-Davidson that the non-retail sales policy has

7     been violated?

8  A  That's correct.

9  Q  To your knowledge under what circumstances has

10     Harley-Davidson given dealers an exception?

11  A  As is stated in the correspondence to the dealers,

12     there are a number of reasons on why that could

13     occur.

14  Q  What are they?

15  A  They might include such things as the dealership

16     being very, very new, not having been in business for

17     a long time, so perhaps not being familiar with the

18     policies.

19  Q  What other reasons?

20  A  It may have been a single or very, very small number

21     of sales that the dealership made that it was of the

22     opinion that they acted in good faith when they made

23     those sales.

24  Q  Other reasons?

25  A  The dealership may have had a new employee who may

Deposition of Steven Verduyn, 5/26/2005

1       have handled the sales transaction and was not

2       familiar with the individual policy that prohibited

3       it.

4   Q   Anything else you can think of?

5   A   In general there's a provision in the policy that

6       allows the director of operations for that area to

7       grant an exception as they see or feel or deem fit.

8   Q   Are you aware of any other reasons -- when you say

9       the director, do you mean the director of field

10      operations?

11  A   That's correct.

12  Q   And are you aware of directors giving exceptions for

13      any reasons other than the ones that you've just

14      stated?

15  A   They would be the ones that made the decision.  I

16      wouldn't know why they -- why they made any

17      particular decision that they did unless it's in a

18      letter on which I'm copied.

19  Q   Are you aware of any decisions to give exceptions

20      that have not been communicated to the dealer in

21      letter form?

22  A   None that immediately come to mind.

23  Q   In other words, to the best of your knowledge, when a

24      decision is made to give a dealer an exception, there

25      is a letter sent to the dealer indicating that an

# EXHIBIT 13

**NORTH END HARLEY-DAVIDSON INC.**
**594 ROUTE 3**
**PLATTSBURGH, NEW YORK  12901**
**800-445-1342**
**THOMAS WYAND , PRESIDENT**

January 11, 2005


Mr. Mike Malicki
Director of Field Ops. Region 1
Harley-Davidson Motor Company
3700 W. Juneau Avenue
Milwaukee, WI  53201


Dear Michael;


I am writing regarding the non-retail sales disputes, previously noted in your inquiries. I would have hoped that a final determination would have been made by this time since the brunt of the documentation was sent to your office in March and more in October of 2004, including titles on file with various states. As you know we are unable to register vehicles purchased from out of state as well as unable to force the owners to provide state registrations to us once their bikes are registered.

It is also not uncommon to have sales of multiple units to be purchased within the same family. I will list dozens of families who have purchased 3 and 4 units from me within a short period of time. So duplication of sales to the same family or family name is not uncommon. There are no red flags that go up when such buyers purchase in that manner, often bargaining quanity into a lower purchase price , accessory or labor discounts.

As for the bikes titled in Maine all units ,as previously mentioned, were sold at retail and titled in the state of Maine. Titles of the bikes were mailed to you along with other documention we were able to produce. At that time individual state registrations were not asked for, I did not have them to produce and I do not have them now. I have 4 full time salesmen on my sales floor and Harley Sales Policy is standard training. I teach them to look for red flags and grey market sales, none of these buyers fit that criteria.

I will say again, if Harley - Davidson has a "list of names" that red flags Director of Filed Operation why isn't such a list made available to dealers! If you have insider information that would be available to warn dealers of "suspected" grey marketers, why aren't we in the information loop? We are not highly suspect of every retail sale that comes walking

H-D 11001
CONFIDENTIAL

through our door. Sales being what they are with new Harley units, it is not my policy to be confrontational with any retail buyer. We prefer to make the sales process as helpful and friendly as possible, and that sales dogma often brings back members of the same family.

At this point I would like to defer directly to my mea culpas, I am therefore sorry 100% of the required documentaion is not available. We are a small retail outlet in a city with a (declining) population of 15,000 people. To say the least we try to be more than helpful with family members who wish to purchase multiple units, Harley or otherwise. In this case we obtained title documentaion from them to insure that individual state sales taxes were paid. If a unit ends up being resold or available for resale after the fact I am sorry. I do not intend to put units up for sale in other markets and in fact that is why I get retail or retail plus for every unit I sell to a customer.

I fully understand Harley-Davidsons policys & intentions , however I do believe I followed proper checks and balances procedurally in the sales of all these units. If, down the road, Harley-Davidson comes to different conclusions after reviewing all the documentation I have provided then I will abide by your ruling in the matter. In the meantimeI will continue to retail the marque as best as I believe I have these past 20 years, to a customer base we have developed through honesty, integrity and hard work. Thank You.

Sincerely,

Thomas Wyand
attached

H-D 11002
CONFIDENTIAL