# EXHIBIT 19

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CYCLE-CRAFT CO., INC. d/b/a
BOSTON HARLEY-DAVIDSON/BUELL,

                    Plaintiff,
                                          Civil Action
vs.                                       No. 04 11402

HARLEY-DAVIDSON MOTOR COMPANY,
INC., and BUELL DISTRIBUTION
COMPANY, LLC,

                    Defendants.
_____/

                         300 SE 2nd Street
                         Fort Lauderdale, Florida
                         February 2, 2005
                         1:00 p.m.


THE VIDEOTAPED DEPOSITION OF

DEBRA LUNSFORD


Taken on Behalf of the Defendants
Pursuant to Notice of Taking Deposition
Commencing at 1:12 p.m.


FLORIDA REALTIME REPORTING - 954.767.0450

Lunsford, Debra  24688sm

```
 1          MR. BERKOWITZ:  Yeah, this is -- we're on
 2     No. 3.
 3   BY MR. BERKOWITZ
 4     Q.   And this is another set of the bills of
 5   sale prepared by Boston Harley-Davidson, but now
 6   we've got a price listed, is that correct?
 7     A.   Yes.
 8          MR. REHNQUIST:  I'm going to object to the
 9     foundation.  I don't think the witness has any
10     basis for knowing that, and she hasn't reviewed
11     the document to see what they are.
12     A.   I --
13          MR. CONTINI:  Just wait for a specific
14     question.
15          THE WITNESS:  Okay.
16          MR. CONTINI:  And don't speculate, Debbie.
17     Only if you have personal knowledge of
18     something.
19          THE WITNESS:  Okay.
20   BY MR. BERKOWITZ
21     Q.   Did you cause 19 separate cashier's checks
22   to be issued for these motorcycles, payable to
23   Boston Harley-Davidson?
24     A.   Yes.
25     Q.   All right.  Can you identify what we've
```

1          THE WITNESS:  I'm sorry.  I'm not

2     accustomed to this, okay.

3          MR. REHNQUIST:  No one should be.

4          THE WITNESS:  Okay.

5          MR. CONTINI:  Bill, it may make it faster

6     for everybody -- the only reason why there's an

7     interruption on the invocation of her Fifth is

8     because of the concerns for Federal money

9     laundering statutes.

10          MR. BERKOWITZ:  All right.  Well, that's

11     fine.

12          MR. CONTINI:  And that's -- she's going to

13     answer everything she can.

14          MR. BERKOWITZ:  I appreciate that.

15          MR. CONTINI:  95 percent of the questions

16     today.

17   BY MR. BERKOWITZ

18       Q.   On these checks in Exhibit 4, there's --

19   there are names for these 19 people that are in the

20   remitter line; do you see that?  I'm not asking who

21   put the names in.  I just want to see if you can

22   identify --

23       A.   Yes.

24       Q.   -- yes, there are names.

25       A.   Yes.

Lunsford, Debra 24688sm                           www.floridarealtime.com

1      Q.    And to your knowledge did any of those

2   people provide any funds for the purchase of any of

3   these motorcycles to DCI?

4      A.    Yes.

5      Q.    Yes, they did?

6      A.    No, I'm sorry.  Say that again.

7      Q.    Did any of the 19 people that are

8   identified as these fictitious customers, did they

9   provide any money to DCI for any of these bikes?

10      A.    No, they did not.  This was all DC

11   International's money.

12      Q.    Okay.  And this was -- these funds were

13   coming out of DC International's bank account at

14   Northern Trust Bank of Florida, is that correct?

15      A.    That's correct.

16            MR. REHNQUIST:  Objection.  Leading.

17            (Conferring with counsel.)

18            MR. CONTINI:  I apologize, gentlemen, for

19      the interruptions on my behalf before.

20   BY MR. BERKOWITZ

21      Q.    The -- the date of the checks, of all of

22   the checks, is July 28, 2003; do you see that?

23      A.    Yes.

24      Q.    That's on Exhibit 4, correct?

25      A.    Yes.

1    purchaser took title to his or her motorcycle in his

2    or her own name, as reflected on the certificates of

3    origin in each deal jacket."  Do you see that

4    sentence?

5         A.    Yes, I do.

6         Q.    Is that sentence true?

7         A.    No.

8         Q.    In fact, DCI purchased all of the 19

9    motorcycles, is that correct?

10        A.    Yes, we did.

11              MR. REHNQUIST:   Objection.

12      BY MR. BERKOWITZ

13        Q.    And Boston Harley-Davidson was aware of

14   that, is that correct?

15              MR. REHNQUIST:   Objection, leading.

16        A.    Boston Harley-Davidson instructed us to do

17   it that way.

18      BY MR. BERKOWITZ

19        Q.    The last sentence of Paragraph 6 states,

20   quote, on paper and as far as anyone at Cycle-Craft

21   knew or could have known, these were sales to

22   individual purchasers in compliance with all

23   Harley-Davidson policies, end quote.  Do you see

24   that statement?

25        A.    Yes, I do.

140
Lunsford, Debra  24688sm                          www.floridarealtime.com

1          the plea agreement with the State Attorney's
2          Office out of Palm Beach, the charge would then
3          be dismissed.  So she was never convicted.
4          Jeopardy did attach and that's why she's
5          answering your questions today, trying to be as
6          cooperative and helpful as possible, as opposed
7          to sitting here, invoking her Fifth Amendment
8          privilege, which she otherwise could do
9          arguably.  I just wanted you to know it wasn't
10         just the title fraud.  I forget which felony
11         you mentioned just now, you mentioned a
12         particular felony, but it would speak to many
13         other arguable felonies, for instance, title
14         fraud, sales tax fraud, wire fraud, bank fraud,
15         money laundering.
16    BY MR. REHNQUIST
17         Q.   I'm not -- I don't mean to quibble about
18    the scope of the -- of the charges, but what I do
19    want to understand is that you did enter into a plea
20    agreement, is that correct?
21         A.   Yes.
22         Q.   And you did plead guilty to a charge,
23    correct?
24         A.   Yes.  One charge of title fraud.
25         Q.   Right.  And that -- and that's a felony in

1    the State of Florida?

2         A.    Yes.

3         Q.    And you received a sentence of one year

4    probation, is that my understanding?

5         A.    Pretrial intervention.

6              MR. CONTINI:  Yeah, and I again might be

7         at fault here.  I don't know that she pled

8         guilty.  She may have pled no contest.  I'm not

9         entirely sure.  Now, in retrospect, I believe

10        it may have been a guilty plea in order to get

11        into PTI, but it's separate and distinct from

12        probation.  Had she gone into -- had she been

13        sentenced to probation, adjudication might be

14        withheld.  In Massachusetts I believe they call

15        it a continuance without a finding.  Here they

16        call it adjudication withheld.  She didn't have

17        that kind of sentence.  She was never sentenced

18        to probation.

19             It's somewhat confusing because the

20        probation department happens to monitor those

21        people who get into the PTI program.  She was

22        accepted into the PTI program which results in

23        a dismissal of the underlying charge.  And I

24        know that -- that may be too much information,

25        but she was not sentenced to probation.  But I

1    believe you may be correct, Mr. Rehnquist; she

2    may have had to enter a guilty plea in order to

3    be accepted into PTI.

4    BY MR. REHNQUIST

5    Q.   Well, Ms. Lunsford, your understanding,

6    and let me just ask you what your understanding is,

7    and the actual legal significance of it, your

8    attorney and I can sort out later.  But your

9    understanding is that you did plead guilty to a

10    charge of title fraud?

11    A.   Yes.

12    Q.   And you pled guilty because you had

13    committed that crime, is that correct?

14    A.   Yes.

15    Q.   And you understood when you pleaded guilty

16    that you could have gone to trial and tried to

17    defend against that charge?

18    A.   Yes.

19    Q.   And you understood and I imagine you were

20    in front of a judge who told you if you went to

21    trial, you had all kind of defenses, you could

22    cross-examine witnesses, the government would have

23    to prove its case beyond a reasonable doubt and

24    other things like that; you understood all that,

25    correct?

Lunsford, Debra 24688sm

1    A.    Yes.

2    Q.    And instead, you pleaded guilty because

3  you were guilty?

4    A.    Yes.

5    Q.    Ms. Lunsford, when did you make the

6  decision that you would submit altered bills of sale

7  to the Department of Motor Vehicles?  I mean, if we

8  can -- if we can just place it in context, July 30

9  was when you sent this fax to Libby.  The

10  applications themselves are dated July 23rd, so that

11  may not be terribly helpful.  But if you can place

12  it in terms of what we've been talking about today,

13  I'd just like to know when it was that you made the

14  decision to -- to alter the bills of sale.

15    A.    When I didn't have the figures.  When I

16  didn't have the correct amount of what the deal was

17  and I didn't know what each bike was.  I didn't know

18  what to take out and what was taxable and wasn't --

19  and what wasn't taxable.  That's when I just did the

20  best I could.  I've never done -- I had never done

21  this before so I didn't know how it worked.  So I

22  just did the best I could.

23    Q.    Did you -- did you alter the bills of sale

24  before you knew how much the figures on the

25  cashier's check were?

1          MR. REHNQUIST:  Sorry.

2          MR. BERKOWITZ:  Did you finish your

3     answer?

4     A.    Excuse me?

5          MR. REHNQUIST:  Yeah.

6   BY MR. REHNQUIST

7     Q.    So you're testifying now about other

8   things you remember Ron saying in this first

9   conversation?

10    A.    It could have been in any of those

11  conversations.

12    Q.    Okay.

13    A.    Okay.  I don't know exactly which one it

14  was or when it was, but I just remember, you

15  know ...

16    Q.    Did he tell you that these motorcycles had

17  to be sold to individuals?

18    A.    Yes.

19    Q.    And did he tell you that -- did he give

20  you any reason as to why the motorcycles had to be

21  sold to individuals?

22    A.    Because he couldn't do a dealer-to-dealer

23  transaction because he had to do it in individual

24  names for his allocation.  He had to -- it had to be

25  like a retail deal.  That's the only way he could

1   let 19 motorcycles go.

2       Q.   Again, but did he tell you that the sales

3   had to be made to individuals?

4       A.   Yes.

5       Q.   Do you remember anything else that -- that

6   Ron Buchbaum said in either this first conversation

7   or any conversation?

8       A.   No.   That's --

9       Q.   That's the substance of it?

10      A.   Pretty much, yeah.

11      Q.   And again, you don't recall the -- the

12  number -- the exact number of the conversations or

13  the exact length of the conversations, but your best

14  memory is that there was two to three conversations

15  and they were no longer than five minutes, is that

16  correct?

17      A.   I don't really remember, but yes, I guess

18  that's -- that's about it.

19      Q.   And again, your best memory is that your

20  telephone conversations with Ron Buchbaum were when

21  you were in the DC Imports office?

22      A.   Yes.

23      Q.   And just to follow up, do you recall, when

24  you talked to either Ron Buchbaum or Sean Walsh,

25  where they were?   In other words, do you know if you

# EXHIBIT 20



C-C 00822
CONFIDENTIAL





C-C 00679
CONFIDENTIAL

05/14/2004  05:28   6173893675

PAGE  04



C-C 00902
CONFIDENTIAL

Northern Trust Bank of Florida N.A.    301038

Office    BOCA RATON    ECV    63-365/660

Date    07-28-2003

Pay to the order of ***BOSTON HARLEY-DAVIDSON***    $ ***9,095.00***

THE SUM OF $9,095 dols 00 cts    D O L L A R S

Two signatures required for amount over $50,000.00

VOID OVER $9,095.00

Craig Kalish

Remitter:

Cashier's Check    Authorized Signature

Authorized Signature

C-C 00861
CONFIDENTIAL



C-C 00666
CONFIDENTIAL



C-C 00838
CONFIDENTIAL



Northern Trust Bank of Florida N.A.

Office    BOCA RATON    RGV    301041

63-965/660

www.northerntrust.com

Date    07-28-2003

Pay to the order of ***BOSTON HARLEY-DAVIDSON***    $ ***7,855.00***

THE SUM OF ⑤ 7,855 dols 00 cts    D O L L A R S

Two signatures required for amount over $50,000.00

VOID OVER $7,855.00

Jason Lozon

Remitter

Cashier's Check    Authorized signature

Authorized Signature

C-C 00890
CONFIDENTIAL

Northern Trust Bank of Florida N.A.

Office _____ BOCA RATON    BCV _____                    301042

Date ____ 07-28-2003 ____

Pay to the order of ***BOSTON HARLEY-DAVIDSON***                    $ ***8,242.00***

THE SUM OF ⑤ 8,2 4 2 dols 0 0cts

                                                    DOLLARS

VOID OVER $8,242.00                    Two signatures required for amount over $50,000.00

Roger Myyyymaki
Remitter

Cashier's Check                                Authorized Signature

                                                    Authorized Signature

C-C 00716
CONFIDENTIAL



Northern Trust Bank of Florida N.A.

Office  BOCA RATON   ECV

301043

63-965/660

Date   07-28-2003

Pay to the order of  ***BOSTON HARLEY-DAVERSON***

$  ***8,170.00***

THE SUM OF 008,170 dols 00 cts

DOLLARS

Two Signatures required for amount over $50,000.00

VOID OVER $8,170.00

JAMES GUSOFF
Remitter

Cashier's Check

Authorized Signature

Authorized Signature

C-C 00593
CONFIDENTIAL



C-C 00871
CONFIDENTIAL

Northern Trust Bank of Florida N.A.

Office _____ BOCA RATON  FCH _____

301045

63-969/660

Date  07-28-2003

Pay to the order of ***ROSTON HARLEY-DAVIDSON*** ___ |$|**25,247.00***

THE SUM OF 25,247 dols 00cts

DOLLARS

VOID OVER $25,247.00

Two signatures required for amount over $50,000.00

LEO LARSEN

Remitter

Cashier's Check

Authorized Signature

Authorized Signature

:301045: :066000969: 10 4 10000010:

C-C 00627
CONFIDENTIAL



Northern Trust Bank of Florida N.A.

Office ⎯⎯ BOCA RATON    ECV ⎯⎯

301046

63-965/660

Date    07-28-2003

Pay to the order of ***BOSTON HARLEY-DAVIDSON***                    $  ***8,170.00***

THE SUM OF $ 8,170 dols 00 cts

DOLLARS

VOID OVER $8,170.00

Two signatures required for amount over $50,000.00

Daniel Gusee
Remee

Cashier's Check                                            Authorized Signature

Authorized Signature

C-C 00607
CONFIDENTIAL



C-C 00733
CONFIDENTIAL



C-C 00748
CONFIDENTIAL



C-C 00785
CONFIDENTIAL



C-C 00772
CONFIDENTIAL



C-C 00647
CONFIDENTIAL



C-C 00697
CONFIDENTIAL

Northern Trust Bank of Florida N.A.

Office   BOCA RATON   FCV

701053

Date   07-28-2003

Pay to the order of ***BOSTON HARLEY-DAVIDSON***   $ ***12,054.00***

THE SUM OF $12,054 dols 00 cts                                    DOLLARS

VOID OVER $12,054.00

Sonia Paradial
Remitter

Cashier's Check                                   Authorized Signature

C-C 00804
CONFIDENTIAL

# EXHIBIT 21

```
 1                              VOLUME:    I
                                PAGES:     1 - 120
 2                              EXHIBITS:  1 - 11

 3
                      UNITED STATES DISTRICT COURT
 4
                        District of Massachusetts
 5

 6
         CYCLE-CRAFT CO., INC.          )
 7       d/b/a BOSTON                    )
         HARLEY-DAVIDSON/BUELL,          )
 8            Plaintiff,                 )
                                         )
 9         VS.                           )  Case No.
                                         )  04 11402 NMG
10       HARLEY-DAVIDSON MOTOR           )
         COMPANY, INC., and BUELL        )
11       DISTRIBUTION COMPANY, LLC.      )
              Defendants.                )
12

13
                VIDEOTAPED DEPOSITION OF JEFFREY P.
14       CHRISTENSEN, a witness called by and on behalf
         of the Defendants, taken pursuant to the
15       applicable provisions of the Federal Rules of
         Civil Procedure, before Sandra L. Bray,
16       Registered Diplomate Reporter, CSR Number
         103593, and Notary Public in and for
17       Commonwealth of Massachusetts, at the offices of
         Boynton Waldron Dolcac Woodman & Scott, P.A.,
18       82 Court Street, Portsmouth, New Hampshire, on
         Wednesday, April 6, 2005, commencing at
19       9:58 a.m.

20

21

22
                         REPORTERS, INC.
23          GENERAL & TECHNICAL COURT REPORTING
            23 Merrymont Road, Quincy, MA  02169
24          617.786.7783/facsimile 617.786.7723
```

1  A.  Seven, eight, yes.  Yes, I'm surprised one's in

2      my name, though.

3  Q.  And why are you surprised that one's in your

4      name, Mr. Christensen?

5  A.  Well, usually I can't buy any new bikes in my

6      name.

7  Q.  And if you look back on Page 1, Mr. Christensen,

8      on the bottom, there's a signature down on the

9      left.  Do you recognize that signature?

10  A.  Looks like Jason's.

11  Q.  How about there's initials on the right,

12      dealer's signature?  Do you recall who that is?

13  A.  No.

14            MR. BENSON:  Would you mark this as

15      Exhibit 3, please?

16            (Motorcycle Bills of Sale were marked

17             Exhibit Number 3 for identification.)

18  Q.  Mr. Christensen, can you take a look at what's

19      been marked as Exhibit 3?  Take a look at that,

20      and let me know whether you recognize these

21      documents.

22  A.  Yes, these look like the bill of sales for all

23      the bikes.  Yep.  I think everybody went down

24      and signed individually for them.

1   Q.   Didn't sell one of these motorcycles to Michael

2        Gallagher?

3   A.   No.

4   Q.   Didn't sell one to Denise Gallagher?

5   A.   No.

6   Q.   You yourself personally didn't buy one of these

7        motorcycles?

8   A.   Well, I bought one here, yeah.

9   Q.   And that was purchasing on behalf of Lee Custom

10       Cycle?

11                  MS. SMAGULA:   Objection.

12  A.   Yeah.

13  Q.   Is that true?

14  A.   Correct.

15                  MR. BENSON:   Would you mark this as

16       Exhibit 4, please?

17                  (Certificates of Origin For a Vehicle

18                  were marked Exhibit Number 4 for

19                  identification.)

20  Q.   Would you take a look at what's been marked as

21       Exhibit 4, Mr. Christensen, and let me know

22       whether you recognize these documents?

23  A.   Yes, these would be a copy of the title on

24       those.

1    Q.    On the eight motorcycles?

2    A.    Correct.

3    Q.    Okay.  And these are the eight motorcycles that

4          were purchased by Lee Custom Cycle?

5                    MS. SMAGULA:  Objection.

6    A.    Correct.

7    Q.    What's that, sir?

8    A.    Correct.

9    Q.    And is that your signature on the second page of

10         this document?

11   A.    Is that my signature?  Yep.

12   Q.    And do you recall how Lee Custom Cycle received

13         copies of these documents?

14   A.    I honestly don't.

15   Q.    Do you recall receiving these at any time from

16         Boston Harley-Davidson?

17   A.    Dave would have.  I don't know if the people

18         individually brought them in, back to David

19         or...

20   Q.    Mr. Karp would know that?

21   A.    Yeah.  Probably everybody individually brought

22         them in and gave them to Dave.

23   Q.    Okay.  Do you have any knowledge of that?

24   A.    I'm not 100 percent sure.

1   Q.   Let me know whether you've seen these drivers'

2       licenses before.

3   A.   Yeah.

4   Q.   When do you recall seeing these?

5   A.   I don't know.  I know these guys, so I've seen

6       their license before.

7   Q.   Do you recall providing these licenses to Boston

8       Harley-Davidson, copies of these licenses?

9               MS. SMAGULA:  Objection.

10  A.   These people must have gone in and then given

11      them to him when they signed the titles and

12      everything like that.

13  Q.   Do you have any knowledge of that?

14  A.   That's what we always do.  That's what they must

15      do.  When you go to buy the thing, to get the

16      title, they want a copy of your license.

17  Q.   But these individuals did not purchase the

18      motorcycles themselves, is that fair to say?

19  A.   Yeah, but the whole --

20            MS. SMAGULA:  Objection.  Sorry.

21  A.   The whole thing, did Jason know that these were

22      going to Lee Custom Cycle?  Yeah.  Did Boston

23      Harley know they were going to Lee Custom Cycle?

24      Probably not.  Did Jaime know they were going to

1    You may inquire.

2              MS. SMAGULA:    Okay.

3  Q.   Mr. Christensen, going back to your

4       conversations with Jason, Jason Morasca, what

5       did Jason say to you about individuals

6       purchasing the bikes?

7  A.   Probably just got to have some names to put the

8       people -- you know, the titles in.

9  Q.   I want you to be -- I know this is a long time

10      ago.  I just want you to be as precise as you

11      can.  What do you remember him saying to you?

12 A.   "Got to get some names to put these bikes in."

13 Q.   Do you recall -- was he saying that in response

14      to something you had said?

15 A.   No, not really.

16 Q.   What was your --

17 A.   Like I said, we all kind of know the deal.  I

18      mean I've done that at Seacoast for years.  They

19      knew that the bikes were going somewhere else.

20      I bring my dad in.  He was 70 years old.  We put

21      one in his name.  They know my dad's not driving

22      the bike.  So I mean I've just been doing that

23      forever.

24 Q.   But did Jason Morasca know any of these

1          from --

2    A.    No.

3    Q.    -- that?

4    A.    No.

5    Q.    So Lee Custom Cycle has never had any trouble

6          with the police with regards to selling bikes?

7    A.    We donate our lease on a PD bike.  We've done

8          that before.  We have a real good rapport with

9          the town, with the police and everybody.  We

10         give firefighter and police discounts.

11   Q.    Has Lee Custom Cycle ever been investigated

12         about taping over VIN numbers?

13   A.    Yes, something came up about that.

14   Q.    What was that?

15   A.    I went down there to register a bike, a custom

16         bike that I bought at a bike show up in Maine,

17         and the guy never registered it.  He never did

18         the title work on it.  He built it.  The guy's

19         like a little Jesse James or something.  It was

20         funny.  We were at the show, and he said, "I

21         bought my first bike from you, man," and he's

22         building all these exotic choppers.

23               So I went down to DMV to register it.

24         I had all the paperwork and stuff, and the guy

1      down at DMV and I grew up together.  He says,

2      "Jeez, it's funny, Jeff.  Your name has come

3      across my desk a lot lately."  I said, "Really.

4      What's that about?"  "Well, Seacoast Harley

5      called up the New Hampshire Dealers Association

6      or DMV, motor vehicles, and wanted to know why

7      am I taping up my VIN numbers and what are they,

8      stolen motorcycles, and yadda, yadda, yadda.

9             So they had a few meetings on it to

10     see if it was legal or not, and they did come up

11     with the answer that, "Yes, they can be taped up

12     while they're in my possession, but when they

13     leave, after they're sold, they have to be

14     untaped and they can't be altered or covered up

15     in any way."  So I assured him that he made the

16     right decision because they're doing that in

17     every other state in the United States.

18  Q.  So do you have bikes on the floor of Lee Custom

19     Cycle with VIN numbers taped over?

20  A.  Once in a while we do.

21  Q.  What is the purpose of that?

22  A.  Just so Ed can't get in there through a spy or

23     somebody else, get the VIN numbers, then call up

24     and cry to Harley-Davidson, have them run the

1    VIN numbers and find out the dealers I bought

2    the bikes from.  Then the dealer gets in trouble

3    that I bought the bike from, but the dealers

4    don't know -- somebody comes in with, you know,

5    a license and everything like that, they don't

6    know.

7  Q.    It's your understanding that the dealer is not

8    aware?

9              MR. BENSON:  Objection.  Move to

10    strike.

11  A.    Yes.  Lee Custom Cycle is buying the bike.  Lee

12    Custom Cycle isn't on the bank check.  You know

13    what I mean?  So the dealer can be sitting there

14    and not even know that we suck bikes out.  We

15    suck bikes out of Seacoast Harley-Davidson; they

16    don't even know it.  We're very aggressive.

17    It's America.  These things are all titled.

18           You know if we did this with sit-down

19    lawn mowers out of Wal-Mart, where would we be?

20    We'd be entrepreneurs; we'd be true Americans

21    and stuff.  You try to do it with a couple of

22    Harleys, and everybody is all worried that you

23    might be able to make a couple bucks off it, you

24    know?

1                      I mean, is buying a Harley illegal

2         now?  I mean, can somebody go in and buy one?  I

3         mean, what's the big deal?

4                      MS. SMAGULA:  I just need a minute.

5    Q.   Mr. Christensen, so whenever Lee Custom Cycle

6         purchases bikes from Harley-Davidson dealers,

7         they provide individual names?  You provide

8         individual names?

9    A.   Right.

10   Q.   That's your practice?

11   A.   Yeah.  Like I say, my dad, my family members.

12        It's just the way the deal works.  They've got

13        to have somebody's name to put it in.  Tons of

14        people have been doing that for a long time.

15        They have their girlfriend.

16   Q.   And in your experience, is the dealer usually

17        aware?

18                      MR. BENSON:  Objection.

19   A.   Sometimes yes, sometimes no.  All depends.

20   Q.   Do you personally own any Harley-Davidson bikes?

21   A.   Yes, I own about 40 of them.

22   Q.   You own about 40 of them?

23                      (The witness nodded.)

24   Q.   You ride all 40 of those?