# EXHIBIT 30

Deposition of Dianne Bolden, 5/25/2005

1          IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

2                  STATE OF WISCONSIN
    -------------------------------------------------------

3
CYCLE-CRAFT CO., INC. d/b/a
4  BOSTON HARLEY-DAVIDSON/BUELL,

5

6

7              vs.              Case No. 04-11402-NMG

8  HARLEY-DAVIDSON MOTOR CO., INC.
   AND BUELL DISTRIBUTION CO., LLC.,

9

10                 Defendant.

11
    -------------------------------------------------------

12

13

14         Video Deposition of DIANNE BOLDEN

15          Wednesday, May 25th, 2005

16                 2:56 p.m.

17                    at

18         Gramann Reporting, LTD
           710 N. Plankinton Ave.
19            Milwaukee, WI

20

21      Reported by Rose M. Coulthart, RPR

22

23

24

25

Deposition of Dianne Bolden, 5/25/2005

```
 1            automatically as a result of the SWR being submitted?
 2   A    Not to my knowledge.
 3   Q    Not to your knowledge.  So you don't know if they
 4            receive any kind of welcome packet or information
 5            about the company?
 6   A    Oh, they do.  When they initially register their
 7            bikes; is that the question?
 8   Q    When the SWR is submitted?
 9   A    Yes.  They receive something.  I'm not sure exactly
10            what it is though.
11   Q    Is that from the motor company itself or is that from
12            the local dealer?
13   A    I'm not sure.
14   Q    Okay.  But you don't have any responsibility for
15            sending anything --
16   A    No.
17   Q    -- to any customers?
18   A    No.
19   Q    Okay.
20                  (Exhibit No. 70 marked for identification.)
21   BY MR. NEE:
22   Q    Okay.  Ms. Bolden, I'm showing you what's been marked
23            as Exhibit 70.  Just take a look at that.  Are you
24            familiar with that?
25   A    Yes.
```

Deposition of Dianne Bolden, 5/25/2005

| | | |
|---|---|---|
| 1 | Q | Can you tell me what it is? |
| 2 | A | Print screen. |
| 3 | Q | It's a print screen? |
| 4 | A | Yes. |
| 5 | Q | Of an SWR? |
| 6 | A | Yes.  From our AS400. |
| 7 | Q | From AS400? |
| 8 | A | Yes. |
| 9 | Q | What does that mean? |
| 10 | A | That's our system. |
| 11 | Q | That's your system? |
| 12 | A | Yes. |
| 13 | Q | And you're proficient with that system? |
| 14 | A | Yes. |
| 15 | Q | Now, is this all the information that the dealer has |
| 16 | | submitted in an SWR? |
| 17 | A | Yes. |
| 18 | Q | Okay.  And are these normally printed out after a |
| 19 | | dealer submits its information electronically? |
| 20 | A | No.  Not unless it's necessary. |
| 21 | Q | Why would it be necessary? |
| 22 | A | Well, okay.  These submissions aren't automatically |
| 23 | | printed out on a daily basis. |
| 24 | Q | Okay. |
| 25 | A | So if it was need for corrections or anything of that |

Deposition of Dianne Bolden, 5/25/2005

```
 1        nature.
 2   Q    So you would only print out a hard copy of the
 3        registration if a change needed to be made or
 4        something like that?
 5   A    Yes.
 6   Q    Can you just explain some of these entries here to
 7        me?  In the upper left-hand corner -- oh, by the way
 8        these documents are Bates numbered down here at the
 9        bottom with numbers.  Do you see that in the lower
10        right-hand corner?
11   A    Um-hmm.
12   Q    That's called a Bates number.  So if I refer to
13        HD21871, I'm referring to the number on the page.
14   A    I need my glasses.
15                MR. BERKOWITZ:  You and me both.
16                THE WITNESS:  Yeah.  That's a lot of
17        numbers.
18                (Off-the-record discussion had.)
19                THE WITNESS:  Wow, I don't think I have
20        them.  Okay.
21   BY MR. NEE:
22   Q    Do you have your glasses?
23   A    You know what, I don't think I do.
24                MR. REHNQUIST:  Mine are 125.
25                MR. BERKOWITZ:  Mine are 250.
```

Deposition of Dianne Bolden, 5/25/2005

```
1    BY MR. NEE:

2    Q    Can you read the document without them?

3    A    Yes, I can.

4    Q    I won't be referring to the page numbers that much.

5    A    Oh, okay.

6    Q    And Mr. Berkowitz can walk you through it if I am.

7    A    All right.

8    Q    In the upper left-hand corner --

9    A    Um-hmm.

10   Q    -- you see it says RGII I guess or?

11   A    Okay.

12   Q    Is that -- what is that entry, do you have any idea?

13   A    That's the program.

14   Q    Okay.  That's the program?

15   A    Yes.

16   Q    So that would be consistent throughout all screen

17        printouts?

18   A    For this, yes.

19   Q    Okay.  And then in the upper right-hand corner it

20        says inquiry?

21   A    Um-hmm.

22   Q    And a date 5/19/05?

23   A    Yes.

24   Q    Is that the date this was printed out?

25   A    Yes.
```

Deposition of Dianne Bolden, 5/25/2005

```
 1    Q    Is that automatically generated when you print a
 2         screen shot out?
 3    A    Yes.
 4    Q    Okay.  And why was this document printed out on this
 5         date, May 19th?  Well, let me back up a second.
 6         Below in the upper left-hand corner I see it says
 7         Bolden D.
 8    A    Um-hmm.
 9    Q    Does that refer to you?
10    A    Yes.
11    Q    Does that mean you entered in -- well, I guess you
12         didn't enter in the information.  Does that mean you
13         printed this registration out?
14    A    That means it was my system --
15    Q    Okay.
16    A    -- that this came up.
17    Q    Your system?
18    A    Yes.
19    Q    Does anyone else have access to the system?
20    A    My system?
21    Q    Yeah.
22    A    No, not my particular personal computer.  No.
23    Q    Okay.  So this was printed off at your computer?
24    A    Yes.  I guess.
25    Q    But you don't recall printing this out?
```

Deposition of Dianne Bolden, 5/25/2005

1  A   No.

2  Q   But you're the only -- but you're the only person who

3      would print something out from your computer?

4  A   Yes.

5  Q   And this was printed out on May 19th, 2005?

6  A   That's what it says, yes.

7  Q   You don't recall printing it out?

8  A   I print out a lot.

9  Q   Yeah.

10 A   So, yes, if it's coming off my system and it's saying

11     Bolden D, yes.

12 Q   Do you remember who asked you to print this out?

13 A   No.

14 Q   Okay.  On the next line down it says co-owner.  What

15     does that mean?

16 A   That means you had the current owner and you have

17     somebody else that possibly -- say a husband and

18     wife.

19 Q   Okay.

20 A   The husband may be the first owner, and the wife is

21     the co-owner of the motorcycle.

22 Q   So you can enter in more than one owner's name here?

23 A   Well, you can owner and a co-owner, yes.

24 Q   Okay.  And then the VIN numbers here, that refers to

25     the VIN number for the motorcycle?

Deposition of Dianne Bolden, 5/25/2005

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And then registration created on? |
| 3 | A | Yes. |
| 4 | Q | I'm assuming that's the date that this was submitted |
| 5 | | electronically to Harley-Davidson? |
| 6 | A | Yes. |
| 7 | Q | And then it also contains the address information for |
| 8 | | the individual purchasing? |
| 9 | A | Yes. |
| 10 | Q | Okay.  And phone number? |
| 11 | A | Yes. |
| 12 | Q | And what does H.O.G. or BRAG indicator mean? |
| 13 | A | Harley's Owner's Group. |
| 14 | Q | Okay. |
| 15 | A | When you buy a motorcycle, you automatically get a |
| 16 | | membership into that.  And BRAG is for Buell. |
| 17 | Q | Okay.  And why does it say N after that? |
| 18 | A | That means no, that they didn't have a H.O.G. or BRAG |
| 19 | | membership. |
| 20 | Q | Okay.  I thought you said they automatically get -- |
| 21 | A | They will.  But initially they may not have one. |
| 22 | Q | Okay. |
| 23 | A | So it would say no, and then they generate one. |
| 24 | Q | Okay.  Who would generate one? |
| 25 | A | H.O.G. or BRAG. |

Deposition of Dianne Bolden, 5/25/2005

```
 1    Q    Okay.  And so are they automatically passed along
 2         this registration information?
 3    A    Yes.
 4    Q    Who passes that on to them?
 5    A    The systems are connected.
 6    Q    Okay.  So there's people beyond your division who
 7         have access to this information?
 8    A    Yes.
 9    Q    Okay.  And then below that it says date purchased?
10    A    Yes.
11    Q    August 6, 2003; is that correct?
12    A    Yeah.  That's what it says.
13              MR. BERKOWITZ:  The first page.
14              MR. NEE:  The first page, yeah.
15    BY MR. NEE:
16    Q    Now, if this bike was purchased on August 6, 2003,
17         why would the registration not have been created
18         until October 30th, 2003?
19              MR. BERKOWITZ:  Objection.  You can answer
20         if you know.
21              THE WITNESS:  I don't know.
22    BY MR. NEE:
23    Q    Okay.  Is the registration -- can a registration be
24         changed?
25    A    Yes.
```

Deposition of Dianne Bolden, 5/25/2005

```
 1   Q   And how is that done?

 2   A   If a dealer contacts me or sends in a request saying

 3       it was incorrect registration.

 4   Q   And are you the only contact person at

 5       Harley-Davidson for changes to SWR's?

 6   A   Yes.

 7   Q   I just want to go back to HD21871 for a second.  This

 8       says registering dealer 1864 Cycle-Craft?

 9   A   Um-hmm.

10   Q   Is that automatically in there?

11   A   Yes.

12   Q   On the --

13   A   Dealer number.

14   Q   Okay.  And then type of sale below that?

15   A   Yes.

16   Q   Retail?

17   A   (Nodding.)

18   Q   What other kinds of sales are there?

19   A   Demo sales, police shrine sales.

20   Q   And are these all required fields that have to be

21       entered in by the dealer?

22   A   Yes.

23   Q   Will the system reject an SWR if all these fields

24       aren't filled in?

25   A   Yes.
```

Deposition of Dianne Bolden, 5/25/2005

| | | |
|---|---|---|
| 1 | Q | Do you see the next two more lines down it says under |
| 2 | | ESP until? |
| 3 | A | Um-hmm. |
| 4 | Q | What does that mean? |
| 5 | A | Extended purchase service plan.  Extended service |
| 6 | | plan. |
| 7 | Q | And that's something that the customer would |
| 8 | | purchase? |
| 9 | A | Yes. |
| 10 | Q | From the dealer? |
| 11 | A | Yes. |
| 12 | Q | And how about below that it says F3 exit F7 update? |
| 13 | A | That's -- |
| 14 | Q | What does that -- |
| 15 | A | -- just prompts for the system. |
| 16 | Q | Um-hmm.  And so with that update F7, is that what you |
| 17 | | would need to do to update the registration? |
| 18 | A | Depends on what needed to be updated. |
| 19 | Q | Um-hmm.  What kinds of things can be updated? |
| 20 | A | Address, zip, maybe a H.O.G. or BRAG membership |
| 21 | | number that was forgotten. |
| 22 | Q | Okay.  And what does the next prompt mean F10 build |
| 23 | | INQ? |
| 24 | A | Those are all just prompts for the system, different |
| 25 | | meanings.  But basically for the registration it |

Deposition of Dianne Bolden, 5/25/2005

1       really doesn't --

2  Q   Okay.  And what is the last UPD mean?

3  A   When it's last updated through the system.  And that

4       particular system I'm not sure because we have

5       different numbers for different systems that update

6       our AS400 system.

7  Q   Okay.  But I thought you said you were the person --

8       the contact person at Harley-Davidson to change

9       information on registration?

10  A   Yes.  Basically yes.

11  Q   So why would someone else be updating information

12      then?

13  A   Our IS department runs various systems.

14  Q   I'm sorry.  What does IS stand for?

15  A   Our data warehouse people, engineers, software

16      analysts --

17  Q   Um-hmm.  Your internal Harley-Davidson --

18  A   Internal, exactly.  Have different programs that they

19      will run through the system, AS400.  And this

20      particular -- I don't know what -- what it was.

21      That's beyond what I do.

22  Q   Okay.  What kind of updates would they be doing

23      though?  Do you mean like software updates or

24      actually entering new information --

25  A   No.

Deposition of Dianne Bolden, 5/25/2005

1       it says transfer, correct?

2   A   Yes.

3   Q   So this would be a limited -- an example of a limited

4       warranty transfer?

5   A   Yes.

6   Q   And that's separate from the dealer contacting you

7       and telling you they want new information entered

8       into a registration?

9   A   Yes.

10   Q   What does a dealer have to do to change an SWR?

11       What's the process?

12   A   The process is to contact me through a fax, phone.

13       We have a feature on our HD-Net that allows dealers

14       to electronically submit changes.

15   Q   So you said phone, fax or HD-Net?

16   A   Yes.

17   Q   Can they call you or there has to be a written

18       submission?

19   A   They call me.

20   Q   Um-hmm.  But do you need something written after they

21       call you?

22   A   Basically, yes.

23   Q   Okay.

24             (Exhibit No. 71 marked for identification.)

25   BY MR. NEE:

Deposition of Dianne Bolden, 5/25/2005

```
1              MR. NEE:  Pre-2000.

2              THE WITNESS:  I don't think it was a

3       policy.  I probably had had lists when I first began

4       to understand and to do it properly.

5  BY MR. NEE:

6  Q    Okay.  On Exhibit 73, the requested changes from

7       Boston Harley-Davidson?

8  A    Um-hmm?

9  Q    Would the fact that you had printed this out and

10      written on it and put it in your file indicated that

11      Jamie had an acceptable reason?

12             MR. BERKOWITZ:  Objection.  You can answer.

13             THE WITNESS:  It was common procedure when

14      a dealer called and I printed -- made a print screen

15      and put a name and their -- their system that they

16      used that that was a acceptable reason.  Yes.

17 BY MR. NEE:

18 Q    Okay. So this would indicate that you had accepted

19      their reason?

20 A    Yes.

21 Q    Okay.  Do you pass along the daily SWR information to

22      accounting, your accounting department at

23      Harley-Davidson?

24 A    No.

25 Q    Do you know if anyone else within the sales
```

# EXHIBIT 31

1

```
                              VOLUME:     I
                              PAGES:      1 - 95
                              EXHIBITS:   1 - 18
```

2

3

UNITED STATES DISTRICT COURT

4

District of Massachusetts

5

6

```
     CYCLE-CRAFT CO., INC.          )
     d/b/a BOSTON                    )
     HARLEY-DAVIDSON/BUELL,          )
          Plaintiff,                 )
                                     )
        VS.                          )   Case No.
                                     )   04 11402 NMG
     HARLEY-DAVIDSON MOTOR           )
     COMPANY, INC., and BUELL        )
     DISTRIBUTION COMPANY, LLC.      )
          Defendants.                )
```

7

8

9

10

11

12

13

          DEPOSITION OF STEPHEN T. VESEY, a witness
called by and on behalf of the Defendants, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Sandra L. Bray,
Registered Diplomate Reporter, CSR Number 103593, and
Notary Public in and for Commonwealth of Massachusetts,
at the offices of Bingham McCutchen, 150 Federal Street,
Boston, Massachusetts, on Wednesday, June 22, 2005,
commencing at 10:01 a.m.

14

15

16

17

18

19

20

```
                    REPORTERS, INC.
           GENERAL & TECHNICAL COURT REPORTING
           23 Merrymont Road, Quincy, MA  02169
           617.786.7783/facsimile 617.786.7723
```

21

22

23

24

1    salaries, say, 1995 through 1999, that would

2    include John and Karen Atwood?

3                        MS. SMAGULA:  Objection.

4    A.  That should include only John and Karen.

5    Q.  No other officers, to your knowledge?

6    A.  There are no other officers.

7    Q.  And they were the only two shareholders as

8        well?

9                        MS. SMAGULA:  Objection.

10   A.  Yes, they were the only two shareholders.

11       There may have been a year or two where some

12       of the stock may have been kept inside

13       Mr. Atwood's estate, but they're the only two

14       shareholders, officers.

15   Q.  And is Karen Atwood still an owner of

16       Cycle-Craft?

17   A.  She owns --

18                        MS. SMAGULA:  Objection.

19   A.  She owns a small percentage of stock.

20   Q.  Do you recall what percentage she owns today?

21   A.  No.

22   Q.  How about at the year end 2004?  Do you recall

23       what percentage?

24   A.  It's footnoted in the body of the financial

1          statements.

2      Q.   Okay.  Year end 2004?

3      A.   '4.

4      Q.   Can you go to Atwood Number 14?  I guess on

5           Vesey 85, is that the note you're referring

6           to?

7      A.   Yes.

8      Q.   So as of year end 2004, John Atwood owned 458

9           shares and Karen Rossi owned the remaining 42

10          shares?

11     A.   Yes.

12     Q.   And pursuant to the buyout agreement, is

13          Mr. Atwood required to purchase those

14          remaining 42 shares?

15     A.   Yes.

16     Q.   And that would be by the end of 2005?

17     A.   Yes.

18               MS. SMAGULA:  Objection.

19     A.   Well, there's no timetable for it.  She has

20          not been pushing to get the money out.  She's

21          very happy to make 6 percent on the interest

22          on this thing.  So it may or may not happen at

23          the end of 2005.

24     Q.   As of today, she still owns the 42 shares?

# EXHIBIT 32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>Plaintiff,<br><br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION<br>)  NO. 04 11402 NMG<br>)<br>)<br>)<br>)<br>)<br>) |

## ANSWERS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES

Defendants Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson") hereby respond to the Third Set of Interrogatories (the "Interrogatories") of Plaintiff Cycle-Craft Co., Inc., d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") as follows.

### GENERAL OBJECTIONS

1.    Harley-Davidson's responses shall not be deemed to constitute an admission that any particular document exists, is relevant, or is admissible as evidence or that any statement or characterization in the request is accurate or complete.

2.    Harley-Davidson objects to these requests to the extent that they seek documents protected by the attorney-client privilege, the work-product doctrine or are otherwise protected from disclosure.

3.      Harley-Davidson objects to any definition, request or instruction that purports to impose any obligation not expressly provided for in the Federal Rules of Civil Procedure or Local Rules.

4.      To the extent the Request calls for information or the production of documents Harley-Davidson regards as confidential and/or sensitive business information, Harley-Davidson objects to providing that information until a suitable protective order has been agreed upon by the parties and entered by the Court.

5.      Harley-Davidson objects to the definition of the term "material involvement" as vague, particularly to the extent that the term "material" is inherently subjective.

6.      Harley-Davidson objects to the definition of the term "adverse action" as overbroad, particularly to the extent that Cycle-Craft has arbitrarily identified certain actions such as "allocation adjustments" and "chargebacks" as "adverse."

7.      These general objections are incorporated into each numbered response, as if each general objection was specifically set forth therein.

## ANSWERS

### INTERROGATORY NO. 25

Please identify and state the basis for each fact or circumstance that you contend establishes, in whole or in part, "good cause" for the termination of the Cycle-Craft dealership under Mass. Gen. Laws Ch. 93B § 5(j).

### ANSWER NO. 25

Harley-Davidson objects to this request on grounds that it is vague, ambiguous and overbroad inasmuch as it asks defendant to "state the basis" for a "fact or circumstance." Subject to and without waiving these objections, Harley-Davidson states that Cycle-Craft's falsification of its sales reports to Harley-Davidson, and related material violations of the Harley-Davidson Dealer Agreement and Non-Retail Sales Policy, as set forth in the two April 20, 2004 letters from Jon Flickinger of Harley-Davidson to John Atwood of Cycle-Craft (which are incorporated herein by reference) and efforts by Cycle-Craft to conceal same constitute good cause for termination, pursuant to Mass. Gen. Laws ch. 93B § 5(h) and (j)(7).

In addition, during this litigation, Harley-Davidson has discovered that Cycle-Craft falsified additional sales reports to Harley-Davidson with respect to motorcycles having the following vehicle identification numbers: 1HD1BMY153Y105320, 1HD1GHV193K310865, 1HD1GEV183K318650, 1HD1GEV193K330502, 1HD1BTY1X3Y091568, 1HD1HAZ423K849398, 1HD1HAZ183K843207. Harley-Davidson denies that any other factor enumerated in Mass. Gen. Laws ch. 93B § 5(j) is pertinent to the circumstances of this case. To the extent that other factors are deemed to be pertinent, they do not outweigh Cycle-Craft's material breach of contract; for example, and without limitation, the following facts and circumstances weigh in favor of termination:

- Cycle-Craft's sales performance is insufficient to outweigh its material breaches of the Dealer Agreement. [see § 5(j)(1)]

- Cycle-Craft's investment is insufficient to outweigh its material breaches of the Dealer Agreement. Additionally, Cycle-Craft's investment has been and/or may be recouped. [see § 5(j)(2-3)]

- Any alleged impact on the public welfare is insufficient to outweigh Cycle-Craft's material breaches of the Dealer Agreement. Among other considerations, it is Harley-Davidson's intention to establish a new dealership in the Boston area following termination of the Cycle-Craft Dealer Agreement. [see § 5(j)(4)]

- The adequacy of Cycle-Craft's facilities, equipment, vehicle parts and personnel is insufficient to outweigh Cycle-Craft's material breaches of the Dealer Agreement. Among other things, Cycle-Craft has failed to engage properly qualified personnel by employing as its general manager an individual with prior convictions for fraudulent conduct [see § 5(j)(5)]

- The adequacy of Cycle-Craft's services to the public is outweighed by Cycle-Craft's material breaches of the Dealer Agreement. Additionally, Cycle-Craft has poor Customer Satisfaction Index scores. [see § 5(j)(6)]

## AS TO ANSWERS

I, Gene Ostrom, depose and state that I am the Director of U.S. Field Sales of Harley-Davidson Motor Company, Inc. and I am authorized to sign these Interrogatories on behalf of Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson"). I have read the foregoing Answers to Plaintiff's Third Set of Interrogatories and know their contents; the answers were prepared with the assistance and advice of counsel and employees of Harley-Davidson upon whose information I have relied; the answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these answers; Harley-Davidson reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been made therein or that more accurate information is available; subject to these limitations these answers are true to the best of my knowledge, information and belief. Signed under pains and penalties of perjury this __12th__ day of July, 2005.

Gene Ostrom
Director of U.S. Field Sales
Harley-Davidson Motor Company, Inc.

AS TO OBJECTIONS:

_[signature]_

William N. Berkowitz, BBO# 544148
Sabita Singh, BBO# 560146
William F. Benson, BB# 646808
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Attorneys for Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC

## CERTIFICATE OF SERVICE

I, Sabita Singh, hereby certify that a true copy of the above document was served upon the attorney of record for each other party, listed below, by hand on July _14_, 2005:

Angela Buchanan Smagula, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

_[signature]_
Sabita Singh

# EXHIBIT 33



WIGGIN & NOURIE, P.A.
Counsellors at Law

Gregory A. Holmes
gholmes@Wiggin-Nourie.com
603-629-4524

March 7, 2003

Harry Nichols, Business Mgmt. Rep.
Harley-Davidson Motor Company, Inc.
3700 Juneau Avenue
P.O. Box 653
Milwaukee, WI 53201

J. WALKER WIGGIN (1901-1995)
PAUL E. NOURIE (1908-1978)
T. WILLIAM BIGELOW (RETIRED)

DORI S. BIGG*
WILLIAM S. ORCUTT†
W. WRIGHT DANENBARGER
L. JONATHAN ROSS
JOHN R. MONSON§
PAUL R. KFOURY, SR.
BENJAMIN F. GAYMAN
GORDON A. REHNBORG, JR.
RICHARD B. MCNAMARA†
GREGORY A. HOLMES†
THOMAS J. PAPPAS
DENNIS T. DUCHARME
GARY M. BURT*
DOREEN F. CONNOR*
STEPHEN J. PATTERSON
STEPHANIE A. BRAY†
SHARI M. JANKOWSKI
JOEL T. BRIGHTON
DARLA S. SEDGWICK
DONALD C. CRANDLEMIRE
JAMES V. FERRO, JR.§
DANIEL DUCKETT†
ELIZABETH M. LEONARD*
NANCY A. DEANGELIS
GAIL E. BAKIS
ASHLYN J. LEMBREE†
CHRISTOPHER J. PYLES†
MEREDITH P. COOK
RALPH SUOZZO
HEATHER E. KRANS†
CAROL L. KUNZ
MARY ANN DEMPSEY†
WILLIAM J. EDWARDS†
DONNA-MARIE COTE
AMY L. BAGLEY
JARED J. NYLUND
SUZANNE M. FOSTER
ROBERT J. CONSAVAGE

* Also Admitted in Maine
† Also Admitted in Massachusetts
* Also Admitted in Connecticut
§ Also Admitted in Rhode Island

**RE:    Boston Harley-Davidson**

Dear Mr. Nichols:

This office represents Cycle-Craft Co., Inc., d/b/a/ Boston Harley-Davidson. We have received and reviewed your letter of February 4, 2003, advising the dealership that certain zip codes are being carved out of its relevant market area for the purpose of monitoring the area for a new dealer.

The purpose of this letter is to advise Harley-Davidson that Boston Harley-Davidson intends to protest any attempt to open a new dealership in its relevant market area. Under Massachusetts law Boston Harley-Davidson has the right to have Harley-Davidson prove that good cause exists for the establishment of a new dealer in its relevant market area. We believe that the current market for Harley-Davidson vehicles does not justify the re-alignment of the current market area and the establishment of another outlet.

In an attempt to avoid the expense of litigating whether Harley-Davidson has good cause for establishing a new dealer in the Danvers area, Boston Harley-Davidson would be willing to discuss opening a secondary retail location in the Danvers area within its relevant market area. Opening a SRL would provide Harley-Davidson with the representation it feels it needs and would allow the Boston Harley-Davidson to continue to service its market. Please contact me if Harley-Davidson desires to discuss the proposal further.

H-D 0979
Confidential

Harry Nichols, Business Mgmt. Rep.
Harley-Davidson Motor Company, Inc.
Page 2
March 7, 2003


Very truly yours,

Gregory A. Holmes

GAH/lw-00459791.DOC

cc:     John F. Atwood

H-D 0980
Confidential

# EXHIBIT 34



Malicki
EXHIBIT 38
4/26/05
GRAMANN REPORTING, LTD.

**From:**      Holaday, Bill
**Sent:**       Friday, December 13, 2002 11:50 AM
**To:**         Malicki, Mike; Ostrom, Gene
**Cc:**         Nichols, Barry; Marcolina, Joe
**Subject:**    Boston Market Study

*Overall the presentations went smoother than I anticipated.  Harry did an excellent job of presenting the material in a way that seemed to minimize the hostility that a few of the dealers are capable of showing.  The following is a brief dealer by dealer account of our visits:*

*1870 Leominster, MA  This was the first visit, and it went very smoothly.  We met withPhil Desmarais, the owner, and his daughters Marlene and Diane.  He had no concerns with the Danvers point, and made the statement that he thought Nashua was a good idea, because he thought it would take some of the pressure off of him regarding service.*

*1864 Everett, MA  John Atwood is very opposed to the Danvers point, and plans to protest it. I asked him if the protest meant that he would have no interest in applying for the point.  He would be interested in doing an SRL in that area, but would not want to spend "$4 million" to do a full dealership.  Late in our discussion he admitted that as far back as 1988 he "knew that you (H-D) needed a dealership up there..."  This is consistent with statements made to me when the market study was first announced.*

*2805 N. Hampton, NH  John McGonagle and his 2nd in command, Ed Moulton, are very opposed to the Danvers point also.  As Harry presented the material, John told us that he could hire someone to put together a report that would come up with the opposite conclusions. He said that business is slowing down, but did not give specifics.  He was concerned that although we say the allocation for Danvers would be 234 now, that by the time we fill the point it could be 400+.  He said that he "never would have built the new building" if he knew we were going to "put a dealer in Danvers"  Although he does not have protest rights, he indicated that he would assist Atwood with his protest. By meeting's end, our conversation was cordial.*

*1294 Manchester, NH  Steve Talarico is very pleased that his Nashua, NH SRL will be converted to a full line dealer, but disappointed that the allocation will be only 169 units.  He has no problem with Danvers.*

1

H-D 1805
Confidential

1851 N. Billerica, MA As expected, Brian Kelly and his general manager, Wayne Hathaway, were very much in favor of the Danvers point. Kelly has long wanted to have a dealership there, and obviously will be will be working very hard to convince us that he is the right person for it. We explained the process, and he understands that this is the first step. He further understands that we will seek applicants and that we will choose the best candidate. We informed him that Atwood would protest the point. Kelly told us that he believes the new law only provides 8 mile protest rights. He had his attorney fax us a copy which Harry will go over with legal. Kelly also has some concerns about Nashua, especially if we were to chose someone else for Danvers, but will not protest it.

On Thursday, I accompanied Harry and Joe to Framingham and Auburn. Joe felt that since I was involved with the original Boston study, and the setup of the Framingham store, that it was a good idea that I attend.

Framingham, MA We met with Jim Pilivin and Robert DiGangi. Pilivin is very opposed to the Danvers point. He says that business is slowing down, and that another point will hurt the market. He said that his "cash flow is down $650,000". I asked him if he is running a loss from the first of the year through November, but he indicated that he did not have that information at this time. He told us that employment will decline next year when the Boston "Big Dig" is complete. I mentioned the fact that he had been the beneficiary of an additional point recommended by the last study, and he answered that he was opposed to the Framingham point, and that he only wanted it to protect his other store.

Auburn, MA Orville Sheldon complimented Harry on the study, and did not express opinion on the additional points, but showed us a hand drawn map with 20 mile circles around each existing dealership. His point was that Danvers was inside the 20 mile protected range of Everett, and therefore the law would prevent us from establishing the point there. We had some discussion on that, and Harry clarified that the 20 miles only gave the dealer protest rights, but did not necessarily exclude the possibility of us establishing a point there.

Additionally, Harry and I took note of the "market prices" on the hang tags at most of the dealerships. For example, Framingham had Road Kings for $23,650, and a fully accessorized Wide Glide was $29,000+, while an accessoried Road Glide at N. Hampton was also $29,000+.

H-D 1806
Confidential

2

# EXHIBIT 35

## Verduyn, Steve

| | |
|---|---|
| **From:** | Verduyn, Steve |
| **Sent:** | Monday, July 28, 2003 12:26 PM |
| **To:** | Malicki, Mike; Contois, Al |
| **Subject:** | RE: SWR report needed |

If you'd be so kind as to send a reminder then (after end of M.Y.) with specificially what you want reviewed, that would be appreciated.

Steve

-----Original Message-----
| | |
|---|---|
| **From:** | Malicki, Mike |
| **Sent:** | Monday, July 28, 2003 12:22 PM |
| **To:** | Verduyn, Steve; Contois, Al |
| **Subject:** | RE: SWR report needed |

*Nothing jumps out, however we need to take a look after the m.y. has ended at the last few weeks. Gene also said that they hammered in a huge amount at the end of last year as well, so maybe we should look at end of m.y. '02.*

*Thank-You and God Bless America*

*M. G. Malicki*
*Director of Field Operations*

-----Original Message-----
| | |
|---|---|
| **From:** | Verduyn, Steve |
| **Sent:** | Monday, July 28, 2003 10:16 AM |
| **To:** | Contois, Al; Malicki, Mike |
| **Subject:** | FW: SWR report needed |

<u>Confidential</u>

fyi....I took a quick glance, and there are only a handful that jump out as a bit odd. Most of those are 2 sales to same person at same address in last 6 months. Also one sale to a Disimone. There is a Thomas and Jeanette Disimone that own a large aftermarket shop in NY state that I have dealt with on other grey market activity.

Anything ring a bell with either of you?

Please advise, and I'd ask we keep the nature of these discussions confidential.

Thanks

Steve

-----Original Message-----
| | |
|---|---|
| **From:** | Bolden, Dianne |
| **Sent:** | Monday, July 28, 2003 9:44 AM |
| **To:** | Verduyn, Steve |
| **Subject:** | RE: SWR report needed |

Steve,

Per your request.

Dianne

<< File: DLR1864.xls >>

Verduyn
EXHIBIT # 14
4.6.05
GRAMANN REPORTING, LTD.

1

H-D 1852
Confidential

-----Original Message-----
**From:**     Verduyn, Steve
**Sent:**     Monday, July 28, 2003 9:28 AM
**To:**       Bolden, Dianne
**Subject:**  SWR report needed

Good morning Dianne-

Can you please run me an SWR report for dealer 1864 (Everett, MA) from 01/01/03 to present?

As always, thank you for your help.

Steve

H-D 1853
Confidential

2

# EXHIBIT 36

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>Plaintiff,<br><br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>Defendants. | CIVIL ACTION<br>NO. 04 11402 NMG |

## SUPPLEMENTAL ANSWERS TO INTERROGATORIES

Defendants Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson") hereby supplement their responses to the interrogatories of Plaintiff Cycle-Craft Co., Inc., d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") as follows.

## GENERAL OBJECTIONS

1.     Harley-Davidson's responses shall not be deemed to constitute an admission that any particular document exists, is relevant, or is admissible as evidence or that any statement or characterization in the request is accurate or complete.

2.     Harley-Davidson objects to these requests to the extent that they seek documents protected by the attorney-client privilege, the work-product doctrine or are otherwise protected from disclosure.

3.    Harley-Davidson objects to any definition, request or instruction that purports to impose any obligation not expressly provided for in the Federal Rules of Civil Procedure or Local Rules.

4.    To the extent the Request calls for information or the production of documents Harley-Davidson regards as confidential and/or sensitive business information, Harley-Davidson objects to providing that information until a suitable protective order has been agreed upon by the parties and entered by the Court.

5.    Harley-Davidson objects to the definition of the term "material involvement" as vague, particularly to the extent that the term "material" is inherently subjective.

6.    Harley-Davidson objects to the definition of the term "adverse action" as overbroad, particularly to the extent that Cycle-Craft has arbitrarily identified certain actions such as "allocation adjustments" and "chargebacks" as "adverse."

7.    These general objections are incorporated into each numbered response, as if each general objection was specifically set forth therein.

### SUPPLEMENTAL ANSWERS

### INTERROGATORY NO. 3

Set forth the date of, and explain the basis for, Harley-Davidson's decision to audit Cycle-Craft's records in February 2004.

### ANSWER NO. 3

In late 2003, Harley-Davidson received an email regarding specific Harley-Davidson motorcycles being sold by Lee Custom Cycle, a used motorcycle dealer, in Lee, New Hampshire. The email has been produced (H-D 1855-1856) and speaks for itself. This email prompted Harley-Davidson to conduct an internal review of Cycle-Craft sales records. The review

indicated a significant increase of sales at the end of the sales period and sales to customers that appeared to be related to Cycle-Craft employees. Based on this investigation, Harley-Davidson made the decision to audit Cycle-Craft's records in February 2004.

## INTERROGATORY NO. 5

Identify and describe any adverse action taken, threatened, and/or contemplated by Harley-Davidson against Cycle-Craft prior to April 20, 2004.

### ANSWER NO. 5

Harley-Davidson objects to this interrogatory on the grounds that it is vague, ambiguous, overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, Harley Davidson answers the interrogatory as follows.

Since August 1, 2000, Harley-Davidson has contemplated, threatened or taken adverse action on occasions when it appeared that Cycle-Craft had violated Harley-Davidson policies. In late 2002, Harley-Davidson learned that Cycle-Craft had sold demonstration vehicles prior to the time they were allowed to be sold. Harley-Davidson disqualified Cycle-Craft from the 2003 Model Year Demo program, but later, at the request of the District Manager, Cycle-Craft was reinstated into the program. In early 2003, Harley-Davidson learned that Cycle-Craft was substantially delinquent on payments due to Harley-Davidson and/or its affiliated financial company. As a result of Cycle-Craft's delinquency, Harley-Davidson placed Cycle-Craft on credit hold during the first half of 2003.

### INTERROGATORY NO. 10

State the basis of your contention in Paragraph 1 of the Answer that "Cycle-Craft falsified sales records and reports to Harley-Davidson and otherwise violated its dealer contracts."

### ANSWER NO. 10

Harley-Davidson objects to this interrogatory on the ground that it is calls for a legal conclusion.    Subject to and without waiving any objections, Harley-Davidson answers the interrogatory as follows. The basis for the contention that Cycle-Craft falsified sales records and reports to Harley-Davidson and otherwise violated its dealer contracts is detailed in two April 20, 2004 letters from Jon Flickinger of Harley-Davidson to John Atwood of Cycle-Craft, copies of which have been previously provided to Cycle-Craft and are incorporated herein by reference.

As noted in the April 20, 2004 letters, Cycle Craft falsely reported 19 motorcycles as retail sales when all 19 motorcycles were sold to DC Imports International ("DCI"), a motorcycle wholesaler in Florida.  The motorcycles were paid for by consecutively numbered cashier's checks from a single bank.  In addition, several of the purported individual customers listed the telephone number of DCI as their telephone numbers.  In fact, the purported customers were employees of or otherwise related to DCI.  The motorcycles were not delivered to the purported individual customers; instead, they were delivered to DCI.  Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported eight motorcycles as retail sales when all eight were sold to Lee Custom Cycles, a used motorcycle dealer in New Hampshire.  Each of the sales folders had the word "Lee" on the outside jacket.  Within

approximately one week of the purported retail sales, two of the motorcycles were being offered for sale by Lee Custom Cycles. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these eight motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported one motorcycle as a retail sale when it was sold to Lou Winz Auto Sales, a used motor vehicle dealer in Massachusetts. The sales and warranty registration and certificate of origin both list Lou Winz Auto Sales as the owner.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported 17 motorcycles as retail sales which took place during the 2003 model year, when these sales did not take place. Cycle-Craft's records showed no paperwork relative to the sale of these 17 motorcycles as initially reported. To the contrary, Cycle-Craft records showed the sale of these 17 motorcycles during the 2004 model year to entirely different customers from those initially reported. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained. The Declarations of Ronald Buchbaum and Kenneth McPhee filed in this action also confirm that these sales, as initially reported by Cycle-Craft, did not take place.

### INTERROGATORY NO. 13

State the basis for your contention in Paragraph 33 of the Answer that Cycle-Craft is not "the exclusive dealer" in the Boston area.

### ANSWER NO. 13

The basis for the contention that Cycle-Craft is not the exclusive dealer in the Boston area is the dealer agreements which provide that Cycle-Craft's territory is "non-exclusive."

Specifically, the Harley-Davidson Motor Company and the Buell Distribution Corporation Motorcycle Dealer Agreements (H-D 0001 - 0003 and H-D 0033 - 0035) provide under section 1.C that the rights granted to the dealer are "non-exclusive" and under section 6 that Dealer's Territory is "non-exclusive" and subject to change. Additionally, the Harley-Davidson Motor Company and the Buell Distribution Corporation General Conditions of Sales and Service (H-D 0007 - 0032 and H-D 0039 - 0083) provide under section A that "Dealer's Territory is non-exclusive" and that "the Territory assigned to Dealer is, and shall be, non-exclusive."

## INTERROGATORY NO. 17

State the basis for your defense that Cycle-Craft's claims are barred by the doctrine of unclean hands.

### ANSWER NO. 17

Harley-Davidson objects to this interrogatory on the ground that it is calls for a legal conclusion. Subject to and without waiving any objections, Harley-Davidson answers the interrogatory as follows. Cycle-Craft has unclean hands in that it violated the dealer contracts by falsifying sales reports to Harley-Davidson and otherwise violated its dealer contracts, as detailed in two April 20, 2004 letters from Jon Flickinger of Harley-Davidson to John Atwood of Cycle-Craft, copies of which have been previously provided to Cycle-Craft and are incorporated herein by reference.

As noted in the April 20, 2004 letters, Cycle Craft falsely reported 19 motorcycles as retail sales when all 19 motorcycles were sold to DC Imports International ("DCI"), a motorcycle wholesaler in Florida. The motorcycles were paid for by consecutively numbered cashier's checks from a single bank. In addition, several of the purported individual customers listed the telephone number of DCI as their telephone numbers. In fact, the purported customers

were employees of or otherwise related to DCI. The motorcycles were not delivered to the purported individual customers; instead, they were delivered to DCI. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported eight motorcycles as retail sales when all eight were sold to Lee Custom Cycles, a used motorcycle dealer in New Hampshire. Each of the sales folders had the word "Lee" on the outside jacket. Within approximately one week of the purported retail sales, two of the motorcycles were being offered for sale by Lee Custom Cycles. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these eight motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported one motorcycle as a retail sale when it was sold to Lou Winz Auto Sales, a used motor vehicle dealer in Massachusetts. The sales and warranty registration and certificate of origin both list Lou Winz Auto Sales as the owner.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported 17 motorcycles as retail sales which took place during the 2003 model year, when these sales did not take place. Cycle-Craft's records showed no paperwork relative to the sale of these 17 motorcycles as initially reported. To the contrary, Cycle-Craft records showed the sale of these 17 motorcycles during the 2004 model year to entirely different customers from those initially reported. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained. The

Declarations of Ronald Buchbaum and Kenneth McPhee filed in this action also confirm that these sales, as initially reported by Cycle-Craft, did not take place.

## INTERROGATORY NO. 18

State the basis for your defense that Cycle-Craft's claims are barred by virtue of its own material violations of its dealer contracts with Harley-Davidson.

### ANSWER NO. 18

Harley-Davidson objects to this interrogatory on the ground that it is calls for a legal conclusion. Subject to and without waiving any objections, Harley-Davidson answers the interrogatory as follows. Cycle-Craft materially violated its dealer contracts with Harley-Davidson by falsifying its sales reports to Harley-Davidson and otherwise violated its dealer contracts, as detailed in two April 20, 2004 letters from Jon Flickinger of Harley-Davidson to John Atwood of Cycle-Craft, copies of which have been previously provided to Cycle-Craft and are incorporated herein by reference.

As noted in the April 20, 2004 letters, Cycle Craft falsely reported 19 motorcycles as retail sales when all 19 motorcycles were sold to DC Imports International ("DCI"), a motorcycle wholesaler in Florida. The motorcycles were paid for by consecutively numbered cashier's checks from a single bank. In addition, several of the purported individual customers listed the telephone number of DCI as their telephone numbers. In fact, the purported customers were employees of or otherwise related to DCI. The motorcycles were not delivered to the purported individual customers; instead, they were delivered to DCI. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported eight motorcycles as retail sales when all eight were sold to Lee Custom Cycles, a used motorcycle dealer in New Hampshire. Each of the sales folders had the word "Lee" on the outside jacket. Within approximately one week of the purported retail sales, two of the motorcycles were being offered for sale by Lee Custom Cycles. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these eight motorcycles were not properly completed and maintained.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported one motorcycle as a retail sale when it was sold to Lou Winz Auto Sales, a used motor vehicle dealer in Massachusetts. The sales and warranty registration and certificate of origin both list Lou Winz Auto Sales as the owner.

As also noted in the April 20, 2004 letters, Cycle-Craft falsely reported 17 motorcycles as retail sales which took place during the 2003 model year, when these sales did not take place. Cycle-Craft's records showed no paperwork relative to the sale of these 17 motorcycles as initially reported. To the contrary, Cycle-Craft records showed the sale of these 17 motorcycles during the 2004 model year to entirely different customers from those initially reported. Review of Cycle-Craft records revealed that pre-delivery inspection reports and sales and warranty registration forms for these 19 motorcycles were not properly completed and maintained. The Declarations of Ronald Buchbaum and Kenneth McPhee filed in this action also confirm that these sales, as initially reported by Cycle-Craft, did not take place.

**INTERROGATORY NO. 22**

Identify all documents concerning and facts supporting all allegations of false report made in the April 20, 2004 letter from Jon Flickinger to John F. Atwood "Re: Inspection of

Records" and the April 20, 2004 letter from Jon Flickinger to John F. Atwood "Re: Notice of Dealer Contract Termination." For each allegations of a false report, include in your response a description of: (a) the statement or report made; (b) the portion of the statement or report that you contend was false; (c) when such statement or report was made and received; (d) the medium through which such statement or report was made or submitted, whether paper or electronic; and (e) the basis for the allegation of falsity.

### ANSWER NO. 22

Documents concerning the allegations of false report made in the April 20, 2004 letter from Jon Flickinger to John F. Atwood "Re: Inspection of Records" and the April 20, 2004 letter from Jon Flickinger to John F. Atwood "Re: Notice of Dealer Contract Termination" have been provided to Cycle-Craft. Facts supporting the same are contained in the two April 20, 2004 letters referenced above.

Each of the SWRs submitted by Cycle-Craft to Harley-Davidson concerning the 45 VINS in question was a false report at the time that it was submitted. They falsely represented the sales to be retail. They falsely reported that these sales were made on or prior to the end of the sales year, July 31, 2003. They falsely represented that the sales were made to the individuals listed in the SWRs. They falsely represented that each of the motorcycles were properly set up, inspected, tested, sold and delivered at the dealership facility, directly to the ultimate consumer.

The false reports were made in electronic form on the date listed in each electronic SWR for each subject VIN as the "registration created on" date. With respect to the 19 motorcycles sold to DCI and the eight motorcycles sold to Lee, the false portions of the SWRs include the customer information and the designation of the sale as retail. With respect to the motorcycle sold to Lou Winz Auto Sales, the false portion of the SWR includes the designation of the sale as

retail. With respect to the 17 motorcycles which were falsely reported as having been sold to Cycle-Craft employees, relatives and friends, the false portions of the SWRs include the customer information, the date of the sale, the occurrence of the sale and the designation of the sale as retail.

## INTERROGATORY NO. 23

Identify all documents and non-documentary agreements and/or understandings that you contend define the contractual relationship between Harley-Davidson and Cycle-Craft at all times during 2003 and 2004.

### ANSWER NO. 23

Documents, agreements and understandings that define the contractual relationship between Harley-Davidson and Cycle-Craft during 2003 and 2004 include the September 19, 2000 Harley-Davidson Motor Company Motorcycle Dealer Contract with addendums and extensions and incorporated General Conditions of Sales and Service and the September 19, 2000 Buell Distribution Corporation Motorcycle Dealer Contract with addendums and extensions and incorporated Buell Distribution Corporation General Conditions of Sales and Service (HD 0001 - 0083) and policies promulgated pursuant thereto, specifically including the 2003 and 2004 non-retail sales policy (HD 0987 - 0988, HD 1637 - 1640). Given the current litigation, the contractual relationship of the parties includes the stipulation of counsel for Harley-Davidson and Cycle-Craft which was made into an Order of the Court dated July 7, 2004 and the accompanying letter agreement of counsel dated June 25, 2004.

## INTERROGATORY NO. 24

Identify all persons, including current and former Harley-Davidson employees, with knowledge of the following topics:

(a)     Harley-Davidson's allocation of motorcycles to dealers;

(b)     Harley-Davidson's enforcement of the non-retail sales policy; and

(c)     Sales and warranty registration forms.

## ANSWER NO. 24

Harley-Davidson objects to this interrogatory to the extent that it calls for information concerning its relationship with dealers other than Cycle-Craft as such information is not reasonably calculated to lead to the discovery of admissible evidence. Additionally, the request is overbroad, unduly burdensome and vague. Subject to and without waiving any objections, Harley-Davidson answers the interrogatory as follows. Bill Dannehl (Vice-President, North American Sales), Gene Ostrom, Jon Flickinger and Dave Hall have knowledge of Harley-Davidson's allocation of motorcycles. Jon Flickinger, Bill Dannehl, Bill Evers and Gene Ostrom have knowledge of Harley-Davidson's enforcement of the non-retail sales policy. Wende Kunz (Senior Analyst for Sales Analysis Database) and Dianne Bolden (Administrative Support), have knowledge of the sales and warranty registration forms.

AS TO ANSWERS

I, Gene Ostrom, depose and state that I am the Director of U.S. Field Sales of Harley-Davidson Motor Company, Inc. and I am authorized to sign these Interrogatories on behalf of Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC (collectively "Harley-Davidson"). I have read the foregoing Supplemental Answers to Interrogatories and know their contents; the answers were prepared with the assistance and advice of counsel and employees of Harley-Davidson upon whose information I have relied; the answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of preparation of these answers; Harley-Davidson reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been made therein or that more accurate information is available; subject to these limitations these answers are true to the best of my knowledge, information and belief. Signed under pains and penalties of perjury this __21st__ day of February, 2005.

Gene Ostrom
Director of U.S. Field Sales
Harley-Davidson Motor Company, Inc.

AS TO OBJECTIONS:

William N. Berkowitz, BBO# 544148
Sabita Singh, BBO# 560146
William F. Benson, BBO# 646808
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Attorneys for Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC

## CERTIFICATE OF SERVICE

I, Sabita Singh, hereby certify that a true copy of the above document was served upon the attorney of record for each other party, listed below, by hand on February 22, 2005:

Angela B. Smagula, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Sabita Singh