UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>Plaintiff,<br><br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>Defendants. | CIVIL ACTION<br>NO. 04 11402 NMG |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, Harley-Davidson Motor Company, Inc. and Buell Distribution Company (collectively, "Harley-Davidson"), hereby respond to plaintiff's Cycle-Craft Co., Inc. d/b/a Boston-Harley-Davidson/Buell ("Cycle-Craft") statement of undisputed facts submitted in support of its motion for summary judgment. In addition to the materials cited herein, Harley-Davidson further relies upon and incorporates by reference Defendants' Statement of Undisputed Facts In Support of Motion for Summary Judgment ("H-D Stmt."), Memorandum of Law in Support of Summary Judgment ("H-D Memo"), the Affidavit of Steven Verduyn ("Verduyn Aff."), and Defendants' Appendix in Support of Summary Judgment ("H-D App."), which were filed by Harley-Davidson on August 12, 2005.

1.      Harley-Davidson does not dispute the facts contained in this paragraph.

2.      Harley-Davidson does not dispute the facts contained in this paragraph.

3.      Harley-Davidson does not dispute that it sent, on April 20, 2004, a Notice of Termination to Cycle-Craft alleging that Cycle-Craft had breached its Dealer Agreement by selling motorcycles to non-retail purchasers and submitting fraudulent sales reports to Harley-Davidson. Harley-Davidson disputes that the notice was sent "without warning." Mr. Verduyn

testified that, while he was conducting the audit, he discussed with Cycle-Craft's General Manager Ronald Buchbaum certain of the fraudulent sales reports submitted by Cycle-Craft to Harley-Davidson.    Deposition of Steven Verduyn ("Verduyn Dep."), pp. 71-72, 161-63.[1] Further, because (a) Cycle-Craft intentionally falsified sales records and attempted to cover up this fraud before the audit, (b) Harley-Davidson conducted an audit of Cycle-Craft's sales records and (c) based on Mr. Verduyn's discussion with Mr. Buchbaum, it would come as no surprise that Cycle-Craft would receive a termination notice.

4.    Harley-Davidson does not dispute that it sent, on April 20, 2004, an Inspection of Records letter to Cycle-Craft and that this letter was sent on the same day as its Notice of Termination.    Harley-Davidson disputes the statement that Cycle-Craft was precluded from responding to either of these letters and states that the referenced document does not address, much less support that assertion.

5.    Harley-Davidson disputes that the statements made in its Notice of Termination were baseless and the citations referenced by plaintiff do not address, much less support this assertion.    It is undisputed that Harley-Davidson had good cause to issue its Notice of Termination.    *See* H-D Stmt. and H-D Memo.    Harley-Davidson does not dispute that Cycle-Craft filed suit under M.G.L. ch. 93B and states that the statute speaks for itself.    The remaining statements contained in this paragraph constitute legal conclusions and contain no material facts. To the extent the Court deems any of the remaining statements to be factual, Harley-Davidson disputes the assertion that a court must consider the seven factors identified in M.G.L. §5(j). Contrary to this assertion, M.G.L. c.93B, §5(h) provides that "good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship . . ." and §5(j) directs the court to consider all "pertinent circumstances" and provides a list of potential circumstances the court may consider.

---

[1] Excerpts from the deposition of Steven Verduyn are included in the Supplemental Appendix submitted herewith at Tab A.

6.    The statements contained in this paragraph constitute legal conclusions and contain no material facts.  To the extent the Court deems this statement to be factual, Harley-Davidson states that it has argued that it has good cause to terminate pursuant to, among other things, M.G.L. c.93B, §5(h).  *See* H-D Memo.

7.    Harley-Davidson does not dispute the facts contained in this paragraph, with the qualification that the referenced Exhibit 1 does not contain the entire Dealer Contract.  *See* H-D App., Tab A.

8.    Harley-Davidson does not dispute that the Dealer Contract is based on a standard form, but adds that the form contains a section for "Additional Provisions" (Section 7), which may contain, depending on the agreement with the individual dealer, non-standard terms and conditions.

9.    Harley-Davidson does not dispute that the Harley-Davidson Motor Company General Conditions of Sales and Service is expressly made part of the Dealer Agreement and is incorporated into the Dealer Agreement.  In further response, Harley-Davidson states that the terms of the Dealer Agreement, including the General Conditions, speak for themselves.

10.    Harley-Davidson does not dispute that the quoted portion of the Dealer Contract appears in said Contract.

11.    Harley-Davidson disputes paragraph 11.  Harley-Davidson states that pursuant to the Dealer Agreement, Cycle-Craft agreed to (i) Tell the Truth, (ii) not to sell Harley-Davidson products, including new motorcycles, to non-retail customers, and (iii) to complete and return a sales and warranty registration form for every new Harley-Davidson Motorcycle that it sold.  H-D Stmt., ¶5, H-D App. Tab A, Dealer Agreement, Section A, B(6), F(7).  Further, Harley-Davidson may terminate the Dealer Agreement if a dealer submits "any application, claim, report, record or other information which is fraudulent or contains material misrepresentations."

-3-

H-D App., Tab A, Standard Provisions, Section 4(b). The prohibition of non-retail sales is also addressed in the NRSP. H-D Stmt., ¶¶12-13.

12.    Harley-Davidson disputes paragraph 12. Section B.6 of the Dealer Contract provides Harley-Davidson with the right to establish policies and the NRSP defines a "non-retail sale." H-D Stmt., ¶13. Harley-Davidson also disputes that it does not identify conduct that will violate Section B.6. Specifically, Section 4(b) of the Standard Provisions provides that Harley-Davidson may terminate the Dealer Agreement if a dealer submits "any application, claim, report, record or other information which is fraudulent or contains material misrepresentations." H-D App., Tab A, Standard Provisions, Section 4(b). Further, Section 6(f) of the Standard Provisions provides that Harley-Davidson may terminate the Dealer Contract if a dealer breaches, violates or fails to fulfill any of its responsibilities under the contract. *Id.,* Section 6(f). The NRSP also identified conduct that violates Section B.6 of the Dealer Agreement. H-D Stmt., ¶13.

13.    Harley-Davidson disputes paragraph 13. Section B.6 of the Dealer Contract refers specifically to the policies and position statements that Harley-Davidson may establish concerning sales to non-retail customers.

14.    Harley-Davidson does not dispute that, in the early 1990s, it began issuing NRSPs to its dealers. Harley-Davidson disputes that they are "fine print."

15.    Harley-Davidson does not dispute that one of the reasons for the NRSP was to prohibit dealers from making sales in the overseas market and states that the deposition testimony cited by plaintiff does not support its assertion that this was a "prime" reason for the policy. Harley-Davidson further states that the prohibition on non-retail sales was also designed to "ensure customer satisfaction and safety, facilitate compliance with federal and state law and laws in various foreign countries, maintain Harley-Davidson's competitive position and protect the integrity of Harley-Davidson's worldwide distribution network." H-D Stmt. ¶12. Further, by prohibiting Harley-Davidson dealers from selling motorcycles to resellers and by requiring

-4-

dealers to submit the names and addresses of the retail customers to whom they sell motorcycles, our company can better (i) assure that consumers are receiving proper guidance, instructions and orientation with respect to the safe operation of our motorcycles; (ii) allocate and distribute our products to those geographic areas and dealers where they are most needed, and (iii) notify customers in case of a safety recall. *Id.*

16.    This statement does not assert any material facts.  To the extent the Court deems the statement to be an assertion of material fact, Harley-Davidson disputes this statement as (i) Cycle-Craft relies on inadmissible hearsay to support the alleged facts contained in this paragraph and (ii) the referenced document does not refer to dealers signing NRSPs, but rather to a proposed "export sales addendum."

17.    Harley-Davidson disputes paragraph 17 and states that the citations referenced by plaintiff do not address, much less support the assertions therein.  The prohibition against non-retail sales was incorporated into the Dealer Agreement and there is no referenced minutes to having dealers sign individual NRSPs.  The Dealer Agreement specifically prohibits non-retail sales and provides that "Seller [Harley-Davidson] reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract." H-D Stmt., ¶7.  Further, Mr. Flickinger testified that "the primary method that we use to communicate the policy is annually we send the dealers their model year pricing, and we attach the policy to the -- to the pricing notification . . . [and] [w]e included [the policy] in the annual mailing of all our various incentive and policy programs . . . it's also posted to HD Net on an annual basis." Plaintiff's Ex. 4 (Flickinger Dep. I) at 118-119.

18.    Harley-Davidson disputes that it does not seek dealers' assent to the prohibition on non-retail sales.  *See* Response to Paragraph 17, above.  Harley-Davidson does not dispute that dealers were not asked to sign individual NRSPs.

19.    This statement does not assert any material facts.  To the extent the Court deems the statement to be an assertion of material fact, Harley-Davidson does not contest it.

20.    Harley-Davidson disputes the assertion that it disseminates the NRSPs under the radar and states that the citations referenced by plaintiff do not address, much less support that assertion.  *See* Harley-Davidson's response to paragraph 17.  In further response, Harley-Davidson states that the terms of the NRSP speak for themselves and does not dispute that Mr. Atwood testified that "dealers were supposed to only sell to ultimate consumers."  Plaintiff's Ex. 7 (Atwood Dep. I) at 42.

21.    Harley-Davidson states that the terms of the NRSP speak for themselves and does not dispute that Ronald Buchbaum testified that Harley-Davidson requires dealers to sell motorcycles to individuals.

22.    This statement does not assert any material facts.  To the extent the Court deems the statement to be an assertion of material fact, Harley-Davidson states that Debra Lunsford testified that she negotiated the sale of 19 motorcycles from Cycle-Craft to DC Imports directly with Ronald Buchbaum.  Deposition of Debra Lunsford ("Lunsford Dep."), pp. 37-39, 183-185.[2] Michael Stevens also testified that he negotiated the sale of 19 motorcycles from Cycle-Craft to DC Imports directly with Ronald Buchbaum.  Deposition of Michael Stevens ("Stevens Dep."), pp. 18-35, 92.[3]  Further, Jason Marasca testified that he advised Ronald Buchbaum that he had sold 8 motorcycles to Lee Custom Cycle and Mr. Buchbaum advised that he needed to call Lee Custom Cycle and get 8 individual names to put on the bills of sales.  Deposition of Jason Marasca ("Marasca Dep."), pp. 13-15.[4]

---

[2] Excerpts from the deposition of Debra Lunsford are included in the Supplemental Appendix submitted herewith at Tab B.

[3] Excerpts from the deposition of Michael Stevens are included in the Supplemental Appendix submitted herewith at Tab C.

[4] Excerpts from the deposition of Jason Marasca are included in the Supplemental Appendix submitted herewith at Tab D.

23.    This statement does not assert any material facts.  To the extent the Court deems the statement to be an assertion of material fact, Harley-Davidson does not dispute that Mr. Contois testified that a dealer must "sell a motorcycle to the end user."  Plaintiff's Ex. 11 (Contois Dep.) at 23.

24.    Harley-Davidson does not dispute the facts contained in this paragraph.

25.    This statement does not assert any admissible material facts.  To the extent the Court deems the statement to be an assertion of material fact, Harley-Davidson does not dispute that Harley-Davidson receives, from time to time, information on "gray market" dealers.  Harley-Davidson disputes that Mr. Verduyn "advocated" for sharing any information; instead, he testified that it "was my opinion that information should be shared" but did not recall discussing this opinion with anyone other than counsel.  Verduyn Dep. at 92-93.  Mr. Verduyn's personal opinion is inadmissible.

26.    Harley-Davidson disputes the assertion that it deals with alleged violations of its non-retail sales policy on an uneven, ad hoc basis and states that the citations referenced by plaintiff do not address, much less support that assertion.  Mr. Flickinger testified that "only in the circumstance where there's a small number of VIN's or vehicles involved would there even be the opportunity for this such discretion to be exercised."  Deposition of Jon Flickinger ("Flickinger Dep.", p. 59.)[5]  Specifically, only if there were ten or fewer vehicles involved, the DFO would have the opportunity to use his or her discretion.  Plaintiff's Ex. 4, (Flickinger Dep.) at 68. *See also* Verduyn Dep., pp. 32-36, 204-205.

27.    Harley-Davidson does not dispute the facts contained in this paragraph, with the qualification that a DFO may use his or her discretion only if the number of vehicles at issue is less than 10. *See* Response to Paragraphs 25 and 26.

---

[5]Excerpts from the deposition of Jon Flickinger are included in the Supplemental Appendix submitted herewith at Tab E.

28.     Harley-Davidson disputes that 19 motorcycles were sold to "Florida residents." They were sold to DC Imports. *See* Response to Paragraph 29, below.

29.     Harley-Davidson disputes the first sentence of paragraph 29 and the assertion that Cycle-Craft sold 19 motorcycles to individuals and states that the citations referenced by plaintiff do not support these assertions. The undisputed facts show that Cycle-Craft sold 19 motorcycles to DC Imports. Lunsford Dep., p. 113 (Q: And is it true that each of these motorcycles was purchased by an individual? A. No.; Q: Were the motorcycles purchased by DCI? A. Yes, they were. Q: And was Boston Harley-Davidson aware of that. A. Yes, they were).

*See also* H-D Stmt., ¶¶70-82; Stevens Dep., pp. 25, 92:

> Q:     So during the first two conversations you did advise Mr. Buchbaum that DC Imports was the entity purchasing the motorcycles?
>
>        (Objection by counsel).
>
> A:     Yes.
>
> . . .
>
> Q:     Now, the deal that you reached with Mr. Buchbaum, that was a deal between DC Imports and Boston Harley Davidson, correct?
>
>        (Objection by counsel.)
>
> A:     Correct.

*See also Lunsford Dep.,* pp. 37-39 (Ronald Buchbaum advised DC Imports to use fictitious names so Cycle-Craft could obtain allocation of motorcycles from Harley-Davidson); 96 (identification of 19 individuals as fictitious purchasers done, at the request of Mr. Buchbaum, to circumvent Harley-Davidson policy).

In further response, Harley-Davidson does not dispute that (a) Michael Stevens, on behalf of DC Imports, negotiated with Cycle-Craft concerning the sale of 19 motorcycles to DC Imports and (b) Cycle-Craft received documents purporting to indicate that nineteen motorcycles were being purchased by individual buyers but states that that Mr. Stevens testified that it was Mr. Buchbaum (Cycle-Craft General Manager) who advised that Mr. Stevens had to get 19 individual names before Cycle-Craft would sell the bikes to DC Imports. Stevens Dep., p. 92:

-8-

Q:  And it was Mr. Buchbaum who advised that you had to get 19 individual names before he would sell the 19 bikes to DC Imports?

(Objection by counsel)

A:  Yes.

*See also* Lunsford Dep., p. 114 (Cycle-Craft instructed DC Imports to put individual names on certificate of origins).

30.    Harley-Davidson does not dispute that Cycle-Craft and/or DC Imports prepared nineteen sham Bills of Sale containing information about nineteen individuals who never purchased the subject motorcycles, but disputes that Cycle-Craft sold any motorcycles to any of those individuals. *See* Response to Paragraph 29, above.  In further response, there is no dispute that Cycle-Craft and DC Imports reached an agreement in which Cycle-Craft would sell 19 motorcycles to DC Imports. H-D Stmt., ¶¶70-82. *See also* Stevens Dep., pp. 22-25, 92.

31.    Harley-Davidson does not dispute that Cycle-Craft and/or DC Imports prepared nineteen Sales and Warranty Registration forms containing information about nineteen individuals but states that the subject motorcycles were sold to DC Imports and not to these individuals. *See* Response to Paragraph 29, above.

32.    Harley-Davidson does not dispute that Cycle-Craft received nineteen individual drivers licenses but states that Mr. Stevens testified that it was Mr. Buchbaum (Cycle-Craft General Manager) who advised that Mr. Stevens had to get 19 individual names before Cycle-Craft would sell the bikes to DC Imports.  Stevens Dep., p. 92.  In further response, there is no dispute that Cycle-Craft and DC Imports reached an agreement in which Cycle-Craft would sell 19 motorcycles to DC Imports. H-D Stmt., ¶¶70-82. *See also* Stevens Dep., pp. 22-25, 92. *See* Response to Paragraph 29, above.

33.    Harley-Davidson does not dispute that the 19 motorcycles were paid for by nineteen consecutively numbered checks with the names of individuals on the remitter line.  In further response, Harley-Davidson states that there is no dispute that that all of the money to

purchase the 19 motorcycles came from DC Imports, and that Sean Walsh, on behalf of Cycle-Craft, knew that DC Imports, and not the named individuals, would be providing the money for the 19 motorcycles. H-D Stmt., ¶76. *See also* Lunsford Dep., p. 51:

> Q:    Did any of the 19 people that are identified as these fictitious customers, did they provide any money to DCI for any of these bikes?
>
> A:    No, they did not. This was all DC International's money.

34.    Harley-Davidson disputes paragraph 34 and states that the citations referenced by plaintiff do not support the assertions therein. Harley-Davidson states that Cycle-Craft emphasized to DC Imports the need to use individual names as sham purchasers in order to circumvent Harley-Davidson's prohibition on retail sales. *See* Response to Paragraph 29, above. Harley-Davidson states that Mr. Stevens testified that it was Mr. Buchbaum (Cycle-Craft General Manager) who advised that Mr. Stevens had to get 19 individual names before he would sell the bikes to DC Imports. Stevens Dep., pp. 22-25, 92; *see also* Lunsford Dep., pp. 37-39, 114. In further response, Harley-Davidson states that Cycle-Craft's General Manager, Ron Buchbaum, approved the sale to DC Imports so long as Mr. Walsh received individual names for the motorcycles being sold, and this was despite the fact that Mr. Buchbaum always knew that Harley did not want dealers selling motorcycles to people that were going to resell them. H-D Stmt., ¶75. Further, Harley-Davidson states that Mr. Walsh informed Ms. Lunsford that the deal between Cycle-Craft and DC Imports had to be in 19 individual names. *Id. See also* Walsh Dep., pp. 57-58.[6]

35.    Harley-Davidson does not dispute the conviction of DC Import's Vice President, Debra Lunsford, of title fraud, and further states that the Florida Highway Patrol concluded that "[t]he records reflect that DC Imports applied for title in the name of 19 individuals who are friends and family of Mrs. Cooke [DC Imports principal] to make the purchases look like

---

[6] Excerpts from the deposition of Sean Walsh are included in the Supplemental Appendix submitted herewith at Tab F.

individual retail sales. This was done to circumvent Harley-Davidson policy prohibiting dealer to dealer sales." H-D Stmt., ¶84.

36.    Harley-Davidson does not dispute the facts contained in this paragraph.

37.    Harley-Davidson disputes the first sentence of paragraph 37 and states that the citations referenced by plaintiff do not support the assertions therein. The undisputed facts show that Cycle-Craft sold 8 motorcycles to Lee Custom Cycle. H-D Stmt., ¶¶85-89. *See also* Deposition of Jeffrey Christensen ("Christensen Dep."), pp. 117-118.[7] In further response, Harley-Davidson does not dispute that Cycle-Craft has paper work purporting to indicate that it sold 8 motorcycles to 8 individuals but states that it is undisputed that Lee Custom -- and not the 8 individuals -- actually purchased the 8 motorcycles from Cycle-Craft. *See* Christensen Dep., pp. 117-118:

Q:    Sometime in July 2003, you had a conversation with Jason at the Boston Harley dealership?

A.    Correct.

Q:    And during that conversation, he advised you that [i]n order for Boston Harley to sell bikes to Lee Custom, you need to find individual names?

      (Objection by counsel)

A:    Yeah, he probably -- I don't really recall exactly but, you know --

Q:    In substance, that was the nature of the conversation?

      (Objection by counsel)

A:    Right.

Q:    And then after that conversation, Lee Custom purchased eight motorcycles from Boston Harley?

A:    Correct.

Q:    And then Lee Custom picked up those eight motorcycles from Boston Harley?

      (Objection by counsel)

A:    At different times.

Q:    And then those motorcycles were brought back to the Lee Custom shop in New Hampshire?

---

[7] Excerpts from the deposition of Jeffrey Christensen are included in the Supplemental Appendix submitted herewith at Tab G.

-11-

A:    Correct.

Q:    And then they were sold to customers of Lee Custom Cycle?

A:    Correct.

*See also* Marasca Dep., p. 11:

Q:    During 2003 did Lee Custom Cycle purchase eight new Harley-Davidson motorcycles from Cycle Craft?

      (Objection)

A:    Yes.

*See also* Christensen Dep., p. 72 (Q:  Okay.  And Jason was aware -- Jason at Boston Harley was aware that the motorcycles were going to Lee Custom Cycle?  (Objection) A:  Correct).  *See also* Christensen Dep., pp. 47-51, 57-58.

38.    Harley-Davidson does not dispute the facts contained in the first sentence of this paragraph.  Harley-Davidson disputes the statements contained in the second sentence of this paragraph and states that the citations referenced by plaintiff do not support the assertions therein.  *See* Marasca Dep., pp. 14-15:

Q:    After you spoke with Mr. Christensen did you write bills of sale?

A:    Yes, the following morning.

Q:    Was this in July of 2003?

A:    Yes, it was.

Q:    And in whose name did you write up the bills of sale?

A:    Lee Custom Cycles.

Q:    Was this a single bill of sale or multiple bills of sale, one for each vehicle?

A:    One for each.  Eight individual bills of sale.

Q:    And after you wrote them up what did you do, if anything?

A:    After I wrote the bills of sales up I went into Ron's [Buchbaum] office and showed him the eight bills of sale.

Q:    What did you tell him?

A:    I sold eight bikes last night.

-12-

Q:    What did he say?

A:    Good job.

Q:    Was there any further discussion?

A:    Yeah, I gave him the bills of sale and he said to call back Lee Custom Cycles and
      get individual names and put the individual names on the bills of sale.

39.    Harley-Davidson disputes paragraph 39 and states that the citations referenced by

plaintiff do not support the assertions therein.  The undisputed facts show that Cycle-Craft sold 8

motorcycles to Lee Custom Cycle.  H-D Stmt., ¶¶85-89.  *See also* Christensen Dep., pp. 117-

118; Marasca Dep., p. 11:

Q:    During 2003 did Lee Custom Cycle purchase eight new Harley-Davidson
      motorcycles from Cycle-Craft?

      (Objection by counsel)

A:    Yes.

In further response, Mr. Marasca testified as follows:

Q:    What was the next thing that you did?

A:    I called up Lee Custom Cycles and asked them to give me eight different names
      to put the motorcycles in.

Q:    Was this Mr. Christensen?

A:    That was Jeff Christensen, yes.

Q:    What did you say to Mr. Christensen and what did he say to you?

A:    I told him that he needed eight individual names for the bikes and I needed eight
      different $500.00 deposits for them.  He asked me why and I told him that that's
      what my manager wants to do.

Marasca Dep., p. 16.  See also Response to Paragraphs 37 and 38.

40.    Harley-Davidson disputes the first sentence of paragraph 40 and states that the

plaintiff does not reference any citations to support such assertion.  The undisputed facts show

that Cycle-Craft sold 8 motorcycles to Lee Custom Cycle.  H-D Stmt., ¶¶85-89.  *See also*

Christensen Dep., pp. 117-118; Marasca Dep., p. 11.  Harley-Davidson also disputes the second

sentence of this paragraph.  The undisputed facts are that Lee Custom purchased these

-13-

motorcycles from Cycle-Craft and resold them. Marasca dep., p. 11; Christensen Dep., pp. 72, 117-118. See also Response to Paragraphs 37-39.

41.    Harley-Davidson disputes paragraph 41 and states that the citations referenced by plaintiff do not support the assertions therein. Mr. Marasca testified that Cycle-Craft sold 8 motorcycles to Lee Custom Cycle and Mr. Christensen testified that Lee Custom purchased 8 motorcycles from Cycle-Craft. Marasca Dep., p. 11; Christensen Dep., pp. 117-118. There was no deception. See also Response to Paragraphs 37-40.

42.    The first sentence of paragraph 42 does not assert any material facts. To the extent the Court deems the first sentence of this paragraph to be an assertion of material fact, Harley-Davidson states that Mr. Marasca testified that Cycle-Craft sold 8 motorcycles to Lee Custom Cycle. Marasca Dep., p. 11. Harley-Davidson disputes the second sentence of paragraph 42 states that the citations referenced by plaintiff do not support the assertions therein. Mr. Marasca testified that Cycle-Craft sold 8 motorcycles to Lee Custom Cycle and Mr. Christensen testified that Lee Custom purchased 8 motorcycles from Cycle-Craft. Marasca Dep., p. 11; Christensen Dep., pp. 117-118. There was no deception. See Response to Paragraphs 37-40.

43.    Harley-Davidson does not dispute the facts contained in this paragraph, though it notes that it makes the allegation for more than 17 vehicles.

44.    Harley-Davidson disputes the first sentence of paragraph 44 and states that plaintiff does not provide any record support for its assertion. The undisputed facts show that Cycle-Craft submitted fraudulent sales reports to Harley-Davidson. H-D Stmt., ¶¶24-65. Harley Davidson does not dispute the remainder of this paragraph.

45.    Harley-Davidson disputes paragraph 45. Cycle-Craft's offer to its employees was to purchase motorcycles at or near cost, which was less than Cycle-Craft's prior practice and reflects a desperation on the part of Cycle-Craft to move motorcycles that could not be moved.

In an attempt to make it appear that these motorcycles were sold to retail customers, Cycle-Craft resorted to fraud. H-D Stmt., ¶¶24-65.

46.    This statement does not assert any material facts. To the extent the Court deems this statement to be an assertion of material fact, Harley-Davidson does not dispute it.

47.    This statement does not assert any material facts. To the extent the Court deems this statement to be an assertion of material fact, Harley-Davidson disputes the first sentence of paragraph 47 and states that the citations referenced by plaintiff do not support the assertions therein. It is undisputed that none of the these individuals actually purchased a motorcycle from Cycle-Craft. H-D Stmt., ¶¶24-65. The second sentence of paragraph 47 does not assert any material facts. To the extent the Court deems this sentence to be an assertion of material fact, Harley-Davidson does not dispute it. Harley-Davidson disputes the third sentence of paragraph 47 and states that the citations referenced by plaintiff do not support the assertions therein. It is undisputed that none of the these individuals actually purchased a motorcycle from Cycle-Craft. H-D Stmt., ¶¶24-65.

48.    Harley-Davidson disputes paragraph 48 and states that the citations referenced by plaintiff do not support the assertions therein. There is no admissible evidence of so-called "commitments" from any of the referenced individuals. *See* Deposition of Kenneth McPhee ("McPhee Dep."), pp. 127, 129:[8]

> Q:    Did you ever see any paperwork about any orders of vehicles by employees pursuant to this expanded offer?
> A.    No, I did not.
> . . .
> Q:    But there's nothing at the dealership that you could find that shows that employees ordered motorcycles pursuant to this expanded offer as indicated in the last sentence of 19?
>        (Objection)
> A:    No.

---

[8] Excerpts from the deposition of Kenneth McPhee are included in the Supplemental Appendix submitted herewith at Tab H.

-15-

*See also* Deposition of Ronald Buchbaum ("Buchbaum Dep."), p. 209 (Q: Did you get anything in writing? A: I don't know. Maybe, maybe not. I don't know.);[9] Deposition of Michael Bloom, pp. 15-21;[10] Deposition of Jamie McGrath, pp. 44-45 (H-D App., Tab K); Deposition of Sean Walsh, pp. 22-24. It is undisputed that Cycle-Craft submitted SWRs to Harley-Davidson on July 31, 2003 -- the last day of the model year -- for individuals to whom Cycle-Craft had not sold motorcycles. H-D Stmt., ¶¶24-65.

49.    Harley-Davidson does not dispute that Cycle-Craft, after the close of the 2003 model-year, contacted a clerical employee of Harley-Davidson to request alteration of Harley-Davidson records to reflect the actual owners. Harley-Davidson disputes that it changed its records "without question" as it subsequently conducted an audit and thereafter issued a Notice of Termination to Cycle-Craft based on Cycle-Craft's submission of fraudulent sales reports.

50.    Harley-Davidson does not dispute that Cycle-Craft purchased the referenced motorcycles from Harley-Davidson. Cycle-Craft never resold these vehicles although they were reported as Cycle-Craft retail sales. H-D Stmt., ¶¶66-69.

51.    Harley-Davidson disputes the first sentence of paragraph 51 and states that the citations referenced by plaintiff do not support the assertions therein. It is undisputed that Cycle-Craft, not Mr. Atwood in his individual capacity, purchased these motorcycles. *See* Plaintiff's Stmt., ¶50; H-D Stmt., ¶¶66-69. Further, Harley-Davidson does not dispute that John Atwood is the President, Chief Executive Officer, Chairman of the Board of Directors, and majority owner of Cycle-Craft. Harley-Davidson disputes Cycle-Craft's assertion that any "purchase by the dealership is in essence a purchase by Mr. Atwood" and states that the citations referenced by plaintiff do not support this assertion. It is undisputed that Cycle-Craft, not Mr. Atwood in his

---

[9] Excerpts from the deposition of Ronald Buchbaum are included in the Supplemental Appendix submitted herewith at Tab I.

[10] Excerpts from the deposition of Michael Bloom are included in the Supplemental Appendix submitted herewith at Tab J.

individual capacity, purchased these motorcycles. *See* Plaintiff's Stmt., ¶50; H-D Stmt., ¶¶66-69.

52.    Harley-Davidson does not dispute that Cycle-Craft purchased three motorcycles but disputes that SWRs were properly submitted by Cycle-Craft.  It is undisputed that Cycle-Craft's submission of SWRs to Harley-Davidson on July 31, 2003 for these three motorcycles violated the Dealer Agreement, and by submitting SWRs to Harley-Davidson for these three motorcycles that were not sold by Cycle-Craft to a retail buyer, Cycle-Craft obtained incentive payments from Harley-Davidson and increased allocation for the 2004 model year to which it was not entitled.  H-D Stmt., ¶69.  Although it is not material, Harley-Davidson disputes that these vehicles were purchased to be "featured in the dealership's collection."  In the course of Harley-Davidson's audit, they were simply part of the dealership's inventory.  Verduyn Dep., pp. 134-137.  *See also* McPhee Dep., p. 114 (none of the three motorcycles were sold to retail customers and two motorcycles are still in crates).

**Harley-Davidson Motor Company, Inc.,
and Buell Distribution Company, LLC**

By their attorneys,


/s/ William F. Benson
William N. Berkowitz, BBO# 544148
Sabita Singh, BBO# 560146
William F. Benson, BBO# 646808
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Ph:  (617) 951-8000
Fx:  (617) 951-8736

Dated:  October 14, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand on October 14, 2005.

/s/ William F. Benson _____
William F. Benson

LITDOCS/613757.2