UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYCLE-CRAFT CO., INC.<br>d/b/a BOSTON HARLEY-DAVIDSON/BUELL,<br><br>      Plaintiff,<br><br>v.<br><br>HARLEY-DAVIDSON MOTOR COMPANY, INC.<br>and BUELL DISTRIBUTION COMPANY, LLC,<br><br>      Defendants. | CIVIL ACTION<br>NO. 04 11402 NMG |

**DEFENDANTS' MEMORANDUM IN FURTHER SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

William N. Berkowitz
William F. Benson
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
617-951-8000


*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.  The Facts Material to Resolution of Harley-Davidson's Motion Have Not Been Controverted by Plaintiff ................................................................. 2

    A.  The Undisputed Facts Establish that Plaintiff Falsely Reported 23 Retail Sales that in Fact Never Occurred ............................................ 2

        1.  Twenty "Sales" That Never Occurred ............................................. 3

        2.  Three More "Sales" That Never Occurred ...................................... 5

    B.  Cycle-Craft Falsely Reported Sales to Wholesalers as Retail Sales ................................................................................................... 5

        1.  Nineteen "Retail" Sales to DC Imports .......................................... 5

        2.  Eight Sales to Lee Custom Cycle .................................................... 7

II.  Cycle-Craft's Undisputed Falsification of its Sales Constitutes Good Cause For Termination As a Matter of Law ................................................ 9

    A.  Cycle-Craft's Alleged Good Sales Performance and Large Investment Cannot Render its Attempted Fraud Excusable as a Matter of Law. .................................................................................. 11

III.  Cycle-Craft's Motion for Summary Judgment is Wrongly Premised on the Notion that Harley-Davidson's Termination is Based Entirely on the NRSPs ................................................................................................ 13

    A.  The Court Need Not Resolve the Question Whether the NRSPs Are Part of the Dealer Agreement as Cycle-Craft Plainly Violated Section B(6) of the Agreement. .................................................... 15

    B.  NRSPs Are Part of the Dealer Agreement ............................................ 16

IV.  There is No Evidence in the Record that Harley-Davidson's Decision to Terminate Was Made in Bad Faith, Was Arbitrary or Was Unconscionable ......................................................................................... 18

V.  Plaintiff Voluntarily Terminated Its Buell Franchise Agreement ......................... 19

CONCLUSION ....................................................................................................... 19

- i -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Annecca, Inc. v. Lexent, Inc.*, 307 F.Supp.2d 999 (N.D. Ill. 2004) ................................12

*Custom Products Corp. v. Intermet Corp.*, 170 F. Supp. 2d 853 (E.D. Wis. 2001) ......................9

*Gallo Motor Center, Inc. v. Mazda Motor of America, Inc.*, 204 F.Supp.2d 144, 151 (D. Mass. 2002), *aff'd,* 347 F.3d 20 (1st Cir. 2003) ..............................................11-12

*Gilson v. Rainin Instrument, LLC*, 2005 WL. 1899471 (W.D. Wis. Aug. 9, 2005) ......................10

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003)..................................................17

*Jaguar Cars v. Blackhorse Motorworks, Ltd.*, 1999 WL 1711085 (E.D. Ky. 1999) ..............12-13

*Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16 (1st Cir. 2001) ..............17

*Summit Packaging Systems, Inc. v. Kenyon & Kenyon*, 273 F.3d 9 (1st Cir. 2001) ....................16

*Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030 (1st Cir. 1984) ...........................16

*U.S. v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987), *cert. denied,* 484 U.S. 943 (1987)...................................................................................................................16

## STATE CASES

*Anthony's Pier Four, Inc. v. HDC Associate*, 411 Mass. 451 (1991)..................................9

*Chesapeake Ford, Inc. v. Ohio Motor Vehicle Dealers Board,* 103 Ohio App. 3d 515 (1995)....................................................................................12

*Craig Foster Ford, Inc. v. Iowa Department of Trans.*, 562 N.W.2d 618 (Iowa 1997)...............12

*Lexington Insurance Co. v. All Regions Chemical Laboratories, Inc.*, 419 Mass. 712 (1995) ..........................................................................................16

*Racine Harley-Davidson, Inc. v. Harley Davidson Motor Co.*, 692 N.W.2d 670 (Wis.Ct.App. 2004) ..................................................................................18

*Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63 (1997) .............................................................16

*Swartz v. UST Corp.*, 2001 WL. 1809798, (Mass. Super. 2001)...................................9-10

LITDOCS/616881.2

## INTRODUCTION

There is nothing in the record to controvert the following facts established by Harley-Davidson's motion for summary judgment:

- The plaintiff submitted 23 sales reports to Harley-Davidson on July 31, 2003 in which it reported that it had made 23 retail sales to employees and other persons connected to the dealership. *See* Defendants' Statement of Undisputed Fact in Support of Motion for Summary Judgment ("SMF"), ¶¶24-64, 66-68, 92-113.

- Those reports were false -- the plaintiff in fact had not made those 23 sales. *Id.*

- The submission of these false sales reports was not a mistake or an oversight -- the plaintiff knew the sales had not been made, inasmuch as the falsely reported "customers" were dealership managers or their friends or relatives. *Id.*

- The plaintiff was motivated to submit false sales reports by a desire to increase its allocation of new model year motorcycles, at the expense of other Harley-Davidson dealers and, ultimately, Harley-Davidson itself. *Id.,* ¶¶18-21.

- The plaintiff falsely reported another 27 units as having been sold to retail customers, when in fact they were sold to resellers -- itself a violation of the parties' Dealer Contract. *Id.,* ¶¶70-81, 85-88.

- The plaintiff directed an elaborate cover-up of the wholesale nature of these transactions by soliciting paperwork in the names of individuals affiliated with the resellers. *Id.,* ¶¶77, 81-82, 87-88.

- 19 of these sales led to the representative of one of the buyers (DC Imports in Florida) being convicted of title fraud, with the Florida Highway Patrol concluding that the reason for the fraud was to "circumvent Harley-Davidson's [non-retail] policy." *Id.,* ¶¶83-84.

- Now, plaintiff perpetuates the cover-up in this Court by proffering the same bogus paperwork as evidence of purported retail transactions -- where no such transactions took place. Opposition, pp. 7-9.

Does Massachusetts law prevent a manufacturer from exercising a contractual right to terminate its business relationship with a dealer who has attempted to defraud it through submission of false sales reports? Common sense dictates that the answer is no, and the plain language of General Laws Chapter 93B confirms that. Contrary to plaintiff's argument, Chapter 93B does not require the Court to consider all seven factors listed in Section 5(j). The statute requires the Court to consider only "pertinent circumstances." (Emphasis added.) It goes on to state that such "pertinent circumstances" "may" [not must] include the enumerated factors. Further, the statute explicitly provides that good cause for termination exists if a dealer materially breaches its dealer agreement. Section 5(h).

- 1 -

Here, the level of plaintiff's investment, whether it provides good service, and whether it sponsors charity events are factors having nothing to do with the grounds for termination in this case. While such factors may be relevant in many franchise cases that turn on issues of sales, service and financial condition -- they are not relevant here. Here, the grounds for termination are the dealer's falsification of reports to the factory and its related material breach of contract, as set forth in the termination notice. Those grounds either constitute legally sufficient bases for termination or they do not. Certainly the law was not meant to give more favorable treatment to the well-capitalized and properly performing dealer who commits fraud over the one whose performance is not as good. Plaintiff's undisputed falsification of its sales reports to Harley-Davidson constitutes a material breach of contract and an irreparable breach of trust. There is good cause for termination as a matter of law, regardless of plaintiff's alleged good sales performance, investment and community service.

## **ARGUMENT**

## I.    THE FACTS MATERIAL TO RESOLUTION OF HARLEY-DAVIDSON'S MOTION HAVE NOT BEEN CONTROVERTED BY PLAINTIFF

### A.    The Undisputed Facts Establish that Plaintiff Falsely Reported 23 Retail Sales that in Fact Never Occurred

It is undisputed that at the end of the 2003 model year, in order to obtain a higher allocation of motorcycles from the factory, Cycle-Craft falsely reported twenty-three retail sales in the names of dealership employees and acquaintances that in fact were never made. SMF, ¶¶18, 20-21, 24-25, 66-68, 92; Declaration of Ronald Buchbaum ("Buchbaum Decl."), ¶¶3, 7; Harley-Davidson Appendix ("H-D App."), Tab G.[1]

---

[1] As noted in defendant's initial memorandum, Cycle-Craft submits an electronic Sales & Warranty Registration ("SWR") report to Harley-Davidson to inform Harley-Davidson that a new motorcycle has been sold by Cycle-Craft. SMF, ¶16; Plaintiff's Response to Harley-Davidson's Statement of Material Facts ("SMF Response"), ¶16. Cycle-Craft admits that the SWR advises Harley-Davidson whether the sale was made to a retail customer and provides Harley-Davidson with the Vehicle Identification Number for the motorcycle sold, the name of the customer, the customer's address and telephone number, and a certification that the Harley-Davidson dealer that sold the motorcycle had delivered the motorcycle to the customer and that the warranty had been explained to the customer. *Id.* The submission of an SWR is important to Harley-Davidson and its customers because it (i) enables

1.     **Twenty "Sales" That Never Occurred**

Cycle-Craft admittedly did not sell or deliver motorcycles to twenty (20) individuals at the end of the 2003 model year, even though it represented to Harley-Davidson that it had done just that.   SMF and SMF Response, ¶¶24-64, 92-113.   Specifically, even though Cycle-Craft submitted SWRs to Harley-Davidson reporting final sales to the following individuals, it is undisputed that these sales in fact never occurred:

    1.     Jarred Buchbaum.  SMF, ¶27;
    2.     Michael Bloom.  SMF, ¶30;
    3.     Roderick Granese.  SMF, ¶33;
    4.     Salvatore Giordano.  SMF, ¶36;
    5.     Lissa Bloom.  SMF, ¶39;
    6.     Matthew Bloom.  SMF, ¶42;
    7.     Joseph Giordano.  SMF, ¶45;
    8.     Sean Walsh.  SMF, ¶48;
    9.     Ronald Buchbaum.  SMF, ¶51;
    10.    John Sica.  SMF, ¶54;
    11.    Daniel Sica.  SMF, ¶57;
    12.    Jamie McGrath.  SMF, ¶60;
    13.    Elaine Bloom.  SMF, ¶63;
    14.    Robert Misiano.  SMF, ¶94;
    15.    James Jouve.  SMF, ¶97;
    16.    Robin Misiano.  SMF, ¶100;
    17.    Marisa Olivo.  SMF, ¶103;
    18.    Howard Cook.  SMF, ¶106;
    19.    Andre Silva.  SMF, ¶109; and
    20.    Sheila Firth.  SMF, ¶112.

Cycle-Craft proffers no evidence to dispute its falsification of the SWRs for these bogus sales.  *See* SMF Response, ¶¶24-64, 92-113.  Instead, plaintiff claims that these individuals (all related to the dealership as employees, family members or friends of same) supposedly gave the dealer verbal "commitments" to purchase these motorcycles.   However, there is no admissible evidence of so-called "commitments" from any of the referenced individuals.  *See* Harley-Davidson's Response to Cycle-Craft's Statement of Undisputed Material Facts ("Harley-

---

Harley-Davidson to comply with federal law concerning vehicle recalls and related matters, (ii) ensures that the motorcycle is qualified for warranty coverage and, (iii) starts the warranty period for that motorcycle for the customer identified on the SWR.  SMF and SMF Response, ¶¶16-17.

Davidson Response"), ¶48.[2]  Even if there were admissible evidence of "commitments," Cycle-Craft concedes that by submitting an SWR to Harley-Davidson, it has <u>certified</u> that the identified motorcycle had been <u>sold and delivered</u> to the identified customer.  SMF Response, ¶16. Contrary to plaintiff's attempt to justify its fraudulent submissions, a verbal "commitment" is obviously not a sale and delivery, and the plaintiff -- an experienced dealer -- knows the difference.[3]

Cycle-Craft cannot escape the sworn testimony of its employees who admitted that the dealer never sold thirteen of these motorcycles to the individuals it had reported to Harley-Davidson as retail customers.  *See* Declaration of Ronald Buchbuam, Cycle-Craft's General Manager, ¶7 (H-D App., Tab G) ("<u>none</u> of these 13 prospective employee/employee-relative buyers carried through with their purchases"); Declaration of Kenneth McPhee, Cycle-Craft Operations Manager, ¶20 (H-D App., Tab H) (identical sworn statement as Mr. Buchbaum). Plaintiff's own admissions in this respect are more than enough to establish that Cycle-Craft falsified its sales reports to Harley-Davidson in material violation of the Dealer Contract.

---

[2] For example, Kenneth McPhee, Cycle-Craft's Operations Manager, testified as follows:

Q:    Did you ever see any paperwork about any orders of vehicles by employees pursuant to this expanded offer?

A:    No, I did not.

*See* McPhee Dep., p. 127; Harley-Davidson Supplemental Appendix ("Supp. App."), Tab G.  *See also* Buchbaum Dep., p. 209 (Supp. App., Tab H); Bloom Dep., pp. 15-21 (Supp. App., Tab I); McGrath Dep., pp. 44-45 (H-D App., Tab K); Walsh Dep., pp. 22-23 (H-D App., Tab J).

[3] Cycle-Craft claims that because the Dealer Agreement does not define "sale" or "sold," this precludes the Court from finding that Cycle-Craft submitted false sales reports.  Cycle-Craft Memorandum, pp. 21-22.  Although there are many terms in the Dealer Agreement that are undefined, Cycle-Craft -- an experienced motorcycle dealer -- cannot seriously contend that it does not know what a motorcycle "sale" entails.  In any event, Cycle-Craft -- by submitting SWRs to Harley-Davidson -- certified that it not only <u>sold</u> the motorcycle to a customer but that it also <u>delivered</u> such motorcycle to the customer and explained the warranty to that customer.  Cycle-Craft did none of the above for these 20 individuals.

- 4 -

### 2.    Three More "Sales" That Never Occurred

Cycle-Craft similarly cannot dispute that it falsely reported the retail sale of three additional motorcycles (also on July 31, 2003) which in fact were never sold by the dealer. The plaintiff admits that it submitted SWRs for three motorcycles even though these motorcycles were never actually sold to anyone.    SMF Response, ¶66.    As the dealer principal, John Atwood, testified:

> Q:    And these motorcycles are still owned by Cycle-Craft today?
>
> A:    Yes.
>
> Q:    They've never been sold by Cycle-Craft to anyone?
>
> A:    No.
>
> Q:    Including you?  Cycle-Craft did not sell them to you?
>
> A:    Not that I'm aware of.
>
> Q:    And Cycle-Craft obtained ownership of these three motorcycles by purchasing them from Harley-Davidson; is that correct?
>
> A:    Yes.

Atwood Dep., pp. 95-96 (H-D App., Tab B).    As confirmed by Mr. Atwood, these three motorcycle are still owned by Cycle-Craft and have never been sold to any retail customer. Accordingly, there is no dispute that Cycle-Craft again falsified its sales reports at the end of the model year, in further material breach of its Dealer Contract.

### B.    Cycle-Craft Falsely Reported Sales to Wholesalers as Retail Sales

#### 1.    Nineteen "Retail" Sales to DC Imports

As noted in Harley-Davidson's initial memorandum, at the end of the 2003 model year, Cycle-Craft sold 19 motorcycles to a Florida wholesaler, DC Imports.  SMF, ¶¶70-81.  Cycle-Craft does not dispute that it reported these 19 sales to Harley-Davidson as "retail" sales, but persists in its assertion that they were, in fact, retail sales.  The undisputed material facts show otherwise.   The unrefuted testimony of three witnesses -- Debra Lunsford (owner of DC Imports), Sean Walsh (Former Cycle-Craft Sales Manager), and Michael Stevens (DC Imports employee) -- together with the undisputed conclusions of the Florida Highway Patrol, establish

- 5 -

that Cycle-Craft conspired with DC Imports to use the names of individuals connected with the wholesaler as purported purchasers of the motorcycles. These names were inserted in the paperwork for the 19 units to make the transactions appear to be ordinary retail sales. The Florida Highway Patrol discovered the scheme, and DC Imports' Debra Lunsford was convicted of title fraud based upon the use of the 19 bogus individual names as supposed purchasers. The police concluded the scam was undertaken to "circumvent Harley Davidson's policy" prohibiting non-retail sales. SMF, ¶¶83-84.

Specifically, Harley-Davidson has proffered the following undisputed evidence:

- DC Imports contacted Cycle-Craft to purchase 19 motorcycles. SMF, ¶¶71, 73-74; Lunsford Dep., pp. 27-33 (H-D App., Tab M); Walsh Dep., pp. 40, 43, 51-52 (H-D App., Tab J); Harley-Davidson Response, ¶¶29-30; Stevens Dep., pp. 18-35, 92 (Supp. App., Tab C).

- DC Imports advised Cycle-Craft that DC Imports planned to resell the 19 motorcycles to another dealer, who had placed a deposit with DC Imports for the units. SMF, ¶74; Lunsford Dep., pp. 30-33 (H-D App., Tab M).

- Cycle-Craft advised DC Imports that in order to purchase the units, DC Imports would need to supply individual names of company personnel and acquaintances to be inserted into the purchase and title documentation to make the transactions appear to be retail sales. SMF, ¶¶75, 77, Lunsford Dep., pp. 39, 96 (H-D App., Tab M); Buchbuam Dep., p. 254 (H-D App., Tab F); Harley-Davidson Response, ¶29; Stevens Dep., p. 92 (Supp. App., Tab C); Lunsford Dep., p. 114 (Supp. App., Tab B).

- Cycle-Craft advised DC Imports (Ms. Lunsford) that this (insertion of false customer names) was necessary in order to avoid a reduction of Cycle-Craft's allocation of motorcycles by Harley-Davidson. Harley-Davidson Response, ¶29; Lunsford Dep., pp. 37-38 (Supp. App., Tab B).

- Cycle-Craft's Sean Walsh testified that this was done in order to "make it appear as though [Cycle-Craft was] complying with Harley-Davidson's policy." Walsh Dep., p. 57 (H-D App., Tab J).

- DC Imports Vice President Debra Lunsford was convicted of title fraud for her role in falsifying the title documents for the sale of 19 motorcycles by Cycle-Craft -- the same documents upon which plaintiff relies in opposition to this motion. Harley-Davidson Response, ¶35.

- The Florida Highway Patrol's investigation of this transaction concluded that the falsification of title documents was undertaken to allow Cycle-Craft to circumvent Harley-Davidson's policy prohibiting wholesale ("dealer-to-dealer") transactions. SMF, ¶84; Brierton Decl. (H-D App., Tab O).

- DC Imports purchased 19 motorcycles from Cycle-Craft. SMF, ¶76; Lunsford Dep. p. 114 (H-D App., Tab M).

- 6 -

- DC Imports purchased the 19 motorcycles with 19 individual (sequentially-numbered) checks, as requested by Cycle-Craft. SMF, ¶76; Lunsford Dep., p. 51 (H-D App., Tab M); Walsh Dep., p. 57 (H-D App., Tab J); Harley-Davidson Response, ¶33.

- Cycle-Craft knew that DC Imports, and not individuals, would be paying for the 19 motorcycles. SMF, ¶76; Walsh Dep., p. 57 (H-D App., Tab J).

- DC Imports contracted with a carrier to pick up the motorcycles at Cycle-Craft and deliver them back to DC Imports. SMF, ¶79; Lunsford Dep., p. 118 (H-D App., Tab M).

The concealment of the wholesale nature of these sales was specifically directed by Cycle-Craft, as its former sales manager, Sean Walsh, testified:

Q: Did you have an understanding as to who would be paying for the [19] bikes?

A: We asked DC Imports to provide us with separate money orders for each motorcycle remitted to the person who is buying the motorcycle.

Q: But did you have an understanding as to what entity or entities was putting up the money for the bikes?

 (Objection by counsel).

A: We knew that DC Imports would be sending us the money we definitely asked them not to have a DC Imports check, to have it specifically represented by the person purchasing the bike.

Q: And again, was that to make it appear as though you were complying with the Harley-Davidson policy?

 (Objection by counsel).

A: It was so that, yes, yes it was. We were very specific with Mike Stevens as to how to fill out all the paperwork.

Walsh Dep., pp. 57-58 (H-D App., Tab J) (Supp. App., Tab I) (emphasis added).

Cycle-Craft's sale of nineteen motorcycles to a wholesaler intending to resell them was a material violation of the parties' Dealer Agreement, Section B(6). Further, Cycle-Craft's false reporting of the sales as "retail" in the SWR submissions to Harley-Davidson was also a material violation of the Dealer Agreement, Section F(7).

### 2. Eight Sales to Lee Custom Cycle

Cycle-Craft submitted eight (8) SWRs to Harley-Davidson indicating that it had sold 8 motorcycles to individuals residing in New Hampshire. Cycle-Craft asserts, without providing any record support, that "the 8 motorcycles at issue were purchased by individual buyers." SMF

Response, ¶86.  In contrast, Harley-Davidson has provided actual record support for its undisputed position that Cycle-Craft sold these 8 motorcycles, not to individuals, but to Lee Custom Cycle.  SMF, ¶¶86-88.  Specifically, Harley-Davidson has provided the following undisputed evidence:

- Lee Custom Cycle purchased 8 new motorcycles from Cycle-Craft in 2003.  SMF, ¶86; Christensen Dep., pp. 49-51, 57-58 (H-D App., Tab P); Marasca Dep., p. 11 (H-D App., Tab Q).
- All of the funds to purchase these motorcycles came from Lee Custom Cycle's bank accounts.  SMF, ¶86; Christensen Dep., pp. 47-48 (H-D App., Tab P); Marasca Dep., p. 11 (H-D App., Tab Q).
- The 8 motorcycles were then transported to Lee Custom Cycle and were sold by Lee Custom Cycle to other individuals.  SMF, ¶86; Christensen Dep., p. 58 (H-D App., Tab P).

In response, Cycle-Craft states that because it received completed Bills of Sale, completed Certificate of Origins, photocopies of drivers licenses and eight separate checks, the "motorcycles at issue were purchased by individual buyers."  SMF Response, ¶86.  These documents are not sufficient to controvert the fact that the actual sale of these 8 motorcycles was made to Lee Custom Cycle.  Indeed, Cycle-Craft cannot dispute the following deposition testimony of Jeff Christensen, owner of Lee Custom Cycle:

Q:    Sometime in July 2003, you had a conversation with Jason at the Boston Harley dealership?

A.    Correct.

Q:    And during that conversation, he advised you that [i]n order for Boston Harley to sell bikes to Lee Custom, you need to find individual names?

(Objection by counsel)

A:    Yeah, he probably -- I don't really recall exactly but, you know --

Q:    In substance, that was the nature of the conversation?

(Objection by counsel)

A:    Right.

Q:    And then after that conversation, Lee Custom purchased eight motorcycles from Boston Harley?

A:    Correct.

Q:    And then Lee Custom picked up those eight motorcycles from Boston Harley?

- 8 -

(Objection by counsel)

A:    At different times.

Q:    And then those motorcycles were brought back to the Lee Custom shop in New Hampshire?

A:    Correct.

Q:    And then they were sold to customers of Lee Custom Cycle?

A:    Correct.

Christensen Dep., pp. 117-118 (Supp. App., Tab F).  Further, Cycle-Craft cannot escape from the deposition testimony of Jason Marasca, its own employee:

Q:    During 2003 did Lee Custom Cycle purchase eight new Harley-Davidson motorcycles from Cycle Craft?

(Objection by counsel)

A:    Yes.

      . . .

Q:    Was it your understanding that Lee Custom Cycle was buying these bikes as part of its business?

A:    Yes.

Marasca Dep., pp. 11, 25 (H-D App., Tab Q).

Cycle-Craft's sale of eight motorcycles to a wholesaler intending to resell them was a material violation of the parties' Dealer Agreement, Section B(6).  Further, Cycle-Craft's false reporting of the sales as "retail" in the SWR submissions to Harley-Davidson was also a material violation of the Dealer Agreement, Section F(7).

## II.    CYCLE-CRAFT'S UNDISPUTED FALSIFICATION OF ITS SALES CONSTITUTES GOOD CAUSE FOR TERMINATION AS A MATTER OF LAW

Cycle-Craft's undisputed falsification of numerous sales reports (SWRs) to Harley-Davidson constituted a material breach of the following express provisions of the Dealer Agreement:[4]

---

[4] Under either Massachusetts law or Wisconsin law, Cycle-Craft materially breached the Dealer Agreement by submitting false sales reports. Here, Cycle-Craft has asserted both a Chapter 93B claim and a common law breach of contract claim so an analysis of both Massachusetts and Wisconsin law is appropriate.  Further, under both Massachusetts and Wisconsin law, a covenant of good faith and fair dealing is implied.  See *Anthony's Pier Four, Inc. v. HDC Assoc.*, 411 Mass. 451, 471 (1991); *Custom Products Corp. v. Intermet Corp.*, 170 F.Supp.2d 853, 860 (E.D. Wis. 2001).  Unquestionably, the dealer's falsification of its retail sales constitutes a material violation of that implied covenant.  See *Swartz v. UST*

- Section A:  Purposes and Objectives of the Contract

  Cycle-Craft represented to Harley-Davidson that it would "Tell the Truth."

- Section B(6):  Non-Retail Sales

  "Dealer [Cycle-Craft] shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers.  Seller [Harley-Davidson] reserves the right to establish from time to time such policies and position statements it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract."

- Section F(7):  Sales and Warranty Registration Form

  "Dealer [Cycle-Craft] shall complete and return to Seller [Harley-Davidson] a sales and warranty registration form for every new Harley-Davidson Motorcycle sold by Dealer.  Dealer must submit such form to Seller within ten (10) days of the delivery of such Harley-Davidson Motorcycle to its customer to comply with the provisions of the National Traffic and Motor Vehicle Safety Act, Public Law 89-563, as amended, and to qualify the Harley-Davidson Motorcycle for coverage under Seller's customer warranty."

- Section M(4)(b):  Termination by Seller

  Harley-Davidson may terminate the Dealer Agreement if a dealer submits "any application, claim, report, record or other information which is fraudulent or contains material misrepresentations."

- Section M(6)(f):  Termination by Seller

  Harley-Davidson may terminate the Dealer Agreement if a dealer breaches, violates or fails to fulfill any of its responsibilities under the contract.

- Section P(6):  Acknowledgements

  "Dealer [Cycle-Craft] acknowledges that each of its responsibilities under this Contract is reasonable, proper and fundamental to the purpose of this Contract and that its failure to fulfill any of them would constitute a material breach.  Dealer also acknowledges that any such failure, occurrence, event or default would constitute a reasonable, fair, good, due and just cause and provocation for termination or non-renewal of this Contract by Seller [Harley-Davidson]."

Here, the undisputed facts establish a clear and undeniable effort on the part of the dealer to defraud Harley-Davidson at the end of the 2003 model year by submitting at least fifty false retail sales reports, including 23 sales which never occurred and 27 sales which were

---

*Corp.*, 2001 WL 1809798 at *5 (Mass. Super. 2001) (defining good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing") quoting M.G.L. ch. 106, §3-103(a)(4); *Gilson v. Rainin Instrument, LLC*, 2005 WL 1899471 at *3 (W.D. Wis. Aug. 9, 2005) (quoting instruction to jury that "duty of good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade").

made to resellers.  Such submission of false sales reports is a material violation of the above-mentioned provisions of the Dealer Agreement.  Indeed, there is no dispute that Cycle-Craft's submission of these fifty false sales reports not only breached Section F(7) of the Dealer Agreement but also violated an explicit, fundamental tenet of the Dealer Agreement:  "To Tell the Truth."  It is beyond cavil that the submission of numerous false sales reports to Harley-Davidson is a material breach the parties' Dealer Contract, and a plain and irreparable breach of trust between the parties.  Accordingly, under Section M(4)(b) of the parties' contract, Harley-Davidson is afforded the contractual right to terminate its business relationship with the dealer, and as set fort herein and in Harley-Davidson's initial memorandum, Massachusetts law does not prohibit the exercise of that contractual right as a matter of law.

A.   **Cycle-Craft's Alleged Good Sales Performance and Large Investment Cannot Render its Attempted Fraud Excusable as a Matter of Law.**

Cycle-Craft's material breaches of the Dealer Agreement are enough to establish good cause for termination under Chapter 93B, Section 5(j)(7).  Contrary to plaintiff's argument, Chapter 93B does not require the Court to weigh or even consider all of the seven factors listed in Section 5(j).  The statute requires the Court to consider only "pertinent circumstances."  It goes on to state that "pertinent circumstances" "may" [not must] include the enumerated factors. Here, the level of plaintiff's investment, amount of business conducted by the dealership, and the dealerships' facility have nothing to do with whether it submitted false sales information to Harley-Davidson (and materially breached the Dealer Agreement) and sought to cover it up. Certainly the law was not meant to give more favorable treatment to well-capitalized and properly performing dealers who commit fraud over the similarly-situated dealer whose performance is not as good.  To the extent that these factors are considered at all, they are entirely outweighed by Cycle-Craft's transgressions.  *See Gallo Motor Center, Inc. v. Mazda Motor of America, Inc.,* 204 F.Supp.2d 144, 151, (D. Mass. 2002), *aff'd,* 347 F.3d 20 (1st Cir. 2003) (in determining whether establishment of a proposed dealership was arbitrary, "courts need not perform a mechanical analysis of all the elements that may have a bearing . . .

- 11 -

[c]ommon sense, experience and expert opinion may properly serve as guideposts in this Court's arbitrariness analysis"); *Craig Foster Ford, Inc. v. Iowa Department of Trans.,* 562 N.W.2d 618 (Iowa 1997) ("positive factors -- such as increased sales -- cannot outweigh findings of pervasive fraud in a dealership's service department") *citing Chesapeake Ford, Inc. v. Ohio Motor Vehicle Dealers Bd.,* 103 Ohio App.3d 515, 660 (1995).

Further, the Court may find that good cause exists for termination under M.G.L. c.93B, §5(h), which provides that "[f]or purposes of this section, good cause may be found if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation, reasonable sales and service performance criteria and capital, personnel, and facility requirements, which were communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal, such that a reasonable opportunity to cure was afforded."  Cycle-Craft asserts that Section 5(h) requires that in order for good cause to be found for a material breach of the Dealer Agreement, Cycle-Craft must have been provided an opportunity to cure its submission of fraudulent sales reports.  Cycle-Craft Opposition, p. 19. Cycle-Craft is mistaken.  Whereas an opportunity to cure applies to the listed material breaches, such as deficient sales and/or service performance, it does not apply to all material breaches of the franchise relationship, and certainly does not apply to Cycle-Craft's submission of false sales reports in violation of the Dealer Agreement as the harm incurred by Harley-Davidson is irreparable and it would be impossible for Cycle-Craft to go back in time and cure such fraudulent activity.  *See, e.g., Annecca, Inc. v. Lexent, Inc.,* 307 F.Supp.2d 999, 1010 (N.D. Ill. 2004) ("unfeasibility of cure and -- critical to this case -- incurability are some of the circumstances that justify a party's decision to bypass the cure requirement and proceed directly to termination"); *Jaguar Cars v. Blackhorse Motorworks, Ltd.,* 1999 WL 1711085 at *2-3 (E.D. Ky. 1999) ("Jaguar was acting out of commercial necessity when it asserted its contractual right to audit Blackhorse's books and terminate its franchise based upon clear fraud . . . good faith

- 12 -

does not require a franchisor who is conducting a fraud investigation to apprise the target of its findings") (attached as Exhibit 1 to Harley-Davidson's original memorandum).

**III.   CYCLE-CRAFT'S MOTION FOR SUMMARY JUDGMENT IS WRONGLY PREMISED ON THE NOTION THAT HARLEY-DAVIDSON'S TERMINATION IS BASED ENTIRELY ON THE NRSPS.**

Harley-Davidson's termination is premised on (i) Cycle-Craft's falsification of sales reports and (ii) Cycle-Craft's violation of the Dealer Agreement's prohibition on non-retail sales. Cycle-Craft, in its Memorandum of Law in Opposition to Harley-Davidson's Motion for Summary Judgment, acknowledges that the "Termination Letter . . . says nothing about the NRSP and cites only alleged contractual violations." Cycle-Craft Opposition, p. 12. Nonetheless, in its Memorandum of Law in Support of its Motion for Summary Judgment, Cycle-Craft mistakenly states that "Harley-Davidson does not even attempt to address the operative language in the Dealer Contract, or to explain how Cycle-Craft may have violated that provision." Cycle-Craft Memorandum, p. 16. Even a cursory reading of Harley-Davidson's memorandum in support of its motion for summary judgment indicates that Cycle-Craft was in material violation of the Dealer Agreement by its submission of fifty false sales reports. Harley-Davidson Memorandum, pp. 17-20. While spending the majority of its brief arguing that the NRSP is not part of the Dealer Agreement, as set forth below, Cycle-Craft glosses over and largely ignores its most egregious violations -- its submission of false sales reports and participation in a scheme to create false dealership documents.

First, Cycle-Craft asserts that it was not fraudulent to submit sales reports to Harley-Davidson for twenty individuals that never actually purchased the motorcycles because Cycle-Craft believed that "commitments were sufficient to warrant reporting a 'sale' to Harley-Davidson." Cycle-Craft Memorandum, p. 3. Although interesting (and unbelievable), Cycle-Craft's subjective belief is irrelevant and not sufficient to defeat Harley-Davidson's Motion. As noted above, it is undisputed that Cycle-Craft did not actually sell or deliver motorcycles to twenty (20) individuals even though it certified, by submission of electronic SWRs to Harley-

- 13 -

Davidson, that it had done just that.  Cycle-Craft's submission of these false sales reports materially violated the Dealer Agreement, regardless of Cycle-Craft's subjective belief at the time.  Dealer Agreement, Section F(7), M(4)(b).  Cycle-Craft also asserts that it was permissible to submit false sales reports to Harley-Davidson because "[a]fter sales of those motorcycles were subsequently made to other, non-employee customers, Cycle-Craft informed Harley-Davidson of the change of owner information."  Cycle-Craft Memorandum, p. 13.  This seems to imply that sales had been originally made to 20 individuals and that these individuals had actually owned the motorcycle for some period of time.  However, it is undisputed that Cycle-Craft did not sell or deliver a single motorcycle to any of the 20 individuals even though it had certified to Harley-Davidson that such sales had been made.  Further, none of these 20 individuals was an owner of a motorcycle even though Cycle-Craft had reported to Harley-Davidson that these individuals were actual owners.  When Cycle-Craft eventually informed Harley-Davidson of the actual ownership information for these 20 motorcycles (i.e, that Cycle-Craft had actually made a legitimate "sale" to a real customer), Cycle-Craft was not "changing" the ownership information, it was admitting that it had falsified the SWRs in the first place.

Second, Cycle-Craft admits without qualification that it never sold three of the units it had certified to Harley-Davidson had been sold at retail.  Cycle-Craft Memorandum, p. 13.  Instead it claims that because these three units were to be kept as part of the dealership's motorcycle "collection," it was permissible to record them as retail sales.  This Alice-in-Wonderland logic is plainly unavailing.  Whether the motorcycles were held by the dealership as inventory, display items or very large paperweights, they were not sold to anyone - much less to retail customers.  As noted in Harley-Davidson's initial memorandum, it is undisputed that John Atwood did not purchase these motorcycles and that Cycle-Craft falsely reported them as retail sales, which was a material violation of the Dealer Agreement.

Third, Cycle-Craft asserts that because it has paperwork indicating that it sold 19 motorcycles to individuals in Florida and 8 motorcycles to individuals in New Hampshire, there was no violation of the Dealer Agreement.  That would be true if Cycle-Craft actually sold these

- 14 -

motorcycles to these individuals in addition to having "paperwork" purporting to show actual retail sales.  As noted above, it is undisputed that sales to these individuals did not actually occur.  It is also undisputed that Cycle-Craft participated in the scheme to create false dealership documents.  *See* Stevens Dep., p. 92; Supp. App., Tab C (Mr. Buchbaum instructed him to get 19 individual names before Cycle-Craft would sell the 19 bikes to DC Imports); Lunsford Dep., p. 114; H-D App., Tab M (Cycle-Craft instructed DC Imports to put individual names on certificate of origins); Christensen Dep., p. 117; Supp. App., Tab F (In order for Cycle-Craft to sell 8 motorcycles to Lee Custom, Lee Custom needed to find 8 individual names); Marasca Dep., pp. 15-16; H-D App., Tab Q (Cycle-Craft advised Lee Custom that it needed to come up with 8 individual names before Cycle-Craft would sell the motorcycles to Lee).

### A. The Court Need Not Resolve the Question Whether the NRSPs Are Part of the Dealer Agreement as Cycle-Craft Plainly Violated Section B(6) of the Agreement.

The first sentence of Section B(6) of the Dealer Agreement provides that "Dealer [Cycle-Craft] shall not sell Harley-Davidson Products for resale to non-retail customers other than United States authorized Harley-Davidson dealers."  Here, it is undisputed that in violation of this section (i) 19 motorcycles were sold by Cycle Craft to DC Imports, a non-retail customer, and Cycle-Craft was aware that DC Imports intended to wholesale the motorcycles to another dealer (*see* Lunsford Dep., 32; H-D App., Tab M), (ii) Cycle-Craft's sales representatives knew that DC Imports, a wholesaler, was paying for the motorcycles (*see* Walsh Dep., p. 57; H-D App., Tab J), (iii) 8 motorcycles were sold by Cycle-Craft to Lee Custom Cycle, a non-retail customer, and Lee resold them its customers (*see* Christensen Dep., pp. 117-118; Supp. App., Tab F); and (iv) Cycle-Craft's sales representatives knew that Lee Custom, a wholesaler, was buying these motorcycles as part of its business and paying for the motorcycles (*see* Marasca Dep., pp. 11, 25; H-D App., Tab Q).

As a matter of law, Mr. Walsh's knowledge that DC Imports was the entity paying for 19 motorcycles and Mr. Marasca's knowledge that Lee Custom was the entity paying for 8

- 15 -

motorcycles is imputed to Cycle-Craft. *See U.S. v. Bank of New England, N.A.,* 821 F.2d 844, 856 (1st Cir. 1987), *cert. denied,* 484 U.S. 943 (1987) ("knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation"); *Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.,* 425 Mass. 63, 66 (1997) ("Under agency principles, notice to a corporation's agent is notice to the corporation."). Accordingly, Cycle-Craft knowingly sold to wholesalers for resale, deliberately breaching Section B(6) of the Dealer Agreement.

## B.    NRSPs Are Part of the Dealer Agreement

The second sentence of Section B(6) of the Dealer Agreement provides that "Seller [Harley-Davidson] reserves the right to establish from time to time such policies and position SMFs it believes are necessary or advisable to carry out the purpose or intent of this part of this Contract." There is no dispute that Cycle-Craft agreed to this contractual provision. Nonetheless, although the NRSPs issued by Harley-Davidson plainly state that "[a]s provided in the Dealer Contract, dealers are prohibited from engaging in non-retail sales of motorcycles," Cycle-Craft asserts that the NRSPs are not part of the Dealer Contract. Cycle-Craft Memorandum, pp. 15-16. In sum, Cycle-Craft argues that even though it contractually agreed that Harley-Davidson could establish NRSPs, Cycle-Craft is free to disregard them upon their actual issuance. Cycle-Craft's interpretation runs afoul of the well-established principle that Courts are to avoid constructions that render terms or phrases meaningless. *See Summit Packaging Systems, Inc. v. Kenyon & Kenyon,* 273 F.3d 9, 12 (1st Cir. 2001) ("basic principle of contract law that constructions that render contract terms meaningless should be avoided"); *Systemized of New England, Inc. v. SCM, Inc.,* 732 F.2d 1030, 1034 (1st Cir. 1984) ("court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage"); *Lexington Ins. Co. v. All Regions Chemical Labs, Inc.,* 419 Mass. 712, 713 (1995) ("A contract should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase").

- 16 -

*Providence Journal Co. v. Providence Newspaper Guild,* 271 F.3d 16 (1st Cir. 2001) is instructive on this issue. In *Providence Journal,* the contract at issue provided "employees with the right to purchase discount parking passes" but was "silent on what benefits accrue to the holder of a parking pass." *Id.* at 21. The Court held that "[p]lain language would seem to dictate that a parking pass entitles one to actually park. Otherwise, the right to purchase a discounted parking pass would be completely meaningless." *Id.* Similarly, here, the plain language of Section B(6) provides Harley-Davidson with the right to issue NRSPs and this contractual right would be rendered meaningless if Cycle-Craft and other Harley-Davidson dealers were free to ignore these policies. Indeed, it would make no sense that Harley-Davidson expressly reserved the right to issue these policies but they would have no actual force and effect upon their issuance. Such an interpretation would improperly render a portion of Section B(6) meaningless. *See id.* ("It makes little sense that the parties bargained for parking passes that did not provide parking . . . it is a basic principle of contract law that construction which render contract terms meaningless should be avoided"). Thus, pursuant to ordinary principles of contractual interpretation, the NRSPs should be considered incorporated by reference into the Dealer Agreement.

Because the NRSP states that "[a] sale by a U.S. dealer of a new or previously unregistered motorcycle will be considered a 'non-retail sale' for purposes of the Dealer Contract and this policy if the motorcycle is not properly set up, inspected, tested, sold and delivered at the dealership facility, directly to the ultimate consumer,[5]" Cycle-Craft violated this policy and the Dealer Agreement by selling 27 motorcycles to DC Imports and Lee Custom Cycle. *Id.*[6]

---

[5] An "ultimate consumer" is defined in the NRSP as "the retail end user who purchases, as indicated on the Certificate of Origin, a new or previously unregistered motorcycle for his or her own use, without the intent to resell, pays all applicable taxes and registration fees, and titles the vehicle in his or her own name."

[6] Contrary to Cycle-Craft's argument, the doctrine of judicial estoppel is not applicable. Harley-Davidson is not "pressing a claim that is inconsistent with a position taken by [Harley-Davidson] either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *InterGen N.V. v. Grina,* 344 F.3d 134, 144 (1st Cir. 2003). Here, Harley-Davidson asserts that the NRSP is part of the Dealer

- 17 -

**IV.    THERE IS NO EVIDENCE IN THE RECORD THAT HARLEY-DAVIDSON'S DECISION TO TERMINATE WAS MADE IN BAD FAITH, WAS ARBITRARY OR WAS UNCONSCIONABLE**

Cycle-Craft asserts that there is "evidence that Harley-Davidson had a hidden agenda, and thus acted in bad faith in its dealings with Cycle-Craft." Cycle-Craft Opposition, p. 23. However, Cycle-Craft does not offer any evidence to support that contention. In contrast, Harley-Davidson provided the following testimony:

> Our decision to inspect Cycle-Craft's sales records was triggered solely by my recommendation, which, as noted, was based on the unsolicited email we received in August 2003, and unusual sales activities by the dealership at the end of the 2003 model year. Our notice of termination, in turn, was based solely on the contractual breaches by the dealership discovered as a result of our inspection of records. Harley-Davidson had no 'ulterior motives' whatsoever.

Affidavit of Steven Verduyn Aff., ¶48. This testimony remains undisputed. Instead, Cycle-Craft claims that "[w]hen Harley-Davidson employees were questioned about the reasons for the termination during their depositions, they uniformly invoked the attorney-client privilege." Cycle-Craft Opposition, p. 23. Contrary to Cycle-Craft's position, the testimony cited by Cycle-Craft clearly indicates that the privilege was properly invoked when Cycle-Craft improperly attempted to question witnesses about communications with Harley-Davidson's in-house counsel. *See* Contois Dep., p. 99 (attorney-client privilege invoked when Mr. Contois was asked about discussions at a meeting attended by in-house counsel); Verduyn Dep., pp. 181, 183-84 (same); Ostrom Dep., pp. 77-78 (same); Malicki Dep., p. 144 (same). Importantly, Cycle-Craft did not and cannot cite a single question where a witness was asked (and was instructed not to answer) whether there were any other reasons, besides the audit results, for the issuance of the Notice of Termination. As stated under oath by Mr. Verduyn, there were no other reasons, which Cycle-Craft cannot and has not disputed. Indeed, Mr. Atwood conceded to his

---

Agreement, which is not inconsistent with the position set forth in *Racine Harley-Davidson, Inc. v. Harley Davidson Motor Co.,* 692 N.W.2d 670 (Wis.Ct.App. 2004). In *Racine,* Harley-Davidson argued that a dealer's assigned territory is not part of the Dealer Agreement because the Dealer Agreement provided Harley-Davidson with the contractual right at any time to modify, alter or adjust a dealer's assigned territory. *Id.,* at 674-75. In any event, *Racine* did not even involve the NRSP.

accountant that Harley-Davidson issued the Notice of Termination based on contractual violations and it had nothing to do with Harley's desire to put a dealership in Danvers.[7]

## V.   PLAINTIFF VOLUNTARILY TERMINATED ITS BUELL FRANCHISE AGREEMENT

As noted in defendants' original submission, plaintiff's Dealer Agreement with Defendant Buell Distribution Company, LLC ("Buell") terminates automatically upon termination of plaintiff's Dealer Agreement with Harley-Davidson Motor Company, Inc. *See* Dealer Agreement; H-D App. Tab A, Section M(4). Here, after the submission of Harley-Davidson's Motion for Summary Judgment, plaintiff voluntarily terminated its agreement with Buell. Affidavit of William Berkowitz, Exhibits 1 and 2. Accordingly, all claims against Buell should be dismissed.

## CONCLUSION

Based on the foregoing, its Response to Cycle-Craft's Statement of Material Facts, its Response to Cycle-Craft's Statement of Undisputed Material Facts, the Affidavit of William N. Berkowitz, its Supplemental Appendix, and its original papers filed in support of Summary Judgment, Harley-Davidson is entitled to judgment as a matter of law on all of the claims asserted against it by plaintiff and plaintiff's Motion for Summary Judgment should be denied.

---

[7] Specifically, Mr. Vesey testified as follows:

Q:    What did he [Mr. Atwood] say?
A:    He told me that they [Cycle-Craft] had shipped some bikes to Florida and apparently they did it wrong or inappropriately or in violation of something, and as a result of that, Harley was taking actions to try to take his franchise away.
Q:    Anything else Mr. Atwood told you about the case?
A:    I asked him if it had anything to do with -- I know a few years ago he joined up with a dealership in New Hampshire to try to stop Harley from putting a dealership into Danvers, and I suggested, 'Is this a squeeze play on Harley's part,' and he said, 'I don't think so.'

Vesey Dep., p. 9 (Supp. App., Tab K).

LITDOCS/616881.2

Respectfully submitted by,

**Harley-Davidson Motor Company, Inc.,**
**and Buell Distribution Company, LLC**

By their attorneys,

_/s/ William F. Benson_____
William N. Berkowitz, BBO# 544148
William F. Benson, BBO# 646808
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Ph:  (617) 951-8000
Fx:  (617) 951-8736

Dated:  October 14, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand on October 14, 2005.

_/s/ William F. Benson_____
William F. Benson