UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
CYCLE-CRAFT CO., INC.                       )
d/b/a BOSTON HARLEY-DAVIDSON/BUELL,         )
                                            )
                         Plaintiff,         )
                                            )   Civil Action
             v.                             )   No. 04 11402 NMG
                                            )
HARLEY-DAVIDSON MOTOR COMPANY, INC.,        )
and BUELL DISTRIBUTION COMPANY, LLC,        )
                                            )
                         Defendants.        )
_____ )

---

**PLAINTIFF CYCLE-CRAFT CO., INC.'S REPLY MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

James C. Rehnquist (BBO# 552602)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

*Attorneys for Plaintiff Cycle-Craft
Co., Inc.
d/b/a Boston Harley-Davidson/Buell*

Dated: October 24, 2005

Pursuant to the parties' agreed-upon briefing schedule, plaintiff Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") submits this brief to respond to arguments made in Defendants' Memorandum in Further Support of Their Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("H-D Rep./Opp.").

Although Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC ("Harley-Davidson") escalates and amplifies the rhetoric in its final brief – accusing Cycle-Craft not only of "fraud" but also of "conspiracy" and a "cover up" – it cannot evade the admissible record evidence that is relevant to the parties' cross-motions for summary judgment. That evidence demonstrates that Cycle-Craft is entitled to summary judgment, as Harley-Davidson cannot justify its termination decision under the applicable "good cause" standard of Chapter 93B.

**1.     The Undisputed Facts Demonstrate That Cycle-Craft Did Not Fraudulently Report Sales That Never Occurred.**

Contrary to Harley-Davidson's contention, H-D Rep./Opp. at 2-5, Cycle-Craft did not fraudulently report sales that never occurred. The undisputed evidence demonstrates that in July 2003 Cycle-Craft made motorcycles available at rock-bottom prices to dealership employees and their family and friends, received commitments to purchase the motorcycles, and in good faith reported these commitments to Harley-Davidson as sales. Plaintiff Cycle-Craft Co., Inc.'s Memorandum of Law In Support of Its Motion for Summary Judgment ("C-C Mem.") at 12-13.

Harley-Davidson disputes these facts principally by arguing that "there is no admissible evidence of so-called 'commitments' from any of the referenced individuals." H-D Rep./Opp. at 3. This is incorrect. As Cycle-Craft has demonstrated, General Manager Ron Buchbaum received verbal commitments from the individual purchasers, and all of the Cycle-Craft employees that Harley-Davidson chose to examine under oath confirmed that those

1

commitments had been made. C-C Mem. at 13. To the extent Harley-Davidson relies on a lack of any formal paperwork memorializing those commitments, such as a purchase-and-sale agreement, H-D Rep./Opp. at 4, the issue is a red herring. As Cycle-Craft demonstrated, it normally does not require a down payment or other paperwork to memorialize an employee sale, and consistent with this practice no such paperwork was required in July 2003. C-C Mem. at 13. Harley-Davidson also contends in its opposition that "Cycle-Craft concedes that by submitting an SWR to Harley-Davidson it has <u>certified</u> that the identified motorcycle has been <u>sold and delivered</u> to the identified customer." H-D Rep./Opp. at 4 (emphasis in original). Not so. The SWR documentation that Harley-Davidson has submitted in support of this argument, *see e.g.,* Verduyn Aff. *Exhibits 6, 8, and 10*, says nothing whatsoever about delivery to the customer.

     Harley-Davidson appears to believe, notwithstanding its admitted failure to ever define the term for its dealers, H-D Rep./Opp. at 4 n.3, that the term "sale" has some sort of abstract, universally understood meaning. Common sense belies this notion. To use one everyday example, people often speak of having "sold" their home based on a "commitment" from a buyer even though the transaction has yet to be finalized, no "delivery" of the property has been made, and significant contingencies remain, such as an inspection of the premises and the buyer's obtaining suitable financing. In any event, that Cycle-Craft's understanding of the term "sale" was different from Harley-Davidson's does not mean that Cycle-Craft committed a material breach of the Dealer Contract, which was silent on how the term should be construed. To the extent the Dealer Contract was ambiguous, moreover, it must be construed against Harley-Davidson, which drafted it. *See, e.g., Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977) ("a writing is construed against the author of the doubtful language").

In view of this ambiguity, Harley-Davidson's argument that Cycle-Craft's SWR submissions constituted "fraud" is untenable. *See Compagnie de Reassurance D'ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 73-79 (1st Cir. 1995) (reversing finding of fraud where critical term in representation was subject to differing interpretations). In addition, when Harley-Davidson's Steve Verduyn inquired about these sales during his on-site audit of Cycle-Craft before the termination letter was sent, Cycle-Craft General Manager Ron Buchbaum openly and freely acknowledged that the sales were reported to Harley-Davidson based on the employees' commitments to purchase, and explained the terms of these commitments. Cycle-Craft Supplemental ("C-C Supp.") *Exhibit 1* (Verduyn Dep. I) at 128.[1] If Cycle-Craft had intended to "defraud" Harley-Davidson, Mr. Buchbaum would hardly have been so forthcoming. Inasmuch as Harley-Davidson has based its termination decision (regarding the SWR submissions) explicitly on "fraud," C-C *Exhibit 26* (Termination Letter) at 2; HD Rep./Opp. at 1-2, 9-11, the absence of fraud demonstrates that summary judgment is appropriate for Cycle-Craft.[2]

**2. Despite Harley-Davidson's Mischaracterization of the Admissible Evidence, the Undisputed Facts Demonstrate That Cycle-Craft Did Not Breach The "Non-Retail Sales" Provision In The Dealer Contract.**

Harley-Davidson's attempt to generate a triable factual dispute on its alleged violations of the Dealer Contract's "Non-Retail Sales" provision consists largely of mischaracterizations of the admissible record evidence. A prime example is Harley-Davidson's reliance on the Florida

---

[1] Exhibits filed with Cycle-Craft's reply brief will be referred to as supplemental exhibits ("C-C Supp. *Exhibit __*") and exhibits previously filed by Cycle-Craft in support of its motion for summary judgment and in opposition to Harley-Davidson's motion for summary judgment will be referred to as exhibits ("C-C *Exhibit __*").

[2] At a minimum, any issue about whether Cycle-Craft committed fraud requires a determination as to Cycle-Craft's "intent," *Macoviak v. Chase Home Mort. Corp.*, 667 N.E.2d 900, 904 (Mass. App. Ct. 1996), an issue that is inappropriate for decision on summary judgment. *See Ruffino v. State Street Bank and Trust Co.,* 908 F. Supp. 1019, 1028 (D. Mass. 1995) ("motive and intent [are] issues least suited for a determination on a motion for summary judgment.").

Highway Patrol's incident report regarding its investigation of Deborah Lunsford. H-D Rep./Opp. at 1, 5-6. As Cycle-Craft previously has explained, the Florida Highway Patrol investigated a "possible series of title frauds committed <u>by DC Imports</u>." Tab O to Harley-Davidson's Appendix (Incident Report) (emphasis added); Cycle-Craft's Response to Harley-Davidson's Statement of Undisputed Facts ("C-C Resp. to H-D SUF") ¶ 84. As a result of that investigation, Debra Lunsford was subsequently convicted of title fraud for submitting forged and false documentation to the Palm Beach County Tax Collector's Office. C-C Resp. to H-D SUF ¶ 84; C-C *Exhibit 19* (Lunsford Dep.) at 140:22-141:5. As is evident from even the most cursory review of the Incident Report, the Florida Highway Patrol was not investigating Cycle-Craft or its sales of motorcycles to individuals in Florida, but rather the subsequent actions of Ms. Lunsford after the motorcycles were sold. Accordingly, any conclusions that the Florida Highway Patrol reached about the "circumvention of Harley-Davidson's policy prohibiting wholesale transactions" were based on Ms. Lunsford's conduct and motivations, and not Cycle-Craft's.

    Harley-Davidson also takes unwarranted liberties with the deposition testimony it uses to support its argument that Cycle-Craft "sold" motorcycles not to individuals but to companies, and that Cycle-Craft "conspired" with these customers and directed a "cover-up" of these transactions. *See* H-D Rep./Opp. at 1, 6-9. Any fair reading of the testimony of the witnesses involved in these transactions demonstrates that, although Cycle-Craft may have been approached by customers wishing to buy multiple motorcycles, Cycle-Craft insisted that the sales be made to individuals and that is what in fact happened. *See* C-C Mem. at 8-11. That Cycle-Craft may have not dealt directly with each individual purchaser, but instead negotiated

the individual sales through a representative or representatives, does not establish a violation of the Dealer Contract.

Cycle-Craft has previously explained Harley-Davidson's mischaracterizations of the record evidence regarding the sales to Florida and New Hampshire residents, C-C Mem. at 9 n.3, 11 n.4; Plaintiff Cycle-Craft Co., Inc.'s Memorandum of Law in Opposition to Harley-Davidson's Motion for Summary Judgment ("C-C Opp.") at 7-9, and will not repeat those observations here. It is worth noting, however, that even though Harley-Davidson had the good fortune to obtain deposition testimony from two disgruntled, former Cycle-Craft employees – Sean Walsh and Jason Marasca[3] – it was unable to obtain any admissible evidence from them to support its position. Although in its most recent brief Harley-Davidson has finally acknowledged Cycle-Craft's objections to the questions it asked these non-party witnesses, it continues to rely on answers to leading, misleading, and ambiguous questions. For example, Harley-Davidson relies on Sean Walsh's answer to the following question: "And again, was that to make it appear as though you were complying with the Harley-Davidson policy?" H-D Rep./Opp. at 7. The question is not only leading, it is also impermissibly vague, as the word "appear" could mean either to actually comply with the policy or to present a false "appearance" of complying with the policy. Walsh's previous answer, moreover, in which he makes reference

---

[3] Mr. Walsh and Mr. Marasca are disgruntled, former employees of Cycle-Craft who do not like Cycle-Craft General Manager Ronald Buchbaum. C-C Supp. *Exhibit 2* (Walsh Dep.) at 90:2-19; 106:22-107:6; C-C Supp. *Exhibit 3* (Marasca Dep.) at 58:12-17, 75:3-5, 77-78. Both refused to accept Cycle-Craft's offer of legal representation for their depositions, C-C Supp. *Exhibit 2* (Walsh Dep.) at 90:20-91:15; C-C Supp. *Exhibit 3* (Marasca Dep.) at 50:10-51:2, choosing instead to speak with Harley-Davidson counsel about their testimony prior to their depositions. C-C Supp. *Exhibit 2* (Walsh Dep.) at 113:2-114:20; C-C Supp. *Exhibit 3* (Marasca Dep.) at 52:1-15.

to "the person purchasing the bike," *id.*, suggests that he believed the motorcycles were being actually sold to the individuals whose names were on the paperwork.[4]

### 3. Harley-Davidson Ignores the Legal Principles That Preclude It From Bootstrapping the NRSPs Into the Dealer Contract.

In response to Cycle-Craft's argument that the NRSPs are not part of the Dealer Contract because they are not incorporated into that contract, C-C Mem. at 15-16, Harley-Davidson does not dispute Cycle-Craft's analysis of the law or the facts.[5] Instead it argues that "it would make no sense that Harley-Davidson expressly reserved the right to issue these policies but they would have no actual force and effect upon their issuance." H-D Rep./Opp. at 17. But Cycle-Craft does not contend the NRSPs had "no actual force and effect"; it simply contends they were not part of the Dealer Contract, and this case is about alleged violations of the Dealer Contract. Violations of the NRSPs themselves could conceivably, in a different case, where the dealer was aware of the NRSP terms, be the basis for the imposition of some sanction of a dealer. But Harley-Davidson has chosen here to pursue the most draconian sanction possible: termination. And since the NRSPs are not part of the Dealer Contract, a dealer's violation of them cannot constitute "good cause" for termination under Mass. Gen. Laws Ch. 93B § 5(j)(7).[6]

---

[4] Another example is Harley-Davidson's reliance on Jason Marasca's affirmative response to the question, "During 2003 did Lee Custom Cycle purchase eight new Harley-Davidson motorcycles from Cycle-Craft?" H-D Rep./Opp. at 9. The term "purchase" itself is vague in this context – pay for? take title to? acquire physically? – and there is no foundation established for the admissibility of this testimony. It is undisputed, moreover, that each individual New Hampshire purchaser signed title documents and presented an individual check for his or her motorcycle. C-C Mem. at 10.

[5] Harley-Davidson does not dispute that under Massachusetts law "it is well established that 'incorporation by reference requires that the document to be incorporated be referred to and described in the contract so that the referenced document may be identified beyond doubt,'" *Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 47 (D. Mass. 1995) (citations omitted), and cannot and does not dispute that the Dealer Contract did not incorporate by reference the NRSP. C-C Mem. at 15-16.

[6] That section contemplates only of "the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the *existing franchise agreement* or of applicable law" (emphasis added) and contains no reference to unilaterally promulgated policies. *See* C-C Mem. at 19-20.

Harley-Davidson's response to Cycle-Craft's judicial estoppel argument – a footnote buried within its brief, HD Rep./Opp. at 17 n.6 – is equally unavailing. Harley-Davidson claims that in *Racine Harley-Davidson, Inc. v. Harley Davidson Motor Co.,* 692 N.W.2d 670 (Wis. Ct. App. 2004), it argued that "a dealer's assigned territory is not part of the Dealer Agreement because the Dealer Agreement provided Harley-Davidson with the contractual right at any time to modify, alter or adjust a dealer's assigned territory." H-D Rep./Opp. at 17-18 n. 6. Regardless of whether this point formed part of Harley-Davidson's argument in *Racine*, Harley-Davidson cannot escape the formulation of its position by the Wisconsin Court of Appeals. *See* C-C Mem. at 17-18. That argument is inconsistent with its present position, and this is a classic case for applying the doctrine of judicial estoppel.

4.     **Harley-Davidson Concedes That Six of the Seven Enumerated Section 5(j) "Pertinent Circumstances" Favor Cycle-Craft But Incorrectly Argues That None of Them Are Relevant Here.**

Harley-Davidson says nothing at all to refute Cycle-Craft's argument that six of the seven "pertinent circumstances" listed in Mass. Gen. Laws Ch. 93B, § 5(j), cut in Cycle-Craft's favor. Instead, despite the command of the Massachusetts legislature in § 5(j) that all circumstances that are "pertinent" to a dealer termination "shall be considered," Harley-Davidson argues that none of these circumstances are relevant here. Harley-Davidson appears to advance two arguments for this position. First, it argues that Cycle-Craft's "fraud" eliminates the need to consider any additional circumstances. H-D Rep./Opp. at 1-2, 9-12. As explained above, Harley-Davidson's allegations of fraud are unfounded.

Second, Harley-Davidson argues that, under § 5(h) of Chapter 93B, a manufacturer can terminate a dealer based on a "material breach" alone, without consideration of any other circumstances. HD Rep./Opp. at 12. But Harley-Davidson misreads § 5(h). Although it has belatedly acknowledged the critical "opportunity to cure" language that it eliminated with

7

ellipses in its original brief, *see* C-C Opp. at 18-19, its attempt to evade the "opportunity to cure" requirement is unavailing.

> Section 5(h) states that good cause for termination may be justified by the manufacturer:
>
> if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation, reasonable sales and service performance criteria and capital, personnel, and facility requirements, which were communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or renewal such that a reasonable opportunity to cure was afforded.

Harley-Davidson argues that the "opportunity to cure" requirement in this section is inapplicable because Cycle-Craft's breach was, in essence, "incurable." H-D Rep./Opp. at 12. This argument ignores the plain language of the statute: the "opportunity to cure" clause clearly modifies all alleged material breaches that might be enlisted to justify a good cause finding thereunder. Harley-Davidson's argument also ignores the interplay between § 5(h) and § 5(j). Plainly, the legislature intended that, on the one hand, the § 5(h) category of material breaches – performance-related breaches for which a meaningful opportunity to cure had been provided – could support good cause for termination without consideration of all pertinent circumstances. On the other hand, the § 5(j) category of material breaches – those for which no such opportunity to cure had been provided – could only support a "good cause" finding when considered in light of "all pertinent circumstances."[7]

---

[7] Neither of the two cases cited by Harley-Davidson to evade the "opportunity to cure" requirement, H-D Rep./Opp. at 12-13, are apposite. Indeed neither involved Mass. Gen. Laws Ch. 93B or even Massachusetts law. In fact, one of the cases which Harley-Davidson cites, *Annecca, Inc. v. Lexent, Inc.*, 307 F. Supp. 2d 999 (N.D. Ill. 2004), did not even involve a motor vehicle franchise termination. Rather, that case related to a dispute over a stock purchase agreement and the language quoted by Harley-Davidson concerned the interpretation of a contract clause under New York law. *See id.* at 1009-10. The other case, *Jaguar Cars v. Blackhorse Motorworks, Ltd.*, 1999 WL 1711085, at *2-3 (E.D. Ky. Nov. 2, 1999), involved Kentucky law and did not relate to any failure to comply with a statutorily mandated opportunity to cure.

**5.      Triable Issues Exist Regarding Cycle-Craft's Claims Under Section 5(m) and to Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Harley-Davidson makes but two points in response to Cycle-Craft's argument that there are genuine factual disputes at issue in regard to its § 5(m) and implied covenant claims. Remarkably, Harley-Davidson fails to address, or even mention, the bulk of the evidence cited by Cycle-Craft showing that the termination was in retaliation for Cycle-Craft's threatened protest of a new dealership in the Danvers/Peabody area:  Harley-Davidson's knowledge of Cycle-Craft's protest threat and its potential to impede the development of the new dealership; Cycle-Craft's lack of any history of non-retail sales; Harley-Davidson's initiation of its investigation of Cycle-Craft under unusual circumstances, and its subsequent mischaracterization of those circumstances; Harley-Davidson's failure to afford Cycle-Craft the opportunity to explain the challenged sales; and Harley-Davidson's flip-flopping in articulating the basis for the termination.  *See* C-C Opp. at 10-12, 22-23.

Neither of the two points Harley-Davidson does make have any merit, moreover.  In response to Cycle-Craft's argument that it can argue the negative inference from Harley-Davidson employees' uniform invocation of the attorney-client privilege when questioned about Cycle-Craft's termination, C-C Opp. at 23-24, Harley-Davidson claims that "the privilege was properly invoked when Cycle-Craft improperly attempted to question witnesses about communications with Harley-Davidson's in-house counsel," H-D Rep./Opp. at 18, and that "Cycle-Craft did not and cannot cite a single question where a witness was asked (and was instructed not to answer) whether there were any other reasons" for the termination.  *Id.*  Again, Harley-Davidson misconstrues Cycle-Craft's argument.  Cycle-Craft is not disputing whether the privilege was properly asserted, but rather the consequences of Harley-Davidson's invocation of the privilege.  Multiple Harley-Davidson employees testified that the decision to terminate

9

Cycle-Craft was made at a single meeting at which Harley-Davison in-house counsel, Ms. Jenny Kent, was present, C-C Supp. *Exhibit 4* (Malicki Dep.) at 143:13-144:22, 146:15-25; C-C Supp. *Exhibit 1* (Verduyn Dep. I) at 183:18-184:12, 185:2-8, and in response to questions regarding the substance of the discussion at that meeting uniformly invoked the attorney-client privilege. *See, e.g.,* C-C *Exhibit 11* (Contois Dep.) at 99:4-13; C-C *Exhibit 12* (Verduyn Dep. I) at 181:1-10, 183:18-184:12; C-C *Exhibit 39* (Ostrom Dep.) at 77:11-78:5; C-C *Exhibit 40* (Malicki Dep.) at 144:10-22. Accordingly, any further questioning on the topic would have been futile, as Harley-Davidson could not have selectively waived the privilege in further responses. In short, Mr. Verduyn's conclusory affidavit testimony that Harley-Davidson "had no ulterior motives" for the termination decision is inconsistent with the invocation of the attorney-client privilege during discovery, and cannot be considered by the Court under Rule 56(e).

Harley-Davidson's argument that Cycle-Craft's John Atwood "conceded" that Harley-Davidson had no ulterior motives in its termination, H-D Rep./Opp. at 18-19, should also be rejected. Mr. Atwood's tentative statement that he "didn't think" the termination was a "squeeze play" is ambiguous on its face, and Mr. Atwood's uninformed speculation – made in approximately March 2005, before Cycle-Craft had taken any depositions or reviewed the bulk of the documents produced by Harley-Davidson – is hardly dispositive of Harley-Davidson's motivation.

## CONCLUSION

For the foregoing reasons, Cycle-Craft is entitled to summary judgment as a matter of law on all of its claims asserted against Harley-Davidson.

                              Respectfully submitted,

                              CYCLE-CRAFT CO., INC.

                              By its attorneys,

                              _/s/ James C. Rehnquist_
                              James C. Rehnquist (BBO# 552602)
                              Christopher C. Nee (BBO# 651472)
                              GOODWIN PROCTER LLP
                              Exchange Place
                              Boston, MA 02109
                              (617) 570-1000

October 24, 2005

LIBA/1640422.1