# EXHIBIT A

```
 1   ------------------------------------------------------------
              UNITED STATES DISTRICT COURT
 2
              DISTRICT OF MASSACHUSETTS
 3   _____

 4   CYCLE-CRAFT COMPANY, INC.,
     d/b/a BOSTON HARLEY-DAVIDSON/
 5   BUELL,
 6              Plaintiffs,
 7         vs.                        Case No. 04-11402-NMG
 8   HARLEY-DAVIDSON MOTOR COMPANY,
     INC., and BUELL DISTRIBUTION
 9   COMPANY, L.L.C.,
10              Defendants.
11   ------------------------------------------------------------
12         VIDEO DEPOSITION OF JON ROBERT FLICKINGER
13                 Tuesday, April 5, 2005
14                       9:29 a.m.
15                          at
16               GRAMANN REPORTING, LTD.
          710 North Plankinton Avenue, Suite 710
17                 Milwaukee, Wisconsin
18
19
20
21
22         Reported by Christine Kovac, RPR
23
24
25
```

Deposition of Jon Robert Flickinger, 4/5/2005

**REDACTED**

3  BY MR. REHNQUIST:
4  Q  So, was there -- was there one meeting in which the
5     results of the audit were reported by Verduyn and
6     another meeting at which the -- the decision to
7     terminate was reached?
8  A  I don't remember specifically, but I find it unlikely
9     that we would have discussed the results of the audit
10    and all of our findings without a discussion of
11    whether we should consider proceeding with
12    termination. Now, I would -- I also doubt that we
13    made a final decision to -- to -- to terminate at that
14    discussion. But usually those discussions would be
15    linked if -- in a situation like this where we
16    determine that there was significant non-retail sales
17    activity, we most certainly would have had a
18    discussion about whether we should proceed with
19    termination or not.
20 Q  Um, can you just summarize for me what Mr. Verduyn
21    stated in reporting the results of his audit?
22       And if you need to instruct him not to answer,
23    you can go ahead and do that.
24       MR. BERKOWITZ: Well, what I'm going to do
25    is instruct you not to disclose any advice of counsel

Page 222

1  or any request for request of counsel during this
2  meeting.
3      THE WITNESS: Okay.
4      MR. BERKOWITZ: But as to this question,
5  I'll permit you to testify.
6      THE WITNESS: Okay.
7      MR. BERKOWITZ: The question is just what
8  was the report -- what was the report results of the
9  audit --
10     THE WITNESS: Yeah.
11     MR. BERKOWITZ: -- by Mr. Verduyn if you
12 recall?
13     THE WITNESS: I don't have a general
14 recollection of the discussion, so I don't remember
15 the specifics. I remember we talked about the types
16 of non-retail sales that had occurred, um, the
17 involvement of a Florida broker or DCI I think was the
18 name of the company. Um, we reviewed some of the
19 documents that were collected in the audit, and
20 subsequently collected, uh, through other, um,
21 efforts, and generally discussed the nature of the --
22 the -- the severity of the non-retail sales.
23     Um, I think he presented that, you know,
24 verbally. There were some summaries of the -- as I
25 recall, of the -- you know, of each VIN and the

Page 223

1  documents associated with those VINs. Um, I don't
2  remember too many details about what those documents
3  looked like, but he conducted an audit, so he had, you
4  know, the results of that.
5  BY MR. REHNQUIST:
6  Q  Were any documents distributed in advance of this
7     meeting?
8  A  I don't recall. Typically they would not be.
9  Q  Why not?
10 A  So I doubt it.
11    Usually -- you know, usually their stacks of,
12    you know, lots of detailed documents -- dealer
13    documents and other documents, and it's prohibitive to
14    copy so much of that stuff. So he would usually bring
15    it with him, and we'd have the -- he'd, you know,
16    share the results. We'd look at some of the documents
17    that he had, and -- and try to understand the issue
18    because they all are pretty unique -- um, and reach a
19    conclusion, make a decision.
20 Q  So did he -- you said that he either showed or
21    described other documents in addition to documents
22    that he had collected at the audit?
23 A  Yeah. As I recall, there were just a number of
24    documents. Some internally generated, some at the
25    audit. I think -- I don't remember specifics, but I

Page 224

1  think we tried to gather some information from some of
2  the sales in Florida. Um, I can't remember if all
3  those came from Cycle-Craft or not. I don't believe
4  they call came directly from Cycle-Craft.
5  Q  Where did they come from?
6  A  I can't -- I don't recall where they came from. It
7     just seems like there were documents from someplace or
8     somebody in Florida or a discussion about documents
9     from Florida. I don't recall the specifics.
10 Q  Do you recall any discussion about a dealer in
11    Louisiana?
12 A  Not -- not at -- not at that time, no, I don't.
13 Q  How long did this -- did this meeting take place when
14    Verduyn reported the results of his audit?
15 A  How long was the meeting?
16 Q  How long was the meeting?
17 A  I don't recall specifically.
18 Q  More than an hour?
19 A  If I were to guess, it would be more than an hour,
20    yes.
21 Q  More than two?
22 A  I don't know. I --
23 Q  Is your best -- is your best estimate between one and
24    two hours?
25 A  Yeah. That would be a fair guess, yes.

Page 225

1  Q  I don't want to you guess, but what's your best -- can
2     you --
3  A  Best estimate would be between an hour and a half and
4     two and a half hours perhaps.
5  Q  And where was the meeting held?
6  A  I believe it was in a conference room on the third
7     floor on our -- in our floor.
8  Q  Okay. And the interrogatory --
9  A  Mm-hmm.
10 Q  By the way, did you review those -- did you review
11    these interrogatory answers for accuracy?
12 A  I believe I did. If I could look through the rest of
13    the documents, it might help jog my memory. When was
14    this done? Do you -- can you help me out on that?
15 Q  Well, it's -- there -- they're not paginated, so if
16    you look at --
17 A  There's -- probably somebody signed this on a certain
18    date?
19 Q  These are signed by Gene Ostrum on December 8th of
20    '04?
21 A  Okay. December 8th of '04. I don't -- December of
22    '04.
23 Q  Maybe it will help if I can point you to the page we
24    were on before.
25 A  Yeah.

Page 226

1  Q  If you look at the top, it does say that the answers
2     were prepared by counsel with input from Jon
3     Flickinger?
4  A  Mm-hmm. Yeah, I just don't know if I reviewed this
5     document when it was finally completed. I don't know
6     -- I don't know.
7  Q  Okay. That's fine.
8         VIDEO TECHNICIAN: Counsel, can we change
9     tapes at this point?
10        MR. REHNQUIST: Yep.
11        VIDEO TECHNICIAN: His is the end of
12    Videotape Number 3. We are off the record at 5:39
13    p.m.
14        (A brief pause in proceedings.)
15        VIDEO TECHNICIAN: This is the beginning of
16    Videotape Number 4 and the continuing deposition of
17    Jon Robert Flickinger. We are back on the record at
18    5:40 p.m.
19 BY MR. REHNQUIST:
20 Q  To the best of your knowledge, Mr. Flickinger, who
21    attended this meeting where Mr. Verduyn made his
22    report? I know you mentioned some people before, but
23    I just want to make sure that I have that correct.
24 A  Well, I believe Jenny Kent was there, myself, Mike
25    Malicki, Joan Ostrum, Steve Verduyn. There were a

Page 227

1     couple of others, but I can't say for certain that I
2     remember exactly that they -- who they were, if they
3     were at the meeting. I mean -- and I think they were
4     perhaps some of these other folks that were mentioned
5     here, but I just don't remember exactly.
6  Q  Maybe Al Contois but you're not sure?
7  A  Maybe. But I'm not positive. He might have been on
8     the phone. I just don't know for sure.
9  Q  And maybe Mr. Evers and Mr. Hall, but you're not sure
10    either?
11 A  I -- I really don't believe Dave Hall participated in
12    that meeting. I could be wrong. And I'm not certain
13    about Bill Evers.
14 Q  Um, did Mr. Verduyn say anything else apart from what
15    you've already talked about?
16        MR. BERKOWITZ: Well, again, excluding any
17    solicitation of advice of counsel or comments of
18    counsel.
19        THE WITNESS: You know, I would say that I
20    don't remember specifics. I do know that he's -- he
21    -- he did go through the various non-retail sales and
22    types of non-retail sales describing his findings in
23    some detail. So, um -- yeah, I'm fairly certain that
24    he commented about things beyond perhaps the things I
25    mentioned earlier. I don't remember the specifics

Page 228

1     beyond the fact that he was reporting his findings of
2     the audit.
3  BY MR. REHNQUIST:
4  Q  When you say his findings, what do you mean?
5  A  Um, providing us with detail about the types of sales,
6     who the sales were made to, who wrote checks for the
7     purchase of motorcycles, um, who the -- who was
8     reported to have been -- the bikes were reported to
9     have been sold, on what date, who the bikes actually
10    were sold to on -- on which dates. Um, the nature of
11    some of the miss -- let's call it misrepresentation or
12    miss reporting -- inaccurate reporting. Um, false
13    reporting of the -- of the sales reports.
14        Um, so he kind of went through, and he goes in
15    each of these situations, and this one he went through
16    and described what he believed to have occurred from
17    his review of all the available records and
18    information.
19 Q  Did anyone take any notes at this meeting?
20 A  I don't recall if anyone was taking notes or not.
21 Q  Did you take notes at this meeting?
22 A  No.
23 Q  Why not?
24 A  I -- I just typically don't take notes at a meeting
25    like this. I -- I'm looking at documents, listening

Page 229

1     to what's being said. Having -- there's a lot of --
2     fair amount of conversation, and it's distracting to
3     take notes. Um --
4  Q  Did anyone who is at the -- putting aside counsel, did
5     anyone ask Mr. Verduyn any questions at this meeting
6     that you recall?
7  A  Oh, I'm sure there were questions asked. I don't
8     remember any specifics, but there are always -- yeah,
9     there were a lot of questions asked I'm sure.
10 Q  Do you remember what any questions were?
11 A  Not -- not specifics. I mean, I remember we asked
12    questions about, you know, the climate at the
13    dealership when the audit was performed, who was
14    involved -- who -- you know, who was involved. Um,
15    the -- the -- um, you know, trying to understand more
16    about the nature of the -- the transactions that
17    occurred. Some of them were quite complicated and the
18    -- and where the motorcycles went, who paid for them,
19    who was reported to have paid for them and/or took
20    delivery.
21        Um, so, yeah, I know we asked a lot of
22    questions and I know -- I know I asked some questions,
23    and I know others did too. It was a fair amount of
24    question and answer and understanding all of the
25    various issues.

Deposition of Jon Robert Flickinger, 4/5/2005

### Page 230

1  Q  Did Mr. Verduyn indicate, um, you know, what
2     information, if any, he had received, um, from the
3     dealer apart from what information was in the dealer
4     files?
5  A  Information received from the dealer, by that you mean
6     John Atwood or --
7  Q  John Atwood, Ron Buchbaum -- any employees?
8  A  As I recall, he mentioned that he had a discussion
9     with Ron Buchbaum about some of the sales. As I
10    recall, either some of Ron's family members or
11    acquaintances or somebody was involved in the reported
12    purchase of some of the motorcycles. So I -- I seem
13    to recall that there was some discussion about, um,
14    Steve's interaction with Ron on some of these sales.
15    I don't remember too many specifics.
16 Q  Do you recall any -- any discussion in this meeting
17    about whether a Dear Dealer letter or non-retail
18    letter had been sent?
19 A  No, I don't recall if -- if we talked about that or
20    sent one.
21 Q  Do you recall if one was sent?
22 A  No, I don't.
23 Q  Do you recall if Verduyn did anything to, um, elicit
24    from the dealer the dealer's side of the story as to
25    why these were in fact retail sales?

### Page 231

1         MR. BERKOWITZ: As part of the audit or at
2     any time?
3  BY MR. REHNQUIST:
4  Q  In connection with the audit or in connection with any
5     time prior to the audit.
6  A  I don't -- I don't know if Steve requested the dealer
7     side. Not certain.
8  Q  Does an audit normally include interviews of employees
9     at the dealer?
10 A  I don't know for sure if it does or not.
11 Q  Are there any policies or procedure for how an audit
12    of dealers is to be conducted either into the inquiry
13    into non-retail sales or otherwise?
14 A  I'm not aware of any such policies.
15 Q  Does Harley-Davidson have any guidelines at all on how
16    to conduct an audit?
17 A  I'm not certain. I'm not aware of any specific
18    guidelines, no.
19 Q  Do you recall any discussion at or in connection with
20    this meeting about whether people should take notes at
21    the meeting?
22 A  No, I don't recall any discussion about that.
23 Q  Would it surprise you to learn that no notes of anyone
24    at this meeting have been produced in this litigation?
25 A  No. It wouldn't surprise me.

### Page 232

1  Q  It's not a common practice at Harley-Davidson for
2     people to take notes at meetings?
3  A  I would say certain meetings it is common practice.
4     Um, I don't think this type of meeting there -- there
5     would be -- that it would be common to take notes.
6     Um --
7  Q  Why not?
8  A  Well, we're reviewing a lot of documentation that for
9     the most part I think speaks for itself. Um, I mean,
10    oftentimes there's a summary of the -- you know, by
11    VIN of the types of non-retail sales or issues, but
12    there's not a lot of -- I mean, aside from asking
13    questions about what we're looking at and the
14    material, I can't think of too many reasons why there
15    would need to be notes taken. Where, you know, in
16    this case there were 40 plus suspected non-retails,
17    and ultimately we determined to be non-retail sales.
18       Um, that's pretty -- you know, you're reviewing
19    the documents, you're talking about the -- you know,
20    the trail of, um, the report, when the reporting was
21    made -- all the things that you need to understand are
22    contained in those documents.
23 Q  All right. But most people takes notes to sort of
24    write down what is significant about a larger set of
25    information. I mean, someone could have taken a note

### Page 233

1     40 plus sales or 19 to DCI. I mean, things like that,
2     right?
3         MR. BERKOWITZ: Objection.
4         THE WITNESS: I -- yeah, you're right
5     somebody could have. Um --
6  BY MR. REHNQUIST:
7  Q  Apart from notes, was there any other written record
8     to your knowledge made of what transpired at this
9     meeting?
10 A  A record of the discussion? No, not that I'm aware
11    of.
12 Q  I don't mean minutes, but any kind of written record
13    or written document that reflects or summarizes what
14    transpired at this meeting.
15 A  Not that I'm aware of, no.
16 Q  And I believe you testified or -- are you aware of
17    whether or not Verduyn made any kind of a written
18    report of his audit or of his findings?
19 A  No. I don't believe there was a written report. I
20    think there -- there likely would have been a summary
21    page of -- by VIN, but, that would be the, you know,
22    and then maybe broken into the various types of sales.
23    That would be normal for a non-retail sales audit.
24    Um --
25 Q  I mean, did Mr. Verduyn come into the meeting with any

Page 234

1   paper with him at all except for the, um -- the
2   documents from the dealer file and the other documents
3   he had obtained in the course of his audit?
4   A  Again, I don't recall any others specifically. There
5      might have been a summary, you know, document. I
6      don't recall for sure though. I don't -- there
7      normally would be a summary document by VIN list, you
8      know, the sale date and who the sale was made to. I
9      don't -- I don't remember that for sure. But usually
10     there would be in a meeting like this. And those
11     would be the only documents that we would need.
12  Q  Was there any discussion at this meeting regarding
13     possible sanctions for Cycle-Craft?
14  A  I don't recall. I mean -- and again, I think we
15     probably discussed if the non-retail sales activity
16     would warrant termination, um, but aside from other
17     sanctions, I don't recall any discussion.
18  Q  And what do you recall being discussed about that --
19     about whether the activity would warrant termination?
20  A  I think it was a fairly fair conclusion that the level
21     of non-retail sales activity -- we had no choice but
22     to issue termination notice.
23  Q  Why?
24  A  Because of the large number involved and the -- large
25     number involved but also the type -- you know, the

**REDACTED**

Page 235

1   clear falsification of documents, um, miss reporting
2   of actual customer names and addresses, um, failure to
3   submit, you know, proper SWR registration information.
4   I think --
5   Q  Let's take those one at a -- well -- um, can you read
6      the last answer back please?
7          (Record was read back by the court reporter.)
8          MR. REHNQUIST: Well, it's six. Um, why
9      don't we call it a day?
10         MR. BERKOWITZ: Okay.
11         MR. REHNQUIST: This is -- Mr. Flickinger,
12     we're going to suspend your deposition for now. You
13     have a business appointment to go to, and that's fine.
14         THE WITNESS: Thank you.
15         MR. REHNQUIST: We will have to resume this,
16     and we'll schedule a mutually convenient time through
17     counsel.
18         THE WITNESS: Okay.