# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CYCLE-CRAFT CO., INC.
d/b/a BOSTON HARLEY-
DAVIDSON/BUELL,

        Plaintiff,

    v.

HARLEY-DAVIDSON MOTOR COMPANY,
INC., and BUELL DISTRIBUTION
COMPANY, LLC,

        Defendant.

Civil Action No. 04 11402 NMG

## PLAINTIFF CYCLE-CRAFT'S SUBMISSION RE: DEPOSITION DESIGNATION OBJECTIONS

Plaintiff Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") hereby submits its position on deposition designations to which Harley-Davidson Motor Company, Inc. and Buell Distribution Company, LLC ("Harley-Davidson") maintains its objections. Pursuant to the Court's directive at the May 18, 2006 pre-trial conference the parties have engaged in discussions in an attempt to resolve their disputes. As a result of those discussions, the parties have reached agreement on the deposition testimony of three witnesses (Ms. Dianne Bolden, Mr. Michael Malicki, and Mr. Barry Nichols) as well as the first day of testimony of a fourth witness (Mr. Jon Flickinger). In addition, Cycle-Craft has decided not to offer deposition testimony from a fifth witness (Mr. Gene Ostrom). This submission pertains to what remains in dispute from one portion of the second day of testimony from Mr. Flickinger, one segment of the testimony of Mr. William Holaday, and several portions of the testimony of Mr. Steven Verduyn.

This submission also contains Cycle-Craft's positions on the designations and

counter-designations of the testimony of Mr. Michael Stevens and Ms. Debra Lunsford,

two Florida residents whose testimony Harley-Davidson intends to present via deposition

video.

1.     **Jon Flickinger (May 27, 2005)**

       A.     Page 107:24 – 110:18
**Page 107**
  24  Q   Do you recognize Exhibit 26 as a letter that a lawyer
  25       for Cycle-Craft, Gregory Holmes, sent -- sent to

**Page 108**
   1       Mr. Berkowitz in response to your two letters
   2       April 20th of 2004?
   3  A   That's -- yes.  That's what this letter looks --
   4       looks like to me.
   5  Q   Do you recall seeing a copy of it in May of 2004?
   6  A   I can't recall for certain.  I think -- I think I
   7       probably did, but I just don't recall for certain.
   8  Q   Do you see that this letter provides various
   9       explanations regarding the alleged violations of the
  10       nonretail sales policy?
  11  A   Yeah.  I see that there's, you know, for most of
  12       these situations it looks like there -- they have
  13       reference to it in this letter.
  14  Q   As you look through the letter and see some of those
  15       explanations, does that refresh your memory as to
  16       whether you've ever seen this letter before?
  17  A   No.  It does not help refresh my memory.
  18  Q   Do you recall having any conversations with anyone at
  19       the motor company apart from counsel regarding the
  20       explanations that are provided in Exhibit 26?
  21  A   Not specific to these, no.  Not specific to this
  22       letter.  I don't recall any conversations, no.
[colloquy deleted]

**Page 109**
   4  BY MR. REHNQUIST:
   5  Q   Do you recall did you have any conversation with
   6       Mr. Verduyn about the substance of Exhibit 26?
   7           MR. BERKOWITZ:  Outside the presence of
   8       counsel, you can answer.

9          THE WITNESS:  I don't recall any
10     conversations.
11  BY MR. REHNQUIST:
12  Q    Did you have any conversations with Mr. Verduyn
13      inside or outside the presence of counsel regarding
14      the substance of Exhibit 26?  Just answer yes or no.
15  A    No.
16  Q    Did you have any conversations with Mr. Ostrom inside
17      or outside the presence of counsel regarding the
18      substance of Exhibit 26?
19  A    I don't recall.
20  Q    Did you have any conversation with Mr. Malicki inside
21      or outside the presence of counsel regarding the
22      substance of Exhibit 26?
23  A    I don't recall.
24  Q    Take a look at page 2 from Exhibit 26?
25  A    Page 2 did you say?

**Page 110**

1  Q    Yeah.  Page 2 under the heading sales made to
2      residents of New Hampshire.  And can you just read
3      that paragraph to yourself, please?
4  A    (Witness complies.)  Okay.
5  Q    When was the first time you heard the explanation for
6      the so-called Lee Custom Cycle sales that is set
7      forth in this paragraph on page 2 of Exhibit 26?
8  A    I don't know.
9          MR. BERKOWITZ:  Objection.  You may answer.
10          THE WITNESS:  I don't recall.
11  BY MR. REHNQUIST:
12  Q    Have you heard that explanation before today?
13  A    This -- this explanation?
14  Q    Yeah.
15  A    I don't recall.
16  Q    You don't recall whether you've ever heard that
17      explanation before?
18  A    No.  I don't recall.

     **Harley-Davidson's Objection:**[1]  As indicated in Harley-Davidson's previous

submission to the Court, it objects to this testimony on relevancy and Rule 408 grounds.

---

[1]          Cycle-Craft submits the objections made by Harley-Davidson's previous submission to the Court solely to provide the Court with the context of the dispute.  Harley-Davidson will set forth its detailed position in its own separate filing.

**Cycle-Craft's Position:** This testimony demonstrates that Mr. Flickinger, the author of the April 20, 2004 Termination Letter, was unaware of or oblivious to Cycle-Craft's attempt to explain the sales in question. The testimony, which shows that Harley-Davidson never gave Cycle-Craft any opportunity to present its "side of the story," but simply jumped to the conclusion that Cycle-Craft had made intentional misrepresentations and had intentionally violated the non-retail sales policy, is directly relevant to Cycle-Craft's claim that its termination for allegedly non-retail sales was not for good cause and was in bad faith and in an arbitrary and unconscionable manner. Because this testimony does not go into the substance of the letter, the concerns of Rule 408 are inapplicable. The testimony is not being offered as an admission of liability and the letter itself need not be admitted into evidence for this testimony to be relevant.

**2.    William Holaday**

     **A.    Page 61:10-22**
```
10  Q   If you look at Exhibit 38, Mr. Holaday, there's a
11      reference in the third paragraph to John Atwood being
12      very opposed to the Danvers point.  Do you see that?
13  A   Yes, I do.
14  Q   And do you recall Mr. Atwood expressing his
15      opposition when the presentation was made?
16  A   Yes.
17  Q   And this was a person-to-person meeting?
18  A   It was Harry Nichols and John Atwood and myself.
19  Q   And do you recall what he said?
20  A   Not specifically, no.
21  Q   But it was -- it was in the nature of opposition?
22  A   Yes.
```

**Harley-Davidson's Objection:** As indicated in Harley-Davidson's previous submission to the Court, it objects to this testimony on relevancy, foundation, and hearsay grounds.

**Cycle-Craft's Position:**  This is testimony concerning an internal Harley-Davidson email produced by Harley-Davidson in connection with this litigation.  The email was authored by Mr. Holaday, Harley-Davidson's District Manager for Cycle-Craft's district, and he testified about it.  Therefore, Harley-Davidson's foundation and hearsay objections have no merit.  The testimony is relevant to Cycle-Craft's claim that the termination was motivated in part by Cycle-Craft's threat to protest the placement of a new dealership in the Danvers/Peabody, MA area.  The testimony is not hearsay because it is not offered for the truth of the matter asserted – whether John Atwood intended to object to the Danvers/Peabody placement.  Rather, it is offered to demonstrate that Harley-Davidson had notice of Mr. Atwood's intent to protest.  If Harley-Davidson is concerned about information pertaining to other dealers contained in the email, Cycle-Craft is willing to redact information regarding other dealers from the email.

3.    **Steven Verduyn (April 6, 2005)**

    A.    **Page 58:5-17**
```
 5  Q   And by audit, do you mean an investigation?  Or, I
 6       mean, are you using the term "audit" to include an
 7       investigation as opposed to the formal on-site audit
 8       at the dealership?
 9  A   Let me clarify.  An audit would be a review of the
10       records prior to making a determination of a course
11       of action.
12  Q    Would a large volume of sales towards the end of the
13       model year without anything else cause you to begin
14       an investigation?  In other words, when I say without
15       anything else, without other reasons to suspect
16       nonretail sales?
17  A   No, not that I can think of.
```

**Harley-Davidson's Objection:**  As indicated in its previous submission to the Court, Harley-Davidson objects to this testimony on relevancy grounds and because it is incomplete testimony.

**Cycle-Craft's Position:**  This testimony describes the customary reasons that cause Harley-Davidson to begin an investigation of a dealer's sales records.  Cycle-Craft will be offering other evidence showing that Harley-Davidson began its investigation of Cycle-Craft without any reason to suspect non-retail sales, a stark departure from standard operating procedure.  Therefore, the testimony is relevant to Cycle-Craft's claim that termination of Cycle-Craft was done in an arbitrary manner and that the purported justifications for the termination were pretextual.  It is not incomplete testimony as it contains a full concession by Mr. Verduyn that a large volume of sales at the end of the model year would not by itself be a sufficient reason to begin an investigation.

     **B.**       **Page 88:16 – 92:18[2]**

**Page 88**
```
25  Q   To your knowledge, had dealers ever been given any
```

**Page 89**
```
 1      advice or warnings about certain gray market
 2      purchasers to avoid dealing with?
 3  A   They were not given lists of specific individuals to
 4      avoid.
 5  Q   Did you ever participate in any discussions at
 6      Harley-Davidson about whether or not that would be a
 7      good idea?
 8  A   Yes.
 9  Q   With whom did you discuss that?
10  A   Counsel.
11  Q   Who?
12  A   Jenny Kent.
13  Q   Anybody else?
14  A   Christine Hansen.
```

---

[2]     Cycle-Craft previously also designated page 88:16-24 but has decided to withdraw that portion of the designation.

15  Q    Anybody else?
16  A    Gene Ostrum.
17  Q    Is he counsel?
18  A    No.  Gene's not counsel.
19  Q    Did you discuss it with Gene Ostrum outside the
20      presence of counsel?
21  A    No, not that I recall.
22  Q    Is this one particular meeting or conversation that
23      you're thinking about?
24  A    There were more than one.
25  Q    When did these conversations occur?

**Page 90**
 1  A    A year or two years ago.  I don't -- I don't have an
 2      exact date.
 3  Q    And did you discuss this matter with counsel because
 4      you were seeking legal advice?
 5  A    Yes.
 6  Q    Did you initiate the conversation with counsel, or
 7      did counsel initiate the conversation with you?
 8  A    Which conversation?
 9  Q    Well, how many conversations were there?
10  A    There were a couple meetings.
11  Q    Let's talk about the meetings first.  Who initiated
12      the meetings?
13  A    I would have been proactive with those in asking that
14      those be set up.
15  Q    And who did you go to to set up such a meeting?
16  A    The attorney on staff at the time.  Initially it was
17      Chris Hansen.
[colloquy deleted]

**Page 92:5-18**
 5  Q    Yeah.  Before initiating a meeting with counsel, did
 6      you form an opinion or make a recommendation as to
 7      whether it would be a good idea or not for
 8      Harley-Davidson to disclose to dealers the identity
 9      of gray market actors?
10  A    In my own mind, yes.
11  Q    And what was that -- what was the view that you
12      developed in your own mind?
13  A    It was my opinion that that information should be
14      shared.
15  Q    Why?
16  A    To stem the growth in nonretail sales activity to
17      certain brokers, certain common last name people that

18        were appearing throughout the country buying bikes.

**Harley-Davidson's Objection:**  As indicated in its previous submission to the Court, Harley-Davidson objects to this testimony on relevancy grounds and because it is "opinion testimony."

**Cycle-Craft's Position:**  This testimony indicates that Harley-Davidson dealers were never supplied with information Harley-Davidson had at its disposal about potential non-retail "gray market" operators, that is, operators who were known to purchase motorcycles from dealers for re-sale.  Harley-Davidson refused to share this information despite the suggestion by Steve Verduyn, the Harley-Davidson "gray market" expert, who was responsible for investigating possible non-retail sales, that such information be shared with the dealers.  The testimony is relevant to the "materiality" of the non-retail sales provision of the Dealer Contract, a "pertinent circumstance" identified by the legislature as relevant to the "good cause" inquiry, *see* Mass. Gen. Laws Ch. 93B § 5(j)(7), and is thus relevant to whether Cycle-Craft's termination was done in an arbitrary manner and/or was supported by good cause.

### C.    Page 128:6-22

```
 6  Q    And what did [Ron Buchbaum] say?
 7  A    He had said, "Well, let me tell you how that
 8       happened."  And he went on to give his response about
 9       the circumstances on why we didn't find any sales
10       jackets for employees or family members.
11  Q    And what did he say?
12  A    He had said that on the end of the model year, that
13       they had a lot of vehicle inventory in stock.  And he
14       called together a meeting of all his employees that
15       were apparently there and working at the time and
16       said, "Listen, we've got all these motorcycles.  We
17       need to get them sold.  It's for our turn and earn
18       with the factory.  And for any employee that's
19       interested, I will sell you a motorcycle for" -- I
```

```
20    believe he had said it's $500 over cost.  And I don't
21    remember the specific dollar amount, but it was
22    certainly well below a normal retail sale price.
```

**Harley-Davidson's Objection:**  As indicated in its previous submission to the Court, Harley-Davidson objects to this testimony on hearsay grounds and because it is "incomplete testimony."

**Cycle-Craft's Position:**  This testimony is not hearsay as it is not offered for the truth of the matter asserted but rather to show that Cycle-Craft voluntarily disclosed to Harley-Davidson its rationale for the legitimacy of certain sales to employees, without hiding anything, which tends to show that any violation of Harley-Davidson's policy that might have occurred was negligent rather than intentional.  The testimony is not hearsay as Mr. Buchbaum's state of mind is relevant because Harley-Davidson has accused Cycle-Craft of fraud, and has attacked Mr. Buchbaum's credibility in particular.  Cycle-Craft is willing to add the rest of Mr. Buchbaum's answer to satisfy the "incomplete" objection.  That testimony is as follows:

```
23           And he said that the response from his
24    employees was overwhelming and that all these
25    employees that I couldn't find sales on -- or sales
```

**Page 129**
```
1    jackets on had said, "Yes, we would like to take
2    advantage of this offer that you've got."  Ron said
3    that he told the employees though that that offer was
4    contingent on or conditioned on them not having a
5    customer -- a retail customer -- customer come in off
6    the street and purchase or express interest in
7    purchasing that bike.
```

**4.    <u>Steven Verduyn (May 26, 2005)</u>**

    **A.    Page 273:2-6**
```
2  Q   Have the DFOs -- has a DFO ever accompanied you on an
```

3    audit in addition to the Cycle-Craft audit?
4  A  Not in addition to, no.
5  Q  That's the only occasion where a DFO accompanied you?
6  A  That's correct.

**Harley-Davidson's Objection:**  As indicated in its previous submission to the Court, Harley-Davidson objects to this testimony on relevancy grounds.

**Cycle-Craft's Position:**  This testimony demonstrates that the investigation and audit of Cycle-Craft did not follow normal Harley-Davidson procedures and that high-level executives at Harley-Davidson had taken a particular interest in the investigation and audit of Cycle-Craft.  Therefore, the testimony is relevant to Cycle-Craft's claims that the termination was arbitrary and pretextual.

## 5.    <u>Michael Stevens</u>

### <u>Cycle-Craft's Objections to Harley-Davidson's Designations</u>

**A.    Page 6:19-23**
19    Q.    You've just been sworn in.  Your
20  testimony's being taken under oath and you're legally
21  obligated to give testimony -- truthful testimony, do
22  you understand that?
23    A.    I do.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony on relevancy grounds and because it is unduly prejudicial.  Whether the witness had been sworn in is irrelevant to the issues in this case.  In addition, all of the witnesses in this case will be testifying under oath.  To allow this testimony to come in would unfairly emphasize that Mr. Stevens is testifying under oath and imply that the jury should give Mr. Stevens' testimony more weight than the testimony of other witnesses.  The Court will give the jury an appropriate instruction concerning deposition testimony.

**B.**     **Page 13:20 - 14:10**

**Page 13**

20    Q.    Do you have any knowledge about anybody
21  else at DC Imports selling to Fort Lauderdale Harley
22  Davidson while you were employed at DC Imports?
23    A.    I was under the impression that they were
24  going to attempt to sell the Boston Harley bikes to
25  Fort Lauderdale, but I didn't witness it or I wasn't

**Page 14**

 1  involved in it.  I had left by then.
 2    Q.    And did someone advise you that they were
 3  attempting to sell these bikes to the Fort Lauderdale
 4  dealership?
 5    A.    Well, they were -- they were in the process
 6  of trying to when I was leaving.
 7    Q.    So when you left DC Imports, DC Imports was
 8  in the process of trying to sell these bikes to
 9  Fort Lauderdale Harley Davidson?
10    A.    Correct.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as hearsay,

speculative, and irrelevant.  This testimony is hearsay and speculative as it is not based

on Mr. Stevens' personal experience but rather on what he had heard from others and/or

his "impression" of what was going to happen after he left his employment with DC

Imports.  In addition, the testimony is irrelevant because the question of what DC Imports

did with the motorcycles after purchasing them from Cycle-Craft under false pretenses

has nothing to do with whether Cycle-Craft made non-retail sales or with the legal issues,

such as "good cause" and "bad faith" under Chapter 93B, in the case.

**C.**     **Page 24:25 – 25:12**

**Page 24**

25    Q.    Okay.  But you advised him that DC Imports

**Page 25**

 1  was the entity that was actually going to purchase the
 2  motorcycles?
 3        MR. REHNQUIST:  Objection, leading.
 4    Q.    You can answer it.

5  A.   Yeah.  I mean, he -- I told him the first
6  two conversations.  I'm sure he knew it was DC Imports
7  that was making the purchases.
8  Q.   So during the first two conversations you
9  did advise Mr. Buchbaum that DC Imports was the entity
10  purchasing the motorcycles?
11      MR. REHNQUIST:  Objection, leading.
12  A.   Yes.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as speculative

and because the questions are patently leading.  The testimony is speculative as Mr.

Stevens is purporting to testify about Mr. Buchbaum's personal knowledge.  In addition,

Mr. Stevens' testimony is given in response to improper, leading questions.

### D.   Page 33:5-9

5  Q.   So once Mr. Buchbaum advised that he would
6  sell the 19 motorcycles to DC Imports, you made
7  initial offer?
8      MR. REHNQUIST:  Objection, leading.
9  A.   Right.

**Cycle-Craft's Objections:**  Cycle-Craft objects to this testimony as Mr. Stevens'

answer is given in response to an improper, leading question.

### _Cycle-Craft's Responses to Harley-Davidson's Objections to Cycle-Craft's Counter-Designations_

### A.   Page 60:12 – 66:6

**Page 60**
12  Q.   And why did you -- why did you come to work
13  at DC Imports?
14  A.   I was offered the position for substantial
15  more money than I was making in sales at
16  Fort Lauderdale, or at least that was the picture they
17  painted.
18  Q.   And did that picture prove not to be as
19  painted?
20  A.   There was no paint.
21  Q.   There was no paint.  Can you tell me a
22  little bit about that?  I mean, first of all, was the
23  connection to DC Imports through Greg Cooke?

24   A.   Correct.
25   Q.   Okay.  And was he the one who talked to you

**Page 61**

1 about going to work for DC Imports or --
2   A.   He had told me that they were interested in
3 opening a wholesale department.  He knows that I know
4 quite a bit about the business, so he had -- he said
5 maybe my wife might be interested in hiring you if
6 you're interested.
7   Q.   And did you come to talk to Diane Cooke
8 sometime after that?
9   A.   Yeah, I did.
10   Q.   And tell me what you remember about that
11 conversation.
12   A.   She offered me and Mr. Gusoff at the same
13 time a position to come and work for her and build a
14 wholesale department attached to their registered
15 importation business.
16   Q.   So was the idea that this was going to be
17 DC Imports sort of moving into a new line of business?
18   A.   Correct.
19   Q.   And when you say a wholesale department,
20 what do you mean?
21   A.   Purchasing bikes and selling them from --
22 at a wholesale, used, pre-titled, things to that
23 effect, foreign units.
24   Q.   Not a Harley Davidson franchise but --
25   A.   No.

**Page 62**

1   Q.   When you say wholesale, you mean dealing
2 with units that have been, you know, previously --
3   A.   Brokering.
4   Q.   -- previously sold?  And did she tell you
5 anything about why she wanted to go into this line of
6 business?
7   A.   Just because of the amount of importation
8 and - that she does and the units stay in her
9 warehouse for a good period of time, available for
10 sale, so she thought it would be a great idea to
11 implement those bikes into sale as well as maybe
12 purchase others and take it from there.
13   Q.   And was the idea that you were going to be
14 selling the Harley Davidsons to individuals or to
15 other businesses?

16    A.    We sold to everybody.
17    Q.    To anybody who would buy?
18    A.    Yeah.
19    Q.    And what did she -- what did she represent
20 to you about the terms of your employment and about
21 the financial condition of the company when you spoke
22 to her?
23    A.    We just -- I mean, we had agreed to -- to
24 percentage of commissions for units of bikes per unit
25 or bodies of bikes, depending on the deals.

**Page 63**

1    Q.    And did she say anything to you about the
2 sort of the financial health or the business of
3 DC Imports?
4    A.    No.  From what I understand, they were
5 fairly healthy.
6    Q.    Did you learn differently once you came to
7 work there?
8    A.    Not necessarily, not necessarily the
9 finances of the company, but -- but in how they paid
10 their employees.
11    Q.    And what did you learn about that?
12    A.    We had -- we, meaning me and Mr. Gusoff,
13 had basically survived off of draws waiting for our
14 major commissions to be paid to us which kept being
15 put on the back burner, back burner.  And then the
16 final deal was this, which we did not get paid for
17 either.
18    Q.    So you got a -- your salary was based on a
19 weekly or a monthly draw with the commissions to come
20 after you made sales?
21    A.    Right, from purchases and sales.
22    Q.    So did -- you know, prior to this
23 transaction that we're talking about today, did you
24 sell bikes and not receive commissions that were due
25 you?

**Page 64**

1    A.    The smaller ones, I received.  The larger
2 ones were basically put off til funds were brought
3 back into the company or - funds were shifted or bikes
4 were sold, basically.
5    Q.    So was -- was there a delay in receiving
6 your commission payments?
7    A.    Several.

8    Q.    And did -- were there some commission
9  payments that you didn't receive at all?
10    A.    Yes.
11    Q.    And was the commission payment on the
12  Boston Harley Davidson deal one of them?
13    A.    Yes.
14    Q.    And were there others?
15    A.    There were -- there were several other
16  smaller deals that got minimized.  We were paid, but
17  paid nowhere near what we were supposed to make.
18    Q.    What was the percentage you were supposed
19  to make?
20    A.    There was -- it varied on -- somewhere in
21  the park of, I believe, 20 percent, 20 to 25 percent
22  of the overall profit.
23    Q.    On the -- on the individual unit?
24    A.    On the sales and on the individual unit.
25  On the purchase units, we would get different.  If we

**Page 65**
1  purchased in large quantities, we would get a
2  percentage of the purchase and then the sale.
3    Q.    Okay.  And did you complain to either Miss
4  Lunsford or Miss Cooke about not getting your
5  commission payments in a -- in a timely -- on a timely
6  basis?
7    A.    At first, I understand that they were
8  trying to put a business together, so I was -- I was
9  compliant for first several weeks, but in the last
10  month that I was there, I did.
11    Q.    And what did they tell you?
12    A.    That they would work everything out and
13  settle it and get us paid, and basically...
14    Q.    Do you believe they were telling you the
15  truth?
16           MR. BENSON:  Objection to form.
17    A.    No.
18    Q.    Why not?
19    A.    I don't believe anybody.  I don't trust
20  many people, so until they -- until I actually receive
21  the money, I don't really believe it, no.
22    Q.    And I gather you're saying here with
23  respect to certain deals you never did receive the
24  money?
25    A.    We did up until the -- until this last

15

**Page 66**
1  deal, but it was -- they basically skimmed it down to,
2  you know, with chargebacks and various write-offs, the
3  deals were not what they were supposed to be.
4      Q.    Did you complain to Miss Lunsford as well
5  as Miss Cooke?
6      A.    Yes.

**Harley-Davidson's Objection:**  As indicated in its previous submission to the

Court, Harley-Davidson objects to this testimony on relevancy and hearsay grounds.

**Cycle-Craft's Position:**  This testimony is relevant as it reflects on the reliability

and credibility of the principals of DC Imports, one of whom, Ms. Debra Lunsford,

Harley-Davidson relies on heavily in support of its case.  The testimony is not hearsay as

most of it is not based on an out of court statement.  The little testimony that is based on

what other individuals told Mr. Stevens is not hearsay as it is not offered for the truth of

the matter asserted (e.g., that the terms of Mr. Stevens employment were X or that DC

Imports was a "healthy" business).  Rather, the testimony is offered to show the impact

that these statements had on Mr. Stevens' state of mind.

6.    **Debra Lunsford**

***Cycle-Craft's Objections to Harley-Davidson's Designations***

    **A.    Page 5:14-18**
14      Q.   You've just been sworn.  Your testimony is
15  being taken under oath.  You're legally obligated to
16  give truthful testimony subject to the penalties of
17  perjury; do you understand that?
18      A.   Absolutely.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony on relevancy

grounds and because it is unduly prejudicial.  *See* Cycle-Craft's Objection to page 6:19-

23 of testimony of Michael Stevens.  Whether the witness had been sworn in is irrelevant

to the issues in this case.  In addition, all of the witnesses in this case will be testifying

under oath.  To allow this testimony to come in would unfairly emphasize that Ms.

Lunsford is testifying under oath and imply that the jury should give Ms. Lunsford's

testimony more weight than the testimony of other witnesses.  The Court will give the

jury an appropriate instruction concerning deposition testimony.

**B.    Page 10:8-11**

```
 8    Q.  All right.  Why was the company closed?
 9    A.  Because a deal with Boston Harley-Davidson
10  that was done was not done correctly and it cost us
11  our company and we had to close it down.
```

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as hearsay.  Ms.

Lunsford's testimony about why the company closed is inadmissible hearsay as the

company did not close until at least four months after she had ceased working there and

Ms. Lunsford was not, in fact, involved in the decision to close the company.[3]  The

---

[3]      Ms. Lunsford later described in detail her knowledge concerning the actual circumstances of the closing of the company:

**Page 170**
```
 8    Q.  Did -- I mean, I understand how this
 9  impacted you, obviously, with the -- the criminal
10  matter.  But is -- is -- did that also cause the
11  company not to be able to operate because you
12  couldn't work there anymore?
13    A.  No.  They were -- they still worked.  They
14  worked up until the -- I guess it was the end of the
15  year.
16    Q.  Okay.  I'm sorry.  I guess I was confused
17  on that.  My understanding was --
18    A.  Right.
19    Q.  My understanding was that the company sort
20  of closed down shortly after this -- this incident
21  in early August of '03.
22    A.  No.  It was like -- I don't know the exact
23  date when it finally closed, but they finally
24  closed.  They -- I mean, they were still in
25  business, you know, for a period of time after I
```
**Page 171**
```
 1  left.
```

17

testimony is also non-responsive as it relates to a deal with Boston Harley-Davidson

rather than to the actual reasons that DC Imports closed.

### C.     Page 32:4-24

```
 4     Q.   Now, do you have an understanding as to
 5  whether either Ron Buchbaum or Sean Walsh knew that?
 6     A.   Yes.  They knew it.  They knew that we
 7  were going to wholesale the bikes.
 8     Q.   How did they know it?
 9     A.   Because there were conversations with
10  Slim, Gus, myself, you know, with them that -- you
11  know, we explained to them that it was of the
12  essence because we already had like a $25,000
13  deposit put down from Fort Lauderdale and we needed
14  to get the bikes.
15     Q.   Did you tell Sean that you had a $25,000
16  deposit from Fort Lauderdale Harley-Davidson for the
17  bikes?
18     A.   I don't remember if I told him that or not
19  but he knew about the -- the money.  I mean, I don't
20  know if I directly told him it was for Fort
21  Lauderdale because that would be, you know -- but he
22  knew that I had the deposit on the bikes for a
23  wholesale dealer, not necessarily Fort Lauderdale,
24  because that would be like, you know –
```

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as speculative

and on hearsay grounds.  Ms. Lunsford is speculating on the knowledge of Mr.

Buchbaum and Mr. Walsh, in part, based on conversations that took place between those

two individuals and Mr. Stevens and Mr. Gusoff.  Further, she admits that she cannot

remember what she told Mr. Walsh, yet she then testifies about what he may have known.

### D.     Page 38:2-14

```
 2     Q.   All right.  And did he tell you why it
 3  needed to show as a retail sale instead of a
 4  dealer-to-dealer sale?
 5     A.   Because --
 6          MR. REHNQUIST:  Object to the --
 7     A.   -- of the allocation.
 8          MR. REHNQUIST:  Whoa, whoa.  Object to the
 9     form.
```

```
10      Go ahead.
11      THE WITNESS:  I'm sorry.
12   BY MR. BERKOWITZ
13    Q.  Was it because of the allocation?
14    A.  Yes, sir.
```

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as non-responsive and speculative.  Ms. Lunsford did not answer the question posed to her.  In addition, the testimony does not make clear whether she is speculating about the reason the sales needed to be retail or whether she is basing her answer on something Mr. Buchbaum told her.  The question that ultimately induces an answer – "Was it because of the allocation?" – is also leading.

**E.    Page 39:2-4, 9-17 and last two sentences of lines 23-25**

```
2     Q.   Okay.  Do you remember anything more
3  specifically about what they told you?
4     A.  No.

9     Q.   From your conversation with Mr. Buchbaum,
10  did you have an understanding as to whether he
11  wanted you to simply plug in names as fictitious
12  buyers for the 19 motorcycles?
13      MR. REHNQUIST:  Object to the form.
14    A.   Right.  He told us to use family, friends,
15  whatever.  It didn't matter.  Just -- you know, they
16  just needed 19 names.

23                      He knew they were being
24  wholesaled.  That was the whole point of the whole
25  deal.
```

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as hearsay, speculative, and non-responsive.  The first portion of the testimony is hearsay as it is based on what she remembers Mr. Gusoff and Mr. Stevens told her ("He told us . . .") about their conversations with Cycle-Craft personnel.  The rest of the testimony is improper as Ms. Lunsford is speculating about Mr. Buchbaum's intent and knowledge.

### F.     Page 51:12-19

12     Q.   Okay.  And this was -- these funds were
13  coming out of DC International's bank account at
14  Northern Trust Bank of Florida, is that correct?
15     A.   That's correct.
16        MR. REHNQUIST:  Objection.  Leading.
17        (Conferring with counsel.)
18        MR. CONTINI:  I apologize, gentlemen, for
19     the interruptions on my behalf before.

**Cycle-Craft's Objection**: Cycle-Craft objects to this question as leading.  In

addition, the designation includes colloquy from counsel.

### G.     Page 55:7-9

7     Q.   Okay.  Was this to maintain the fiction of
8  19 buyers for these motorcycles?
9     A.   Yes.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this question as leading and the

answer as speculative.  Ms. Lunsford previously testified that Ms. Christensen caused the

checks to be issued by the bank.  Ms. Lunsford cannot testify about another person's

intent.

### H.     Page 57:9 – 62:9

**Page 57**

9     Q.   All right.  I want to go through these one
10  by one.  The first page of Exhibit 8 is a driver's
11  license for Thomas Stimpson, do you see that?
12     A.   Yes.
13     Q.   And who was he?  Or who is he?
14     A.   I don't know.  He's a friend of somebody
15  that worked there.  I don't know.
16     Q.   All right.  But he was asked to fax his
17  driver's license over to DCI for use in connection
18  with the acquisition of these 19 motorcycles?
19     A.   Yes.
20     Q.   All right.  And then the next one is your
21  driver's license, is that correct?
22     A.   That's correct.
23     Q.   The next page is a driver's license for
24  Jason Anthony Gotham, is that correct?
25     A.   Yes.

**Page 58**

1    Q.  All right.  And there's a handwritten note
2  to Slim, is that correct?
3    A.  Yes.
4    Q.  And who is Mr. Gotham?
5    A.  I guess it's a friend of Slim's.
6    Q.  All right.  The next one is Edward B.
7  Stevens, do you see that?
8    A.  Yes.
9    Q.  Do you know who Edward B. Stevens is?
10    A.  Slim's grandfather.
11    Q.  The next one is Kevin W. Greene, do you
12  see that?
13    A.  Yes.
14    Q.  Do you know who Kevin Greene is?
15    A.  No, I do not.
16    Q.  The next driver's license in this package
17  is Carolyn -- looks like Caznina (sic), do you see
18  that?
19    A.  Yes.
20    Q.  And do you know this individual?
21    A.  No, I do not.
22    Q.  All right.  The next driver's license is
23  Sonia Paulovich?
24    A.  Yes.
25    Q.  And do you know Sonia?

**Page 59**

1    A.  Yes.
2    Q.  And did Sonia -- I think you already
3  indicated --
4    A.  Yes.
5    Q.  -- Sonia worked at the company at the
6  time?
7    A.  That's correct.
8    Q.  And did you ask Sonia to provide her
9  driver's license in connection with this
10  transaction?
11    A.  Yes.
12    Q.  The next driver's license is Leopold
13  Larsen, do you see that?
14    A.  Yes.
15    Q.  And do you know Leo Larsen?
16    A.  Yes.
17    Q.  And did he work at DCI?

18    A.  No.
19    Q.  Okay.  What did --
20    A.  That was Sonia's --
21    Q.  What connection did he have?
22    A.  Sonia's boyfriend at the time.
23    Q.  All right.  Did you ask Sonia to ask her
24  boyfriend to send his driver's license?
25    A.  No, we just asked everybody.

**Page 60**

 1    Q.  Tried to come up with as many names as you
 2  could?
 3    A.  The 19 names.
 4    Q.  All right.  The next one, it's hard to
 5  make out from the copy that we got, but it indicates
 6  Craig Kapilla at the top, do you see that?
 7    A.  Yeah.
 8    Q.  Do you know who that was?
 9    A.  I don't know.
10    Q.  All right.  The next driver's license is
11  Renee Myllymake (sic)?
12    A.  That was Gus' girlfriend.
13    Q.  Okay.  The next one is Jason J. Lozon, do
14  you see that?
15    A.  Yes.
16    Q.  Do you know who that was?
17    A.  No.
18    Q.  The next one is Louis James Gusoff, a
19  Michigan's driver's license, do you know who that
20  was?
21    A.  Gus' dad.
22    Q.  Okay.  The next one is James Carl Gusoff,
23  do you know who that was?
24    A.  No.  It's a relative of Gus', okay.  I'm
25  sorry.

**Page 61**

 1    Q.  Gus is known as Gus from his last name,
 2  not his first, I take it?
 3    A.  Exactly.
 4    Q.  All right.  What's his first name, Gus?
 5    A.  No.  It's Gus Gusoff.  That is his name.
 6    Q.  Oh, okay, it is his --
 7    A.  It's Gus -- it is his first name, Gus
 8  Gusoff.
 9    Q.  All right.

10    A.   But any Gusoff has to be, I guess, one of
11 his relatives.
12    Q.   Okay.  The next one is Harold Christensen?
13    A.   Karen's husband.
14    Q.   All right.  And then Karen Christensen?
15    A.   Karen.
16    Q.   All right.  The next one is Daniel William
17 Gusoff -- Gusoff?
18    A.   Better known as Gus.
19    Q.   Okay.  So that's Gus.
20    A.   Okay.
21       MR. REHNQUIST:  I'm sorry, this is Gus --
22    A.   Daniel is Gus.
23  BY MR. BERKOWITZ
24    Q.   The next one is Branford A. Lunsford.  Is
25 that your husband?

**Page 62**
1    A.   That's my husband.
2    Q.   The next one is Michael E. Stevens?
3    A.   Slim.
4    Q.   That was Slim?
5    A.   Yeah.  So his name is Michael E.  It's not
6 Steve.
7    Q.   Okay.  Then the last one here is Heather
8 Danielle Wingard?
9    A.   It's my daughter.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as irrelevant and

cumulative.  Whether Ms. Lunsford knew or could identify each of the purchasers of the

motorcycles at issue is irrelevant to the question of whether Cycle-Craft actually sold the

motorcycles to individuals, or even whether Cycle-Craft reasonably believed it was

making sales to individual end-users.

    I.    Page 94:6 – 96:24
**Page 94**
6    Q.   Directing your attention to Officer
7 Caserta's incident report and to the section with
8 the heading "narrative," towards the bottom of the
9 page, numbered 46, do you see that?
10    A.   Right here, yes.
11    Q.   Yes.  Could you please just read that

12  narrative silently to yourself and then I have a
13  couple of questions about it.

[colloquy deleted]

**Page 96**

3     Q.  Okay.  Directing your attention to Page 46
 4  and the sentence that begins "The records," "The
 5  records reflect that DC Imports applied for" -- and
 6  then we're missing a word -- "in the name of 19
 7  individuals who are friends or family of Mrs. Cooke
 8  to make the purchases look like individual retail"
 9  and then we have SA, but not the rest of the word.
10  "This was done to circumvent Harley-Davidson policy
11  prohibiting dealer to dealer sales."  Do you see
12  that?
13     A.  Yes.
14     Q.  Okay.  And is it true that what you've
15  testified to in connection with these 19 motorcycles
16  that were purchased by DCI, that the identification
17  of 19 individuals as fictitious purchasers was, in
18  fact, done to circumvent the Harley-Davidson policy
19  prohibiting dealer-to-dealer sales?
20         MR. REHNQUIST:  Objection.
21     A.  Absolutely.
22   BY MR. BERKOWITZ
23     Q.  All right.  And whose idea was that?
24     A.  Ron Buchbaum of Boston Harley-Davidson.

    **Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony on hearsay

grounds.  Harley-Davidson is attempting to rely on an out of court statement in a police

report as proof that there was an attempt to circumvent Harley-Davidson policy.  *See*

*United States v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("[H]earsay statements by third

persons . . . are not admissible under [803(8)(C)] merely because they appear within

public records.").  Even if the statement is determined to be a conclusion, the report does

not contain any information about how this conclusion was reached.  *See United States v.*

*Romo*, 914 F.2d 889, 896 (7th Cir. 1990) (affirming district court's ruling of

inadmissibility in part because "defense counsel failed to establish any foundation for

allowing the report in as evidence; he offered no evidence as to how the report was prepared or the basis of the information contained in the report"). Furthermore, the conclusion is untrustworthy as it was likely based on a statement of Ms. Lunsford, an unreliable individual facing criminal charges at the time she was interviewed by the Florida Highway Patrol. *See id.* ("The court was correct to be suspect of an apparently offhanded remark in a report containing tips from informants, and to rule that the circumstances of the report did not sufficiently guarantee its trustworthiness."); *Gross v. King David Bistro*, 84 F.Supp.2d 675, 678 (D. Md. 2000) (ruling conclusion in report was not trustworthy because it was based on interviews with interested and biased witnesses). This is a textbook example of inadmissible hearsay.

> **J.    Page 112:9 – 116:8; page 117:6 – 118:24**

**Page 112**
9    Q.   Okay.  We've marked as Exhibit 20 a
10   document in our lawsuit up in Boston that's entitled
11   declaration of Kenneth McPhee.  I know you haven't
12   seen this document before, but I'm going to ask you
13   a couple of questions about what Mr. McPhee says in
14   his declaration.
15        (Thereupon, the referred-to document was
16    marked by the court reporter as Exhibit 20.)
17   BY MR. BERKOWITZ
18    Q.   Did you ever have any conversation with
19   Kenneth McPhee?
20    A.   I don't know who Kenneth McPhee is.
21    Q.   All right.  Do you see in Paragraph 2 of
22   his declaration that he identifies himself as the
23   operations manager of plaintiff Cycle-Craft Company,
24   Inc., d/b/a Boston Harley-Davidson/Buell?
25    A.   Yes.

**Page 113**
1    Q.   All right.  I'd like to direct your
2   attention to the second page of this declaration and
3   specifically, Paragraph 6.  I'm going to ask you to
4   read that silently to yourself, please.
5        Just let me know when you've finished it.

6    A.  Okay.

7    Q.  All right.  Directing your attention to

8 the second sentence of this paragraph, it reads, "In

9 point of fact, according to the criteria set out in

10 the Harley-Davidson nonretail sales policy by which

11 I and my staff evaluate each and every motorcycle

12 purchase, each of these motorcycles was purchased by

13 an individual."  Do you see that sentence?

14    A.  Yes, I do.

15    Q.  And is it true that each of these

16 motorcycles was purchased by an individual?

17    A.  No.

18    Q.  Were the motorcycles purchased by DCI?

19    A.  Yes, they were.

20    Q.  And was Boston Harley-Davidson aware of

21 that?

22    A.  Yes, they were.

23       MR. REHNQUIST:  Objection.

24  BY MR. BERKOWITZ

25    Q.  The next sentence states, "Each individual

**Page 114**

1 purchaser took title to his or her motorcycle in his

2 or her own name, as reflected on the certificates of

3 origin in each deal jacket."  Do you see that

4 sentence?

5    A.  Yes, I do.

6    Q.  Is that sentence true?

7    A.  No.

8    Q.  In fact, DCI purchased all of the 19

9 motorcycles, is that correct?

10    A.  Yes, we did.

11       MR. REHNQUIST:  Objection.

12  BY MR. BERKOWITZ

13    Q.  And Boston Harley-Davidson was aware of

14 that, is that correct?

15       MR. REHNQUIST:  Objection, leading.

16    A.  Boston Harley-Davidson instructed us to do

17 it that way.

18  BY MR. BERKOWITZ

19    Q.  The last sentence of Paragraph 6 states,

20 quote, on paper and as far as anyone at Cycle-Craft

21 knew or could have known, these were sales to

22 individual purchasers in compliance with all

23 Harley-Davidson policies, end quote.  Do you see

24 that statement?

26

25    A.  Yes, I do.

**Page 115**

1    Q.  Is that a true statement?

2    A.  That's a false statement.

3    Q.  In fact, Boston Harley-Davidson was aware

4  that, in fact, these vehicles were being purchased

5  by DCI and not the individual purchasers listed on

6  the MSOs, is that correct?

7    A.  That's correct.

8       MR. REHNQUIST:  Objection -- objection,

9    leading.

10   BY MR. BERKOWITZ

11   Q.  Is that correct?

12   A.  That's correct.

13      MR. REHNQUIST:  Objection.

14      That was 20?

15      MR. BENSON:  Yes.

16      MR. BERKOWITZ:  That was 20.

17   BY MR. BERKOWITZ

18   Q.  I'm now going to show you what we've

19  marked as Exhibit 21, which is, I know, another

20  document that you've never seen.

21      (Thereupon, the referred-to document was

22      marked by the court reporter as Exhibit 21.)

23   BY MR. BERKOWITZ

24   Q.  This is a memorandum of law in support of

25  motion for preliminary injunction support --

**Page 116**

1  submitted to the court by the Boston Harley-Davidson

2  dealership.  And I'm going to direct your attention

3  to Page 8.

4    A.  Okay.

5    Q.  And I'll ask you to read silently to

6  yourself the paragraph that appears under

7  Section 4A.

8    A.  Okay.

**Page 117**

6    Q.  All right.  But you do know that 19

7  motorcycles were sold by Boston Harley-Davidson to

8  DC Imports International, is that correct?

9    A.  That is correct.

10   Q.  All right.  In the next sentence, it

11  states, "In fact, each of these motorcycles was

12  purchased by an individual customer."  Do you see
13  that statement?
14      A.  Yes.
15      Q.  And is that a true statement?
16      A.  That's a false statement.
17      Q.  All right.  It goes on to state in the
18  next sentence, in keeping -- quote, in keeping with
19  the provisions of the nonretail policy, each
20  purchaser took title to his or her motorcycle in his
21  or her own individual name, as reflected on the
22  certificate of origin for each motorcycle.  Do you
23  see that sentence?
24      A.  Yes, I do.
25      Q.  Is it true that each purchaser took title

**Page 118**

 1  to his or her motorcycle in his or own -- her own
 2  individual name?
 3      A.  That's not true.
 4      Q.  The last sentence in this paragraph prior
 5  to the citation to the McGrath declaration states,
 6  and I quote, each of these units was properly set
 7  up, inspected, and sold at the dealership.  Do you
 8  see that statement?
 9      A.  Yes.
10      Q.  Were these units sold at the Boston
11  Harley-Davidson dealership?
12          MR. REHNQUIST:  Objection.  Form.
13      A.  They were not sold to the individuals at
14  that dealership.
15    BY MR. BERKOWITZ
16      Q.  As you testified earlier, you contracted
17  with a carrier to go up and pick up the --
18      A.  Nineteen.
19      Q.  -- the 19 motorcycles and deliver them
20  back to the purchaser, which was DCI, is that
21  correct?
22          MR. REHNQUIST:  Objection.  Leading.
23      Form.
24      A.  That is correct.

       **Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as it is given in

response to an improper line of questioning.  All of the testimony is in response to

questions about the Declaration of Kenneth McPhee.  It is wholly inappropriate to ask

one witness to comment on the testimony of another witness. *See, e.g.*, *United States v. Rhynes*, 218 F.3d 310, 324 (4th Cir. 2000) ("I should add that asking, in terms, one witness to comment on the testimony of another witness is a practice so uniformly disapproved as not to bear citation.") (Widener, J., concurring); *United States. v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) ("[W]e state the rule now emphatically: counsel should not ask one witness to comment on the veracity of the testimony of another witness.").

### K.    Page 119:14 – 120:23

**Page 119**

14    Q.  Why do you say that?
15    A.  Because the only communications that we
16 had about these motorcycles were directly with DC
17 Imports International with Boston Harley-Davidson.
18 That's the only -- they never talked to these
19 individuals.  They didn't even know who these
20 individuals were.
21    Q.  Do you understand what the consequences
22 might be for your not giving honest and truthful
23 testimony today?
24    A.  Yes.
25    Q.  And given the investigation by the Florida

**Page 120**

1 Highway Patrol and the resolution of that
2 investigation, do you have an understanding that the
3 consequences of your giving false testimony could be
4 very serious?
5    A.  I absolutely understand.
6    Q.  And has all your testimony today been
7 honest and truthful?
8    A.  It has been honest and truthful.
9    Q.  And other than Mr. Buchbaum and Mr. Walsh,
10 did you have any communications at any time with any
11 other individual at Boston Harley-Davidson that you
12 can recall?
13    A.  Not unless it was somebody that was
14 answering the telephone and put you on hold to get
15 to the person.  I mean, like a secretary or
16 something like that.
17    Q.  And is it your testimony here today under
18 oath that the idea of creating 19 retail customers

19 and making this appear to be 19 retail sales was the
20 idea of Mr. Buchbaum?
21      MR. REHNQUIST:  Objection.
22      A.  Yes.  It was his -- it was his idea
23 totally.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this testimony as speculative and because it is given in response to an improper line of questioning and is unduly prejudicial.  Ms. Lunsford speculates about the knowledge and state of mind of employees of Cycle-Craft in her responses.  In addition, all of the witnesses in this case will be testifying under oath.  To allow the testimony about Ms. Lunsford's answers being "honest and truthful" to come in would unfairly emphasize Ms. Lunsford's testimony and imply that the jury should give Ms. Lunsford's testimony more weight than the testimony of other witnesses.  The Court will give the jury an appropriate instruction concerning deposition testimony.

      L.      Page 183:25 – 185:1

**Page 183**
25      Q.  All right.  And did you discuss with

**Page 184**
 1 Mr. Buchbaum that you didn't have 19 customers
 2 standing by, ready to buy these units?
 3      MR. REHNQUIST:  Objection, leading.
 4      A.  No.  I mean, it was known that it was --
 5 the 19 bikes were going to us.
 6  BY MR. BERKOWITZ
 7      Q.  And did he make any suggestion as to how
 8 you should do the paperwork in order to make it
 9 appear to be 19 retail sales or 19 sales to end
10 users?
11      A.  That they needed 19 different driver's
12 license of family and friends, that it could be
13 family and friends or just whoever.
14      Q.  So was it Mr. Buchbaum who suggested to
15 you to contact family and friends to do the
16 paperwork on these transactions?
17      A.  Just that he needed 19 different, you

30

18  know, driver's license to do it.
19      Q.  All right.  And was he the one who
20  suggested that you could contact family and friends
21  to --
22      A.  Yes.
23      Q.  -- get those 19 --
24      A.  Yes.
25      Q.  -- driver's licenses?

**Page 185**
1      A.  Yes.

**Cycle-Craft's Objection:**  Cycle-Craft objects to this line of questioning as

leading and to the testimony as speculative.  Ms. Lunsford cannot give testimony about

the knowledge or state of mind of other individuals.


*Cycle-Craft's Responses to Harley-Davidson's Objections to Cycle-Craft's Counter-*
*Designations*

    **A.    Page 47:25 – 48:21**
**Page 47**
25      Q.  All right.  Can you identify what we've

**Page 48**
1  premarked as Defendant's Exhibit 4 as those checks?
2  And take your time and look through them.

[Colloquy]

19      Q.  Can you identify those as the cashier's
20  checks?
21      A.  I'd like to invoke my Fifth on this.

**Harley-Davidson's Objection:**  As indicated in Harley-Davidson's previous

submission to the Court, it objects to this testimony on relevancy grounds.

**Cycle-Craft's Response:**  This testimony is relevant as it demonstrates that Ms.

Lunsford engaged in fraudulent criminal activity in connection with this transaction.  The

testimony thus reflects on her credibility as a witness.

**B.    Page 147:4-22**

4    Q.   Did you instruct Karen Christensen to --
5  to go to Northern Bank & Trust and receive cashier's
6  checks for the purchase prices of the -- the 19
7  sales?
8    A.   I invoke my Fifth.
9    Q.   Did you instruct Karen Christensen to
10  Federal Express those cashier's checks to Boston
11  Harley-Davidson?
12    A.   I invoke my Fifth.
13    Q.   Did you discuss with Karen Christensen
14  whether there might be criminal exposure in the
15  nature of bank fraud in the dealings that you and
16  she contemplated with Northern Bank & Trust?
17    A.   I invoke my Fifth.
18    Q.   Did you have any conversations with Karen
19  Christensen about the paperwork that she had to
20  submit to Northern Bank & Trust in order to receive
21  the 19 cashier's checks?
22    A.   I invoke my Fifth.

**Harley-Davidson's Objection:**  As indicated in Harley-Davidson's previous

submission to the Court, it objects to this testimony on relevancy grounds.

**Cycle-Craft's Response:**  This testimony is relevant as it demonstrates that Ms.

Lunsford engaged in fraudulent criminal activity in connection with this transaction.  The

testimony thus reflects on her credibility as a witness.

Respectfully submitted,


CYCLE-CRAFT CO., INC.

By its attorneys,


/s/ Christopher C. Nee
James C. Rehnquist (BBO# 552602)
Samantha L. Schreiber (BBO# 640058)
Christopher C. Nee (BBO# 651472)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Dated: July 31, 2006


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
July 31, 2006.

/s/ Christopher C. Nee

LIBA/1700429.2