# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CYCLE-CRAFT CO., INC. d/b/a
BOSTON HARLEY-DAVIDSON/BUELL,

          Plaintiff,

vs.                                    Civil Action
                                       No. 04 11402

HARLEY-DAVIDSON MOTOR COMPANY,
INC., and BUELL DISTRIBUTION
COMPANY, LLC,

          Defendants.
_____/

                         300 SE 2nd Street
                         Fort Lauderdale, Florida
                         February 2, 2005
                         1:00 p.m.


                THE VIDEOTAPED DEPOSITION OF

                    DEBRA LUNSFORD


            Taken on Behalf of the Defendants
         Pursuant to Notice of Taking Deposition
              Commencing at 1:12 p.m.


       FLORIDA REALTIME REPORTING - 954.767.0450

2

4

1  Thereupon:
2          DEBRA LUNSFORD
3  a witness named in the notice heretofore filed,
4  being of lawful age and having been first duly
5  sworn, testified on her oath as follows:

3

5

14     Q.   You've just been sworn.  Your testimony is
15  being taken under oath.  You're legally obligated to
16  give truthful testimony subject to the penalties of
17  perjury; do you understand that?
18     A.   Absolutely.
19     Q.   All right.  I'm going to start by asking
20  you to identify the subpoena that was issued for
21  your deposition, which we've premarked as Exhibit 1.
22         (Thereupon, the referred-to document was
23     marked by the court reporter as Exhibit 1.)
24  BY MR. BERKOWITZ
25     Q.   And I'll ask you if you've seen that

2 (Pages 2 to 5)

6

1  subpoena before.
2      A.  Yes.
3      Q.  All right.  And you're here in response to
4  that subpoena?
5      A.  That is correct.
6      Q.  All right.  And you and I have not spoken
7  before, is that correct?
8      A.  Never.
9      Q.  All right.  And have you spoken with any
10  representative of Harley-Davidson Motor Company in
11  connection with your deposition today?
12      A.  No.
13      Q.  And have you spoken with anyone besides
14  your counsel about your deposition here today?
15      A.  No.
16      Q.  All right.  Are you currently employed?
17      A.  No.
18      Q.  All right.  When was the last time you
19  were employed?
20      A.  August of 2003.
21      Q.  By whom were you employed at that time?
22      A.  DC Imports International.
23      Q.  When were you first employed by DC Imports
24  International; in other words, when did you become
25  employed by them?

7

1      A.  In 1999.
2      Q.  Okay.  Where do you reside today?
3      A.  Would you like the address?
4      Q.  Yes, please.
5      A.  5896 Northwest 56th Drive, Coral Springs,
6  Florida 33067.
7      Q.  Okay.  And your date of birth, please?
8      A.  Is May 8, 1961.
9      Q.  Social Security number?
10      A.  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.
11      Q.  Are you married?
12      A.  Yes.
13      Q.  And your husband's name?
14      A.  Bran -- legal name is Branford,
15  B-R-A-N-F-O-R-D, A. Lunsford.
16      Q.  Okay.  And your maiden name?
17      A.  Is Youngblood.
18      Q.  Can you describe for us the nature of the
19  business that was being operated by DC Imports
20  International when you were employed there?
21      A.  Yes.  We imported motorcycles and brought
22  them back into compliance within the guidelines of
23  the EPA and the DOT.
24      Q.  And what do you mean when you say brought
25  them back into compliance?

8

1      A.  In other words, if they were built for
2  European specifications, they had things that had to
3  be changed, such as the speedometers and different
4  things on the bike.  There's a list of different
5  different parts that had to be switched out.  They
6  had to be inspected and things like that.  And they
7  were approved and done by the DOT and EPA
8  guidelines.
9      Q.  Okay.  What position did you hold with the
10  company from '99 to 2003?
11      A.  Vice president.
12      Q.  Okay.  Who was the president during that
13  time?
14      A.  Diane Cooke.
15      Q.  Can you identify for us some of the other
16  people that were employed there during the period
17  1999 to 2003?
18      A.  Yes.  There were a couple different
19  people, but I'll -- let me try to remember.  Sonia
20  Paulovich.
21      Q.  And did she have a title or a position?
22      A.  No.
23      Q.  All right.
24      A.  She handled most of the clerical work.
25      Q.  All right.

9

1      A.  Stephanie Westbrook.
2      Q.  And what did she do for the company?
3      A.  Clerical.  Karen -- and I can't remember
4  her last name.  I'm so sorry.
5      Q.  Is it Christensen?
6      A.  Yes.  Karen Christensen.  And she
7  was our accountant.  Gus Gusoff.
8      Q.  Could you spell that for our stenographer?
9      A.  G-U-S-S-O-F (sic), I believe.
10      Q.  And what did he do for the company?
11      A.  Sales.  And Slim, which his last name was
12  Stevens.  I believe his first name was Steve.
13      Q.  So his name is Steve Stevens, but they
14  called his Slim?
15      A.  Correct.
16      Q.  And what did he do for the company?
17      A.  Sales.  Let's see, Adrian Paulovich.
18      Q.  Adrian?
19      A.  Adrian, uh-huh.  And he worked in the
20  warehouse.  And there was some other gentlemen that
21  worked in the warehouse, but they came and went.
22      Q.  Okay.
23      A.  Okay.  I don't remember their names.  One
24  was Chris.  That's -- I don't remember the other
25  names.

3 (Pages 6 to 9)

Lunsford, Debra  24688sm                                    www.floridarealtime.com

10

1    Q. Okay. Do you know whether the company's
2 still operating today?
3    A. Absolutely not.
4    Q. Okay. What happened to the company?
5    A. We had to close the company.
6    Q. When did that happen?
7    A. It happened in 2003.
8    Q. All right. Why was the company closed?
9    A. Because a deal with Boston Harley-Davidson
10 that was done was not done correctly and it cost us
11 our company and we had to close it down.
12    Q. Now, I've seen some reference to a company
13 called DC Imports, Inc., as well as DC Imports
14 International, Inc.; were there two companies?
15    A. Two separate entities.
16    Q. All right. Now, did you work for both of
17 them or just one?
18    A. Just one. DC Imports International.
19    Q. All right. Where was DC Imports
20 International located?
21    A. Oh, God. Military Trail.
22    Q. In what city or town?
23    A. Deerfield Beach.
24    Q. All right. And how about DC Imports,
25 Inc.?

11

1    A. The same place.
2    Q. All right. What was the difference
3 between the two companies to your understanding?
4    A. One was a --
5    MR. REHNQUIST: Object to the form.
6 BY MR. BERKOWITZ:
7    Q. Go ahead. You can answer.
8    A. Okay. One was a registered importer,
9 which was DC Imports. That was just an RI -- which
10 is called a registered importer. DC Imports
11 International was a ICI, which is a importer that
12 can do it from abroad. In other words, European
13 bikes were DC Imports International, and any bikes
14 coming from Canada or something like that, then they
15 only needed a RI.
16    Q. So --
17    A. But I dealt with all the European.
18    Q. I see.
19    A. Okay.
20    Q. And what affiliation, to your knowledge,
21 did Diane Cooke have with DC Imports as
22 distinguished from DC Imports International?
23    A. She was the president.
24    Q. All right. Which of the people that
25 you've already identified for me, if any, worked for

12

1 DC Imports, Inc., as distinguished from DC Imports
2 International, Inc.?
3    A. Sonia Paulovich. Karen Christensen.
4 Stephanie Westbrook. And Adrian Paulovich.
5    Q. Okay. And did they carry out similar
6 duties with respect to DC Imports as DC Imports
7 International as you've already described?
8    A. That is correct.
9    Q. All right. To your knowledge, did the DC
10 in the title in each of the two companies stand for
11 Diane Cooke?
12    A. Yes.
13    Q. Do you know whether Diane Cooke was
14 involved in any other businesses besides
15 DC Imports/DC Imports International during the time
16 that you were employed by DC Imports International?
17    A. No, she was not. Not to my knowledge.

13

13    Q. Let me try again. As I understand it,
14 both of the companies would import motor vehicles
15 into the United States, is that correct?
16    A. That's correct.
17    Q. Okay. What did the companies do with them
18 once they got to the United States and they were
19 made compliant for US standards?
20    A. Okay. If -- if they were individual
21 bikes -- we did it for individuals as well, okay,
22 for military people. So they would, of course, come
23 get their motorcycle and do the appropriate type of
24 work so it would be legal in the United States.
25    The -- the motorcycles that we got in

4 (Pages 10 to 13)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

14

1  bulk, those motorcycles would be resold. We would
2  have -- people would buy those motorcycles. But it
3  was all -- we never did individual. It was all
4  dealer to dealer.
5      Q. In other words, your customers were
6  dealers, is that correct?
7      A. Right. Like your mom and pops, you know,
8  the majority of them were your mom and pops.
9      Q. Okay. As distinguished from individual
10  customers, is that right?
11      A. Right. We didn't sell individual.
12      Q. You didn't -- you didn't operate a retail
13  business, in other words?
14      A. No.
15      Q. And I assume you didn't advertise for
16  general consumer consumption?
17      A. Absolutely not.
18      Q. All right.
19      A. We had no showroom. We had --
20      Q. I'm going to ask you questions about DCI
21  now, and when I refer to DCI, I'm referring to the
22  entity that you were employed by, DC Imports
23  International; do you understand?
24      A. Yes.
25      Q. Okay. How did DCI obtain customers; how

15

1  did they drum up business among dealers or other
2  businesses?
3      A. They found us.
4      Q. Okay.
5      A. That's basically how it happened. They
6  found us. I mean, we didn't advertise at all.
7      Q. In your estimation, were you generally
8  known to motorcycle dealerships in your area?
9      A. What happens -- what happens is there's a
10  list that the DOT and EPA put out of all ICIs and
11  what -- and geographically what area they're located
12  in. So that list goes out to -- is known to the
13  public and they found us. We didn't advertise. We
14  didn't have to. We turned away business.

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

22

24

3      Q.   All right.  Ms. Lunsford, at some point
4   did you become aware of Boston Harley-Davidson?
5      A.   Yes.
6      Q.   Approximately when was that?
7      A.   Around the end of August 2003.
8      Q.   All right.  And this is Cycle-Craft
9   Company, Inc., doing business as Boston
10   Harley-Davidson?
11      A.   That's correct.

23

25

14      Q.   All right.  I need to take this in baby
15   steps.
16      A.   Okay.
17      Q.   The first time --
18      A.   I was just trying to give you the whole
19   synopsis.
20      Q.   And I want to come back and cover all of
21   that and more.

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450



26

22    Q.  Okay.  What was the next thing that
23  happened after you learned about the possibility to
24  buy these 19 motorcycles?
25         MR. REHNQUIST:  Objection.  Calls for a

28

1  first time that you talked with anybody at Boston
2  Harley; was that with Mr. Buchbaum?
3    A.  No.  It was with Sean.
4    Q.  Okay.  And tell me what your conversation
5  was.
6    A.  Sean didn't understand and nor did I why
7  we had to do it in 19 individual names, but Ron
8  insisted it be done that way because Ron insisted
9  that we have 19 different cashier checks in
10  individual names, and that was going to be a
11  difficult thing to do; why couldn't we just give it
12  one lump sum and let them divide the money on how
13  they want to do it because it was coming from the
14  same source?

27

1      narrative.
2  BY MR. BERKOWITZ:
3    Q.  Go ahead.
4    A.  We wanted to do the deal to get the 19
5  motorcycles dealer-to-dealer.  They tried to --
6    Q.  Okay.  Let me -- let me cut you off there.
7    A.  Okay.
8    Q.  Did you get involved directly and start
9  dealing with Boston Harley at this point?
10    A.  Yes.
11    Q.  Okay.  What -- who did you talk to?
12    A.  Ron Buchbaum.
13    Q.  By phone, I assume?
14    A.  Yes.  And Sean -- I can't recall his last
15  name.  Sean.
16    Q.  If I were to suggest to you that it was
17  Walsh, does that ring a bell?
18    A.  Yes, that's it.  Sean Walsh.
19    Q.  Okay.  You talked to them both at the same
20  time or multiple times?
21    A.  Not at the same time.  Not at the -- not
22  on like a three-way conversation, not at the same
23  time, but I spoke to both of them on different
24  occasions.
25    Q.  Okay.  I'm going to ask you about the

29

1    Q.  All right.  So in your first conversation
2  when you spoke to Sean, did you tell him that you
3  didn't want to do it that way?
4    A.  Yes.
5    Q.  And tell us what you told Sean.
6    A.  I told Sean that it was going to be like
7  jumping through hoops to do it that way, and it was
8  dealer-to-dealer and why should we have to pay, you
9  know, tax on it when it's not individuals, it's
10  dealer-to-dealer.
11    Q.  Tell us what you mean by
12  "dealer-to-dealer."
13    A.  In other words, it's one -- we were -- at
14  that time when we had our retail license, we had to
15  get a dealer's license, so it was dealer-to-dealer.
16  That way you don't pay your sales tax when you do a
17  dealer-to-dealer.  It's more like a wholesale deal.
18    Q.  All right.
19    A.  Am I --
20    Q.  And -- and what was Sean's reaction when
21  you said that you didn't want to do it that way?
22    A.  He said that under no circumstances, that
23  Ron wouldn't go for it, that Ron told him that it
24  had to be done in 19 different names.
25    Q.  Okay.  Now, as of this point in time, you

30

1  hadn't spoken with Ron, is that correct?
2      A.  That's correct.
3      Q.  All right.  What else was said in this
4  conversation that you can remember between you and
5  Sean?
6      A.  That's about it.
7      Q.  How did you leave it with him; was he
8  going to go back and talk to Ron or what?
9      A.  Yeah.  He was going to go talk to him and
10  see what he could do, but he didn't give me very
11  high hopes that he would change his mind.
12      Q.  All right.  At the time that you called
13  Mr. Walsh, did you know what you would do with the
14  19 motorcycles if you obtained them?
15      A.  Yeah.  We were going to try to wholesale
16  them to another dealer.
17      Q.  Okay.  Did you know which one at that
18  point?
19      A.  No.  That was still in the works.
20      Q.  Had there been any discussion about --
21  well, strike that.
22          Was Renegade Harley-Davidson in existence
23  at that time?
24      A.  No.
25      Q.  All right.

31

1          MR. CONTINI:  Answer the question that he
2  asks.
3      A.  I know -- I believe that it was Fort
4  Lauderdale that was interested in the motorcycles.
5  BY MR. BERKOWITZ:

32

4      Q.  Now, do you have an understanding as to
5  whether either Ron Buchbaum or Sean Walsh knew that?
6      A.  Yes.  They knew it.  They knew that we
7  were going to wholesale the bikes.
8      Q.  How did they know it?
9      A.  Because there were conversations with
10  Slim, Gus, myself, you know, with them that -- you
11  know, we explained to them that it was of the
12  essence because we already had like a $25,000
13  deposit put down from Fort Lauderdale and we needed
14  to get the bikes.
15      Q.  Did you tell Sean that you had a $25,000
16  deposit from Fort Lauderdale Harley-Davidson for the
17  bikes?
18      A.  I don't remember if I told him that or not
19  but he knew about the -- the money.  I mean, I don't
20  know if I directly told him it was for Fort
21  Lauderdale because that would be, you know -- but he
22  knew that I had the deposit on the bikes for a
23  wholesale dealer, not necessarily Fort Lauderdale,
24  because that would be like, you know --
25      Q.  Did you tell him that you had another

33

1  dealer that had given you a deposit for the bikes?
2      A.  Yeah.  Absolutely.
3      Q.  All right.
4      A.  We told him we had a couple different
5  ones.
6      Q.  All right.  Do you recall anything else
7  from your first conversation with Sean other than
8  what you've already told us?
9      A.  No.
10      Q.  All right.
11      A.  I'm trying to think.

9 (Pages 30 to 33)

Lunsford, Debra 24688sm
Case 1:04-cv-11402-NMG    Document 114-2    Filed 08/01/2006    Page 10 of 34
www.floridarealtime.com



34

36

7       Q.  Was it your understanding that the end of
8    the model year was coming up at the end of that --
9       A.  Yeah, this was August.

23       Q.  Did you know that because of your
24    familiarity with Harley-Davidson?
25       A.  Yes.

35

37

1       Q.  All right.  After you had the conversation
2    with Gus and Slim, you said you intervened.  What
3    happened?
4       A.  I don't know if Ron called me or I called
5    him, okay, but there was a -- on his cell phone.
6    And, you know, we told him that that was fine, we
7    wouldn't do the deal, and --
8       Q.  Well, why wouldn't you do the deal; did
9    you say why?
10       A.  Because I wasn't going to get 19 different
11    cashier's checks and 19 individual names.  You know,
12    I just -- I thought it was ridiculous.  And he just
13    insisted that's the only way he could do it, so ...
14       Q.  Did he say why it's the only way I can do
15    it?
16       A.  Absolutely.  Just --
17       Q.  What did he say; what did he tell you?
18       A.  Because he had to have it in the
19    individual names because it had to --
20    dealer-to-dealer could not sell dealer-to-dealer.
21    Okay.  They had to have 19 individual names like as
22    a retail deal so it would show as a retail deal, and
23    they had to, like, register their warranty or
24    something like that --
25       Q.  Did he tell you --

10 (Pages 34 to 37)

38

1    A.  – so you could get the allocation.
2    Q.  All right.  And did he tell you why it
3    needed to show as a retail sale instead of a
4    dealer-to-dealer sale?
5    A.  Because –
6        MR. REHNQUIST:  Object to the –
7    A.  – of the allocation.
8        MR. REHNQUIST:  Whoa, whoa.  Object to the
9    form.
10       Go ahead.
11       THE WITNESS:  I'm sorry.
12   BY MR. BERKOWITZ
13   Q.  Was it because of the allocation?
14   A.  Yes, sir.
15   Q.  How did you leave it at the end of that
16   conversation?
17   A.  That was the way I left it.
18   Q.  That you weren't going to do it?
19   A.  Uh-huh.
20       MR. CONTINI:  You have to say yes.
21   BY MR. BERKOWITZ
22   Q.  You have to answer verbally.
23   A.  Yes.  I'm sorry.
24   Q.  All right.  Tell us what happened next.
25   A.  Somehow, some way, they – Gus and Slim

39

1    saved it and they said the deal was on again.
2    Q.  Okay.  Do you remember anything more
3    specifically about what they told you?
4    A.  No.
5    Q.  Did you get in – did you get involved
6    again at some point?
7    A.  Yeah, when the – when the paperwork came
8    and the titling part.
9    Q.  From your conversation with Mr. Buchbaum,
10   did you have an understanding as to whether he
11   wanted you to simply plug in names as fictitious
12   buyers for the 19 motorcycles?
13       MR. REHNQUIST:  Object to the form.
14   A.  Right.  He told us to use family, friends,
15   whatever.  It didn't matter.  Just – you know, they
16   just needed 19 names.
17   BY MR. BERKOWITZ
18   Q.  Did – in your conversation with
19   Mr. Buchbaum, did you have – did you mention at all
20   the fact that the motorcycles were going to go to
21   another dealer?
22   A.  Yeah.  I told him that we had a deposit
23   from another dealer.  He knew they were being
24   wholesaled.  That was the whole point of the whole
25   deal.

40

41

11 (Pages 38 to 41)

46

```
6       Q.  The conversations that you had with Ron
7   Buchbaum and Sean that you've already told us about,
8   those took place in the -- in the end of July time
9   frame, not the end of August, is that correct?
10      A.  That is correct.  Yes.
11      Q.  Okay.  Of 2003?
12      A.  Of 2003.
```

48

```
1   premarked as Defendant's Exhibit 4 as those checks?
2   And take your time and look through them.
```

```
19      Q.  Can you identify those as the cashier's
20  checks?
21      A.  I'd like to invoke my Fifth on this.
```

47

```
21      Q.  Did you cause 19 separate cashier's checks
22  to be issued for these motorcycles, payable to
23  Boston Harley-Davidson?
24      A.  Yes.
25      Q.  All right.  Can you identify what we've
```

49

13 (Pages 46 to 49)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

50

51

 1    Q.   And to your knowledge did any of those
 2  people provide any funds for the purchase of any of
 3  these motorcycles to DCI?

10    A.   No, they did not.  This was all DC
11  International's money.
12    Q.   Okay.  And this was -- these funds were
13  coming out of DC International's bank account at
14  Northern Trust Bank of Florida, is that correct?
15    A.   That's correct.
16    MR. REHNQUIST:  Objection.  Leading.
17    (Conferring with counsel.)
18    MR. CONTINI:  I apologize, gentlemen, for
19  the interruptions on my behalf before.
20  BY MR. BERKOWITZ
21    Q.   The -- the date of the checks, of all of
22  the checks, is July 28, 2003; do you see that?
23    A.   Yes.
24    Q.   That's on Exhibit 4, correct?
25    A.   Yes.

52

 1    Q.   And if you look at Exhibit 3, the date of
 2  the fax of the bills of sale is also July 28, 2003,
 3  is that right?
 4    A.   Yes.
 5    Q.   Do you recall when payment was made, that
 6  is, the checks were delivered to Boston
 7  Harley-Davidson in relation to when they were issued
 8  by the bank; in other words, did a number of days go
 9  by or were they immediately delivered or do you
10  remember?
11    A.   I'm sure they were FedEx'd immediately.

53

14 (Pages 50 to 53)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450



54

56

16    Q.   So did you have to collect driver's
17  licenses from the 19 individuals?
18    A.   Yes.
19    Q.   Showing you Exhibit 8, can you identify
20  that document for us?  Take your time.
21    (Thereupon, the referred-to document was
22  marked by the court reporter as Exhibit 8.)
23    MR. REHNQUIST:  Is Exhibit 8 a -- a subset
24  of the documents that were produced in the --
25    MR. BERKOWITZ:  Yes, these --

55

57

2    Q.   And was there a reason why 19 checks were
3  made out to the tax collector, instead of a single
4  check, to your knowledge?
5    A.   Because they were being done as
6  individuals.
7    Q.   Okay.  Was this to maintain the fiction of
8  19 buyers for these motorcycles?
9    A.   Yes.

1    MR. REHNQUIST:  -- the -- the bound
2  document with a bunch of tabs?
3    MR. BENSON:  Yes.
4    MR. BERKOWITZ:  I believe that's correct,
5  yes.
6    A.   Yes, these were the driver's license
7  because these were the individual names.
8  BY MR. BERKOWITZ:
9    Q.   All right.  I want to go through these one
10  by one.  The first page of Exhibit 8 is a driver's
11  license for Thomas Stimpson, do you see that?
12    A.   Yes.
13    Q.   And who was he?  Or who is he?
14    A.   I don't know.  He's a friend of somebody
15  that worked there.  I don't know.
16    Q.   All right.  But he was asked to fax his
17  driver's license over to DCI for use in connection
18  with the acquisition of these 19 motorcycles?
19    A.   Yes.
20    Q.   All right.  And then the next one is your
21  driver's license, is that correct?
22    A.   That's correct.
23    Q.   The next page is a driver's license for
24  Jason Anthony Gotham, is that correct?
25    A.   Yes.

15 (Pages 54 to 57)

58

1    Q.   All right.  And there's a handwritten note
2    to Slim, is that correct?
3    A.   Yes.
4    Q.   And who is Mr. Gotham?
5    A.   I guess it's a friend of Slim's.
6    Q.   All right.  The next one is Edward B.
7    Stevens, do you see that?
8    A.   Yes.
9    Q.   Do you know who Edward B. Stevens is?
10   A.   Slim's grandfather.
11   Q.   The next one is Kevin W. Greene, do you
12   see that?
13   A.   Yes.
14   Q.   Do you know who Kevin Greene is?
15   A.   No, I do not.
16   Q.   The next driver's license in this package
17   is Carolyn -- looks like Caznina (sic), do you see
18   that?
19   A.   Yes.
20   Q.   And do you know this individual?
21   A.   No, I do not.
22   Q.   All right.  The next driver's license is
23   Sonia Paulovich?
24   A.   Yes.
25   Q.   And do you know Sonia?

59

1    A.   Yes.
2    Q.   And did Sonia -- I think you already
3    indicated --
4    A.   Yes.
5    Q.   -- Sonia worked at the company at the
6    time?
7    A.   That's correct.
8    Q.   And did you ask Sonia to provide her
9    driver's license in connection with this
10   transaction?
11   A.   Yes.
12   Q.   The next driver's license is Leopold
13   Larsen, do you see that?
14   A.   Yes.
15   Q.   And do you know Leo Larsen?
16   A.   Yes.
17   Q.   And did he work at DCI?
18   A.   No.
19   Q.   Okay.  What did --
20   A.   That was Sonia's --
21   Q.   What connection did he have?
22   A.   Sonia's boyfriend at the time.
23   Q.   All right.  Did you ask Sonia to ask her
24   boyfriend to send his driver's license?
25   A.   No, we just asked everybody.

60

1    Q.   Tried to come up with as many names as you
2    could?
3    A.   The 19 names.
4    Q.   All right.  The next one, it's hard to
5    make out from the copy that we got, but it indicates
6    Craig Kapilla at the top, do you see that?
7    A.   Yeah.
8    Q.   Do you know who that was?
9    A.   I don't know.
10   Q.   All right.  The next driver's license is
11   Renee Myllymake (sic)?
12   A.   That was Gus' girlfriend.
13   Q.   Okay.  The next one is Jason J. Lozon, do
14   you see that?
15   A.   Yes.
16   Q.   Do you know who that was?
17   A.   No.
18   Q.   The next one is Louis James Gusoff, a
19   Michigan's driver's license, do you know who that
20   was?
21   A.   Gus' dad.
22   Q.   Okay.  The next one is James Carl Gusoff,
23   do you know who that was?
24   A.   No.  It's a relative of Gus', okay.  I'm
25   sorry.

61

1    Q.   Gus is known as Gus from his last name,
2    not his first, I take it?
3    A.   Exactly.
4    Q.   All right.  What's his first name, Gus?
5    A.   No.  It's Gus Gusoff.  That is his name.
6    Q.   Oh, okay, it is his --
7    A.   It's Gus -- it is his first name, Gus
8    Gusoff.
9    Q.   All right.
10   A.   But any Gusoff has to be, I guess, one of
11   his relatives.
12   Q.   Okay.  The next one is Harold Christensen?
13   A.   Karen's husband.
14   Q.   All right.  And then Karen Christensen?
15   A.   Karen.
16   Q.   All right.  The next one is Daniel William
17   Gusoff -- Gusoff?
18   A.   Better known as Gus.
19   Q.   Okay.  So that's Gus.
20   A.   Okay.
21        MR. REHNQUIST:  I'm sorry, this is Gus --
22   A.   Daniel is Gus.
23   BY MR. BERKOWITZ:
24   Q.   The next one is Branford A. Lunsford.  Is
25   that your husband?

16 (Pages 58 to 61)

Lunsford, Debra  24688sm

www.floridarealtime.com

62

```
1       A.   That's my husband.
2       Q.   The next one is Michael E. Stevens?
3       A.   Slim.
4       Q.   That was Slim?
5       A.   Yeah.  So his name is Michael E.  It's not
6  Steve.
7       Q.   Okay.  Then the last one here is Heather
8  Danielle Wingard?
9       A.   It's my daughter.
```

64

63

65

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

Case 1:04-cv-11402-NMG    Document 114-2    Filed 08/01/2006    Page 17 of 34
Lunsford, Debra  24688sm
www.floridarealtime.com

90

91

92

18    Q.   Okay.  At some point you took delivery on
19  these motorcycles, is that correct, at DCI?
20    A.   That's correct.
21    Q.   And how were the — how were the
22  motorcycles delivered to DCI?
23    A.   By a transport company.
24    Q.   Okay.  So you contracted with a company to
25  go and get the 19 motorcycles at Harley-Davidson of

93

1  Boston and bring them back down to DCI?
2    A.   Yes.
3    Q.   All right.  And on or about August 5th,
4  2003, did something happen?
5      MR. REHNQUIST:  Objection.
6    A.   August 5th?  Yes.
7      MR. BERKOWITZ:  Just a minute.
8      (Thereupon, a discussion was held off the
9    record, after which the following proceedings
10    were held:)
11  BY MR. BERKOWITZ
12    Q.   Prior to their arrival at DCI, had you
13  seen these motorcycles before?
14    A.   No.
15    Q.   All right.  What happened on August 5th,
16  2003?
17    A.   Two investigators walked into our office
18  and asked to see the files on these 19 motorcycles.
19    Q.   All right.  And these were investigators
20  from the Florida Highway Patrol?
21    A.   Yes.
22    Q.   And did you speak with either of the
23  investigators?
24    A.   With both of them.
25    Q.   With both of them?

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450    800-707-0450

94

1    A.  Yes.
2    Q.  Did you speak with Corporal Anthony
3  Caserta, Jr., who authored this incident report that
4  we see at Pages 46 to 47 of Exhibit 17?
5    A.  Yes, I did.
6    Q.  Directing your attention to Officer
7  Caserta's incident report and to the section with
8  the heading "narrative," towards the bottom of the
9  page, numbered 46, do you see that?
10    A.  Right here, yes.
11    Q.  Yes.  Could you please just read that
12  narrative silently to yourself and then I have a
13  couple of questions about it.

96

3    Q.  Okay.  Directing your attention to Page 46
4  and the sentence that begins "The records," "The
5  records reflect that DC Imports applied for" — and
6  then we're missing a word — "in the name of 19
7  individuals who are friends or family of Mrs. Cooke
8  to make the purchases look like individual retail"
9  and then we have SA, but not the rest of the word.
10  "This was done to circumvent Harley-Davidson policy
11  prohibiting dealer to dealer sales."  Do you see
12  that?
13    A.  Yes.
14    Q.  Okay.  And is it true that what you've
15  testified to in connection with these 19 motorcycles
16  that were purchased by DCI, that the identification
17  of 19 individuals as fictitious purchasers was, in
18  fact, done to circumvent the Harley-Davidson policy
19  prohibiting dealer-to-dealer sales?
20        MR. REHNQUIST:  Objection.
21    A.  Absolutely.
22    BY MR. BERKOWITZ
23    Q.  All right.  And whose idea was that?
24    A.  Ron Buchbaum of Boston Harley-Davidson.

95

97

25 (Pages 94 to 97)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450    800-707-0450

110

112

9       Q.   Okay.  We've marked as Exhibit 20 a
10   document in our lawsuit up in Boston that's entitled
11   declaration of Kenneth McPhee.  I know you haven't
12   seen this document before, but I'm going to ask you
13   a couple of questions about what Mr. McPhee says in
14   his declaration.
15           (Thereupon, the referred-to document was
16       marked by the court reporter as Exhibit 20.)
17   BY MR. BERKOWITZ
18       Q.   Did you ever have any conversation with
19   Kenneth McPhee?
20       A.   I don't know who Kenneth McPhee is.
21       Q.   All right.  Do you see in Paragraph 2 of
22   his declaration that he identifies himself as the
23   operations manager of plaintiff Cycle-Craft Company,
24   Inc., d/b/a Boston Harley-Davidson/Buell?
25       A.   Yes.

111

113

1       Q.   All right.  I'd like to direct your
2   attention to the second page of this declaration and
3   specifically, Paragraph 6.  I'm going to ask you to
4   read that silently to yourself, please.
5           Just let me know when you've finished it.
6       A.   Okay.
7       Q.   All right.  Directing your attention to
8   the second sentence of this paragraph, it reads, "In
9   point of fact, according to the criteria set out in
10   the Harley-Davidson nonretail sales policy by which
11   I and my staff evaluate each and every motorcycle
12   purchase, each of these motorcycles was purchased by
13   an individual."  Do you see that sentence?
14       A.   Yes, I do.
15       Q.   And is it true that each of these
16   motorcycles was purchased by an individual?
17       A.   No.
18       Q.   Were the motorcycles purchased by DCI?
19       A.   Yes, they were.
20       Q.   And was Boston Harley-Davidson aware of
21   that?
22       A.   Yes, they were.
23           MR. REHNQUIST:  Objection.
24   BY MR. BERKOWITZ
25       Q.   The next sentence states, "Each individual

29 (Pages 110 to 113)

114

1 purchaser took title to his or her motorcycle in his
2 or her own name, as reflected on the certificates of
3 origin in each deal jacket." Do you see that
4 sentence?
5     A. Yes, I do.
6     Q. Is that sentence true?
7     A. No.
8     Q. In fact, DCI purchased all of the 19
9 motorcycles, is that correct?
10     A. Yes, we did.
11         MR. REHNQUIST: Objection.
12 BY MR. BERKOWITZ
13     Q. And Boston Harley-Davidson was aware of
14 that, is that correct?
15         MR. REHNQUIST: Objection, leading.
16     A. Boston Harley-Davidson instructed us to do
17 it that way.
18 BY MR. BERKOWITZ
19     Q. The last sentence of Paragraph 6 states,
20 quote, on paper and as far as anyone at Cycle-Craft
21 knew or could have known, these were sales to
22 individual purchasers in compliance with all
23 Harley-Davidson policies, end quote. Do you see
24 that statement?
25     A. Yes, I do.

115

1     Q. Is that a true statement?
2     A. That's a false statement.
3     Q. In fact, Boston Harley-Davidson was aware
4 that, in fact, these vehicles were being purchased
5 by DCI and not the individual purchasers listed on
6 the MSOs, is that correct?
7     A. That's correct.
8         MR. REHNQUIST: Objection -- objection,
9     leading.
10 BY MR. BERKOWITZ
11     Q. Is that correct?
12     A. That's correct.
13         MR. REHNQUIST: Objection.
14         That was 20?
15         MR. BENSON: Yes.
16         MR. BERKOWITZ: That was 20.
17 BY MR. BERKOWITZ
18     Q. I'm now going to show you what we've
19 marked as Exhibit 21, which is, I know, another
20 document that you've never seen.
21         (Thereupon, the referred-to document was
22     marked by the court reporter as Exhibit 21.)
23 BY MR. BERKOWITZ
24     Q. This is a memorandum of law in support of
25 motion for preliminary injunction support --

116

1 submitted to the court by the Boston Harley-Davidson
2 dealership. And I'm going to direct your attention
3 to Page 8.
4     A. Okay.
5     Q. And I'll ask you to read silently to
6 yourself the paragraph that appears under
7 Section 4A.
8     A. Okay.

117

6     Q. All right. But you do know that 19
7 motorcycles were sold by Boston Harley-Davidson to
8 DC Imports International, is that correct?
9     A. That is correct.
10     Q. All right. In the next sentence, it
11 states, "In fact, each of these motorcycles was
12 purchased by an individual customer." Do you see
13 that statement?
14     A. Yes.
15     Q. And is that a true statement?
16     A. That's a false statement.
17     Q. All right. It goes on to state in the
18 next sentence, in keeping -- quote, in keeping with
19 the provisions of the nonretail policy, each
20 purchaser took title to his or her motorcycle in his
21 or her own individual name, as reflected on the
22 certificate of origin for each motorcycle. Do you
23 see that sentence?
24     A. Yes, I do.
25     Q. Is it true that each purchaser took title

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450    800-707-0450

118

1  to his or her motorcycle in his or own -- her own
2  individual name?
3      A.  That's not true.
4      Q.  The last sentence in this paragraph prior
5  to the citation to the McGrath declaration states,
6  and I quote, each of these units was properly set
7  up, inspected, and sold at the dealership.  Do you
8  see that statement?
9      A.  Yes.
10     Q.  Were these units sold at the Boston
11 Harley-Davidson dealership?
12     MR. REHNQUIST:  Objection.  Form.
13     A.  They were not sold to the individuals at
14 that dealership.
15 BY MR. BERKOWITZ
16     Q.  As you testified earlier, you contracted
17 with a carrier to go up and pick up the --
18     A.  Nineteen.
19     Q.  -- the 19 motorcycles and deliver them
20 back to the purchaser, which was DCI, is that
21 correct?
22     MR. REHNQUIST:  Objection.  Leading.
23 Form.
24     A.  That is correct.
25

119

14     Q.  Why do you say that?
15     A.  Because the only communications that we
16 had about these motorcycles were directly with DC
17 Imports International with Boston Harley-Davidson.
18 That's the only -- they never talked to these
19 individuals.  They didn't even know who these
20 individuals were.
21     Q.  Do you understand what the consequences
22 might be for your not giving honest and truthful
23 testimony today?
24     A.  Yes.
25     Q.  And given the investigation by the Florida

120

1  Highway Patrol and the resolution of that
2  investigation, do you have an understanding that the
3  consequences of your giving false testimony could be
4  very serious?
5      A.  I absolutely understand.
6      Q.  And has all your testimony today been
7  honest and truthful?
8      A.  It has been honest and truthful.
9      Q.  And other than Mr. Buchbaum and Mr. Walsh,
10 did you have any communications at any time with any
11 other individual at Boston Harley-Davidson that you
12 can recall?
13     A.  Not unless it was somebody that was
14 answering the telephone and put you on hold to get
15 to the person.  I mean, like a secretary or
16 something like that.
17     Q.  And is it your testimony here today under
18 oath that the idea of creating 19 retail customers
19 and making this appear to be 19 retail sales was the
20 idea of Mr. Buchbaum?
21     MR. REHNQUIST:  Objection.
22     A.  Yes.  It was his -- it was his idea
23 totally.

121

122

124

3      Q.  Okay.  Let me -- let me -- let me ask this
4   question.  Do you understand that Libby's Tag and
5   Title submitted documentation on behalf of DC
6   Imports International to the State of Florida in an
7   effort to get title for 19 motorcycles?
8      A.  Yes.
9      Q.  I mean, you recall being questioned about
10  Exhibit 2, which was a fax that you sent to Libby,
11  providing some of that information?
12     A.  Yes.
13     Q.  And you sent that -- you sent that fax to
14  Libby on July 30th?
15     A.  Yes.
16     Q.  What's Libby's last name, by the way, do
17  you know?
18     A.  I can't remember.
19     Q.  But the business is Libby's Tag and Title?
20     A.  Right.  It's -- it should be on her
21  receipt thing.
22     Q.  Okay.  Are they still in business, as far
23  as you know?
24     A.  I have no idea.
25     Q.  Take a look at Tab A of Exhibit 23.

123

125

1   You'll see the first page behind Tab A is an invoice
2   from Libby's?
3      A.  Yes.
4      Q.  And do you see that the next several pages
5   of documents in Tab A appear to be Boston
6   Harley-Davidson bills of sale?
7      A.  Yes.  And it looks like there's an MSO.
8      Q.  And following the bills of sale are MSOs?
9      A.  Yes.
10     Q.  And do you see that the -- the bills of
11  sale in Exhibit A do not have any price listed for
12  the bike in the right-hand column?
13     A.  Yes.
14     Q.  Do you know how it came to pass that these
15  bills of sale without any prices in the right-hand
16  column were prepared?
17     A.  I -- I don't know.  I can't remember.
18     Q.  Do you have any knowledge of you or anyone
19  at DC Imports altering the bills of sale that you
20  received from Boston Harley-Davidson?
21     A.  Yes.  I did.
22     Q.  Okay.  Can you tell me what you did as far
23  as altering the bills of sale that you received from
24  Harley-Davidson?
25     A.  We didn't know what the price was on the

Lunsford, Debra 24688sm                    www.floridarealtime.com

126

1  motorcycles because the deal had changed so many
2  times, so until we found out what the price was
3  going to be, because we never received any originals
4  from Boston Harley-Davidson.
5      Q.  So were these blank bills of sale
6  documents that you sent to Libby at a time when you
7  did not know the purchase price for the bikes?
8      A.  Yes, that's correct.

127

128

129

13      Q.  Okay.  Did the -- and you provided Libby
14  of Libby's Tag and Title with the bill of sale with
15  the whited out -- with the -- with the new number
16  that you had revised?
17      A.  No.  No.  She had a blank one.  She had
18  the blank bills of sales.  She never had an amount
19  on the bill of sale.
20      Q.  Did you -- what did you do then with
21  the -- the bills of sale that had the revised
22  numbers?
23      A.  We took these and put all the paperwork
24  together to take them to West Palm to get them
25  titled.  And then we had the taxes.  We had the

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450



130
1    taxes figured up on this.  And cut the checks for
2    the amount of taxes for the individuals and sent it
3    up to West Palm to get everything titled.
4        Q.  Okay.  So the way it worked was that Libby
5    would fill out the applications and then return them
6    to you and you would send them to -- to West Palm
7    for the title?
8        A.  Typically she would do everything because
9    it was being done -- we had never done individuals
10   like this, you know what I'm saying, so to speak, so
11   basically she would fill out and do everything.  But
12   on this particular instance, because of the way that
13   the deal was arranged, she just filled out the --
14   like the name and the -- you know, all the pertinent
15   information, and then we had to put it together on
16   the back end.
17       Q.  So you -- you prepared the -- the actual
18   bills of sale that were submitted to -- to West Palm
19   for titling?
20       A.  Yes.
21       Q.  And did you do that for all of the 19
22   bills of sale?
23       A.  Yes.
24       Q.  You personally did that?
25       A.  Yes.

131
1        Q.  And when you say to West Palm for -- for
2    titling, can you -- can you just help me with
3    what -- what that means?  Is that the -- the
4    register --
5        A.  To the -- to the department where they --
6    you know, you just take the package to them and
7    they -- you drop it off to them and they --
8        Q.  Is that the department of motor safety
9    or --
10       A.  Motor vehicles.

132

133
13       Q.  And again, just to sum up, these are bills
14   of sale on which you altered the purchase price that
15   was on the document when you received it from
16   Harley-Davidson?
17           MR. BERKOWITZ:  You mean Boston
18   Harley-Davidson?
19           MR. REHNQUIST:  I'm sorry, from Boston
20   Harley-Davidson.
21       A.  Yes.

34 (Pages 130 to 133)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450    800-707-0450

138

140

```
22      Q.  And you did plead guilty to a charge,
23   correct?
24      A.  Yes.  One charge of title fraud.
25      Q.  Right.  And that -- and that's a felony in
```

139

141

```
5      Q.  Now, it was this -- it was submitting
6   false information to the Department of Motor
7   Vehicles or the department of motor safety that led
8   to your criminal conviction, isn't it?
9      A.  That's correct.
```

```
1   the State of Florida?
2      A.  Yes.
3      Q.  And you received a sentence of one year
4   probation, is that my understanding?
5      A.  Pretrial intervention.
```

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

Case 1:04-cv-11402-NMG    Document 114-2    Filed 08/01/2006    Page 26 of 34
Lunsford, Debra 24688sm
www.floridarealtime.com

142

But your
9   understanding is that you did plead guilty to a
10  charge of title fraud?
11      A.  Yes.
12      Q.  And you pled guilty because you had
13  committed that crime, is that correct?
14      A.  Yes.
15      Q.  And you understood when you pleaded guilty
16  that you could have gone to trial and tried to
17  defend against that charge?
18      A.  Yes.
19      Q.  And you understood and I imagine you were
20  in front of a judge who told you if you went to
21  trial, you had all kind of defenses, you could
22  cross-examine witnesses, the government would have
23  to prove its case beyond a reasonable doubt and
24  other things like that; you understood all that,
25  correct?

143

1       A.  Yes.
2       Q.  And instead, you pleaded guilty because
3   you were guilty?
4       A.  Yes.

144

145

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

146

148

147

```
 4      Q.  Did you instruct Karen Christensen to --
 5   to go to Northern Bank & Trust and receive cashier's
 6   checks for the purchase prices of the -- the 19
 7   sales?
 8      A.  I invoke my Fifth.
 9      Q.  Did you instruct Karen Christensen to
10   Federal Express those cashier's checks to Boston
11   Harley-Davidson?
12      A.  I invoke my Fifth.
13      Q.  Did you discuss with Karen Christensen
14   whether there might be criminal exposure in the
15   nature of bank fraud in the dealings that you and
16   she contemplated with Northern Bank & Trust?
17      A.  I invoke my Fifth.
18      Q.  Did you have any conversations with Karen
19   Christensen about the paperwork that she had to
20   submit to Northern Bank & Trust in order to receive
21   the 19 cashier's checks?
22      A.  I invoke my Fifth.
```

149

```
 4      Q.  Okay.  Now, you have apparently agreed, by
 5   virtue of your plea agreement, that submitting false
 6   application to the Department of Motor Vehicles was
 7   title fraud, is that correct?
 8      A.  Yes.
 9      Q.  Did you tell Libby of Libby's Tag and
10   Title that you were -- that you were intending to
11   submit false information to the Department of Motor
12   Vehicles?
13      A.  No.
14      Q.  Did you tell -- well, just if you look on
15   Tab 2 of Exhibit 23, the -- the fourth page of Tab 2
16   is a copy of a driver's license; that's Michael
17   Stevens, also known as Slim?
18      A.  Yes.
19      Q.  And for each of the 19 motorcycles, you
20   submitted to the -- well, I haven't asked this
21   question.  Let me ask it.
22          Did -- did you submit a copy of the
23   driver's license in connection with the packet of
24   materials you sent to the Department of Motor
25   Vehicles?
```

38 (Pages 146 to 149)

Lunsford, Debra  24688sm

www.floridarealtime.com

150

1     A.  Yes.

20      Q.  You compiled the information and gave it
21   to Karen to take to West Palm?
22      A.  Yes.
23      Q.  Okay.  And if you look at Tabs 2 through
24   19 -- and we've been through these before for --
25   well, let me -- let me do it a faster way.  For each

151

1   of these 19 motor vehicles, did you give to Karen a
2   copy of a driver's license with the names that we've
3   gone over as part of that package?
4      A.  Yes.

23      Q.  Well, but -- so did you tell anybody whose
24   driver's license you submitted that you were
25   altering other documents that were being submitted

152

1   to the Department of Motor Vehicles?
2      A.  No.

153

39 (Pages 150 to 153)

Lunsford, Debra  24688sm

158

160

159

```
 9      Q.   Okay.  Did -- did you overhear or
10   participate in a conference call with any
11   conversations that -- that Gus or Slim had with
12   anyone from Boston Harley-Davidson?
13      A.   I don't remember.
14      Q.   So your knowledge of what Boston
15   Harley-Davidson said or did is based on what you
16   heard from Gus or what you heard from Slim or what
17   you personally heard yourself?
18      A.   What I personally -- yes.
19      Q.   Those are the three sources?
20      A.   Right.
```

161

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450    800-707-0450

162

---

163

4       Q.   Ms. Lunsford, I want to ask you about your
5    conversations with Sean Walsh.
6       A.   Okay.
7       Q.   And I want you, as carefully as you can,
8    not necessarily using the exact words, but I want
9    you to tell me everything that you remember that
10   Sean Walsh said to you in each of those
11   conversations.
12      A.   Well, really, one of the conversations
13   that stands out to me was the one when we were
14   trying to get the payment for the 19 motorcycles and
15   he said that Ron wanted it in 19 individual names.
16   We couldn't pay in one lump check.  And we were both
17   kind of kidding around with each other, you know,
18   saying, you know, what a pain in the butt, you know,
19   to have to do that, to put it in 19 different names,
20   when we could just do it in one check.
21      Q.   So you and Sean were frustrated at the
22   requirement that it had to be -- had to be 19 sales?
23      A.   Right.
24      Q.   What else do you remember about that
25   conversation with Sean?

---

164

1       A.   That's about it.
2       Q.   And again, Sean was -- do I have this
3    right, that Sean was telling you that Ron insisted
4    that it be 19 individual sales?
5       A.   That's right.

---

165

12      Q.   And what do you remember Ron saying, as
13   accurately as you can, in the first conversations?
14      A.   Just that --
15      Q.   Or do you recall the circumstances of
16   what -- that led you to talk to Ron in the first
17   place?
18      A.   I think it was an intervention.  I can't
19   remember exactly how it came to be that I got on the
20   telephone with him.  But I think it started out with
21   Gus and Slim and then I ended up getting on the
22   phone because the price on the bikes had changed or
23   something.  And -- and then Ron was saying that, you
24   know, that was the only way that the deal could be
25   done and it had to be done by that Saturday or he

---

42 (Pages 162 to 165)

**166**

1   was going to sell the bikes.
2     Q.  And you understood that he had to -- your
3   understanding -- well, did -- did Ron say in this
4   conversation why he had to get the deal done by
5   Saturday?  Did Ron himself say why?
6     A.  Yeah.  He said that he had to get those
7   bikes off the floor because of his allocation.
8     Q.  Did he specifically refer to his
9   allocation in that conversation?
10    A.  Yes.
11    Q.  Do you recall anything else that Ron
12  Buchbaum said in this first conversation?
13    A.  No.  He was just a pain in the butt.
14    Q.  Well, why -- what do you mean, he was a
15  pain in the butt?
16    A.  He was just hard to deal with, you know,
17  because I -- we didn't want to do it that way and he
18  just -- you know, he -- he just said that was --
19  that way or no way, that we had to do it that way.
20    Q.  Okay.  Well, I'm saying --
21    A.  I just wanted to cut the one check.  I
22  didn't want to go through 19 cashier checks and he
23  wanted the 19 individual ones and --
24    Q.  Well, okay.  Did -- did he --

**167**

7    Q.  So you're testifying now about other
8  things you remember Ron saying in this first
9  conversation?
10    A.  It could have been in any of those
11  conversations.
12    Q.  Okay.
13    A.  Okay.  I don't know exactly which one it
14  was or when it was, but I just remember, you
15  know ...
16    Q.  Did he tell you that these motorcycles had
17  to be sold to individuals?
18    A.  Yes.
19    Q.  And did he tell you that -- did he give
20  you any reason as to why the motorcycles had to be
21  sold to individuals?
22    A.  Because he couldn't do a dealer-to-dealer
23  transaction because he had to do it in individual
24  names for his allocation.  He had to -- it had to be
25  like a retail deal.  That's the only way he could

**168**

1   let 19 motorcycles go.
2    Q.  Again, but did he tell you that the sales
3  had to be made to individuals?
4    A.  Yes.
5    Q.  Do you remember anything else that -- that
6  Ron Buchbaum said in either this first conversation
7  or any conversation?
8    A.  No.  That's --
9    Q.  That's the substance of it?
10    A.  Pretty much, yeah.
11    Q.  And again, you don't recall the -- the
12  number -- the exact number of the conversations or
13  the exact length of the conversations, but your best
14  memory is that there was two to three conversations
15  and they were no longer than five minutes, is that
16  correct?
17    A.  I don't really remember, but yes, I guess
18  that's -- that's about it.

**169**

18    Q.  I think you testified in response to
19  Mr. Berkowitz that you had to close the company
20  because the deal with Boston Harley-Davidson was not
21  done correctly.
22    A.  Well --
23    Q.  Is that -- do I have that right?
24    A.  Well, it's -- it's more than that.  It
25  was -- I had some health issues.  I had -- my mother

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

Lunsford, Debra  24688sm

170

1  was sick.  She passed away in March.  And I just had
2  a lot of things and that was just, I guess, the -- I
3  guess that was the main run.  Number one, I got
4  arrested.  Okay.  Which enabled me to work -- I
5  mean, I couldn't work.  I got arrested and I had to
6  go through a lot of legal proceedings and stuff and
7  I just -- I couldn't work then.
8       Q.  Did -- I mean, I understand how this
9  impacted you, obviously, with the -- the criminal
10  matter.  But is -- is -- did that also cause the
11  company not to be able to operate because you
12  couldn't work there anymore?
13       A.  No.  They were -- they still worked.  They
14  worked up until the -- I guess it was the end of the
15  year.
16       Q.  Okay.  I'm sorry.  I guess I was confused
17  on that.  My understanding was --
18       A.  Right.
19       Q.  My understanding was that the company sort
20  of closed down shortly after this -- this incident
21  in early August of '03.
22       A.  No.  It was like -- I don't know the exact
23  date when it finally closed, but they finally
24  closed.  They -- I mean, they were still in
25  business, you know, for a period of time after I

171

1  left.

172

173

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

Lunsford, Debra 24638sm
Case 1:04-cv-11402-NMG   Document 114-2   Filed 08/01/2006   Page 33 of 34
www.floridarealtime.com

178

180

```
 5      Q.  Do you hold any bitterness towards Boston
 6   Harley-Davidson or Ron Buchbaum about what happened
 7   to you?
 8      A.  No, I don't.  Because what I did, I had to
 9   be accountable for, and I was.  And that's the way
10   that it is.  And I just want this to get over with.
11      Q.  Okay.  And Ron Buchbaum or Boston
12   Harley-Davidson didn't have any part in the -- in
13   the title fraud that you pleaded guilty to?
14      A.  No.  None whatsoever.
15      Q.  No one from Boston Harley-Davidson told
16   you to submit altered bills of sale to the
17   department of motor safety, did they?
18      A.  Nope.
```

179

181

```
 4      Q.  Ms. Lunsford, your counsel has indicated
 5   that you may wish to clarify some of your answers to
 6   questions regarding your role in dealing with
 7   obtaining cashier's checks from Northern Bank &
 8   Trust, is that correct?
 9      A.  Yes.
10      Q.  Why don't you go ahead and -- and do that.
11      A.  Basically, on the checks, Karen
12   Christensen, you have to understand, she was our
13   accountant.  She played a major role in our -- in
14   our company, okay.  She handled our QuickBooks.  She
15   handled everything.  The checks to the employees.
16   Everything.  She -- that's what she was, an
17   accountant.
18          And she is the one who took it upon
19   herself to call Northern Trust, because she could
20   deal with Northern Trust, and get the checks issued
21   individually.  And she was very proud of herself
22   when she did it.  She said, look what I did, I got
23   it done, I got it -- I got Northern Trust to do 19
24   different cashier checks.
```

46 (Pages 178 to 181)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450

182

183

184

```
 1   Mr. Buchbaum that you didn't have 19 customers
 2   standing by, ready to buy these units?
 3        MR. REHNQUIST:  Objection, leading.
 4        A.  No.  I mean, it was known that it was --
 5   the 19 bikes were going to us.
 6    BY MR. BERKOWITZ
 7        Q.  And did he make any suggestion as to how
 8   you should do the paperwork in order to make it
 9   appear to be 19 retail sales or 19 sales to end
10   users?
11        A.  That they needed 19 different driver's
12   license of family and friends, that it could be
13   family and friends or just whoever.
14        Q.  So was it Mr. Buchbaum who suggested to
15   you to contact family and friends to do the
16   paperwork on these transactions?
17        A.  Just that he needed 19 different, you
18   know, driver's license to do it.
19        Q.  All right.  And was he the one who
20   suggested that you could contact family and friends
21   to --
22        A.  Yes.
23        Q.  -- get those 19 --
24        A.  Yes.
25        Q.  -- driver's licenses?
```

185

```
 1        A.  Yes.
```

```
19        Q.  In your testimony in response to
20   Mr. Rehnquist's questions, you indicated that
21   Mr. Buchbaum insisted that the deal be done with 19
22   individuals, as opposed to a single transaction, is
23   that correct?
24        A.  That is correct.
25        Q.  All right.  And did you discuss with
```

```
20
21
22
23
24
25
```

47 (Pages 182 to 185)

FLORIDA REALTIME REPORTING SERVICES, INC.
954-767-0450   800-707-0450