# EXHIBIT B



**WIGGIN & NOURIE, P.A.**
Counsellors at Law



Gregory A. Holmes
gholmes@Wiggin-Nourie.com
603-629-4524

May 14, 2004

J. WALKER WIGGIN (1901-1995)
PAUL E. NOURIE (1908-1978)
T. WILLIAM BIGELOW (RETIRED)

DORT S. BIGG*
WILLIAM S. ORCUTT†
W. WRIGHT DANENBARGER
L. JONATHAN ROSS
JOHN R. MONSON†
PAUL R. KFOURY, SR.
BENJAMIN F. GAYMAN
GORDON A. REHNBORG, JR.
RICHARD B. MCNAMARA†
GREGORY A. HOLMES‡
THOMAS J. PAPPAS
PETER E. HUTCHINS
DENNIS T. DUCHARME
GARY M. BURT*
DOREEN F. CONNOR*
STEPHEN J. PATTERSON
STEPHANIE A. BRAY†
SHARI M. JANKOWSKI
ELLEN M. JOSEPH
JAN P. MYSKOWSKI†
DARLA S. SEDGWICK
DENIS O. ROBINSON
JAMES V. FERRO, JR.§
DANIEL DUCKETT†
ELIZABETH M. LEONARD*
NANCY A. DEANGELIS
GAIL E. BAKIS
ASHLYN J. LEMBREE†
CHRISTOPHER J. PYLES†
MEREDITH P. COOK
RALPH SUOZZO
ERIK T. BARSTOW†
HEATHER E. KRANS†
CAROL L. KUNZ
MARY ANN DEMPSEY†
WILLIAM J. EDWARDS†
DONNA-MARIE COTE
JARED D. NYLUND
SUZANNE M. FOSTER
ROBERT J. CONSAVAGE
STEPHAN P. PARKS

\* Also Admitted in Maine
† Also Admitted in Massachusetts
‡ Also Admitted in Connecticut
§ Also Admitted in Rhode Island

<u>**For Settlement Purposes Only, Not Admissible in Further Proceedings**</u>

BY UPS

William N. Berkowitz, Esq.
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110-1726

RE:   Cycle-Craft Co., Inc. d/b/a Boston Harley-Davidson/Buell
      Our File No. 11830/1

Dear Mr. Berkowitz:

This letter responds to Jon Flickinger's two letters of April 20, 2004, and follows the meeting of May 5, 2004 between John Atwood and Ron Buchbaum of Cycle-Craft, Inc. d/b/a Boston Harley-Davidson/Buell ("Cycle-Craft") and Messrs. Flickinger and Malicki of Harley-Davidson Motor Co., Inc. ("Harley-Davidson").

Certain of Mr. Flickinger's statements at the May 5 meeting revealed a misunderstanding on his part concerning the nature of the unit sales at issue. However, Mr. Flickinger did suggest that, if an explanation of the transactions demonstrated only a *de minimis* infraction of any applicable sales policy of Harley-Davidson, Harley-Davidson would consider withdrawing the April 20, 2004 "Notice of Dealer Contract Termination."

It is important to note at the outset that John Atwood had no knowledge of or participation in the 45 unit sales identified in Mr. Flickinger's "Inspection of Records" letter. The purpose of this letter is to review the unit sales at issue and to demonstrate that they should not be the basis of termination of Cycle-Craft's Dealer Contract.

<u>**Sales to Residents of Florida**</u>

The "Inspection of Records" letter purports to identify 19 motorcycles as "purchased from Cycle-Craft by a motorcycle wholesaler, DC Imports International of Deerfield Beach, Florida (DCI)." These motorcycles were

William N. Berkowitz, Esq.
Page 2
May 14, 2004

not purchased from Cycle-Craft by DC Imports. Each individual motorcycle was purchased by the individual identified as the customer in the SWR. Although these 19 customers may have been affiliated in some way with DC Imports, each one took title to his or her motorcycle in his or her own individual name, as reflected on the Certificate of Origin. Each of the certified checks representing payment for these motorcycles indicates that the remitter is the individual listed on the SWR. The documents demonstrating that each of these sales was made to an individual are attached at Tabs 1 through 19.

## Sales Made to Residents of New Hampshire

Mr. Flickinger's April 20, 2004 "Inspection of Records" letter identifies eight units which Harley-Davidson claims were sold "to Lee Custom Cycle, a used motorcycle dealer in Lee, New Hampshire." However, each of the motorcycles was sold, not to Lee Custom Cycle but to the individuals identified as the customer in the SWR. Each customer took title to the motorcycle in his or her own name and, to Cycle-Craft's knowledge, paid for the motorcycle with his or her own funds. Each customer individually took delivery of his or her unit on Cycle-Craft's premises. The documents demonstrating that each of these sales was made to an individual are attached at Tabs 20 through 27.

## Sale to Jayne Handscom

Mr. Flickinger's April 20, 2004 "Inspection of Records" letter claims that "VIN 1HB1FYW103Y610226 was sold by Cycle-Craft to Lou Winz Auto, a Massachusetts used vehicle dealer, but falsely designated as a retail sale." On the contrary, the sale was accurately designated as a retail sale. The ultimate user of the motorcycle is Jayne Handscom. Since the motorcycle was sold for the use of this individual, it was accurately designated as a retail sale.

Even if the ultimate consumer is considered to be Lou Winz Auto Sales, rather than Ms. Handscom individually, the sale remains a retail sale. The certificate of origin discloses that the unit is titled to Lou Winz Auto Sales. Cycle-Craft correctly and forthrightly disclosed Lou Winz Auto Sales as the purchaser on the SWR. This was a legitimate retail sale. Supporting documents are attached at Tab 28.

## Motorcycles Sold to Cycle-Craft and "in Fictitious Names"

Mr. Flickinger's April 20, 2004 "Inspection of Records" letter claims that "Cycle-Craft also submitted false Sales and Warranty Registration Forms," under fictitious names or sales dates, for 17 units. Cycle-Craft intended all of these sales to be legitimate retail

William N. Berkowitz, Esq.
Page 3
May 14, 2004

sales, as demonstrated below. These units are identified below by the last six digits of the VIN.

Certain of the units identified in this section of the letter were initially sold to Cycle-Craft employees or their relatives. Of course, Cycle-Craft employees have from time to time purchased units from the dealership. For example, see VIN 810566 (sold to Calvin Bloom) at Tab 29; VIN 634902 (sold to Anthony Hendry) at Tab 30; 424633 (sold to Charles Potts) at Tab 31; 618602 (sold to salesperson Sean Walsh) at Tab 32 and 609903 (sold to Kenneth McPhee) at Tab 33.

Harley-Davidson's allocation closes on July 31 of each year. Any inventory not sold by July 31 is deducted from the dealership's allocation in the following year. In July, 2003, Cycle-Craft faced an overstocked inventory situation, brought on by cold weather in New England last summer. As a result, there was a risk to Cycle-Craft of significant reduction of its 2004 allocation. To reduce the overstocked inventory and preserve the dealership's 2004 allocation, Cycle-Craft employees or their relatives were, absent Mr. Atwood's knowledge or approval, given the opportunity to buy units at $500.00 over dealer invoice. At least two Cycle-Craft employees or employee relatives bought and took delivery of units, at $500.00 over dealer invoice, under this program. See 637433 (sold to Joseph Giordano, related to Cycle-Craft employee Joseph Giordano) at Tab 34 and 633629 (sold to Charles Potts) at Tab 35.

In other cases, the employee or relative did not actually take delivery of units that he or she bought. Some of these employees or relatives changed their minds and cancelled their purchases. Others understood that, if a customer indicated interest in the unit before the employee/relative took delivery, the employee/relative would return the unit as a courtesy to the dealership, to allow the dealership to make the sale. These transactions are the ones identified in Mr. Flickinger's "Inspection of Records" letter, and are explained below.

**082225:** This unit was sold on July 3, 2003 to Mr. Fred Giordano of 13240 Inkster Road, Romulus, Michigan. Mr. Giordano is related to a Joseph Giordano who is a Cycle-Craft employee. Mr. Fred Giordano paid for the unit with a check written on the account of his business, First Class Autos, Inc. Nevertheless, the sale was strictly to Mr. Giordano individually. Mr. Giordano donated the unit to a Toys for Tots raffle in Michigan. The winner of the raffle was one Michael J. Pankake, of 9343 Caprice Drive, Plymouth, Michigan. The certificate of origin reflects that the unit was titled to Mr. Pankake, who was also properly recorded as the owner on the SWR. See Tab 36.

**638979:** Cycle-Craft general manager Ron Buchbaum purchased this motorcycle on July 31, 2003 for his son, Jarred. Before Mr. Buchbaum took delivery, customer Edwin

William N. Berkowitz, Esq.
Page 4
May 14, 2004

Velasquez negotiated the purchase of this unit. Mr. Buchbaum cancelled his purchase, and the unit was purchased by Mr. Velasquez. The bill of sale reflects that Mr. Velasquez negotiated the purchase of this unit on July 31, 2003, although his financing was not approved, and therefore the remaining documents not signed, until August 2, 2003. The SWR was properly adjusted to reflect Mr. Velasquez as the owner. See Tab 37.

**107390:** This unit was purchased by Michael Bloom, Cycle-Craft's sales manager, on July 31, 2003. Mr. Bloom later changed his mind and cancelled his purchase of this unit. It was then purchased by customer Joann Stanwood. The bill of sale reflects that Ms. Stanwood negotiated the purchase of this unit on July 31, 2003, although funding was not complete until the next day, August 1, 2003. The SWR was properly adjusted to reflect Ms. Stanwood as the owner. See Tab 38.

**097183:** Roderick Granese purchased this unit on July 31, 2003. Mr. Granese is not an employee of Cycle-Craft, but is most likely a customer who changed his mind and cancelled his purchase. The bill of sale for this unit reflects that customer Jason Blodgett negotiated the purchase of this unit on the same day, July 31, 2003, although financing was not completed until approximately August 7, 2003. The SWR was properly adjusted to reflect Mr. Blodgett as the owner. See Tab 39.

Another nine of the units identified in this section of the "Inspection of Records" letter were initially purchased by Cycle-Craft employees or employee relatives on July 31, 2003. In some cases, the employee or relative changed his or her mind about the purchase. In other cases, before the initial purchasers took delivery, other customers indicated interest in the units. In all cases, the initial employee-purchaser cancelled his or her purchase and the new customer negotiated a new purchase. With two exceptions, the second purchase was, according to the bill of sale, transacted within a few days after the initial purchase, although the financing on the second purchase frequently required approximately another week to be completed. The two exceptions are most likely because of the initial purchaser's inability to obtain financing after a protracted attempt to do so, resulting in the second purchases two or three months later. These nine sales are listed as follows:

William N. Berkowitz, Esq.
Page 5
May 14, 2004

| VIN | Name of Employee/Relative | Second Purchaser | Date of 2nd Purchase, per bill of sale |
|---|---|---|---|
| 105487 Tab 40 | Salvatore Giordano, son of maintenance supervisor Joseph Giordano | Michael Botelho | 8/1/03 |
| 842917 Tab 41 | Lissa Bloom, daughter of sales mgr Mike Bloom | Jorge Orellana | 8/2/03 |
| 085436 Tab 42 | Matthew Bloom, son of sales mgr Mike Bloom | Mark Connelly | 8/3/03 |
| 052286 Tab 43 | Joseph Giordano, maintenance supervisor | Deborah Colleran | 8/4/03 |
| 839405 Tab 44 | Sean Walsh, salesperson | Paul Kalinoski | 8/5/03 |
| 638193 Tab 45 | Ron Buchbaum, general mgr | Robert Tindle | 8/6/03 |
| 099680 Tab 46 | John Sica | Robert Richards | 8/9/03 |
| 314311 Tab 47 | Daniel Sica | Stephen Kenney | 9/14/03 |
| 842594 Tab 48 | Jamie McGrath | Vincent Fiamma | 11/5/03 |

In each case, the SWR was appropriately adjusted to reflect the second purchaser as the customer.

**848962:** Elaine Bloom, wife of Cycle-Craft's sales manager Mike Bloom, purchased this unit on July 31, 2003. Ms. Bloom later changed her mind and decided not to purchase the unit. Customer Thomas Mulvey negotiated the purchase of the motorcycle on August 22, 2003, according to the bill of sale. Mr. Mulvey donated the unit to a charity raffle. The winner of the raffle was one Lorraine Sheehan, who was designated the customer on the SWR. Ms. Sheehan transferred the unit to one Steven Smyrnios. Mr. Smyrnios is the current owner of the vehicle and is currently recorded as the customer on the SWR. See Tab 49.

**630589, 951664, and 431340:** Page Three of Mr. Flickinger's "Inspection of Records" letter claims that these units "were falsely reported as having been sold at retail, when in fact they had not been sold at all, but remained in dealer inventory as of the date of inspection." These units were not falsely reported. They were accurately reported as sold to Cycle-Craft. John Atwood has historically bought two or three units from each model year and kept them for historical collection purposes. These three units were

William N. Berkowitz, Esq.
Page 6
May 14, 2004

added to that collection. Cycle-Craft took title to these units and still is in possession of these units. Cycle-Craft is listed as the purchaser on the title and on the SWR. Cycle-Craft does not intend to broker or resell these units. They are legitimate retail sales to Cycle-Craft.

I trust that the above explanation of the sales demonstrates that Cycle-Craft's intent at all times was to transact these sales professionally, with integrity, and according to Harley-Davidson's directives. Even if a few of these sales involve technical violations of Harley-Davidson's reporting rules, the minor infractions should be measured against the larger context of outstanding performance by this dealership.

We have requested from you a copy of whatever non-retail policy was in effect at Harley-Davidson in 2003, when the audited sales were transacted. Until you respond to that request, we do not know if such a policy was even in effect in 2003, and cannot assume that any 2003 policy was equivalent to the 2004 version.

We anticipate that we can resolve these issues short of litigation. However, if this does proceed to the point of litigation, we must point out that Harley-Davidson has taken the position before the New Hampshire Motor Vehicle Industry Board in another case that any document outside the four corners of the Dealer Contract itself, such as the Motorcycle Non-Retail Policy (or in that case, a territory list of zip codes), is not part of the "franchise agreement" as defined by the dealer statute, and thus does not give rise to contractual or statutory obligations on the parties. Applying Harley-Davidson's New Hampshire argument to this case would prevent Harley-Davidson from relying on the 2003 policy, even if one exists.

In any event, assuming that there is an enforceable policy which is substantially identical to the 2004 Motorcycle Non-Retail policy, that document suggests a range of remedies to correct non-conforming sales reporting. Termination of the dealer's Motorcycle Dealer Contract is far and away the most severe penalty, and evidently is reserved for egregious violations. Cycle-Craft's handling of these sales was neither egregious nor intentionally deceitful; in fact, it probably does not deviate substantially from the conduct of many Harley-Davidson dealerships. In short, the penalty of terminating Cycle-Craft's 45-year franchise is far more severe than is necessary to remedy whatever infraction might have occurred.

If Harley-Davidson insists on proceeding with the termination of Cycle-Craft's Motorcycle Dealer Contract, Cycle-Craft will dispute that decision as is its right under the Massachusetts dealer statute, M.G.L. ch. 93B. Section 5(a) of the statute requires a franchisor to have good cause to terminate a franchise. Section 5(j) requires that, in determining whether good cause exists, the court do more than look at the single issue of

William N. Berkowitz, Esq.
Page 7
May 14, 2004

whether the franchisor can prove that a material breach of the dealer contract occurred. This section of the statute requires that "the court shall consider all pertinent circumstances, that may include, but shall not be limited to:

(1)  the amount of business transacted by the affected motor vehicle dealer during the 3 year period immediately preceding such notice as compared to the business available to it;

(2)  the investment necessarily made and obligations incurred by the affected motor vehicle dealer to perform its obligations under the existing franchise agreement;

(3)  the permanency of the investment of the affected motor vehicle dealer;

(4)  whether it is injurious or beneficial to the public welfare for the franchise agreement of the affected motor vehicle dealer to expire, to be modified, or to be terminated, or for the affected motor vehicle dealer to be replaced;

(5)  whether the affected motor vehicle dealer has adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the consumers for motor vehicles handled by the affected motor vehicle dealer;

(6)  whether the affected motor vehicle dealer has been and is rendering adequate services to the public; and

(7)  the existence and materiality of any breaches, defaults or violations by the affected motor vehicle dealer of the terms or provisions of the existing franchise agreement or of applicable law."

Cycle-Craft has been an outstanding dealer for Harley-Davidson for over 45 years. Cycle-Craft currently purchases from Harley-Davidson, and sells to the public, more motorcycles, motorclothes, parts and accessories than any other Harley-Davidson dealer in New England. Cycle-Craft has an extraordinarily loyal customer base. Over the past 45 years, John Atwood and his family have made enormous investments in real estate, equipment and personnel in order to create a top-notch facility in which to showcase Harley-Davidson and Buell products.

In 1993, the Atwoods undertook to relocate the dealership to a former paint factory across the street. Although it was difficult and expensive to convert and remodel, John Atwood and his sister Karen loved the look of the building. With its red brick exterior and tower, it reminded them of Harley-Davidson's headquarters in Milwaukee. They

William N. Berkowitz, Esq.
Page 8
May 14, 2004

knew it could become a landmark location to the Harley world. The remodeling took four years.

The newly remodeled 86,000 square foot facility made Harley-Davidson/Buell of Boston the world's largest Harley-Davidson dealership in square footage. The facility is a modern state of the art dealership while retaining the old world charm of the more than 100-year-old industrial building. Jeff Bluestein, Chairman of the Board of Harley-Davidson, was so impressed with the new building that he included a two-page spread about it in the 1997 Harley-Davidson annual report. On a visit to the dealership Bluestein told John Atwood that the building looked more like the original Harley-Davidson headquarters in Milwaukee than the actual headquarters looks now.

The dealership employs over 60 talented, trained and enthusiastic individuals, who keep the dealership running smoothly and present a professional, positive sales and service experience to the public. Cycle-Craft has always strived for complete honesty in its dealings with Harley-Davidson. Cycle-Craft has consistently done its best to comply with Harley-Davidson's sales policies and directives as Cycle-Craft understood them. It would be illogical in the extreme for Cycle-Craft to jeopardize its illustrious 45-year relationship with Harley-Davidson, as well as the livelihood of 60 hard-working individuals, in return for any slight advantage that would be gained by misreporting the sale of 45 motorcycles.

Cycle-Craft is more than a well-run dealership successfully penetrating the Boston market with Harley-Davidson products. It is a community institution. Generations of the Atwood family have sold Harley-Davidson motorcycles to generations of families in and around Boston since 1959. Even if Harley-Davidson could seamlessly replace Cycle-Craft with another dealer, which is extremely unlikely, the loyalty and sense of community institution that exists now would be irretrievably lost. The facility that preserves the concept of Harley-Davidson's original headquarters would also become unavailable. In short, the termination of Cycle-Craft's franchise would be injurious to the public welfare. The loss of a 45-year tradition of excellence in representing Harley-Davidson is not warranted by the existence of a few minor infractions of sales reporting policies that can easily be remedied by other means.

We hope that the foregoing is helpful in resolving the situation, and stand ready to answer any questions you may have.

William N. Berkowitz, Esq.
Page 9
May 14, 2004


Very truly yours,

Gregory A. Holmes

GAH/map\00545981.DOC

cc:    John F. Atwood